**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 ([___]) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS, SECTION 503(b)(9) CLAIMANTS, AND LIEN CLAIMANTS, AND (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS, AND (III) GRANTING RELATED RELIEF**

Never Slip Holdings, Inc. and its affiliated debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through their undersigned proposed counsel, hereby submit this motion (this "Motion") for entry of interim and final orders granting the relief described below. In support hereof, the Debtors rely on the *Declaration of Christopher Sim, Chief Financial Officer of Never Slip Holdings, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] filed concurrently herewith, and further represent as follows:

## JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516). The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

*Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these chapter 11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a), 363(b), 503(b)(9), 1107(a), and 1108 of title 11 of the United States Code, as amended (the "Bankruptcy Code"). The relief is also appropriate in accordance with Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Rule 9013-1(m).

**RELIEF REQUESTED**

4. The Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order"), (i) authorizing the Debtors to pay certain prepetition amounts owing on account of (a) Critical Vendor Claims, (b) Section 503(b)(9) Claims, and (c) Lien Claims (each as defined herein) (together, the "Prepetition Trade Claims," and the holders thereof, the "Prepetition Trade Claimants") in the aggregate amount not to exceed $10,547,000 on an interim basis (the "Interim Cap") and an additional $22,073,000 on a final basis (the "Final Cap"), (ii) authorizing the Debtors' banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing, and (iii) granting related relief.

5. Additionally, the Debtors also request that the Court authorize the Debtors to document treatment in accordance with the Interim Order or Final Order by entering into written agreements (the "Trade Agreements"), which, as more fully described below, may condition payment of certain Prepetition Trade Claims, at the Debtors' discretion, upon the vendor (i) continuing to provide products and services to the Debtors in accordance with trade terms no worse than those in place during the one hundred and eighty (180) days prior to the Petition Date (as defined below) (the "Customary Trade Terms"), or (ii) accepting some discount on its prepetition claim amount.

6. The Debtors further respectfully request that the Court schedule a final hearing to consider approval of this Motion on a final basis at the earlier of either the confirmation hearing or the thirtieth (30th) day following the Petition Date (defined below), or as soon thereafter as the Court's schedule permits.

**BACKGROUND**

7. On April 1, 2024 (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committee of unsecured creditors has been appointed in these chapter 11 cases.

8. Founded in 1984, the Debtors, together with their non-Debtor subsidiaries (collectively, the "Company"), are the leading business-to-business brand and category creator of slip resistant footwear and other safety products for employers, employees, and individual

consumers. The Company has a highly diverse and loyal customer base and sells its products to businesses, including restaurants, supermarkets, hotels, casinos, manufacturers, healthcare institutions, and food service companies, as well as directly to end users. The Company offers its customers purpose-built branded and proprietary private label products at competitive prices that use patented outsole technology to prevent fall-related workplace injuries.

9. Additional factual background regarding the Company, including their business operations, their corporate and capital structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

**THE PREPETITION TRADE CLAIMANTS**

10. The Debtors provide slip resistant footwear to over thirty thousand (30,000) corporate accounts across the foodservice, grocery, hospitality, industrial, health care, public service, and educational service industries. Ninety-five percent (95%) of the top one hundred (100) United States ("U.S") restaurant brands are customers of the Debtors. Production of the Debtors' products requires the services of a variety of carefully sourced third-party vendors, and the inability to conduct business with one vendor could result in a significant delay or even shutdown in production of the applicable footwear, which would drastically harm the Debtors' relationships with customers. The Debtors' success therefore depends on their access to and relationships with a network of vendors and suppliers of a variety of products and services and certain of those vendors and suppliers are absolutely critical to the Debtors' business. Specifically, the Debtors depend on the uninterrupted flow of inventory and, in certain instances, natural and synthetic rubber, leather, textiles, synthetics, synthetic mesh, polyurethane, foam, aluminum, steel, and other goods used to make their non-slip outsoles.

11. Maintaining the Debtors' supply chain without disruption is critical to the Debtors' ability to generate revenue. In the ordinary course of business, the Debtors issue purchase orders to manufacturers, all of which are based outside the United States, for the procurement and manufacture of the Debtors' goods, namely, slip resistant footwear (collectively, the "Retail Goods"). The Debtor entities in the U.S. pay for all manufacturing of inventory. All inventory for sale in the U.S. and Canada is imported directly into the U.S. from foreign manufacturers. After purchase orders are issued to the manufacturers, through the use of third-party logistics providers and shippers, Retail Goods are shipped from the applicable manufacturer—primarily in Vietnam or China, among others—to the U.S. or other destination country, as applicable.

## I. CRITICAL VENDORS

12. The Debtors have spent significant time, aided by advisors, reviewing, and analyzing their books and records and historical practice to identify certain critical business relationships and suppliers of products and services, the loss of which would immediately and irreparably harm their businesses (the "Critical Vendors"). In the process, the Debtors considered a variety of factors, including:

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;
- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;
- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;
- whether alternative vendors are available that can provide the requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;
- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;
- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;
- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis;
- the location of the vendor;
- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation; and
- whether failure to pay a particular vendor could cause an inability to properly service the Debtors' customers and result in substantial revenue loss; and the health of each vendor relationship, the vendor's familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be satisfied elsewhere in the chapter 11 process.

13. Following this analysis, the Debtors designated certain vendors as Critical Vendors. The Critical Vendors provide services and goods that are generally proprietary or significantly integrated into the Debtors' business and operational systems (and in some cases, both) such that the Debtors cannot easily replicate or replace the services and goods received from the Critical Vendors. The Critical Vendors generally fall into two categories.

**A. *Manufacturing Vendors***

14. Among the Critical Vendors who provide manufacturing services for the Debtors are (a) third-party manufacturers, all of which are based overseas (the "Third-Party Manufacturers") and (b) vendors who produce and supply inputs to make and package Retail Goods (the "Raw Materials Vendors") (and, together with the Third-Party Manufacturers, the "Manufacturing Vendors"). The Manufacturing Vendors provide, among other things, critical inventory of Retail Goods to the Debtors. While most of the Manufacturing Vendors are required, by contract, to purchase the raw inputs to be used in the manufacturing of Retail Goods, a small

portion of the Manufacturing Vendors, mainly in Portugal, require the Debtors, by contract, to purchase the raw inputs used for the manufacturing of Retail Goods.

