## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 ([___]) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE CERTAIN INTERCOMPANY TRANSACTIONS AND (II) GRANTING RELATED RELIEF

Never Slip Holdings, Inc. and its affiliated debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through their undersigned proposed counsel, hereby submit this motion (this "Motion") for entry of interim and final orders granting the relief described below.  In support hereof, the Debtors rely on the *Declaration of Christopher Sim, Chief Financial Officer of Never Slip Holdings, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] filed concurrently herewith, and further represent as follows:

### JURISDICTION AND VENUE

1.  The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them either later in this Motion or in the First Day Declaration.

*Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 345, 363, and 503 of title 11 of the United States Code, as amended (the "Bankruptcy Code").  The relief is also appropriate in accordance with Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 9013-1(a).

## RELIEF REQUESTED

4.      The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order"):  (i) authorizing the Debtors, in their discretion, to (a) continue to operate their Cash Management System (as defined herein); (b) pay any prepetition or postpetition amounts outstanding on account of the Bank Claims (as defined herein); (c) maintain existing Business Forms (as defined herein) in the ordinary course of business; (d) continue to perform Intercompany Transactions (as defined herein) consistent with historical practice; and (ii) granting related relief.

5.      The Debtors further respectfully request that the Court schedule a final hearing to consider approval of this Motion on a final basis within thirty (30) days following the Petition Date (as defined herein) or as soon thereafter as the Court's schedule permits.

2

**BACKGROUND**

6.        On April 1, 2024 (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committee of unsecured creditors has been appointed in these chapter 11 cases.

7.        Founded in 1984, the Debtors, together with their non-Debtor subsidiaries (collectively, the "Company"), are the leading business-to-business brand and category creator of slip resistant footwear and other safety products for employers, employees, and individual consumers.  The Company has a highly diverse and loyal customer base and sells its products to businesses,  including restaurants, supermarkets, hotels, casinos, manufacturers, healthcare institutions, and food service companies, as well as directly to end users.  The Company offers its customers purpose-built branded and proprietary private label products at competitive prices that use patented outsole technology to prevent fall-related workplace injuries.

8.        Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

A.        **THE CASH MANAGEMENT SYSTEM**

9.        The Debtors operate an integrated system of Bank Accounts (as defined herein) to facilitate the collection and disbursement of funds across the Debtors (the "Cash Management

System"). The Cash Management System enables transactions and transfers among the various Bank Accounts required to facilitate the Debtors' collections and disbursements. Further, the Cash Management System enables monitoring of collection and disbursement activity and facilitates the Debtors' reporting through the development of timely and accurate information. The Debtors maintain oversight of the Cash Management System and implement cash management controls for receiving, processing, and releasing funds. Additionally, the Debtors regularly reconcile the Debtors' books and records to ensure that all transfers are properly accounted for.

10.    The Debtors estimate that cash collections average approximately $16,600,000 per month from customer receipts. As further discussed herein, the Debtors' cash collections are processed and distributed into the Master Depository Account and ultimately to the Payroll Account or the Master Disbursement Account (all as defined herein) for (a) obligations such as vendor payments, payroll and employee benefits, and (b) to pay Bank Fees (as defined herein). The Debtors estimate that total ordinary course disbursements will average approximately $17,300,000[3] per month during these chapter 11 cases.

11.    Due to the nature of the Debtors' businesses and the disruption to their businesses that would result if the Debtors were required to close their existing Bank Accounts, it is critical that the Debtors' Cash Management System remains in place on a postpetition basis. Accordingly, pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, the Debtors seek authorization to maintain their existing Bank Accounts and continue using their Cash Management System.

---

[3]    This estimate is based on a historical estimate and excludes non-ordinary course disbursements prepetition, including, without limitation, any restructuring related costs.

B.      **BANK ACCOUNTS**

12.      The Cash Management System includes a total of twenty (20) bank accounts as of the Petition Date, and three (3) additional bank accounts that will be activated shortly after the Petition Date (collectively, the "Bank Accounts").[4]  As further set forth on **Exhibit C** attached hereto, and in the table below, the Cash Management System includes accounts held by both Debtors and non-Debtors.  The Debtors' Bank Accounts are held at JPMorgan Chase Bank ("JPM" or the "Bank").

13.      The functions of the Bank Accounts are described in the following table:

| Debtor Bank Accounts | | | | |
|---|---|---|---|---|
| **Entity** | **Bank** | **ZBA** | **Account Number (Last 4 digits)** | **Account Purpose** |
| Shoes For Crews, LLC | JPM | No | x1022 | Master Depository Account (USD)<br>▪ Receives:<br>  - B2B Inflows (defined herein)<br>  - JPM Dep. ZBA x3871 (ORL)<br>  - JPM Dep. ZBA x6528 (LV)<br>  - JPM Canada x8365<br>  - BOI (Europe) Ltd. x7593 & x2252<br>▪ Disburses:<br>  - JPM Payroll ZBA x0355<br>  - JPM Master Disb. ZBA x7195 |
| Shoes For Crews, LLC | JPM | Yes | x7195 | Master Disbursement Account (USD)<br>▪ Receives:<br>  - JPM Master Depository x1022<br>▪ Disburses:<br>  - To make operational disbursements for the Debtors<br>  - CMB (GZ) Co. Ltd. x2902 |
| Shoes For Crews, LLC | JPM | Yes | x3871 | Depository Account - Orlando (USD)<br>▪ Receives from DTC inflows (defined herein)<br>▪ Disburses:<br>  - JPM Master Depository x1022 |
| Shoes For Crews, LLC | JPM | Yes | x6528 | Depository Account – Las Vegas (USD)<br>▪ Receives from DTC inflows<br>▪ Disburses:<br>  - JPM Master Depository x1022 |

---

[4]      Although the Cash Management System includes twenty (20) Bank Accounts as of the Petition Date, and three (3) Bank Accounts that will be activated shortly after the Petition Date, the Debtors reserve the right to close existing accounts or open new accounts in the ordinary course of business.

| Debtor Bank Accounts | | | | |
|---|---|---|---|---|
| **Entity** | **Bank** | **ZBA** | **Account Number (Last 4 digits)** | **Account Purpose** |
| Shoes For Crews, LLC | JPM | Yes | x0355 | Payroll Account (USD)<br>▪ Receives:<br> - JPM Master Depository x1022<br>▪ Disburses:<br> - Payroll processer (Paylocity) pulls funds automatically for payroll |
| Shoes For Crews, LLC | JPM | No | x1986 | Certificate of Deposit Account<br>▪ balance $250,000 plus accrued interest<br>▪ held to collateralize the Debtors' Corporate Card Program |
| Never Slip Topco, Inc. | JPM | No | x3087 | Checking Account (USD)<br>▪ Dormant account<br>▪ Holds no balance or operational use |
| Shoes For Crews, LLC | JPM | No | x2203[5] | Utilities Deposit Account<br>▪ To be activated shortly after the Petition Date |
| Shoes For Crews, LLC | JPM | No | x2211[6] | CIT Facility Escrow Account<br>▪ To be activated shortly after the Petition Date |
| Shoes For Crews, LLC | JPM | No | x2195[7] | Professional Fee Escrow Account<br>▪ To be activated shortly after the Petition Date |

| Non-Debtor Bank Accounts | | | | |
|---|---|---|---|---|
| **Entity** | **Bank** | **ZBA** | **Account Number (Last 4 digits)** | **Account Purpose** |
| SFC Canada Distributions ULC | JPM | No | x8365 | Main Operating Account (CAD)<br>▪ Receives<br> - B2B and DTC inflows<br>▪ Disburses:<br> - To make operational payments for the Canadian non-Debtor Subsidiary<br> - JPM Master Depository x1022 |
| Shoes for Crews (Europe) Limited | BOI[8] | No | x2134 | Disbursement Account (EUR)<br>▪ Receives:<br> - BOI (Europe) Ltd. x7593 & x2252<br>▪ Disburses: |

---

[5] The Utilities Deposit Account ending in x2203 will be used to provide adequate assurance payments for future utility services and is further described in the *Debtors' Motion For Entry Of Interim And Final Orders (I)(A) Approving The Debtors' Proposed Adequate Assurance Of Payment For Future Utility Services, (B) Approving The Debtors' Proposed Procedures For Resolving Additional Assurance Requests, And (C) Prohibiting Utility Providers From Altering, Refusing, Or Discontinuing Services; And (II) Granting Related Relief.*

[6] The CIT Facility Escrow Account ending in x2211 will be used to hold the CIT Facility payments and is further described in the Interim DIP Order.

[7] The Professional Fee Escrow Account ending in x2195 will be used to hold professional fees and is further described in the Interim DIP Order.