15. The Manufacturing Vendors produce and supply the inventory of Retail Goods that generates the Debtors' revenues. Due to product specifications and compliance requirements, the Debtors would be unable to obtain comparable products, supplies, and materials from alternative sources without significant disruption to the their operations. Indeed, there are long lead times for developing and sourcing many of the raw materials used in the manufacturing of Debtors' Retail Goods. The Debtors thus believe that any replacement sources, to the extent even available, would result in lengthy delays in production given the Debtors' volume requirements for inventory of Retail Goods and would cause the Debtors to incur significant additional costs and expenses. Further, substantially all the Debtors' Manufacturing Vendors are foreign companies or such manufacturing operations are physically located outside the U.S. Suppliers and vendors located in foreign countries are often unfamiliar with the chapter 11 process, frequently react skeptically to various debtor protections, and may consider themselves beyond the jurisdiction of the Court. Failing to pay certain Manufacturing Vendors may also cause Manufacturing Vendors to refuse to accept future purchase order for inventory of Retail Goods or otherwise divert shipments already in process or in transit. Therefore, it is even imperative that the Debtors continue to receive these critical products and services without interruption. As of the Petition Date, the Debtors estimate that approximately $10,478,000 is due and outstanding to the Manufacturing Vendors, approximately $6,795,000 of which will come due within the 30 days following the Petition Date.[3]

[3] Of the $10,478,000 due and outstanding to the Manufacturing vendors, approximately $2,943,013 of which are Section 503(b)(9) Claims (as defined below).

**B.** ***Miscellaneous Vendors***

16. In addition to the Manufacturing Vendors, the Debtors also conduct business with Critical Vendors who (a) write, design, and produce sales literature, advertisements, and other creative campaigns for marketing, advertising, and selling Retail Goods (the "Marketing Vendors"), and who (b) supply office, IT, and other administrative products and information technology products and services to the Debtors (the "Miscellaneous Vendors"). The Marketing Vendors produce and supply advertising materials that account for a substantial portion of the Debtors' incoming business, and the Miscellaneous Vendors produce and supply products and services that account for a substantial portion of the Debtors' revenues. The Miscellaneous Vendors are often the exclusive supplier or licensor of certain hardware and software for the Debtors. Should the Debtors' business relationship with them be discontinued, finding a substitute provider and integrating it with the Debtors' operation will be administratively burdensome, time-consuming, expensive, and will significantly interfere with the day-to-day operations of the business. Some Miscellaneous Vendors have been so integrated into the Debtors' operation due to the Debtors' use of their hardware or software, that replacing them on short notice amidst an in-court reorganization would be impractical, if not entirely impossible.

17. As of the Petition Date, the Debtors estimate that approximately $1,703,000 is due and outstanding to the Miscellaneous Vendors, approximately $1,454,000 of which will come due within the 30 days following the Petition Date.

18. The Debtors believe there is a significant and material risk that a Critical Vendor may stop providing services to the Debtors on a timely basis or completely sever its business relationship with the Debtors. Short of severing their relations with the Debtors, nonpayment of certain Critical Vendor Claims (defined below) may also cause Critical Vendors to take other harmful actions, including refusing to supply goods or services, which would be to the detriment

of the Debtors' customers. Providing uninterrupted services for the Debtors' customers is critical to the Debtors' businesses and cash flows, and the Debtors can ill afford any delays or interruptions of this nature.

19. Any material interruption in the provision of the products and services by the Critical Vendors, however brief, including the delivery of key commodities and essential services, could cause irreparable harm to the Debtors' go-forward businesses, goodwill, employees, customer base, and market share. If the Debtors are unable to acquire goods from the Critical Vendors to fulfill actual and projected orders of Retail Goods, the Debtors will experience a corresponding loss of revenues based on an inability to meet demand and the Debtors' customer relationships could suffer irreparable damage. Such harm would likely far outweigh the cost of payment of prepetition claims of Critical Vendors (collectively, the "Critical Vendor Claims").[4] Furthermore, the loss of trade terms (whether on account of demands for cash-in-advance, cash-on-delivery, or otherwise) would negatively impact the Debtors' liquidity. It is thus essential to the Debtors' restructuring efforts to pay certain Prepetition Trade Claims of Critical Vendors to maintain the supply of the commodities critical to the Debtors' business operations for production of slip resistant footwear. The Debtors intend to pay prepetition Critical Vendor Claims only when, in their business judgment, the benefits to their estates from making such payments will exceed the costs to their estates.

20. In total, the Debtors believe that, as of the Petition Date, they owe approximately $12,181,000 to the Critical Vendors, approximately $8,249,000 of which will come due within the 30 days following the Petition Date.

---

4 Notwithstanding the relief requested herein, the Debtors reserve all their rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Critical Vendor on account of, among other things, any violation of the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code.

## II. TRADE TERMS CONDITIONS

21. The loss of trade terms with Critical Vendors (whether on account of demands for cash-in-advance, cash-on-delivery, or otherwise) would negatively impact the Debtors' liquidity. To preserve working capital and liquidity during the chapter 11 cases and ensure that the Debtors continue to receive vital products and services, the Debtors seek authority, in their discretion, to condition any payment on account of Critical Vendor Claims on entry into a Trade Agreement, under which such Critical Vendor may be required to (a) continue supplying products or services to the Debtors on the Customary Trade Terms between the parties (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, and other applicable terms and programs), or (b) agree to accept some discount on its prepetition claim. The Debtors, however, reserve the right to negotiate different terms with any Critical Vendor, as a condition to payment of any Critical Vendor Claim, whether or not memorialized by a Trade Agreement, to the extent the Debtors determine that such trade terms are necessary to procure essential products and services or are otherwise in the best interests of the Debtors' estates.

22. The Debtors hereby request authority to enter into Trade Agreements with the Critical Vendors if the Debtors determine, in their discretion, that such an agreement is necessary to their postpetition operations.[5] Maintaining normal trade credit terms will improve the Debtors' chances of successfully emerging from chapter 11 because purchasing goods on credit preserves working capital and liquidity—enabling the Debtors to maintain their competitiveness and to maximize the value of their businesses. This is particularly critical for the Debtors, who took the

---

[5] The Debtors' entry into a Trade Agreement shall not change the nature or priority of the underlying Critical Vendor Claims and shall not constitute an assumption or rejection under section 365 of the Bankruptcy Code of any executory contract or prepetition or postpetition agreement between the Debtors and a Critical Vendor.

availability of their existing trade credit into account when sizing their post-petition borrowing needs.