[8] As used herein, BOI refers to the "Bank of Ireland."

| Non-Debtor Bank Accounts | | | | |
|---|---|---|---|---|
| **Entity** | **Bank** | **ZBA** | **Account Number (Last 4 digits)** | **Account Purpose** |
| | | | | -    To make operational payments for the Irish non-Debtor Subsidiary |
| Shoes for Crews (Europe) Limited | BOI | No | x7593 | Restricted Operating/Controlled Account (EUR) <br> ▪  Receives: <br> -    B2B and DTC inflows <br> ▪  Disburses: <br> -    BOI (Europe) Ltd. x2134, x7303, x9001 & x9002 <br> -    JPM Master Depository x1022 |
| Shoes for Crews (Europe) Limited | BOI | No | x1565 | Operating/Controlled Account (EUR) <br> ▪  Fixed deposit account used to secure the Irish non-Debtor Subsidiaries bank activity <br> ▪  Used to secure EU bank activity <br> -    Holds approx. 100,000 Euros |
| Shoes for Crews (Europe) Limited | BOI | No | x2252 | Restricted Operating/Controlled Account (GBP) <br> ▪  Receives: <br> -    B2B and DTC Inflows. <br> ▪  Disburses: <br> -    BOI (Europe) Ltd. x2134, x7303, x9001 & x9002 <br> -    JPM Master Depository x1022 |
| Shoes for Crews (Europe) Limited | BOI | No | x7303 | Exempt Account (EUR) <br> ▪  Receives: <br> -    BOI (Europe) Ltd. x7593 and x2252 <br> ▪  Disburses: <br> -    Historically, no disbursements have been made, but can disburse to JPM Master Depository x1022 |
| Shoes for Crews (Europe) Limited | BOI | No | x9001 | Exempt Account (GBP) <br> ▪  Receives: <br> -    BOI (Europe) Ltd. x7593 and x2252 <br> ▪  Disburses: <br> -    Historically, no disbursements have been made, but can disburse to JPM Master Depository x1022 |
| Shoes for Crews (Europe) Limited | BOI | No | x9002 | Exempt Account (USD) <br> ▪  Receives: <br> -    BOI (Europe) Ltd. x7593 and x2252 <br> ▪  Disburses: <br> -    Historically, no disbursements have been made, but can disburse to JPM Master Depository x1022 |
| Shoes For Crews Footwear (Guangzhou) Co. Ltd. | CMB[9] | No | x0701 | Operating Account (RMB) <br> ▪  Receives <br> -    B2B and DTC inflows <br> -    CMB (GZ) Ltd. x2902 <br> ▪  Disburses: <br> -    Primarily disburses for payroll and employee reimbursement in China |

---

[9]    As used herein, CMB refers to "China Merchants Bank."

| Non-Debtor Bank Accounts | | | | |
|---|---|---|---|---|
| **Entity** | **Bank** | **ZBA** | **Account Number (Last 4 digits)** | **Account Purpose** |
| Shoes For Crews Footwear (Guangzhou) Co. Ltd. | CMB | No | x2902 | Capital Account (USD)<br>▪ Receives:<br>  - JPM Master Disb. ZBA x7195<br>▪ Disburses:<br>  - CMB (GZ) Co. Ltd. x6002, x0701 & x5954 and DSB (SGD) Ltd. x2330 |
| Shoes For Crews APAC PTE. LTD. | DBS[10] | No | x2330 | Operating Account (SGD)<br>▪ Receives<br>  - B2B and DTC inflows<br>  - CMB (GZ) Ltd. x2902<br>▪ Disburses<br>  - For operational disbursements in SGD |
| Shoes For Crews Footwear (Guangzhou) Co. Ltd. | ICBC[11] | No | x5954 | Operating Account (RMB)<br>▪ Receives<br>  - B2B and DTC inflows<br>  - CMB (GZ) Ltd. x2902<br>▪ Disburses:<br>  - To pay vendors in RMB |
| Shoes For Crews Footwear (Guangzhou) Co. Ltd. | ICBC | No | x6002 | Operating Account (USD)<br>▪ Receives<br>  - B2B and DTC inflows<br>  - CMB (GZ) Ltd. x2902<br>▪ Disburses:<br>  - To pay vendors in USD |

## C.    COLLECTIONS

### i.    United States Debtors

14.    The Debtors in these chapter 11 cases, which are domesticated in the United States, collect receipts from their customers through two (2) different Bank Accounts located at JPMorgan Chase (together, the "Collection Accounts"). The Collection Accounts are both zero-balance accounts ("ZBAs"), which distribute funds into the Bank Account ending in x1022 held at Shoes For Crews, LLC (the "Master Depository Account"). The average monthly balance in the Master Depository Account from January 2024 to February 2024 was approximately $5.3 million. The funds in the Master Depository Account are held until disbursement into the Bank Account ending

---

[10]    As used herein, DBS refers to "Development Bank of Singapore Limited."

[11]    As used herein, ICBC refers to "Industrial and Commercial Bank of China."

in x0355 (the "<u>Payroll Account</u>") or the Bank Account ending in x7195 (the "<u>Master Disbursement</u> <u>Account</u>").  Both the Payroll Account and the Master Disbursement Account are ZBAs and are held at Shoes For Crews, LLC.

15.     Funds received from the sale of Debtors' inventory directly from consumers ("<u>DTC</u> <u>Inflows</u>") are transferred to the Master Depository Account.  DTC Inflows from checks, credit cards, and electronic payments are transferred to the Master Depository Account via payment processors.  The payment processors include Paymentech, LLC, PayPal Holdings, Inc, Afterpay, Ltd., Braintree (service of PayPal Holdings, Inc), and American Express Bank, LLC.  The Debtors do not hold funds in payment processors; instead, the funds flow through the payment processors automatically and are sent to the Debtors within approximately one business day.

16.     DTC Inflows from cash payments move through a safe deposit box on a daily basis to the ZBAs ending in x3871 or x6528 and then are swept into the Master Depository Account. The ZBA ending in x3871 collects cash payments from the Orlando store location, and the ZBA ending in x6528 collects cash payments from the Las Vegas store location.

17.     Funds received from the sale of Debtors' inventory from other businesses ("<u>B2B</u> <u>Inflows</u>") are transferred, either directly or via payment processor, to the Master Depository Account.

18.     As further discussed below and as illustrated in **<u>Exhibit C</u>** attached hereto, the Debtors, in the ordinary course of business, collect certain funds from the Canadian and Irish non-Debtor Subsidiaries related to intercompany transactions, including the Intercompany Transfers, the Intercompany Receivables, and the Shared Services (all as defined below) (collectively, the <u>Intercompany Transactions</u>").  The collected funds from Intercompany Transactions are used to

reimburse the Debtor for operating expenses made by the Debtors on behalf of the Canadian and Irish non-Debtor Subsidiaries.

19.     The Debtors collect funds from the Canadian subsidiary from the Bank Account ending in x8365 held at Shoes For Crews Canada Distributions ULC.  The Debtors collect funds from the Irish non-Debtor Subsidiary from the Bank Accounts ending in x7539 or x2252 held at Shoes For Crews (Europe) Limited.  The funds collected from the Canadian and Irish non-Debtor Subsidiaries are transferred into the Master Depository Account.  On a monthly basis, the Debtors collect into the Master Depository Account approximately $250,000 from the Canadian non-Debtor Subsidiary and approximately $1,050,000 from the Irish non-Debtor  Subsidiary on account of these Intercompany Transactions.

### ii.     Foreign Non-Debtor Subsidiaries

20.     There are four non-Debtor subsidiaries, which include (a) Shoes For Crews Canada Distributions ULC (the "Canadian non-Debtor Subsidiary"), (b) Shoes For Crews (Europe) Limited (the "Irish non-Debtor Subsidiary"), (c) Shoes For Crews Footwear (Guangzhou) Co. Limited (the "Chinese non-Debtor Subsidiary"), and (d) Shoes For Crews APAC PTE. LTD. (the "Singapore non-Debtor Subsidiary," and together with (d), the "APAC non-Debtor Subsidiaries"). The proceeds from accounts receivable collected by the non-Debtor subsidiaries are owed directly to the respective subsidiary and do not constitute a portion of the Debtors' estate.  Similarly, the proceeds from accounts receivable collected by the Debtors are not owed to the non-Debtor subsidiaries.

21.     B2B Inflows and DTC Inflows collected by the Canadian non-Debtor Subsidiary are transferred, either directly or via payment processor, to the Bank Account ending in x8365 held at SFC Canada Distributions ULC.

22.     B2B Inflows and DTC Inflows collected by the Irish non-Debtor Subsidiary are transferred, either directly or via payment processor, to the Bank Accounts ending in x7593 or x2252 (together, the "Controlled Accounts") held at Shoes For Crews (Europe) Limited.  These accounts are controlled per the Credit Agreement, dated as of May 16, 2023, among Shoes For Crews (Europe) Limited and Ares Capital Corporation (the "Irish Credit Agreement").  The Irish non-Debtor Subsidiary is permitted to use the Controlled Accounts without restrictions (including to withdraw Cash and Cash Equivalents from Controlled Accounts and to transfer Cash and Cash Equivalents to exempt accounts) so long as there is not a continuing material event of default, or the Administrative Agent has not delivered a Cash Control Notice to the Borrower pursuant to the Cash Collateral covenant in the Irish Credit Agreement.  Exempt accounts (the "Exempt Accounts") are all deposit accounts of the Irish non-Debtor Subsidiary that are not Controlled Accounts.

23.     B2B Inflows and DTC Inflows collected by the APAC non-Debtor Subsidiaries are transferred, either directly or via payment processor, to the Bank Accounts ending in x5954, x0701 or x6002 held at Shoes For Crews Footwear (Guangzhou) Co. Limited or the Bank Account ending in x2330 held at Shoes For Crews APAC (Singapore).

## D.    DISBURSEMENTS

### i.    United States Debtors

24.     The Debtors make certain disbursements in the ordinary course of business through the Master Disbursement Account and the Payroll Account.  The Debtors' disbursements include disbursements for accounts payable, employee benefits, domestic and international wires, and to other Bank Accounts in the Cash Management System for, among other things, various accounts payable obligations.  The funds in the Master Depository Account are held in the account until

disbursement to the Bank Account ending in x0355 (the "Payroll Account"), or the Bank Account ending in x7195 (the "Master Disbursement Account").

25.    To fund payroll for the United States employees, funds are transferred from the Master Depository Account to the Payroll Account, which is a ZBA.  The payroll processor, Paylocity, automatically pulls funds out of the Payroll Account every other Friday on a bi-weekly basis pursuant to the Debtors' payroll procedures.