23. If a Critical Vendor refuses to provide products or services to the Debtors on Customary Trade Terms (or such other terms that the parties agree upon as a condition to providing Critical Vendor status) following any postpetition payment toward its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby request authority, in their discretion and without further order of the Court but with notice to the affected Critical Vendor (a) to declare such Trade Agreement immediately terminated (if applicable) and (b) to declare any payments made to such Critical Vendor on account of its Critical Vendor Claim to have been in payment of then outstanding postpetition obligations owed to such Critical Vendor without further order of the Court.

24. In the event that the Debtors exercise the rights set forth in the preceding paragraph, as applicable, the Debtors request that the Critical Vendor against which the Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Critical Vendor, without giving effect to any rights of setoff or reclamation. In essence, the Debtors seek to return the parties to their respective positions immediately prior to entry into a Trade Agreement in the event one is terminated, or a Critical Vendor refuses to provide products or services to the Debtors on Customary Trade Terms following any payment toward its Critical Vendor Claim.

## III. SECTION 503(b)(9) CLAIMANTS

25. Certain Critical Vendors also hold claims against the Debtors on account of goods received by the Debtors in the ordinary course of business within twenty (20) days prior to the Petition Date (the "Section 503(b)(9) Claims"). As a result, a vendor may refuse to fulfill new

orders without payment of its Section 503(b)(9) Claim, which would negatively affect the Debtors' businesses and ability to satisfy customer demand.

26. All of the Section 503(b)(9) Claimants are also Critical Vendors. The Debtors' relationships with these vendors, and with many other Section 503(b)(9) Claimants, are not governed by long-term contracts. Rather, the Debtors obtain Retail Goods from such Claimants on an order-by-order basis and not always pursuant to the terms of contract. As a result, a 503(b)(9) Claimant may refuse to supply new orders if the Debtors do not pay the Section 503(b)(9) Claims. Such refusal would negatively affect the Debtors' estates, as the Debtors' business is dependent on the steady flow of Retail Goods.

27. The Debtors also believe that certain Section 503(b)(9) Claimants could demand payment in cash on delivery—further exacerbating the Debtors' liquidity. Typically, however, the Debtors are provided with thirty (30)-day payment terms from the date of delivery, which is invoiced from when the Retail Goods are loaded on the boat for approximately forty-five (45) days, for a total of approximately seventy-five (75) days before payment is due from the date of delivery. As of the Petition Date, the Debtors estimate that approximately $2,943,013 is owed to Section 503(b)(9) Claimants, all of which will come due within the 30 days following the Petition Date, the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.[6]

## IV. LIEN CLAIMS

28. In the ordinary course of business, the Debtors necessarily depend on the uninterrupted flow of inventory and other goods through their supply chain and distribution

[6] The Debtors do not concede that any claims described in this Motion are conclusively entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code, and the Debtors expressly reserve the right to contest the extent or validity of all such claims.

network. The Debtors' distribution system requires the Debtors to use a network of, among others, shippers, common carriers, dedicated carriers, freight-forwarders, and parcel carriers (the "Shippers") and third-party warehousemen, storage facilities, distributors, and logistics providers (the "Warehousemen," and, together with the Shippers, the "Lien Claimants") who transport, deliver, or store the Debtors' Retail Goods. In total, the Debtors supply chain and distribution network consists of anywhere between twenty (20) and thirty (30) Lien Claimants. The Debtor entities in the U.S. pay for all shipping and warehousing in the U.S. and Canada, while the foreign non-Debtor subsidiaries pay for shipping and warehousing in mainland Europe and the United Kingdom.

29. After Retail Goods are shipped from their applicable manufacturer, Retail Goods are typically stored in third-party warehouses, primarily owned and operated by CEVA Logistics US, Inc. ("CEVA US") in North America, and primarily owned and operated by CEVA Logistics EU, Inc. ("CEVA EU") in mainland Europe and the United Kingdom. Then, freight-forwarders or other carriers, such as Geodis Wilson ("Geodis"), United Parcel Service, Inc. ("UPS") or the Federal Express Corporation ("FedEx"), transport the Retail Goods to the appropriate destination locations. Freight-forwarders or other carriers who transport the Retail Goods to their destination locations pay any import fees upfront which are later reimbursed by the Debtors. Title to the Retail Goods does not transfer from CEVA US or CEVA EU to the Company until the Retail Goods are put on a boat in transit. At any given time, there is approximately $4-5 million in inventory on the water, all of which is captured in the Company's financial records as an accrual and, at any given time, there may be approximately $2 million of open purchase orders that have not yet been fulfilled.

30. Retail Goods manufactured by overseas vendors and suppliers require substantial transport times to reach the Debtors. For example, Retail Goods manufactured in and shipped from China typically take between three (3) and four (4) weeks to arrive in the U.S, and Retail Goods manufactured in and shipped from Vietnam typically take between four (4) and six (6) weeks to arrive in the U.S. In 2024, the Debtors anticipate that approximately seventy percent (70%) of Retail Goods will be manufactured in Vietnam and thirty percent (30%) of Retail Goods will be manufactured in China, while in 2023, approximately sixty (60%) of Retail Goods were manufactured in China and forty percent (40%) of Retail Goods were manufactured in Vietnam. The relative increase in shipments coming from Vietnam and relative decrease in shipments coming from China can be attributed to cost reductions associated with Vietnamese shipping after the COVID-19 pandemic.

31. The Lien Claimants perform a number of services for the Debtors that are integral to the Debtors' ongoing business operations and the uninterrupted supply and distribution of Retail Goods. The Debtors estimate that at any given time, a material amount of the Debtors' Retail Goods and property is in the hands of third-party Lien Claimants. Unless the Lien Claimants are paid amounts outstanding as of the Petition Date, the Debtors believe that the Lien Claimants may refuse to provide services integral to the Debtors' supply chain and, worse, the Lien Claimants are likely to assert Liens against the Debtors' property or exercise their rights to "freeze" property in their possession while they seek to setoff or even recoup any amounts outstanding. Therefore, absent immediate payment of the Lien Claims (defined below), the Debtors face a significant immediate risk of disruption to their business operations and the possible loss of Retail Goods and revenue. Indeed, not only do the Debtors rely heavily on the Lien Claimants to currently deliver and store the Debtors' Retail Goods, but also the Debtors expect to continue to rely on many of

the Lien Claimants for future deliveries and storage of their Retail Goods. Thus, to maintain access to the Retail Goods that are essential to the continued viability of the Debtors' operations and to preserve the value of such Retail Goods, the Debtors seek authority to honor outstanding invoices related to the prepetition services provided by the Lien Claimants.