26.    The Master Disbursement Account, which is a ZBA, is used to make all North American operating disbursements including vendor payments related to shipping and manufacturing, professional services, insurance, utilities, leases, and taxes.

27.    As further discussed below and as illustrated in **Exhibit C** attached hereto, certain of the Debtors, in the ordinary course of business, also fund certain Intercompany Transactions from the Master Disbursement Account with the Chinese non-Debtor Subsidiary.  Certain of the Debtors are party to a management services agreement with the Chinese non-Debtor Subsidiary, pursuant to which the Chinese non-Debtor Subsidiary manages manufacturing relationships, conducts research and development, and maintains oversight over quality control of the products in exchange for a management fee (the "Chinese Management Fees").  The Chinese Management Fees are approximately $165,000 per month, which the Debtors transfer from the Master Disbursement Account to the Chinese non-Debtor Subsidiary's Bank Account ending in x2902 held at Shoes For Crews Footwear (Guangzhou) Co. Ltd.  The Bank Account ending in x2902 is used to receive capital infusions from the United States as required under Chinese Law.  The Bank Account ending in x2902 then disburses the funds into the Bank Accounts ending in x5954, x0701 or x6002 held at Shoes For Crews Footwear (Guangzhou) Co. Limited or the Bank Account ending in x2330 held at Shoes For Crews APAC.  The Chinese non-Debtor Subsidiary uses such funds in

the ordinary course to, among other things, facilitate payroll, pay rent, and make other necessary operational payments.

### i. Foreign Non-Debtor Subsidiaries

28.    The Canadian non-Debtor Subsidiary uses the Bank Account ending in x8365 to make operational payments in Canada related to salaries, wages, benefits, rents, and other general and administrative expenditures.

29.    The Irish non-Debtor collects funds in the Restricted Accounts from B2B Inflows and DTC Inflows.  Funds in the Restricted Accounts can either be disbursed to the Bank Account ending in x2134, transferred to one of three (3) Exempt Accounts, or transferred to the Master Depository Account to reimburse Intercompany Transactions.  The Exempt Accounts include the Bank Accounts ending in x7303, x9001, and x9002.  Any excess funds above what is needed for operational disbursements and reimbursement to the Debtors are transferred to the Exempt Accounts.

30.    The APAC non-Debtor Subsidiaries use the Bank Accounts ending in x5954, x0701 and x6002 at Shoes For Crews Footwear (Guangzhou) Co. Limited and the Bank Account ending in x2330 at Shoes For Crews APAC to make operational payments related to salaries, rents, and other general and administrative expenditures.

### E.    CIT FACTORING FACILITY

31.    On November 15, 2018, the Company entered into a Non-Notification Factoring Agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "CIT Factoring Agreement", together with the Prepetition First Lien Loan Documents, the Prepetition Sidecar Loan Documents, and the Prepetition Second Lien Loan Documents, the "Prepetition Secured Documents") to sell and assign

accounts, including such accounts arising from or related to sales of inventory or rendition of services to The CIT Group/Commercial Services, Inc. ("CIT").

32.     The CIT Factoring Agreement is secured with cash collateral from Don't Slip Inc., an affiliate of CCMP Capital Investors III, L.P.  The Company currently conducts weekly reconciliations every Friday with CIT regarding advances and paydowns for the CIT Factoring Facility.  Treatment of the CIT Factoring Agreement, and amounts related thereto is set forth in the Interim DIP Order.

## F.    ADEQUATE ASSURANCE BANK ACCOUNT

33.     Prior to the Petition Date, the Debtors repurposed the Bank Account ending in x2203 as a segregated account that the Debtors propose will hold an adequate assurance deposit for the benefit of the Debtors' utility providers throughout the course of these chapter 11 cases (the "Adequate Assurance Account").[12]  Pursuant to the Utilities Motion, the Debtors propose funding the Adequate Assurance Account with $10,064.

## G.    CORPORATE CARD PROGRAM

34.     The Debtors have expense reimbursement policies for certain business-related and preapproved travel, lodging, ground transportation, meals and entertainment, vehicle rentals, vehicle allowance and usage (milage), cell phone usage, internet, parking and tolls, and other miscellaneous business expenses (the "Business Expenses").  The Business expenses are ordinary course expenses that the Debtors' Employees may incur on corporate cards issued by American

---

[12]    In accordance with the Adequate Assurance Procedures (as defined in the *Debtors' Motion for Entry of Interim and Final Orders (I)(A) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (B) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (C) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services; and (II) Granting Related Relief* (the "Utilities Motion")), filed contemporaneously herewith, the Adequate Assurance Account will be funded as soon as reasonably practicable after the Court enters an order granting the relief requested in the Utilities Motion.  The Debtors also reserve the right to change which Bank Account shall be the Adequate Assurance Account on an as-needed basis.

Express ("Amex") in the ordinary course in performing their job function (the "Corporate Cards").[13] The Company also utilizes corporate departmental purchasing cards through JPMorgan Chase (the "P-Cards," and together with the Corporate Cards, the "Corporate Card Program"). The Corporate Card Program is an integral part of the Debtors' cash management and account functions. The ability of the Debtors to use the Corporate Card Program on a go-forward basis is essential to the continued operation of the Debtors' business and the corporate administration thereof in order for the relevant employees and vendors to have assurance that they will be able to undertake certain business expenses without having to seek reimbursement from their own account or otherwise seek proper remittance. Accordingly, the Debtors' inability to maintain the Corporate Card Program would result in unnecessary hardship on the continued operation of the Debtors' business. The Debtors incur approximately $110,000 in Bank Fees each month under the Cash Management System. To maintain the integrity of their Cash Management System and the Debtors' ability to operate in the ordinary course, the Debtors seek authorization to pay all prepetition obligations in relation to the Corporate Cards and to continue honoring obligations in relation to the Corporate Cards on a postpetition basis in the ordinary course of business. As of the Petition Date, the Debtors estimate that there may be up to $280,000 outstanding on account of the Corporate Cards, all of which will come due within the 30 days following the Petition Date.

## H.    BANK CLAIMS

35.    In the ordinary course of business, the Debtors incur periodic service charges and other ordinary course fees in connection with maintaining the Cash Management System (collectively, the "Bank Fees"). The Debtors incur approximately $110,000 in Bank Fees each

---

[13]    The Corporate Card Program is further described in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Employee Benefits Obligations and Other Compensation, and (B) Continue Employee Benefits Programs and Pay Related Administrative Obligations and (II) Granting Related Relief* (the "Wages Motion").

month under the Cash Management System.  The Debtors estimate that approximately $110,000 in Bank Fees that accrued prepetition will come due within the first thirty days of these chapter 11 cases.  To maintain the integrity of their Cash Management System, the Debtors request authority to pay all prepetition Bank Fees and to continue to pay Bank Fees in the ordinary course on a postpetition basis.

36.     In addition to the Bank Fees, in connection with the Cash Management System, the Debtors may incur other charges ("Bank and Processor Charges," and together with the Bank Fees, the "Bank Claims") in connection with:  (a) checks that have been dishonored or returned for insufficient funds in the applicable account; (b) any reimbursement or other payment obligations, such as overdrafts, arising under any agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements; and (c) any credit card processing fees or other related payment obligations, subject to the terms of any applicable deposit account control agreements.  The Debtors estimate that approximately $150,000 in Bank and Processor Charges are currently due and owing as of the Petition Date, all of which will be payable within the first thirty days of these chapter 11 cases.

## I.     THE BUSINESS FORMS

37.     The Debtors use various pre-printed documents (the "Business Forms"), such as checks, invoices, and letterhead, in the ordinary course of business.  Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession. Nonetheless, most parties doing business with the Debtors will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding these chapter 11 cases and the notice of commencement served on parties in interest.

38.     Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates. Thus, the Debtors request that they be authorized to use their existing Business Forms without placing a "Debtor In Possession" legend on each, until their existing stock is depleted. Once the Debtors have exhausted their existing stock of checks or forms, any new check stock or subsequently printed checks or forms will bear the designation "Debtor In Possession" with the joint case number. To the extent that checks or forms are prepared electronically, the Debtors will add a "Debtor In Possession" designation to such checks within fourteen days of the Petition Date.

## J.     THE INTERCOMPANY TRANSACTIONS

### i.     Overview of the Intercompany Transactions

39.     The Debtors have historically, in the ordinary course of business, engaged in routine business relationships with certain of their non-Debtor subsidiaries through various Intercompany Transactions resulting from Intercompany Transfers, Intercompany Receivables, and Shared Services. The Debtors closely track all intercompany fund transfers in their respective accounting systems and therefore can ascertain, trace, and account for all Intercompany Transactions.

40.     The Intercompany Transactions are an essential component of the Debtors' business operations. More specifically, the Debtors engage in Intercompany Transactions to, among other things, complete transactions with administrative ease, fund ordinary course of business expenses (*e.g.*, vendor payments), and facilitate operations on a daily basis. The Intercompany Transactions are trackable, and the Debtors intend to account for all postpetition Intercompany Transactions in accordance with pre-bankruptcy procedures.

41.     Any interruption of the Intercompany Transactions would disrupt the Debtors' operations and result in great harm to the Debtors' estates and their stakeholders.

Accordingly, the Debtors seek authority, and, to the extent applicable, relief from the automatic stay, to continue the Intercompany Transactions in the ordinary course of business on a postpetition basis.

42.     As a result of the various Intercompany Transactions discussed below, at any given time, there may be intercompany balances owing by one Debtor to a non-Debtor or by one non-Debtor to a Debtor (the "Intercompany Claims").  For the reasons set forth herein, and given the importance of the Intercompany Transactions to the Debtors' business operations, if the Debtors were unable to maintain such Intercompany Transactions, their businesses and their estates would be negatively impacted.