32. Although the Debtors generally timely pay the Lien Claimants, as of the Petition Date, certain Lien Claimants may not have been paid for services they rendered prior to the Petition Date. As a result, certain of the Lien Claimants may have claims (the "Lien Claims") for which they would be entitled to assert and perfect mechanics', warehouse, possessory, or similar statutory liens (collectively, the "Liens") or exercise rights of setoff or recoupment with respect to the Debtors' Retail Goods or other property, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code. To the extent any Lien Claimant has already perfected a lien on any of the Debtors' or their customers' property or, in the Debtors' estimation, could assert and perfect a lien on any such property, it is imperative that the Debtors be authorized to pay such Lien Claimants, regardless of whether their claims arose prior to or after the Petition Date. Such payment will secure the release of any such liens and ensure the Debtors' continued, uninterrupted access to the goods and services provided by the Lien Claimants. As of the Petition Date, the Debtors estimate that approximately $9,892,000 is owed to the Lien Claimants on account of the Lien Claims, approximately $2,298,000 of which will come due within the 30 days following the Petition Date.

33. In addition to the Lien Claimants, the Debtors also utilize customs brokers (the "Customs Brokers"), either paying the Customs Brokers directly or reimbursing the Lien Claimants for such amounts. The Customs Brokers serve as licensed brokers for the Debtors and provide vital additional services that enable the Debtors to comply with the complex customs laws

and regulations when importing Retail Goods into the U.S. from other countries and when exporting Retail Goods into Canada, mainland Europe, and the United Kingdom from other countries.

34. The Customs Brokers provide services necessary for customs clearance, pay customs and import duties, charges, and tariffs on behalf of the Debtors, and perform other critical services necessary for the Debtors to receive goods. Typically, the Lien Claimants pay any amounts owed to the Customs Brokers and such amounts are then reimbursed by the Debtors to the Lien Claimants. Such amounts are on account of customs duties, import and export charges, and tariffs, including fees to the U.S., Canadian, mainland Europe and United Kingdom Customs Services (the "Import and Export Charges"). The Debtors seek authority, in their discretion, to continue to pay Import and Export Charges in the ordinary course of business.

35. Further, the Debtors have one outstanding customs bond (the "Customs Bond") related to the Import and Export Charges for which the Debtors have posted a $800,000 letter of credit and $675,000 in cash, for a total of $1,475,000. The Debtors seek to pay, in the ordinary course of business, any associated fees or expenses with the Customs Bond. Because the Debtors depend on the Lien Claimants for the delivery of Retail Goods, it is essential for the Debtors to incentivize the Lien Claimants to continue performing services in a timely manner.

36. In an exercise of their reasonable business judgment, the Debtors have determined that continuing to receive goods and services from the Critical Vendors and Lien Claimants is necessary to continue to operate their businesses as going concerns and to maximize value. If granted discretion to satisfy Critical Vendor Claims as requested herein, the Debtors will assess, on a case-by-case basis, the benefits to their estates of paying the Critical Vendor Claims and pay any such claim only to the extent their estates will benefit. Without the relief requested in this

Motion, the Debtors believe that the Critical Vendors and Lien Claimants may cease providing certain critical goods and services and thereby take action that could impede the Debtors' going concern value—a result that could be devastating for the Debtors and their stakeholders. Further, the DIP Budget (as defined in the DIP Motion[7]) contemplates sufficient funds to continue to pay the Critical Vendor Claims and Lien Claims in the ordinary course, should the Court grant the requested relief.

37. The Debtors' businesses rely on the Lien Claimants and Customs Brokers, each of which are integral for the Debtors' continued supply of customers with its Retail Goods. Consequently, it is within the Debtors' sound business judgment and consistent with applicable law to pay the Lien Claims the Import and Export Charges to: (a) ensure proper delivery and storage of the Debtors' Retail Goods that were ordered prepetition; (b) avoid disruptions to the Debtors' business operations, such as delays of deliveries and services and interference with the transportation of imported and exported Retail Goods, that might result from the Lien Claimants ceasing to do business; and (c) avoid the costs and expenses associated with litigation or negotiations regarding the Lien Claimants' rights to assert secured claims, obtain adequate protection, or pursue setoff or recoupment.

38. The Debtors also propose that they be authorized to require the Lien Claimants to provide favorable trade terms for the postpetition procurement of goods and services. Specifically, the Debtors seek authorization to condition payment of the Lien Claims and Import and Export Charges upon such Lien Claimants' agreement to continue or recommence supplying goods and

[7] The "DIP Motion" means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, filed contemporaneously herewith.

services to the Debtors in accordance with the Customary Trade Terms consistent with the parties' ordinary course of business as of the Petition Date or as otherwise agreed by the Debtors in their reasonable business judgment.

39. In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this Motion and thereafter does not continue to provide goods or services on Customary Trade Terms, then: (a) any payment on account of a prepetition claim received by such party shall be deemed an improper postpetition transfer pursuant to section 549 of the Bankruptcy Code and, therefore, immediately recoverable by the Debtors in cash upon written request by the Debtors; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance and such Lien Claimant will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## V. OUTSTANDING ORDERS

40. Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders"). In the mistaken belief that they would be general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition—potentially disrupting the Debtors' ongoing business operations and requiring the Debtors to expend substantial time and effort in issuing such substitute orders. As set forth in greater detail below, the Debtors request that the Court confirm the

administrative expense priority of the Outstanding Orders and authorize the Debtors to pay any amounts due on account of Outstanding Orders as they come due in the ordinary course of business.

## BASIS FOR RELIEF

### I. THE COURT SHOULD AUTHORIZE PAYMENT OF THE PREPETITION TRADE CLAIMS

#### A. THE COURT MAY AUTHORIZE THE DEBTORS TO PAY THE CRITICAL VENDOR CLAIMS PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE

42. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations, including payments to Critical Vendors, when it is necessary to protect and preserve the estate. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts "[h]ave approved . . . 'critical vendor' orders that allow payment of essential suppliers' prepetition invoices . . . ."); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "[e]ssential to the survival of the debtor during the chapter 11 reorganization"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a bankruptcy court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of the Critical Vendor Claims as provided herein.

43. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "[u]se, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1). A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of

the debtor. *See Ionosphere Clubs, Inc.*, 98 B.R. at 175 (noting that section 363(b) of the Bankruptcy Code provides "broad flexibility" to authorize a debtor to honor prepetition claims when supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "[o]nly be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ*, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

44. Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "[i]ssue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Pursuant to section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses. *See Just for Feet*, 242 B.R. at 825−26. Specifically, a court may use its power pursuant to section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). Indeed, the U.S. Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *Id*. (stating courts may authorize payment of prepetition claims when there "[i]s the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "[i]mmediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their

pre-reorganization claims have been paid[]") (internal citations omitted); *In re Just for Feet*, 242 B.R. at 824−25 (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191−92 (Bankr. D. Del. 1994) (same).

45. The Debtors' request for authority to pay Critical Vendor Claims as requested herein is appropriate and warranted under the circumstances. Payment of the Critical Vendor Claims, as described above, is essential to the continued operation of the Debtors' business. Failure to pay such claims could harm the Debtors' ability to obtain necessary products and services, prevent the Debtors from preserving favorable trade terms, and increase the likelihood for significant disruptions to the Debtors' operations.

46. The resulting harm to the Debtors' estates far outweighs the cost associated with paying a portion of the Debtors' prepetition obligations to the Critical Vendors. As stated above, the Critical Vendors provide goods and services that, in the Debtors' business judgment, are necessary to ensure the continued functioning of the Debtors' business and preserve and maximize the going concern value of their businesses. If the Critical Vendors cease to continue to provide goods and services to the Debtors, the Debtors face a degradation in the value of their businesses due to interruption of the flow of necessary products and services to the Debtors and impairment of the Debtors ability to provide products to their customers. Thus, the Debtors submit that their other creditors will be no worse off from implementation of the relief sought herein, and in fact will fare far better, if the Debtors are empowered to negotiate such payments to achieve a smooth transition into bankruptcy with minimal disruption to their operations.

47. Accordingly, in light of the potential for immediate and irreparable consequences if the Critical Vendors do not continue to provide uninterrupted and timely deliveries of products

and services, the Debtors have determined, in the exercise of their business judgment, that payment of Critical Vendor Claims necessary to the go-forward business may be essential to avoid costly disruptions to their operations. The Debtors have examined other options short of payment of the Critical Vendor Claims and have determined that to avoid significant disruption of the Debtors' operations, the Debtors must pay all or part of the Critical Vendor Claims. For these reasons, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, preserving value for the benefit of all stakeholders in these chapter 11 cases, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

48. The importance of debtors paying claims of Critical Vendors to avoid significant disruption to business operations and immediate and irreparable harm to estates has been recognized by courts in this district, and such courts have granted relief similar to the relief requested herein. *See, e.g.*, *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. April 24, 2023); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Sep. 22, 2022); *In re BL Restaurants Holding, LLC*, Case No. 20-10156 (MWF) (Bankr. D. Del. Feb. 26, 2020) [D.I. 181]; *In re RUI Holding Corp.*, No. 19-11509 (JTD) (Bankr. D. Del. Aug. 7, 2019) [D.I. 118]; *In re Hexion Holdings LLC*, Case No. 19-10684 (KG) (Bankr. D. Del. May 1, 2019) [D.I. 102]; *In re Imerys Talc Am., Inc.*, Case No. 10289 (LSS) (Bankr. D. Del. Feb. 14, 2019) [D.I. 51]; *In re Consolidated Infrastructure Grp., Inc.*, Case No. 19-10165 (BLS) (Bankr. D. Del. Jan. 31, 2019) [D.I. 29]; *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Nov. 27, 2019) [D.I. 82].[8]

---

[8] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

## B. THE COURT MAY AUTHORIZE THE PAYMENT OF CLAIMS ENTITLED TO ADMINISTRATIVE EXPENSE PRIORITY PURSUANT TO SECTION 503(b)(9) OF THE BANKRUPTCY CODE

49. Section 503(b)(9) of the Bankruptcy Code provides administrative priority for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). These claims must be paid in full for the Debtors to confirm a chapter 11 plan. 11 U.S.C. § 1129(a)(9)(A). Consequently, payment of the Critical Vendors' Section 503(b)(9) Claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan. Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy. In other words, payment of the Section 503(b)(9) Claims of Critical Vendors merely accelerates the timing of payment and does not change the ultimate treatment of such claims under a chapter 11 plan.

50. The Debtors' ongoing ability to obtain products as provided herein is necessary to preserve the value of their estates. Absent the payment of the Critical Vendors' Section 503(b)(9) Claims at the outset of these chapter 11 cases—which may merely accelerate the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to products necessary to maintain the Debtors' operations and maximize the value of the Debtors' estates. In addition, the Bankruptcy Code does not prohibit a debtor from paying Section 503(b)(9) Claims prior to confirmation. As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *See, e.g.*, *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21-23 ("I think arguably the debtor could pay its 503(b)(9) claimants without court approval."). The timing of such payments also lies squarely within the Court's discretion. *See In re Global Home Prods., LLC*, No. 06 10340 (KG), 2006 WL

3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "[t]he timing of the payment of that administrative expense claim is left to the discretion of the Court").

### C. THE COURT MAY AUTHORIZE THE DEBTORS TO PAY LIEN CLAIMS

#### (a) The Relief Requested Only Affects the Timing of Payments and Does Not Prejudice Any Creditors

51. Pursuant to section 506 Bankruptcy Code, the Lien Claimants are or may become secured creditors in these chapter 11 cases. In fact, many, if not all, of the Lien Claimants could perfect the Liens they would otherwise have under applicable law pursuant to sections 546(b) or 547(e)(2)(A) of the Bankruptcy Code, notwithstanding the existence of the automatic stay applicable in these chapter 11 cases. See 11 U.S.C. §§ 362(b)(3), 546, 547. To the extent a Lien Claimant holds such a secured claim, such Lien Claimant would be entitled to adequate protection and payment in full under a plan of reorganization. 11 U.S.C. §§ 361, 1129.