43.     Because the Debtors engaged in the Intercompany Transactions on a prepetition basis and such transactions are common for businesses such as the Debtors, the Debtors believe that they may continue Intercompany Transactions in the ordinary course of business under section 363(c)(1) of the Bankruptcy Code without Court approval.  Nonetheless, by this Motion, the Debtors seek express authority to continue engaging in the Intercompany Transactions. Consistent with their prepetition practice, the Debtors will maintain records of all transfers and can ascertain, trace, and account for all of the Intercompany Transactions.

ii.     **Intercompany Transfers**

44.     In the ordinary course of business, the Debtors engage in intercompany transfers (the "Intercompany Transfers") with the Chinese non-Debtor Subsidiary.  Certain of the Debtors are party to a management services agreement with the Chinese non-Debtor Subsidiary, pursuant to which the Chinese non-Debtor Subsidiary manages manufacturing relationships, conducts research and development, and maintains oversight over quality control of the products in exchange for the Chinese Management Fees.  Once the Intercompany Transfers are made, the Chinese non-Debtor Subsidiary uses the funds collected from the Chinese Management Fees in

the ordinary course to, among other things, facilitate payroll, pay rent, and make any other necessary operational payments. The Intercompany Transfers allow the Company to support its diverse domestic and foreign operations, and to ensure that ongoing operations of the Chinese non-Debtor Subsidiary is sustained and adequately funded. This, in turn, enables the Chinese non-Debtor Subsidiary to continue to provide important functions for the Company, such as the oversight of the manufacturing facilities, product development, and quality control.

45.     During these chapter 11 cases, the Debtors will need to pay the Chinese Management Fees to the Chinese non-Debtor Subsidiary for working capital purposes and to support their operations and therefore ensure the continued stability of the Debtors' global enterprise. It is anticipated that the commencement of the chapter 11 cases may result in, among other things, a contraction of credit and liquidity available to the Chinese non-Debtor Subsidiary. As a result, the Debtors seek authority, in their discretion, to make Intercompany Transfers during the course of the chapter 11 cases up to $165,000 upon entry of the Interim Order and $165,000 per month upon entry of the Final Order to the Chinese non-Debtor Subsidiary without further approval of the Court.[14] As described above, such amounts shall be used for, among other things, payroll, rent, and certain taxes and fees. The Debtors make no other Intercompany Transfer outflows to any other non-Debtor subsidiary. Given the value of the Chinese non-Debtor Subsidiary's oversight, research and development, and quality control, the Debtors' ability to continue to make Intercompany Transfers is critical to the continued operation of such entity and in turn necessary to ensure the preservation of the Debtors' enterprise as a whole.

---

[14]    For the avoidance of doubt, transfers related to the creation or reconciliation of accounting-related ledger entries will not be counted towards these interim and final amounts.

### iii.    Intercompany Receivables

46.    The Debtors pay certain third-party manufacturers or vendors directly for certain inventory which is shipped directly to and sold by certain of the Debtors' non-Debtor subsidiaries, which generates an intercompany receivable (the "Intercompany Receivables") on the Debtors books.   A corresponding intercompany payable is concurrently generates on the applicable non-Debtor subsidiary's books.   With respect to the Irish non-Debtor Subsidiary, the third-party vendor invoices are paid by the Debtors when the inventory invoices are in United States Dollars.  The Irish non-Debtors subsidiary pays the Debtors on a monthly basis approximately $1,050,000 on account of the Intercompany Receivables and Shared Services, as further discussed below.  The Intercompany Receivables with the Irish non-Debtors subsidiary do not include mark-up fees.

47.    The Debtors purchase all of the inventory for the Canadian non-Debtor Subsidiary. The Intercompany Receivables with the Canadian non-Debtor Subsidiary are made at an intercompany mark-up to account for transfer and warehouse prices.  The Canadian non-Debtor Subsidiary pays the Debtors on a monthly basis approximately $250,000 on account of the Intercompany Receivables and Shares Services, as further discussed below.

48.    The Intercompany Receivables provide the non-Debtor foreign subsidiaries with much-needed inventory in an efficient matter, which in turn provides the Debtors with significantly greater geographic market access than they would otherwise be able to achieve absent their affiliate businesses.  During the chapter 11 cases, the Debtors expect that they may continue to purchase certain merchandise and goods from third-party vendors to be sold to their non-Debtor foreign subsidiaries.   As a result, the Debtors seek to continue the Intercompany Receivables on a postpetition basis in the ordinary course of their businesses.

### iv.   Shared Services

49.     As part of Debtors' business operations, the Debtors provide the Canadian non-Debtor Subsidiary with various services in a cost-effective and efficient manner (collectively, the "Shared Services").   Shared Services include marketing, technology support, management services, and payroll and financial support (including accounting, treasury, accounts payable, and accounts receivable), among others.   Pursuant to a management services agreement, the Canadian non-Debtor Subsidiary pays the Debtors on a monthly basis approximately $250,000 for the costs of the Shared Services and the Intercompany Receivables, as further discussed above.

50.     In addition to the Shared Services the Debtor provides to the Canadian non-Debtor Subsidiary pursuant to the Canadian management services agreement, the Debtors also pay one vendor for an accounting software system that is shared with the Irish non-Debtors subsidiary. The Debtors pay amounts to the vendor on a monthly basis.   Once the vendor is paid, the intercompany balance is concurrently recorded on the Debtors' and Irish non-Debtors subsidiary's books and records to reflect an amount that is owed from the Irish non-Debtors subsidiary to the applicable Debtor on account of the portion of the accounting software system that is applicable to the Irish non-Debtors subsidiary.   The Irish non-Debtors subsidiary pays the Debtors on a monthly basis approximately $1,050,000 on account of the Shared Services and the Intercompany Receivables, as further discussed above.

51.     The Shared Services and resultant intercompany charges are integral to the continued operation of Debtors' businesses, disruption of which would impose unnecessary costs and administrative burdens on the Debtors' estates.   As a result, the Debtors seek to continue the Shared Services and pay or otherwise settle any amounts related thereto on a postpetition basis.

**BASIS FOR RELIEF**

A.    **THE COURT SHOULD AUTHORIZE THE DEBTORS TO MAINTAIN THEIR EXISTING BANK ACCOUNTS AND USE THEIR EXISTING CASH MANAGEMENT SYSTEM AND MODIFY ANY REQUIREMENT TO CLOSE EXISTING ACCOUNTS**

52.    Although the Debtors maintain the Bank Accounts as part of an established Cash Management System, the *Operating Guidelines for Chapter 11 Cases* (the "U.S. Trustee Guidelines") require that the Debtors, as debtors in possession, take certain actions with respect to their prepetition Bank Accounts in order for the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") to supervise the administration of the chapter 11 cases. These requirements are designed to draw a clear line of demarcation between prepetition and postpetition transactions and operations and prevent the inadvertent postpetition payment of prepetition claims. The Debtors submit, however, that a modification of certain requirements is warranted.

53.    Specifically, the Debtors' Bank Accounts are held at JPMorgan Chase, which is a financially stable financial institution. To protect against the unauthorized payment of prepetition obligations, the Debtors represent that, if they are authorized to use the Bank Accounts, they will not pay, and the Bank will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court. The Debtors will provide the U.S. Trustee with notice of any new accounts.

54.    Enforcement of the U.S. Trustee's requirements without modification would significantly disrupt the Debtors' business. Indeed, as explained in more detail above, the Bank Accounts comprise an established Cash Management System that the Debtors must maintain to ensure collections and disbursements occur. The Debtors' Cash Management System allows the Debtors to centrally manage cash and includes the necessary accounting controls to enable the Debtors to trace funds through the system and ensure that all transactions are adequately

documented and readily ascertainable.  While the chapter 11 cases are pending, the Debtors will continue to maintain detailed records reflecting all transfers of funds.

55.    Accordingly, to avoid delays in payments to administrative creditors, to ensure a smooth transition into chapter 11, and to maximize the value of their estates, the Debtors submit that:  (a) they should be permitted to continue to maintain their existing Bank Accounts, open new accounts, and close existing accounts as needed; and (b) the requested relief should extend to any new accounts by providing that the new accounts are deemed to be Bank Accounts and are similarly subject to the rights, obligations, and relief granted by this Court.

56.    Both as part of the Motion and in other motions that have been concurrently filed, the Debtors are requesting authority to pay, in their discretion, certain prepetition obligations. With respect to certain of these obligations, the Debtors may have issued checks prior to the Petition Date that have yet to clear the banking system.  The Debtors intend to inform the Bank which such checks should be so honored.  Therefore, the Debtors request that the Banks be authorized and directed to rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored.  The Debtors further request that the Interim Order and the Final Order specify that the Banks shall not have any liability to any party for relying on such representations.  This relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular prepetition check may be honored in accordance with an order by the Court or otherwise.

57.    Allowing the Debtors to use their prepetition Cash Management System and engage in related "routine transactions" comports with applicable provisions of the Bankruptcy Code.  In particular, section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to "use

property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of this section is to provide a debtor with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court. *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.") (citations omitted); *In re Vision Metals, Inc.*, 325 B.R. 138, 145 (Bankr. D. Del. 2005) (same). The authority granted by section 363(c)(1) of the Bankruptcy Code extends to a debtor in possession's continued use of its customary cash management system and, thus, supports the relief requested. *See*, *e.g.*, *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (noting that courts have shown a reluctance to interfere in a debtor's making of routine, day-to-day business decisions) (citations omitted); *Vision Metals*, 325 B.R. at 142 ("[W]hen a Chapter 11 debtor-in-possession continues to operate its business, as permitted by section 1108, no court authorization is necessary for the debtor to enter transactions that fall within the ordinary course of its business.").