52. Consequently, by authorizing the Debtors to pay the Lien Claims, this Court is simply affecting the timing of when the Lien Claimants receive payment. And critically, by permitting the Debtors to pay the Lien Claims now, the Court is minimizing the Debtors' administrative costs and expenses by enabling the Debtors to avoid potential adequate protection or default interest payments. Thus, on this basis alone, the Debtors request this Court authorize the Debtors to pay the Lien Claims.

#### (b) The Relief Requested is Also Authorized by Sections 105 and 363 of the Bankruptcy Code

53. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations, including payments like the ones requested by this Motion, when it is necessary to protect and preserve the estate. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts "[h]ave approved orders . . . that allow payment of essential suppliers' prepetition invoices . . . ."); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999)

(finding that payment of prepetition claims to certain vendors was "[e]ssential to the survival of the debtor during the chapter 11 reorganization"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

54. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "[u]se, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also James A. Phillips, Inc.*, 29 B.R. at 393−94 (relying on section 363 of the Bankruptcy Code to allow a contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b) of the Bankruptcy Code).

55. Courts also authorize payment of prepetition claims, such as those described herein, in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "[i]ssue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when doing so is essential to the continued operation of a debtor's businesses. *Just for Feet*, 242 B.R. at 825−26. Specifically, a court may use its powers under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *Ionosphere Clubs*, 98 B.R. at 175−76; *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "[i]s the possibility that the creditor will employ an immediate economic sanction[] failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). A bankruptcy court's use of its equitable powers to "[a]uthorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76. Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "[o]nly be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

56. This flexible approach is particularly critical when, as here, payment of the amounts owing to the Lien Claimants are crucial to the Debtors' continued operations and restructuring efforts. In *In re Structurlite Plastics Corp.*, the bankruptcy court recognized that "[a] bankruptcy court may exercise its equity powers under § 105(a) to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately.'" 86 B.R. 922, 931 (Bankr. S.D. Ohio

1988) (quoting *In Re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987)). The court explained that "[a] *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the [Bankruptcy] Code." *Id.* at 932. Allowing the Debtors to pay the Lien Claims pursuant to sections 363(b) and 105(a) of the Bankruptcy Code is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value and maximizing the value of property available to satisfy creditors. *Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).

57. Courts in this district have routinely granted relief similar to the relief requested herein. *See, e.g.*, *In re FB Debt Fin. Guar., LLC*, No. 23-10025 (KBO) (Bankr. D. Del. Feb. 3, 2023) (authorizing debtors to pay prepetition lien claims in the ordinary course of business); *In re OSG Grp. Holdings, Inc.*, No. 22-10718 (JTD) (Bankr. D. Del. Aug. 29, 2022) (same); *In re TPC Grp. Inc.*, No. 22-10493 (CTG) (Bankr. D. Del. June 30, 2022) (same); *In re PWM Prop. Mgmt. LLC*, No. 21-11445 (MFW) (Bankr. D. Del. Dec. 1, 2021) (same); *In re Brooks Brothers Grp., Inc.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 11, 2020) (same).[9]

### D. THE COURT SHOULD CONFIRM THAT OUTSTANDING ORDERS ARE ADMINISTRATIVE EXPENSE PRIORITY CLAIMS AND THAT PAYMENT OF SUCH CLAIMS IS AUTHORIZED

58. Pursuant to section 503(b)(1) of the Bankruptcy Code, claims that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are entitled to administrative expense priority because they benefit the estate postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and

---

[9] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority). Thus, granting the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have absent such relief and will not prejudice any other party in interest.

59. Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to assure certain suppliers that their corresponding claims will be afforded administrative expense priority. The attendant disruption and delay to the continuous and timely flow of critical materials and other goods to the Debtors would force the Debtors to potentially halt operations, disrupt the Debtors' business, and lead to a loss of revenue, all to the detriment of the Debtors and their creditors.

60. Indeed, courts in this circuit and others have routinely granted the type of relief requested herein. *See, e.g.*, *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. April 24, 2023) (granting administrative expense priority to undisputed obligations on account of outstanding orders on a final basis); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Sep. 22, 2022) (same); *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Oct. 18, 2023) (granting administrative expense priority to undisputed obligations on account of outstanding orders on an interim basis).[10]

## II. THE COURT SHOULD AUTHORIZE THE BANKS TO HONOR AND PROCESS THE DEBTORS' PAYMENTS IN ACCORDANCE WITH THE MOTION

61. The Debtors have sufficient liquidity to pay the amounts set forth in this Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims

[10] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

will not be paid out except as authorized by this Court. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. The Debtors therefore submit that the Court authorize and direct the Banks, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before, on, or after the Petition Date, provided that sufficient funds are available in the applicable bank accounts to cover the checks and electronic fund transfers. The Debtors also request that the Banks be authorized to rely on the Debtors' designation or representation that any particular check or electronic payment request has been approved pursuant to the Interim Order and the Final Order.

## III. THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

62. Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one (21) days of the Petition Date requires that the Debtors demonstrate that such relief "is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the success of the chapter 11 cases depends upon the continued ability to satisfy the Critical Vendor Claims, Section 503(b)(9) Claims, and Lien Claims. Without the services of the Critical Vendors, the Section 503(b)(9) Claimants, or the Lien Claimants, the Debtors' estates would suffer immediate and detrimental consequences to the Debtors' businesses, which would jeopardize the Debtors' efforts to preserve and maximize the value of their estates, to the detriment and prejudice of all of the Debtors' stakeholders. As the Debtors operate in a highly competitive industry, the Debtors cannot afford any material disruptions of their business operations or present anything less than a "business as usual" appearance to the public. It is the Debtors' business judgment that continuation of their positive relationships with the Critical Vendors, the Section 503(b)(9) Claimants, and the

Lien Claimants is critical to avoid any unexpected or inopportune interruption to their operations and increases the likelihood of successfully prosecuting the chapter 11 cases. If the relief requested herein is not granted, the Debtors' failure to satisfy the Critical Vendor Claims, Section 503(b)(9) Claims or Lien Claims would cause the Debtors' estates immediate and irreparable harm by detracting from, and potentially derailing, the Debtors' restructuring efforts.

63. For the reasons set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## IV. WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

64. Additionally, with respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), to the extent not satisfied, and the fourteen (14)-day stay under Bankruptcy Rule 6004(h). As set forth throughout this Motion, any delay in obtaining Retail Goods would be detrimental to the Debtors, their creditors, and their estates, as the Debtors' ability to manage and run their business operations without any unexpected or inopportune interruption requires, in part, that they continue to be able to receive and deliver necessary Retail Goods.