58.     To the extent that use of the existing Cash Management System falls outside the ordinary course of business, such use is permitted by sections 363(b)(1) and 105(a) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code further provides that this Court may "issue any order . . . that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. *Id.* § 105(a). As described herein, the continuation of the Cash Management System is necessary and appropriate and will allow the Debtors to

expeditiously carry out these chapter 11 cases, while still providing protections to the Debtors' creditors by ensuring that the Debtors' cash is used appropriately and in accordance with the applicable provisions of the Bankruptcy Code and this Court's orders.

**B.    MAINTAINING THE EXISTING CASH MANAGEMENT SYSTEM WILL NOT HARM PARTIES IN INTEREST**

59.    The Debtors' continued use of their Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies, expenses and distraction associated with disrupting this system and minimizing delays in the payment of postpetition obligations.    Parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including maintenance of the Bank Accounts.    The Debtors have developed and implemented appropriate mechanisms to ensure that Debtor entities will not make unauthorized payments for prepetition obligations.    Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments for prepetition debts without the prior approval of the Debtors' accounting department.    In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

**C.    AUTHORIZING THE DEBTORS TO CONTINUE USING DEBIT, WIRE, AND ACH TRANSFERS IS WARRANTED**

60.    The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check.    The Debtors conduct a large number of transactions on a daily basis through ACH transfers and other similar methods.    If the Debtors' ability to conduct transactions by debit, wire, ACH transfer, or other similar methods is impaired, the Debtors' day-to-day activities may be unnecessarily disrupted, and the estates will incur additional costs.    The Debtors maintain records of all electronic disbursements and are able to account for such payments the same as if they were made by check.

Therefore, the Debtors submit that authorizing the continuation of using debit, wire, and ACH transfers is warranted.

**D.**      **THE COURT SHOULD AUTHORIZE THE DEBTORS TO HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE CASH MANAGEMENT SYSTEM**

61.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors seek authority, in their discretion, to pay or reimburse the Bank in the ordinary course of business for any Bank Claims arising prior to, on, or after the Petition Date.

62.      Additionally, in most, if not all circumstances, the Bank would be entitled to setoff or recoup fees related to the Bank Accounts based on its account agreements with the Debtors or applicable law.  Thus, by authorizing the Debtors to pay or honor such prepetition obligations, the Court will enable the Debtors to normalize operations and avoid the disruption that would otherwise occur if the Bank Accounts were frozen pending payment or resolution of disputes regarding the priority of claims or rights of recoupment.

**E.**      **THE COURT SHOULD AUTHORIZE THE DEBTORS TO CONTINUE TO USE EXISTING BUSINESS FORMS AND CHECKS**

63.      To minimize expenses to their estates, the Debtors also seek authorization to continue using the Business Forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession.  Modifying existing Business Forms would be burdensome and expensive and would confer no corresponding benefit upon those dealing with the Debtors, most of whom, as noted above, will be aware of the commencement of these chapter 11 cases.  The Debtors therefore request authorization to use their existing Business Forms without adding a "Debtor in Possession" or similar legend.  The Debtors will obtain new check stock bearing the designation "Debtor in Possession" after depleting their current check stock.  To the extent that Business Forms and checks are prepared electronically, the Debtors will

add a "Debtor In Possession" designation to such Business Forms and checks within fourteen days of the Petition Date.

## F.   CAUSE EXISTS TO MODIFY CERTAIN REQUIREMENTS OF SECTION 345(b) OF THE BANKRUPTCY CODE

64.    Section 345(a) of the Bankruptcy Code authorizes a debtor in possession to make deposits or investments of estate money in a manner "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).  For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety, "unless the court for cause orders otherwise."  *Id.* § 345(b).  Alternatively, the debtor may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303.[15]  Additionally, under the U.S. Trustee Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at one or more authorized depositories.

65.    To the extent that the Cash Management System does not strictly comply with section 345 of the Bankruptcy Code, the Debtors seek a waiver of the deposit and investment requirements set forth therein for a 30-day period commencing upon entry of the Interim Order, without prejudice to the Debtors' right to seek further modifications or extensions of time.  Courts

---

[15]    Section 9303 of title 31 provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may instead provide an eligible obligation, designated by the Secretary of the Treasury, as an acceptable substitute for a surety bond.  31 U.S.C. § 9303.

may waive compliance with section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines for "cause."  In evaluating whether "cause" exists, courts have considered a number of factors, including:

(a)    the sophistication of the debtor's business;

(b)    the size of the debtor's business operations;

(c)    the amount of the investments involved;

(d)    the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor in possession funds are held;

(e)    the complexity of the case;

(f)    the safeguards in place within the debtor's own business for ensuring the safety of the funds;

(g)    the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(h)    the benefit to the debtor;

(i)    the harm, if any, to the debtor;

(j)    the harm, if any, to the estate; and

(k)    the reasonableness of the debtor's request for relief from section 345(b) of the Bankruptcy Code requirements in light of the overall circumstances of the case.

*In re Serv. Merch. Co., Inc*., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

66.    Here, these factors warrant a modification of the requirements of section 345 of the Bankruptcy Code to the extent the Cash Management System does not already strictly comply with its requirements.

67.    The Debtors' Bank Accounts comply with the requirements of section 345(b) of the Bankruptcy Code.  The Debtors' Bank Accounts are maintained at JP Morgan Chase, which the Debtors understand has executed a Uniform Depository Agreement with, and is designated as an authorized depository by, the U.S. Trustee, pursuant to the U.S. Trustee Guidelines.  Moreover,

the Debtors' active Bank Accounts are insured by the Federal Deposit Insurance Corporation. Thus, the Debtors believe that any funds that are deposited in these Bank Accounts are secure.

68.     The Debtors request that they be permitted to maintain their Bank Accounts in accordance with their existing practices, for a 30-day period commencing upon entry of the Interim Order, without prejudice to the Debtors' right to seek further modifications or extensions of time. Congress recognized that strict compliance with the requirements of section 345(b) of the Bankruptcy Code in large chapter 11 cases such as these is not only unnecessary, but may indeed be inconsistent with section 345(a) of the Bankruptcy Code, which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money."  Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause."  140 Cong. Rec. H10767 (daily ed. Oct. 4, 1994) (statement of Rep. Brooks).

## G.  THE COURT SHOULD AUTHORIZE THE DEBTORS TO CONTINUE INTERCOMPANY TRANSACTIONS AND GRANT ADMINISTRATIVE EXPENSE PRIORITY STATUS TO THE RELATED INTERCOMPANY CLAIMS

69.     The Bankruptcy Code affords debtors in possession the freedom to obtain unsecured credit and incur unsecured debt in the ordinary course of business without notice and a hearing.  *See* 11 U.S.C. § 364(a).  The Debtors seek authority, to the extent necessary, to obtain unsecured credit and incur unsecured debt in the ordinary operation of their Cash Management System, including in connection with Intercompany Transactions.[16]  If the Debtors cannot continue

---

[16]  Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like it, the Debtors submit that the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, to the extent the Debtors' continued payments made on behalf of non-Debtor affiliates pursuant to the Intercompany Transactions described above are outside of the ordinary course of business, the Debtors submit that such continued payments are justified by the circumstances.  The operations of the Company's non-Debtor subsidiaries are dependent on access to and participation in the Cash Management System.  Requiring the

the Intercompany Transactions, their ordinary-course operations would be unnecessarily and severely hindered.  Avoiding such hindrances by continuing the Intercompany Transactions is therefore in the best interests of the Debtors' estates.  Moreover, consistent with prepetition practice, the Debtors will track all fund transfers in their accounting system and will continue to be able to ascertain, trace and account for all Intercompany Transactions.

70.     Because these transactions represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System, the Debtors respectfully request the authority to continue conducting the Intercompany Transactions in the ordinary course of business without need for further Court order.

71.     Additionally, pursuant to sections 105(a) and 503(b) of the Bankruptcy Code, the Debtors request that any Intercompany Claims incurred in connection with Intercompany Transactions in the ordinary course of business be granted administrative expense priority status.  If the Intercompany Claims are accorded administrative expense priority status, each entity using funds that flow through the Cash Management System will continue to bear ultimate repayment responsibility for such ordinary-course transactions, thereby protecting the interests of the Debtors' creditors.

72.     The importance of continuing intercompany transactions and granting administrative expense status to postpetition intercompany transfers in large chapter 11 cases has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *iMedia Brands, Inc.,* No. 23-10852 (KBO) (Bankr. D. Del.

---

Company to extract its non-Debtor affiliates from the Cash Management System would create an unnecessary administrative and financial burden on the Debtors' estates, which would distract the Debtors, whose full attention is required to administer their chapter 11 cases during this critical time.  It would also negatively impact the Debtors' ability to operate as a going concern, as further discussed above.