65. For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen (14)-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Interim Order and the Final Order.

## V. IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

66. The Court may grant the relief requested in this Motion immediately if the "[r]elief is necessary to avoid immediate and irreparable harm." Bankruptcy Rule 6003; *In re First NLC*

*Fin. Servs.,* LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008). The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the Third Circuit has instructed that irreparable harm is that which "[c]annot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates. Importantly, the amounts sought to be paid under the Interim Order are only those amounts that will come due in the first thirty (30) days of the chapter 11 cases pursuant to the Customary Trade Terms and, accordingly, the Debtors have appropriately tailored the relief to that which must be paid pending the final hearing on the Motion.

67. The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen (14)-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

**RESERVATION OF RIGHTS**

68. Nothing in this Motion: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or

otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtors. Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**NOTICE**

69. The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the holders of the fifty (50) largest unsecured claims against the Debtors on a consolidated basis; (g) counsel to the DIP agent; (h) counsel to Antares Capital LP, as administrative agent, under the Debtors' First Lien Credit Agreement and the Debtors' Sidecar Credit Agreement, King & Spalding LLP (Attn: Lindsey Henrikson and Matthew Warren, email: lhenrikson@kslaw.com and mwarren@kslaw.com); (i) counsel to Ares Capital Corporation, as administrative agent, under the Debtors' Second Lien Credit Agreement, Proskauer Rose LLP, (Attn: David M. Hillman and Justin Breen, email: DHillman@proskauer.com and JBreen@proskauer.com); (j) the banks and financial institutions where the Debtors maintain accounts; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order and the Final Order, substantially in the form annexed hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: April 2, 2024
Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
Email: desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Cristine Pirro Schwarzman (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com
cristine.schwarzman@ropesgray.com

-and-

**ROPES & GRAY LLP**
Conor P. McNamara (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail: conor.mcnamara@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

# EXHIBIT A

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Never Slip Holdings, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10663 ([___])<br><br>(Jointly Administered)<br><br>**Re: Docket No. ____** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS, SECTION 503(b)(9) CLAIMANTS, AND LIEN CLAIMANTS, AND (B) FOLLOW CERTAIN PROCEDURES RELATED THERETO; (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for entry of this interim order (the "Order") and a final order (i) authorizing the Debtors, in their sole discretion, to (a) pay certain prepetition claims of Critical Vendors, Section 503(b)(9) Claimants, and Lien Claimants and (b) follow certain procedures related thereto; (ii) authorizing Banks to honor and process check and electronic transfer requests related to the foregoing; and (iii) granting related relief, all as more fully set forth in the Motion; and upon consideration of the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of these cases and this proceeding is proper in

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516). The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

this district pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT**:**

1. The Motion is granted on an interim basis as set forth herein.

2. The final hearing on the Motion (the "Final Hearing") is set for ______ __, 2024 at __:__ a.m./p.m. (prevailing Eastern Time). Any objections or responses to the entry of the proposed Final Order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____ ___, 2024 (the "Objection Deadline"), and shall be served on the following parties or their respective counsel on or before the Objection Deadline: (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Gregg M. Galardi and Cristine Pirro Schwarzman, email: gregg.galardi@ropesgray.com and cristine.schwarzman@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Conor P. McNamara, email: conor.mcnamara@ropesgray.com); and Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 N. Market Street, Suite 5400, Wilmington, DE 19801 (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com); (b) the U.S. Trustee, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda

Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (c) counsel to Antares Capital LP, as administrative agent, under the Debtors' First Lien Credit Agreement and the Debtors' Sidecar Credit Agreement, King & Spalding LLP (Attn: Lindsey Henrikson and Matthew Warren, email: lhenrikson@kslaw.com and mwarren@kslaw.com); (d) counsel to Ares Capital Corporation, as administrative agent, under the Debtors' Second Lien Credit Agreement, Proskauer Rose LLP (Attn: David M. Hillman and Justin Breen, email: DHillman@proskauer.com and JBreen@proskauer.com); and (e) counsel for any statutory committee appointed in these chapter 11 cases. If no objections or responses are filed and served by the Objection Deadline, the Court may enter the Final Order without further notice or hearing.

3. The Debtors are hereby authorized, but not required, to pay, in their sole discretion, without further order of this Court, the Critical Vendor Claims (inclusive of the Section 503(b)(9) Claims) and Lien Claims (inclusive of any Import and Export Charges), provided that such payments shall not exceed $10,547,000 absent further order of this Court. The Debtors are further authorized, but not directed, in their discretion, to settle all or some of the Prepetition Trade Claims for less than their face amount without further notice or hearing. Nothing in this paragraph shall be construed as requiring the Debtors to make a payment to a particular creditor or claimant. The Debtors shall provide a copy of this Order to any Prepetition Trade Claimant to whom a payment is made pursuant to this Order.

| **Prepetition Critical Vendor and Lien Claimant Obligations** | **Approximate Amount Due and Payable on an Interim Basis** |
|---|---|
| Manufacturing Vendors | $6,795,000[3] |
| Miscellaneous Vendors | $1,454,000 |
| Lien Claimants | $2,298,000 |
| **Total** | **$10,547,000** |

[3] The Debtors estimate that approximately $2,943,013 of the $6,795,000 payable to Critical Vendor Manufacturing Vendors is on account of Section 503(b)(9) Claims.

4. The Debtors are further authorized in their sole discretion, to undertake appropriate efforts to enter into Trade Agreements with the Prepetition Trade Claimants if the Debtors determine, in their discretion, that such an agreement is necessary to the Debtors' operations; *provided*, *however*, that the absence of such written verification or the Debtors' failure to request such an acknowledgement will not limit the Debtors' rights hereunder; *provided further*, *however*, that the Debtors' inability to obtain a commitment to provide Customary Trade Terms shall not preclude the Debtors from paying certain Prepetition Trade Claims if the Debtors determine, in the reasonable exercise of their business judgment, that payment of such Prepetition Trade Claims is nevertheless necessary to the Debtors' operations. Nothing in this paragraph shall be construed as requiring the Debtors to make a payment to a particular creditor or claimant.