Aug. 7, 2023) (granting administrative expense status to intercompany claims); *In re FB Debt Financing Guarantor, LLC*, No. 23-10025 (KBO) (Bankr. D. Del. Feb. 6, 2023) (same); *In re OSG Group Holdings, Inc.*, No. 22-10718 (JTD) (Bankr. D. Del. Aug. 29, 2022) (same); *In re Enjoy Technology, Inc.*, No. 22-10580 (JKS) (Bankr. D. Del. July 20, 2022) (same); *In re PWM Property Management LLC*, No. 21-11445 (MFW) (Bankr. D. Del. Dec. 1, 2021) (same); *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW) (Bankr. D. Del. Apr. 6, 2021) (same).[17]

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

73.    The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Bankruptcy Rule 6003; *In re First NLC Fin. Servs.*, *LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008).  The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the Third Circuit has instructed that irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial."  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  The Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

74.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate without interruption and to

---

[17]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## RESERVATION OF RIGHTS

75.    Nothing in this Motion:  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtors.  Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

76.    The Debtors will provide notice of this Motion to:  (a) United States Trustee for the District of Delaware, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the holders of the fifty (50) largest unsecured claims against the Debtors on a consolidated basis; (g) counsel to Antares Capital LP, as administrative agent, under the Debtors' First Lien Credit Agreement and the Debtors' Sidecar Credit Agreement,

King & Spalding LLP (Attn: Lindsey Henrikson and Matthew Warren, email: lhenrikson@kslaw.com and mwarren@kslaw.com); (h) counsel to Ares Capital Corporation, as administrative agent, under the Debtors' Second Lien Credit Agreement, Proskauer Rose LLP (Attn: David M. Hillman and Justin Breen, email: DHillman@proskauer.com and JBreen@proskauer.com); (i) banks and financial institutions where the Debtors maintain accounts; (j) the Authorities; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order and the Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and such other and further relief as may be just and proper.

Dated:  April 2, 2024
Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
Email: desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Cristine Pirro Schwarzman (*pro hac vice* pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com
         cristine.schwarzman@ropesgray.com

-and-

**ROPES & GRAY LLP**
Conor P. McNamara (*pro hac vice* pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail:  conor.mcnamara@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

**Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 ([___]) |
| Debtors. | (Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING**
**DEBTORS TO (A) CONTINUE TO OPERATE**
**THEIR CASH MANAGEMENT SYSTEM, (B) HONOR**
**CERTAIN PREPETITION OBLIGATIONS RELATED THERETO,**
**(C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) PERFORM CERTAIN**
**INTERCOMPANY TRANSACTIONS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for entry of this interim order (the "Order") and a final order: (i) authorizing the Debtors, in their discretion, to (a) continue to operate their Cash Management System, (b) pay any prepetition or postpetition amounts outstanding on account of the Bank Claims, (c) maintain existing Business Forms in the ordinary course of business, and (d) continue to perform Intercompany Transactions consistent with historical practice; and (ii) granting related relief, all as more fully set forth in the Motion; and upon consideration of the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of these

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

cases and this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      The final hearing on the Motion (the "Final Hearing") is set for _____ __, 2024 at __:__ a.m./p.m. (prevailing Eastern Time).  Any objections or responses to the entry of the proposed Final Order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____ ___, 2024 (the "Objection Deadline"), and shall be served on the following parties or their respective counsel on or before the Objection Deadline:  (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Gregg M. Galardi and Cristine Pirro Schwarzman, email: gregg.galardi@ropesgray.com and cristine.schwarzman@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Conor P. McNamara, email: conor.mcnamara@ropesgray.com); and Chipman Brown Cicero & Cole, LLP, Hercules Plaza, 1313 N. Market Street, Suite 5400, Wilmington, DE 19801 (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com); (b) the United States Trustee for the District of Delaware, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov

and Fang.Bu@usdoj.gov); (c)  counsel to Antares Capital LP, as administrative agent, under the

Debtors' First Lien Credit Agreement and the Debtors' Sidecar Credit Agreement, King &

Spalding LLP (Attn: Lindsey Henrikson and Matthew Warren, email: lhenrikson@kslaw.com and

mwarren@kslaw.com); (d) counsel to Ares Capital Corporation, as administrative agent, under the

Debtors' Second Lien Credit Agreement, Proskauer Rose LLP (Attn: David M. Hillman and Justin

Breen, email: DHillman@proskauer.com and JBreen@proskauer.com); and (e) counsel for any

statutory committee appointed in these chapter 11 cases.  If no objections or responses are filed

and served by the Objection Deadline, the Court may enter the Final Order without further notice

or hearing.

3.      The Debtors are authorized, but not directed, to maintain and use their current Cash

Management System existing as of the Petition Date subject to any modification provided herein.

| Interim Prepetition Cash Management Obligation | Approximate Amount Due and Payable on an Interim Basis |
|---|---|
| Chinese Management Fees | $165,000 |
| Corporate Card Program | $280,000 |
| Bank and Processor Claims | $150,000 |
| **Total** | **$595,000** |

4.      The Debtors are authorized to open new bank accounts or close any existing bank

accounts as they may deem necessary and appropriate in their discretion; *provided* that (a) the

Debtors shall give five days advance notice to the U.S. Trustee and any statutory committees

appointed in these chapter 11 cases, and (b) any new bank account shall be at a bank that has

executed a Uniform Depository Agreement with the U.S. Trustee for the District of Delaware, or

at such bank that is willing to immediately execute such an agreement.  The relief granted in this

Order is extended to any new bank account opened by the Debtors after the date hereof, which

account shall be deemed a Bank Account, and to the bank at which such account is opened.

5.      In each instance in which the Debtors hold an account at a Bank that is a party to a Uniform Depository Agreement with the U.S. Trustee, within 10 business days from the date of entry of this Order, the Debtors shall (a) contact the Bank; (b) provide the Bank with each of the Debtors' employer identification numbers; and (c) identify each of their accounts held at the Bank as being held by a debtor in possession and provide the case number.

6.      To the extent any Bank Accounts existing as of the Petition Date are not in compliance with section 345(b) of the Bankruptcy Code and any provision of the U.S. Trustee Guidelines, the Debtors shall have 30 days from the date of this Order (or such additional time to which the U.S. Trustee may agree) to either bring such Bank Accounts into compliance with section 345(b) of the Bankruptcy Code or to make such other arrangements as are agreed to by the U.S. Trustee or approved by the Court; *provided* that nothing in the foregoing shall prevent the Debtors or the U.S. Trustee from seeking further relief from the Court to the extent such an arrangement cannot be reached within that time period (or such other period as agreed to by the Debtors and the U.S. Trustee).  For banks at which the Debtors hold accounts that are not party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors shall use their good-faith efforts to cause the banks to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee within 15 days of the date of this Order.  The U.S. Trustee's rights to seek further relief from this Court on notice in the event that the aforementioned banks are unwilling to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee are fully reserved.

7.      The Bank Accounts are deemed debtor in possession accounts.  The Debtors are authorized to maintain and use the Bank Accounts in the same manner and with the same account numbers, styles, and document forms as those employed prior to the Petition Date, including, without limitation:  (a) to deposit funds in, and withdraw funds from, the Bank Accounts by all

usual means, including checks, wire transfers, ACH transfers, drafts, electronic fund transfers, and other debits or items presented, issued, or drawn on the Bank Accounts, (b) to pay ordinary course Bank Claims in connection with the Bank Accounts, including, subject to paragraph 10 of this Order, any Bank Claims arising prior to the Petition Date, and (c) to perform their obligations under the documents and agreements governing the Bank Accounts, including without limitation, any prepetition Cash Management System agreements or treasury services agreements, in each case subject to the terms of each applicable deposit account control agreement.

8.      Those certain existing deposit agreements between the Debtors and the Bank shall continue to govern the postpetition Cash Management System relationship between the Debtors and the Bank, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect.

9.      The Debtors are authorized pursuant to Section 364(b) of the Bankruptcy Code to continue using the Corporate Cards and P-Cards and to pay in the ordinary course of business any amounts owing prepetition or postpetition on account of the Corporate Cards and P-Cards.

10.      The Debtors are authorized to pay or reimburse their Bank and service providers, in the ordinary course of business for any Bank Claims arising prior to the Petition Date, up to $150,000 on an interim basis.

11.      Those agreements existing between the Debtors and the Banks as of the Petition Date shall continue to govern the postpetition cash management relationship between the Debtors and the Banks and all of the provisions of such agreements, including any termination, fee provisions, rights, benefits, collateral, and offset rights, and remedies afforded under such agreements shall remain in full force and effect absent further order of the Court or, with respect to any such agreement with the applicable Bank (including, for the avoidance of doubt, any rights

of a Bank to use funds from the Bank Accounts to remedy any overdraft of another Bank Account or other cash management obligations, whether prepetition or postpetition, to the extent permitted under the applicable agreement), unless the Debtors and such Bank agree otherwise, and any other legal rights and remedies afforded to the Banks under applicable law shall be preserved.

12.     The Banks are authorized and directed without the need for further order of this Court to in the ordinary course of business:  (a) continue to administer, service, and maintain, the Bank Accounts as such accounts were administered, serviced, and maintained prior to the Petition Date, without interruption and in the ordinary course; (b) receive, process, honor, and pay any and all checks, drafts, wires, ACH transfers, electronic fund transfers, payment orders, or other items presented, issued, or drawn on the Bank Accounts (collectively, the "Disbursements") on account of a claim, provided that the Debtors shall only instruct or request any Cash Management Bank to pay or honor any check, draft, ACH transfers, or electronic funds transfer, or other payment item issued on a Bank Account prior to the Petition Date but presented to such Cash Management Bank for payment after the Petition Date as authorized by an order of the Court; and (c) debit the Bank Accounts for:  (i) all undisputed prepetition bank and service fees outstanding as of the date hereof, if any, owed to the Banks for the maintenance of the Cash Management System; (ii) all checks drawn on the Debtors' Bank Accounts which were cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; and (iii) all checks or other items deposited in one of the Debtors' Bank Accounts at such Bank prior to the Petition Date, which have not been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the applicable Debtor was responsible for such items prior to the Petition Date.