5. If any party accepts payment hereunder for a prepetition obligation of the Debtors premised on compliance with the above, and thereafter fails to comply with the Customary Trade Terms, or other such terms as agreed to by the Debtors, then, subject to entry of a final order on the Motion from this Court: (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, immediately recoverable in cash upon written request by the Debtors; provided, that such party shall be provided reasonable opportunity to contest such request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then

outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

6. If any Prepetition Trade Claimant accepts payment on account of a prepetition obligation of the Debtors and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms (or such other terms as are agreed to by the parties, regardless of whether the parties have entered into a Trade Agreement), the Debtors reserve all rights and remedies, including to assert on notice and a hearing that such payments made constitute avoidable postpetition transfers pursuant to section 549 of the Bankruptcy Code and, as such, are recoverable by the Debtors.

7. The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments. The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Order.

8. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of the chapter 11 cases with respect to prepetition amounts owed in connection with any Prepetition Trade Claims referenced herein.

9. For the avoidance of doubt, the authorization granted hereby to pay the Prepetition Trade Claims shall not create any obligation on the part of the Debtors or their officers, directors, attorneys, or agents to pay the Prepetition Trade Claims. None of the foregoing persons shall have any liability on account of any decision by the Debtors to not pay or to settle a Prepetition Trade Claim for less than the asserted amount of such claim.

10. Nothing herein shall prejudice the Debtors' rights to request additional authority to pay Prepetition Trade Claims.

11. Nothing in this Order nor any actions taken hereunder: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtors; or (e) shall create, or is intended to create, any rights in favor of, or enhance the status of any claim held by, any person. Any payment made pursuant to this Order is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

12. The requirements of Bankruptcy Rule 6003 are satisfied.

13. Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof and notice of the Motion as provided therein shall be

deemed good and sufficient pursuant to the requirements of Bankruptcy Rule 6004(a) and the Local Rules.

14. The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

15. This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

# EXHIBIT B

## Final Order

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 ([___]) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. ____** |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO (A) PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS, SECTION 503(B)(9) CLAIMANTS, AND LIEN CLAIMANTS, AND (B) FOLLOW CERTAIN PROCEDURES RELATED THERETO; (II) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for entry of an interim order and this final order (the "Order") (i) authorizing the Debtors, in their sole discretion, to (a) pay certain prepetition claims of Critical Vendors, Section 503(b)(9) Claimants, and Lien Claimants and (b) follow certain procedures related thereto; (ii) authorizing Banks to honor and process check and electronic transfer requests related to the foregoing; and (iii) granting related relief, all as more fully set forth in the Motion; and upon consideration of the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of these cases and this proceeding is proper in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516). The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

this district pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are hereby authorized, but not required, to pay, in their sole discretion, without further order of this Court, the Critical Vendor Claims (inclusive of the Section 503(b)(9) Claims) and Lien Claims (inclusive of any Import and Export Charges), provided that such payments shall not exceed $22,073,000 in the aggregate (inclusive of the amounts in the Interim Cap) absent further order of this Court. The Debtors are further authorized, but not directed, in their sole discretion, to settle all or some of the Prepetition Trade Claims for less than their face amount without further notice or hearing. Nothing in this paragraph shall be construed as requiring the Debtors to make a payment to a particular creditor or claimant. The Debtors shall provide a copy of this Order to any Prepetition Trade Claimant to whom a payment is made pursuant to this Order.

| Prepetition Critical Vendor and Lien Claimant Obligations | Approximate Amount Due and Payable on a Final Basis |
|---|---|
| Manufacturing Vendors | $10,478,000[3] |
| Miscellaneous Vendors | $1,703,000 |
| Lien Claimants | $9,892,000 |
| **Total** | **$22,073,000** |

3. The Debtors are further authorized in their sole discretion, to undertake appropriate efforts to enter into Trade Agreements with the Prepetition Trade Claimants if the Debtors determine, in their discretion, that such an agreement is necessary to the Debtors' operations; *provided*, *however*, that the absence of such written verification or the Debtors' failure to request such an acknowledgement will not limit the Debtors' rights hereunder; *provided further*, *however*, that the Debtors' inability to obtain a commitment to provide Customary Trade Terms shall not preclude the Debtors from paying certain Prepetition Trade Claims if the Debtors determine, in the reasonable exercise of their business judgment, that payment of such Prepetition Trade Claims is nevertheless necessary to the Debtors' operations. Nothing in this paragraph shall be construed as requiring the Debtors to make a payment to a particular creditor or claimant.

4. If any party accepts payment hereunder for a prepetition obligation of the Debtors premised on compliance with the above, and thereafter fails to comply with the Customary Trade Terms, or other such terms as agreed to by the Debtors, then, subject to entry of a final order on the Motion from this Court: (a) any payment on account of a prepetition claim received by such party shall be deemed, in the Debtors' sole discretion, an improper postpetition transfer and, therefore, immediately recoverable in cash upon written request by the Debtors; provided, that such party shall be provided reasonable opportunity to contest such request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been

[3] The Debtors estimate that approximately $2,943,013 of the $10,478,000 payable to Critical Vendor Manufacturing Vendors is on account of Section 503(b)(9) Claims.

made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

5. If any Prepetition Trade Claimant accepts payment on account of a prepetition obligation of the Debtors and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms (or such other terms as are agreed to by the parties, regardless of whether the parties have entered into a Trade Agreement), the Debtors reserve all rights to assert that such payments made constitute avoidable postpetition transfers pursuant to section 549 of the Bankruptcy Code and, as such, are recoverable by the Debtors.

6. The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments. The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Order.

7. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored

as a consequence of the chapter 11 cases with respect to prepetition amounts owed in connection with any Prepetition Trade Claims referenced herein.

8. For the avoidance of doubt, the authorization granted hereby to pay the Prepetition Trade Claims shall not create any obligation on the part of the Debtors or their officers, directors, attorneys, or agents to pay the Prepetition Trade Claims. None of the foregoing persons shall have any liability on account of any decision by the Debtors to not pay or to settle a Prepetition Trade Claim for less than the asserted amount of such claim.

9. Nothing herein shall prejudice the Debtors' rights to request additional authority to pay Prepetition Trade Claims.

10. Nothing in this Order nor any actions taken hereunder: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtors; or (e) shall create, or is intended to create, any rights in favor of, or enhance the status of any claim held by, any person. Any payment made pursuant to this Order is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

11. Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof and notice of the Motion as provided therein shall be

deemed good and sufficient pursuant to the requirements of Bankruptcy Rule 6004(a) and the Local Rules.

12. The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

13. This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.