13.     Subject to the provisions of this Order, the Banks are authorized to and shall rely on the representations of the Debtors as to which Disbursements are authorized to be honored or dishonored, whether or not such Disbursements are dated, drawn, or issued prior to, on, or subsequent to the Petition Date, and whether or not the Banks believe the payment is authorized by an order of the Court.  The Banks shall not be deemed in violation of this Order and shall have no liability for relying on such representations by the Debtors, without any duty of further inquiry, or honoring any Disbursement that is subject to this Order either (a) at the direction of the Debtors to honor such prepetition Disbursement, (b) in the good faith belief that this Court has authorized such prepetition Disbursement to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item-handling procedures.  To the extent that the Debtors direct that any Disbursement be dishonored or the Banks inadvertently dishonor any Disbursements, the Debtors may issue replacement Disbursements consistent with the orders of this Court.

14.     The Banks are further authorized to (a) honor the Debtors' directions with respect to the opening or closing of any Bank Account, and (b) accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions, and the Banks shall have no liability to any party for relying on such representations or instructions.

15.     To the extent any other order is entered by this Court authorizing the Banks to honor checks, drafts, ACH transfers, or other electronic funds transfers or any other withdrawals made, drawn, or issued in payment of prepetition claims, the obligation to honor such items shall be subject to this Order.

16.     The Debtors shall serve a copy of this Order on the Banks within five business days of the entry of this Order, and upon any bank at which the Debtors open a new bank account, immediately upon the opening of such new account.

17.     In connection with the ongoing use of their Cash Management System, the Debtors shall continue to maintain records with respect to all transfers of cash so that all transactions may be readily ascertained, traced, recorded properly, and distinguished between prepetition and postpetition transactions.  The Debtors and the Banks may agree, without further order of this Court, to implement any changes to the Cash Management System and procedures in the ordinary course of business and not inconsistent with this Order that they deem appropriate in their discretion, including, without limitation, closing any of the Bank Accounts or opening new bank accounts as set forth herein.

18.     The Debtors are authorized to continue to use their existing Business Forms without alteration or change and without the designation "Debtor in Possession" imprinted upon them; *provided*, *however*, once the Debtors' existing checks have been used, the Debtors shall, when reordering checks, require the designation "Debtor in Possession" and the corresponding bankruptcy case number on all checks; *provided further* that, with respect to checks which the Debtors or their agents print themselves, the Debtors shall begin printing the "Debtor in Possession" legend and the bankruptcy case number on such items within 14 days of the date of entry of this Order.

19.     The Debtors are authorized to continue engaging in Intercompany Transactions in the ordinary course of business including transferring funds through the Cash Management System.  The Debtors are authorized to make Intercompany Transfers of up to $165,000 to their foreign non-Debtor subsidiaries on an interim basis.  The Intercompany Claims arising postpetition in the ordinary course of business relating to the Intercompany Transactions shall have administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code.

20.     Notwithstanding the Debtors' use of a consolidated Cash Management System, the Debtors shall calculate quarterly fees payable under 28 U.S.C. § 1930(a)(6) based on the disbursements of (or on behalf of) each Debtor regardless of which entity actually makes such disbursements.

21.     Nothing in this Order nor any actions taken hereunder: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the discretion of the Debtors; or (e) except with respect to the Intercompany Transactions, shall create, or is intended to create, any rights in favor of, or enhance the status of any claim held by, any person. Any payment made pursuant to this Order is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

22.     The requirements of Bankruptcy Rule 6003 are satisfied.

23.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof and notice of the Motion as provided therein shall be deemed good and sufficient pursuant to the requirements of Bankruptcy Rule 6004(a) and the Local Rules.

24.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

25.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

26.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

## EXHIBIT B

**Final Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 ([___]) |
| Debtors. | (Jointly Administered) |

**FINAL ORDER (I) AUTHORIZING
DEBTORS TO (A) CONTINUE TO OPERATE
THEIR CASH MANAGEMENT SYSTEM, (B) HONOR
CERTAIN PREPETITION OBLIGATIONS RELATED THERETO,
(C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) PERFORM CERTAIN
INTERCOMPANY TRANSACTIONS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for entry of an interim order and this final order (the "Order"):  (i) authorizing the Debtors, in their discretion, to (a) continue to operate their Cash Management System, (b) pay any prepetition or postpetition amounts outstanding on account of the Bank Claims, (c) maintain existing Business Forms in the ordinary course of business, and (d) continue to perform Intercompany Transactions consistent with historical practice; and (ii) granting related relief all as more fully set forth in the Motion; and upon consideration of the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of these

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

cases and this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and

this Court having found that the relief requested in the Motion is in the best interests of the Debtors'

estates, their creditors, and other parties in interest; and this Court having found that the Debtors'

notice of the Motion and opportunity for a hearing on the Motion were appropriate under the

circumstances and no other notice need be provided; and this Court having reviewed the Motion

and having heard the statements in support of the relief requested therein at a hearing, if necessary,

before this Court (the "Hearing"); and this Court having determined that the legal and factual bases

set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and

upon all of the proceedings had before this Court; and after due deliberation and sufficient cause

appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, to maintain and use their current Cash

Management System existing as of the Petition Date subject to any modification provided herein.

| Final Prepetition Cash Management Obligation | Approximate Amount Due and Payable on a Final Basis |
|---|---|
| Chinese Management Fees | $495,000 |
| Corporate Card Program | $940,000 |
| Bank and Processor Claims | $462,000 |
| **Total** | **$1,897,000** |

3.      The Debtors are authorized to open new bank accounts or close any existing bank

accounts as they may deem necessary and appropriate in their discretion; *provided that* (a) the

Debtors shall give advance notice as soon as practicable to the U.S. Trustee and any statutory

committees appointed in these chapter 11 cases, and (b) any new bank account shall be at a bank

that has executed a Uniform Depository Agreement with the U.S. Trustee for the District of

Delaware, or at such bank that is willing to immediately execute such an agreement.  The relief

granted in this Order is extended to any new bank account opened by the Debtors after the date hereof, which account shall be deemed a Bank Account, and to the bank at which such account is opened.

4.      In each instance in which the Debtors hold an account at a Bank that is a party to a Uniform Depository Agreement with the U.S. Trustee, to the extent the Debtors did not previously do so following entry of the Interim Order, the Debtors shall as soon as possible (a) contact the Bank, (b) provide the Bank with each of the Debtors' employer identification numbers, and (c) identify each of their accounts held at the Bank as being held by a debtor in possession and provide the case number.

5.      The U.S. Trustee Guidelines are hereby modified such that the Debtors are not required to:  (a) close all existing bank accounts and open new debtor in possession accounts or (b) establish specific bank accounts for tax payments.

6.      The Bank Accounts are deemed debtor in possession accounts.  The Debtors are authorized to maintain and use the Bank Accounts in the same manner and with the same account numbers, styles, and document forms as those employed prior to the Petition Date, including, without limitation:  (a) to deposit funds in, and withdraw funds from, the Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, drafts, electronic fund transfers, and other debits or items presented, issued, or drawn on the Bank Accounts, (b) to pay ordinary course Bank Claims in connection with the Bank Accounts, including any Bank Claims arising prior to the Petition Date, and (c) to perform their obligations under the documents and agreements governing the Bank Accounts, including without limitation, any prepetition Cash Management System agreements or treasury services agreements, in each case subject to the terms of each applicable deposit account control agreement.

7.     Those certain existing deposit agreements between the Debtors and the Banks shall continue to govern the postpetition Cash Management System relationship between the Debtors and the Banks, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect.

8.     The Debtors are authorized pursuant to Section 364(b) of the Bankruptcy Code to continue using the Corporate Cards and P-Cards and to pay in the ordinary course of business any amounts owing prepetition or postpetition on account of the Corporate Cards and P-Cards.

9.     The Debtors are authorized to pay or reimburse their Banks and service providers, in the ordinary course of business for any Bank Claims arising prior to the Petition Date.

10.    Those agreements existing between the Debtors and the Banks as of the Petition Date shall continue to govern the postpetition cash management relationship between the Debtors and the Banks and all of the provisions of such agreements, including any termination, fee provisions, rights, benefits, collateral, and offset rights, and remedies afforded under such agreements shall remain in full force and effect absent further order of the Court or, with respect to any such agreement with the applicable Bank (including, for the avoidance of doubt, any rights of a Bank to use funds from the Bank Accounts to remedy any overdraft of another Bank Account or other cash management obligations, whether prepetition or postpetition, to the extent permitted under the applicable agreement), unless the Debtors and such Bank agree otherwise, and any other legal rights and remedies afforded to the Banks under applicable law shall be preserved.

11.    The Banks are authorized and directed without the need for further order of this Court to in the ordinary course of business:  (a) continue to administer, service, and maintain, the Bank Accounts as such accounts were administered, serviced, and maintained prior to the Petition Date, without interruption and in the ordinary course; (b) receive, process, honor, and pay any and

all checks, drafts, wires, ACH transfers, electronic fund transfers, payment orders, or other items presented, issued, or drawn on the Bank Accounts (collectively, the "Disbursements") on account of a claim; and (c) debit the Bank Accounts for:  (i) all undisputed prepetition bank and service fees outstanding as of the date hereof, if any, owed to the Banks for the maintenance of the Cash Management System; (ii) all checks drawn on the Debtors' Bank Accounts which were cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; and (iii) all checks or other items deposited in one of the Debtors' Bank Accounts with such Bank prior to the Petition Date, which have not been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the applicable Debtor was responsible for such items prior to the Petition Date.

12.     Subject to the provisions of this Order, the Banks are authorized to and shall rely on the representations of the Debtors as to which Disbursements are authorized to be honored or dishonored, whether or not such Disbursements are dated, drawn, or issued prior to, on, or subsequent to the Petition Date, and whether or not the Banks believe the payment is authorized by an order of the Court.  The Banks shall not be deemed in violation of this Order and shall have no liability for relying on such representations by the Debtors, without any duty of further inquiry, or honoring any Disbursement that is subject to this Order either (a) at the direction of the Debtors to honor such prepetition Disbursement, (b) in the good faith belief that this Court has authorized such prepetition Disbursement to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item-handling procedures.  To the extent that the Debtors direct that any Disbursement be dishonored or the Banks inadvertently dishonor any Disbursements, the Debtors may issue replacement Disbursements consistent with the orders of this Court.

13.     The Banks are further authorized to (a) honor the Debtors' directions with respect to the opening or closing of any Bank Account, and (b) accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions, and the Banks shall have no liability to any party for relying on such representations or instructions.

14.     To the extent any other order is entered by this Court authorizing the Banks to honor checks, drafts, ACH transfers, or other electronic funds transfers or any other withdrawals made, drawn, or issued in payment of prepetition claims, the obligation to honor such items shall be subject to this Order.

15.     The Debtors shall serve a copy of this Order on the Banks within five business days of the entry of this Order, and upon any bank at which the Debtors open a new bank account, immediately upon the opening of such new account.

16.     In connection with the ongoing use of their Cash Management System, the Debtors shall continue to maintain records with respect to all transfers of cash so that all transactions may be readily ascertained, traced, recorded properly, and distinguished between prepetition and postpetition transactions.  The Debtors and the Banks may agree, without further order of this Court, to implement any changes to the Cash Management System and procedures in the ordinary course of business and not inconsistent with this Order that they deem appropriate in their discretion, including, without limitation, closing any of the Bank Accounts or opening new bank accounts as set forth herein.

17.     The Debtors are authorized to continue to use their existing Business Forms without alteration or change and without the designation "Debtor in Possession" imprinted upon them; *provided, however,* once the Debtors' existing checks have been used, the Debtors shall, when reordering checks, require the designation "Debtor in Possession" and the corresponding

bankruptcy case number on all checks; *provided further* that, with respect to checks which the Debtors or their agents print themselves, the Debtors shall begin printing the "Debtor in Possession" legend and the bankruptcy case number on such items within 14 days of the date of entry of this Order.

18.     The Debtors are authorized to continue engaging in Intercompany Transactions in the ordinary course of business, including transferring funds through the Cash Management System.  The Debtors are authorized to make Intercompany Transfers of up to $165,000 per month to their foreign non-Debtor subsidiaries on a final basis.  The Intercompany Claims arising postpetition in the ordinary course of business relating to the Intercompany Transactions shall have administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code based upon net transfer accounting entries.

19.     Notwithstanding the Debtors' use of a consolidated Cash Management System, the Debtors shall calculate quarterly fees payable under 28 U.S.C. § 1930(a)(6) based on the disbursements of (or on behalf of) each Debtor regardless of which entity actually makes such disbursements.

20.     Nothing in this Order nor any actions taken hereunder:  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (c) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; (d) shall be construed as a promise to pay a claim or continue any applicable program postpetition, which decision shall be in the

discretion of the Debtors; or (e) except with respect to the Intercompany Transactions, shall create, or is intended to create, any rights in favor of, or enhance the status of any claim held by, any person.  Any payment made pursuant to this Order is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

21.     The requirements of Bankruptcy Rule 6003 are satisfied.

22.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof and notice of the Motion as provided therein shall be deemed good and sufficient pursuant to the requirements of Bankruptcy Rule 6004(a) and the Local Rules.

23.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

24.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

77.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

## __EXHIBIT C__

**Cash Management System Schematic**

March 2024

**BRG CORPORATE FINANCE**

# Shoes For Crews – CASH MANAGEMENT FLOWCHART



**INTELLIGENCE THAT WORKS**

# CASH MANAGEMENT FLOW CHART





**United States**

B2B

DTC [1] (Digital)

DTC [1] Storefront

Via payment processors [2]

Cash payments

Safe Dep. box

JPM Dep. ZBA 3871 (ORL)

JPM Dep. ZBA 6528 (LV)

JPM Master Depository x1022

JPM Payroll ZBA 0355

JPM Master Disb. ZBA 7195

Dormant account [3] — JPM Checking x3087

Certificate of Deposit [4] — x1986

Term Deposit account [5] — BOI (Europe) Ltd x1565

**EU & Canada**

B2B

DTC [1] (Digital)

Via payment processors [2]

JPM Canada x8365

BOI (Europe) Ltd x7593

BOI (Europe) Ltd x2252

"Controlled Accounts" restricted by Ares per May-23 Credit Facility.

BOI (Europe) Ltd. Disb. x2134

BOI (Europe) Ltd. Exempt x7303

BOI (Europe) Ltd. Exempt x9001

BOI (Europe) Ltd. Exempt x9002

**APAC**

B2B

DTC [1] (Digital)

Via payment processors [2]

ICMB (GZ) Co. Ltd. Op. x6002

DBS (SGD) PTE. LTD Op. x2330

CMB (GZ) Ltd Op. x0701

ICMB (GZ) Ltd. Op. x5954

CMB (GZ) Ltd. Capital x2902

*Notes:*
*(1): Includes Checks, Electronic Payments, and Credit Cards ("CC").*
*(2): Payment processors include Payment tech (Chase), PayPal, Afterpay, Braintree, American Express*
*(3): Dormant account. No balance or activity*
*(4): CD balance of $250,000 plus accrued interest*
*(5): Fixed Deposit Account. Used to secured EU bank activity, holds ~100,000 Euros.*

**Key:**

- Solid black line: Represents monetary transfer between accounts

- Black dotted line: Represents transfer between EU restricted and non- restricted accounts. **x7593 and x2252 can transfer to any of x7303, x9001, and x9002**

- Green dotted line: Represents transfer between entities

- Blue outline: Represents debtor accounts

**Currency:**

USD

EUR

GBP

CAD

SGD

RMB

2

# CASH MANAGEMENT NARRATIVE



**US / Debtor entities**
- **JPM Dep. ZBA 3871 (Orlando):** ZBA used to deposit cash received at Orlando store location. Cash is then transferred to Master Depository x1022.
- **JPM Dep. ZBA 6528 (Las Vegas):** ZBA used to deposit cash received at Las Vegas store location. Cash is then transferred to Master Depository x1022.
- **JPM Payroll ZBA 0355:** ZBA used to make fund payroll for United States entities. Account is funded by JPM Master Depository x1022. The Company's payroll processor (Paylocity) pulls automatically from this account.
- **JPM Master Dist. ZBA 7195:** ZBA used to make operating disbursements related to North American and EU / Canada entities including vendor payments related to shipping & manufacturing, professional services, insurance, utilities, leases, and taxes. ZBA also used to pay monthly service fee to APAC via x6002. Monthly service fee relates primarily to Salaries, Wages, and Benefits incurred in APAC entities, funded by United States entities. Approximate average monthly service fee amount as of February 2024 was $160,000.
- **JPM Checking x3087:** Account is dormant and hold no balance or operational use.
- **Certificate of Deposit x010-00709571986:** Certificate of Deposit held to collateralize the company credit card program. Balance of CD is $250,000 + accrued interest.

**EU & Canada / Non-Debtor entities**
- **JPM Canada x8365:** Account used to collect revenues from customers in Canada as well as make operational payments in Canada related to salaries, wages, and benefits, rent, and other general and administrative expenditures. Account also used to partially reimburse United States entity (x1022) for vendor payments made on behalf of Canadian entity for inventory and shipping. Monthly intercompany payments are made manually and are generally ~$250,000 but may fluctuate depending on cash available at Canadian entity.
- **BOI (Europe) Ltd. x7593 (EURO) and x2252 (GBP):** Account used to collect revenues from customers in Europe (Euro / GBP). Accounts also used to partially reimburse United States entity (x1022) for vendor payments made on behalf of European entity for inventory and shipping. Monthly intercompany payments are made manually and are generally ~$750,000 collectively across both accounts but may fluctuate depending on cash available at European entity.
  - These accounts are considered "restricted" per May-23 credit agreement with Ares. This means that they are eligible to be securitized in the event of default and their respective balances do not count toward Company liquidity in lender reporting for Ares. As such, funds are typically transferred out of these "restricted" accounts and to one of the "Exempt" accounts listed below (x7303, x9001, and x9002).
- **BOI (Europe) Ltd. x2134:** Account used to make operational payments for European entity related to operational payments in Europe including salaries, wages, and benefits. Account is funded by x7593.
- **BOI (Europe) Ltd Exempt x7303 (EUR), x9001 (GBP), and x9002 (USD)**
  - Accounts are not considered "restricted" per May-23 Ares credit agreement and count toward liquidity in lender reporting. As such, any excess funds above what is needed for operational disbursements and reimbursement to US entity are transferred here for holding.
  - Historically, no disbursements have been made from these accounts – they receive and transfer funds only to accounts x7593 and x2252.
  - Funds can be transferred directly from these funds to x1022, but this has not been done historically.

**APAC / Non-Debtor entities**
- **ICMB (GZ) Ltd. Capital x3902:** Account primarily used to receive capital infusion from the US (funds from the US must go through a "Capital" account per legislation in China. US manually wires GZ entity once per month to fund operations. GZ does not currently reimburse US entity for payments made on its behalf.
- **ICMB (GZ) Co. Ltd. x6002:** General account used to collect payments from customers & pay vendors in USD.
- **DBS (SGD) PTE. x2330:** Operating account used to collect revenues from customers and make operational disbursements in SGD.
- **CMB (GZ) Ltd. x0701:** Operating account used for all transactions including transferring funds and withdrawing cash. Account is used primarily for payroll and employee reimbursements in China.
- **ICMB (GZ) Ltd. x5954:** General account used to collect payments from customers & pay vendors RMB.

**Bank Key:**
- JPM - JPMorgan Chase
- CMB - China Merchants Bank
- DBS - DBS Bank
- BOI - Bank of Ireland

