## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 ([___]) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Never Slip Holdings, Inc. and its affiliated debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors")[2] in the above-captioned chapter 11 cases (these "Chapter 11 Cases"), by and through their undersigned proposed counsel, hereby submit this motion (this "Motion") pursuant to sections 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the District of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (896); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516). The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them either later in this Motion, in the First Day Declaration, or in the Interim Order, as applicable, and each as defined herein.

Delaware (the "Local Rules") for entry of interim and final orders granting the relief requested below. In support hereof, the Debtors rely on the *Declaration of Kyle Richter, Proposed Financial Advisor, in Support of Debtors' Motion to Obtain Postpetition Debtor in Possession Financing* (the "Richter Declaration") and the *Declaration of Tero Jänne, Proposed Investment Banker to the Debtors, in Support of the Debtors' Motion to Obtain Postpetition Debtor in Possession Financing* (the "Jänne Declaration"), both filed in connection herewith and incorporated herein for reference, and further represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors began marketing substantially all of the Company's assets prior to the filing of these Chapter 11 Cases with the support of the prepetition lenders. While the prepetition marketing process did not generate any actionable offers for the purchase of the Company's assets, the Debtors were able to reach an agreement with the Prepetition First Lien Lenders on the terms of a sale of all or substantially all of the Debtors' assets, subject to a bidding process to ensure that the Debtors receive the highest or otherwise best offer for those assets. With the assistance of their advisors, the Debtors are actively working to finalize an asset purchase agreement for the proposed transaction in the very near-term. Consistent with the milestones set forth herein, the Debtors anticipate filing a motion to approve the bidding process within five (5) calendar days of the Petition Date.

2.      The DIP Facility is a superpriority priming senior secured multiple draw term loan facility providing for new funds in the amount of $30 million,[3] of which up to an aggregate principal amount of $20 million would be made available upon entry of an interim order. The Debtors require immediate access to this additional liquidity to continue operations and preserve

---

[3]     In addition, the DIP Facility provides for $800,000 of outstanding letter of credit obligations to be rolled into the DIP LC Facility.

the Debtors' going-concern value during the sale process. It is also critically important that the Debtors are sufficiently funded during the Chapter 11 Cases to address concerns raised by their parties in interest, including employees, customers, wholesale partners, and vendors. The DIP Credit Facility, if approved, would allow the Debtors to secure postpetition financing and utilize Cash Collateral in conformance with the Bankruptcy Code, allowing the Debtors to continue operating and ensuring payments to employees, third-party vendors, utilities, taxing authorities, and insurance companies, as well as the timely payment of administrative expenses. Moreover, as evidenced by the marketing process for the DIP Credit Facility, the DIP is the only, and therefore the best, financing available to the Debtors.

3.    The sale process, the DIP Credit Facility, and the consensual use of Cash Collateral provide the Debtors with a smooth landing into these Chapter 11 Cases and a viable path forward through the continuation of a sales process that will maximize the value of the Debtors' assets for the benefit of all creditors. For these reasons, and for the reasons set forth herein, the Debtors respectfully request that the Court grant the relief requested.

<b>JURISDICTION AND VENUE</b>

4.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. Pursuant to Local Rule 9013-1(f), of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Chapter 11 Cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003 and 9014, and Local Rule 4001-2.

## RELIEF REQUESTED

7.      The Debtors respectfully request entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"):

(i)      authorizes the Debtor designated as "Borrower" under, and as defined in, the DIP Credit Agreement (as defined below) (the "Borrower") to obtain, and Never Slip Holdings, Inc. (the "Parent") and the other guarantors (the "DIP Guarantors") under the DIP Loan Documents (as defined below) to unconditionally guaranty, jointly and severally, the Borrower's obligations in respect of, senior secured priming and superpriority postpetition financing, which if approved on a final basis would consist of (x) a letter of credit facility for up to $800,000 (the "DIP LC Facility"), (y) a term loan facility for up to $30,000,000 (the "DIP Term Loan Facility" and the "new money" term loans extended thereunder, the "DIP Term Loans" and, together with the Roll Up DIP Facility (as defined below) and the DIP LC Facility, the "DIP Facility" and loans extended under the DIP Facility, including the Letters of Credit (as defined in the DIP Credit Agreement) and the Roll Up DIP Loans (as defined below), the "DIP Loans"), of which an initial amount of $20,000,000 will be made available upon entry of the Interim Order, pursuant to the terms of (x) this Interim Order, (y) that certain Senior Secured Priming and Superiority Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "DIP Credit Agreement"),[4] by and among the Borrower, the DIP Guarantors, Antares Capital LP, as administrative agent and collateral agent (in such capacity, and as administrative agent and collateral agent under the Roll Up DIP Facility, collectively, the "DIP Agent"), and the other financial institutions party to the DIP Credit Agreement as "Lenders" under, and as defined in, the DIP Credit Agreement (together with the Roll Up DIP Lenders (as defined below), collectively, the "DIP Lenders," and together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "DIP Secured Parties"), and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement, and

---

[4]    Unless otherwise specified herein, all capitalized terms used herein without definition shall have the respective meanings given to such terms in the DIP Credit Agreement.

together with the DIP Credit Agreement, collectively, the "DIP Loan Documents"), to: (A) fund, among other things, ongoing working capital, general corporate expenditures and other financing needs of the Debtors, (B) subject to entry of a Final Order (as defined below), convert on a cashless basis up to $83,831,822 of the outstanding principal amount of the Loans under the Prepetition First Lien Credit Agreement and up to $6,168,178 of the outstanding principal amount of the Loans under the Prepetition Sidecar Credit Agreement in connection with the DIP Term Loans to DIP Obligations under the DIP Loan Documents, as provided in such Final Order (the holders of such rolled up Prepetition First Lien Obligations, the "Roll Up DIP Lenders," and the administrative agent and collateral agent for the Roll Up DIP Lenders, the "Roll Up DIP Agent," and together with the Roll Up DIP Lenders, collectively, the "Roll Up DIP Secured Parties," and such converted Prepetition First Lien Obligations, the "Roll Up DIP Loans," and such credit facility, the "Roll Up DIP Facility"), (C) pay certain adequate protection amounts to the Prepetition First Lien Secured Parties (as defined below) as described below, (D) pay certain transaction fees and other costs and expenses of administration of the Cases, and (E) pay certain fees and expenses (including accrued and unpaid reasonable and documented attorneys' fees and expenses) and interest owed to the DIP Secured Parties under the DIP Loan Documents and this Interim Order;

(ii)     approving the terms of, and authorizing the Debtors to execute and deliver, and perform under, the DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Interim Order;

(iii)    granting, subject to the Carve-Out in all respects, (x) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (as defined below) and shall be junior solely to the Carve-Out and any valid, enforceable and non-avoidable Liens that are (A) in existence on the Petition Date (as defined below), (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition First Liens (as defined below) after giving effect to any applicable intercreditor or subordination agreement (all such Liens, collectively, the "Prepetition Prior Liens") and (y) to the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including, upon entry of this Interim Order, any proceeds of actions brought under section 549 of the Bankruptcy Code, and upon entry of the Final Order, the proceeds of Avoidance Actions (as defined below);

(iv)     authorizing the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including Cash Collateral in which the Prepetition First Lien Secured Parties (as defined below) or the DIP

Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise;

(v)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(vi)    authorizing the Borrower at any time prior to the earlier of thirty-five (35) calendar days from the Petition Date and the entry of the Final Order to borrow under the DIP Facility in an aggregate outstanding principal amount that will not exceed $20,000,000, and authorizing the DIP Guarantors to unconditionally guaranty such obligations jointly and severally;

(vii)    granting the Prepetition First Lien Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition First Lien Adequate Protection (as defined below), which consists of, among other things, and solely to the extent of any diminution in value, First Lien Adequate Protection Liens (as defined below), First Lien Adequate Protection Superiority Claims (as defined below), the Roll Up DIP Facility, and current payment of accrued and unpaid prepetition and postpetition reimbursable fees and expenses;

(viii)    granting the Prepetition Second Lien Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition Second Lien Adequate Protection (as defined below), which consists of, among other things, and solely to the extent of any diminution in value, Second Lien Adequate Protection Liens (as defined below) and Second Lien Adequate Protection Superpriority Claims (as defined below);

(ix)    authorizes the Debtors to (a) fund the Debtors' CIT Payment (as defined below) to partially satisfy the obligations owing to CIT under the CIT Factoring Agreement into the Escrow Account (as defined below) and (b) pay the Debtors' CIT Payment to CIT;

(x)    scheduling a final hearing on the DIP Motion (the "Final Hearing") to consider entry of a final order that grants all of the relief requested in the DIP Motion on a final basis (the "Final Order" and, together with the Interim Order, the "DIP Orders");

(xi)    upon entry of the Final Order, certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code; and

(xii)    providing for the immediate effectiveness of this Interim Order and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

**BACKGROUND**

## I.  CHAPTER 11 CASES

8.      On the date hereof (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committee of unsecured creditors has been appointed.

9.      Founded in 1984, the Debtors, together with their non-Debtor subsidiaries (collectively, the "<u>Company</u>"), are the leading business-to-business brand and category creator of slip resistant footwear and other safety products for employers, employees, and individual consumers.  The Company has a highly diverse and loyal customer base and sells its products to businesses, including restaurants, supermarkets, hotels, casinos, manufacturers, healthcare institutions, and food service companies, as well as directly to end users.  The Company offers its customers purpose-built branded and proprietary private label products at competitive prices that use patented outsole technology to prevent fall-related workplace injuries.

10.      Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

## II.  PREPETITION INDEBTEDNESS

11.      As of the Petition Date, the Debtors have approximately $480 million of funded principal debt obligations, consisting of obligations under the Prepetition First Lien Credit

Agreement, the Sidecar Credit Agreement, the Prepetition Second Lien Credit Agreement, the

Irish Credit Agreement, and the CIT Factoring Facility (each as defined below).

       12.     The following table details the Company's prepetition capital structure (as of the

Petition Date) with respect to their funded debt[5]:

---

[5]   The following summary of the Debtors' prepetition funded indebtedness is qualified in its entirety by reference to the applicable provisions of the relevant prepetition debt documents.

| Instrument | Approx. Balance ($mm) | Rate | Security |
|---|---|---|---|
| Prepetition First Lien Credit Facility | $282.2 | SOFR + 5.25%/ ABR + 4.25% | any and all property of any loan party subject (or purported to be subject) to a lien under any collateral document and any and all other property of any loan party, now existing or hereafter acquired, that is or becomes subject (or purported to be subject) to a lien pursuant to any collateral document to secure the secured obligations |
| Prepetition Sidecar Credit Facility | $20.8 | SOFR + 4.00%/ ABR + 3.00% | any and all property of any loan party subject (or purported to be subject) to a lien under any collateral document and any and all other property of any loan party, now existing or hereafter acquired, that is or becomes subject (or purported to be subject) to a lien pursuant to any collateral document to secure the obligations |
| Prepetition Second Lien Credit Facility | $147.3 | SOFR + 12.29%/ ABR + 11.29% | any and all property of any loan party subject (or purported to be subject) to a lien under any collateral document and any and all other property of any loan party, now existing or hereafter acquired, that is or becomes subject (or purported to be subject) to a lien pursuant to any collateral document to secure the secured obligations |

| Instrument | Approx. Balance ($mm) | Rate | Security |
|---|---|---|---|
| Irish Credit Facility | $19.9 | SOFR + 5.25%/ ABR + 4.25% | all property of the loan parties, now owned or hereafter acquired, upon which a lien is purported to be created by any security document; provided, that notwithstanding anything to the contrary in this agreement, any security document or any other loan documents, the exempt accounts, and any moneys, cash, cash and/or cash equivalents on deposit or otherwise held in the exempt accounts, (a) shall not constitute collateral, (b) shall constitute "excluded assets" (as such term is defined in the collateral agreement) and (c) shall be unrestricted under any and all circumstances |

| Instrument | Approx. Balance ($mm) | Rate | Security |
|---|---|---|---|
| CIT Factoring Facility | $8.2 | Highest of (i) Chase Prime Rate + 1.00% and 5.5% (on daily debit balances in Funds in Use account) | (a) present and future accounts and related property including, without limitation, any and all instruments, documents, chattel paper (including electronic chattel paper) and any other supporting obligations owing to you related to accounts; (b) unpaid seller's rights (including rescission, repossession, replevin, reclamation and stoppage in transit) related to accounts; (c) rights to any inventory represented by the foregoing, including returned goods in relation to accounts; (d) reserves and credit balances arising under the CIT Factoring Agreement; (e) guarantees, collateral, supporting obligations and letter of credit rights with respect to accounts; (f) general intangibles (including all payment intangibles and all other rights to payment) related to accounts; (g) cash and non-cash proceeds of the foregoing; and (h) books and records evidencing or pertaining to the foregoing. |

**A.    Prepetition First Lien Credit Facility**

13.    On October 27, 2015, Debtor SHO Holding I Corporation (the "Borrower") entered into that certain Loan and Security Agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition First Lien Credit Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Loan Documents"), among SHO Holding I Corporation, as Borrower, the

guarantors party thereto, the other financial institutions party thereto as "Lenders" (collectively, the "Prepetition First Lien Lenders") and Antares Capital LP, as administrative agent and collateral agent (in such capacities, the "Prepetition First Lien Agent" and, collectively with the Prepetition First Lien Lenders, the "Prepetition First Lien Secured Parties")). Pursuant to the Prepetition First Lien Loan Documents, the Prepetition First Lien Lenders agreed to extend loans and other financial accommodations to the Borrower. The Prepetition First Lien Lenders provided an initial term loan of $233.0 million, which was subsequently increased by $25.0 million as per the second amendment to the Prepetition First Lien Credit Agreement, resulting in a total of $242.9 million principal amount currently outstanding under the Prepetition First Lien Loan Documents.

14.    Each of Never Slip Holdings, Inc., SHO Holding I Corporation, SHO Holding II Corporation, Shoes For Crews, Inc., SFC Holdings, Inc., Shoes for Crews Canada, Ltd., SFC Holdings, LLC, Shoes for Crews, LLC, SRS/MKS, L.L.C., SFC Canada, Inc., and Sunrise Enterprises, LLC (collectively, the "Prepetition First Lien Guarantors") and the Prepetition First Lien Agent are party to the First Lien Loan Guarantee dated October 27, 2015 (the "Prepetition First Lien Guarantee"). Pursuant to the Prepetition First Lien Guarantee, each of the Prepetition First Lien Guarantors has agreed to pay any amount of principal, interest, costs, expenses, or other amounts owed under or in connection with the Prepetition First Lien Credit Agreement that has not been fully and irrevocably paid by the Borrower. The obligations under the Prepetition First Lien Credit Agreement are secured by substantially all of the assets of each of the Borrower and Prepetition First Lien Guarantors. The liens securing the obligations under the Prepetition First Lien Credit Agreement are *pari passu* with the liens securing obligations under the Prepetition Sidecar Credit Agreement.

15.     On June 29, 2023, the Company entered into a fifth amendment to the Prepetition First Lien Credit Agreement, which replaced the LIBOR interest rate with SOFR.  The interest rate on the Prepetition First Lien Credit Facility was 5.25% per annum for SOFR loans and 4.25% per annum for ABR loans  as of the Petition Date.

16.     On December 8, 2023, the Company entered into a Forbearance Agreement and a sixth amendment to the Prepetition First Lien Credit Agreement (the "Prepetition First Lien Forbearance Agreement") due to certain that had occurred, were continuing to occur, or were anticipated to occur.  Pursuant to the Prepetition First Lien Forbearance Agreement, the Company had requested, and the lenders had agreed to, forbear from exercising their default-related rights and remedies during the Forbearance Period (as defined in the Prepetition First Lien Forbearance Agreement).

17.     On January 31, 2024, the Company entered into the first amendment to the Prepetition First Lien Forbearance Agreement and a seventh amendment to the Prepetition First Lien Credit Agreement, extending the interest payment date for all accrued and unpaid interest due on or before January 31, 2024, to February 16, 2024.

18.     On February 16, 2024, the Company entered into a second amendment to the Prepetition First Lien Forbearance Agreement and an eighth amendment to the Prepetition First Lien Credit Agreement, extending the interest payment date for all accrued and unpaid interest due on or before January 31, 2024, to March 25, 2024.

19.     On March 4, 2024, the Company entered into a third amendment to the Prepetition First Lien Forbearance Agreement and a ninth amendment o the Prepetition First Lien Credit Agreement, extending the interest payment dates for all accrued and unpaid interest due on or before January 31, 2024, to March 4, 2024.

20.     On March 25, 2024, the Forbearance Period expired after the Debtors and the Prepetition First Lien Lenders were unable to reach an agreement on the terms of an extension of the Forbearance Period.  As of December 31, 2023, none of the defaults had been cured.

21.     All borrowings under the Prepetition First Lien Credit Facility mature on April 27, 2024.  As of the Petition Date, approximately $282.2 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the Prepetition First Lien Credit Facility.

22.     On December 31, 2023, the Company issued one standby letter of credit to an insurance company for $0.8 million.

**B.      Sidecar Credit Facility**

23.     On October 31, 2019, the Borrower entered into that certain Credit Agreement (as amended, restated, supplemented, amended and restated, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Sidecar Credit Agreement" and, collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Sidecar Loan Documents"), among SHO Holding I Corporation, as Borrower, the guarantors party thereto, the other financial institutions party thereto as "Lenders" (collectively, the "Prepetition Sidecar Lenders") and Antares Capital LP, as administrative agent and swingline lender (in such capacities, the "Prepetition Sidecar Agent" and, together with the Prepetition Sidecar Lenders, the "Prepetition Sidecar Secured Parties")).  Pursuant to the Prepetition Sidecar Loan Documents, the Prepetition Sidecar Lenders (a) agreed to extend credit in the form of a revolving facility with an available amount of $20.0 million to the Borrower, and (b) agreed to convert certain interest payments due under the Prepetition Sidecar Credit Agreement into term loans in the amount of approximately $354,000.

14

24.     Each of Never Slip Holdings, Inc., SHO Holding II Corporation, Shoes For Crews, Inc., SFC Holdings, Inc., Shoes for Crews Canada, Ltd., SFC Holdings, LLC, Shoes for Crews, LLC, SRS/MKS, L.L.C., SFC Canada, Inc., and Sunrise Enterprises, LLC (the "Prepetition Sidecar Guarantors") and the Prepetition Sidecar Agent are party to the Loan Guarantee dated October 31, 2019, as amended, restated, amended and restated, modified or otherwise supplemented from time to time (the "Sidecar Guarantee").  Pursuant to the Sidecar Guarantee, each of the Prepetition Sidecar Guarantors has agreed to guarantee payment of any amount of principal, interest, costs, expenses, or other amounts owed under or in connection with the Prepetition Sidecar Credit Agreement that has not been fully and irrevocably paid by the Borrower. The obligations under the Prepetition Sidecar Credit Agreement are secured by substantially all of the assets of each of the Borrower and Prepetition Sidecar Guarantors on a *pari passu* basis with the liens securing obligations under the Prepetition First Lien Credit Agreement.

25.     On July 1, 2023, the Company entered into a second amendment to the Prepetition Sidecar Credit Agreement, which replaced LIBOR interest rates with SOFR.  The interest rate on the Prepetition Sidecar Credit Facility was 4.00% per annum for SOFR loans and 3.00% per annum for ABR loans as of the Petition Date.

26.     The Prepetition Sidecar Credit Facility has a stated maturity date of April 27, 2024. As of the Petition Date, approximately $20.8 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the Prepetition Sidecar Credit Facility.

C.     **Prepetition Second Lien Credit Facility**

27.     On October 27, 2015, the Borrower entered into that certain Loan and Security Agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition Second Lien Credit Agreement" and, collectively, with any other agreements and documents executed or delivered in connection

therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Loan Documents"), among SHO Holding I Corporation, as Borrower, the guarantors party thereto, the other financial institutions party thereto as "Lenders" (collectively, the "Prepetition Second Lien Lenders") and Ares Capital Corporation, as administrative agent and collateral agent (in such capacities, the "Prepetition Second Lien Agent" and, collectively with the Prepetition Second Lien Lenders, the "Prepetition Second Lien Secured Parties" and, together with the Prepetition First Lien Secured Parties and the Prepetition Sidecar Secured Parties, the "Prepetition Secured Parties"). Pursuant to the Prepetition Second Lien Loan Documents, the Prepetition Second Lien Lenders agreed to extend loans for an aggregate principal amount of $100 million to the Borrower.

28.     Each of SHO Holding II Corporation, Shoes For Crews, Inc., SFC Holdings, Inc., SFC Holdings, LLC, SFC Canada, Inc., Shoes for Crews, LLC, SRS/MKS, L.L.C., and Sunrise Enterprises, LLC (the "Prepetition Second Lien Guarantors") and the Prepetition Second Lien Agent are party to the Second Lien Loan Guarantee dated October 27, 2015 (the "Prepetition Second Lien Guarantee"). Pursuant to the Prepetition Second Lien Guarantee, each of the Prepetition Second Lien Guarantors has agreed to pay any amount of principal, interest, costs, expenses, or other amounts owed under or in connection with the Prepetition Second Lien Credit Agreement that has not been fully and irrevocably paid by the Borrower. The obligations under the Prepetition Second Lien Credit Agreement are secured by substantially all of the assets of each of the Borrower and Prepetition Second Lien Guarantors. Pursuant to the Intercreditor Agreement dated October 27, 2015 by and between the Prepetition First Lien Lenders and Prepetition Second Lien Lenders (the "First Lien/Second Lien ICA"), the secured obligations under the Prepetition

Second Lien Credit Agreement are subordinate to the liens securing obligations under the Prepetition First Lien Credit Agreement and the Prepetition Sidecar Credit Agreement.

29.     On May 16, 2023, the Company entered into a third amendment to the Prepetition Second Lien Credit Agreement providing for an applicable interest rate of 9.29% for ABR loans and 10.29% for LIBOR rate loans; provided, that for each interest payment date occurring after the third amendment in which the Company pays in-kind any portions of interest, the applicable rate increases by 100 basis points from each interest payment date.

30.     On June 29, 2023, the Company entered into a fourth amendment to the Prepetition Second Lien Credit Agreement in order to replace LIBOR interest rates with SOFR.

31.     On December 8, 2023, the Company entered into a Forbearance Agreement and a fifth amendment to the Prepetition Second Lien Credit Agreement (the "Prepetition Second Lien Forbearance Agreement") due to certain defaults that had occurred, were continuing to occur, or were anticipated to occur.  Pursuant to the Prepetition Second Lien Forbearance Agreement, which expired on March 25, 2024, the Company is subject to an ongoing forbearance fee of 0.25% of the outstanding amount of loans under the Prepetition Second Lien Credit Facility that is fully earned and non-refundable upon each 30-day anniversary of November 15, 2023.  As of December 31, 2023, none of the current defaults have been cured.

32.     The Prepetition Second Lien Credit Facility and all relating borrowings are secured by all assets of the Company, which act as collateral.  The liens under the Prepetition Second Lien Credit Agreement are subordinate to the liens under the Prepetition First Lien Credit Agreement and Prepetition Sidecar Credit Agreement.  The Prepetition Second Lien Credit Facility has a stated maturity date of October 27, 2024.  Interest on outstanding amounts under the Prepetition Second Lien Credit Facility was 12.29% per annum for SOFR loans and 11.29% per annum for

ABR loans as of the Petition Date. As of the Petition Date, approximately $147.3 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the Prepetition Second Lien Credit Facility.

> **D.    Irish Credit Facility**

34.    On May 16, 2023, the Company's European subsidiary, Shoes For Crews (Europe) Limited (the "Prepetition Irish Borrower") entered into that certain Loan and Security Agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition Irish Credit Agreement," and, collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Irish Loan Documents"), among the Irish Borrower, the other financial institutions party thereto as "Lenders" (collectively, the "Prepetition Irish Lenders") and Ares Capital Corporation, as administrative agent and collateral agent (in such capacities, the "Prepetition Irish Agent").  Pursuant to the Irish Loan Documents, the Irish Lenders agreed to extend credit to the Irish Borrower in the form of an initial loan for an aggregate principal amount of $13.0 million and a delayed draw term loan commitment of $5.0 million.  The obligations under the Irish Credit Agreement are secured by the assets of the Irish Borrower except as to Exempt Accounts (as defined in the Irish Credit Agreement) and any moneys, cash, and/or cash equivalents on deposit or otherwise held in the Exempt Accounts (as defined in the Irish Credit Agreement).

35.    On December 8, 2023, the Company entered into a Forbearance Agreement and a first amendment to the Irish Credit Agreement (the "Prepetition Irish Forbearance Agreement") due to Current Defaults that have occurred and are continuing to occur and are anticipated to occur. Due to the Irish Forbearance Agreement, the Company is subject to an ongoing forbearance fee of

0.25% of the outstanding amount of loans under the Irish Credit Facility that is fully earned and non-refundable upon each 30-day anniversary of November 15, 2023.  As of December 31, 2023, none of the current defaults have been cured.

36.    The Irish Credit Facility has a stated maturity date of April 27, 2024, but that maturity date is automatically extended to the same date of any extension of the Initial First Lien Credit Facility maturity date.  The interest rate on the Irish Credit Facility was 5.25% per annum for SOFR loans and 4.25% per annum for ABR loans as of the Petition Date.  As of the Petition Date, approximately $19.9 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the Irish Credit Facility.

### E.    CIT Factoring Facility

37.    On November 15, 2018, the Company entered into a Non-Notification Factoring Agreement (as amended, restated, supplemented, amended and restated or otherwise modified from time to time prior to the Petition Date, the "CIT Factoring Agreement", and together with the Prepetition First Lien Loan Documents, the Prepetition Sidecar Loan Documents, and the Prepetition Second Lien Loan Documents, the "Prepetition Secured Documents") to sell and assign accounts, including such accounts arising from or related to sales of inventory or rendition of services, to The CIT Group/Commercial Services, Inc. ("CIT").

38.    Under this arrangement, CIT assumes no risk of nonpayment and holds recourse back to the Company if payment is not made on any account.  In addition, the Company continues to service these accounts for invoicing and collection and remits the payments to CIT once received.  The Company pays a factoring fee of 0.50% of the gross face amount of the accounts factored with CIT.  Interest is charged on outstanding advances at a rate equal to the greater of 1% plus the Chase Prime Rate or 5.5% per annum.  The CIT Factoring Agreement is guaranteed by Don't Slip Inc., an affiliate of CCMP Capital Investors III, L.P. and CCMP Capital Investors III

(Employee), L.P. (collectively, "CCMP") with a cash pledge in the amount of $8.5 million.  As of the Petition Date, approximately $8.1 million in aggregate principal amount and accrued but unpaid interest remains outstanding on the CIT Factoring Facility.

39.    Immediately prior to the Petition Date, the Debtors, the Prepetition First Lien Secured Parties, Prepetition Sidecar Lenders, the Prepetition Second Lien Lenders, the Prepetition Irish Lenders, and CCMP entered into a restructuring support agreement (the "Restructuring Support Agreement") whereby each of the aforementioned parties agreed to support the restructuring and recapitalization transactions set forth in the term sheets annexed thereto.  Among other things, the Restructuring Support Agreement provides for the infusion of $30 million in debtor in possession financing, a sales process with a committed stalking horse bidder, and agreement among key stakeholders regarding the treatment of the Prepetition Irish Facility and the CIT Facility.  With respect to the CIT Facility, the Restructuring Support Agreement provides for the funding of the CIT Escrow Account, as further set forth herein.

## RELIEF REQUESTED

## I.    THE DEBTORS' URGENT AND IMMEDIATE LIQUIDITY NEEDS

40.    In anticipation of their need for debtor in possession financing and the use of Cash Collateral,[6] the Debtors have, in consultation with Berkeley Research Group, LLC ("BRG"), performed a review and analysis of their projected cash needs.  Based upon that review and analysis, the Debtors and their advisors determined that the use of cash collateral alone would be

---

[6]    As discussed in greater detail in the First Day Declaration and the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions; and (II) Granting Related Relief*, filed contemporaneously herewith, the Debtors operate a complex cash management system including a total of twenty (20) bank accounts (the "Accounts"), which are held at JPMorgan Chase Bank.  Without the ability to access cash in their Accounts, the Debtors will not be able to continue operations in the ordinary course of business.  Such cessation would detrimentally impact the value of the enterprise, including critical relationships with vendors and thousands of the Debtors' customers.

insufficient to operate their businesses, and that additional funding was necessary.  The Debtors

are in need of both access to Cash Collateral and an immediate infusion of liquidity to ensure

sufficient working capital to operate their businesses, pay their employees and vendors, service

their customers, administer their estates during the Chapter 11 Cases, and fund the sale process.

Richter Decl. ¶ 6.  BRG undertook a detailed analysis of the Debtors' operations and funding

needs, and, from this review and analysis, it became clear that the Debtors would require an

infusion of capital to operate during these Chapter 11 Cases as they conduct their marketing

process.  *Id*. at ¶ 8.

41.    Without prompt access to postpetition financing and Cash Collateral, the Debtors

would be unable to:  (a) ensure payments to employees, third-party vendors, utilities, taxing

authorities, and insurance companies, among others, who provide the essential services needed to

operate, maintain, and insure the Debtors' assets; (b) ensure the timely payment of administrative

expenses to be incurred; (c) provide a positive message to the market that these Chapter 11 Cases

are sufficiently funded and that the sale process will be adequately robust, which is critical to

ensure confidence in the Debtors from, among others, their customers, employees, and vendors;

and (d) make any necessary payments to preserve the value of the Debtors' brand in the United

States and other countries and to preserve the value of the foreign non-debtor subsidiaries.  *Id*. ¶

7.  Immediate access to the DIP Credit Facility and continued access to the Cash Collateral is

therefore crucial to the Debtors' efforts to preserve value for their stakeholders during these

Chapter 11 Cases and to avoid immediate and irreparable harm to the Debtors' estates.  *Id.*

42.    In furtherance of their cash needs, the Debtors and BRG prepared the Initial Budget

(attached as Exhibit 1 to the Interim Order) outlining the funding that would be critical in the initial

thirteen (13) weeks post-filing, with such budget to be updated pursuant to the terms of the DIP

Credit Agreement and the Interim Order.  *Id.* at ¶ 8.  Based on information available as of the Petition Date, the Debtors believe that the Initial Budget, as will be updated, is an accurate reflection of their initial funding requirements and will allow them to meet their obligations in these Chapter 11 Cases.  *Id*.  The Debtors also believe, and therefore submit, that the Initial Budget is fair, reasonable, and appropriate under the circumstances.  *Id*.

## II.    ALTERNATIVE SOURCES OF FINANCING ARE NOT AVAILABLE ON BETTER TERMS

### A.    THE MARKETING PROCESS

43.    Prior to the commencement of these Chapter 11 Cases, on June 26, 2022, the Debtors retained Solomon Partners Securities, LLC ("Solomon") to act as the Debtors' exclusive investment banker in connection with, among other things, a prepetition marketing process for a sale of substantially all of the Debtors' assets as well as a marketing process for the Debtors' proposed debtor in possession financing facility. Jänne Decl. ¶ 9.  The Debtors did not receive any indications of interest during the marketing process sufficient to clear the Debtors' funded indebtedness.  *Id*. at ¶ 10.  As of the Petition Date, 49 potentially interested purchasers were contacted and over 36 parties executed non-disclosure agreements ("NDAs") and received the confidential information memorandum (the "CIM").  Of the parties that executed NDAs, 11 submitted indications of interest, 6 of which ultimately submitted letters of intent to purchase the Debtors' business.  Each of the letters of intent came in at a purchase price short of the face value of the Debtors' secured debts. *Id*..

44.    Obtaining access to third-party postpetition financing was difficult because all or nearly all of the Debtors' assets are encumbered under the existing capital structure, which, along with the Debtors' approximately $480.0 million of prepetition funded indebtedness, restricts the availability of, and options for, postpetition financing.  *Id*. at ¶ 11.  To avoid a protracted and

expensive priming fight, which the Debtors could not afford, the Debtors and their advisors believed that their only alternatives were to:  (a) obtain the consent of the Prepetition Secured Parties to the priming of their liens by a third-party lender; (b) locate a third-party lender willing to provide postpetition financing on a junior or unsecured basis; or (c) find lenders willing to refinance out the Prepetition Secured Parties and provide incremental liquidity, which they did not expect to find due to the results of the prepetition sale marketing process.  *Id.*  In addition, because the prepetition sale process did not yield any indications of interest sufficient to clear the debt, the Debtors believe that there is not an equity cushion available for the Debtors to obtain debtor in possession financing that would enable the priming of the Prepetition Secured Parties' liens over their objections.  *Id.*

45.    Notwithstanding the foregoing considerations, Solomon contacted a handful of well-known, potential third-party debtor in possession ("DIP") financing providers, including certain parties contacted in connection with the November 1, 2023 financing process, in anticipation of a Chapter 11 filing.  *Id.* at ¶ 12.  Solomon reached out to 18 potential third-party financing sources as part of a new debt financing to facilitate the restructuring of the Debtors' debt obligations. *Id.* at ¶ 10.  During this process, none of the financing sources contacted by Solomon indicated a willingness to provide financing in an amount required by the Debtors to facilitate a refinancing of even the Debtors' first lien debt obligations.  *Id.* at ¶ 12.  None of the third-party DIP financing sources that Solomon reached out to demonstrated any interest in pursuing a potential financing. Due to the Debtors' financial position and their existing leveraged capital structure, the Debtors were unable to find any interested third-party financing parties.  *Id.*  In addition, any senior financing that does not include the consent of the Prepetition Secured Parties would have required non-consensual priming.  Neither the Prepetition First Lien Lenders nor the

Prepetition Second Lien Lenders was willing to consent to a third-party financing that would prime their liens. *Id.* For the foregoing reasons, the Debtors, in consultation with Solomon, determined that reaching out to additional third-party financing sources would be fruitless and unlikely to result in any financing proposals. *Id.* As a result, under these circumstances, there is no better financing available to the Debtors other than the DIP Credit Facility. *Id.*

### B. THE DIP CREDIT FACILITY HAS BEEN HEAVILY NEGOTIATED

46. The Debtors' management team and legal and financial advisors were actively involved throughout the negotiations with the DIP Lenders for debtor in possession financing, which were conducted at arm's length and in good faith. Richter Decl. ¶ 9. The terms of the DIP Credit Facility were negotiated for several weeks leading up to the Petition Date, with the Debtors and their advisors exchanging multiple drafts of the term sheet for the DIP Credit Facility as well as each of the DIP Documents. *Id.* The Debtors and their advisors worked to negotiate the most favorable terms of the DIP Credit Facility available to the Debtors given the Debtors' lack of alternative third-party financing. *Id.* Ultimately, the DIP Lenders were unwilling to lend on terms other than those specifically set forth in the DIP Documents. *Id.*

### B. THE RATES AND FEES OF THE DIP CREDIT FACILITY ARE REASONABLE

47. Pursuant to the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders. Jänne Decl. ¶ 13. Specifically, the Debtors have agreed to an interest rate of: (a) for the New Money DIP Loans that are SOFR loans, 8.00% per annum and (ii) ABR loans, 7.00% per annum; and (b) for the Roll Up DIP Loans that are (i) SOFR loans, 6.00% per annum and (ii) ABR loans, 5.00% per annum (together, the "Applicable Rate"). *Id.* Upon the occurrence and during the continuation of a DIP Event of Default, interest would accrue at (i) in the case of over principal or overdue interest on

any loan, 2.00% plus the Applicable Rate; and (ii) in the case of any other amount, 2.00% plus the Applicable Rate for ABR loans plus the Alternate Base Rate.[7]  *Id.*  In addition, the Debtors have agreed to pay to the DIP Lenders the:  (i) Commitment Fee; (ii) Unused Commitment Fee; (iii) Seasoning/Fronting Fee; and (iv) Administrative Agency Fee, all as defined and further discussed below (collectively, the "DIP Fees").  *Id.*

48.    The Applicable Rate and the DIP Fees provided for in the DIP Credit Facility are reasonable under the circumstances as compared to similar debtor in possession financings in the market as well as the attendant interest rates and fees in comparable debtor in possession financing facilities.  *Id.* at ¶ 14.  The Applicable Rate and DIP Fees are customary, usual, and in line with debtor in possession financings of this kind.  *Id.*  The Debtors and their advisors considered the Applicable Rate and the DIP Fees when determining whether the DIP Credit Facility constituted the best alternative reasonably available to the Debtors.  *Id.*  As a result, the Debtors' payment of the Applicable Rate and DIP Fees in order to obtain the DIP Credit Facility is in the best interests of the estates.

49.    The Debtors and the DIP Lenders agree that the terms, covenants, interest rates, and fees were subject to negotiation and are an integral component of the overall terms of the DIP Credit Facility.  *Id.* at ¶ 14.  Under the Debtors' circumstances, the interest rates and fees reflected in the DIP Credit Agreement are reasonable and constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund their Chapter 11 Cases, and are an integral component of the overall terms of the DIP Credit Facility.  *Id.*

---

[7]    "Alternate Base Rate" means, for any day, a rate per annum equal to the highest of (a) the Federal Funds Effective Rate in effect on such day plus 0.50%, (b) to the extent ascertainable, Adjusted Term SOFR (which rate shall be calculated based upon an Interest Period of one month in effect on such day) plus 1.00% (c) the Prime Rate and (d) 2.00%.

### C.    THE MILESTONES THAT THE DEBTORS MUST MEET UNDER THE TERMS OF THE DIP CREDIT FACILITY ARE REASONABLE

50.    The DIP Credit Facility contemplates, as a product of negotiation with and as required by the DIP Lenders as a condition to providing the DIP Credit Facility, certain milestones that the Debtors must meet throughout their Chapter 11 Cases (the "Milestones"), the failure of which would constitute an event of default under the DIP Credit Agreement and Restructuring Support Agreement.  These Milestones were heavily negotiated and required by the DIP Lenders as conditions to providing the DIP Credit Facility. Richter Decl. ¶ 10

51.    The DIP Credit Facility serves as an important component of these Chapter 11 Cases because it provides the Debtors with the stability and certainty that they need to smoothly land into chapter 11 and continue to operate in the ordinary course of business, all while facilitating and hopefully consummating a sale of their business as a going concern.  *Id.* at 10.  The continued and viable operation of the Debtors' businesses would not be possible absent access to the DIP Credit Facility.  *Id.*  The DIP Credit Facility, and the Debtors' ability to achieve the milestones contemplated therein, if approved, would prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, of the Debtors' businesses, and enable the Debtors to facilitate the sale process and consummate the Sale Transaction.  *Id.*

## III.    MATERIAL TERMS OF THE DIP CREDIT FACILITY[8]

52.    The following chart contains a summary of: (i) the material terms of the DIP Credit Facility; and (ii) use of the Prepetition Secured Parties' Cash Collateral, each with references to

---

[8]    The following summary of the DIP Credit Facility is qualified in its entirety by reference to the applicable provisions of the relevant DIP Documents or the Interim Order, as applicable.  To the extent there are any inconsistencies between this summary and the provisions of the DIP Documents or the Interim Order, the

the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), and Local Rule 4001-2.

| SUMMARY OF MATERIAL TERMS OF THE DIP CREDIT FACILITY | | |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | SHO Holding I Corporation | DIP Credit Agmt. Preamble |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each of the Debtors (other than the Borrower) | DIP Credit Agmt. Sch. § 1.01 |
| **Administrative Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Antares Capital LP | DIP Credit Agmt. Sch. Preamble |
| **Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Antares Capital LP | DIP Credit Agmt. Sch. Preamble |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | (a) each Lender with a New Money Initial DIP Commitment (defined below) severally and not jointly agrees to lend to the Borrower (A) on the Closing Date, upon satisfaction of the conditions set forth in the DIP Credit Agreement, a term loan in a principal amount not to exceed its pro rata share of $20,000,000 (the "New Money Initial DIP Borrowing"; the Commitment to make the New Money Initial DIP Loan hereunder, such Lender's "New Money Initial DIP Commitment" (which, as of the Closing Date, shall be in the amount set forth adjacent such Lender's name under a heading of the same title on Schedule 1.01(a)). Amounts borrowed under subsection 2.01(a) are also referred to as the "New Money Initial DIP Loan." Amounts borrowed as a New Money Initial DIP Loan which are repaid or prepaid may not be reborrowed. The Borrower hereby (x) represents, warrants, agrees, covenants and reaffirms that it has no defense, right of set off, claim or counterclaim against the Administrative Agent and the Lenders with regard to its Obligations in respect of the New Money Initial DIP Loan and (y) reaffirms its obligation to repay the New Money Initial DIP Loan in accordance with the terms and provisions of this Agreement, the other Loan Documents, and the DIP Orders. Upon the borrowing of any New Money Initial DIP Loan under the New Money Initial DIP Commitment, such Commitment shall be deemed permanently reduced to $0.00.  Unless previously terminated, the New Money Initial DIP Commitments | DIP Loan Agmt. § 2.01, Sch. 1.01(a) |

provisions of the Interim Order or the DIP Documents, as applicable, shall control.  Any capitalized terms used but not otherwise defined in this summary shall have the respective meanings ascribed to such terms in the DIP Documents or the Interim Order, as applicable.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2 herein.

shall automatically terminate after the Closing Date; (b) each Lender with a New Money DIP Commitment (defined below) severally and not jointly agrees to lend to the Borrower, upon satisfaction of the conditions set forth in the DIP Credit Agreement, a term loan in a principal amount equal to the remaining unfunded balance of the New Money DIP Commitments (each, a "New Money DIP Borrowing", and together with the New Money Initial Dip Borrowing, the "New Money DIP Borrowings" and the date on which the New Money DIP Borrowing is made, the "New Money DIP Borrowing Date"). The Commitment to make the New Money DIP Loans hereunder constitutes such Lender's "New Money DIP Commitment" (which, as of the Closing Date, shall be in the amount set forth adjacent such Lender's name under a heading of the same title on Schedule 1.01(a)). Amounts borrowed are also referred to as the "New Money DIP Loans." Amounts borrowed as a New Money DIP Loan which are repaid or prepaid may not be reborrowed. The Borrower hereby (x) represents, warrants, agrees, covenants and reaffirms that it has no defense, right of set off, claim or counterclaim against the Administrative Agent and the Lenders with regard to its Obligations in respect of the New Money DIP Loans and (y) reaffirms its obligation to repay the New Money DIP Loans in accordance with the terms and provisions of this Agreement, the other Loan Documents, and the DIP Orders. Upon the borrowing of any New Money DIP Loans or New Money DIP LC Term Loan under the New Money DIP Commitment such Commitment shall be deemed permanently reduced to $0.00; (c) each Lender with a New Money DIP LC Commitment (defined below) (each such lender, a "New Money DIP LC Lender") severally and not jointly agrees to fund to the Administrative Agent for distribution to the Issuing Bank, upon satisfaction of the conditions set forth in Section 4.02, its pro rata share of any LC Disbursement. Each New Money DIP LC Lender shall be deemed to have made a term loan to the Borrower equal to its pro rata share of such LC Disbursement (such term loan, the "New Money DIP LC Term Loan" and the date on which the New Money DIP LC Term Loan is made, the "New Money DIP LC Borrowing Date"). The Commitment to make the New Money DIP LC Commitment hereunder constitutes such Lender's "New Money DIP LC Commitment" (which, as of the Closing Date, shall be in the amount set forth adjacent such Lender's name under a heading of the same title on Schedule 1.01(a)). Amounts borrowed as a New Money DIP LC Term Loan which are repaid or prepaid may not be reborrowed. The Borrower hereby (x) represents, warrants, agrees, covenants and reaffirms that it has no defense, right of set off, claim or counterclaim against the Administrative Agent and the Lenders with regard to its Obligations in respect of the New Money DIP LC

| | | |
|---|---|---|
| | Term Loans and (y) reaffirms its obligation to repay the New Money DIP LC Term Loans in accordance with the terms and provisions of this Agreement, the other Loan Documents, and the DIP Orders. The New Money DIP LC Commitment of each Lender shall be reduced by the amount funded hereunder and shall be terminate on the day prior to the DIP Termination Date. Upon the borrowing of any New Money DIP LC Term Loans under the New Money DIP LC Commitment, such Commitment shall be deemed permanently reduced by the amount of such New Money DIP LC Term Loan. | |
| **Provisions Deeming Prepetition Debt To Be Postpetition Debt** Local Rule 4001- 2(a)(i)(O) | Each Lender identified on <u>Schedule 1.01(a)</u> as having a "Roll-Up DIP Loan Amount" shall, upon the occurrence of the Roll-Up DIP Effective Time, in the Final DIP Order, be deemed to have converted a portion of such Lender's Loans as defined under the Prepetition First Lien Credit Agreement held as of the Petition Date equal to its Roll-Up DIP Loan Amount, without constituting a novation and such amounts shall be deemed borrowed hereunder on such date and shall satisfy and discharge such Loans under the Prepetition First Lien Credit Agreement held by such Lender (collectively, the "<u>Roll-Up DIP Loans</u>"). The Borrower hereby (x) represents, warrants, agrees, covenants and reaffirms that it has no defense, right of set off, claim or counterclaim against the Administrative Agent and the Lenders with regard to its Obligations in respect of the Roll-Up DIP Loans and (y) reaffirms its obligation to repay Roll-Up DIP Loans in accordance with the terms and provisions of this Agreement, the other Loan Documents and the DIP Orders; | DIP Credit Agmnt § 2.01 |
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(M) | All DIP Obligations will be due and payable in full in cash unless otherwise agreed to by the DIP Lenders on the earliest of (i) the date that is one-hundred fifty (150) calendar days after the Petition Date, (ii) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code, (iii) if the Final Order has not been entered, the date that is thirty (30) calendar days after the Petition Date, (iv) the acceleration of the DIP Loans and the termination of the New Money DIP Commitments upon the occurrence of an event referred to below under "Termination", and (v) the Effective Date (as defined below) (any such date, the "<u>DIP Termination Date</u>"). Principal of, and accrued interest on, the DIP Loans and all other amounts owing to the DIP Agent and/or the DIP Lenders under the DIP Facility shall be payable on the DIP Termination Date. | DIP Credit Agmt. § 1.1 |
| **Use of Proceeds** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(L) | The proceeds of the DIP Credit Facility shall be used solely for the following purposes, subject in all cases to the Approved Budget: <br><br> (i)    pay related transaction costs, interest, fees, payments and expenses with respect to the DIP Credit Facility; | DIP Credit Agmt. § 5.11; Interim Order § 15 |

|  |  |  |
|---|---|---|
|  | (ii) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of the Chapter 11 Cases;<br><br>(iii) fund the Carve-Out;<br><br>(iv) fund the Escrow Account; and<br><br>(v) fund the costs of the administration of these Chapter 11 Cases and the consummation of the Sale Transaction.<br><br>No Cash Collateral or proceeds of the DIP Loans shall be used by any Debtor, directly or indirectly, to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the DIP Credit Agreement or the other DIP Documents, or in any manner that would violate applicable sanctions, anti-money laundering laws, or anti-corruption laws. |  |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(B) | <u>**Interest Rate**</u>:<br>(i) for the Roll Up DIP Loans that are SOFR loans, 8.00% per annum and (ii) ABR loans, 7.00% per annum; (ii) or the New Money DIP Loans that are (i) SOFR loans, 6.00% per annum and (ii) ABR loans, 5.00% per annum<br><br><u>**Default Interest Rate**</u>:<br>(i) in the case of over principal or overdue interest on any loan, 2.00% plus the Applicable Rate; and (ii) in the case of any other amount, 2.00% plus the Applicable Rate for ABR loans plus the Alternate Base Rate. | DIP Credit Agmt. § 2.13 |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(B) | <u>**Commitment Fee**</u><br>5.00% of the New Money DIP Commitment<br><br><u>**Unused Commitment Fee**</u><br>2.00% of the New Money DIP Commitment<br><br><u>**Seasoning/Fronting Fee**</u><br>$250,000<br><br><u>**Administrative Agency Fees**</u>:<br>$50,000 | DIP Credit Agmt. § 2.12 |
| **Priority, Collateral Under the DIP Credit Facility**<br>Bankruptcy Rule 4001(c)(1)(B)(i),<br>4001(c)(1)(B)(ii) | To secure the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, 363, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected postpetition security interests in and liens (collectively, the "<u>DIP Liens</u>") on the DIP Collateral. | DIP Credit Agmt. § 2.26; Interim Order ¶¶ 3-4 |

| | | |
|---|---|---|
| | "DIP Collateral" means, collectively, (i) all accounts, (ii) chattel paper; (iii) commercial tort claims; (iv) all securities accounts, all deposit accounts, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession or under the control of any agent or any lender or any affiliate, representative, agent or participant of any agent or any lender, (v) all documents, (vi) general intangibles (including, without limitation, all payment intangibles, intellectual property and licenses, (vii) all goods, including, without limitation, all equipment, fixtures and inventory, (viii) instruments (including, without limitation, promissory notes), (ix) investment property, (x) letter-of-credit rights, (xi) pledged interest, (xii) all supporting obligations, (xiii) all other tangible and intangible personal property of such Loan Party (whether or not subject to the Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Loan Party described herein (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Loan Party in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Loan Party or any other Person from time to time acting for such Loan Party that at any time evidence or contain information relating to any of the property described in the preceding clauses of herein or are otherwise necessary or helpful in the collection or realization thereof, (xiv) present and future claims or causes of action, including avoidance actions or proceeds thereof under, inter alia, Sections 542, 544, 545, 547, 548, 549, 550, 552 and 553 of the Bankruptcy Code, subject to entry of the Final DIP Order; (xv) all proceeds, products and accessions with respect to any of the foregoing DIP Collateral. | |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii)<br>Local Rule 4001-2(a)(i)(F) | The Interim Order provides a "Carve-Out" of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code, appointed in these Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code, including a Pre Carve-Out Trigger Notice Cap and a Post Carve Out Trigger Notice Cap, all as defined and detailed in the Interim Order | Interim Order § 7 |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | **Adequate Protection Liens**:<br>Solely to the extent of any Diminution in Value, from and after the Petition Date, resulting from the use, sale, or lease by the Debtors of the applicable Prepetition First Lien Collateral (including Cash Collateral), the granting | Interim Order §§ 3-4 |

of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition First Liens thereto and to the Carve-Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code, the Prepetition First Lien Agents, for the benefit of all the Prepetition First Lien Secured Parties, are hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "First Lien Adequate Protection Liens"), which First Lien Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition First Liens and the Carve-Out.

**Adequate Protection Superpriority Claim**:
To the extent of any Diminution in Value, the Prepetition Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "First Lien Adequate Protection Superpriority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, junior only to the DIP Superpriority Claims and the Carve-Out to the extent provided herein and in the DIP Loan Documents, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions); provided, however, that the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the First Lien Adequate Protection Superpriority Claims or Second Lien Adequate Protection Superpriority Claims unless and until all DIP Obligations (including, subject to entry of the Final Order, the Roll Up DIP Obligations) have been Paid in Full (as defined below). Subject to the relative priorities set forth above, the First Lien Adequate Protection Superpriority Claims or Second Lien Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis. For purposes of this Interim Order, the terms "Paid in Full," "Repaid in Full," "Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations, Prepetition First Lien Obligations, or Prepetition Second Lien Obligations, (i) the indefeasible payment in full in cash of such obligations, (ii) the termination or cash collateralization, in accordance with the DIP Loan Documents, Prepetition First Lien Loan Documents, or Prepetition Second Lien Loan

|  | Documents, as applicable, of all undrawn letters of credit outstanding thereunder, and (iii) the termination of all credit commitments under the DIP Loan Documents, the Prepetition First Lien Loan Documents, or the Prepetition Second Lien Loan Documents, as applicable; provided, however, that the First Lien Adequate Protection Superpriority Claims granted to the Prepetition First Lien Secured Parties may be impaired pursuant to any chapter 11 plan of reorganization in the Cases with the vote of the applicable class of the holders of such claims that satisfies the requirements of section 1126 of the Bankruptcy Code, in which case, Paid in Full (or any of the other variants of this phrase referenced above) would occur upon consummation of such plan.<br><br>**Adequate Protection Payments**:<br>Without limiting any rights of the Prepetition First Lien Agents and the other Prepetition First Lien Secured Parties under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a requirement, for obtaining the consent of the Prepetition First Lien Secured Parties to the entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall pay or reimburse in cash the Prepetition First Lien Agents for any and all fees, costs, expenses, and charges (including the reasonable and documented fees, costs, and expenses of counsel and financial advisors for the Prepetition First Lien Agents) to the extent, and at the times, payable under the Prepetition First Lien Loan Documents, including any unpaid fees, costs and expenses accrued prior to the Petition Date; provided that, such fees, costs, expenses, and charges shall be subject to the terms of the Prepetition First Lien Loan Documents and Paragraph 20(b) of the Interim Order; provided, further, that any reimbursement of post-petition fees, costs and expenses under the Prepetition First Lien Credit Agreement shall be reapplied to reduce the principal amount of the Prepetition First Lien Obligations to the extent this Court determines in a final, non-appealable order that the Prepetition First Lien Secured Parties are not entitled to such payment or reimbursement pursuant to section 506(b) of the Bankruptcy Code. |  |
|---|---|---|
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br>Local Rule 4001-2(a)(i)(H) | Each of Holdings and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document have been paid in full in cash, each of Holdings and the Borrower shall and shall cause each of the Subsidiaries to ensure that each of the milestones set forth below is achieved in accordance with the applicable timing referred to below (or such later dates as may be approved in writing by the Required Lenders in their reasonable discretion): | DIP Credit Agmt. § 5.16 |

(a) Immediately following the Petition Date, the marketing process related to the Debtors' Sale shall be initiated.

(b) No later than five (5) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order authorizing and approving, on an interim basis, the DIP Facility (including the Commitments, all documents and lender fees related thereto, and the payment of the fees and expenses of the Administrative Agent's and Prepetition First Lien Agent's advisors.

(c) No later than five (5) calendar days after the Petition Date, the Debtors shall file a motion (the "Sale Motion"), in form and substance acceptable to the Administrative Agent and the Required Lenders, requesting (x) an order from the Bankruptcy Court (the "Bid Procedures Order") (i) approving the proposed bid procedures attached to the Sale Motion related to the sale of substantially all of the assets of the Debtors (the "Bid Procedures"), and (y) an order from the Bankruptcy Court (the "Sale Order") approving the sale of the Debtors' assets to the highest and best bidder for such assets pursuant to Section 363 of the Bankruptcy Code (the "Sale") determined in accordance with the Bid Procedures.

(d) No later than 35 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order authorizing and approving, on a final basis, the DIP Facility (including the Commitments, all documents and lender fees related thereto, and the payment of the fees and expenses of the Administrative Agent's and Prepetition First Lien Agent's advisors.

(e) No later than 35 calendar days after the Petition Date, the Debtors shall have obtained the Bid Procedures Order, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

(f) No later than 45 days after the Petition Date, the Debtors shall have completed an auction, as necessary, in connection with the Sale in accordance with the Bid Procedures Order.

(g) No later than 50 days after the Petition Date, in the discretion of the Administrative Agent at the direction of the Required Lenders, the Bankruptcy Court shall have entered a final order approving a Sale.

| | | |
|---|---|---|
| **Loan Covenants**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(B) | The DIP Documents contain affirmative covenants that are customary and appropriate for debtor in possession financings of this type, including, but not limited to: (i) financial statements and other reports; (ii) existence; (iii) payment of taxes; (iv) maintenance of properties; (v) insurance; (vi) inspections; (vii) maintenance of books and records; (viii) compliance laws; (ix) environmental; (x) use of proceeds; (xi) bankruptcy covenants; (xii) chapter 11 cases; (xiii) cash management; (xiv) budget matters.<br><br>The DIP Documents also contain negative covenants that are customary and appropriate for debtor in possession financings of this type, including, but not limited to: (i) limitation on indebtedness; (ii) limitation on liens; (iii) negative pledges; (iv) limitation on sale of assets; (iv) limitation on restricted payments; (v) certain other financial covenants; (vi) sale leasebacks; (vii) amendments of junior debt documents; (viii) prepayment of other indebtedness; and (ix) repayment of indebtedness. | DIP Credit Agmt. §§ 5, 6 |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(M) | Events of Default include:<br><br>(a) Failure to make Payments When Due. Failure by the Borrower to pay (i) any installment of principal of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Loan or any fee or any other amount due hereunder within five Business Days after the date due; or<br><br>(b) Default in Other Agreements. (i) Failure by any Loan Party or any of its Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in clause (a) above or under the Prepetition Credit Agreements) with an aggregate outstanding principal amount exceeding the Threshold Amount, in each case beyond the grace period, if any, provided therefor; or (ii) breach or event of default by any Loan Party or any of its Subsidiaries with respect to any other term of one or more items of Indebtedness with an aggregate outstanding principal amount exceeding the Threshold Amount, if the effect of such breach or event of default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, such Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; provided, that any failure described under clause (i) or (ii) above is unremedied and is not waived by the holders of | DIP Credit Agmt. § 7 |

such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Article 7; or

(c) Breach of Certain Covenants.  Failure of any Loan Party, as required by the relevant provision, to perform or comply with any term or condition contained in Section 2.26, Section 5.01(a), (b), (c), (d) or (e)(i), Section 5.02 (as it applies to the preservation of the existence of the Borrower), Section 5.14, Section 5.16, or Article 6; or

(d) Breach of Representations, Etc.  Any representation, warranty or certification made or deemed made by any Loan Party in any Loan Document or in any certificate required to be delivered in connection herewith or therewith (including, for the avoidance of doubt, any Perfection Certificate and any Perfection Certificate Supplement) being untrue in any material respect as of the date made or deemed made; or

(e) Other Defaults Under Loan Documents.  Default by any Loan Party in the performance of or compliance with any term contained herein or any of the other Loan Documents, other than any such term referred to in any other Section of this Article 7, which default has not been remedied or waived within 10 days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(f) Involuntary Bankruptcy; Appointment of Receiver, Etc.  Other than the Chapter 11 Cases, (i) the entry by a court of competent jurisdiction of a decree or order for relief in respect of Holdings, the Borrower or any of its Subsidiaries in an involuntary case under any Debtor Relief Law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal, state or local law; or (ii) the commencement of an involuntary case against Holdings, the Borrower or any of its Subsidiaries under any Debtor Relief Law; the entry by a court having jurisdiction in the premises of a decree or order for the appointment of a receiver, receiver and manager, (preliminary) insolvency receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Holdings, the Borrower or any of its Subsidiaries, or over all or a substantial part of its property; or the involuntary appointment of an interim receiver, trustee or other custodian of Holdings, the Borrower or any of its Subsidiaries for all or a substantial part of its property, which remains undismissed, unvacated, unbounded or unstayed pending appeal for 20 consecutive days;

or

(g)  Voluntary Bankruptcy; Appointment of Receiver, Etc.  Other than the Chapter 11 Cases, (i) the entry against Holdings, the Borrower or any of its Subsidiaries of an order for relief, the commencement by Holdings, the Borrower or any of its Subsidiaries of a voluntary case under any Debtor Relief Law, or the consent by Holdings, the Borrower or any of its Subsidiaries to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case, under any Debtor Relief Law, or the consent by the Borrower or any of its Subsidiaries to the appointment of or taking possession by a receiver, receiver and manager, trustee or other custodian for all or a substantial part of its property; (ii) the making by Holdings, the Borrower or any of its Subsidiaries of a general assignment for the benefit of creditors; or (iii) the admission by Holdings, the Borrower or any of its Subsidiaries in writing of their inability to pay their respective debts as such debts become due; or

(h)  Judgments and Attachments.  The entry or filing of one or more final money judgments, writs or warrants of attachment or similar process against Holdings, the Borrower or any of its Subsidiaries or any of their respective assets involving in the aggregate at any time an amount in excess of the Threshold Amount (in either case to the extent not adequately covered by self-insurance (if applicable) or by insurance as to which the relevant third party insurance company has been notified and not denied coverage), which judgment, writ, warrant or similar process remains unpaid, undischarged, unvacated, unbonded or unstayed pending appeal for a period of 45 days; or

(i)  Employee Benefit Plans.  The occurrence of one or more ERISA Events, which individually or in the aggregate result in liability of Holdings, the Borrower or any of its Subsidiaries in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; or

(j)  Change of Control.  The occurrence of a Change of Control; or

(k)  Guaranties, DIP Collateral and Other Loan Documents.  At any time after the execution and delivery thereof (i) any Loan Guaranty for any reason ceasing to be in full force and effect (other than in accordance with its terms or as a result of the occurrence of the Termination Date) or being declared to be null and void or the repudiation in writing by any Loan Party of its obligations thereunder (other than as a result of the discharge

of such Loan Party in accordance with the terms thereof), (ii) this Agreement or any collateral document ceasing to be in full force and effect (other than solely by reason of (x) the failure of the Administrative Agent to maintain possession of any DIP Collateral actually delivered to it or the failure of the Administrative Agent to file UCC (or equivalent) continuation statements, (y) a release of DIP Collateral in accordance with the terms hereof or thereof or (z) the occurrence of the Termination Date or any other termination of such collateral document in accordance with the terms thereof) or being declared null and void or (iii) the contesting by any Loan Party of the validity or enforceability of any material provision of any Loan Document (or any Lien purported to be created by the collateral documents or any collateral provision in the Loan Documents or Loan Guaranty) in writing or denial by any Loan Party in writing that it has any further liability (other than by reason of the occurrence of the Termination Date), including with respect to future advances by the Lenders, under any Loan Document to which it is a party; it being understood and agreed that the failure of the Administrative Agent to maintain possession of any DIP Collateral actually delivered to it or file any UCC (or equivalent) continuation statement shall not result in an Event of Default under this clause (k) or any other provision of any Loan Document; or

(l) Subordination. The Obligations ceasing or the assertion in writing by any Loan Party that the Obligations cease to constitute senior indebtedness under the subordination provisions of any document or instrument evidencing any permitted Subordinated Indebtedness or any Junior Lien Indebtedness with an aggregate principal amount outstanding in excess of the Threshold Amount or any such subordination provision being invalidated or otherwise ceasing, for any reason, to be valid, binding and enforceable obligations of the parties thereto; or

(m) Chapter 11 Cases: The occurrence of any of the following in any Chapter 11 Case:

(i) filing of a plan of reorganization under Chapter 11 of the Bankruptcy Code by the Debtors that has not been consented to by the Required Lenders;

(ii) filing of a plan of reorganization or liquidation by the Debtors that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by the Administrative Agent and the Required Lenders;

(iii) any of the Debtors shall file a pleading seeking to vacate or modify any of the DIP Orders without the prior consent of the Administrative Agent at the direction of the Required Lenders;

(iv) entry of an order without the prior written consent of the Required Lenders amending, supplementing or otherwise modifying the DIP Orders (other than, in respect of the Interim DIP Order, the entry of the Final DIP Order);

(v) reversal, vacatur or stay of the effectiveness of any DIP Order (and, other than, in respect of the Interim DIP Order, the entry of the Final DIP Order);

(vi) any material violation of the terms of any DIP Order by the Debtors;

(vii) dismissal of the Chapter 11 Case of a Debtor or conversion of the Chapter 11 Case of a Debtor to a case under Chapter 7 of the Bankruptcy Code;

(viii) appointment of a Chapter 11 trustee without the consent of the Required Lenders;

(ix) any sale of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code or entry into an agreement obligating any Debtor to consummate any such sale (other than a Sale) unless (i) the proceeds of such sale indefeasibly satisfy the Obligations and Prepetition First Lien Obligations in full in cash or (ii) such sale is supported by the Administrative Agent at the direction of the Required Lenders;

(x) appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrower or any Guarantor without the consent of the Required Lenders;

(xi) failure to meet a Milestone, unless extended or waived pursuant by the prior written consent of the Administrative Agent at the direction of the Required Lenders;

(xii) granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on Prepetition Collateral of any of the Debtors;

(xiii) the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or pari passu with the Lenders' claims under the DIP Facility;

(xiv) the Debtors shall seek, or shall support any other person's motion seeking (in any such case,

<table>
<tr><td></td><td>verbally in any court of competent jurisdiction or by way of any motion or pleading with the Bankruptcy Court, or any other writing to another party in interest by Debtors) to challenge the extent, validity, perfection, priority, or enforceability of any of the Lien or obligations of the parties under the Prepetition First Lien Loan Documents;<br><br>(xv) payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or consented to by the Administrative Agent at the direction of the Required Lenders, or otherwise required under the Bankruptcy Code or by the Bankruptcy Court;<br><br>(xvi) expiration or termination of exclusivity by the Debtors or the filing of a plan of reorganization without the prior consent of the Required Lenders;<br><br>(xvii) cessation of the DIP Liens or the DIP Superpriority Claims to be valid, perfected and enforceable in all respects<br><br>(xviii) the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, without the prior written consent of the Required Lenders;<br><br>(xix) any of the Debtors uses cash collateral or New Money DIP Loans for any item other than those set forth in, and in accordance with, the Approved Budget and as approved by the Bankruptcy Court, the Carve-Out or prepays prepetition debt, except with the prior consent of the Required Lenders;<br><br>(xx) the Debtors fail to comply with the Budget Covenants; and<br><br>(xxi) any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full in cash and the commitments are terminated</td><td></td></tr>
<tr><td>**Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(E)</td><td>The effectiveness of the DIP Credit Facility shall be subject to certain customary closing conditions, including, without limitation, the satisfaction of the following conditions precedent (the "<u>Conditions Precedent</u>"):<br><br>(i)   All DIP Documents shall have been executed;<br><br>(ii)   The Chapter 11 Cases shall have been filed with the Bankruptcy Court on the Petition Date and shall not have been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. No trustee under Chapter 11 of the Bankruptcy</td><td>DIP Credit Agmt.<br>§ 4.01</td></tr>
</table>

Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases of the Debtors;

(iii)    The Administrative Agent and the Lenders shall have received the Initial Budget in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders;

(iv)    The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date and executed by a secretary, assistant secretary or other senior officer (as the case may be) thereof, which shall (A) certify that attached thereto is a true and complete copy of the resolutions or written consents of its shareholders, board of directors, board of managers, members or other governing body authorizing the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions or written consents have not been modified, rescinded or amended and are in full force and effect, (B) identify by name and title and bear the signatures of the officers, managers, directors or authorized signatories of such Loan Party authorized to sign the Loan Documents to which it is a party on the Closing Date and (C) certify (x) that attached thereto is a true and complete copy of the certificate or articles of incorporation or organization (or memorandum of association or other equivalent thereof) of such Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by-laws or operating, management, partnership or similar agreement and (y) that such documents or agreements have not been amended (except as otherwise attached to such certificate and certified therein as being the only amendments thereto as of such date) and (ii) a good standing (or equivalent) certificate as of a recent date for such Loan Party from its jurisdiction of organization;

(v)    The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date; provided that if any such representation is qualified by or subject to a "material adverse effect", "material adverse change" or similar term or qualification, such representation is true and correct in all respects;

(vi)    Prior to or substantially concurrently with the funding of the New Money Initial DIP Loan hereunder, the Administrative Agent shall have received in cash (i) all fees required to be paid by the Borrower on the Closing Date hereunder and (ii) all expenses required to be paid by the Borrower for which invoices have been presented at least three Business Days prior to the Closing Date or such later date to which the Borrower may agree (including the fees and expenses of legal counsel), in each case on or before the Closing Date, which amounts may be offset against the proceeds of the Loans;

(vii)    The Administrative Agent shall have received, all first day motions, including those related to the DIP Facility, filed by the Debtors and related orders entered by the Bankruptcy Court in the Chapter 11 Cases, each in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders;

(viii)    Within three (3) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion, (i) authorizing and approving the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority claim status, security interests and priming liens, and the payment of all fees, referred to herein and therein; (ii) authorizing the lifting or modification of the automatic stay to permit the Borrowers and the Guarantors to perform their obligations, and the Lenders to exercise their rights and remedies, with respect to the DIP Facility; (iii) authorizing the use of cash collateral and providing for adequate protection in favor of the Prepetition Agents and Prepetition Lenders, as and to the extent provided herein and therein; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the Administrative Agent (at the direction of the Required Lenders) and the Debtors, in their respective discretion in each case, which Interim DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent (at the direction of the Required Lenders)

| Indemnification<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrower shall indemnify each Arranger, the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages and liabilities incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby and/or the enforcement of the Loan Documents, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby or thereby, (ii) the use of the proceeds of the Loans, (iii) any actual or alleged Release or presence of Hazardous Materials on, at, under or from any property currently or formerly owned or operated by the Borrower, any of its Subsidiaries or any other Loan Party or any Environmental Liability related to the Borrower, any of its Subsidiaries or any other Loan Party and/or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower, any other Loan Party or any of their respective Affiliates); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that any such loss, claim, damage, or liability results solely from the gross negligence or willful misconduct by such Indemnitee, in each case, as determined by a final non-appealable judgment of a court of competent jurisdiction. Each Indemnitee shall be obligated to refund or return any and all amounts paid by the Borrower pursuant to this <u>Section 9.03(b)</u> to such Indemnitee for any fees, expenses, or damages to the extent such Indemnitee is not entitled to payment thereof in accordance with the terms hereof.  All amounts due under this <u>paragraph (b)</u> shall be payable by the Borrower within 10 days (x) after written demand therefor, in the case of any indemnification obligations and (y) in the case of reimbursement of costs and expenses, after receipt of summary invoices thereof  (subject in all respects to applicable privilege or work product doctrines )supporting the relevant reimbursement request. This <u>Section 9.03(b)</u> shall not apply to Taxes other than any Taxes that represent losses, claims, damages or liabilities in respect of a non-Tax claim | DIP Credit Agmt. § 9.03 |
| **Approved Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Approved Budget means: a rolling 13-week cash flow budget  that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales and international transfers), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases, capital expenditures, issuances of any | DIP Credit Agmt. § 5.01(d); Interim Order ¶ 2(e) |

| | | |
|---|---|---|
| Local Rule 4001-2(a)(iii) | letter of credit, including the fees relating thereto, and estimated fees and expenses of the DIP Agent (including counsel and financial advisors therefor), the Prepetition First Lien Agents (including counsel and financial advisors therefor), and any other fees and expenses relating to the DIP Facility), (iii) the sum of weekly unused availability under the DIP Facility plus unrestricted cash on hand (collectively, "<u>Aggregate Liquidity</u>"), and (iv) the weekly outstanding principal balance of the loans made under the DIP Facility (including the principal amount of the Roll Up DIP Facility from and after the entry of a Final Order) | |
| **Variance Covenant** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i) | Compliance with the Approved Budget shall be tested initially after conclusion of the fourth full week following Petition Date (the "<u>First Testing Date</u>") (testing the period from the Petition Date through and including April 26, 2024 (such initial testing period, the "<u>First Testing Period</u>")) and continuing on each fourth Friday thereafter (each, a "<u>Subsequent Testing Date</u>") (in each case, testing the trailing four week period ending on the Friday before the applicable Subsequent Testing Date (each, a "<u>Four Week Testing Period</u>")): (i) (A) for the First Testing Date, the sum of all actual disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) for the First Testing Period shall not exceed 120% of the sum of the "Total Operating Disbursements" for such First Testing Period as set forth in the Approved Budget, and (B) for each Subsequent Testing Date, the sum of all actual disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) for the immediately preceding Four Week Testing Period shall not exceed 120% of the sum of the "Total Operating Disbursements" for such immediately preceding Four Week Testing Period as set forth in the Approved Budget; and (ii) (A) for the First Testing Date, (x) the sum of actual receipts of the Debtors for the First Testing Period shall not be less than 80% of the sum of the "Total Receipts" for such First Testing Period as set forth in the Approved Budget and (y) the sum of international transfers of the Debtors for the First Testing Period shall not be less than 80% of the sum of the "International Transfers" for such First Testing Period as set forth in the Approved Budget, and (B) for each Subsequent Testing Date, (x) the sum of actual receipts of the Debtors for the immediately preceding Four Week Testing Period shall not be less than 80% of the sum of the "Total Receipts" for such immediately preceding Four Week Testing Period as set forth in the Approved Budget and (y) the sum of international transfers of the Debtors for the immediately preceding Four Week Testing Period shall not be less than 80% of the sum of the "International Transfers" for such immediately preceding Four Week Testing Period as set | DIP Credit Agmt. § 5.01(d); Interim Order ¶ 2(f) |

| | forth in the Approved Budget; _provided_, that, in all circumstances, a positive variance in any one measurement period shall be carried over for use in subsequent periods solely on a line item basis. | |
|---|---|---|
| **Use of Cash Collateral; Entities with Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | Prepetition Secured Parties consent to the use of Cash Collateral subject to the Approved Budget, which is subject to the Permitted Variances, and the terms of the DIP Orders. | Interim Order ¶ 3 |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(b)<br>Local Rule 4001(a)(i)(U) | Upon entry of the Final Order, the DIP Collateral shall include Avoidance Actions Proceeds | Interim Order ¶ 3 |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B), 4001(c)(1)(B)(viii)<br>Local Rule 4001(a)(i)(Q) | The Debtors' Stipulations made in the Interim Order are subject to the rights of parties to assert standing to bring a Challenge (as defined in the Interim Order) within seventy-five (75) days following the entry of the Interim Order. Failure of the creditors' committee or any other party in interest to file such a pleading with the Court shall forever bar such party from making such a Challenge | Interim Order ¶ 6 |
| **Waivers/Modification of Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv)<br>Local Rule 4001-2(a)(i)(S) | If any DIP Event of Default occurs and is continuing, the automatic stay in these Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Lenders and the Prepetition Secured Parties is modified so that five (5) days after the date a Termination Declaration (as defined in the Interim Order) is delivered (the "Remedies Notice Period"): (i) the DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the respective DIP Documents and the Interim Order to satisfy the relevant DIP Obligations, DIP Superpriority Claim and DIP Liens, subject to the Carve-Out; and (b) the Controlling Collateral Agent shall be entitled to exercise its rights and remedies in accordance with the applicable Prepetition First Lien Documents and the Interim Order to satisfy the relevant Prepetition First Lien Obligations, Adequate Prepetition Superpriority Claims and Prepetition Adequate Protection Liens, subject to the Carve-Out. | DIP Credit Agmt. § 7.02; Interim Order ¶ 16 |
| **Section 506(c), 552(b) "Equities of the Case," and Marshalling Waivers**<br>Bankruptcy Rule 4001(c)(1)(B)(x);<br>Local Rule 4001-2(a)(i)(V)-(X) | The Interim Order provides, with respect to the DIP Secured Parties, and with respect to the Prepetition Secured Parties the Final Order shall provide, for: (i) a waiver of the "equities of the case" exception to section 552(b) of the Bankruptcy Code, and (ii) a waiver of the ability to surcharge under section 506(c) of the Bankruptcy Code. The Final Order shall provide for a waiver of the equitable doctrine of "marshalling." | Interim Order ¶ 3-4 |

52.    Each of the foregoing terms is justified because the Debtors need immediate access

to financing and the use of Cash Collateral to continue in these Chapter 11 Cases and facilitate the

sale process.  The DIP Credit Facility, which was negotiated in good faith and at arm's length, is the only viable proposal to provide critical liquidity.

**BASIS FOR RELIEF REQUESTED**

**I.    ENTRY INTO THE DIP DOCUMENTS IS AN EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGEMENT**

53.    The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the proceeds of the DIP Loans, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

54.    To determine whether the business judgment test is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Dura Auto. Sys. Inc*., No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).  Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment

46

made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513–14 (Bankr. D. Utah. Oct 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

55.     In determining whether the Debtors have exercised sound business judgment in entering into the DIP Documents, the Court should consider the economic terms of the DIP Credit Facility under the totality of circumstances.  *See* Hr'g Tr. at 734–35:24, *In re Lyondell Chem. Co*., No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously, referring to the period following the 2008 financial markets collapse); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable).  Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered under the DIP Credit Facility.  *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms . . .  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization . . . .").

56.     The Debtors' decision to enter into the DIP Credit Facility is an exercise of their sound business judgment.  As further discussed in the Richter Declaration, the DIP Credit Facility was a product of an arms'-length negotiation and a careful evaluation of alternatives.  Richter

Decl. ¶ 9. The Debtors ultimately decided that moving forward with the proposed DIP Credit Facility was an appropriate step given that the DIP Credit Facility: (a) allows the Debtors to avoid a value-destructive priming fight; (b) provides a path forward in chapter 11 by allowing the Debtors to facilitate the sale process with a stalking horse bidder, subject to higher and better bids; and (c) allows the Debtors to operate in the ordinary course of business postpetition and fund the administration of the Chapter 11 Cases for the benefit of the estates and all of the Debtors' stakeholders. Jänne at ¶ 11; Richter Decl. ¶ 9. The DIP Credit Facility allows the Debtors to obtain necessary liquidity on market terms, without the risk of a priming fight, and fund the sale process with the benefit of a Stalking Horse Bid. Jänne Decl. ¶ 11. The Debtors and their advisors therefore determined that entry into the DIP Credit Facility was the best path available and they have obtained the best terms currently achievable under the circumstances. Jänne Decl. ¶ 8.

## II. THE DEBTORS SHOULD BE AUTHORIZED TO GRANT LIENS AND SUPERPRIORITY CLAIMS

57. The Debtors propose to obtain the DIP Credit Facility by providing security interests and liens as set forth in the DIP Documents and described above. The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances. Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

58.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). "[Section 364(c)] imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

59.    When few (or no) lenders are likely to be able or willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected most favorable of two offers it received).

60.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.    the credit transaction is necessary to preserve the assets of the estate; and

    c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re L.A. Dodgers LLC*, 457 B.R. at 312; *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393,  401–02 (Bankr. E.D. Pa. 1988).  Furthermore, in the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).

61.    As described above, the Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses and administer their estates.  Richter Decl. ¶ 6.  From the outset, several factors made clear that the required new money infusion in the form of debtor in possession financing would be highly likely to originate from existing members of the Debtors' capital structure.  First, substantially all of the Debtors' assets were encumbered under the Prepetition Secured Documents, which restricted the availability of, and the Debtors' options for, securing additional financing absent lenders' consent or a bankruptcy.  Jänne Decl. at ¶ 11.  Second, the Debtors' lenders had made clear that they were unwilling to provide: (i) debt

financing on an unsecured basis; or (ii) equity financing subordinated to existing debt claims. *Id.* at ¶ 12. Third, third-party unsecured financing was not a viable option due to the amount of existing secured debt relative to the Debtors' financial position. *Id.*. Fourth, the Prepetition Secured Parties would not consent to "priming" debtor in possession financing, either provided by a third-party or from an existing member of the Debtors' capital structure (other than themselves), and the absence of a sufficient equity cushion made it unlikely that priming debtor in possession financing could be obtained over the objection of the Prepetition Secured Parties. *Id.*. Accordingly, the only available avenue for obtaining workable financing was with the Debtors' existing stakeholders. *Id.* at 11.

62.     As discussed above and as set forth in the Jänne Declaration, Solomon solicited potential alternative debtor in possession financing from a handful of well-known third-party DIP financing parties to develop viable alternatives to the financing proposed by the DIP Lenders. Jänne Decl. ¶ 11. However, those efforts resulted in the Debtors receiving no viable or actionable financing alternative, and as a result, no better financing is available. *Id.*

63.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, when the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Consent by the secured creditors to liens priming their interests in collateral obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur

"priming" liens under the DIP Credit Agreement if either (a) the Prepetition Secured Parties support the priming or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

64.    Here, the Prepetition Secured Parties support priming their own prepetition liens in connection with the DIP Credit Facility.  Further, the Debtors do not believe any alternative financing is available on equal or better terms from the DIP Lenders, without granting first priority liens in the Prepetition Collateral.  Jänne Decl. at ¶ 12.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

65.    Finally, as evidenced by the Richter Declaration, the incremental liquidity provided under the DIP Credit Agreement is needed to ensure adequate working capital and funding for other administrative expenses associated with these Chapter 11 Cases.  Richter Decl. ¶ 7.  The Debtors, with the assistance of BRG, Solomon, and their other professionals, engaged in extensive, good-faith and arm's-length negotiation with the DIP Lenders over the terms of the DIP Credit Agreement.  Those negotiations resulted in fair and reasonable terms that are consistent with or better than terms generally available in the market for debtor in possession financing.

## III.    THE DEBTORS SHOULD BE AUTHORIZED TO USE CASH COLLATERAL

66.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).

67.     Here, the use of Cash Collateral is consensual.  The Prepetition Secured Parties are deemed to consent to the Debtors' use of the Cash Collateral by virtue of (i) the Prepetition First Lien Lenders expressly consent to the use of Cash Collateral; and (ii) the First Lien/Second Lien ICA, which, pursuant to section 6.2 thereof, expressly restricts the Prepetition Second Lien Lenders from objecting to the use of cash collateral.

68.     Parties with an interest in cash collateral are entitled to adequate protection under section 363(e) of the Bankruptcy Code.  11 U.S.C. § 363(e).  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

69.     As noted above, the Prepetition Secured Parties have or are deemed to have consented to the use of Cash Collateral, and the Debtors propose providing the Prepetition Secured Parties with adequate protection that is fair and reasonable and adequately protects against the diminution in value of their interest in the Prepetition Collateral.  Specifically, the Prepetition Secured Parties are entitled to, among other things: (a) with respect to the Prepetition First Lien

Secured Parties: (i) adequate protection liens (subject to the Carve-Out and the priorities set out in the Interim Order); (ii) allowed adequate protection superpriority claims under sections 507(b) of the Bankruptcy Code (subject to the Carve-Out and the priorities set out in the Interim Order); and (iii) adequate protection payments of the reasonable and documented fees, costs, and expenses of counsel and financial advisors for the Prepetition First Lien Agents (the "<u>Prepetition First Lien Adequate Protection</u>") and (b) with respect to the Prepetition Second Lien Secured Parties: (i) adequate protection liens (subject to the Carve-Out and the priorities set out in the Interim Order) and (ii) allowed adequate protection superpriority claims under sections 507(b) of the Bankruptcy Code (subject to the Carve-Out and the priorities set out in the Interim Order) (the "<u>Prepetition Second Lien Adequate Protection</u>").

70.    The adequate protection obligations above are sufficient to protect the Prepetition Secured Parties from any potential diminution in value of their Prepetition Collateral, including the Cash Collateral.  In light of the foregoing, the Debtors submit, and the Prepetition Secured Parties agree, that the proposed adequate protection to be provided is appropriate.

## IV.    THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES DUE UNDER THE DIP DOCUMENTS

71.    The Debtors have agreed, subject to Court approval, to pay certain fees (including the Commitment Fee, the Unused Commitment Fee, the Seasoning/Fronting Fee, and the Administrative Agency Fee) to the DIP Lenders in exchange for their providing the DIP Credit Facility.  As set forth in the Jänne Declaration, the terms of the DIP Documents, including the fees imposed thereunder, constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund their Chapter 11 Cases and are an integral component of the overall terms of the DIP Credit Facility.  Jänne Decl. ¶¶ 10–15. Moreover, the fees are customary and usual and in line with debtor in possession financings of this

kind.  *Id.* at ¶ 13.  The Debtors considered the fees when determining in their sound business judgment whether the DIP Credit Facility constituted the best alternative reasonably available to the Debtors.  The Debtors believe paying these fees in order to obtain the DIP Credit Facility is in the best interests of the Debtors' estates. *Id*.  Accordingly, the Court should authorize the Debtors to pay the fees.

## V.    THE DIP LENDERS SHOULD BE DEEMED GOOD FAITH LENDERS

72.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

73.    Here, the Debtors believe the DIP Credit Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing.  As further described in the Richter Declaration, negotiations of the terms of the DIP Credit Agreement with the DIP Lenders were conducted in good faith and at arms' length.    Richter Decl. ¶ 9.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Credit Facility will be used only for purposes that are permissible under the Bankruptcy Code, and in accordance with the DIP Orders and the DIP Documents, including, for the avoidance of doubt, the Approved Budget (subject to any Permitted Variances).  Further, no consideration is being provided to any party to the DIP Documents other than as described herein and in the Jänne Declaration.  Accordingly, the

Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VI.    OTHER RELIEF

### A.    The CIT Escrow

74.    In order to resolve potential disputes regarding the treatment of the CIT Factoring Agreement, and in accordance with the Restructuring Support Agreement, the Debtors propose funding a portion of the Initial Draw equal to 80% of the amount outstanding under the CIT Factoring Agreement into a segregated account (the "Escrow Account") to partially satisfy the obligations owing to CIT under the CIT Factoring Agreement (the "Debtors' CIT Payment").

75.    After consultation with CIT, if CIT consents to such treatment: (a) the Debtors shall fund the Debtors' CIT Payment from the Escrow Account to partially satisfy the obligations owing to CIT in connection with the CIT Factoring Agreement; (b) CIT shall make a demand pursuant to the Secured Guaranty, dated as of July 11, 2023, among Don't Slip Inc. and CIT, to the extent required by the terms of such guaranty, for all remaining amounts owing to CIT under the Factoring Agreement after payment by the Debtors set forth in the immediately preceding clause (such amount, the "CIT Balance Owed"); (c) CIT shall take possession of the Pledged Sum (as defined in the Secured Guaranty) in the Special Account (as defined in the Secured Guaranty); and (d) upon receipt of the Debtors' CIT Payment and the CIT Balance Owed, the Debtors will take all necessary steps to coordinate with CIT to immediately (i) terminate the Factoring Agreement, the Guaranty Agreement and the Cash Pledge Agreement (as defined in the Guaranty), (ii) release any remaining funds in the Special Account to Don't Slip Inc., (iii) transfer and assign to the Debtors the Accounts (as defined in the Factoring Agreement) and (iv) release CIT's lien and security interest on the Accounts.

76.     In the event CIT does not consent to the conditions set forth in paragraph 76 within 5 business days from the Petition Date, and to the extent CIT makes demand under the Secured Guaranty and takes possession of the Pledged Sum in the Special Account, the Debtors shall be authorized to release cash payments from the Escrow Account to Don't Slip Inc. in the amount of the Pledged Sum received by CIT; provided, that any such cash payment by the Debtors shall not exceed the amount of the Debtors' CIT Payment**.**

### B.     Payment of Fees and Expenses of the Prepetition Secured Parties

77.     In addition to the fees and expenses paid as adequate protection to the Prepetition First Lien Secured Parties, the Debtors propose to pay, subject to entry of the Final Order, and in accordance with the terms of the Restructuring Support Agreement, all reasonable and documented fees and expenses of counsel to the Prepetition Second Lien Secured Parties and Prepetition Irish Lenders, Proskauer Rose, up to an aggregate cap not to exceed $650,000, and upon the earlier of entry of the Final DIP Order or payment in full of the CIT Factoring Agreement, all reasonable and documented accrued fees and expenses of counsel to Don't Slip, Inc., CCMP Capital Investors III, L.P., and CCMP Capital Investors III (Employee), L.P., Weil Gotshal & Manges, in an amount not to exceed $300,000.

### VII.    MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED

78.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtors and the DIP Secured Parties, as applicable, to, among other things:  (i) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) upon the occurrence of a DIP Event of Default, subject to any applicable notice periods set forth in the DIP Orders, exercise any remedies available to them; and (iii) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Documents.

79.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.   *See, e.g.*, *iMedia Brands, Inc.*, No. 23-10852 (KBO) (Bankr. D. Del. July 6, 2023); *In re OSG Group Holdings, Inc.*, No. 22-10718 (JTD) (Bankr. D. Del. Aug. 9, 2022); *In re RentPath Holdings, Inc.,* No. 20-10312 (BLS) (Bankr. D. Del. Mar. 10, 2020); *In re Blackhawk Mining LLC,* No. 19-11595 (LSS); (Bankr. D. Del. Aug. 13, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. January 17, 2019).

## REQUEST FOR A FINAL HEARING

80.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request the Court set a date for the final hearing that is as soon as practicable, and in no event more than thirty-five (35) days after the Petition Date in accordance with the Milestones, and fix the time and date prior to the final hearing for parties to file objections to this Motion.

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

81.     The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Bankruptcy Rule 6003; *In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008).  The Third Circuit Court of Appeals has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the Third Circuit has instructed that irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial."  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  As explained above and in the Richter Declaration, access to the DIP Credit Facility and the use of Cash Collateral, in the interim amounts proposed, are essential and the relief requested is narrowly tailored to only the relief that is

necessary to prevent immediate and irreparable damage to the Debtors' operations, and therefore, Bankruptcy Rule 6003 is satisfied.

## BANRUPTCY RULE 6004(a) AND (h) WAIVERS ARE APPROPRIATE

82.    To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances, and waive the fourteen (14)-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above and in the Richter Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

83.    Except as otherwise provided in the DIP Orders, nothing contained herein is intended or shall be construed as:  (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action that may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third-party under section 365 of the Bankruptcy Code.

## NOTICE

84.    The Debtors will provide notice of this Motion to:  (a) the U.S. Trustee, 844 N. King Street, Room 2207, Wilmington, Delaware, 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct

business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the holders of the fifty (50) largest unsecured claims against the Debtors on a consolidated basis; (g) counsel to Antares Capital LP, as administrative agent, under the Debtors' First Lien Credit Agreement and the Debtors' Sidecar Credit Agreement, King & Spalding LLP (Attn: Lindsey Henrikson and Matthew Warren, email: lhenrikson@kslaw.com and mwarren@kslaw.com) and [DE Local Counsel; (h) counsel to Ares Capital Corporation, as administrative agent, under the Debtors' Second Lien Agreement, Proskauer Rose LLP (Attn: David M. Hillman and Justin Breen, email: DHillman@proskauer.com and JBreen@proskauer.com); and [DE Local Counsel]; (i) the banks and financial institutions where the Debtors maintain accounts; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order, substantially in the form annexed hereto as **Exhibit A**, and the Final Order, granting the relief requested herein and such other and further relief as the Court deems appropriate under the circumstances.

Dated:  April 2, 2024  
        Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
Email: desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Cristine Pirro Schwarzman (*pro hac vice* admission pending)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com
        cristine.schwarzman@ropesgray.com

-and-

**ROPES & GRAY LLP**
Conor P. McNamara (*pro hac vice* admission pending)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail:  conor.mcnamara@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **EXHIBIT A**

**Interim Order**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 ([___]) |
| Debtors. | (Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE
BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL
PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING
ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES PURSUANT
TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING
LIENS AND SUPERPRIORITY CLAIMS, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion, dated April 1, 2024 (the "DIP Motion"), of the Borrowers (as defined

below), and the other debtors and debtors in possession (collectively, the "Debtors"), in the above-

referenced chapter 11 cases (the "Cases"), seeking entry of an interim order (this "Interim Order")

pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(2), 364(c)(3), 364(d)(l),

364(e), 503, 507, and 552 of chapter 11 of title 11 of the United States Code (as amended, the

"Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"), that, among other things:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516). The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

(i)        authorizes the Debtor designated as "Borrower" under, and as defined in, the DIP Credit Agreement (as defined below) (the "Borrower") to obtain, and Never Slip Holdings, Inc. (the "Parent") and the other guarantors (the "DIP Guarantors") under the DIP Loan Documents (as defined below) to unconditionally guaranty, jointly and severally, the Borrower's obligations in respect of, senior secured priming and superpriority postpetition financing, which if approved on a final basis would consist of (x) a letter of credit facility for up to $800,000 (the "DIP LC Facility"), (y) a term loan facility for up to $30,000,000 (the "DIP Term Loan Facility" and the "new money" term loans extended thereunder, the "DIP Term Loans" and, together with the Roll Up DIP Facility (as defined below) and the DIP LC Facility, the "DIP Facility" and loans extended under the DIP Facility, including the Letters of Credit (as defined in the DIP Credit Agreement) and the Roll Up DIP Loans (as defined below), the "DIP Loans"), of which an initial amount of $20,000,000 (the "Interim Draw") will be made available upon entry of the Interim Order, pursuant to the terms of (x) this Interim Order, (y) that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of April [_], 2024 (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "DIP Credit Agreement" attached hereto as **Exhibit 2**),[2] by and among the Borrower, the DIP Guarantors, Antares Capital LP, as administrative agent and collateral agent (in such capacity, and as administrative agent and collateral agent under the Roll Up DIP Facility, collectively, the "DIP Agent"), and the other financial institutions party to the DIP Credit Agreement as "Lenders" under, and as defined in, the DIP Credit Agreement (together with the Roll Up DIP Lenders (as defined below), collectively, the "DIP Lenders," and together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "DIP Secured Parties"), and (z) any and

---

[2]     Unless otherwise specified herein, all capitalized terms used herein without definition shall have the respective meanings given to such terms in the DIP Credit Agreement.

all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "DIP Loan Documents"), to: (A) fund, among other things, ongoing working capital, general corporate expenditures and other financing needs of the Debtors, (B) subject to entry of a Final Order (as defined below), convert on a cashless basis up to $83,831,822 of the outstanding principal amount of the Loans under the Prepetition First Lien Credit Agreement and up to $6,168,178 of the outstanding principal amount of the Loans under the Prepetition Sidecar Credit Agreement in connection with the DIP Term Loans to DIP Obligations under the DIP Loan Documents, as provided in such Final Order (the holders of such rolled up Prepetition First Lien Obligations, the "Roll Up DIP Lenders," and the administrative agent and collateral agent for the Roll Up DIP Lenders, the "Roll Up DIP Agent," and together with the Roll Up DIP Lenders, collectively, the "Roll Up DIP Secured Parties," and such converted Prepetition First Lien Obligations, the "Roll Up DIP Loans," and such credit facility, the "Roll Up DIP Facility), (C) pay certain adequate protection amounts to the Prepetition First Lien Secured Parties (as defined below) as described below, (D) pay certain transaction fees and other costs and expenses of administration of the Cases, and (E) pay certain fees and expenses (including accrued and unpaid reasonable and documented attorneys' fees and expenses) and interest owed to the DIP Secured Parties under the DIP Loan Documents and this Interim Order

(ii)     approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Loan Documents and authorizes the Debtors to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Interim Order;

(iii)    grants, subject to the Carve-Out in all respects, (x) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, which Liens shall

be senior to the Primed Liens (as defined below) and shall be junior solely to the Carve-Out and any valid, enforceable and non-avoidable Liens that are (A) in existence on the Petition Date (as defined below), (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition First Liens (as defined below) after giving effect to any applicable intercreditor or subordination agreement (all such Liens, collectively, the "Prepetition Prior Liens") and (y) to the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including,[3] upon entry of this Interim Order, any proceeds of actions brought under section 549 of the Bankruptcy Code, and upon entry of the Final Order, the proceeds of Avoidance Actions (as defined below);

(iv)    authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), including Cash Collateral in which the Prepetition First Lien Secured Parties (as defined below) or the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise;

(v)    authorizes the Debtors to (i) fund the Debtors' CIT Payment (as defined below) to partially satisfy the obligations owing to CIT under the CIT Factoring Agreement into a segregated account (the "Escrow Account"), and (ii) pay the Debtors' CIT Payment to CIT Commercial Services ("CIT");

---

[3]    As used herein, the words "including" or "include" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

(vi)    modifies the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(vii)    authorizes the Borrower at any time prior to the earlier of thirty-five (35) calendar days from the Petition Date and the entry of the Final Order to borrow under the DIP Facility in an aggregate outstanding principal amount that will not exceed $20,000,000 with respect to the DIP Term Loans, and an aggregate outstanding principal amount of Letters of Credit outstanding under the DIP LC Facility that will not exceed $800,000, and authorizes the DIP Guarantors to unconditionally guaranty such obligations jointly and severally;

(viii)    grants the Prepetition First Lien Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition First Lien Adequate Protection (as defined below), which consists of, among other things, and solely to the extent of any Diminution in Value, First Lien Adequate Protection Liens (as defined below), First Lien Adequate Protection Superiority Claims (as defined below), and current payment of accrued and unpaid prepetition and postpetition reimbursable fees and expenses;

(ix)    grants the Prepetition Second Lien Secured Parties, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition Second Lien Adequate Protection (as defined below), which consists of, among other things, and solely to the extent of any Diminution in Value, Second Lien Adequate Protection Liens (as defined below) and Second Lien Adequate Protection Superpriority Claims (as defined below);

(x)    schedules a final hearing on the DIP Motion (the "Final Hearing") *to be held no later than two business days prior to the deadline for entry of Final Order* to consider entry of a final order that grants all of the relief requested in the DIP Motion on a final basis and which final

order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other parties in interest or this Court) acceptable to the DIP Agent and the Prepetition First Lien Agents (the "Final Order" and, together with the Interim Order, the "DIP Orders");

(xi)    waives, upon entry of the Final Order, certain rights of the Debtors to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code;

(xii)    provides for the immediate effectiveness of this Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness; and

(xiii)    grants related relief.

Having considered the DIP Motion, the DIP Credit Agreement, the *Declaration of Kyle Richter, in Support of Debtors' Motion to Obtain Postpetition Debtor in Possession Financing* (the "Richter Declaration") and the *Declaration of Tero Jänne, , in Support of Debtors' Motion to Obtain Postpetition Debtor in Possession Financing* (the "DIP Declaration"), and the evidence submitted or proffered at the hearing on this Interim Order (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(c), and 4001(d) and 9014 and all applicable Local Rules, notice of the DIP Motion and the Interim Hearing having been provided pursuant to Bankruptcy Rule 4001(b)(1)(C); an Interim Hearing having been held and concluded on April [__], 2024; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the

6

Debtors' entry into the DIP Credit Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**THIS COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

A.     **Petition Date**.  On April 1, 2024 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (this "Court").  The Debtors have continued in the management and operation of their businesses and properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No statutory committee of unsecured creditors (to the extent such committee is appointed, the "Committee"), trustee, or examiner has been appointed in the Cases.

B.     **Jurisdiction and Venue**.  This Court has core jurisdiction over the Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and other predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 and the Local Rules.

C.     **Notice**.  The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001.  Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the

---

[4]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

District of Delaware (the "United States Trustee"); (ii) the United States Attorney's Office for the District of Delaware; (iii) the state attorney's general for all states in which the Debtors conduct businesses; (iv) the Internal Revenue Service; (v) the United States Securities and Exchange Commission; (vi) the holders of the fifty (50) largest unsecured claims against the Debtors on a consolidated basis; (vii) counsel to the Prepetition First Lien Agents (as defined below); (viii) the Prepetition First Lien Agents; (ix) counsel to the Prepetition Second Lien Agent (as defined below); (x) the Prepetition Second Lien Agent; (xi) CIT; (xii) the DIP Agent; (xiii) counsel to the DIP Agent; (xiv) the banks and financial institutions where the Debtors maintain accounts; (xv) all parties known to have asserted a lien against the Debtors' assets; and (xvi) any party that has requested notice pursuant to Bankruptcy Rule 2002. Under the circumstances, such notice of the DIP Motion, the relief requested therein, and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the Local Rules.

D.     **Debtors' Stipulations Regarding the Prepetition First Lien Facilities**.

Subject only to the rights of parties in interest that are specifically set forth in Paragraph 6 below, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree (paragraphs D and E hereof shall be referred to herein collectively as the "Debtors' Stipulations") as follows:

(i)     **Prepetition First Lien Credit Facilities**.

a.     Pursuant to that certain First Lien Credit Agreement, dated as of October 27, 2015 (as amended, restated or otherwise modified from time to time, the "Prepetition Initial First Lien Credit Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Initial First Lien Loan Documents"), among (i) SHO Holding I Corporation, as borrower, (ii) the guarantors party thereto, (iii) the other financial institutions party thereto as "Lenders"

(collectively, the "<u>Prepetition Initial First Lien Lenders</u>"), and (iv) Antares Capital LP, as administrative agent and collateral agent (in such capacities, the "<u>Prepetition Initial First Lien Agent</u>"), the Prepetition Initial First Lien Lenders agreed to extend loans and other financial accommodations to the Borrower.

b.    Pursuant to that certain Sidecar Credit Agreement (as defined in the Prepetition Initial First Lien Credit Agreement), dated as of October 31, 2019 (as amended, restated or otherwise modified from time to time, the "<u>Prepetition Sidecar Credit Agreement</u>" together with the Prepetition Initial First Lien Credit Agreement, the "<u>Prepetition First Lien Credit Agreements</u>," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Sidecar Loan Documents</u>" and, together with the Prepetition Initial First Lien Loan Documents, the "<u>Prepetition First Lien Loan Documents</u>"), among (i) SHO Holding I Corporation, as borrower, (iii) the guarantors party thereto, (iii) the other financial institutions party thereto as "Lenders" (collectively, the "<u>Prepetition Sidecar Lenders</u>" and, together with the Prepetition Initial First Lien Lenders, the "<u>Prepetition First Lien Lenders</u>"), and (iv) Antares Capital LP, as administrative agent and collateral agent (in such capacities, the "<u>Prepetition Sidecar Agent</u>" and together with the Prepetition Initial First Lien Agent, the "<u>Prepetition First Lien Agents</u>" and, collectively, with the Prepetition Sidecar Lenders, the Prepetition Initial First Lien Agent, the Prepetition Initial First Lien Lenders and any other party to which Prepetition First Lien Obligations (as defined below) are owed, the "<u>Prepetition First Lien Secured Parties</u>"), the Prepetition Sidecar Lenders agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition Sidecar Loan Documents.

c.    All obligations of the Debtors arising under the Prepetition Initial First Lien Credit Agreement and the Prepetition Sidecar Credit Agreement (including all of the "Obligations" as respectively defined therein) or the other Prepetition First Lien Loan Documents shall collectively be referred to herein as the "<u>Prepetition First Lien Obligations</u>."

(ii)    <u>Prepetition First Liens and Prepetition First Lien Collateral</u>. Pursuant to the Collateral Documents (as defined in the Prepetition Initial First Lien Credit Agreement) and the Collateral Documents (as defined in the Prepetition Sidecar Credit Agreement) (collectively, as such documents were amended, restated, supplemented, or otherwise modified from time to

time, the "<u>Prepetition First Lien Collateral Documents</u>"), by and among each of the grantors party thereto (the "<u>Prepetition First Lien Grantors</u>") and the Prepetition First Lien Agents, each Prepetition First Lien Grantor granted to each of the Prepetition First Lien Agents, for the benefit of itself and the other Prepetition First Lien Secured Parties, to secure the Prepetition First Lien Obligations, a first priority security interest in and continuing Lien (the "<u>Prepetition First Liens</u>") on substantially all of such Prepetition First Lien Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All "Collateral" as defined in the Prepetition First Lien Credit Agreements granted or pledged by such Prepetition First Lien Grantors pursuant to any Prepetition First Lien Collateral Documents or any other Prepetition First Lien Loan Documents shall collectively be referred to herein as the "<u>Prepetition First Lien Collateral</u>."  As of the Petition Date, (I) the Prepetition First Liens (a) are legal, valid, binding, enforceable, and perfected Liens, (b) were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (d) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Adequate Protection Liens, (C) the Carve-Out (as defined below), and (D) the Prepetition Prior Liens, and (II) (w) the Prepetition First Lien Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition First Lien Obligations exist, (y) subject to the Challenge Period and related provisions

in Paragraph 6 below, no portion of the Prepetition First Lien Obligations or any payments made

to any or all of the Prepetition First Lien Secured Parties are subject to avoidance, disallowance,

disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or

"claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or

applicable non-bankruptcy law, and (z) each of the Guarantees (as defined in the Prepetition First

Lien Credit Agreements) shall continue in full force and effect to unconditionally guaranty the

Prepetition First Lien Obligations notwithstanding any use of Cash Collateral permitted hereunder

or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors

pursuant to the terms of this Interim Order or the DIP Loan Documents.

(iii) <u>Amounts Owed under Prepetition First Lien Loan Documents</u>.  As of the

Petition Date, the applicable Debtors owed the Prepetition First Lien Secured Parties, pursuant to

the Prepetition First Lien Loan Documents, without defense, counterclaim, reduction or offset of

any kind, in respect of loans made, letters of credit issued and other financial accommodations

made by the Prepetition First Lien Secured Parties, (x) an aggregate principal amount of not less

than $257,107,000 with respect to the Term Loans (as defined in the Prepetition Initial First Lien

Credit Agreement), not less than $25,125,000 with respect to the Revolving Loans (as defined in

the Prepetition Initial First Lien Credit Agreement), and not less than $800,000 with respect to the

LC Obligations (as defined in the Prepetition Initial First Lien Credit Agreement), *plus* (y) an

aggregate principal amount of not less than $20,407,000 with respect to the Revolving Loans and

an aggregate principal amount of not less than $354,000 with respect to the First Amendment Term

Loans (each as defined in the Prepetition Sidecar Credit Agreement), *plus* (z) all accrued and

hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any

reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and

expenses that are chargeable or reimbursable under the Prepetition First Lien Loan Documents), and other amounts now or hereafter due under the Prepetition First Lien Loan Documents.

(iv)    <u>Release of Claims</u>.    Subject to entry of the Final Order and any Challenge pursuant to Paragraph 6 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition First Lien Secured Parties and their respective affiliates, assigns or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives of the foregoing (all of the foregoing, collectively and each solely in their capacities as such, the "<u>Prepetition First Lien Secured Party Releasees</u>") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or recovery against any and all of the Prepetition First Lien Secured Party Releasees, whether arising at law or in equity, relating to or otherwise in connection with the Prepetition First Lien Obligations, the Prepetition First Liens, or the debtor-creditor relationship between any of the Prepetition First Lien Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (I) any recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (II) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition First Lien Obligations or any payments or other transfers made on account of the Prepetition First Lien Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition First Liens securing the Prepetition First Lien Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously

12

received by any of the Prepetition First Lien Secured Party Releasees.

        E.        **Debtors' Stipulations Regarding the Prepetition Second Lien Facility**.
Subject to the rights of parties in interest that are specifically set forth in Paragraph 6 below, the Debtors, on behalf of themselves and on behalf of their estates, further admit, stipulate, acknowledge, and agree as follows:

        (i)        Pursuant to that certain Second Lien Credit Agreement, dated as of October 27, 2015 (as amended, restated or otherwise modified from time to time, the "Prepetition Second Lien Credit Agreement," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Loan Documents"), among (a) SHO Holding I Corporation, as borrower, (b) the guarantors party thereto, (c) the other financial institutions party thereto as "Lenders" (collectively, the "Prepetition Second Lien Lenders"), and (d) Ares Capital Corporation, as administrative agent and collateral agent (in such capacities, the "Prepetition Second Lien Agent" and, collectively with the Prepetition Second Lien Lenders, the "Prepetition Second Lien Secured Parties" and, together with the Prepetition First Lien Secured Parties, the "Prepetition Secured Parties"), the Prepetition Second Lien Lenders agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition Second Lien Loan Documents. All obligations of the Debtors arising under the Prepetition Second Lien Credit Agreement (including all of the "Obligations" as respectively defined therein) or the other Prepetition Second Lien Loan Documents shall collectively be referred to herein as the "Prepetition Second Lien Obligations."

        (ii)        Prepetition Second Liens and Prepetition Second Lien Collateral. Pursuant to the Collateral Documents (as defined in the Prepetition Second Lien Credit Agreement)

(collectively, as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Collateral Documents"), by and among each of the grantors party thereto (the "Prepetition Second Lien Grantors") and the Prepetition Second Lien Agent, each Prepetition Second Lien Grantor granted to the Prepetition Second Lien Agent, for the benefit of itself and the other Prepetition Second Lien Secured Parties, to secure the Prepetition Second Lien Obligations, a second priority security interest in and continuing Lien (the "Prepetition Second Liens" and, together with the Prepetition First Liens, the "Prepetition Liens") on substantially all of such Prepetition Second Lien Grantor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All "Collateral" as defined in the Prepetition Second Lien Credit Agreement granted or pledged by such Prepetition Second Lien Grantors pursuant to any Prepetition Second Lien Collateral Documents shall collectively be referred to herein as the "Prepetition Second Lien Collateral."  As of the Petition Date, (I) the Prepetition Second Liens (a) are legal, valid, binding, enforceable, and perfected Liens, (b) were granted to, or for the benefit of, the Prepetition Second Lien Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (d) are subject and subordinate only to (A) the DIP Liens, (B) the Adequate Protection Liens, (C) the Prepetition First Liens, (D) the Carve-Out (as defined below), and (E) the Prepetition Prior Liens, and (II) (w) the Prepetition Second Lien Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Second Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362

14

of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Second Lien Obligations exist, (y) no portion of the Prepetition Second Lien Obligations or any payments made to any or all of the Prepetition Second Lien Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) each of the Guarantees (as defined in the Prepetition Second Lien Credit Agreement) shall continue in full force and effect to unconditionally guaranty the Prepetition Second Lien Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Loan Documents.

(iii)    <u>Amounts Owed under Prepetition Second Lien Loan Documents</u>.  As of the Petition Date, the applicable Debtors owed the Prepetition Second Lien Secured Parties, pursuant to the Prepetition Second Lien Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made, letters of credit issued and other financial accommodations made by the Prepetition Second Lien Secured Parties, (x) an aggregate principal amount of not less than $147,292,000 with respect to the Loans (as defined in the Prepetition Second Lien Credit Agreement), *plus* (y) all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Second Lien Loan Documents), and other amounts now or hereafter due under the Prepetition Second Lien Loan Documents.

(iv)    <u>Release of Claims</u>.  Subject in all respects to entry of the Final Order and any Challenge pursuant to Paragraph 6 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition Second Lien Secured Parties and their respective affiliates, assigns or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives of the foregoing (all of the foregoing, collectively and each solely in their capacities as such, the "<u>Prepetition Second Lien Secured Party Releasees</u>") from any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights and other rights of disgorgement or recovery against any and all of the Prepetition Second Lien Secured Party Releasees, whether arising at law or in equity, relating to or otherwise in connection with the Prepetition Second Lien Obligations, the Prepetition Second Liens, or the debtor-creditor relationship between any of the Prepetition Second Lien Secured Parties, on the one hand, and any of the Debtors, on the other hand, including (I) any recharacterization, subordination, avoidance, disallowance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (II) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Second Lien Obligations or any payments or other transfers made on account of the Prepetition Second Lien Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Second Liens securing the Prepetition Second Lien Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Second Lien Secured Party Releasees.

(v)  Intercreditor Agreements.  The Debtors stipulate and agree that the First Lien Intercreditor Agreement, dated as of October 31, 2019, by and among the Prepetition Initial First Lien Agent and the Prepetition Sidecar Agent (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Sidecar Intercreditor Agreement") sets forth provisions governing the relative priorities and rights of the Prepetition First Lien Secured Parties and their respective Prepetition First Lien Obligations.  The Debtors further stipulate and agree that the Intercreditor Agreement, dated as of October 27, 2015, by and among the Prepetition Initial First Lien Agent and the Prepetition Second Lien Agent (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Second Lien Intercreditor Agreement" and together with the Sidecar Intercreditor Agreement, the "Intercreditor Agreements") sets forth subordination and other provisions governing the relative priorities and rights of the Prepetition First Lien Secured Parties and their respective Prepetition First Lien Obligations and Prepetition First Liens, on the one hand, and the Prepetition Second Lien Secured Parties and their respective Prepetition Second Lien Obligations and Prepetition Second Liens, on the other hand.  Pursuant to section 510 of the Bankruptcy Code, such Intercreditor Agreements and any other intercreditor agreement or subordination agreement between or among the Prepetition First Lien Agents, the Prepetition Second Lien Agent, any Prepetition First Lien Lender, any Prepetition Second Lien Lender, any Debtor or affiliate thereof, and any other applicable intercreditor or subordination provisions contained in any credit agreement, security agreement, indenture or related document, (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights and remedies of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties (including the relative priorities, rights and remedies of such parties with respect to the replacement liens and administrative expense claims and superpriority administrative expense

claims granted, or amounts payable, by the Debtors under this Interim Order or otherwise and the modification of the automatic stay), and (iii) shall not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Loan Documents, and for avoidance of doubt, any acts or omissions by any Prepetition Second Lien Secured Party in connection with any chapter 11 plan of reorganization or liquidation in these Cases (whether confirmed under section 1129(a) or (b) of the Bankruptcy Code), and any distributions on account of, or other treatment of, any Prepetition Second Lien Obligations pursuant to any such plan, shall remain subject to the Intercreditor Agreement (including its turnover provisions) or any other applicable intercreditor or subordination provisions.

(vi)    _Cash Collateral_.    Subject to Paragraphs 6 and 11(b) hereof, all of the Debtors' cash (other than cash in the Escrow Account or in the Excluded Accounts (as defined in DIP Loan Documents, Prepetition First Lien Loan Documents, or Prepetition Second Lien Loan Documents, as applicable)), wherever located, constitutes Cash Collateral of the Prepetition First Lien Agents and the other Prepetition First Lien Secured Parties.

F.    **Findings Regarding the DIP Facility**.

(i)    Need for Postpetition Financing.    The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, to complete the Debtors' marketing and sale process, and to otherwise preserve the value of the Debtors' estates.    The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to a successful sale or to otherwise preserve the enterprise value of the Debtors' estates.

18

Immediate and irreparable harm will be caused to the Debtors and their estates if immediate financing is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Interim Order and the DIP Loan Documents.

(ii)    <u>No Credit Available on More Favorable Terms</u>.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Loan Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claims (as defined below), (b) allowing the DIP Secured Parties to provide the loans, letters of credit, and other financial accommodations under the DIP Facility (including the Roll Up DIP Loans) on the terms set forth herein and in the DIP Loan Documents, and (c) granting to the Prepetition Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including the Prepetition First Lien Adequate Protection and the conversion of certain Prepetition First Lien Obligations into the Roll Up DIP Facility (collectively, the "<u>DIP Protections</u>").

(iii)    The Roll-Up DIP Facility shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Prepetition First Lien Prepetition Lenders in their capacity as DIP Lenders, to fund amounts and provide other consideration to the Debtors under the DIP Facility and not as payments under, adequate protection for, or otherwise

19

on account of any of the Prepetition First Lien Secured Obligations. The Prepetition First Lien Secured Parties would not otherwise consent to the use of their Cash Collateral and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder, without the inclusion of Roll Up DIP Loans upon entry of the Final Order.

G.        **Interim Financing**.  During the Interim Period (as defined below), the DIP Secured Parties and, as applicable, the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties are willing to, or are otherwise deemed to under the terms of the applicable Intercreditor Agreements, provide financing to the Debtors or consent to the use of Cash Collateral by the Debtors, subject to (i) the entry of this Interim Order, and (ii) the terms and conditions of the DIP Loan Documents.

H.        **Adequate Protection for Prepetition Secured Parties**.

(i)        The Prepetition Secured Parties have agreed to permit the Debtors to use the Prepetition First Lien Collateral and the Prepetition Second Lien Collateral, including the Cash Collateral, during the Interim Period, subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  In addition, the DIP Facility contemplated hereby provides for a priming of the Prepetition First Liens and Prepetition Second Liens pursuant to section 364(d) of the Bankruptcy Code.  Solely to the extent of any aggregate postpetition diminution in value of their respective interests in the Prepetition First Lien Collateral (as defined herein) or the Prepetition Second Lien Collateral (as defined herein) as of the Petition Date, including, as applicable, with respect to the Cash Collateral (such diminution, a "Diminution in Value"), the Prepetition Secured Parties are entitled to the adequate protection as set forth herein, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to this Court at

20

the Interim Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition Secured Parties.  Prepetition First Lien Lenders holding more than 50% of the aggregate principal balance of the Loans (as defined in the Prepetition Initial First Lien Credit Agreement) (which Prepetition Initial First Lien Lenders constitute "Required Lenders," as defined in the Prepetition Initial First Lien Credit Agreement) and 50% of the aggregate principal balance of the Loans (as defined in the Prepetition Sidecar Credit Agreement) (which Prepetition Sidecar Lenders constitute "Required Revolving Lenders," as defined in the Prepetition Sidecar Credit Agreement) have expressly consented to the entry of this Interim Order and the relief provided herein and pursuant to the terms of the Prepetition First Lien Credit Agreements, the consents of such Prepetition First Lien Lenders are binding on all Prepetition First Lien Secured Parties.  None of the remaining Prepetition First Lien Secured Parties has filed an objection to the entry of this Interim Order or the relief provided herein, and in any event, the prepetition Liens and security interests of such parties are adequately protected pursuant to the terms of this Interim Order.  Notwithstanding anything to the contrary herein, the Prepetition First Lien Secured Parties' consent to the DIP Facility and to the priming of the Prepetition First Liens by the DIP Liens is expressly limited to the present DIP Facility and the DIP Liens securing same and shall not be applicable to any other debtor in possession credit facility, even if it contains substantially the same economic terms as this DIP Facility.

(ii)    The DIP Facility contemplated hereby provides for a priming of the Prepetition Second Liens pursuant to section 364(d) of the Bankruptcy Code.  The Prepetition

Second Lien Secured Parties are deemed to have consented to the relief provided for herein pursuant to and in accordance with the Second Lien Intercreditor Agreement. The prepetition Liens and security interests of such parties are adequately protected pursuant to the terms of this Interim Order.

    I.    **Section 552**.  In light of the subordination of their Liens and superpriority administrative claims to the Carve-Out and the DIP Liens, each of the Prepetition First Lien Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and  the "equities of the case" exception shall not apply, in each case, subject to the entry of the Final Order.

    J.    **Business Judgment and Good Faith Pursuant to Section 364(e)**.

    (i)    The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Interim Order.

    (ii)    The Debtors' agreement to the terms and conditions of the DIP Facility and the DIP Loan Documents, and to the payment of all fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  Such terms and conditions are supported by reasonably equivalent value and fair consideration.

    (iii)    The DIP Secured Parties, the Prepetition First Lien Secured Parties, and the Debtors, with the assistance and counsel of their respective advisors, have acted in good faith and at arms' length in, as applicable, negotiating, consenting to, or agreeing to, the DIP Facility (including, subject to the entry of the Final Order and challenge pursuant to paragraph 6 below, the Roll Up DIP Facility), the Debtors' use of the DIP Collateral and the Prepetition First

Lien Collateral (including Cash Collateral), the DIP Loan Documents and the DIP Protections (including the Prepetition First Lien Adequate Protection and the Prepetition Second Lien Adequate Protection). The DIP Obligations (including all advances that are made at any time to the Debtors under the DIP Loan Documents, and including the Roll Up DIP Loans) and the Debtors' use of the DIP Collateral and the Prepetition First Lien Collateral (including Cash Collateral) shall be deemed to have been extended or consented to by the DIP Secured Parties and the Prepetition First Lien Secured Parties for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express and good faith reliance upon the protections offered by section 364(e) of the Bankruptcy Code and this Interim Order, and, accordingly, the DIP Liens, the DIP Superpriority Claims, the Prepetition First Lien Adequate Protection and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and this Interim Order in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

K.      **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates, their businesses and properties, and their ability to successfully sell their assets or otherwise preserve the enterprise value of the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and authorization of the use of Cash Collateral in accordance with this Interim Order and the DIP Loan Documents is therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.  Based on all of the

foregoing, sufficient cause exists for immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2(b).

**NOW, THEREFORE**, based on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Prepetition First Lien Agents and the requisite Prepetition First Lien Secured Parties (on behalf of all of the Prepetition First Lien Secured Parties), and the DIP Agent (on behalf of all of the DIP Secured Parties) to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.      **Motion Granted**.  The DIP Motion is hereby granted as set forth herein.  Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.      **DIP Loan Documents and DIP Protections**.

(a)      Approval of DIP Loan Documents.  The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Interim Order, to incur the DIP Obligations (as defined below) (including, subject to the entry of the Final Order, and subject to challenge pursuant to paragraph 6 below, to convert $83,8831,822 of the Loans (as defined in the Prepetition Initial First Lien Credit Agreement) and $6,168,178 of the Revolving Loans (as defined in the Prepetition Sidecar Credit Agreement) to Roll Up DIP Loans), in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents that may be required or necessary for the performance by the applicable Debtors under the DIP Loan Documents and the creation and

24

perfection of the DIP Liens described in, and provided for, by this Interim Order and the DIP Loan Documents.  The Debtors are hereby authorized to do and perform all acts and pay the principal, interest, fees, expenses, and other amounts described in the DIP Loan Documents as such become due pursuant to the DIP Loan Documents and this Interim Order, including all closing fees, administrative fees, commitment fees, and reasonable and documented attorneys', financial advisors', and accountants' fees, and disbursements arising under the DIP Loan Documents and this Interim Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect; provided, however, that the payment of the fees and expenses of the Lender Professionals (as defined below) shall be subject to the provisions of Paragraph 20(b).  Upon their execution and delivery, the DIP Loan Documents shall represent the legal, valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms.  Each officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

(b)     DIP Obligations.  For purposes of this Interim Order, the term "DIP Obligations" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement and other DIP Loan Documents (including all "Obligations" as defined in the DIP Credit Agreement, and subject to the entry of the Final Order and challenge pursuant to paragraph 6 below, the Roll Up DIP Obligations) and shall include the principal of, interest on, and fees, costs, expenses, and other charges owing in respect of, such amounts (including any accrued and unpaid reasonable and documented attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan Documents

or this Interim Order), and any obligations in respect of indemnity claims, whether contingent or otherwise, set forth in the DIP Loan Documents.  Notwithstanding anything to the contrary herein, the relative rights and priorities of the Roll Up DIP Secured Parties and the other DIP Secured Parties in respect of the DIP Collateral shall be as provided in the DIP Orders.  Notwithstanding anything to the contrary herein, all Letters of Credit (as defined in Prepetition First Lien Credit Agreement) shall be deemed to constitute Letters of Credit, as defined in and as issued in connection with, the DIP Credit Agreement, and accordingly, from and after the Petition Date, all L/C Exposure in respect of such Letters of Credit shall constitute part of the DIP Obligations (and shall not be part of the Roll Up DIP Facility) and shall be allocable to the DIP Lenders in accordance with the terms of the DIP LC Facility, and upon closing of the DIP LC Facility, none of the Prepetition First Lien Secured Parties and Roll Up DIP Secured Parties, in each case, except in their respective capacities as DIP Lenders, shall have any further liability with respect to such L/C Exposure; provided, however, that nothing herein shall alter any such parties' obligations as the issuer of any Letters of Credit.

(c)      Authorization to Incur DIP Obligations and Use Cash Collateral.  To enable the Debtors to continue to operate their businesses and preserve and maximize the value of their estates, during the period from the entry of this Interim Order through and including the earliest to occur of (i) the entry of the Final Order, or (ii) the Termination Declaration (as defined below), in each case unless extended by written agreement of the DIP Agent and the Prepetition Initial First Lien Agent (the period from the entry of this Interim Order through and including such earliest date, the "Interim Period"), the Borrower is hereby authorized (x) to use Cash Collateral and (y) to borrow under the DIP Facility; provided that (i) the aggregate outstanding amount for all such borrowings shall not exceed $20,000,000 under the DIP Term Loan Facility; and (ii) any proposed

use of the proceeds of DIP Loans or use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order and the DIP Loan Documents, including the Approved Budget and the Budget Covenants, each as defined and contained in Paragraphs 2(e) and 2(f) below, respectively.  Following the entry of the Final Order, the Borrower's authority to incur further DIP Obligations, if any, and use further Cash Collateral will be governed by the terms of such Final Order and the DIP Loan Documents. All DIP Obligations shall be unconditionally guaranteed, on a joint and several basis, by the DIP Guarantors, as further provided in the DIP Loan Documents.

(d)     <u>Roll Up DIP Facility</u>.  Subject to the entry of the Final Order, and subject to challenge pursuant to paragraph 6 below, up to $83,831,822 of the Loans (as defined in the Prepetition Initial First Lien Credit Agreement) and up to $6,168,178 of the Revolving Loans (as defined in the Prepetition Sidecar Credit Agreement) in connection with the DIP Term Loans shall immediately, automatically, and irrevocably be deemed to have been converted into Roll-Up Obligations and, except as otherwise provided in the Final Order and the DIP Loan Documents, shall be entitled to all the priorities, privileges, rights, and other benefits afforded to the other DIP Obligations under the Final Order and the DIP Loan Documents.  Upon entry of the Final Order, (i) the full amount of the Roll Up DIP Loans will not be required to be repaid in cash on the Maturity Date, but instead shall be treated in any manner acceptable to Roll Up DIP Agent and the holders of Roll Up DIP Loans representing at least two-thirds in amount and more than one-half in number of all Roll Up DIP Loans (such holders, the "<u>Requisite Roll Up DIP Lenders</u>"), and (ii) notwithstanding the foregoing, and unless the Requisite Roll Up DIP Lenders otherwise agree in writing, all Roll Up DIP Obligations shall become due and payable in full in cash on the Maturity Date.  As used herein, the term "<u>Roll UP DIP Obligations</u>" shall mean the Roll Up DIP Loans and all interest accruing thereon and all other amounts owing by the respective Debtors in respect

thereof.  The Roll Up Obligations shall be without prejudice to the rights of any third party, including, without limitation, the Committee, to seek any appropriate remedy from the Court in the event of a timely and successful Challenge (as defined herein), and in the event of a successful Challenge, the Court may fashion an appropriate remedy in respect of the Roll Up Obligations.

(e)    <u>Budget</u>.  Attached hereto as <u>Exhibit 1</u> is a rolling 13-week cash flow budget (the "<u>Initial Approved Budget</u>") that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales and international transfers), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases, capital expenditures, issuances of any letter of credit, including the fees relating thereto, and estimated fees and expenses of the DIP Agent (including counsel and financial advisors therefor), the Prepetition First Lien Agents (including counsel and financial advisors therefor), and any other fees and expenses relating to the DIP Facility), (iii) the sum of weekly unused availability under the DIP Facility plus unrestricted cash on hand (collectively, "<u>Aggregate Liquidity</u>"), and (iv) the weekly outstanding principal balance of the loans made under the DIP Facility (including the principal amount of the Roll Up DIP Facility from and after the entry of a Final Order).  Commencing on April 5, 2024 and continuing every fourth Friday thereafter (*i.e.*, every four weeks), the Debtors shall prepare and deliver simultaneously to the DIP Agent and the Prepetition First Lien Agents an updated "rolling" 13-week budget, which, once approved in writing by each of the DIP Agent and the Prepetition Initial First Lien Agent in their respective sole discretion, shall supplement and replace the Initial Approved Budget or Supplemental Approved Budget (as defined below), as applicable, then in effect (each such updated budget that has been approved in writing by each of the DIP Agent and the Prepetition First Lien Agent, a "<u>Supplemental Approved Budget</u>") without further notice, motion, or application to, order of, or

hearing before, this Court; provided, however, that the DIP Agent and the Prepetition Initial First Lien Agent shall each have until Tuesday of the following week to approve each updated "rolling budget" (any such party that fails to timely provide the Debtors written notice of any objection to such updated "rolling budget" shall be deemed to have approved such updated "rolling budget"); provided, further, however, that unless and until each of the DIP Agent and the Prepetition Initial First Lien Agent have approved (or be deemed to have approved as provided above) such updated budget, the Debtors shall still be subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect in accordance with this Interim Order, and the DIP Secured Parties and the Prepetition First Lien Secured Parties shall, as applicable, have no obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto, as applicable.  The Initial Approved Budget, as modified by all Supplemental Approved Budgets, shall constitute the "Approved Budget." Commencing on April 12, 2024 and continuing every Friday thereafter (*i.e.*, every week), the Debtors shall prepare and deliver simultaneously to the DIP Agent and the Prepetition First Lien Agents a variance report/reconciliation report certified by the Chief Financial Officer of the Debtors, in form reasonably acceptable to the DIP Agent and the Prepetition Initial First Lien Agent, setting forth on a line-item basis (A) the actual cash receipts, expenditures, disbursements, and outstanding revolving loan balance (separating out the amount of the Roll Up DIP Facility during the Interim Period) of the Debtors for such immediately preceding week and the Aggregate Liquidity and outstanding letter of credit exposure as of the end of such week, (B) the variance in dollar amounts of the actual cash receipts, international transfers and disbursements for each weekly period from those reflected for the corresponding period in the Approved Budget, (C) a description of the nature of any positive or negative variance of greater than fifteen percent (15%) and $150,000 in certain

29

line items to be agreed, and (D) whether the Debtors complied with the applicable Budget Covenants defined in the following Paragraph 2(f) for the applicable testing period. Notwithstanding anything to the contrary in this Interim Order and subject to the provisions of Paragraph 20(b), the professional fees, costs and expenses of the DIP Agent's advisors and the Prepetition First Lien Agents' advisors, respectively, shall be due, payable and paid in accordance with the terms of this Interim Order notwithstanding any budgeted amounts for such fees, costs and expenses set forth in the Approved Budget, and the Debtors shall not be deemed to have breached the terms of the Approved Budget or the Budget Covenants to the extent the actual amount of such fees, costs and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget.

(f)    Budget Covenants.  The Debtors shall only incur DIP Obligations and expend Cash Collateral and other DIP Collateral proceeds in accordance with the specific purposes, and at the specific time periods, set forth in the Approved Budget (and in the case of the costs and expenses of the DIP Agent and Prepetition First Lien Agents, in accordance with the DIP Loan Documents and this Interim Order without being limited by the Approved Budget), subject to the following permitted variances (the "Permitted Variances"), which shall be tested initially after conclusion of the fourth full week following Petition Date (the "First Testing Date") (testing the period from the Petition Date through and including April 26, 2024 (such initial testing period, the "First Testing Period")) and continuing on each fourth Friday thereafter (each, a "Subsequent Testing Date") (in each case, testing the trailing four week period ending on the Friday before the applicable Subsequent Testing Date (each, a "Four Week Testing Period")): (i) (A) for the First Testing Date, the sum of all actual disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) for the First

30

Testing Period shall not exceed 120% of the sum of the "Total Operating Disbursements" for such First Testing Period as set forth in the Approved Budget, and (B) for each Subsequent Testing Date, the sum of all actual disbursements of the Debtors (calculated in the same manner as the "Total Operating Disbursements" in the Approved Budget were calculated) for the immediately preceding Four Week Testing Period shall not exceed 120% of the sum of the "Total Operating Disbursements" for such immediately preceding Four Week Testing Period as set forth in the Approved Budget; and (ii) (A) for the First Testing Date, (x) the sum of actual receipts of the Debtors for the First Testing Period shall not be less than 80% of the sum of the "Total Receipts" for such First Testing Period as set forth in the Approved Budget and (y) the sum of international transfers of the Debtors for the First Testing Period shall not be less than 80% of the sum of the "International Transfers" for such First Testing Period as set forth in the Approved Budget, and (B) for each Subsequent Testing Date, (x) the sum of actual receipts of the Debtors for the immediately preceding Four Week Testing Period shall not be less than 80% of the sum of the "Total Receipts" for such immediately preceding Four Week Testing Period as set forth in the Approved Budget and (y) the sum of international transfers of the Debtors for the immediately preceding Four Week Testing Period shall not be less than 80% of the sum of the "International Transfers" for such immediately preceding Four Week Testing Period as set forth in the Approved Budget; provided, that, in all circumstances, a positive variance in any one measurement period shall be carried over for use in subsequent periods solely on a line item basis.  The foregoing budget-related covenants are collectively referred to herein as the "Budget Covenants."

(g)    Interest, Fees, Costs, Indemnities and Expenses.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Loan Documents, in each case without

further notice, motion, or application to, order of, or hearing before, this Court; provided, that interest with respect to the Roll Up DIP Loans shall be paid-in-kind.  The Debtors shall pay all fees, costs, indemnities, expenses (including accrued and unpaid reasonable and documented out-of-pocket legal and other professional fees and expenses of the DIP Agent) and other charges payable under the terms of the DIP Loan Documents.  All such fees, costs, indemnities, expenses and disbursements, whether incurred, paid or required to be paid prepetition or postpetition and whether or not budgeted in the Approved Budget, are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Agent or its professionals as of the Petition Date for payment of such fees, costs, indemnities, expenses and disbursements may be applied for payment) as contemplated in this Interim Order and the DIP Loan Documents, and, subject to the provisions of Paragraph 20(b) with respect to the fees and expenses of the Lender Professionals, shall be non-refundable and not subject to challenge in any respect.

(h)     Use of DIP Facility and Proceeds of DIP Collateral.  The Borrower shall apply the proceeds of all DIP Collateral solely in accordance with this Interim Order and the DIP Loan Documents, which shall include, for the avoidance of doubt, the continued performance of intercompany transfers with each of the Debtors and with the non-Debtor foreign subsidiaries in the ordinary course, in accordance with the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Certain Intercompany Transactions, and (II) Granting Related Relief* (the "Cash Management Order") and the Approved Budget.  Without limiting the foregoing, the Debtors shall not be permitted to make any payments (from the DIP Collateral, the proceeds of DIP Loans or otherwise) on account of any prepetition debt or obligation prior to the effective date of a

32

confirmed chapter 11 plan or plans with respect to any of the Debtors, except (a) with respect to the Prepetition First Lien Obligations as set forth in this Interim Order and a Final Order; (b) as provided in the orders approving each of the "first day" motions, which orders shall be in form and substance reasonably acceptable to the DIP Agent and the Prepetition Initial First Lien Agent; (c) as approved by the Court and expressly provided in other motions, orders, and requests for relief, each in form and substance acceptable to the DIP Agent and the Prepetition Initial First Lien Agent prior to such motion, order, or request for such relief being filed; or (d) as otherwise expressly provided in the DIP Credit Agreement, without giving effect to any amendment or waiver thereof to which the Prepetition Initial First Lien Agent has not consented in writing.

(i)     Conditions Precedent. The DIP Secured Parties and Prepetition First Lien Secured Parties each have no obligation to extend credit under the DIP Facility or permit use of any DIP Collateral or Prepetition First Lien Collateral or any proceeds thereof, including Cash Collateral, as applicable, during the Interim Period unless and until all conditions precedent to the extension of credit or use of DIP Collateral, Prepetition First Lien Collateral or proceeds thereof under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and the Prepetition Initial First Lien Agent in accordance with the DIP Loan Documents or Prepetition First Lien Credit Agreements, as applicable, and this Interim Order, or as otherwise permissible under the Bankruptcy Code.

(j)     DIP Liens. Subject to the Carve-Out, as security for the DIP Obligations, effective as of the Petition Date, and subject to the relative priorities as between the Roll Up DIP Facility and the remainder of the DIP Facility as more fully set forth in this Interim Order and the DIP Loan Documents, the following security interests and Liens, which shall immediately and without any further action by any Person be valid, binding, permanent, perfected, continuing, enforceable,

and non-avoidable upon the entry of this Interim Order, are hereby granted by the Debtors to the

DIP Agent, for itself and the other DIP Secured Parties (all such security interests and Liens

granted to the DIP Agent for the benefit of all the DIP Secured Parties pursuant to this Interim

Order and the DIP Loan Documents, the "DIP Liens"), on all property of the Debtors, now existing

or hereinafter acquired, including all cash and cash equivalents (whether maintained with the DIP

Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory,

goods, accounts receivable, other rights to payment, intercompany loans and other investments,

securities and other investment property, contracts, contract rights, properties, plants, equipment,

machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents,

instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting

obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights,

trademarks, trade names, other intellectual property, intellectual property licenses, permits,

franchise rights, capital stock and other equity interests of subsidiaries and in other entities, tax

and other refunds, insurance proceeds, commercial tort claims, and other causes of action, and

proceeds relating thereto (including proceeds of Avoidance Actions), proceeds of actions brought

under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral

(whether received by judgment, settlement or otherwise), all other Collateral (as defined in the

DIP Loan Documents), and all other "property of the estate" (as defined in section 541 of the

Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now

existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits,

replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever

located; provided, however, that the DIP Liens on the proceeds of Avoidance Actions shall be

subject to the entry of the Final Order; provided, further, that the DIP Liens on the equity interests

of the Debtors and their direct or indirect subsidiaries shall consist of (A) 100% of the equity

interests of Parent and each direct and indirect domestic Debtor subsidiary thereof, (B) 100% of

the non-voting equity interests of each direct or indirect foreign subsidiary of any Debtor; and

(C) 100% of the voting equity interests of each foreign subsidiary directly owned by any Debtor

(all of the foregoing collateral collectively referred to as the "DIP Collateral"):

> (I)    pursuant to section 364(c)(2) of the Bankruptcy Code and subject to the Carve-Out, a perfected, binding, continuing, enforceable, and non-avoidable first priority Lien on all unencumbered DIP Collateral, including, subject to the entry of the Final Order, proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing (collectively, the "Avoidance Actions", which for the avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise;

> (II)   pursuant to section 364(c)(3) of the Bankruptcy Code and subject to the Carve-Out, a perfected, binding, continuing, enforceable, and non-avoidable Lien upon all DIP Collateral that is subject solely to the Prepetition Prior Liens, which DIP Lien shall be junior only to such Prepetition Prior Liens and the Carve-Out; and

> (III)  pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming Lien on all other DIP Collateral (including Cash Collateral), which DIP Lien (x) shall be senior to the First Lien Adequate Protection Liens and Second Lien Adequate Protection Liens and senior and priming to (A) the Prepetition Liens and (B) any Liens that are junior to the Prepetition Liens, the First Lien Adequate Protection Liens, or the Second Lien Adequate Protection Liens, after giving effect to any applicable intercreditor or subordination agreements (the Liens referenced in clauses (A) and (B), collectively, the "Primed Liens") and shall be junior only to the Prepetition Prior Liens and the Carve-Out.

Notwithstanding the foregoing, the DIP Collateral shall not include (a) the Escrow Account or

(b) any assets (the "Excluded Assets") to the extent that, and for so long as, the grant of a security

interest therein would be prohibited by, cause a default under, result in a breach of, or otherwise

violate applicable law or any organizational documents or any contractual or lease provisions or give another party any rights of termination or acceleration or any rights to obtain a Lien to secure obligations owing to such party; provided that this clause will not apply to restrictions overridden or rendered unenforceable by the Bankruptcy Code or the Uniform Commercial Code's anti-assignment provisions or by other applicable law or as a result of the Cases or, to the extent this clause was applicable because the grant of a security interest would violate applicable law, if there is a change of law that would result in a grant of a security interest no longer violating applicable law; provided, further, that upon the removal of all restrictions specified in this clause or upon such change in law, as may be applicable, the exclusion set forth in this clause shall no longer apply; provided, further, that Excluded Assets shall not include any proceeds, substitutions or replacements of any Excluded Assets.

(k)     DIP Lien Priority.  Notwithstanding anything to the contrary contained in this Interim Order or the DIP Loan Documents, for the avoidance of doubt, the DIP Liens granted to the DIP Agent for the benefit of the DIP Secured Parties shall in each and every case be first priority senior Liens that (i) are subject only to the Prepetition Prior Liens, and to the extent provided in this Interim Order and the DIP Loan Documents, shall also be subject to the Carve-Out, and (ii) except as provided in the immediately preceding sub-clause (i), are senior to all prepetition and postpetition Liens or other interests of any kind of any other person or entity (including the Primed Liens), whether created voluntarily or involuntarily (including by order of a court).

(l)     Enforceable Obligations.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto (including any trustee or other estate

36

representative in any Successor Case (as defined below), and their creditors and other parties-in-interest, in accordance with their terms. Subject to entry of the Final Order and the rights of parties in interest as set forth in Paragraph 6 and the provisions of Paragraph 2(d) hereof with respect to the Roll Up DIP Obligations, no obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, disallowable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, surcharge, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(m)    _Superpriority Administrative Claim Status_. In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations (other than the Roll Up DIP Obligations) shall constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out in accordance with this Interim Order, over all adequate protection and other diminution claims (including the First Lien Adequate Protection Superpriority Claims (as defined below) and the Second Lien Adequate Protection Superpriority Claims (as defined below)), priority and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims (the "_DIP Superpriority Claims_"). The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered

administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions.  Other than as expressly provided in the DIP Credit Agreement or this Interim Order with respect to the Carve-Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising under the DIP Loan Documents or this Interim Order.  The DIP Superpriority Claims granted hereunder to the Roll Up DIP Secured Parties shall be immediately junior in priority and subject to the DIP Superpriority Claims of the other DIP Secured Parties.

(n)  <u>Priority of DIP Liens and DIP Superpriority Claims</u>.  Subject to entry of a Final Order, the DIP Liens and the DIP Superpriority Claims: (A) shall not be subject to sections 506, 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "<u>Successor Case</u>"), or upon the dismissal of any of the Cases, and (D) notwithstanding anything to the contrary in any "first day" orders of this

38

Court in any of the Cases, shall be senior to any administrative claims arising under any such "first day" orders.

3.     **Adequate Protection for Prepetition First Lien Secured Parties**.     In consideration for the use of the Prepetition First Lien Collateral (including Cash Collateral) and the priming of the Prepetition First Liens, the Debtors are authorized to provide, and the Prepetition First Lien Agents shall receive, adequate protection for the benefit of the Prepetition First Lien Secured Parties (collectively referred to as the "Prepetition First Lien Adequate Protection") as follows:

(i)     First Lien Adequate Protection Liens.  Solely to the extent of any Diminution in Value, from and after the Petition Date, resulting from the use, sale, or lease by the Debtors of the applicable Prepetition First Lien Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition First Liens thereto and to the Carve-Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code, the Prepetition First Lien Agents, for the benefit of all the Prepetition First Lien Secured Parties, are hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "First Lien Adequate Protection Liens"), which First Lien Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition First Liens and the Carve-Out; provided, for the avoidance of doubt, that the DIP Collateral shall not include the Escrow Account, nor shall the First Lien Adequate Protection Liens attach to the Escrow Account.

(ii)     First Lien Adequate Protection Superpriority Claims.  To the extent of any Diminution in Value, the Prepetition First Lien Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "First Lien Adequate Protection Superpriority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, junior only to the DIP Superpriority Claims and the Carve-Out to the extent provided herein and in the DIP Loan Documents, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions); provided, however, that the Prepetition First Lien Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the First Lien Adequate Protection Superpriority Claims unless and until all DIP Obligations (including, subject to entry of the Final Order, the Roll Up DIP Obligations) have been Paid in Full (as defined below).  Subject to the relative priorities set forth above, the First Lien Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.  For purposes of this Interim Order, the terms "Paid in Full," "Repaid in Full," "Repay in Full," and "Payment in Full" shall mean, with respect to any referenced DIP Obligations, Prepetition First Lien Obligations, or Prepetition Second Lien Obligations, (i) the indefeasible payment in full in cash of such obligations, (ii) the termination or cash collateralization, in accordance with the DIP Loan Documents, Prepetition First Lien Loan Documents, or Prepetition Second Lien Loan Documents, as applicable, of all undrawn letters of credit outstanding thereunder,  and (iii) the termination of all credit commitments under the DIP Loan Documents,   the Prepetition First Lien Loan

Documents, or the Prepetition Second Lien Loan Documents, as applicable; provided, however, that the First Lien Adequate Protection Superpriority Claims granted to the Prepetition First Lien Secured Parties may be impaired pursuant to any chapter 11 plan of reorganization in the Cases with the vote of the applicable class of the holders of such claims that satisfies the requirements of section 1126 of the Bankruptcy Code, in which case, Paid in Full (or any of the other variants of this phrase referenced above) would occur upon consummation of such plan.

(iii)    Priority of First Lien Adequate Protection Liens and First Lien Adequate Protection Superpriority Claims.  Subject in all respects to entry of a Final Order and the Carve-Out, the First Lien Adequate Protection Liens and the First Lien Adequate Protection Superpriority Claims (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or pari passu with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims against any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Cases or any Successor Cases, or upon the dismissal of any of the Cases, and (D) notwithstanding anything to the contrary in any "first day" orders of this Court in any of the Cases, shall be senior to any administrative claims arising under any such "first day" orders.

(iv)    Interest and Professional Fees.  Without limiting any rights of the Prepetition First Lien Agents and the other Prepetition First Lien Secured Parties under section 506(b) of the Bankruptcy Code, which rights are hereby preserved, and in consideration, and as a

41

requirement, for obtaining the consent of the Prepetition First Lien Secured Parties to the entry of this Interim Order and the Debtors' consensual use of Cash Collateral as provided herein, the Debtors shall pay or reimburse in cash the Prepetition First Lien Agents for any and all fees, costs, expenses, and charges (including the reasonable and documented fees, costs, and expenses of counsel and financial advisors for the Prepetition First Lien Agents) to the extent, and at the times, payable under the Prepetition First Lien Loan Documents, including any unpaid fees, costs and expenses accrued prior to the Petition Date; provided that, such fees, costs, expenses, and charges shall be subject to the terms of the Prepetition First Lien Loan Documents and Paragraph 20(b) hereof; provided, further, that any reimbursement of post-petition fees, costs and expenses under the Prepetition First Lien Credit Agreement shall be reapplied to reduce the principal amount of the Prepetition First Lien Obligations to the extent this Court determines in a final, non-appealable order that the Prepetition First Lien Secured Parties are not entitled to such payment or reimbursement pursuant to section 506(b) of the Bankruptcy Code.

(v)    The Debtors shall deliver to the Prepetition First Lien Secured Parties all information, reports, documents and other material that the Debtors provide to the DIP Secured Parties pursuant to the DIP Loan Documents.

(vi)    Notwithstanding the Payment in Full of the DIP Obligations and the termination of the DIP Loan Documents, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition First Lien Agents and the Prepetition First Lien Secured Parties, and may be enforced by the Prepetition First Lien Agents. Unless otherwise expressly set forth herein, any consent or approval rights or similar rights granted or referenced in this Interim Order in favor of any or all of the DIP Agent, the other DIP Secured

Parties, the Prepetition First Lien Agents and the other Prepetition First Lien Secured Parties may be exercised (or not exercised) in the sole discretion of such party.

(vii)    <u>Consent to Priming and Adequate Protection</u>.  The Prepetition First Lien Agents, on behalf of the Prepetition First Lien Secured Parties, consent to the Prepetition First Lien Adequate Protection and the priming provided for herein; <u>provided</u>, <u>however</u>, that such consent of the Prepetition First Lien Agents to the priming of the Prepetition First Liens and the use of Cash Collateral is expressly conditioned upon the entry of this Interim Order, and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Loan Documents; and <u>provided</u>, <u>further</u>, that such consent shall be of no force and effect in the event this Interim Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition First Lien Agents) or the DIP Loan Documents and DIP Facility as set forth herein are not approved.

(viii)    <u>Right to Seek Additional Adequate Protection</u>.    Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, this Court finds that the adequate protection provided herein is reasonable to protect the interests of the Prepetition Secured Parties.  However, the Prepetition First Lien Agents, on behalf of the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Agent (subject to the Second Lien Intercreditor Agreements), on behalf of the Prepetition Second Lien Secured Parties, as applicable, may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the grant of any additional or alternative adequate protection (except

as provided in the Intercreditor Agreements); provided that any such additional or alternative adequate protection shall at all times be subordinate and junior to the Carve-Out and the claims and Liens of the DIP Secured Parties granted under this Interim Order and the DIP Loan Documents, including any such additional or alternative adequate protection of the benefit of the Prepetition Second Lien Secured Parties shall be subordinate and junior to the claims and Liens of the Prepetition First Lien Secured Parties in all respects. The consent of the Prepetition First Lien Secured Parties to the priming of the Prepetition First Liens by the DIP Liens and the Debtors' use of Cash Collateral on the terms set forth herein does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition First Lien Secured Parties that their respective interests in the Prepetition First Lien Collateral are adequately protected pursuant to this Interim Order or otherwise.

4.      **Adequate Protection for Prepetition Second Lien Secured Parties**. In consideration for the use of the Prepetition Second Lien Collateral (including Cash Collateral) and the priming of the Prepetition Second Liens, the Debtors are authorized to provide, and the the Prepetition Second Lien Agent shall receive, for the benefit of the Prepetition Second Lien Secured Parties, adequate protection (collectively referred to as the "Prepetition Second Lien Adequate Protection") as follows:

(i)      Second Lien Adequate Protection Liens.  Solely to the extent of any Diminution in Value from and after the Petition Date, resulting from the use, sale, or lease by the Debtors of the applicable Prepetition Second Lien Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition Second Liens thereto and to the Carve-Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code, the Prepetition Second Lien Agent, for

the benefit of all the Prepetition Second Lien Secured Parties, are hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363, and 364 of the Bankruptcy Code, replacement Liens upon all of the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "Second Lien Adequate Protection Liens"), which Second Lien Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, the Prepetition Second Liens, the First Lien Adequate Protection Liens, and the Carve-Out.

(ii)        Second Lien Adequate Protection Superpriority Claims.  To the extent of any Diminution in Value, the Prepetition Second Lien Secured Parties are hereby further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "Second Lien Adequate Protection Superpriority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, junior only to the DIP Superpriority Claims, the First Lien Adequate Protection Superpriority Claims, and the Carve-Out to the extent provided herein and in the DIP Loan Documents, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions); provided, however, that the Prepetition Second Lien Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Second Lien Adequate Protection Superpriority Claims unless and until all DIP Obligations (including, subject to entry of the Final Order, the Roll Up DIP Obligations) and Prepetition First Lien Obligations have been Paid in Full (as defined below).  Subject to the relative priorities set forth

above, the Second Lien Adequate Protection Superpriority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and several basis.

(iii)      Priority of Second Lien Adequate Protection Liens and Second Lien Adequate Protection Superpriority Claims.  Subject in all respects to the Carve-Out, the First Lien Adequate Protection Liens, and the First Lien Adequate Protection Claims, the Second Lien Adequate Protection Liens and the Second Lien Adequate Protection Superpriority Claims (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any Liens or claims against any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, and (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Cases or any Successor Cases, or upon the dismissal of any of the Cases.

(iv)      Consent to Priming and Adequate Protection.  Pursuant to the Second Lien Intercreditor Agreement, the Prepetition Second Lien Agent, on behalf of the Prepetition Second Lien Secured Parties, consents to the Prepetition Second Lien Adequate Protection and the priming provided for herein.

5.      **Automatic Postpetition Lien Perfection.**  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the First Lien Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise

46

be required under the law of any jurisdiction, (b) obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral (and the DIP Agent and, after Payment in Full of the DIP Facility, the Prepetition First Lien Agents shall be deemed, without any further action, to have control over all the Debtors' deposit accounts, securities accounts and commodities accounts within the meaning of such Uniform Commercial Code and other law) or (c) taking any other action to validate or perfect the DIP Liens and the First Lien Adequate Protection Liens or to entitle the DIP Liens and the First Lien Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent and the Prepetition First Lien Agents (in the latter case, solely with respect to the First Lien Adequate Protection Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed or recorded as of the Petition Date.  The applicable Debtors shall execute and deliver to the DIP Agent or the Prepetition First Lien Agents, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection and priority of the DIP Liens and the First Lien Adequate Protection Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, each of the DIP Agent and the Prepetition First Lien Agents may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or

record such copy of this Interim Order.  Subject to the entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or other monetary obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order or in favor of the Prepetition First Lien Secured Parties in accordance with this Interim Order.  To the extent that any Prepetition First Lien Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies, or is the secured party under any of the Prepetition First Lien Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the Debtors' insurance policies, and the secured party under each such Prepetition First Lien Loan Document, shall have all rights and powers attendant to that position (including rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan Documents and second, subsequent to Payment in Full of all DIP Obligations, for the benefit of the Prepetition First Lien Secured Parties. The Prepetition First Lien Agents shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code

and this Interim Order, is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

      6.      **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. The Debtors' Stipulations shall be binding upon the Debtors and their estates in all circumstances upon entry of this Interim Order.  The Debtors' Stipulations shall be binding upon each other party in interest, including the Committee, except to the extent and only to the extent such Committee or any other party in interest with standing (including any chapter 11 trustee) other than the Debtors (or if the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), *first*, commences, by the earlier of (x) with respect to parties in interest with requisite standing (including the Committee) other than the Debtors, on or before seventy-five (75) calendar days following the date of entry of the Interim Order, (y) the date that the Committee (if any) agrees to terminate the Challenge Period (as defined herein) prior to the date that is seventy-five (75) days after the Petition Date, with such termination binding all parties in interest, including any subsequently appointed chapter 7 trustee, and (z) the date of entry of the Sale Order, (such period, as the same may be extended in accordance with this Paragraph 6, the "Challenge Period," and the date that is the next business day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"): (A) a contested matter, adversary proceeding, challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations, or (B) a contested matter, adversary proceeding against any or all of the Prepetition Secured Parties in connection with or related to the Prepetition Obligations, or the actions or

49

inactions of any of the Prepetition Secured Parties arising out of or related to the Prepetition Obligations or the Prepetition First Lien Loan Documents or the Prepetition Second Lien Loan Documents, including any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Obligations (including those under sections 506, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition First Lien Secured Parties) (clauses (i) and (ii) collectively, the "Challenges" and, each individually, a "Challenge"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge").  Notwithstanding the foregoing, the Committee (if any) may agree to terminate the Challenge Period prior to the date that is seventy-five (75) days after the Petition Date and such termination shall, subject to entry of the Final Order, bind all parties in interest, including any subsequently appointed chapter 7 trustee, absent subject party in interest objecting at the Final Hearing to the Committee's right to terminate the Challenge Period prior to the date that is seventy-five (75) days after the Petition Date.  If a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) days after the date on which such trustee is appointed or elected.

Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Cases and any Successor Cases (and after the dismissal of these Cases or any Successor Cases): (i) all payments made to or for the benefit of the Prepetition First Lien Secured Parties pursuant to, or otherwise authorized by, this Interim Order

or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition First Lien Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code (which claims and Liens shall have been deemed satisfied to the extent the Prepetition First Lien Obligations are converted into Roll Up DIP Obligations as provided herein), and (iv) the Debtors' Stipulations, including the release provisions therein, shall be binding on all parties in interest in these Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.  The Challenge Period may be extended (a) with the prior written consent of the Company and counsel to the DIP Agent and Prepetition Initial First Lien Agent or (b) pursuant to an order of the Court entered before the expiration of the Challenge Period for good cause shown upon an application for extension filed and served by a party in interest; provided, that an extension pursuant to the foregoing clause (b) shall only be applicable to such party in interest and the particular Challenge set forth in such application; provided, further, that the timely filing of a motion seeking standing to file a Challenge before the expiration of the Challenge Period, which attaches a draft complaint setting forth the legal and factual bases of the proposed

Challenge, shall toll the Challenge Period only as to the party that timely filed such standing motion until such motion is resolved or adjudicated by the Court. Notwithstanding anything to the contrary herein: (x) the DIP Agent, the Roll Up DIP Lenders, the Prepetition First Lien Agents, and the Prepetition First Lien Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing reserve all of their rights to contest on any grounds any Challenge; and (y) nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' estates. The failure of any party in interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 6 or to require or permit an extension of the Challenge Period Termination Date. In the event of a successful Challenge, the Court may fashion an appropriate remedy, including disgorgement.

7.    **Carve-Out**. Subject to the terms and conditions contained in this Paragraph 7, each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, the Second Lien Adequate Protection Liens, and the Second Lien Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out in accordance with the terms of this Interim Order:

(i)    Carve-Out. For purposes of this Interim Order, "Carve-Out" means (a) all unpaid fees required to be paid in these Cases to the clerk of the Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a)(6); (b) all reasonable and documented fees and expenses

up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code without regard to the notice as set forth in (e) below); (c) subject to the terms and conditions of this Interim Order, the accrued and unpaid fees, costs, and disbursements of professionals retained by the Debtors in these Cases (collectively, the "Debtor Professionals") that are incurred prior to the delivery by the DIP Agent or the Prepetition Initial First Lien Agent of a Carve-Out Trigger Notice (as defined below), and are allowed by this Court under sections 327, 328, 330, or 363 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals; (d) subject to the terms and conditions of this Interim Order, the reasonable accrued and unpaid fees, costs, and disbursements of professionals retained by the Committee in these Cases (collectively, the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons" and such fees and expenses of the Professional Persons, the "Professional Fees"), in each case that are incurred before or on the first business day following the delivery by the DIP Agent or the Prepetition Initial First Lien Agent of a Carve-Out Trigger Notice and in accordance with the Approved Budget and the Budget Covenants, and that are allowed by this Court under sections 328, 330, or 1103 of the Bankruptcy Code and remain unpaid after application of any retainers being held by such professionals, in an aggregate amount not to exceed $150,000; and (e) the accrued and unpaid fees, costs, and disbursements of the (i) Debtor Professionals (without regard to whether the fees and expenses of the Debtor Professionals are provided for in the Approved Budget) and (ii) the Committee Professionals, in each case, that are incurred on or after the first business day after the delivery of a Carve-Out Trigger Notice by the DIP Agent or the Prepetition Initial First Lien Agent, that are included in the Approved Budget for the applicable period and comply with the Budget Covenants and are allowed by this Court under sections 327, 328, 330 or 363 of the Bankruptcy Code after application of any retainers being held by such professionals, in

an aggregate amount not to exceed $375,000 (the, the "Post-Default Carve-Out Cap").  The term "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Prepetition Initial First Lien Agent to the Debtors' lead counsel, the United States Trustee, and lead counsel to any Committee appointed in these Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Termination Event (as defined below), expressly stating that the Post-Default Carve-Out Cap is triggered.

(ii)  Carve-Out Account. The Debtors shall (a) contemporaneously with the initial funding of the loans, transfer cash proceeds from the DIP Facility in an amount equal to the budgeted weekly professional fees for the first two weekly periods estimated in the Initial Approved Budget and (b) thereafter on a weekly basis, transfer cash proceeds from the DIP Facility or cash on hand in an amount equal to the total budgeted weekly professional fees for the next unfunded week estimated in the Initial Approved Budget into an escrow account (the "Carve-Out Account").  In addition, within three (3) days of the date on which the Carve-Out Trigger Notice is delivered, if any, the Debtors shall fund an amount equal to the Post Carve-Out Trigger Notice Cap into the Carve-Out Account.  The Carve-Out Account will be established and held in trust exclusively for the benefit of the Professional Persons, including with respect to obligations arising out of the Carve-Out.  All amounts deposited in the Carve-Out Account shall continue to be subject to the DIP Liens, the First Lien Adequate Protection Liens and the Prepetition First Liens such that, upon final payment of all amounts due and owing under the Carve-Out, any funds remaining in the Carve-Out Account shall be remitted to the DIP Agent or the Prepetition First Lien Agents, as applicable, for application in accordance with this Interim Order and the DIP Loan Documents or Prepetition Loan Documents, as applicable. No amounts set forth in this subparagraph 7(i) with

respect to the Post-Default Carve-Out Cap may be modified without the prior written consent of the DIP Agent and the Prepetition First Lien Agents.  The Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited by the estimates set forth in the Approved Budget or to the funds held in the Carve-Out Account.

(iii)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.  Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed (i) to obligate any DIP Secured Party or any Prepetition Secured Party in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement or (ii) to increase the Carve-Out if actual allowed fees and expenses of any of the Professional Persons are higher in fact than the amounts in the Approved Budget (with respect to the Committee Professionals) or the Post-Default Carve-Out Cap.   Notwithstanding any provision in this Paragraph 7 to the contrary, no portion of the Carve-Out, Cash Collateral, Prepetition First Lien Collateral, DIP Collateral or proceeds of the DIP Facility shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 15 hereof.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any DIP Secured Party or any Prepetition First Lien Secured Party to object to the allowance and payment of any such fees and expenses.

(iv)     <u>Payment of Allowed Professional Fees and Expenses Prior to the Termination</u> <u>Declaration Date</u>.  Prior to the occurrence of the Termination Declaration Date (as defined below), the Debtors shall be permitted to pay allowed fees and expenses of the Professional Persons (to the extent the fees and expenses of the Committee Professionals were incurred in accordance with the Approved Budget), subject to this Interim Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any interim compensation procedures order entered by this Court.   The amounts paid prior to the Carve-Out Trigger Notice shall not reduce the Post-Default Carve-Out Cap.

8.     **Waiver of 506(c) Claims**.  Subject to entry of a Final Order, and as a further condition of (i) the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and the consent of the DIP Secured Parties and the Prepetition First Lien Secured Parties to the payment of the Carve-Out to the extent provided herein) and (ii)  the Debtors' use of Cash Collateral pursuant to this Interim Order and a Final Order, (a) no costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition First Lien Secured Parties, the Prepetition First Lien Collateral, the DIP Collateral and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition First Lien Agents, (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, and (c) the exercise prior to the entry of the Final Order of any rights under section 506(c) of the Bankruptcy Code or otherwise to charge any costs or expense of administration of the Cases or any Successor Cases from or against the Prepetition First Lien Secured Parties or their Prepetition First Liens on or other interests in

any or all of the DIP Collateral, the Prepetition First Lien Collateral and the Cash Collateral shall not impair and shall be subject to, and junior to, the DIP Liens on and the DIP Secured Parties' other interests in the DIP Collateral, the Prepetition First Lien Collateral and the Cash Collateral and the other DIP Protections accorded the DIP Secured Parties.

9. **After-Acquired Property**.  Except as otherwise expressly provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date (or a valid, enforceable and unavoidable Lien that is perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code) that is not subject to subordination or avoidance under the Bankruptcy Code or other provisions or principles of applicable law.

10. **Protection of DIP Secured Parties' and Prepetition First Lien Secured Parties' Rights**.

(a)    Unless the DIP Agent and the Prepetition Initial First Lien Agent shall have provided their prior written consent or all DIP Obligations and Prepetition First Lien Obligations have been Paid in Full, the Debtors shall not request or support any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral or Prepetition First Lien Collateral or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition First Liens, the First Lien

Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims or the other DIP Protections; (ii) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations and the Prepetition First Lien Obligations or as otherwise permitted in the DIP Loan Documents and this Interim Order, (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff against any of its prepetition indebtedness based upon any such return pursuant to section 553 of the Bankruptcy Code or otherwise, or (iv) any modification of any of the DIP Secured Parties' or the Prepetition First Lien Secured Parties' rights under this Interim Order, the DIP Loan Documents or the Prepetition First Lien Loan Documents with respect to any DIP Obligations or Prepetition First Lien Obligations.

(b)    The Debtors (or their legal and financial advisors in the case of clauses (ii) through (iv) below) will, whether or not the DIP Obligations have been Paid in Full, (i) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents, (ii) reasonably cooperate with, consult with, and provide to the DIP Secured Parties and the Prepetition First Lien Secured Parties all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the DIP Secured Parties or the Prepetition First Lien Secured Parties) to provide under the DIP Loan Documents, the Prepetition Loan Documents (in the absence of the pendency of these Cases) or the provisions of this Interim Order, (iii) permit consultants, advisors and other representatives (including third party representatives) of each of the DIP Agent and the Prepetition First Lien Agents to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business

operations, and accounts with their respective officers, employees, independent public accountants and other professional advisors (other than legal counsel) as and to the extent required by the DIP Loan Documents or the Prepetition First Lien Loan Documents, (iv) permit the DIP Agent and the Prepetition First Lien Agents and their respective consultants, advisors and other representatives to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, and (v) permit the DIP Agent and the Prepetition First Lien Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral and the Prepetition First Lien Collateral.  Notwithstanding anything to the contrary contained herein, the Debtors do not waive any right to attorney-client, work product, or similar privilege, and the Debtors shall not be required to provide the DIP Agent, the Prepetition First Lien Agents, or their respective counsel and financial advisors with any information subject to attorney-client privilege or consisting of attorney work product.  For the avoidance of doubt, the Prepetition First Lien Agents shall have the same access and cooperation rights as the DIP Agent for purposes of this subparagraph (b).

11.    **Cash Collection**.  (a) From and after the date of the entry of this Interim Order, all Cash Collateral that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box or deposit accounts into which the collections and proceeds of the Prepetition First Lien Collateral were deposited under the Prepetition First Lien Loan Documents (or in such other accounts as are designated by the DIP Agent from time to time) (collectively, the "Cash Collection Accounts"), which accounts shall be subject to the sole dominion and control of the DIP Agent and the Prepetition First Lien Agents (and the funds in such accounts may be used by

the Debtors to the extent provided in this Interim Order and the DIP Loan Documents).  Upon the direction of the DIP Agent or, following Payment in Full of the DIP Obligations, the Prepetition First Lien Agents, at any time after the occurrence of a Termination Event and subject to the provisions of Paragraph 7, all proceeds in the Cash Collection Accounts shall be remitted to the DIP Agent for application to the DIP Obligations until Payment in Full and then to the Prepetition First Lien Agents for application to the Prepetition First Lien Obligations until Payment in Full, and the DIP Agent and the Prepetition First Lien Agents shall be entitled to take all action that is necessary or appropriate to effectuate the foregoing, subject with respect to the Prepetition First Lien Agents, the Sidecar Intercreditor Agreement.  Upon a draw under, and in accordance with, the DIP Term Loan Facility, any funded DIP Term Loans shall be deposited into the Cash Collection Accounts for use solely subject to, and in accordance with, the Approved Budget and this Interim Order.

12.     **Treatment of CIT Factoring Agreement**.  The Debtors shall fund a portion of the Interim Draw equal to 80% of the amount outstanding under the CIT Factoring Agreement (the "Debtors' CIT Payment") to partially satisfy the obligations owing to CIT under the CIT Factoring Agreement (as defined herein) into the Escrow Account.  The obligations arising under the CIT Factoring Agreement shall then be resolved as follows:

(a)     After consultation and agreement with CIT: (i) the Debtors shall fund the Debtors' CIT Payment from the Escrow Account to partially satisfy the obligations owing to CIT in connection with the Non-Notification Factoring Agreement dated as of November 15, 2018, as amended, restated, amended and restated, modified or supplemented from time to time (the "CIT Factoring Agreement"); (ii) CIT shall make a demand pursuant to the Secured Guaranty, dated as of July 11, 2023 as amended, restated, amended and restated, modified or supplemented from time

to time (the "Secured Guaranty"), among Don't Slip Inc. and CIT, to the extent required by the terms of such guaranty, for all remaining amounts owing to CIT under the Factoring Agreement after payment by the Debtors set forth in the immediately preceding clause (such amount, the "CIT Balance Owed") and (ii) CIT takes possession of the Pledged Sum (as defined in the Secured Guaranty) in the Special Account (as defined in the Secured Guaranty); and (iii) upon receipt of the Debtors' CIT Payment and the CIT Balance Owed, the Debtors will take all necessary steps to coordinate with CIT to immediately (i) terminate the Factoring Agreement, the Guaranty Agreement and the Cash Pledge Agreement (as defined in the Guaranty), (ii) release any remaining funds in the Special Account to Don't Slip Inc., (iii) transfer and assign to the Debtors the Accounts (as defined in the Factoring Agreement) and (iv) release CIT's lien and security interest on the Accounts.

(b)      In the event the conditions set forth in paragraph (a) hereof are not satisfied within 5 business days from the Petition Date (except as otherwise extended by agreement of the DIP Agent, Don't Slip Inc. and the Debtors),  (1) (i) through (iv) in paragraph (a) hereof shall not occur, and (2) to the extent CIT makes demand under the Secured Guaranty and takes possession of the Pledged Sum in the Special Account, the Debtors shall be authorized to release cash payments from the Escrow Account to Don't Slip Inc. in the amount of the Pledged Sum received by CIT in accordance with this Order; provided, that any such cash payment by the Debtors shall not exceed the amount of the Debtors' CIT Payment.

13.    **Disposition of DIP Collateral; Credit Bid**.

(a) Unless the DIP Obligations and the Prepetition First Lien Obligations are Paid in Full upon the closing of a sale or other disposition of the DIP Collateral or Prepetition First Lien Collateral or unless ordered by the Court, the Debtors shall not sell, transfer, lease, encumber, or

otherwise dispose of any portion of the DIP Collateral or any Prepetition First Lien Collateral (or enter into any binding agreement to do so) without the prior written consent of the DIP Agent and the Prepetition Initial First Lien Agent (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or Prepetition First Lien Secured Party or any order of this Court), except as permitted in the DIP Loan Documents or the Prepetition First Lien Loan Documents, as applicable, and this Interim Order. Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance or other disposition of any DIP Collateral outside the ordinary course of business shall be remitted to the DIP Agent for application to the DIP Obligations and then to the Prepetition First Lien Obligations, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents or the Prepetition First Lien Loan Documents, as the case may be.  In addition, the Debtors are authorized to enter into such blocked account agreements (with cash dominion, if the DIP Agent so elects) with the DIP Agent and such financial institutions as the DIP Agent may require, and, if it so elects, the DIP Agent shall be entitled to enjoy the benefit of all control agreements to which the Prepetition First Lien Agents are a party without the need to enter into new blocked account agreements.

(b)  Subject to Paragraph 6 of this Interim Order and section 363(k) of the Bankruptcy Code, the Prepetition Initial First Lien Agent (or one or more of its designees, affiliates or assignees), in accordance with the Sidecar Intercreditor Agreement, shall have the unqualified right to credit bid up to the full amount of any Prepetition First Lien Obligations in any sale of the Prepetition First Lien Collateral (or any DIP Collateral subject to any First Lien Adequate Protection Liens) under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code to the extent any sale contemplated

thereunder does not result in Payment in Full of all of the DIP Obligations on the effective date of such plan, or (iii) section 725 of the Bankruptcy Code.  The DIP Agent (or one or more of its designees, affiliates or assignees) shall have the unqualified right to credit bid any or all of the DIP Obligations under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) section 725 of the Bankruptcy Code.  If the DIP Agent or the Prepetition Initial First Lien Agent or their respective designees, affiliates or assignees make a credit bid in connection with any auction or other sale process relating to the sale or other disposition of any DIP Collateral or Prepetition First Lien Collateral, then for purposes of such auction or sale process or any applicable order of this Court, the DIP Agent or Prepetition Initial First Lien Agent shall be automatically deemed to be a qualified bidder and its bid shall be automatically deemed to constitute a qualified bid, regardless of whether the qualified bidder or qualified bid requirements are satisfied.

14.    **Termination Events**.  The following shall constitute a termination event under this Interim Order and the DIP Loan Documents unless waived in writing by each of the DIP Agent and the Prepetition Initial First Lien Agent (each, a "Termination Event"):

(a)    The occurrence of an "Event of Default" under the DIP Credit Agreement, as set forth therein (a "DIP Default Termination Event"), including, for the avoidance of doubt, the failure to obtain entry of the Final Order, in form and substance acceptable to the DIP Agent and the Prepetition First Lien Agents, on or before thirty-five (35) calendar days after the Petition Date.

(b)    Any other breach, default or other violation by any of the Debtors of the terms and provisions of this Interim Order.

(c)     The Debtors' failure to comply with any of the obligations and deadlines set forth in Exhibit 3 attached hereto (the "Sale/Chapter 11 Milestones").

15.     **Rights and Remedies Upon Termination Event**.

(a)     Upon five (5) business days' written notice from the DIP Agent to the Debtors, their counsel, the United States Trustee, and counsel to the Committee (if any) following the Termination Declaration Date (the "Notice Period"), unless prior to such time the Court orders otherwise, the DIP Agent is hereby granted relief from the automatic stay, without further notice, hearing, motion, order or other action of any kind, to the extent necessary to permit the DIP Secured Parties to exercise (i) immediately upon the occurrence and during the continuance of any Termination Event, all rights and remedies under this Interim Order, the DIP Loan Documents or applicable non-bankruptcy law (other than those rights and remedies against the DIP Collateral as provided in subparagraph 15(b) below), including the right to (i)(1) declare all DIP Obligations to be immediately due and payable, (2) declare the termination, reduction or restriction of any further commitment to extend credit to the Debtors, to the extent any such commitment remains, or (3) terminate the DIP Facility and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the other DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; or (ii) declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral (any such declaration under any of clauses 15(a)(i)(1), (2) or (3) or (ii) shall be made to the respective lead counsel to the Debtors, the Committee and the United States Trustee, and shall be referred to herein as a "Termination Declaration" and the date that is the earliest to occur of any such Termination Declaration being herein referred to as the "Termination Declaration Date").  During such Notice Period, the Debtors may not use Cash Collateral or any amounts previously or thereafter advanced

under the DIP Credit Facility except to pay payroll and other expenses critical to keep the business of the Debtors operating in accordance with the Approved Budget.

(b)    In addition to the rights and remedies described above, five (5) business days following the Termination Declaration Date, unless prior to such time this Court orders otherwise, the DIP Agent is hereby granted relief from the automatic stay, without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on, its DIP Liens on all or any portion of the DIP Collateral, including by collecting accounts receivable and applying the proceeds thereof to the DIP Obligations subject to the Carve-Out, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral. In the event that a party seeks an emergency hearing during the Notice Period, the Notice Period shall be tolled with respect to such party until final resolution by the Court.  During such Notice Period, the Debtors may not use Cash Collateral or any amounts previously or thereafter advanced under the DIP Credit Facility except to pay payroll and other expenses critical to keep the business of the Debtors operating in accordance with the Approved Budget.

(c)    Upon the effectiveness of any relief from the automatic stay with respect to the DIP Facility pursuant to Paragraph 15(b) hereof, the Prepetition First Lien Agents shall have relief from the automatic stay to the same extent as the DIP Agent, and without further notice, hearing, motion, order or other action of any kind, to foreclose on, or otherwise enforce and realize on its Prepetition First Liens and the First Lien Adequate Protection Liens on, all or any portion of the DIP Collateral or Prepetition First Lien Collateral (including by collecting accounts receivable and applying the proceeds thereof to the Prepetition First Lien Obligations, and by occupying the Debtors' premises to sell or otherwise dispose of the DIP Collateral or Prepetition First Lien Collateral) or otherwise exercise remedies against the DIP Collateral or Prepetition First

Lien Collateral permitted by this Interim Order, the Prepetition First Lien Loan Documents or applicable non-bankruptcy law; provided, however, that any such foreclosure or other enforcement by the Prepetition First Lien Agents of any Prepetition First Liens or any First Lien Adequate Protection Liens or any other such exercise of remedies by the Prepetition First Lien Agents against the DIP Collateral or Prepetition First Lien Collateral shall not interfere with or otherwise be inconsistent with any foreclosure or other enforcement by the DIP Agent of any DIP Liens or other DIP Protections or any other exercise of remedies by the DIP Agent, and any proceeds received by the Prepetition First Lien Agents in connection with such foreclosure, enforcement or other exercise of remedies shall be turned over to the DIP Agent for application to the DIP Obligations until Paid in Full.

(d)     Subject to the provisions of Paragraph 6 hereof, all proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties or the Prepetition First Lien Secured Parties shall be turned over first to the DIP Agent for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents and this Interim Order until Payment in Full of all of the DIP Obligations and then to the Prepetition First Lien Agents for application to the Prepetition First Lien Obligations under, and in accordance with the provisions of, the Prepetition First Lien Loan Documents and this Interim Order until Payment in full of the Prepetition First Lien Obligations.

(e)     Subject to entry of the Final Order, and notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent or the other DIP Secured Parties contained in this Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon five (5) business days' written notice to the Debtors and any landlord, lienholder, licensor, or other

third party owner of any leased or licensed premises or intellectual property that a Termination Event has occurred and is continuing, the DIP Agent (i) may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to any DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors that are owned by or subject to a Lien of any third party and that are used by Debtors in their businesses, in the case of either subparagraph (i) or (ii) of this Paragraph 15(e) without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; provided, however, that the DIP Agent, on behalf of the DIP Secured Parties, shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by such DIP Agent calculated on a *per diem* basis.  Nothing herein shall require the Debtors, the DIP Agent, or the other DIP Secured Parties to assume any lease, license or other contract under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties in this Paragraph 15(e).

(f)     Subject to the entry of the Final Order and Payment in Full of the DIP Obligations, notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the Prepetition First Lien Agents or the other Prepetition First Lien Secured Parties contained in this Interim Order or the Prepetition First Lien Loan Documents, or otherwise available at law or in equity, the Prepetition First Lien Agents shall succeed to, and be

entitled to, all of the rights, remedies, benefits and protections accorded to the DIP Agent pursuant to Paragraph 15(e), as if all references therein to the "DIP Agent" and the " DIP Parties" are references to the "Prepetition First Lien Agents" and the "Prepetition First Lien Secured Parties."

(g)     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of this Interim Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the First Lien Adequate Protection Liens, the Second Lien Adequate Protection Liens, and the DIP Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition First Lien Secured Parties under the DIP Loan Documents, the DIP Facility, and this Interim Order, (ii) authorize the DIP Secured Parties and the Prepetition First Lien Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents, the Prepetition First Lien Loan Documents or this Interim Order, (iii) to permit each of the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agents and the other Prepetition First Lien Secured Parties to perform any act authorized under this Interim Order and the DIP Loan Documents, and (iv) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Loan Documents.

16.     **Restriction on Use of Proceeds**.  Notwithstanding anything herein to the contrary, no loans or proceeds from the DIP Facility, DIP Collateral, Cash Collateral (including any retainer held by any professionals for the below-referenced parties), Prepetition First Lien Collateral, or any portion of the Carve-Out may be used by (a) any Debtor, Committee or trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Professional Persons) to investigate or prosecute any Challenge (including any litigation or other action) in connection with the value of the Prepetition First Lien Collateral or the DIP Collateral (or to pay any professional fees and disbursements incurred in connection

therewith) at any time; or (b) any Debtor, any Committee, or any trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity (including any of the Professional Persons) to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Secured Parties, or to seek any modification to this Interim Order not approved by the DIP Agent and, to the extent such modification would affect the rights of any of the Prepetition First Lien Secured Parties, the Prepetition First Lien Agents; (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, any or all of the DIP Secured Parties, the Prepetition First Lien Secured Parties, their respective affiliates, assigns or successors and the respective officers, directors, employees, agents, attorneys, representatives and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including (A) any Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations or the Prepetition First Lien Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition First Liens, or the First Lien Adequate Protection Liens; (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Prepetition First Liens, the First Lien Adequate Protection Liens, or the other Prepetition First Lien Adequate Protection; (D) except to contest in good faith the occurrence or continuance of any Termination Event as

69

permitted in Paragraph 15, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Secured Parties', and, after the Payment in Full of the DIP Obligations, the Prepetition First Lien Secured Parties', assertion, enforcement, or realization on the Cash Collateral, the DIP Collateral or the Prepetition First Lien Collateral in accordance with the DIP Loan Documents or the Prepetition First Lien Loan Documents, as applicable, or this Interim Order; or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties hereunder or under the DIP Loan Documents or the Prepetition First Lien Loan Documents, as applicable, or any payments made thereunder or in respect thereof; provided, however, up to $50,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition First Lien Collateral, any Cash Collateral and proceeds of the DIP Facility may be used by the Committee (to the extent such Committee is appointed) to investigate (but not to prosecute) the claims or Liens of the Prepetition First Lien Agents and the other Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents (but not the claims or Liens of the DIP Agent and the other DIP Secured Parties other than with respect to the Roll Up Obligations) so long as such investigation occurs within the Challenge Period; (iii) pay any fees or similar amounts to any person (other than the Prepetition First Lien Secured Parties) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Agent and the Prepetition Initial First Lien Agent; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral or Prepetition First Lien Collateral, unless otherwise permitted hereby, without the prior written consent of the DIP Agent and the Prepetition First Lien Agents.

17.    **Proofs of Claim**.  The Prepetition First Lien Secured Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claim allowed herein.  The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition First Lien Secured Parties in respect of all Prepetition First Lien Obligations.  In addition, the Prepetition First Lien Secured Parties and the DIP Secured Parties will not be required to file any request for allowance or payment of any administrative expenses, and this Order shall be deemed to constitute a timely filed request for allowance or payment of any Prepetition First Lien Obligations constituting administrative expenses or any DIP Obligations, as applicable. Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or Successor Cases to the contrary, each of the Prepetition First Lien Agents, for the benefit of itself and the other Prepetition First Lien Secured Parties, and the DIP Agent, for the benefit of itself and the other DIP Secured Parties, is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend or supplement, in its discretion) in each of the Cases or Successor Cases (i) in the case of each Prepetition First Lien Agents, a proof of claim or aggregate proofs of claim in respect of any Prepetition First Lien Obligations, and (ii) in the case of each of the Prepetition First Lien Agents and the DIP Agent, a request or aggregate requests for allowance or payment of any portion of the Prepetition First Lien Obligations constituting administrative expenses or any DIP Obligations, as applicable.

18.    **Preservation of Rights Granted Under the Interim Order**.

(a)    <u>No Non-Consensual Modification or Extension of Interim Order</u>.  The Debtors irrevocably waive any right to seek any amendment, modification, or extension of this Interim Order (including through any chapter 11 plan of reorganization) without the prior written consent of the DIP Agent and the Prepetition Initial First Lien Agent, and no such consent shall be

implied by any other action, inaction, or acquiescence of the DIP Secured Parties or any of the Prepetition First Lien Secured Parties.  In the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash authorized or made hereby or pursuant to the DIP Loan Documents, or Lien, claim, priority or other DIP Protections authorized or created hereby or pursuant to the DIP Loan Documents.  Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter reversed or modified by a subsequent order of this Court or any other court, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and notwithstanding any such reversal or modification, any use of Cash Collateral or any DIP Obligations or any DIP Protections (including the Prepetition First Lien Adequate Protection) incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Agent or  the Prepetition First Lien Agents, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the original provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order), and the DIP Secured Parties and the Prepetition First Lien Secured Parties shall be entitled to all of the DIP Protections (including the Prepetition First Lien Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted pursuant to section 364(e) of the Bankruptcy Code, this Interim Order, or the DIP Loan Documents.

(b)      <u>Dismissal</u>.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, then notwithstanding any such dismissal, (i) the DIP Protections (including the Prepetition First Lien Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, respectively, shall remain in full force and effect and be binding on all parties in interest and be governed in all respects by the provisions of this Interim Order (and shall maintain their respective priorities as provided by this Interim Order) until all DIP Obligations and all Prepetition First Lien Obligations have been Paid in Full, and such order of dismissal shall so provide (in accordance with sections 105 and 349 of the Bankruptcy Code), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections (including the Prepetition First Lien Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, respectively.

(c)      <u>Survival of Interim Order</u>.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections (including the Prepetition First Lien Adequate Protection), and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case or Successor Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Cases or any Successor Case in

this Court, or terminating the joint administration of these Cases or any Successor Case or by any other act or omission. The terms and provisions of this Interim Order, including all of the DIP Protections (including the Prepetition First Lien Adequate Protection) and all other rights, remedies, Liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties, respectively, shall continue in full force and effect and be binding on all parties in interest notwithstanding the entry of any such order, and such DIP Protections (including the Prepetition First Lien Adequate Protection), and such other rights, remedies, Liens priorities, privileges, protections and benefits, shall continue in full force and effect in these proceedings and in any Successor Cases and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order. Subject to the provisions of Paragraph 2(d) of this Interim Order with respect to the treatment of the Roll Up DIP Obligations pursuant to any chapter 11 plan of reorganization or liquidation with respect to any of the Debtors, the DIP Obligations shall not be discharged by the entry of an order confirming any such chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

19.    **Insurance Policies**.  Upon entry of this Interim Order, the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agents and the other Prepetition First Lien Secured Parties shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, and the Debtors shall take such actions as are reasonably requested by the DIP Agent or the Prepetition First Lien Agents from time to time to evidence or effectuate the foregoing.

20.    **Other Rights and Obligations**.

(a)    <u>Expenses</u>.  As provided in the DIP Loan Documents (and without limiting the Debtors' respective obligations thereunder), the applicable Debtors will pay all reasonable expenses incurred by the DIP Agent (including the reasonable and documented fees and disbursements of its outside counsel and one firm of local counsel engaged by the DIP Agent in connection with the Cases or third-party appraisers, consultants, advisors and auditors engaged by or for the benefit of the DIP Agent or its counsel) in connection with the preparation, execution, delivery, and administration of the DIP Loan Documents, this Interim Order, the Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

(b)    <u>Notice of Professional Fees</u>.  Professionals for the DIP Agent and the Prepetition First Lien Agents (including professionals engaged by counsel to the DIP Agent or Prepetition First Lien Agent, as applicable) (collectively, the "<u>Lender Professionals</u>") shall not be required to comply with the United States Trustee fee guidelines or submit invoices to this Court, United States Trustee, any Committee or any other party in interest.  Copies of summary invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Lender Professionals to the United States Trustee, counsel for any Committee, and such other parties as this Court may direct.  The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; <u>provided</u>, <u>however</u>, that such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or

other applicable privilege.  If the Debtors, United States Trustee or any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten (10) days of receipt of such invoices (the "<u>Review Period</u>"), then the Debtors, United States Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professionals an objection (the "<u>Fee Objection</u>") limited to the issue of the reasonableness of such fees and expenses, and any failure by any such party to file a Fee Objection within the Review Period shall constitute a waiver of any right of such party to object to the applicable invoice.  Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  Subject to the Review Period, the Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.   If a Fee Objection is made during the Review Period, then the disputed portion of the invoiced fees, costs, and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court.  All such unpaid fees, costs, expenses, and charges of the DIP Agent that have not been disallowed by this Court on the basis of an objection filed by the Debtor, the United States Trustee or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral as specified in this Interim Order.  Subject to Paragraph 6, any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the DIP Agent or the other DIP Secured Parties in

connection with or with respect to the DIP Facility, the DIP Credit Agreement, or the other DIP Loan Documents are hereby approved in full. Subject to entry of the Final Order, and in accordance with the terms of the Restructuring Support Agreement, the Debtors shall pay all reasonable and documented fees and expenses of counsel to the Prepetition Second Lien Secured Parties and Prepetition Irish Lenders, Proskauer Rose, up to an aggregate cap not to exceed $650,000, and upon the earlier of entry of the Final DIP Order or payment in full of the CIT Factoring Agreement, pay all reasonable and documented accrued fees and expenses of counsel to Don't Slip, Inc., CCMP Capital Investors III, L.P., and CCMP Capital Investors III (Employee), L.P., Weil Gotshal & Manges, in an amount not to exceed $300,000.

(c)     <u>Binding Effect</u>.  Subject only to Paragraph 6 above, the provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Cases and any Successor Cases, including the DIP Secured Parties, the Prepetition First Lien Secured Parties, any Committee, and the Debtors and their respective estates, successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; <u>provided</u>, <u>however</u>, that the DIP Secured Parties and the Prepetition First Lien Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(d)     <u>No Waiver</u>.  The failure of the Prepetition First Lien Secured Parties or the DIP Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition First Lien Loan Documents, the DIP Loan Documents or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Nothing contained in this Interim Order (including the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any Prepetition First Lien Secured Party or any DIP Secured Party, including rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).  Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, any right or ability of the Prepetition First Lien Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the Cases or any Successor Cases to cases under chapter 7, dismissal of the Cases or any Successor Cases, or the appointment of a trustee or examiner in the Cases or any Successor Cases, or to oppose the use of Cash Collateral in any Successor Case, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors or seek early termination of the Debtors' exclusive rights to propose a plan under the Bankruptcy Code, or (iii) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Prepetition First Lien Secured Parties, respectively, under the DIP Loan Documents or the Prepetition First Lien Loan Documents, the Bankruptcy Code or otherwise.  Except to the extent otherwise expressly provided in this Interim Order or by

law, neither the commencement of the Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of the Prepetition First Lien Secured Parties under the Prepetition First Lien Loan Documents or with respect to any non-Debtor entities or their respective assets, whether such rights and remedies arise under the Prepetition First Lien Loan Documents, applicable law, or equity.

(e)    <u>No Third Party Rights</u>.  Except as explicitly provided for herein or in any DIP Loan Document, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or  direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(f)    <u>No Marshaling</u>.  Subjection to entry of the Final Order, neither the DIP Secured Parties nor the Prepetition First Lien Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition First Lien Collateral, as applicable.

(g)    <u>Amendments</u>.  The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement, or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such

amendment, modification, supplement, or waiver is material.  No waiver, modification, or amendment of any of the provisions of the DIP Loan Documents shall be effective unless set forth in writing, signed by or on behalf of all the Debtors and the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) and, except as provided herein, approved by this Court.  Notwithstanding the foregoing, no waiver, modification or amendment of any of the provisions of this Interim Order or the DIP Loan Documents that would directly and adversely affect the rights or interests of the Prepetition First Lien Secured Parties, as applicable, shall be effective unless also consented to in writing by the Prepetition Initial First Lien Agent on behalf of the Prepetition First Lien Secured Parties (after obtaining the approval of the requisite Prepetition First Lien Secured Parties under the Prepetition Credit Agreement).

(h)    <u>Inconsistency</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(i)    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(j)    <u>Reservation of Rights</u>.  Nothing in this Interim Order shall be deemed to constitute the consent of the DIP Secured Parties or the Prepetition First Lien Secured Parties, and

each of the foregoing expressly reserve the right to object, to entry of any Order of the Court that provides for the sale or other disposition of all or substantially all of the assets of the Debtors (or any other sale or other disposition of assets of any of the Debtors outside the ordinary course of business) to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the DIP Obligations, the Prepetition First Lien Obligations, and the Prepetition First Lien Adequate Protection and all of the foregoing are Paid in Full on the closing date of such sale.

(k)    <u>Headings</u>.  Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Interim Order.

21.    **<u>Final Hearing</u>**

(a)    The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, 2024 , at _____ (prevailing Eastern time) at the United States Bankruptcy Court for the District of Delaware.  The proposed Final Order shall be substantially the same as the Interim Order except that (i) those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification, and (ii) where appropriate, references to this Interim Order shall be changed to references to the Final Order.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)    <u>Final Hearing Notice</u>.  On or before _____, 2024, the Debtors shall serve, by email service if available, or by United States mail, first-class postage prepaid (such service constituting adequate notice of the Final Hearing), (i) notice of the entry of this Interim

Order and of the Final Hearing (the "<u>Final Hearing Notice</u>") and (ii) a copy of this Interim Order

on the parties having been given notice of the Interim Hearing and to any other party that has filed

a request for notices with this Court and to any Committee after the same has been appointed, or

Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state

that any party in interest objecting to the entry of the proposed Final Order shall file written

objections with the Clerk of the Bankruptcy Court no later than _____, 2024, which

objections shall be served so that the same are received on or before such date by:  (a) counsel to

the Debtors, (i) Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036

(Attn: Gregg M. Galardi, email: gregg.galardi@ropesgray.com and Cristine Pirro Schwarzman,

email: cristine.schwarzman@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd

Floor, Chicago, Illinois 60606 (Attn: Conor P. McNamara, email:

conor.mcnamara@ropesgray.com); (ii) Chipman Brown Cicero & Cole, LLP, 1313 N. Market

Street, Suite 5400, Wilmington, Delaware 19801 (Attn: Mark L. Desgrosseilliers, email:

desgross@chipmanbrown.com); (b) counsel to the DIP Agent and Prepetition First Lien Agents,

King & Spalding LLP, 110 North Wacker Drive, Suite 3800, Chicago, Illinois 60606 (Attn:

Lindsey Henrikson, email: lhenrikson@kslaw.com and Matthew Warren, email:

mwarren@kslaw.com); (c) counsel to the Prepetition Second Lien Agent, Proskauer Rose LLP,

Eleven Times Square, New York, NY 10036 (Attn: David M. Hillman, email:

dhillman@proskauer.com; Justin Breen, email: JBreen@proskauer.com; Steven Hornik, email:

SHornik@proskauer.com); (e) and the Office of the United States Trustee for the District of

Delaware; (f) counsel for any statutory committee appointed in these Cases; and such objections

shall be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, in

each case to allow actual receipt of the foregoing no later than _____, 2024, at 4:00 p.m. (prevailing Eastern time).

22.    **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to resolve any and all disputes arising under or related to the DIP Obligations, the DIP Loan Documents, or the provisions of this Interim Order, and to enforce this Interim Order according to its terms.

# **EXHIBIT 1**

## **Initial Approved Budget**

(see attached)

**Shoes For Crews**
**DIP Budget**
**$ in 000s**

| Forecast<br>Week #<br>Week Ending (Friday) | Forecast<br>1<br>4/5 | Forecast<br>2<br>4/12 | Forecast<br>3<br>4/19 | Forecast<br>4<br>4/26 | Forecast<br>5<br>5/3 | Forecast<br>6<br>5/10 | Forecast<br>7<br>5/17 | Forecast<br>8<br>5/24 | Forecast<br>9<br>5/31 | Forecast<br>10<br>6/7 | Forecast<br>11<br>6/14 | Forecast<br>12<br>6/21 | Forecast<br>13<br>6/28 | Forecast<br>13Wk<br>Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Cash Flow** | | | | | | | | | | | | | | |
| 1.) Total Operating Receipts | 2,634 | 2,734 | 3,236 | 3,236 | 4,248 | 4,080 | 4,074 | 4,074 | 4,095 | 4,355 | 4,339 | 4,339 | 4,339 | 49,784 |
| Operating Disbursements | | | | | | | | | | | | | | |
| 2.) Inventory AP | - | - | - | - | - | - | (486) | (1,135) | (1,614) | (2,026) | (1,469) | (1,490) | (1,251) | (9,470) |
| 3.) Warehousing & Shipping | (1,586) | (237) | (237) | (237) | (3,237) | (237) | (237) | (237) | (3,237) | (237) | (237) | (237) | (3,237) | (13,434) |
| 4.) Critical Vendor Program | (2,085) | (1,669) | (2,286) | (2,135) | (2,089) | (1,118) | (743) | - | - | (55) | - | - | - | (12,181) |
| 5.) Payroll & Benefits | (108) | (1,000) | (359) | (1,109) | (100) | (885) | (131) | (1,045) | (100) | (895) | (131) | (1,045) | (100) | (7,008) |
| 6.) Sales & Other Tax | - | (966) | (405) | - | - | - | (887) | (100) | - | - | (913) | - | - | (3,271) |
| 7.) Customer Programs | (16) | (29) | (266) | (16) | (16) | (104) | (16) | (16) | (16) | (16) | (104) | (68) | (16) | (702) |
| 8.) OCP | (19) | (19) | (19) | (19) | (119) | (19) | (19) | (19) | (19) | (119) | (19) | (19) | (19) | (451) |
| 9.) CapEx | (6) | (61) | (5) | (5) | (6) | (61) | (5) | (5) | (92) | (90) | (61) | (46) | (5) | (448) |
| 10.) Other Operating | (503) | (307) | (69) | (39) | (662) | (589) | (369) | (339) | (347) | (654) | (619) | (339) | (347) | (5,186) |
| 11.) **Total Operating Disbursements** | **(4,322)** | **(4,290)** | **(3,646)** | **(3,561)** | **(6,230)** | **(3,014)** | **(2,895)** | **(2,897)** | **(5,426)** | **(4,093)** | **(3,555)** | **(3,245)** | **(4,976)** | **(52,151)** |
| 12.) **Operating Cash Flow** | **(1,688)** | **(1,556)** | **(410)** | **(325)** | **(1,983)** | **1,066** | **1,179** | **1,177** | **(1,331)** | **262** | **784** | **1,094** | **(637)** | **(2,367)** |
| Non-Operating Disbursements | | | | | | | | | | | | | | |
| 13.) CIT Escrow | (6,452) | - | - | - | (1,613) | - | - | - | - | - | - | - | - | (8,065) |
| 14.) Professional Fees | (2,369) | (570) | (730) | (555) | (2,747) | (393) | (553) | (704) | (529) | (1,478) | (240) | (640) | (4,338) | (15,848) |
| 15.) Utility Deposits | (10) | - | - | - | - | - | - | - | - | - | - | - | - | (10) |
| 16.) Pre-Petition Contract Cures | - | - | - | - | - | - | - | - | - | - | - | - | (1,220) | (1,220) |
| 17.) Other | - | - | - | - | - | - | - | - | - | - | - | - | (500) | (500) |
| 18.) **Non-Operating Disbursements** | **(8,831)** | **(570)** | **(730)** | **(555)** | **(4,360)** | **(393)** | **(553)** | **(704)** | **(529)** | **(1,478)** | **(240)** | **(640)** | **(6,058)** | **(25,642)** |
| 19.) **Net Cash Flow - Excl. Transfers** | **(10,519)** | **(2,126)** | **(1,140)** | **(880)** | **(6,343)** | **673** | **626** | **473** | **(1,860)** | **(1,216)** | **544** | **454** | **(6,695)** | **(28,009)** |
| Intercompany Transfers | | | | | | | | | | | | | | |
| 20.) Transfers from Europe to US | - | - | - | - | 1,050 | - | - | - | 1,050 | - | - | - | 1,050 | 3,150 |
| 21.) Transfers from Canada to US | - | - | - | - | 250 | - | - | - | 250 | - | - | - | 250 | 750 |
| 22.) APAC Management Fee | - | (165) | - | - | - | - | (165) | - | - | - | (165) | - | - | (495) |
| 23.) **Net Cash Flow - Incl. Transfers** | **(10,519)** | **(2,291)** | **(1,140)** | **(880)** | **(5,043)** | **673** | **461** | **473** | **(560)** | **(1,216)** | **379** | **454** | **(5,395)** | **(24,604)** |
| DIP Assumptions | | | | | | | | | | | | | | |
| 24.) DIP Financing Proceeds (Net) | 18,700 | - | - | - | 9,500 | - | - | - | - | - | - | - | - | 28,200 |
| 25.) DIP New Money Interest | - | - | - | - | (312) | - | - | - | (318) | - | - | - | (317) | (947) |
| 26.) **Net Cash Flow - Incl. DIP** | **8,181** | **(2,291)** | **(1,140)** | **(880)** | **4,145** | **673** | **461** | **473** | **(878)** | **(1,216)** | **379** | **454** | **(5,711)** | **2,649** |
| **II. Cash Roll & Liquidity** | | | | | | | | | | | | | | |
| US Book Cash Balance* | | | | | | | | | | | | | | |
| 27.) Beginning US Book Cash | 1,922 | 10,103 | 7,812 | 6,672 | 5,792 | 9,937 | 10,610 | 11,070 | 11,544 | 10,665 | 9,449 | 9,829 | 10,283 | 1,922 |
| 28.) + Net Cash Flow | 8,181 | (2,291) | (1,140) | (880) | 4,145 | 673 | 461 | 473 | (878) | (1,216) | 379 | 454 | (5,711) | 2,649 |
| 29.) **Ending US Book Cash** | **10,103** | **7,812** | **6,672** | **5,792** | **9,937** | **10,610** | **11,070** | **11,544** | **10,665** | **9,449** | **9,829** | **10,283** | **4,571** | **4,571** |
| New Money DIP Facility | | | | | | | | | | | | | | |
| 30.) Beginning Balance | - | 20,000 | 20,000 | 20,000 | 20,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | - |
| 31.) +/- Draw / (Paydown) | 20,000 | - | - | - | 10,000 | - | - | - | - | - | - | - | - | 30,000 |
| 32.) **Ending Balance** | **20,000** | **20,000** | **20,000** | **20,000** | **30,000** | **30,000** | **30,000** | **30,000** | **30,000** | **30,000** | **30,000** | **30,000** | **30,000** | **30,000** |

*Excludes Non-Debtor or Encumbered Cash Balances

## **EXHIBIT 2**

## **DIP CREDIT AGREEMENT**

(see attached)

*Proposed Execution Version*

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of [●], 2024

among

SHO HOLDING I CORPORATION,
as the Borrower,

NEVER SLIP HOLDINGS, INC.,
as Holdings,

THE FINANCIAL INSTITUTIONS PARTY HERETO,
as Lenders,

and

ANTARES CAPITAL LP,
as Administrative Agent

Table of Contents

Page

ARTICLE I DEFINITIONS                                                                3

Section 1.01.    Defined Terms ........................................................................ 3
Section 1.02.    Classification of Loans and Borrowings ........................................ 35
Section 1.03.    Terms Generally....................................................................... 35
Section 1.04.    Accounting Terms; GAAP. ......................................................... 36
Section 1.05.    [Reserved] .............................................................................. 36
Section 1.06.    Timing of Payment of Performance ............................................. 36
Section 1.07.    Times of Day............................................................................ 37
Section 1.08.    Currency Generally. .................................................................. 37
Section 1.09.    [Reserved] .............................................................................. 37
Section 1.10.    [Reserved]............................................................................... 37
Section 1.11.    Rounding ................................................................................ 37
Section 1.12.    Divisions ................................................................................ 38
Section 1.13.    UCC Terms. ............................................................................ 38

ARTICLE II THE CREDITS                                                              38

Section 2.01.    Commitments. ......................................................................... 38
Section 2.02.    Loans and Borrowings. ............................................................. 40
Section 2.03.    Requests for New Money DIP Borrowings .................................... 40
Section 2.04.    [Reserved]............................................................................... 41
Section 2.05.    Letters of Credit ...................................................................... 41
Section 2.06.    Benchmark Replacement Setting. ............................................... 44
Section 2.07.    Funding of Borrowings. ............................................................ 45
Section 2.08.    Type; Interest Elections. ........................................................... 45
Section 2.09.    Termination and Reduction of Commitments.................................. 47
Section 2.10.    Repayment of Loans; Evidence of Debt. ....................................... 47
Section 2.11.    Prepayment of Loans. ............................................................... 48
Section 2.12.    Fees. ..................................................................................... 50
Section 2.13.    Interest................................................................................... 50
Section 2.14.    Alternate Rate of Interest .......................................................... 52
Section 2.15.    Increased Costs. ...................................................................... 52
Section 2.16.    Break Funding Payments ........................................................... 53
Section 2.17.    Taxes. .................................................................................... 54
Section 2.18.    Payments Generally; Allocation of Proceeds; Sharing of Payments. ......... 57
Section 2.19.    Mitigation Obligations; Replacement of Lenders. ........................... 59
Section 2.20.    Illegality ................................................................................ 60
Section 2.21.    Defaulting Lenders.................................................................... 61
Section 2.22.    [Reserved]............................................................................... 62
Section 2.23.    [Reserved]............................................................................... 62
Section 2.24.    Rates...................................................................................... 62
Section 2.25.    No Discharge; Survival of Claims. ............................................... 63
Section 2.26.    Super Priority Nature of Obligations and Lenders' DIP Liens. ........... 63
Section 2.27.    Release. .................................................................................. 63
Section 2.28.    Waiver of Certain Rights. .......................................................... 64
Section 2.29.    Grant of Security; Security for Obligations; Debtors Remain Liable. ......... 64

i

Table of Contents
(continued)

Page

ARTICLE III REPRESENTATIONS AND WARRANTIES                                            66

    Section 3.01.    Organization; Powers .......................................................... 66
    Section 3.02.    Authorization; Enforceability ............................................... 66
    Section 3.03.    Governmental Approvals; No Conflicts................................ 67
    Section 3.04.    Financial Condition; No Material Adverse Effect. ............... 67
    Section 3.05.    Properties. ............................................................................ 67
    Section 3.06.    Litigation and Environmental Matters. ................................ 68
    Section 3.07.    Compliance with Laws. ....................................................... 68
    Section 3.08.    Investment Company Status .................................................. 68
    Section 3.09.    Taxes ................................................................................... 68
    Section 3.10.    ERISA. ................................................................................. 68
    Section 3.11.    Disclosure. ........................................................................... 69
    Section 3.12.    [Reserved] ............................................................................ 69
    Section 3.13.    Capitalization and Subsidiaries ........................................... 69
    Section 3.14.    Security Interest in DIP Collateral ...................................... 69
    Section 3.15.    Labor Disputes .................................................................... 69
    Section 3.16.    Federal Reserve Regulations ............................................... 69
    Section 3.17.    Economic and Trade Sanctions and Anti-Corruption Laws ............... 69
    Section 3.18.    Chapter 11 Cases. ................................................................ 70
    Section 3.19.    DIP Orders. ........................................................................ 70

ARTICLE IV CONDITIONS                                                                  70

    Section 4.01.    Closing Date......................................................................... 70
    Section 4.02.    Each Credit Extension .......................................................... 73

ARTICLE V AFFIRMATIVE COVENANTS                                                        74

    Section 5.01.    Financial Statements and Other Reports ............................. 74
    Section 5.02.    Existence ............................................................................. 77
    Section 5.03.    Payment of Taxes ............................................................... 77
    Section 5.04.    Maintenance of Properties .................................................. 77
    Section 5.05.    Insurance ............................................................................. 77
    Section 5.06.    Inspections .......................................................................... 78
    Section 5.07.    Maintenance of Book and Records ..................................... 78
    Section 5.08.    Compliance with Laws ....................................................... 78
    Section 5.09.    Environmental. .................................................................... 78
    Section 5.10.    [Reserved] ........................................................................... 80
    Section 5.11.    Use of Proceeds. ................................................................. 80
    Section 5.12.    Bankruptcy Covenants. ....................................................... 80
    Section 5.13.    Chapter 11 Cases. ............................................................... 80
    Section 5.14.    Cash Management System. .................................................. 81
    Section 5.15.    Further Assurances. ............................................................. 81
    Section 5.16.    Milestones. ......................................................................... 82
    Section 5.17.    Budget Matters. .................................................................. 83
    Section 5.18.    Europe Operations............................................................... 83

Table of Contents
(continued)

ARTICLE VI NEGATIVE COVENANTS                                                                        83

Section 6.01.        Indebtedness.....................................................................................83
Section 6.02.        Liens................................................................................................85
Section 6.03.        No Further Negative Pledges ...........................................................87
Section 6.04.        Restricted Payments; Certain Payments of Indebtedness. ..............88
Section 6.05.        Restrictions on Subsidiary Distributions..........................................89
Section 6.06.        Investments .....................................................................................90
Section 6.07.        Fundamental Changes; Disposition of Assets..................................91
Section 6.08.        Sale and Lease-Back Transactions...................................................91
Section 6.09.        Transactions with Affiliates .............................................................91
Section 6.10.        Conduct of Business.........................................................................91
Section 6.11.        Amendments or Waivers of Organizational Documents....................92
Section 6.12.        Amendments of or Waivers with Respect to Restricted Debt...........92
Section 6.13.        Fiscal Year ......................................................................................92
Section 6.14.        Permitted Activities of Holdings......................................................92
Section 6.15.        Investigation Rights.........................................................................93
Section 6.16.        Compliance with DIP Orders and Approved Budget.......................93

ARTICLE VII EVENTS OF DEFAULT                                                                         94

Section 7.01.        Events of Default ............................................................................94
Section 7.02.        Remedies upon an Event of Default..................................................97
Section 7.03.        Rights Not Exclusive. ......................................................................98
Section 7.04.        Application of Proceeds. ..................................................................98

ARTICLE VIII THE ADMINISTRATIVE AGENT                                                                 98
ARTICLE IX MISCELLANEOUS                                                                             106

Section 9.01.        Notices. ........................................................................................106
Section 9.02.        Waivers; Amendments. ..................................................................108
Section 9.03.        Expenses; Indemnity. .....................................................................111
Section 9.04.        Waiver of Claim. ...........................................................................112
Section 9.05.        Successors and Assigns...................................................................112
Section 9.06.        Survival .........................................................................................117
Section 9.07.        Counterparts; Integration; Effectiveness.........................................117
Section 9.08.        Severability ...................................................................................118
Section 9.09.        Right of Setoff................................................................................118
Section 9.10.        Governing Law; Jurisdiction; Consent to Service of Process. .........118
Section 9.11.        Waiver of Jury Trial .......................................................................119
Section 9.12.        Headings ........................................................................................119
Section 9.13.        Confidentiality ...............................................................................119
Section 9.14.        No Fiduciary Duty ..........................................................................120
Section 9.15.        Several Obligations.........................................................................121
Section 9.16.        USA PATRIOT Act .........................................................................121
Section 9.17.        Disclosure .....................................................................................121
Section 9.18.        Appointment for Perfection .............................................................121

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| Section 9.19. | Interest Rate Limitation | 121 |
| Section 9.20. | [Reserved]. | 122 |
| Section 9.21. | Conflicts | 122 |
| Section 9.22. | Release of Guarantors | 122 |
| Section 9.23. | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 122 |

iv

SCHEDULES:

Schedule 1.01(a) – Commitment Schedule
Schedule 1.01(b) – Mortgages
Schedule 1.01(c) – Cash Management Accounts
Schedule 3.05 – Fee Owned Real Estate Assets
Schedule 3.13 – Subsidiaries
Schedule 6.01 – Existing Indebtedness
Schedule 6.02 – Existing Liens
Schedule 6.06 – Existing Investments
Schedule 6.09 – Existing Transactions with Affiliates
Schedule 9.01 – Borrower's Website Address for Electronic Delivery

EXHIBITS:

Exhibit A – Form of Assignment and Assumption
Exhibit B – Form of Borrowing Request
Exhibit C – Form of Compliance Certificate
Exhibit D – Form of Interest Election Request
Exhibit E – Form of Perfection Certificate
Exhibit F – Form of Perfection Certificate Supplement
Exhibit G – Form of Promissory Note
Exhibit H – Form of Guaranty Agreement
Exhibit I – Initial Budget
Exhibit J-1 – Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit J-2 – Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit J-3 – Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit J-4 – Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

<u>SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT</u>

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of [●], 2024 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, this "**Agreement**"), by and among SHO Holding I Corporation, a Delaware corporation (the "**Borrower**"), Never Slip Holdings, Inc., a Delaware corporation ("**Holdings**"), the lenders from time to time party hereto (the "**Lenders**"), and Antares Capital LP ("**Antares Capital**"), in its capacities as administrative agent and collateral agent (the "**Administrative Agent**").

<u>RECITALS</u>

A.      On [●], 2024, (the "**Petition Date**"), the Borrower and the other Loan Parties (collectively, the "**Debtors**" and, each individually, a "**Debtor**") each commenced a chapter 11 case, which are being jointly administered under Case No. [●] (each a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**") by filing separate voluntary petitions for reorganization under Chapter 11 of Title 11 of the U.S. Code, 11 U.S.C. 101 *et seq.* (the "**Bankruptcy Code**"), with the United Stated Bankruptcy Court for the District of Delaware (together with any other court having jurisdiction over the Chapter 11 Cases or any proceeding therein from time to time, the "**Bankruptcy Court**"); and each Debtor continues to operate its businesses and manage its properties as a debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      Prior to the Petition Date, certain financial institutions provided financing to the Borrowers, pursuant to that certain First Lien Credit Agreement, dated as of October 27, 2015 among Holdings, the Borrower, the guarantors from time to time party thereto, the lenders party thereto from time to time (the "**Prepetition First Lien Lenders**"), and Antares Capital LP, as administrative agent and collateral agent (the "**Prepetition First Lien Credit Agreement Agent**", together with the Prepetition Sidecar Agent (as defined below), the "**Prepetition First Lien Agents**") (as amended by that certain First Amendment, dated as of November 20, 2015, that certain Second Amendment, dated as of December 27, 2016, that certain Third Amendment, dated as of October 31, 2019, that certain Fourth Amendment, dated as of July 27, 2020, and that certain Fifth Amendment, dated as of June 29, 2023, and as further amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "**Prepetition First Lien Credit Agreement**" and, together with all related Loan Documents (as defined therein) and the Prepetition Sidecar Loan Documents (as defined below), the "**Prepetition First Lien Loan Documents**", and the loans and revolving loans and obligations under the Prepetition First Lien Credit Agreement (the "**Prepetition Initial First Lien Obligations**", together with the Prepetition Sidecar Obligations (as defined below), the "**Prepetition First Lien Obligations**").

C.      Prior to the Petition Date, certain financial institutions provided financing to the Borrower, pursuant to that certain Sidecar Credit Agreement, dated as of October 13, 2019 among Holdings, the Borrower, the guarantors from time to time party thereto, the lenders party thereto from time to time (the "**Prepetition Sidecar Lenders**"), and Antares Capital LP, as administrative agent and collateral agent (the "**Prepetition Sidecar Agent**") (as amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "**Prepetition Sidecar Credit Agreement**" and, together with all related Loan Documents (as defined therein), the "**Prepetition Sidecar Loan Documents**", and the loans and obligations under the Prepetition Sidecar Credit Agreement, the "**Prepetition Sidecar Obligations**").

D.      Prior to the Petition Date, certain financial institutions provided financing to the Borrower, pursuant to that certain Second Lien Credit Agreement, dated as of October 27, 2015 among Holdings, the Borrower, the guarantors from time to time party thereto, the lenders party thereto from time to time (the "**Prepetition Second Lien Lenders**" and collectively with the Prepetition First Lien Lenders

1

and the Prepetition Sidecar Lenders, the "**Prepetition Lenders**"), and Ares Capital Corporation as administrative agent and collateral agent (the "**Prepetition Second Lien Agent**" and collectively with the Prepetition First Lien Agents, the "**Prepetition Agents**") (as amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "**Prepetition Second Lien Credit Agreement**" (and collectively with the Prepetition First Lien Credit Agreement and the Prepetition Sidecar Credit Agreement, the "**Prepetition Credit Agreements**") and, together with all related Loan Documents (as defined therein), the "**Prepetition Second Lien Loan Documents**" (and collectively with the Prepetition First Lien Loan Documents, the "**Prepetition Loan Documents**"), and the loans and obligations under the Prepetition Second Lien Credit Agreement, the "**Prepetition Second Lien Obligations**" and collectively with the Prepetition First Lien Obligations, the "**Prepetition Obligations**").

       E.      Prior to the Petition Date, the Prepetition First Lien Agents entered into that certain First Lien Intercreditor Agreement, dated as of October 31, 2019, (as amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "**Prepetition Sidecar Intercreditor Agreement**") and the Prepetition First Lien Credit Agreement Agent and the Prepetition Second Lien Agent entered into that certain Intercreditor Agreement, dated as of October 27, 2015 (as amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "**Prepetition Second Lien Intercreditor Agreement**" and together with the Prepetition Sidecar Intercreditor Agreement, the "**Prepetition Intercreditor Agreements**").

       F.      The Borrower has requested that the Lenders provide a senior secured, superpriority debtor-in-possession term loan facility to the Borrower in the maximum aggregate principal amount of $[120,800,000], consisting of (I) a new money facility comprised of (x) $20,000,000 in an aggregate maximum principal amount of New Money Initial DIP Loan and (y) $10,000,000 in an aggregate maximum principal amount of New Money Delayed Draw DIP Loans, in each case as described below (the "**New Money DIP Facility**"), (II) a letter of credit facility in an aggregate maximum principal amount of $800,000 (the "**New Money DIP LC Facility**"), and (III) a roll-up facility in the aggregate principal amount of $[90,000,000] as described below (the "**Roll-Up DIP Facility**"; together with the New Money DIP Facility and the New Money DIP LC Facility, the "**DIP Facility**") as further set forth herein.  The New Money DIP Loans will be made for purposes set forth in <u>Section 5.11</u>.

       G.      Each of the Guarantors will guaranty all of the Obligations under the Loan Documents.

       H.      In order to secure the Obligations of the Borrower and the other Loan Parties under the Loan Documents, the Borrower and the other Loan Parties will each grant to the Administrative Agent, for the benefit of Administrative Agent and all other Secured Parties, subject to the Carve-Out, a security interest in and a DIP Lien upon substantially all of the now existing and hereafter acquired property of each of the Borrower and the other Loan Parties.

       I.      The relative priority of the DIP Liens and security interests granted to secure the Obligations in relation to the Liens and security interests securing the Prepetition Obligations will be set forth in the DIP Orders.

       J.      The Lenders are willing to extend such credit to the Borrower and the other Loan Parties on the terms and subject to the conditions set forth herein and the DIP Orders, as applicable. Accordingly, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01.    <u>Defined Terms</u>.  As used in this Agreement, the following terms have the meanings specified below:

"**ABR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Alternate Base Rate.

"**ABR Loan**" means a Loan bearing interest at a rate determined by reference to the Alternate Base Rate.

"**ABR Term SOFR Determination Day**" has the meaning specified in the definition of "Term SOFR".

"**ACH**" means automated clearing house transfers.

"**Additional Agreement**" has the meaning assigned to such term in <u>Article 8</u>.

"**Adjusted Term SOFR**" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b)  the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"**Administrative Agent**" has the meaning assigned to such term in the preamble to this Agreement.

"**Administrative Questionnaire**" has the meaning assigned to such term in <u>Section 2.22(d)</u>.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings, the Borrower or any of their respective Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claim), whether pending or, threatened in writing, against or affecting Holdings, the Borrower or any of their respective Subsidiaries or any property of Holdings, the Borrower or any of their respective Subsidiaries.

"**Aggregate Liquidity**" has the meaning set forth in the DIP Orders.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person. No Person shall be an "Affiliate" of Holdings or any subsidiary thereof solely because it is an unrelated portfolio company of the Sponsor and none of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of Holdings or any subsidiary thereof.

3

"**Agreement**" has the meaning assigned to such term in the preamble to this Superpriority Secured Debtor-in-Possession Credit Agreement.

"**Alternate Base Rate**" means, for any day, a rate per annum equal to the highest of (a) the Federal Funds Effective Rate in effect on such day *plus* 0.50%, (b) to the extent ascertainable, Adjusted Term SOFR (which rate shall be calculated based upon an Interest Period of one month in effect on such day) *plus* 1.00%, (c) the Prime Rate and (d) 2.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or Adjusted Term SOFR, as the case may be, shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or Adjusted Term SOFR, as the case may be.

"**Alternative Interest Rate Election Event**" has the meaning assigned to such term in Section 2.14(b).

"**Antares Capital**" has the meaning assigned to such term in the preamble to this Agreement.

"**Applicable Rate**" means:

(a)     with respect to New Money DIP Loans that are (i) SOFR Loans, 8.00% per annum and (ii) ABR Loans, 7.00% per annum;  and

(b)     with respect to Roll-Up DIP Loans that are (i) SOFR Loans, 6.00% per annum and (ii) ABR Loans, 5.00% per annum.

"**Approved Budget**" means the Initial Budget, as modified by all Supplemental Approved Budgets.

"**Approved Fund**" means, with respect to any Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (a) such Lender, (b) any Affiliate of such Lender or (c) any entity or any Affiliate of any entity that administers, advises or manages such Lender.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.05), and accepted by the Administrative Agent in the form of Exhibit A or any other form approved by the Agent and the Borrower.

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.06(d) (but including any tenor for such Benchmark that is added to the definition of "Interest Period" pursuant to Section 2.06(d)).

"**Bail-in Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-in Legislation**" means, (a) with respect to the any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the

European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-in Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Bankruptcy Court**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Benchmark**" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.06(a).

"**Benchmark Replacement**" means, with respect to any Benchmark Transition Event, the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment; provided, that if such Benchmark Replacement as so determined would be less than the Floor, then such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Date**" means a date and time determined by the Administrative Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

      (a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

    (b)  in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

    "**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

    (a)  a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof);

    (b)  a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof); or

    (c)  a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if such Benchmark is a term rate, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Start Date**" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.06 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.06.

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership solely to the extent required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Bid Procedures**" has the meaning set forth in Section 5.16(c).

"**Bid Procedures Order**" has the meaning set forth in Section 5.16(c).

"**Board**" means the Board of Governors of the Federal Reserve System of the U.S.

"**Borrower**" has the meaning assigned to such term in the preamble to this Agreement.

"**Borrower Materials**" has the meaning assigned to such term in Section 9.01(d).

"**Borrowing**" means any Loans of the same Type made, deemed made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"**Borrowing Request**" means a request by the Borrower for a Borrowing in accordance with Section 2.03 and substantially in the form attached hereto as Exhibit B or such other form that is reasonably acceptable to the Administrative Agent and the Borrower.

"**Business Day**" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions in such state are authorized or required by law to close, and if any such day relates to any SOFR Loan, then the term "Business Day" shall mean any such day that is a U.S. Government Securities Business Day.

"**Budget Covenants**" has the meaning set forth in the DIP Orders.

"**Budget Update**" has the meaning set forth in Section 5.01(d).

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding for the avoidance of doubt any Indebtedness convertible into or exchangeable for any of the foregoing.

"**Captive Insurance Subsidiary**" means any Subsidiary of the Borrower that is maintained as a special purposes self-insurance subsidiary and is subject to regulation as an insurance company (or any Subsidiary thereof).

"**Carve-Out**" has the meaning set forth in the then applicable DIP Order.

"**Carve-Out Trigger Notice**" has the meaning set forth in the then applicable DIP Order.

"**Cash**" means money, currency or a credit balance in any Deposit Account, in each case determined in accordance with GAAP.

"**Cash Collateral**" means any collateral that constitutes "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code securing the Prepetition First Lien Obligations.

"**Cash Equivalents**" means, as at any date of determination, (a) readily marketable securities (i) issued or directly and unconditionally guaranteed or insured as to interest and principal by the U.S. government or (ii) issued by any agency or instrumentality of the U.S. the obligations of which are backed by the full faith and credit of the U.S., in each case maturing within one year after such date and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (b) readily marketable direct obligations issued by any state of the U.S. or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (c) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); (d) deposits, money market deposits, time deposit accounts, certificates of deposit or bankers' acceptances (or similar instruments) maturing within one year after such date and issued or accepted by any Lender or by any bank organized under, or authorized to operate as a bank under, the laws of the U.S., any state thereof or the District of Columbia or any political subdivision thereof and that has capital and surplus of not less than $100,000,000 and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; and (e) shares of any money market mutual fund that has (i) substantially all of its assets invested in the types of investments referred to in clauses (a) through (d) above, (ii) net assets of not less than $250,000,000 and (iii) a rating of at least A-2 from S&P or at least P-2 from Moody's.

In the case of any Investment by any Foreign Subsidiary, "Cash Equivalents" shall also include (x) Investments of the type and maturity described in clauses (a) through (e) above of foreign obligors, which Investments or obligors (or the parent companies thereof) have the ratings described in such

8

clauses or equivalent ratings from comparable foreign rating agencies and (y) other short-term Investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in Investments analogous to the Investments described in <u>clauses (a)</u> through <u>(e)</u> and in this paragraph.

"**Cash Management Accounts**" means the bank accounts of each Loan Party maintained at one or more Cash Management Banks listed on <u>Schedule 1.01(c)</u>.  All funds in each Cash Management Account shall be DIP Collateral and proceeds of DIP Collateral and the Administrative Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any deposit account or security account.

"**Cash Management Bank**" means each bank with whom Deposit Accounts are maintained.

"**Change in Law**" means (a) the adoption of any law, treaty, rule or regulation after the Closing Date, (b) any change in any law, treaty, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date (other than any such request, guideline or directive to comply with any law, rule or regulation that was in effect on the Closing Date).  For purposes of this definition and <u>Section 2.15</u>, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case described in <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u> above, be deemed to be a Change in Law, regardless of the date enacted, adopted, issued or implemented.

"**Challenge**" has the meaning set forth in <u>Section 6.15</u>.

"**Change of Control**" means the earliest to occur of:

(a)     at any time prior to a Qualifying IPO, the Permitted Holders ceasing to beneficially own, either directly or indirectly (within the meaning of Rule 13d-3 and Rule 13d-5 under the Exchange Act), Capital Stock representing more than 50% of the total voting power of all of the outstanding voting stock of Holdings;

(b)     at any time on or after a Qualifying IPO, the acquisition, directly or indirectly, by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act), including any group acting for the purpose of acquiring, holding or disposing of Securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act, but excluding any employee benefit plan and/or Person acting as the trustee, agent or other fiduciary or administrator therefor), other than one or more Permitted Holders, of Capital Stock representing more than the greater of (x) 35% of the total voting power of all of the outstanding voting stock of Holdings and (y) the percentage of the total voting power of all of the outstanding voting stock of Holdings owned, directly or indirectly, beneficially by the Permitted Holders (it being understood that a "Change of Control" shall not be deemed to have occurred with respect to <u>clauses (a)</u> and <u>(b)</u> above if the Permitted Holders have, at such time, the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the board of directors or similar governing body of Holdings); and

(c)       the Borrower ceasing to be a direct or indirect Wholly-Owned Subsidiary of Holdings;

*provided* that the creation of a Parent Company shall not in and of itself cause a Change of Control so long as at the time such Person became a Parent Company, no Person and no group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act), including any such group acting for the purpose of acquiring, holding or disposing of Securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act) (other than any Permitted Holders), shall have beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provisions), directly or indirectly, of 50% or more, in the case of clause (a) above, or 35% or more, in the case of clause (b) above, of the total voting power of all of the outstanding voting stock of Holdings.

"**Chapter 11 Case**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Charge**" means any charge, fee, expense, cost, accrual or reserve of any kind.

"**Charged Amounts**" has the meaning assigned to such term in Section 9.19.

"**Closing Date**" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"**Code**" means the Internal Revenue Code of 1986 as amended.

"**Co-Investors**" means (a) the officers, directors and members of the management of the Borrower, any Parent Company and/or any subsidiary of the Borrower and (b) SMS Holdings, LLC, the SMS Permitted Transferees and/or their respective Affiliates, in each case, solely to the extent that such Persons or Affiliates own Capital Stock in the Borrower or any direct or indirect parent thereof on the Closing Date.

"**Committee**" shall mean the official committee of unsecured creditors, if any, appointed in the Chapter 11 Cases.

"**Commitment**" means, with respect to each Lender, such Lender's New Money Initial DIP Commitment or New Money Delayed Draw DIP Commitment, as applicable, in effect as of such time.

"**Commitment Schedule**" means the Schedule attached hereto as Schedule 1.01(a).

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*).

"**Company Competitor**" means any Person that is a competitor of the Borrower and/or any of its subsidiaries and/or the Target and/or any of its subsidiaries.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Confidential Information**" has the meaning assigned to such term in Section 9.13.

"**Conforming Changes**" means, with respect to either the use or administration of Adjusted Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of

10

"ABR," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.16 and other technical, administrative or operational matters) that the Administrative Agent decides (in consultation with the Borrower) may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides (in consultation with the Borrower) is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Copyright**" means the following:  (a) all copyrights, rights and interests in copyrights, works protectable by copyright whether published or unpublished, copyright registrations and copyright applications; (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing.

"**Credit Extension**" means the making of a Loan.

"**Debtor**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code of the U.S., and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the U.S. or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Declined Proceeds**" has the meaning assigned to such term in Section 2.11(b)(vi).

"**Default**" means any event or condition which upon notice, lapse of time or both would become an Event of Default.

"**Defaulting Lender**" means any Lender that has (a) defaulted in its obligations under this Agreement, including without limitation, to (x) make a Loan within two Business Days of the date required to be made by it hereunder or (y) fund its participation in a Letter of Credit required to be funded by it hereunder within two Business Days of the date such obligation arose or such Letter of Credit was required to be made or funded, (b) notified the Administrative Agent or any Loan Party in writing that it does not intend to satisfy any such obligation or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under agreements in which it commits to

extend credit generally, (c) failed, within two Business Days after the request of Administrative Agent or the Borrower, to confirm in writing that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans and participations in then outstanding Letters of Credit; <u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this <u>clause (c)</u> upon receipt of such written confirmation by the Administrative Agent, (d) become (or any parent company thereof has become) insolvent or been determined by any Governmental Authority having regulatory authority over such Person or its assets, to be insolvent, or the assets or management of which has been taken over by any Governmental Authority, (e) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in, any such proceeding or appointment, unless in the case of any Lender subject to this <u>clause (e)</u>, the Borrower and the Administrative Agent shall each have determined that such Lender intends, and has all approvals required to enable it (in form and substance satisfactory to each of the Borrower and the Administrative Agent), to continue to perform its obligations as a Lender hereunder, or (f) become the subject of a Bail-In Action; <u>provided</u> that no Lender shall be deemed to be a Defaulting Lender solely by virtue of the ownership or acquisition of any Capital Stock in such Lender or its parent by any Governmental Authority; <u>provided</u> that, such action does not result in or provide such Lender with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contract or agreement to which such Lender is a party

"**Derivative Transaction**" means (a) any interest-rate transaction, including any interest-rate swap, basis swap, forward rate agreement, interest rate option (including a cap, collar or floor), and any other instrument linked to interest rates that gives rise to similar credit risks (including when-issued securities and forward deposits accepted), (b) any exchange-rate transaction, including any cross-currency interest-rate swap, any forward foreign-exchange contract, any currency option, and any other instrument linked to exchange rates that gives rise to similar credit risks, (c) any equity derivative transaction, including any equity-linked swap, any equity-linked option, any forward equity-linked contract, and any other instrument linked to equities that gives rise to similar credit risk and (d) any commodity (including precious metal) derivative transaction, including any commodity-linked swap, any commodity-linked option, any forward commodity-linked contract, and any other instrument linked to commodities that gives rise to similar credit risks; <u>provided</u> that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees, members of management, managers or consultants of the Borrower or its subsidiaries shall be a Derivative Transaction.

"**DIP Collateral**" has the meaning provided in <u>Section 2.29</u>.

"**DIP Facility**" has the meaning assigned to such term in the Recitals to this Agreement.

"**DIP Letter of Credit**" has the meaning assigned to such term in <u>Section 2.05(a)</u>.

"**DIP Liens**" shall have the meaning assigned to such term in the then applicable DIP Order.

"**DIP Order**" means the Interim DIP Order or the Final DIP Order, as applicable, or each of them as the context may require.

"**DIP Proceeds**" means the proceeds received by the Borrower from the Loans.

"**DIP Superpriority Claims**" has the meaning set forth in the then applicable DIP Order.

12

"**DIP Termination Date**" means the date that all outstanding Obligations will be due and payable in full in cash unless as otherwise set forth in the Restructuring Support Agreement or otherwise agreed to by the Administrative Agent at the direction of the Required Lenders on the earliest of (i) the date that is [one hundred fifty (150) calendar days] after the Petition Date, (ii) the date of consummation of any sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code, (iii) if the Final DIP Order has not been entered, thirty (30) calendar days after the Petition Date, (iv) the acceleration of the Loans and the termination of the Commitments upon the occurrence, and during the continuance of an Event of Default (at the direction of the Required Lenders following and during the continuation of any Event of Default), and (iv) the effective date of any Chapter 11 plan.

"**Disposition**" or "**Dispose**" means the sale, lease, sublease, or other disposition of any property of any Person.

"**Disqualified Capital Stock**" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than for Qualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than for Qualified Capital Stock), in whole or in part, on or prior to 91 days following the latest possible DIP Termination Date at the time such Capital Stock is issued (it being understood that if any such redemption is in part, only such part coming into effect prior to 91 days following the latest possible DIP Termination Date shall constitute Disqualified Capital Stock), (b) is or becomes convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock that would constitute Disqualified Capital Stock, in each case at any time on or prior to 91 days following the latest possible DIP Termination Date at the time such Capital Stock is issued, (c) contains any mandatory repurchase obligation or any other repurchase obligation at the option of the holder thereof (other than for Qualified Capital Stock), in whole or in part, which may come into effect prior to 91 days following the latest possible DIP Termination Date at the time such Capital Stock is issued (it being understood that if any such repurchase obligation is in part, only such part coming into effect prior to 91 days following the latest possible DIP Termination Date shall constitute Disqualified Capital Stock) or (d) provides for the scheduled payments of dividends in Cash on or prior to 91 days following the latest possible DIP Termination Date at the time such Capital Stock is issued; <u>provided</u> that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Capital Stock upon the occurrence of any change in control, Qualifying IPO or any Disposition occurring prior to 91 days following the latest possible DIP Termination Date at the time such Capital Stock is issued shall not constitute Disqualified Capital Stock if such Capital Stock provides that the issuer thereof will not redeem any such Capital Stock pursuant to such provisions prior to the Termination Date.

Notwithstanding the preceding sentence, (A) if such Capital Stock is issued pursuant to any plan for the benefit of directors, officers, employees, members of management, managers or consultants or by any such plan to such directors, officers, employees, members of management, managers or consultants, in each case in the ordinary course of business of Holdings, the Borrower or any Subsidiary, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by the issuer thereof in order to satisfy applicable statutory or regulatory obligations, and (B) no Capital Stock held by any future, present or former employee, director, officer, manager, member of management or consultant (or their respective Affiliates or Immediate Family Members) of the Borrower (or any Parent Company or any subsidiary) shall be considered Disqualified Capital Stock because such stock is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option, stock appreciation right or other stock award agreement, stock ownership plan, put agreement, stockholder agreement or similar agreement that may be in effect from time to time.

13

"**Disqualified Institution**" means:

(a)    (i) any Person identified in writing and reasonably acceptable to the Administrative Agent prior to the Closing Date (the Persons described in this <u>clause (a)(i)</u>, the "<u>Identified Disqualified Lenders</u>"), (ii) any reasonably identifiable Affiliate of any Identified Disqualified Lender (on the basis of such Affiliate's name) and (iii) any Affiliate of any Identified Disqualified Lender that is identified in writing to the Administrative Agent as such,

(b)    any Affiliate of any Arranger (or any director (or equivalent manager), officer or employee of any Arranger or any Affiliate thereof) that is engaged as a principal primarily in private equity, mezzanine financing or venture capital, and

(c)    (i) any Person that is or becomes a Company Competitor and is (A) identified in writing to the Administrative Agent prior to the Closing Date, (B) any Person identified in writing to (and reasonably approved in writing by) the Administrative Agent after [___], 2024 and prior to the Closing Date and (C) any Person identified in writing to (and reasonably approved in writing by) the Administrative Agent on or after the Closing Date, (ii) any Affiliate of any Person described in <u>clause (c)(i)</u> above that is reasonably identifiable as an Affiliate of such Person on the basis of such Affiliate's name and (iii) any other Affiliate of any Person described in <u>clause (c)(i)</u> above that is identified in writing to the Administrative Agent as such;

it being understood and agreed that the identification of any Person as a Disqualified Institution after the Closing Date shall not apply to retroactively disqualify any Person that has previously acquired an assignment or participation interest in any Loan, subject, in the case of assignments and participations made after the date on which any such Person is identified as a Disqualified Institution, to the provisions of <u>Section 9.05</u>.

"**Dollars**" or "**$**" refers to lawful money of the U.S.

"**Domestic Subsidiary**" means any direct or indirect subsidiary of Holdings organized under the laws of the United States, any state thereof or the District of Columbia.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means (a) any Lender, (b) any commercial bank, insurance company, or finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), (c) any Affiliate of any Lender, or (d) any Approved Fund of any Lender; <u>provided</u> that in any event, "Eligible Assignee" shall not include (i) any natural person, (ii) any Disqualified Institution or (iii) the Borrower or any of its Affiliates.

14

"**Environment**" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata & natural resources such as wetlands, flora and fauna.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm the Environment.

"**Environmental Laws**" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other applicable requirements of Governmental Authorities and the common law relating to (a) environmental matters, including those relating to any Hazardous Materials Activity; or (b) the generation, use, storage, transportation or disposal of or exposure to Hazardous Materials, in any manner applicable to the Borrower or any of its Subsidiaries or any Facility.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation or remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means, as applied to any Person, (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which that Person is a member; and (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which that Person is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the 30-day notice period has been waived); (b) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Pension Plan, or the filing of any request for or receipt of a minimum funding waiver under Section 412 of the Code with respect to any Pension Plan or a failure to make a required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (e) the institution by the PBGC of proceedings to terminate any Pension Plan; (f) the imposition of liability on the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) of the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates from any Multiemployer Plan, or the receipt by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of

ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA or is in "endangered" or "critical" status, within the meaning of Section 432 of the Code or Section 305 of ERISA; (h) a failure by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates to pay when due (after expiration of any applicable grace period) any installment payment with respect to withdrawal liability under Section 4201 of ERISA; (i) a determination that any Pension Plan is, or is reasonably expected to be, in "at-risk" status, within the meaning of Section 430(i)(4) of the Code or Section 303(i)(4) of ERISA; (j) the incurrence of liability or the imposition of a Lien pursuant to Section 436 or 430(k) of the Code or pursuant to ERISA with respect to any Pension Plan; or (k) any Foreign Plan Event.

"**EU Bail-in Legislation Schedule**" means the EU Bail-in Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning assigned to such term in Article 7.

"**Exchange Act**" means the Securities Exchange Act of 1934 and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Accounts**" means, collectively, (A) any payroll accounts and accounts having a zero balance at the end of each Business Day, (B) accounts with amounts on deposit that do not exceed $50,000 at any one time, (C) withholding tax and fiduciary accounts, (D) escrow accounts (holding funds for the benefit of third parties (other than Holdings or any of its subsidiaries) funded in connection with Permitted Acquisitions or other Investments permitted hereunder and (E) deposit, securities, commodity or similar accounts in jurisdictions outside the United States.

"**Excluded Assets**" has the meaning set forth in the DIP Order.

"**Excluded Subsidiary**" means, collectively, (i) Shoes for Crews (Europe) Limited Company, (ii) Shoes for Crews APAC (Singapore), (iii) Shoes for Crews Footwear (Guangzhou) Co., Ltd., and (iv) Shoes for Crews Canada Distributions ULC.

"**Excluded Taxes**" means, with respect to the Administrative Agent or any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) its net income or franchise Taxes (i) by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed under Section 884(a) of the Code or any similar Tax, imposed by any jurisdiction described in clause (a), (c) in the case of any Foreign Lender, any U.S. federal withholding Tax that is imposed on amounts payable to such Foreign Lender pursuant to a Requirement of Law in effect at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office), except (i) pursuant to an assignment or designation of a new lending office under Section 2.19 and (ii) to the extent that such Foreign Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts from any Loan Party with respect to such withholding Tax pursuant to Section 2.17, (d) any Tax imposed as a result of a failure by the Administrative Agent or any Lender to comply with Section 2.17(f) and (e) any U.S. withholding Tax under FATCA.

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or, except with respect to Articles 5 and 6, hereof owned, leased, operated or used by the Borrower or any of its Subsidiaries.

16

"**Family Member**" means, with respect to any individual, any current or former spouse, direct lineal descendants (including adopted children), or antecedents of such individual.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above), and any treaty, law, regulation or other official guidance enacted in any other jurisdiction relating to any intergovernmental agreement between the U.S. and any other jurisdiction that facilitates the implementation of such Sections of the Code.

"**FCPA**" has the meaning assigned to such term in Section 3.17(b).

"**Federal Funds Effective Rate**" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Federal Reserve Board**" means the Board of Governors of the Federal Reserve System of the United States.

"**Final DIP Order**" means an order entered by the Bankruptcy Court in the Chapter 11 Cases substantially in the form of the Interim DIP Order (with only such modifications thereto as are necessary to convert the Interim DIP Order to a final order and other modifications as are satisfactory in form and substance to the Administrative Agent at the direction of the Required Lenders).

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrower ending December 31 of each calendar year.

"**Flood Hazard Property**" means any parcel of any real property subject to a Mortgage located in the U.S. in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Flood Insurance Laws**" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iv) Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"**Floor**" means a rate of interest equal to 1.00%.

"**Foreign Lender**" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Foreign Plan**" means any plan, fund (including, without limitation, any superannuation fund) or other similar program established or maintained outside the United States by the Borrower or any of its Subsidiaries primarily for the benefit of employees of the Borrower or such Subsidiary residing

outside the United States, which plan, fund or other similar program provides, or results in, defined benefit retirement income or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"**Foreign Plan Event**" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable legal requirement, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure of the Borrower or any Subsidiary to make the required contributions or payments, under any applicable legal requirement, on or before the due date for such contributions or payments, (c) the receipt by the Borrower or any Subsidiary of a notice from a Governmental Authority relating to the intention to terminate such Foreign Plan or to appoint a trustee or similar official to administer such Foreign Plan, or alleging the insolvency of such Foreign Plan, or (d) the incurrence of any liability by any Loan Party or Subsidiary under applicable legal requirements on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**Funding Account**" has the meaning assigned to such term in Section 2.03(f).

"**GAAP**" means generally accepted accounting principles in the U.S. in effect and applicable to the accounting period in respect of which reference to GAAP is made.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state or locality of the U.S., the U.S., or a foreign government or any other political subdivision thereof, including central banks and supra national bodies.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Granting Lender**" has the meaning assigned to such term in Section 9.05(e).

"**Guarantee**" of or by any Person (the "**Guarantor**") means any obligation, contingent or otherwise, of the Guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation of any other Person (the "**Primary Obligor**") in any manner and including any obligation of the Guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other monetary obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the Primary Obligor so as to enable the Primary Obligor to pay such Indebtedness or other monetary obligation, (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or monetary obligation, (e) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (f) secured by any Lien on any assets of such Guarantor securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Guarantor (or any right, contingent or otherwise, of any holder of such Indebtedness or other monetary obligation to obtain any such Lien); provided that the term "Guarantee" shall not include

18

endorsements for collection or deposit in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition, Disposition or other transaction permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"**Hazardous Materials**" means any chemical, material, substance or waste, or any constituent thereof, which is prohibited, limited or regulated as "toxic", "hazardous" or as a "pollutant" or "contaminant" or words of similar meaning or effect by any Environmental Law or any Governmental Authority.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Material, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Material, and any corrective action or response action with respect to any of the foregoing.

"**Hedge Agreement**" means any agreement with respect to any Derivative Transaction between any Loan Party or any Subsidiary and any other Person.

"**Holdings**" has the meaning assigned to such term in the preamble to this Agreement.

"**IFRS**" means international accounting standards within the meaning of the IAS Regulation 1606/2002, as in effect from time to time (subject to the provisions of <u>Section 1.04</u>), to the extent applicable to the relevant financial statements.

"**Immediate Family Member**" means, with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, domestic partner, former domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships), any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals, such individual's estate (or an executor or administrator acting on its behalf), heirs or legatees or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"**Indebtedness**" as applied to any Person means, without duplication, (a) all indebtedness for borrowed money; (b) that portion of obligations with respect to Capital Leases to the extent recorded as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP; (c) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP; (d) any (i) obligation owed for all or any part of the deferred purchase price of property or services  (other than any earn out obligation or purchase price adjustment), which purchase price is (x) due more than six months from the date of incurrence of the obligation in respect thereof or (y) evidenced by a note or similar written instrument (but in any case, excluding (A) any such obligations incurred under ERISA, (B) accrued expenses and trade accounts payable in the ordinary course of business (including on an inter-company basis) and (C) liabilities associated with customer prepayments and deposits) and (ii) any earn out obligation or purchase price adjustment solely to the extent such obligation (x) becomes a liability on the statement of financial position or balance sheet (excluding the

footnotes thereto) in accordance with GAAP and (y) has not been paid within 10 days after becoming due and payable; (e) all Indebtedness of others secured by any Lien on any property or asset owned or held by such Person regardless of whether the Indebtedness secured thereby shall have been assumed by such Person or is non-recourse to the credit of such Person; (f) the face amount of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings; (g) the Guarantee by such Person of the Indebtedness of another; (h) all obligations of such Person in respect of any Disqualified Capital Stock and (i) all net obligations of such Person in respect of any Derivative Transaction, including any Hedge Agreement, whether or not entered into for hedging or speculative purposes; <u>provided</u> that the amount of Indebtedness of any Person for purposes of <u>clause (e)</u> shall be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith.  For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or any joint venture (other than any joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited; <u>provided</u> that, notwithstanding anything herein to the contrary, the term "Indebtedness" shall not include, and shall be calculated without giving effect to, the effects of Accounting Standards Codification Topic 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose hereunder as a result of accounting for any embedded derivatives created by the terms of such Indebtedness and any such amounts that would have constituted Indebtedness hereunder but for the application of this proviso shall not be deemed an incurrence of Indebtedness hereunder.  Notwithstanding the foregoing, Indebtedness of Holdings and its Subsidiaries shall exclude (1) liabilities under vendor agreements to the extent such liabilities may be satisfied exclusively through non-cash means such as purchase volume earning credits, (2) reserves for deferred taxes and (3) for all purposes under this Agreement other than for purposes of <u>Section 6.01</u>, intercompany Indebtedness among Holdings and its Subsidiaries.

"**Indemnified Taxes**" means Taxes, other than Excluded Taxes or Other Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Indemnitee**" has the meaning assigned to such term in <u>Section 9.03(b)</u>.

"**Information**" has the meaning set forth in <u>Section 3.11(a)</u>.

"**Initial Budget**" means a rolling 13-week cash flow budget that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales and international transfers), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases, capital expenditures, issuances of any letter of credit, including the fees relating thereto, and estimated fees and expenses of the Administrative Agent (including counsel and financial advisors therefor), the Prepetition First Lien Credit Agreement Agent (including counsel and financial advisors therefor), and any other fees and expenses relating to the DIP Facility), (iii) Aggregate Liquidity, and (iv) the weekly outstanding principal balance of the loans made under the DIP Facility (including the principal amount of the Roll-Up DIP Facility from and after the entry of a Final DIP Order).  Such Initial Budget shall be in the form set forth in Exhibit I hereto and also attached as an exhibit to the Interim DIP Order.  Until supplemented pursuant to <u>Section 5.01(d)</u> and approved (or deemed approved) by the Administrative Agent at the direction of the Required Lenders in accordance hereof, the Initial Budget shall constitute the Approved Budget.

"**Interest Election Request**" means a request by the Borrower in the form of <u>Exhibit D</u> or another form reasonably acceptable to the Administrative Agent to convert or continue a Borrowing in accordance with <u>Section 2.08</u>.

20

"**Interest Payment Date**" means (a) with respect to any ABR Loan, the last Business Day of each month (commencing on April 30, 2024), or the maturity date applicable to such Loan and (b) with respect to any SOFR Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and the applicable DIP Termination Date.

"**Interest Period**" means with respect to any SOFR Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one month thereafter (in each case, subject to the availability thereof), as the Borrower may elect; provided that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, (iii) no Interest Period in respect of any Loan or Borrowing shall extend beyond the applicable DIP Termination Date of such Loan and (iv) no tenor that has been removed from this definition pursuant to Section 2.06(d) shall be available for specification in any Borrowing Request or Interest Election Request.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**Interim DIP Order**" means the interim order entered by the Bankruptcy Court in the Chapter 11 Cases (as the same may be amended, supplemented, or modified form time to time after  entry thereof in a manner satisfactory to the Administrative Agent and Required Lenders in their sole discretion) authorizing and approving, among other things, the DIP Facility, use of cash  collateral and the Transactions, which interim order is in form and substance satisfactory to the Administrative Agent at the direction of the Required Lenders.

"**Investigation Period**" has the meaning set forth in <u>Section 6.15</u>.

"**Investment**" means (a) any purchase or other acquisition by the Borrower or any of its Subsidiaries of any of the Securities of any other Person (other than any Loan Party), (b) the acquisition by purchase or otherwise (other than any purchase or other acquisition of inventory, materials, supplies and/or equipment in the ordinary course of business) of all or substantially all of the business, property or fixed assets of any other Person or any division or line of business or other business unit of any other Person and (c) any loan, advance (other than any advance to any current or former employee, officer, director, member of management, manager, consultant or independent contractor of the Borrower, any Subsidiary or any Parent Company for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by the Borrower or any of its Subsidiaries to any other Person.  Subject to <u>Section 5.10</u>, the amount of any Investment shall be the original cost of such Investment, *plus* the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect thereto, but giving effect to any repayments of principal in the case of any Investment in the form of a loan and any return of capital or return on Investment in the case of any equity Investment (whether as a distribution, dividend, redemption or sale but not in excess of the amount of the relevant initial Investment).

"**Investors**" means (a) the Sponsor and (b) the Co-Investors.

"**IP Rights**" has the meaning assigned to such term in <u>Section 3.05(c)</u>.

"**IRS**" means the U.S. Internal Revenue Service.

"**Issuing Bank**" means Canadian Imperial Bank of Commerce.

"**Junior Lien Indebtedness**" means any Indebtedness that is secured by a security interest on the DIP Collateral (other than Indebtedness among Holdings and/or its subsidiaries) that is expressly junior or subordinated to the Lien securing the Secured Obligations.

"**LC Collateral Account**" has the meaning assigned to such term in <u>Section 2.05(j)</u>.

"**LC Disbursement**" means a payment or disbursement made by an Issuing Bank pursuant to a Letter of Credit.

"**LC Exposure**" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time and (b) the aggregate principal amount of all LC Disbursements that have not yet been reimbursed at such time.

"**Lenders**" has the meaning assigned to such term in the preamble to this Agreement.

"**Letter of Credit**" means any letter of credit issued (or deemed issued) pursuant to this Agreement.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; <u>provided</u> that in no event shall an operating lease in and of itself be deemed to constitute a Lien.

"**Loan Documents**" means this Agreement, any Promissory Note, each Loan Guaranty, any collateral documents and any intercreditor agreement required to be entered into pursuant to the terms of this Agreement and any other document or instrument designated by the Borrower and the Administrative Agent as a "Loan Document." Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto.

"**Loan Guaranty**" means the Guaranty Agreement, substantially in the form of <u>Exhibit H</u>, executed by each Loan Party party thereto and the Administrative Agent for the benefit of the Secured Parties.

"**Loan Parties**" means Holdings, the Borrower, each Subsidiary Guarantor, and in each case their respective successors and permitted assigns.

"**Loans**" means the New Money DIP Loans and the Roll-Up DIP Loans.

"**Material Adverse Effect**" means any event, circumstance or condition that materially adversely affects: (i) the business, operations, properties or condition (financial or otherwise) of the Debtors and their subsidiaries, collectively; (ii) the legality, validity or enforceability of any Loan Documents or the DIP Orders; (iii) the ability of the Borrower or the other Loan Parties, taken as a whole, to perform their payment obligations under the Loan Documents; (iv) the perfection or priority of the DIP Liens granted pursuant to the Loan Documents or the DIP Orders; or (v) the rights and remedies of the Administrative Agent and the Lenders under the Loan Documents taken as a whole.

"**Maximum Rate**" has the meaning assigned to such term in <u>Section 9.19</u>.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgages**" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Administrative Agent, for the benefit of the Administrative Agent and the relevant Secured Parties, on any Real Estate Asset constituting DIP Collateral.

"**Multiemployer Plan**" means any employee benefit plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA, that is subject to the provisions of Title IV of ERISA, and in respect of which the Borrower or any of its Subsidiaries, or any of their respective ERISA Affiliates, makes or is obligated to make contributions or with respect to which any of them has any ongoing obligation or liability, contingent or otherwise.

"**Narrative Report**" means, with respect to the financial statements with respect to which it is delivered, a management discussion and narrative report describing the operations of Holdings, the Borrower and its Subsidiaries for the applicable Fiscal Quarter or Fiscal Year and for the period from the beginning of the then-current Fiscal Year to the end of the period to which the relevant financial statements relate.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to:   (a) any Cash payments or proceeds (including Cash Equivalents) received by Holdings or any of its Subsidiaries (i) under any casualty insurance policy in respect of a covered loss thereunder of any assets of Holdings or any of its Subsidiaries or (ii) as a result of the taking of any assets of Holdings or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, *minus* (b) (i) any actual out-of-pocket costs incurred by Holdings or any of its Subsidiaries in connection with the adjustment, settlement or collection of any claims of Holdings or the relevant Subsidiary in respect thereof, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest and other amounts on any Indebtedness (other than the Loans, Indebtedness under any Prepetition Credit Agreement and any Indebtedness secured by a Lien that is *pari passu* with or expressly subordinated to the Lien on the DIP Collateral or the Prepetition Obligations) that is secured by a Lien on the assets in question and that is required to be repaid or otherwise comes due or would be in default under the terms thereof as a result of such loss, taking or sale, (iii) in the case of a taking, the reasonable out-of-pocket costs of putting any affected property in a safe and secure position, (iv) any selling costs and out-of-pocket expenses (including reasonable broker's fees or commissions, legal fees, transfer and similar Taxes and the Borrower's good faith estimate of income Taxes paid or payable) in connection with any sale or taking of such assets as described in <u>clause (a)</u> of this definition and (v) any amounts provided as a reserve in accordance with GAAP against any liabilities under any indemnification obligation or purchase price adjustments associated with any sale or taking of such assets as referred to in <u>clause (a)</u> of this definition (<u>provided</u> that to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Insurance/Condemnation Proceeds).

"**Net Proceeds**" means (a) with respect to any Disposition (including any Prepayment Asset Sale), the Cash proceeds (including Cash Equivalents and Cash proceeds subsequently received (as and when received) in respect of non-cash consideration initially received), net of (i) selling costs and out-of-pocket expenses (including reasonable broker's fees or commissions, legal fees, transfer and similar Taxes and the Borrower's good faith estimate of income Taxes paid or payable (including pursuant to Tax sharing arrangements or any Tax distributions) in connection with such Disposition), (ii) amounts provided as a reserve in accordance with GAAP against any liabilities under any indemnification obligation or purchase price adjustment associated with such Disposition (<u>provided</u> that to the extent and at the time any

such amounts are released from such reserve, such amounts shall constitute Net Proceeds), (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness (other than the Loans, Indebtedness under any Prepetition Credit Agreement and any Indebtedness secured by a Lien that is *pari passu* with or expressly subordinated to the Lien on the DIP Collateral or the Prepetition Obligations) which is secured by the asset sold in such Disposition and which is required to be repaid or otherwise comes due or would be in default and is repaid (other than any such Indebtedness that is assumed by the purchaser of such asset) and (iv) Cash escrows (until released from escrow to the Borrower or any of its Subsidiaries) from the sale price for such Disposition; and (b) with respect to any issuance or incurrence of Indebtedness or Capital Stock, the Cash proceeds thereof, net of all Taxes and customary fees, commissions, costs, underwriting discounts and other fees and expenses incurred in connection therewith.

"**New Money Delayed Draw DIP Borrowing**" has the meaning assigned to such term in Section 2.01(b).

"**New Money Delayed Draw DIP Borrowing Date**" has the meaning assigned to such term in Section 2.01(b).

"**New Money Delayed Draw DIP Commitments**" has the meaning assigned to such term in Section 2.01(b).

"**New Money Delayed Draw DIP Loans**" has the meaning assigned to such term in Section 2.01(b).

"**New Money DIP Borrowing**" has the meaning assigned to such term in Section 2.01(b).

"**New Money DIP Commitments**" means the New Money Initial DIP Commitment, the New Money DIP LC Commitments and the New Money Delayed Draw DIP Commitments.

"**New Money DIP Facility**" has the meaning assigned to such term in the Recitals to this Agreement.

"**New Money DIP LC Borrowing Date**" has the meaning assigned to such term in Section 2.01(d).

"**New Money DIP LC Commitment**" has the meaning assigned to such term in Section 2.01(d).

"**New Money DIP LC Facility**" has the meaning assigned to such term in the Recitals to this Agreement

"**New Money DIP LC Lender**" has the meaning assigned to such term in Section 2.01(d).

"**New Money DIP LC Term Loan**" has the meaning assigned to such term in Section 2.01(d).

"**New Money DIP Loans**" means the New Money Initial DIP Loan, the New Money DIP LC Term Loans and the New Money Delayed Draw DIP Loans.

"**New Money Initial DIP Borrowing**" has the meaning assigned to such term in Section 2.01(a).

"**New Money Initial DIP Commitment**" has the meaning assigned to such term in Section 2.01(a).

"**New Money Initial DIP Loan**" has the meaning assigned to such term in Section 2.01(a).

"**Non-Consenting Lender**" has the meaning assigned to such term in Section 2.19(b).

"**Obligations**" means all unpaid principal of and accrued and unpaid interest (including PIK Interest and interest, fees and expenses accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, all LC Exposure, all accrued and unpaid fees and all expenses, reimbursements, indemnities and all other advances to, debts, liabilities and obligations of the Loan Parties to the Lenders or to any Lender, the Administrative Agent or any indemnified party arising under the Loan Documents in respect of any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute, contingent, due or to become due, now existing or hereafter arising.

"**OFAC**" has the meaning assigned to such term in Section 3.17.

"**Organizational Documents**" means (a) with respect to any corporation, its certificate or articles of incorporation or organization and its by-laws, (b) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, (d) with respect to any limited liability company, its articles of organization or certificate of formation, and its operating agreement, and (e) with respect to any other form of entity, such other organizational documents required by local law or customary under such jurisdiction to document the formation and governance principles of such type of entity. In the event that any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Connection Taxes**" means, with respect to any Lender or the Administrative Agent, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means any and all present or future stamp, court or documentary taxes or any intangible, recording, filing or other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, but not including, for the avoidance of doubt, any Excluded Taxes.

"**Parent Company**" means Holdings and any other Person of which the Borrower is an indirect Wholly-Owned Subsidiary.

"**Participant**" has the meaning assigned to such term in Section 9.05(c).

"**Participant Register**" has the meaning assigned to such term in Section 9.05(c).

"**Patent**" means the following: (a) any and all patents and patent applications; (b) all inventions described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions

and continuations in part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan", as defined in Section 3(2) of ERISA (other than a Multiemployer Plan), that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, which the Borrower or any of its Subsidiaries, or any of their respective ERISA Affiliates, maintains or contributes to or has an obligation to contribute to, or otherwise has any liability, contingent or otherwise.

"**Perfection Certificate**" means a certificate substantially in the form of Exhibit E.

"**Perfection Certificate Supplement**" means a supplement to the Perfection Certificate substantially in the form of Exhibit F.

"**Perfection Requirements**" means the filing of appropriate financing statements with the office of the Secretary of State or other appropriate office of the state of organization of each Loan Party, the filing of appropriate assignments or notices with the U.S. Patent and Trademark Office and the U.S. Copyright Office, the proper recording or filing, as applicable, of Mortgages and fixture filings with respect to any Real Estate Asset constituting DIP Collateral and to the extent required hereunder, the entry into control agreements or other control arrangements with respect to deposit accounts, securities accounts and commodities accounts, in each case in favor of the Administrative Agent for the benefit of the Secured Parties and the delivery to the Administrative Agent of any stock certificate or promissory note required to be delivered pursuant to the applicable Loan Documents, together with instruments of transfer executed in blank.

"**Periodic Term SOFR Determination Day**" has the meaning specified in the definition of "Term SOFR".

"**Permitted Holders**" means (a) the Investors and (b) any Person with which one or more Investors form a "group" (within the meaning of Section 14(d) of the Exchange Act) so long as, in the case of this clause (b), the relevant Investors beneficially own more than 50% of the relevant voting stock beneficially owned by the group.

"**Permitted Liens**" means Liens permitted pursuant to Section 6.02.

"**Permitted Variance(s)**" has the meaning set forth in the Interim DIP Order.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity.

"**Petition Date**" has the meaning assigned to such term in the Recitals to this Agreement.

"**PIK Interest**" has the meaning assigned to such term in Section 2.13(e).

"**Plan**" means any "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA) maintained by the Borrower or any of its Subsidiaries or, with respect to any such plan that is

subject to Section 412 of the Code or Title IV of ERISA, any of its ERISA Affiliates, other than any Multiemployer Plan.

"**Platform**" has the meaning assigned to such term in <u>Section 9.01(d)</u>.

"**Prepayment Asset Sale**" means any Disposition by the Borrower or its Subsidiaries (other than a Disposition made pursuant to, <u>Section 6.07(b).</u>

"**Prepetition Agents**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Collateral**" has the meaning assigned to such term in <u>Section 5.11</u>.

"**Prepetition Credit Agreements**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition First Lien Agents**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition First Lien Credit Agreement**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition First Lien Credit Agreement Agent**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition First Lien Intercreditor Agreement**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition First Lien Lenders**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition First Lien Loan Documents**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition First Lien Obligations**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition First Lien Secured Parties**" means (i) the Prepetition First Lien Lenders, (ii) the Prepetition Sidecar Lenders and (iii) the Prepetition First Lien Agents.

"**Prepetition Intercreditor Agreements**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Lenders**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Letter of Credit**" means that certain Irrevocable Standby Letter of Credit No. SBGN116052 issued by Canadian Imperial Bank of Commerce to Never Slip Topco, Inc., on behalf of Shoes for Crews, LLC with Atlantic Specialty Insurance Company as beneficiary thereunder in an aggregate amount of $800,000, as amended or otherwise modified prior to the date hereof.

27

"**Prepetition Loan Documents**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Obligations**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Second Lien Agent**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Second Lien Credit Agreement**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Second Lien Intercreditor Agreement**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Second Lien Lenders**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Second Lien Loan Documents**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Second Lien Obligations**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Sidecar Agent**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Sidecar Credit Agreement**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Sidecar Intercreditor Agreement**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Sidecar Lenders**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Sidecar Loan Documents**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Prepetition Sidecar Obligations**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Primary Obligor**" has the meaning assigned to such term in the definition of "Guarantee".

"**Prime Rate**" means the rate of interest per annum determined from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City and notified to the Borrower. The prime rate is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such rate.

"**Professional Costs**" shall mean any payment or the obligation to make payment on account of fees and expenses incurred by professional advisors to the Loan Parties, the Lenders, the Administrative Agent, or any other party's professional advisors, the fees and expenses of which are obligated to be paid by the Loan Parties (including, but not limited to, the fees and expenses of professional advisors to any committee appointed in the Chapter 11 Cases), the Lenders or the Administrative Agent in connection with the Chapter 11 Cases and/or the Loan Documents.

"**Promissory Note**" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit G, evidencing the aggregate outstanding principal amount of Loans of the Borrower to such Lender resulting from the Loans made by such Lender.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" has the meaning assigned to such term in Section 9.01(d).

"**Qualified Capital Stock**" of any Person means any Capital Stock of such Person that is not Disqualified Capital Stock.

"**Real Estate Asset**" means, at any time of determination, all right, title and interest (fee, leasehold or otherwise) of any Loan Party in and to real property (including, but not limited to, land, improvements and fixtures thereon).

"**Register**" has the meaning assigned to such term in Section 9.05(b)(iv).

"**Regulation D**" means Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation H**" means Regulation H of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation T**" means Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Funds**" shall mean with respect to any Lender that is an Approved Fund, any other Approved Fund that is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Related Parties**" means, with respect to any specified Person, such Person's Affiliates and the respective directors, managers, officers, trustees, employees, partners, agents, advisors and other representatives of such Person and such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the Environment (including the abandonment or disposal of any barrels, containers or other closed

receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Released Parties**" has the meaning set forth in <u>Section 6.15</u>.

"**Relevant Governmental Body**" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"**Representative**" has the meaning assigned to such term in <u>Section 9.13</u>.

"**Required Lenders**" means, at any time, Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time.

"**Requirements of Law**" means, with respect to any Person, collectively, the common law and all federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" of any Person means the chief executive officer, the president, the chief financial officer, the treasurer, any assistant treasurer, any executive vice president, any senior vice president, any vice president or the chief operating officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement, and, as to any document delivered on the Closing Date, shall include any secretary or assistant secretary or any other individual or similar official thereof with substantially equivalent responsibilities of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of any Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party, and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Responsible Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of a Responsible Officer of the Borrower that such financial statements fairly present, in all material respects, in accordance with GAAP, the consolidated financial condition of the Borrower as at the dates indicated and its consolidated income and cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Restricted Amount**" has the meaning set forth in <u>Section 2.11(b)(iv)</u>.

"**Restricted Debt**" has the meaning set forth in <u>Section 6.04(b)</u>.

"**Restricted Debt Payment**" has the meaning set forth in <u>Section 6.04(b)</u>.

"**Restricted Payment**" means (a) any dividend or other distribution on account of any shares of any class of the Capital Stock of the Borrower, except a dividend payable solely in shares of Qualified Capital Stock to the holders of such class; (b) any redemption, retirement, sinking fund or similar

payment, purchase or other acquisition for value of any shares of any class of the Capital Stock of the Borrower and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of the Capital Stock of the Borrower now or hereafter outstanding.

"**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of April 1, 2024, by and among the Borrower, the other Loan Parties, the Agent, the Lenders, the Prepetition Second Lien Lenders, CCMP Capital Investors III, L.P., CCMP Capital Investors (Employee) III, L.P., Don't Slip Inc., the persons designated as lenders under that certain Credit Agreement, dated as of May 16, 2023 between Shoes for Crews (Europe) Limited Company, as borrower and the lenders thereto, and the other parties thereto from time to time as consenting parties.

"**Roll-Up DIP Facility**" has the meaning assigned to such term in the Recitals to this Agreement.

"**Roll-Up DIP Loan Amount**" means with respect to each Lender, the percentage of the Roll-Up DIP Loans allocated to such Lender as set forth opposite such Lender's name on Schedule 1.01(a) under the heading "Roll-Up DIP Loan Amount" (as updated by the Administrative Agent from time to time on or prior to the Roll-Up Effective Time in accordance with the terms of the Restructuring Support Agreement and the Interim DIP Order or Final DIP Order, as applicable).

"**Roll-Up DIP Loans**" has the meaning assigned to such term in Section 2.01(c).

"**Roll-Up Effective Time**" means the moment in time immediately following the entry of the Final DIP Order by the Bankruptcy Court approving the roll-up of certain Prepetition First Lien Obligations as contemplated therein and herein.

"**S&P**" means Standard & Poor's Financial Services LLC, a subsidiary of the McGraw-Hill Companies, Inc.

"**Sale**" has the meaning set forth in Section 5.16(c).

"**Sale Motion**" has the meaning set forth in Section 5.16(c).

"**Sale Order**" has the meaning set forth in Section 5.16(c).

"**Sale and Lease-Back Transaction**" has the meaning assigned to such term in Section 6.08.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of its functions.

"**Secured Parties**" means (i) the Lenders, (ii) the Administrative Agent, and (iii) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing; provided that

"Securities" shall not include any earn-out agreement or obligation or any employee bonus or other incentive compensation plan or agreement.

"**Securities Act**" means the Securities Act of 1933 and the rules and regulations of the SEC promulgated thereunder.

"**SMS Members**" means Stanley R. Smith and Matthew K. Smith.

"**SMS Permitted Transferees**" means (i) either or both of the SMS Members, (ii) a Family Member of either of the SMS Members, (iii) any corporation, partnership, limited liability company or similar entity controlled by one or both of the SMS Members, or any Family Member of the SMS Members, and of which there are no principal beneficiaries or owners other than the SMS Members or one or more Family Members of the SMS Members or (iv) any trustee of a trust (including an *inter vivos* trust) of which there are no principal beneficiaries other than the SMS Members or one or more Family Members of the SMS Members.

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SOFR Borrowing**" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"**SOFR Loan**" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (b) of the definition of "Alternate Base Rate".

"**SPC**" has the meaning assigned to such term in Section 9.05(e).

"**Specified transaction**" shall have the meaning ascribed to such term in Section 1.08(a).

"**Sponsor**" means CCMP Capital Advisors, LLC and any of its controlled Affiliates and funds managed or advised by any of them or any of their respective controlled Affiliates.

"**Subject Proceeds**" has the meaning assigned to such term in Section 2.11(b)(ii).

"**Subordinated Indebtedness**" means any Indebtedness (other than Indebtedness among Holdings and/or its subsidiaries) of the Borrower or any of its Subsidiaries that is expressly subordinated in right of payment to the Obligations.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof; provided that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interests in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.  Unless otherwise specified, "subsidiary" shall mean any subsidiary of the Borrower.

"**Subsidiary Guarantor**" means (x) on the Closing Date, each Subsidiary of the Borrower (other than any subsidiary that is an Excluded Subsidiary on the Closing Date) and (y) thereafter, each subsidiary of the Borrower that guarantees the Obligations pursuant to the terms of this Agreement and the Loan Guaranty, in each case, until such time as the relevant subsidiary is released from its obligations under the Loan Guaranty in accordance with the terms and provisions hereof.

"**Supplemental Approved Budget**" has the meaning set forth in Section 5.01(d).

"**Taxes**" means any and all present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Termination Date**" has the meaning assigned to such term in the lead-in to Article 5.

"**Term SOFR**" means,

(a)      for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**ABR Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Day

"**Term SOFR Adjustment**" means, with respect to any SOFR Loan, a percentage per annum as set forth below for the Interest Period applicable thereto:

| Interest Period | Percentage |
|---|---|
| One month | 0.11448 % |
| Three months | 0.26161% |
| Six months | 0.42826% |

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**Threshold Amount**" means $500,000.

"**Trademark**" means the following: (a) all trademarks (including service marks), common law marks, trade names, trade dress, domain names and logos, slogans and other indicia of origin under the laws of any jurisdiction in the world, and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all renewals of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (d) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (e) all domestic rights corresponding to any of the foregoing.

"**Transactions**" means, collectively, (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party, (b) the commencement and filing of the Chapter 11 Cases, and (c) the payment of fees and expenses in connection with the consummation of the Transactions.

"**Type**", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Alternate Base Rate.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the creation or perfection of security interests.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"**Unused New Money DIP Delayed Draw Commitment**" of any Lender, at any time, means the remainder of the New Money DIP Delayed Draw Commitment of such Lender at such time, if any, *less* the aggregate outstanding amount of New Money DIP Delayed Draw Loans made by such Lender.

"**U.S.**" means the United States of America.

34

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in Section 2.17(f).

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"**Variance Report**" has the meaning assigned to such term in Section 5.01(d).

"**Wholly-Owned Subsidiary**" of any Person means a subsidiary of such Person, 100% of the Capital Stock of which (other than directors' qualifying shares or shares required by law to be owned by a resident of the relevant jurisdiction) shall be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02. Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.*, a "SOFR Loan") Borrowings also may be classified and referred to by Type (*e.g.*, a "SOFR Borrowing").

Section 1.03. Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan Document (or any Prepetition Loan Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified or extended, replaced or refinanced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications or extensions, replacements or refinancings set forth herein), (b) any reference to any law in any Loan Document shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law, (c) any reference herein or in any Loan Document to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "herein," "hereof" and "hereunder," and words of similar import, when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision hereof, (e) all references herein or in any Loan Document to Articles, Sections, clauses, paragraphs, Exhibits and Schedules shall be construed to refer to

Articles, Sections, clauses and paragraphs of, and Exhibits and Schedules to, such Loan Document, (f) in the computation of periods of time in any Loan Document from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" mean "to but excluding" and the word "through" means "to and including" and (g) the words "asset" and "property", when used in any Loan Document, shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including Cash, securities, accounts and contract rights.

Section 1.04.    Accounting Terms; GAAP.

(a)    All financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and, except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP, as in effect from time to time; provided that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date of delivery of the financial statements described in Section 3.04(a) in GAAP or in the application thereof (including the conversion to IFRS as described below) on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change becomes effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided, further, that if such an amendment is requested by the Borrower or the Required Lenders, then the Borrower and the Administrative Agent shall negotiate in good faith to enter into an amendment of the relevant affected provisions (without the payment of any amendment or similar fee to the Lenders) to preserve the original intent thereof in light of such change in GAAP or the application thereof; provided, further, that all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any subsidiary at "fair value", as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof. If the Borrower notifies the Administrative Agent that the Borrower (or its applicable Parent Company) is required to report under IFRS or has elected to do so through an early adoption policy, "**GAAP**" shall mean international financial reporting standards pursuant to IFRS (provided that after such conversion, the Borrower cannot elect to report under GAAP).

(b)    Notwithstanding anything to the contrary contained in paragraph (a) above or in the definition of "Capital Lease", in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that such leases were in existence on the date hereof) that would constitute Capital Leases in conformity with GAAP on the date hereof shall be considered Capital Leases, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

Section 1.05.    [Reserved].

Section 1.06.    Timing of Payment of Performance.  When payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or

performance shall extend to the immediately succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

Section 1.07.    <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

Section 1.08.    <u>Currency Generally</u>.

(a)    For purposes of any determination under <u>Article 5</u>, <u>Article 6</u> or <u>Article 7</u> with respect to the amount of any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Investment, Disposition, Sale and Lease-Back Transaction, affiliate transaction or other transaction, event or circumstance, or any determination under any other provision of this Agreement, (any of the foregoing, a "**specified transaction**"), in a currency other than Dollars, (i) the Dollar equivalent amount of a specified transaction in a currency other than Dollars shall be calculated based on the rate of exchange quoted by the Bloomberg Foreign Exchange Rates & World Currencies Page (or any successor page thereto, or in the event such rate does not appear on any Bloomberg Page, by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower) for such foreign currency, as in effect at 11:00 a.m. (London time) on the date of such specified transaction (which, in the case of any Restricted Payment, shall be deemed to be the date of the declaration thereof and, in the case of the incurrence of Indebtedness, shall be deemed to be on the date first committed); <u>provided</u> that if any Indebtedness is incurred (and, if applicable, associated Lien granted) to refinance or replace other Indebtedness denominated in a currency other than Dollars, and the relevant refinancing or replacement would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing or replacement, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing or replacement Indebtedness (and, if applicable, associated Lien granted) does not exceed an amount sufficient to repay the principal amount of such Indebtedness being refinanced or replaced, except by an amount equal to (x) unpaid accrued interest and premiums (including tender premiums) thereon *plus* other reasonable and customary fees and expenses (including upfront fees and original issue discount) incurred in connection with such refinancing or replacement, (y) any existing commitments unutilized thereunder and (z) additional amounts permitted to be incurred under <u>Section 6.01</u> and (ii) for the avoidance of doubt, no Default or Event of Default shall be deemed to have occurred solely as a result of a change in the rate of currency exchange occurring after the time of any specified transaction so long as such specified transaction was permitted at the time incurred, made, acquired, committed, entered or declared as set forth in <u>clause (i)</u>.

(b)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Borrower's consent to appropriately reflect a change in currency of any country and any relevant market convention or practice relating to such change in currency.

Section 1.09.    [Reserved].

Section 1.10.    [Reserved].

Section 1.11.    <u>Rounding</u>.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up for five).

Section 1.12.   <u>Divisions</u>.   Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.13.   <u>UCC Terms</u>.   The following terms shall have the respective meanings provided for in the Uniform Commercial Code as in effect from time to time in the State of New York: "Accounts", "Account Debtor", "Cash Proceeds", "Certificate of Title", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Commodity Contracts", "Deposit Account", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Noncash Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Security Account", "Software", "Supporting Obligations" and "Tangible Chattel Paper".

## ARTICLE II

## THE CREDITS

Section 2.01.   <u>Commitments</u>.

(a)      Subject to the terms and conditions of this Agreement and the Restructuring Support Agreement and in reliance upon the representations and warranties of the Loan Parties contained herein, each Lender with a New Money Initial DIP Commitment (defined below) severally and not jointly agrees to lend to the Borrower (A) on the Closing Date, upon satisfaction of the conditions set forth in <u>Section 4.01</u>, a term loan in a principal amount not to exceed its pro rata share of $20,000,000 (the "**New Money Initial DIP Borrowing**"; the Commitment to make the New Money Initial DIP Loan hereunder, such Lender's "**New Money Initial DIP Commitment**" (which, as of the Closing Date, shall be in the amount set forth adjacent such Lender's name under a heading of the same title on <u>Schedule 1.01(a)</u>). Amounts borrowed under this subsection 2.01(a) are also referred to as the "**New Money Initial DIP Loan**." Amounts borrowed as a New Money Initial DIP Loan which are repaid or prepaid may not be reborrowed. The Borrower hereby (x) represents, warrants, agrees, covenants and reaffirms that it has no defense, right of set off, claim or counterclaim against the Administrative Agent and the Lenders with regard to its Obligations in respect of the New Money Initial DIP Loan and (y) reaffirms its obligation to repay the New Money Initial DIP Loan in accordance with the terms and provisions of this Agreement, the other Loan Documents, and the DIP Orders. Upon the borrowing of any New Money Initial DIP Loan under the New Money Initial DIP Commitment, such Commitment shall be deemed permanently reduced to $0.00.   Unless previously terminated, the New Money Initial DIP Commitments shall automatically terminate after the Closing Date.

(b)      Subject to the terms and conditions of this Agreement and the Restructuring Support Agreement and relying upon the representations and warranties herein set forth, of this Agreement and in reliance upon the representations and warranties of the Loan Parties contained herein, each Lender with a New Money Delayed Draw DIP Commitment (defined below) severally and not jointly agrees to lend to the Borrower, upon satisfaction of the conditions set forth in <u>Section 4.02</u>, a term loan in a principal amount not to exceed its pro rata share of $10,000,000 in the aggregate (each, a "**New Money Delayed Draw DIP Borrowing**", and together with the New Money Initial Dip Borrowing, the "**New Money DIP Borrowings**" and the date on which the New Money Delayed Draw DIP Borrowing is made, the "**New**

**Money Delayed Draw DIP Borrowing Date**"). The Commitment to make the New Money Delayed Draw DIP Loans hereunder constitutes such Lender's "**New Money Delayed Draw DIP Commitment**" (which, as of the Closing Date, shall be in the amount set forth adjacent such Lender's name under a heading of the same title on Schedule 1.01(a)). Amounts borrowed under this subsection 2.01(b) are also referred to as the "**New Money Delayed Draw DIP Loans**." Amounts borrowed as a New Money Delayed Draw DIP Loan which are repaid or prepaid may not be reborrowed. The Borrower hereby (x) represents, warrants, agrees, covenants and reaffirms that it has no defense, right of set off, claim or counterclaim against the Administrative Agent and the Lenders with regard to its Obligations in respect of the New Money Delayed Draw DIP Loans  and (y) reaffirms its obligation to repay the New Money Delayed Draw DIP Loans in accordance with the terms and provisions of this Agreement, the other Loan Documents, and the DIP Orders. Upon the borrowing of any New Money Delayed Draw DIP Loans or New Money DIP LC Term Loan under the New Money Delayed Draw DIP Commitment such Commitment shall be deemed permanently reduced to $0.00.

(c)     Subject to the terms and conditions of this Agreement and the Restructuring Support Agreement, and in reliance upon the representations and warranties of the Loan Parties contained herein, each Lender identified on Schedule 1.01(a) as having a "Roll-Up DIP Loan Amount" shall, upon the occurrence of the Roll-Up DIP Effective Time, to the extent set forth in the Final DIP Order, be deemed to have converted a portion of such Lender's Loans as defined under the Prepetition First Lien Credit Agreement or the Prepetition Sidecar Credit Agreement, as applicable, held as of the Petition Date equal to its Roll-Up DIP Loan Amount, without constituting a novation and such amounts shall be deemed borrowed hereunder on such date and shall satisfy and discharge such Loans under the Prepetition First Lien Credit Agreement or Prepetition Sidecar Credit Agreement, as applicable, held by such Lender (collectively, the "**Roll-Up DIP Loans**"). The Borrower hereby (x) represents, warrants, agrees, covenants and reaffirms that it has no defense, right of set off, claim or counterclaim against the Administrative Agent and the Lenders with regard to its Obligations in respect of the Roll-Up DIP Loans and (y) reaffirms its obligation to repay Roll-Up DIP Loans in accordance with the terms and provisions of this Agreement, the other Loan Documents and the DIP Orders.

(d)     Subject to the terms and conditions of this Agreement and the Restructuring Support Agreement and relying upon the representations and warranties herein set forth, of this Agreement and in reliance upon the representations and warranties of the Loan Parties contained herein, each Lender with a New Money DIP LC Commitment (defined below) (each such lender, a "**New Money DIP LC Lender**") severally and not jointly agrees to fund to the Administrative Agent for distribution to the Issuing Bank, upon satisfaction of the conditions set forth in Section 4.02,  its pro rata share of any LC Disbursement. Each New Money DIP LC Lender shall be deemed to have made a term loan to the Borrower equal to its pro rata share of such LC Disbursement (such term loan, the "**New Money DIP LC Term Loan**" and the date on which the New Money DIP LC Term Loan is made, the "**New Money DIP LC Borrowing Date**"). The Commitment to make the New Money DIP LC Commitment hereunder constitutes such Lender's "**New Money DIP LC Commitment**" (which, as of the Closing Date, shall be in the amount set forth adjacent such Lender's name under a heading of the same title on Schedule 1.01(a)). Amounts borrowed as a New Money DIP LC Term Loan which are repaid or prepaid may not be reborrowed. The Borrower hereby (x) represents, warrants, agrees, covenants and reaffirms that it has no defense, right of set off, claim or counterclaim against the Administrative Agent and the Lenders with regard to its Obligations in respect of the New Money DIP LC Term Loans  and (y) reaffirms its obligation to repay the New Money DIP LC Term Loans in accordance with the terms and provisions of this Agreement, the other Loan Documents, and the DIP Orders. The New Money DIP LC Commitment of each Lender shall be reduced by the amount funded hereunder and shall be terminate on the day prior to the DIP Termination Date. Upon the borrowing of any New Money DIP LC Term Loans under the New Money DIP LC Commitment, such Commitment shall be deemed permanently reduced by the amount of such New Money DIP LC Term Loan.

Section 2.02.    Loans and Borrowings.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.

(b)    Subject to Section 2.01 and Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or SOFR Loans as the Borrower may request in accordance herewith; provided that, no Loan shall be made, converted into or continued as a SOFR Loan, if (i) an Event of Default has occurred and is continuing and the Administrative Agent or Required Lenders have determined not to make or continue any Loan as a SOFR Loan as a result thereof or (ii) the Administrative Agent is or Required Lenders are stayed by the Bankruptcy Code from making such determination.  Each Lender at its option may make any SOFR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement, (ii) such SOFR Loan shall be deemed to have been made and held by such Lender, and the obligation of the Borrower to repay such SOFR Loan shall nevertheless be to such Lender for the account of such domestic or foreign branch or Affiliate of such Lender and (iii) in exercising such option, such Lender shall use reasonable efforts to minimize increased costs to the Borrower resulting therefrom (which obligation of such Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it otherwise determines would be disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.15 shall apply); provided further that any such domestic or foreign branch or Affiliate of such Lender shall not be entitled to any greater indemnification under Section 2.17 with respect to such SOFR Loan than that to which the applicable Lender was entitled on the date on which such Loan was made (except in connection with any indemnification entitlement arising as a result of a Change in Law after the date on which such Loan was made).

(c)    Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of 10 different Interest Periods in effect for SOFR Borrowings at any time outstanding (or such greater number of different Interest Periods as the Administrative Agent may agree from time to time).

(d)    Notwithstanding any other provision of this Agreement, the Borrower shall not, nor shall it be entitled to, request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the DIP Termination Date applicable to such Loans.

Section 2.03.    Requests for New Money DIP Borrowings.  Each Borrowing in respect of the New Money DIP Facility, each conversion of Loans from one Type to the other, and each continuation of SOFR Loans shall be made upon irrevocable notice by the Borrower to the Administrative Agent.  Each such notice must be in writing or by telephone (and promptly confirmed in writing) and must be received by the Administrative Agent (by hand delivery, fax or other electronic transmission (including ".pdf" or ".tiff")) not later than 12:00 p.m. (i) three Business Days prior to the requested day of any Borrowing, conversion or continuation of SOFR Loans (or one Business Day in the case of any Borrowing of SOFR Loans to be made on the Closing Date) or (ii) on the requested date of any Borrowing of ABR Loans (or, in each case, such later time as shall be acceptable to the Administrative Agent); Each written notice (or confirmation of telephonic notice) with respect to a Borrowing by the Borrower pursuant to this Section 2.03 shall be delivered to the Administrative Agent in the form of a written Borrowing Request, appropriately completed and signed by a Responsible Officer of the Borrower.  Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(a)    [reserved];

(b)    the aggregate amount of the requested Borrowing;

(c)    the date of such Borrowing, which shall be a Business Day;

(d)    whether such Borrowing is to be an ABR Borrowing or a SOFR Borrowing;

(e)    in the case of a SOFR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(f)    the location and number of the Borrower's account or any other designated account(s) to which funds are to be disbursed (the "**Funding Account**").

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested SOFR Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  The Administrative Agent shall advise each Lender of the details thereof and of the amount of the Loan to be made as part of the requested Borrowing (x) in the case of any ABR Borrowing, on the same Business Day of receipt of a Borrowing Request in accordance with this Section 2.03 or (y) in the case of any SOFR Borrowing, no later than one Business Day following receipt of a Borrowing Request in accordance with this Section 2.03. Notwithstanding anything to the contrary contained herein, with respect to any SOFR Loan having an Interest Period greater than three (3) months, upon the occurrence of any Event of Default, at the Administrative Agent's election if such Event of Default is then continuing, upon written notice thereof to the Borrower, any such outstanding SOFR Loan shall be automatically and irrevocably converted to an ABR Loan on the second (2nd) Business Day following receipt of such notice. Upon such conversion, Borrower shall immediately pay to the Administrative Agent (for the benefit of each applicable Lender) any fees, losses or expenses sustained or incurred by the Administrative Agent or such Lender as a result of the conversion of such SOFR Loan to an ABR Loan prior to the last day of the applicable Interest Period, to the extent required to be compensated by the Borrower in accordance with Section 2.16.

Section 2.04.    [Reserved].

Section 2.05.    Letters of Credit.

(a)    General.    Subject to the terms and conditions of this Agreement and the Restructuring Support Agreement, and in reliance upon the representations and warranties of the Loan Parties contained herein, upon the Closing Date, the Prepetition Letter of Credit shall be deemed to have been issued hereunder as a "Letter of Credit" (the "**DIP Letter of Credit**"). For the avoidance of doubt, the Issuing Bank shall not issue Letters of Credit (other than the DIP Letter of Credit) pursuant to this Agreement after the Closing Date.

(b)    Amendment, Renewal, Extension; Inconsistencies.    Notwithstanding anything to the contrary in this Agreement, any Letter of Credit, letter of credit application or other document entered into by the Borrower with the Issuing Bank,  no Letter of Credit may be increased, amended, extended, renewed or otherwise modified during the term of this Agreement.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control. No Letter of Credit, letter of credit application or other document entered into by the Borrower with the Issuing Bank relating to any Letter of Credit shall contain any representations or warranties, covenants or events of default not set forth in this Agreement (and to the extent inconsistent herewith shall be rendered null and void), and all representations and warranties, covenants and events of default set forth therein shall

contain standards, qualifications, thresholds and exceptions for materiality or otherwise consistent with those set forth in this Agreement (and, to the extent inconsistent herewith, shall be deemed to automatically incorporate the applicable standards, qualifications, thresholds and exceptions set forth herein without action by any Person).

(c)     [Reserved].

(d)     [Reserved].

(e)     Reimbursement. If the Issuing Bank makes any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 1:00 p.m. on the Business Day immediately following the date on which the Borrower receives notice under paragraph (g) of this Section 2.05 of such LC Disbursement.  If the Borrower fails to make such payment when due, the Administrative Agent shall notify each New Money DIP LC Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such New Money DIP LC Lender's pro rata share thereof.  Promptly following receipt of such notice, each New Money DIP LC Lender shall make a New Money DIP LC Term Loans equal to its pro rata share of the payment then due from the Borrower, in the manner as provided in Section 2.01(d) hereof and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the New Money DIP LC Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that New Money DIP LC Lenders have made New Money DIP LC Term Loans pursuant to this paragraph to reimburse the Issuing Bank, then applied ratably to the Loans (based upon the then outstanding principal amounts); [provided that, such prepayments shall be applied (i) first, to prepay the New Money DIP LC Term Loans, (ii) second, to prepay the Roll-Up DIP Loans and (iii) third, to prepay the other New Money DIP Loans.]

(f)     Obligations Absolute.  The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (e) of this Section 2.05 shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under any Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.05, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Administrative Agent, the New Money DIP LC Lenders nor the Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; provided that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence, bad faith or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the

Issuing Bank shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)    [Reserved].

(h)    Interim Interest. If the Issuing Bank makes any LC Disbursement, then, unless the Borrower reimburses such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at the rate per annum then applicable to Loans that are ABR Loans; provided that if the Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph (e) of this Section 2.05, then Section 2.13(d) shall apply. Interest accrued pursuant to this paragraph shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by the making of any New Money DIP LC Term Loan by a New Money DIP LC Lender pursuant to paragraph (e) of this Section 2.05 to reimburse the Issuing Bank shall be for the account of such New Money DIP LC Lender  and shall be payable on the date on which the Borrower is required to reimburse the applicable LC Disbursement in full (and, thereafter, on demand).

(i)    [Reserved].

(j)    Cash Collateralization.

(i)    If any Event of Default exists, then on the Business Day that the Borrower receives notice from the Administrative Agent at the direction of the Required Lenders demanding the deposit of Cash collateral pursuant to this paragraph (j), the Borrower shall deposit, in an interest bearing account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the New Money DIP LC Lenders (the "**LC Collateral Account**"), an amount in Cash equal to 105% of the LC Exposure as of such date (*minus* the amount then on deposit in the LC Collateral Account); provided that the obligation to deposit such Cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in Section 7.01(f) or (g).

(ii)    Any such deposit under clause (i) above shall be held by the Administrative Agent as DIP Collateral for the payment and performance of the Obligations in accordance with the provisions of this paragraph (j). The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account, and the Borrower hereby grants the Administrative Agent, for the benefit of the Secured Parties, a DIP Lien on the LC Collateral Account. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the Loans has been accelerated (but subject to the consent of the Required Lenders) be applied to satisfy other Obligations. If the Borrower is required to provide an amount of Cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (together with all interest and other earnings with respect

thereto, to the extent not applied as aforesaid) shall be returned to the Borrower promptly but in no event later than three Business Days after such Event of Default has been cured or waived.

Section 2.06.    Benchmark Replacement Setting.

(a)    Benchmark Replacement Setting. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.06(a) will occur prior to the applicable Benchmark Transition Start Date.

(b)    Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent (in consultation with the Borrower) will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.06(d) and (v) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.06, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.06.

(d)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)    Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans and (ii) any outstanding affected SOFR Loans will be deemed to have been converted to ABR Loans at the end of the applicable Interest Period.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

Section 2.07.    Funding of Borrowings.

(a)    Each Lender shall make each Loan  to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m. to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to a Cash Management Account (or in the case of any New Money DIP LC Term Loans, the Administrative Agent will make such Loans available to the Issuing Bank in accordance with the terms hereof). Upon the occurrence of the Roll-Up Effective Time, the Roll-Up DIP Loans shall be deemed to have been made in accordance with Section 2.01(c) of this Agreement. Nothing in this Agreement or the other Loan Documents shall be deemed to require the Administrative Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder

(b)    Unless the Administrative Agent has received notice from any Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section 2.07 and may, in reliance upon such assumption, make available to the Borrower (or in the case of any New Money DIP LC Term Loans, the Issuing Bank) a corresponding amount.  In such event, if any Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower (or in the case of any New Money DIP LC Term Loans, the Issuing Bank) to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to Loans comprising such Borrowing at such time.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing and the Borrower's obligation to repay the Administrative Agent such corresponding amount pursuant to this Section 2.07(b) shall cease.  If the Borrower pays such amount to the Administrative Agent, the amount so paid shall constitute a repayment of such Borrowing by such amount.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower or any other Loan Party may have against any Lender as a result of any default by such Lender hereunder.

Section 2.08.    Type; Interest Elections.

(a)    Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a SOFR Borrowing, shall have an initial Interest Period as specified in such

Borrowing Request; provided, that each issuance of Roll-Up DIP Loans or New Money DIP LC Term Loans shall initially constitute SOFR Loans with an initial Interest Period of three months (unless the Borrower specifies to the Administrative Agent by no later than 12:00 p.m. three Business Days prior to the Roll-Up Effective Time or New Money DIP LC Borrowing Date, as applicable, a different Interest Period or specifies that such Loans be ABR Loans).  Thereafter, the Borrower may elect to convert any Borrowing to a Borrowing of a different Type or to continue such Borrowing and, in the case of a SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section 2.08; provided that, there shall not at any time be more than a total of 10 different Interest Periods in effect for SOFR Borrowings at any time outstanding (or such greater number of different Interest Periods as the Administrative Agent may agree from time to time).

(b)    To make an election pursuant to this Section 2.08, the Borrower shall notify the Administrative Agent of such election either in writing (by hand delivery, fax or other electronic transmission (including ".pdf" or ".tif")) or by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery, fax or other electronic transmission (including ".pdf" or ".tif") to the Administrative Agent of a written Interest Election Request signed by a Responsible Officer of the Borrower.

(c)    Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a SOFR Borrowing; and

(iv)    if the resulting Borrowing is a SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a SOFR Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each applicable Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, such Borrowing shall be converted at the end of such Interest Period to a SOFR Borrowing with an Interest Period of one month.  Notwithstanding any contrary provision hereof, if an Event of Default exists and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as such Event of Default exists (i) no outstanding Borrowing may be converted

to or continued as a SOFR Borrowing and (ii) unless repaid, each SOFR Borrowing shall be converted to an ABR Borrowing at the end of the then-current Interest Period applicable thereto.

Section 2.09.    Termination and Reduction of Commitments.

(a)    The New Money Initial DIP Commitment shall automatically terminate upon the making of the New Money Initial DIP Loan on the Closing Date. The New Money Delayed Draw DIP Commitment  shall automatically terminate upon the making of the New Money DIP Delayed Draw Loan on the New Money Delayed Draw DIP Borrowing Date. The New Money DIP LC Commitment shall automatically terminate upon the DIP Termination Date; *provided,* that in connection with each Borrowing of New Money DIP LC Term Loans in accordance with Section 2.01(d), the New Money DIP LC Commitment  of each applicable Lender shall be reduced on a dollar-for-dollar basis by the amount of New Money DIP LC Term Loans made by such Lender on each applicable New Money DIP LC Borrowing Date**.**

Section 2.10.    Repayment of Loans; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to repay the Loans on the DIP Termination Date, without further application to order from the Bankruptcy Court, in an amount equal to the principal amount of the Loans outstanding on such date, together in each case with accrued and unpaid interest on the principal amount to be paid to but excluding the date of such payment. In addition, on the DIP Termination Date, the Borrower shall cancel and return all outstanding Letters of Credit (or alternatively, with respect to any outstanding Letter of Credit, furnish to the Administrative Agent a Cash deposit (or a backup standby letter of credit) equal to 105% of the LC Exposure (*minus* the amount then on deposit in the LC Collateral Account) as of such date).

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period (if any) applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b or (c) of this Section 2.10 shall be prima facie evidence of the existence and amounts of the obligations recorded therein (absent manifest error); provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any manifest error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement; provided, further, that in the event of any inconsistency between the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section 2.10 and any Lender's records, the accounts of the Administrative Agent shall govern.

(e)    Any Lender may request that Loans made by it be evidenced by a Promissory Note. In such event, the Borrower shall prepare, execute and deliver to such Lender a Promissory Note payable to such Lender and its registered assigns; it being understood and agreed that such Lender (and/or its applicable assign) shall be required to return such Promissory Note to the Borrower in accordance with Section 9.05(b)(iii) and upon the occurrence of the Termination Date (or as promptly thereafter as practicable).

Section 2.11.    Prepayment of Loans.

(a)    Optional Prepayments.

(i)    Upon prior notice in accordance with paragraph (a)(ii) of this Section 2.11, the Borrower shall have the right at any time and from time to time to prepay any Borrowing of Loans in whole or in part without premium or penalty except as provided in 2.16.  Each such prepayment shall be paid to the Lenders on pro rata basis among in accordance with the then outstanding Loans in accordance with clause (ii) below.

(ii)    The Borrower shall notify the Administrative Agent by telephone (promptly confirmed in writing) of any prepayment under this Section 2.11(a) (A) in the case of a prepayment of a SOFR Borrowing, not later than 12:00 p.m. three Business Days before the date of prepayment or (B) in the case of a prepayment of an ABR Borrowing, not later than 11:00 a.m. on the day of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid.  Promptly following receipt of any such notice relating to any Borrowing, the Administrative Agent shall advise the relevant Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount at least equal to the amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02(c).  Each prepayment of Loans made pursuant to this Section 2.11(a) shall be applied in direct order of maturity; provided that, prepayments of the Loans shall be applied (i) first, to prepay the Roll-Up DIP Loans and (ii) second, to prepay the New Money DIP Loans.

(b)    Mandatory Prepayments.

(i)    [Reserved].

(ii)    No later than the fifth Business Day following the receipt of Net Proceeds in respect of any Prepayment Asset Sale or Net Insurance/Condemnation Proceeds, the Borrower shall apply an amount equal to 100% of the Net Proceeds or Net Insurance/Condemnation Proceeds received with respect thereto in excess of such thresholds (the "**Subject Proceeds**") to prepay the outstanding principal amount of the Loans in accordance with clause (vi) below.

(iii)    In the event that the Borrower or any of its Subsidiaries receives Net Proceeds from the issuance or incurrence of Indebtedness by the Borrower or any of its Subsidiaries (other than with respect to Indebtedness permitted under Section 6.01), the Borrower shall, substantially simultaneously with (and in any event not later than the next succeeding Business Day) the receipt of such Net Proceeds by the Borrower or its applicable Subsidiary, apply an amount equal to 100% of such Net Proceeds to prepay the outstanding principal amount of Loans in accordance with clause (vi) below.

(iv)    Notwithstanding anything in this Section 2.11(b) to the contrary, (A) the Borrower shall not be required to prepay any amount that would otherwise be required to be paid pursuant to Section 2.11(b)(ii) above to the extent that the relevant Prepayment Asset Sale is consummated by any Foreign Subsidiary or the relevant Net Insurance/Condemnation Proceeds are received by any Foreign Subsidiary, as the case may be, for so long as the repatriation to the Borrower of any such amount would be prohibited under any Requirement of Law or conflict with the fiduciary duties of such Foreign Subsidiary's directors, or result in, or could reasonably be expected to result in, a material risk of personal or criminal liability for any officer, director, employee, manager, member of management or consultant of such Foreign Subsidiary (the

Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions required by applicable Requirements of Law to permit such repatriation); it being understood that once the repatriation of the relevant affected Subject Proceeds is permitted under the applicable Requirement of Law and, to the extent applicable, would no longer conflict with the fiduciary duties of such director, or result in, or could reasonably be expected to result in, a material risk of personal or criminal liability for the Persons described above, the relevant Foreign Subsidiary will promptly repatriate the relevant Subject Proceeds and the repatriated Subject Proceeds will be promptly (and in any event not later than two Business Days after such repatriation) applied (net of additional Taxes payable or reserved against as a result thereof) to the repayment of the Loans pursuant to this <u>Section 2.11(b)</u> to the extent required herein (without regard to this <u>clause (iv)</u>) and (B) if the Borrower determines in good faith that the repatriation to the Borrower of any amounts required to mandatorily prepay the Loans pursuant to <u>Section 2.11(b)(ii)</u> above would result in material and adverse tax consequences, taking into account any foreign tax credit or benefit actually realized in connection with such repatriation (such amount, a "**Restricted Amount**"), as reasonably determined by the Borrower, the amount the Borrower shall be required to mandatorily prepay pursuant to <u>Section 2.11(b)(ii)</u> above shall be reduced by the Restricted Amount until such time as it may repatriate to the Borrower the Restricted Amount without incurring such material and adverse tax liability; <u>provided</u> that to the extent that the repatriation of any Subject Proceeds of the relevant Foreign Subsidiary would no longer have an adverse tax consequence, an amount equal to the Subject Proceeds not previously applied pursuant to preceding <u>clause (B)</u>, shall be promptly applied to the repayment of the Loans pursuant to <u>Section 2.11(b)</u> as otherwise required above (without regard to this <u>clause (iv)</u>);

(v)     Each Lender may elect, by notice to the Administrative Agent at or prior to the time and in the manner specified by the Administrative Agent, prior to any prepayment of Loans required to be made by the Borrower pursuant to this <u>Section 2.11(b)</u>, to decline all (but not a portion) of its pro rata share of such prepayment (such declined amounts, the "**Declined Proceeds**"), in which case such Declined Proceeds shall be applied, *first*, ratably to prepayment of the Loans held by Lenders that have not elected to decline such prepayment pursuant to this <u>Section 2.11(b)</u> until paid in full, *second*, ratably to prepay the Prepetition Initial First Lien Obligations pursuant to the terms of the Prepetition First Lien Credit Agreement and the Prepetition Sidecar Obligations pursuant to the terms of the Prepetition Sidecar Credit Agreement in accordance with the Prepetition Sidecar Intercreditor Agreement, *third*, *to* prepay the Prepetition Second Lien Obligations pursuant to the terms of the Prepetition Second Lien Credit Agreement, and *fourth*, to the extent of any excess, and subject to the terms of this Agreement and the DIP Orders,, to be retained by the Borrower. If any Lender fails to deliver a notice to the Administrative Agent of its election to decline receipt of its pro rata share of any mandatory prepayment within the time frame specified by the Administrative Agent, such failure will be deemed to constitute an acceptance of such Lender's pro rata share of the total amount of such mandatory prepayment of Loans.

(vi)     (A) Each prepayment of Loans pursuant to this <u>Section 2.11(b)</u> shall be applied ratably to the Loans (based upon the then outstanding principal amounts); provided that, such prepayments shall be applied (i) first, to prepay the Roll-Up DIP Loans and (ii) second, to prepay the New Money DIP Loans. The amount of such mandatory prepayments shall be applied on a *pro rata* basis to the then outstanding Loans being prepaid irrespective of whether such outstanding Loans are ABR Loans or SOFR Loans; <u>provided</u> that the amount thereof shall be applied first to ABR Loans to the full extent thereof before application to the SOFR Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to <u>Section 2.16</u>.

(vii)     [Reserved].

49

(viii)    At the time of each prepayment required under Section 2.11(b)(i), (ii) or (iii), the Borrower shall deliver to the Administrative Agent a certificate signed by a Responsible Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment.  Each such certificate shall specify the Borrowings being prepaid and the principal amount of each Borrowing (or portion thereof) to be prepaid.  Prepayments shall be accompanied by accrued interest as required by Section 2.13.  All prepayments of Borrowings under this Section 2.11(b) shall be subject to Section 2.16.

Section 2.12.    Fees.

(a)    The Borrower agrees to pay to the Administrative Agent for the account of each Lender (other than any Defaulting Lender) a commitment fee, which shall accrue at a rate equal to the [2.00%] per annum on the average daily amount of the Unused New Money DIP Delayed Draw Commitment of such Lender during the period from and including the Closing Date to the date on which such Lender's New Money DIP Delayed Draw Commitments terminate.  Accrued commitment fees shall be payable in arrears on the first Business Day of each calendar month for the month then ended (commencing on April 30, 2024) and on the date on which the New Money DIP Delayed Draw Commitments terminate.

(b)    The Borrower agrees to pay to the Administrative Agent for the account of each New Money DIP LC Lender (other than any Defaulting Lender) a commitment fee, which shall accrue at a rate equal to the [2.00%] per annum on the average daily amount of the Unused New Money DIP LC Commitment of such Lender during the period from and including the Closing Date to the date on which such Lender's New Money DIP LC Commitments terminate. Accrued commitment fees shall be payable in arrears on the first Business Day of each calendar month for the month then ended (commencing on April 30, 2024) and on the date on which the New Money DIP LC Commitments terminate.

(c)    The Borrower agrees to pay in cash to the Administrative Agent for the account of each Lender (other than any Defaulting Lender) a closing fee equal to [5.00%] of the New Money DIP Commitments.

(d)    The Borrower agrees to pay to the Administrative Agent, for its own account, the fees in the amounts and at the times separately agreed upon by the Borrower and the Administrative Agent in writing.

(e)    All fees payable hereunder shall be paid on the dates due, in Dollars and in immediately available funds, to the Administrative Agent for distribution, in the case of commitment fees and closing fees, to the Lenders.  Fees paid shall not be refundable under any circumstances.  Fees payable hereunder shall accrue through and including the last day of the month immediately preceding the applicable fee payment date.

(f)    Unless otherwise indicated herein, all computations of fees shall be made on the basis of a 360-day year and shall be payable for the actual days elapsed (including the first day but excluding the last day).  Each determination by the Administrative Agent of a fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.13.    Interest.

(a)    The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate *plus* the Applicable Rate.

(b)     The Loans comprising each SOFR Borrowing shall bear interest at Adjusted Term SOFR for the Interest Period in effect for such Borrowing *plus* the Applicable Rate.

(c)     [Reserved].

(d)     Notwithstanding the foregoing and subject to Section 2.21, upon the occurrence and during the continuance of any Default or Event of Default, the principal of, and all accrued and unpaid interest on, all Loans, unpaid LC Disbursements, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, to the fullest extent permitted by law, after as well as before judgment, from and after the date of occurrence of such Default or Event of Default until such Default or Event of Default is no longer continuing, at a rate per annum equal to (i) in the case of principal or overdue interest of any Loan or unreimbursed LC Disbursement, 2.00% *plus* the rate otherwise applicable to such Loan or LC Disbursement as provided in the preceding paragraphs of this Section 2.13 or Section 2.05(h) or (ii) in the case of any other amount, 2.00% *plus* the rate applicable to Loans that are ABR Loans as provided in paragraph (a) of this Section 2.13; provided that no amount shall accrue pursuant to this Section 2.13(d) on any reimbursement obligation in respect of any LC Disbursement or other amount payable to a Defaulting Lender so long as such Lender is a Defaulting Lender.

(e)     Subject to the terms of this Section 2.13(e), accrued interest shall be payable in cash in arrears on each Interest Payment Date for such Loan and on the DIP Termination Date; provided that (i) solely with respect to the Roll-Up DIP Loans, interest shall be capitalized, compounded and added to the unpaid principal amount of the applicable Roll-Up DIP Loans on such Interest Payment Date (the "**PIK Interest**") (for the avoidance of doubt, all interest payable in respect of the New Money DIP Loans shall be paid in cash and shall not at any time be PIK Interest), (ii) interest accrued pursuant to paragraph (d) of this Section 2.13 shall be payable in cash on demand, (iii) in the event of any or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such prepayment and (iii) in the event of any conversion of any SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion. Amounts representing the PIK Interest shall be treated as Roll-Up DIP Loans for all purposes of this Agreement and shall bear interest in accordance with this Section 2.13.

(f)     All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed for ABR Loans shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall bear interest for one day; provided further that, in the case of any ABR Loan, interest shall accrue through and including the last day of the month preceding the applicable Interest Payment Date.

(g)     Term SOFR Conforming Changes.  In connection with the use or administration of Term SOFR, the Administrative Agent (in consultation with the Borrower) will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

Section 2.14.    <u>Alternate Rate of Interest</u>. Subject to Section 2.06, if, on or prior to the first day of any Interest Period for any SOFR Loan:

(a)    the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or

(b)    the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Adjusted Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent,

then, in each case, the Administrative Agent will promptly so notify the Borrower and each Lender.

Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (with respect to clause (b), at the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period.   Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.16. Subject to Section 2.06, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to clause (b) of the definition of "Alternate Base Rate" until the Administrative Agent revokes such determination.

Section 2.15.    <u>Increased Costs</u>.

(a)    <u>If any Change in Law</u>:

(i)    imposes, modifies or deems applicable any reserve, special deposit, or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, or

(ii)    subjects any Lender to any Taxes (other than Indemnified Taxes, Other Taxes and Excluded Taxes) on its loans, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or

(iii)    imposes on any Lender any other condition affecting this Agreement or SOFR Loans made by any Lender or any Letter of Credit or participation therein,

and the result of any of the foregoing is to increase the cost to the relevant Lender of making or maintaining any SOFR Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) in respect of any SOFR Loan or Letter of Credit in an amount deemed by such Lender to be material, then, within 30

days after the Borrower's receipt of the certificate contemplated by paragraph (c) of this Section 2.15, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; provided that the Borrower shall not be liable for such compensation if (x) the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto, or (y) such Lender invokes Section 2.20.

(b)     If any Lender determines that any Change in Law regarding liquidity or capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (other than due to Taxes, which shall be dealt with exclusively pursuant to Section 2.17) (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then within 30 days of receipt by the Borrower of the certificate contemplated by paragraph (c) of this Section 2.15 the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section 2.15 and setting forth in reasonable detail the manner in which such amount or amounts were determined and certifying that such Lender is generally charging such amounts to similarly situated borrowers shall be delivered to the Borrower and shall be conclusive absent manifest error.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.15 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16.    Break Funding Payments. In the event of (a) the conversion or prepayment of any principal of any SOFR Loan other than on the last day of an Interest Period applicable thereto (whether voluntary, mandatory, automatic, by reason of acceleration or otherwise), (b) the failure to borrow, convert, continue or prepay any SOFR Loan on the date or in the amount specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.09(b)) or (c) the assignment of any SOFR Loan of any Lender other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense incurred by such Lender that is attributable to such event (including any loss, cost or expense arising from the liquidation or redeployment of funds or from any fees payable, but excluding loss of profit).   A certificate of any Lender (i) setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.16, the basis therefor and, in reasonable detail, the manner in which such amount or amounts were determined and (ii) certifying that such Lender is generally charging the relevant amounts to similarly situated borrowers shall be delivered to the Borrower and shall be conclusive absent manifest error.   The Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

Section 2.17.    <u>Taxes</u>.

(a)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by applicable Requirement of Law.  If any applicable Requirement of Law requires the deduction or withholding of any Tax from any such payment, then (i) if such Tax is an Indemnified Tax and/or Other Tax, the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions and withholdings have been made (including deductions and withholdings applicable to additional sums payable under this <u>Section 2.17</u>), each Lender or, in the case of any payment made to the Administrative Agent for its own account, the Administrative Agent, receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)    In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)    Each Loan Party shall jointly and severally indemnify the Administrative Agent and each Lender within 30 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes payable or paid by the Administrative Agent or such Lender, as applicable (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.17</u>) (other than any penalties attributable to the gross negligence, bad faith or willful misconduct of the Administrative Agent or such Lender), and, in each case, any reasonable expenses arising therefrom or with respect thereto; <u>provided</u> that if such Loan Party reasonably believes that such Taxes were not correctly or legally asserted, the Administrative Agent or such Lender, as applicable, will use reasonable efforts to cooperate with such Loan Party to obtain a refund of such Taxes (which shall be repaid to such Loan Party in accordance with <u>Section 2.17(h)</u>) so long as such efforts would not, in the sole determination of the Administrative Agent or such Lender, result in any additional out-of-pocket costs or expenses not reimbursed by such Loan Party or be otherwise materially disadvantageous to the Administrative Agent or such Lender, as applicable.  In connection with any request for reimbursement under this <u>Section 2.17(c)</u>, the relevant Lender or the Administrative Agent, as applicable, shall deliver a certificate to the Borrower (i) setting forth, in reasonable detail, the basis and calculation of the amount of the relevant payment or liability and (ii) certifying that it is generally charging the relevant amounts to similarly situated borrowers, which certificate shall be conclusive absent manifest error. Notwithstanding anything to the contrary contained in this <u>Section 2.17(c)</u>, the Loan Parties shall not be required to indemnify the Administrative Agent or any Lender pursuant to this <u>Section 2.17</u> for any Indemnified Taxes or Other Taxes, to the extent the Administrative Agent or such Lender fails to notify the Borrower of such possible indemnification claim within 180 days after the event; <u>provided</u> <u>further</u> that, if the event is a Change in Law that is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(d)    Each Lender shall severally indemnify the Administrative Agent, within 30 days after demand therefor, for (i) any Indemnified Taxes or Other Taxes imposed on or with respect to any payment under any Loan Document that is attributable to such Lender (but only to the extent that no Loan Party has already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 9.05(c)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender that are payable or paid by the Administrative Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant

54

Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to any Lender under any Loan Document or otherwise payable by the Administrative Agent to any Lender from any other source against any amount due to the Administrative Agent under this clause (d).

(e)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by any Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment that is reasonably satisfactory to the Administrative Agent.

(f)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation as the Borrower or the Administrative Agent may reasonably request to permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(ii)    Without limiting the generality of the foregoing:

(A)    each Lender that is not a Foreign Lender shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two executed original copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    each Foreign Lender shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of any Foreign Lender claiming the benefits of an income tax treaty to which the U.S. is a party, two executed original copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to such tax treaty;

(2)    two executed original copies of IRS Form W-8ECI;

(3)    in the case of any Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or 881(c) of the

Code, (x) a certificate substantially in the form of Exhibit J-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed original copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

      (4)      to the extent any Foreign Lender is not the beneficial owner, two executed original copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-2 or Exhibit J-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if such Foreign Lender is a partnership and one or more partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-4 on behalf of each such partner;

      (C)      each Foreign Lender shall deliver to the Borrower and the Administrative Agent  on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), two executed original copies of any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

      (D)      if a payment made to any Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by applicable Requirements of Law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation as is prescribed by applicable Requirements of Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA, or to determine the amount, if any, to deduct and withhold from such payment.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.  Notwithstanding anything to the contrary in this Section 2.17(f), no Lender shall be required to provide any documentation that such Lender is not legally eligible to deliver.

(g)     On or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), the Administrative Agent will deliver to the Borrower either (i) an executed original copy of IRS Form W-9, or (ii) (x) with respect to any amounts received on its own account, an executed original copy of an applicable IRS Form W-8, and (y) with respect to any amounts received for or on account of any Lender, an executed original copy of IRS Form W-8 IMY certifying on Part I, Part II and Part VI thereof that it is a U.S. branch that has agreed to be treated as a U.S. person for U.S. federal tax purposes with respect to payments received by it from the Borrower in its capacity as Administrative Agent, as applicable. The Administrative Agent shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide the certification described in the prior sentence.

(h)     If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by any Loan Party or with respect to which such Loan Party has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.17 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that such Loan Party, upon the request of the Administrative Agent or such Lender agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event shall the Administrative Agent or any Lender be required to pay any amount to a Loan Party pursuant to this paragraph (h) to the extent that the payment thereof would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the position that the Administrative Agent or such Lender would have been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  This Section 2.17 shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the relevant Loan Party or any other Person.

(i)     Survival.  Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.18.     Payments Generally; Allocation of Proceeds; Sharing of Payments.

(a)     Unless otherwise specified (including with respect to PIK Interest), the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to the time expressed hereunder or under such Loan Document (or, if no time is expressly required, by 2:00 p.m.) on the date when due, in cash in immediately available funds, without set-off (except as otherwise provided in Section 2.17) or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent to the applicable account designated to the Borrower by the Administrative Agent, except that payments pursuant to Sections 2.15, 2.16 or 2.17 and 9.03 shall be made directly to the Persons entitled thereto. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Each Lender agrees that

in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round such Lender's percentage of such Borrowing to the next higher or lower whole dollar amount.  All payments (including accrued interest) hereunder shall be made in Dollars.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)     All proceeds of DIP Collateral received by the Administrative Agent at any time when an Event of Default exists and all or any portion of the Loans have been accelerated hereunder pursuant to Section 7.01 or otherwise received in connection with any foreclosure on or other exercise of remedies with respect to the DIP Collateral pursuant to the Loan Documents shall, upon election by the Administrative Agent or at the direction of the Required Lenders, be applied first, to the payment of all costs and expenses then due incurred by the Administrative Agent in connection with any collection, sale or realization on DIP Collateral or otherwise in connection with this Agreement, any other Loan Document or any of the Obligations, including all court costs and the fees and expenses of agents and legal counsel, the repayment of all advances made by the Administrative Agent hereunder or under any other Loan Document on behalf of any Loan Party and any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document, second, on a *pro rata* basis, to pay any fees, indemnities or expense reimbursements then due to the Administrative Agent (other than those covered in clause first above) from the Borrower constituting Obligations, third, on a *pro rata* basis in accordance with the amounts of the Obligations (other than any Obligations incurred after the date hereof that are either junior in right of payment or are secured by a Lien that is junior to the DIP Liens securing the Obligations on the date hereof) (other than contingent indemnification obligations for which no claim has yet been made) owed to the Secured Parties on the date of any such distribution, to the payment in full of such Obligations (including, with respect to LC Exposure, an amount to be paid to the Administrative Agent equal to 105% of the LC Exposure (minus the amount then on deposit in the LC Collateral Account) on such date, to be held in the LC Collateral Account as Cash collateral for such Obligations); provided that if any Letter of Credit expires undrawn, then any Cash collateral held to secure the related LC Exposure shall be applied in accordance with this Section 2.18(b), beginning with clause first above, fourth, on a *pro rata* basis in accordance with the amounts of all other Obligations (other than contingent indemnification obligations for which no claim has yet been made) owed to the applicable Secured Parties on the date of any such distribution, to the payment in full of such Obligations and fifth, to, or at the direction of, the Borrower or as a court of competent jurisdiction may otherwise direct.

(c)     If any Lender obtains payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) in respect of any principal of or interest on any of its Loans or participations in LC Disbursements held by it resulting in such Lender receiving payment in excess of such Lender's ratable share of payments on account of the Loans or participations in LC Disbursements obtained by all the Lenders, then the Lender receiving such excess shall purchase (for Cash at face value) participations in the Loans and sub participations in LC Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans or LC Disbursements; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with Sections 2.22, 2.23 and 9.02(c).  If any Lender obtains payment (whether voluntary, involuntary, through exercise of any right of set-off or otherwise) in respect of any principal of or interest

on any of its Loan that is junior in right of payment to any other Loan that has not been repaid in full, such Lender shall promptly remit such payment to the Administrative Agent for application is accordance with <u>clause (b)</u>. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.   The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this <u>Section 2.18(c)</u> and will, in each case, notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this <u>Section 2.18(c)</u> shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

(d)    Unless the Administrative Agent has received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of any Lender hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lender the amount due.  In such event, if the Borrower has not in fact made such payment, then each Lender severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)    If any Lender fails to make any payment required to be made by it pursuant to <u>Section 2.07(b)</u> or <u>Section 2.18(d)</u>, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19.    <u>Mitigation Obligations; Replacement of Lenders</u>.

(a)    If any Lender requests compensation under <u>Section 2.15</u> or such Lender determines it can no longer make or maintain SOFR Loans pursuant to <u>Section 2.20</u>, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.17</u>, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or its participations in any Letter of Credit affected by such event, or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 2.15</u> or <u>2.17</u>, as applicable, in the future or mitigate the impact of <u>Section 2.20</u>, as the case may be, and (ii) would not subject such Lender to any material unreimbursed out-of-pocket cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If (i) any Lender requests compensation under <u>Section 2.15</u> or such Lender determines it can no longer make or maintain SOFR Loans pursuant to <u>Section 2.20</u>, (ii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.17</u>, (iii) any Lender is a Defaulting Lender or (iv) in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender directly

59

affected thereby" (or any other group of Lenders other than the Required Lenders) with respect to which Required Lender consent (or the consent of Lenders holding loans or commitments of such lesser group representing more than 50% of the sum of the total loans and unused commitments of such lesser group at such time) has been obtained, as applicable, any Lender is a non-consenting Lender (each such Lender described in this clause (iv), a "**Non-Consenting Lender**"), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, (x) terminate the applicable Commitments of such Lender, and repay all Obligations of the Borrower owing to such Lender relating to the applicable Loans and participations held by such Lender as of such termination date or (y) replace such Lender by requiring such Lender to assign and delegate (and such Lender shall be obligated to assign and delegate), without recourse (in accordance with and subject to the restrictions contained in Section 9.05), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if any Lender accepts such assignment); provided that (A) such Lender shall have received payment of an amount equal to the outstanding principal amount of its Loans and Commitments and participations in LC Disbursements (if applicable), accrued interest thereon, accrued fees and all other amounts payable to it under any Loan Document with respect to such Loans and/or Commitments, (B) in the case of any assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a reduction in such compensation or payments and (C) such assignment does not conflict with applicable law. No Lender (other than a Defaulting Lender) shall be required to make any such assignment and delegation, and the Borrower may not repay the Obligations of such Lender or terminate its Commitments, if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each Lender agrees that if it is replaced pursuant to this Section 2.19, it shall execute and deliver to the Administrative Agent an Assignment and Assumption to evidence such sale and purchase and shall deliver to the Administrative Agent any Promissory Note (if the assigning Lender's Loans are evidenced by one or more Promissory Notes) subject to such Assignment and Assumption (provided that the failure of any Lender replaced pursuant to this Section 2.19 to execute an Assignment and Assumption or deliver any such Promissory Note shall not render such sale and purchase (and the corresponding assignment) invalid), such assignment shall be recorded in the Register, any such Promissory Note shall be deemed cancelled. Each Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Lender's attorney-in-fact, with full authority in the place and stead of such Lender and in the name of such Lender, from time to time in the Administrative Agent's discretion, with prior written notice to such Lender, to take any action and to execute any such Assignment and Assumption or other instrument that the Administrative Agent may deem reasonably necessary to carry out the provisions of this clause (b).

Section 2.20. Illegality. If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date that it is unlawful, for such Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, then, on notice thereof by such Lender to the Borrower through the Administrative Agent (an "Illegality Notice"), (i) any obligation of such Lender to make or continue SOFR Loans in Dollars or to convert ABR Loans to SOFR Loans and any right of the Borrower to continue SOFR Loans shall be suspended and (ii) if such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Adjusted Term SOFR component of the Alternate Base Rate, the interest rate on which ABR Loans of such Lender, shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist (which notice such Lender agrees to give promptly). Upon receipt of such notice, (x) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or convert all of such Lender's SOFR

Loans to ABR Loans (the interest rate on which ABR Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate) either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such SOFR Loans (in which case the Borrower shall not be required to make payments pursuant to Section 2.16 in connection with such payment) and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Adjusted Term SOFR, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.16.  Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the determination of such Lender, otherwise be materially disadvantageous to such Lender.

Section 2.21.    <u>Defaulting Lenders</u>.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    Fees shall cease to accrue on the unfunded portion of any Commitment of such Defaulting Lender pursuant to Section 2.12(a) and pursuant to any other provisions of this Agreement or other Loan Document.

(b)    The Commitments of such Defaulting Lender shall not be included in determining whether all Lenders, each affected Lender, the Required Lenders, or such other number of Lenders as may be required hereby or under any other Loan Document have taken or may take any action hereunder (including any consent to any waiver, amendment or modification pursuant to Section 9.02); <u>provided</u> that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately and adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

(c)    Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 2.11, Section 2.15, Section 2.16, Section 2.17, Section 2.18, Article 7, Section 9.05 or otherwise, and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to Section 9.09), shall be applied at such time or times as may be determined by the Administrative Agent and, where relevant, the Borrower as follows:  <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, , so long as no Default or Event of Default exists as the Borrower may request, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; <u>third</u>, as the Administrative Agent or the Borrower may elect, to be held in a deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans that such Defaulting Lender has committed to fund (if any) under this Agreement; <u>fourth</u>, to the payment of any amounts owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any non-Defaulting Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>fifth</u>, to the payment of any amounts owing to the

Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loan in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loan was made or created, as applicable, at a time when the conditions set forth in Section 4.02 were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans and funded and unfunded participations in L/C Obligations are held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to any Defaulting Lender that are applied (or held) to pay amounts owed by any Defaulting Lender or to post Cash collateral pursuant to this Section 2.21(c)  shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(d) Notwithstanding the fact that any Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, (x) no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender and (y) except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

Section 2.22.    [Reserved].

Section 2.23.    [Reserved].

Section 2.24.    Rates. The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Alternate Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Alternate Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Alternate Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Alternate Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 2.25.    <u>No Discharge; Survival of Claims</u>.  Until the DIP Termination Date but subject to the terms of the Restructuring Support Agreement in all respects, each of the Loan Parties agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the DIP Superpriority Claims and the DIP Liens granted to the Administrative Agent pursuant to the DIP Orders and described in <u>Section 2.29</u> shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case, and such claims and Liens shall be paid in full in cash by any such plan in each case, unless otherwise agreed by the Administrative Agent (at the direction of the Required Lenders), including with respect to the assumption of the underlying Obligations by any purchaser of the Debtors' assets.

Section 2.26.    <u>Super Priority Nature of Obligations and Lenders' DIP Liens</u>.  Subject in all respects to the Carve-Out, the priority of the Secured Parties' DIP Liens on the DIP Collateral owned by the Loan Parties shall be set forth in the DIP Orders.

(a)    Subject in all respects to the Carve-Out, all Obligations shall constitute DIP Superpriority Claims.

(b)    Subject in all respects to the Carve-Out, upon entry of the Interim DIP Order, the DIP Liens granted to the Administrative Agent for the benefit of the Lenders on the DIP Collateral shall be valid and automatically perfected and with the priority as set forth in the DIP Orders.

(c)    Subject in all respects to the Carve-Out, except as set forth herein or the DIP Orders, the Debtors shall not seek approval of any other claim having a priority superior or pari passu to that granted to the Administrative Agent and Lenders by the DIP Orders while any Obligations remain outstanding.

Section 2.27.    <u>Release</u>.  The Borrower and each of the Guarantors hereby acknowledges effective upon entry of the Interim DIP Order, and subject to the terms thereof and of the Final DIP Order, that the Borrower, the Guarantors and any of their Subsidiaries have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's, the Guarantors' or any Subsidiaries' liability to repay the Administrative Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Administrative Agent or any Lender in their respective capacities as such.  Upon entry of the Interim DIP Order, the Borrower and the Guarantors, each in their own right and on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge the Administrative Agent and the Lenders in their respective capacities as such and all of the Administrative Agent's and the Lenders' respective officers, directors, servants, agents, advisors, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them of and from any and all actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, existing at the time of entry of the Interim DIP Order, whether in law, equity or otherwise (including, without limitation, any so-called "lender liability" or equitable subordination or recharacterization claims or defenses and those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional costs, and incidental, consequential and punitive damages payable to third parties) directly or indirectly arising out of, connected with or relating to this Agreement, the DIP Orders and the transactions (including, for avoidance of doubt, the Transactions) contemplated hereby, and all other agreements, certificates, instruments and other documents and

63

statements (whether written or oral) related to any of the foregoing.  Notwithstanding anything herein to the contrary, the Borrower and Guarantors shall not have any obligation to indemnify or hold harmless any Administrative Agent or any Lender hereunder with respect to liabilities to the extent they result from gross negligence or willful misconduct of such Administrative Agent or Lender, as applicable, as finally determined by a court of competent jurisdiction

Section 2.28.    <u>Waiver of Certain Rights</u>.

(a)    Subject in all respects to the Carve-Out, on and after the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrowers and the other Loan Parties hereby irrevocably waive any right, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the DIP Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

(b)    Subject in all respects to the Carve-Out, upon entry of the Final DIP Order, in no event shall the Administrative Agent, the Lenders, the Prepetition Agents or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds thereof shall be received and applied pursuant to the DIP Orders, the Loan Documents and the Prepetition Loan Documents, as applicable, notwithstanding any other agreement or provision to the contrary.

(c)    Subject in all respects to the Carve-Out, upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) or 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Administrative Agent, the Lenders, the Prepetition Agents or the Prepetition Lenders upon the DIP Collateral or the Prepetition Collateral, and (ii) the Administrative Agent, the Lenders, the Prepetition Agents and the Prepetition Lenders, shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Administrative Agent, the Lenders, the Prepetition Agents and the Prepetition Lenders with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral

Section 2.29.    <u>Grant of Security; Security for Obligations; Debtors Remain Liable</u>. Pursuant to the DIP Orders, and subject in all respects to the Carve-Out, as collateral security for the payment, performance and observance of all of the Obligations, each Loan Party hereby pledges and collaterally assigns to the Administrative Agent (and its agents and designees), and grants to the Administrative Agent (and its agents and designees), for the benefit of the Secured Parties, a continuing security interest in, all personal property and Fixtures of such Loan Party, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including, without limitation, the following (all being collectively referred to herein as "**DIP Collateral**"):

(i)    all Accounts;

(ii)    all Chattel Paper (whether tangible or electronic);

(iii)    all Commercial Tort Claims, including, without limitation, the Commercial Tort Claims described in Schedule 4.10 hereto;

(iv)    all securities accounts, all deposit accounts, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession or under the control of any Agent or any Lender or any affiliate, representative, agent or participant of any Agent or any Lender;

(v)    all Documents;

(vi)    all General Intangibles (including, without limitation, all Payment Intangibles, Intellectual Property and Licenses);

(vii)    all Goods, including, without limitation, all Equipment, Fixtures and Inventory;

(viii)    all Instruments (including, without limitation, Promissory Notes);

(ix)    all Investment Property;

(x)    all Letter-of-Credit Rights;

(xi)    all Pledged Interests;

(xii)    all Supporting Obligations;

(xiii)    all other tangible and intangible personal property of such Loan Party (whether or not subject to the Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Loan Party described in the preceding clauses of this Section 2.29 hereof (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Loan Party in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Loan Party or any other Person from time to time acting for such Loan Party that at any time evidence or contain information relating to any of the property described in the preceding clauses of this Section 4.10 hereof or are otherwise necessary or helpful in the collection or realization thereof;

(xiv)    all present and future claims or causes of action, including avoidance actions or proceeds thereof under, inter alia, Sections 542, 544, 545, 547, 548, 549, 550, 552 and 553 of the Bankruptcy Code, subject to entry of the Final DIP Order; and

(xv)    all proceeds, products and accessions with respect to any of the foregoing DIP Collateral.

In each case, howsoever such Loan Party's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

(a)    Notwithstanding anything herein to the contrary, and subject to the terms of the DIP Orders, in no event shall the DIP Collateral include (nor shall any defined term used therein include), and no Debtor shall be deemed to have granted a security interest in, any of such Debtor's rights or interests in any Excluded Assets.

(b)    The DIP Orders grant DIP Liens with respect to the DIP Collateral, and the DIP Collateral is collateral security for, the prompt payment in full when due and owing, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, of all Obligations.  It is the intention of the parties that if the Administrative Agent shall fail to have a perfected Lien in any particular property or assets of any Loan Party for any reason whatsoever, the provisions of this Agreement and/or the other Loan Documents, together with the DIP Orders, all financing statements and other public financing relating to Liens filed or recorded by the Administrative Agent against the Loan Parties and, with respect to all Loan Parties, the DIP Orders and any other order entered by the Bankruptcy Court to secure the Obligations, would be sufficient to create a perfected first priority Lien in any property or assets that such Loan Party may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the DIP Collateral.

(c)    Anything contained herein to the contrary notwithstanding, (a) each Debtor shall remain liable under any contracts and agreements included in the DIP Collateral, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by an Agent of any of its rights hereunder or under any other Loan Document shall not release any Debtor from any of its duties or obligations under the contracts and agreements included in the DIP Collateral unless the applicable Agent has expressly in writing assumed such duties and obligations and released the Debtors from such duties and obligations, and (c) the Administrative Agent shall not have any obligation or liability under any contracts, licenses, and agreements included in the DIP Collateral by reason of this Agreement, nor shall the Administrative Agent be obligated to perform any of the obligations or duties of any Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder unless the such Agent has expressly in writing assumed such duties and obligations and released the Debtors from such duties and obligations.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

On the dates and to the extent required pursuant to Section 4.01 or 4.02, as applicable, each of (i) in the case of Holdings, solely with respect to Sections 3.01, 3.02, 3.03, 3.07, 3.08, 3.09, 3.13, 3.14, 3.16 and 3.17, and (ii) the Borrower hereby represent and warrant to the Lenders that:

Section 3.01.    Organization; Powers.    Each of the Loan Parties and each of its Subsidiaries (a) subject to entry by the Bankruptcy Court of the applicable DIP Orders, is (i) duly organized and validly existing and (ii) in good standing (to the extent such concept exists in the relevant jurisdiction) under the laws of its jurisdiction of organization, (b) subject to entry by the Bankruptcy Court of the applicable DIP Orders, has all requisite organizational power and authority to own its property and assets and to carry on its business as now conducted and (c) is qualified to do business in, and is in good standing (to the extent such concept exists in the relevant jurisdiction) in, every jurisdiction where its ownership, lease or operation of properties or conduct of its business requires such qualification; except, in each case referred to in this Section 3.01 (other than clause (a)(i) with respect to the Borrower and clause (b) with respect to the Loan Parties) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.02.    Authorization; Enforceability.  Subject to entry by the Bankruptcy Court of the applicable DIP Orders,  the execution, delivery and performance of each of the Loan Documents are within each applicable Loan Party's corporate or other organizational power and have been duly authorized by all necessary corporate or other organizational action of such Loan Party.  Each Loan Document to which any Loan Party is a party has been duly executed and delivered by such Loan Party and each Loan

Document and each DIP Order is a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms.

Section 3.03.    <u>Governmental Approvals; No Conflicts</u>.    Subject to entry by the Bankruptcy Court of the applicable DIP Orders, the execution and delivery of the Loan Documents by each Loan Party party thereto and the performance by such Loan Party thereof (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) in connection with the Perfection Requirements and (iii) such consents, approvals, registrations, filings, or other actions the failure to obtain or make which could not be reasonably expected to have a Material Adverse Effect, (b) will not violate any (i) of such Loan Party's Organizational Documents or (ii)  Requirements of Law applicable to such Loan Party which violation, in the case of this <u>clause (b)(ii)</u>, could reasonably be expected to have a Material Adverse Effect and (c) will not violate or result in a default under (i) the Prepetition Credit Agreements or (ii) any other material Contractual Obligation to which such Loan Party is a party which violation, in the case of this <u>clause (c)</u>, could reasonably be expected to result in a Material Adverse Effect.

Section 3.04.    <u>Financial Condition; No Material Adverse Effect</u>.

(a)    The financial statements most recently provided pursuant to <u>Section 5.01(a)</u> or <u>(b)</u>, as applicable, present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower on a consolidated basis as of such dates and for such periods in accordance with GAAP, subject, in the case of financial statements provided pursuant to <u>Section 5.01(a)</u>, to the absence of footnotes and normal year-end adjustments.

(b)    The Initial Budget delivered pursuant to <u>Section 4.01(c)</u> and each Supplemental Approved Budget delivered thereafter are based on good faith estimates and assumptions believed by management of the Borrower to be reasonable and fair in light of current conditions and facts known to the Borrower at the time delivered.

(c)    Since the Petition Date, there have been no events, developments or circumstances that have had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.05.    <u>Properties</u>.

(a)    As of the Closing Date, <u>Schedule 3.05</u> sets forth the address of each Real Estate Asset (or each set of such assets that collectively comprise one operating property) that is owned in fee simple by any Loan Party.

(b)    The Borrower and each of its Subsidiaries have good and valid fee simple title to or rights to purchase, or valid leasehold interests in, or easements or other limited property interests in, all of their respective Real Estate Assets and have good title to their personal property and assets, in each case, except (i) for defects in title that do not materially interfere with their ability to conduct their business as currently conducted or to utilize such properties and assets for their intended purposes or (ii) where the failure to have such title would not reasonably be expected to have a Material Adverse Effect.  All such properties and assets are free and clear of Liens, other than Permitted Liens.

(c)    The Borrower and its Subsidiaries own or otherwise have a license or right to use all rights in Patents, Trademarks, Copyrights and other rights in works of authorship (including all copyrights embodied in software) and all other intellectual property rights ("**IP Rights**") used to conduct the businesses of the Borrower and its Subsidiaries as presently conducted without, to the knowledge of the

67

Borrower, any infringement or misappropriation of the IP Rights of third parties, except to the extent such failure to own or license or have rights to use would not, or where such infringement or misappropriation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.06.    Litigation and Environmental Matters.

(a)    There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting the Loan Parties or any of their Subsidiaries which (i) would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (ii) involve any Loan Document or the Transactions or (iii) restrain, prevent, or impose or would reasonably be expected to impose materially adverse conditions under the DIP Facility.

(b)    Except for any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, (i) no Loan Party nor any of its Subsidiaries is subject to or has received notice of any Environmental Claim or any Environmental Liability or knows of any basis for any Environmental Liability of the Borrower or any of its Subsidiaries and (ii) no Loan Party nor any of its Subsidiaries has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law.

(c)    Neither any Loan Party nor any of its Subsidiaries has treated, stored, transported or Released any Hazardous Materials on, at or from any currently or formerly operated real estate or facility in a manner that would reasonably be expected to have a Material Adverse Effect.

Section 3.07.    Compliance with Laws.  Subject to  entry by the Bankruptcy Court of the applicable DIP Orders, each of Holdings, the Borrower and each of its Subsidiaries is in compliance with all Requirements of Law applicable to it or its property, except, in each case, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.08.    Investment Company Status.  No Loan Party is an "investment company" as defined in, or is required to be registered under, the Investment Company Act of 1940.

Section 3.09.    Taxes.  Each of Holdings, the Borrower and each of its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it that are due and payable, including in its capacity as a withholding agent, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to file or pay, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.10.    ERISA.

(a)    (i) Each Plan and (ii) each Foreign Plan, is in compliance in form and operation with its terms and all applicable laws and regulations (including, without limitation, with respect to each Plan, ERISA and the Code), except, in each case, where any failure to comply would not reasonably be expected to result in a Material Adverse Effect.

(b)    No ERISA Event has occurred and is continuing or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect.

Section 3.11.    Disclosure.  As of the Closing Date, all written information (other than forward-looking information and information of a general economic or industry-specific nature) concerning Holdings, the Borrower and its Subsidiaries and the Transactions, and that was prepared by or on behalf of Holdings or its subsidiaries or their respective representatives and made available to any Lender or the Administrative Agent in connection with the Transactions and the DIP Orders on or before the Closing Date (the "**Information**"), when taken as a whole, did not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto from time to time).

Section 3.12.    [Reserved].

Section 3.13.    Capitalization and Subsidiaries.  Schedule 3.13 sets forth, in each case as of the Closing Date, (a) a correct and complete list of the name of each subsidiary of Holdings and the ownership interest therein held by Holdings or its applicable subsidiary, and (b) the type of entity of Holdings and each of its subsidiaries.

Section 3.14.    Security Interest in DIP Collateral.   The provisions of this Agreement, the DIP Orders, and  the collateral provisions in the Loan Documents, subject to entry of the DIP Orders,  create legal, valid and enforceable first-priority Liens on all of the DIP Collateral pledged hereunder or thereunder, in each case, with respect to priority, subject to no Liens with the relative priorities granted pursuant to the terms of the DIP Orders. Pursuant to the terms of the Interim DIP Order and/or Final DIP Order, no filing or other action will be necessary to perfect or protect such Liens and security interests. Pursuant to and to the extent provided in the Interim DIP Order and the Final DIP Order, the Indebtedness of the Debtors under this Agreement will constitute part of the DIP Superpriority Claims.

Section 3.15.    Labor Disputes.   Except as individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes, lockouts or slowdowns against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower or any of its Subsidiaries, threatened and (b) the hours worked by and payments made to employees of the Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.

Section 3.16.    Federal Reserve Regulations.   No part of the DIP Proceeds will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that results in a violation of the provisions of Regulation T, U or X.

Section 3.17.    Economic and Trade Sanctions and Anti-Corruption Laws.

(a)        (i) None of Holdings, the Borrower nor any of its Subsidiaries nor, to the knowledge of the Borrower, any director, officer, agent, employee or Affiliate of any of the foregoing is (A) a person on the list of "Specially Designated Nationals and Blocked Persons" or (B) currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("**OFAC**") or the U.S. State Department; and (ii) the Borrower will not directly or, to its knowledge, indirectly, use the DIP Proceeds or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person or in any country or territory that is currently subject to any U.S. sanctions administered by OFAC.  For the avoidance of doubt, the countries and territories currently subject to U.S. sanctions administered by OFAC are Cuba, Iran, Syria, Sudan, North Korea and the Crimea Territory of Ukraine.

(b)        To the extent applicable, each Loan Party is in compliance in all material respects with (i) each of the foreign assets control regulations of the U.S. Treasury Department (31 CFR, Subtitle B, Chapter V), and any other enabling legislation or executive order relating thereto, (ii) the USA PATRIOT Act and (iii) the U.S. Foreign Corrupt Practices Act of 1977 (the "**FCPA**").

(c)        No part of the DIP Proceeds will be used, directly or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to improperly obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA.

Section 3.18.    Chapter 11 Cases. The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice has been or will be given of (i) the motion seeking approval of the Loan Documents, the Interim DIP Order and the Final DIP Order, (ii) the hearing for the entry of the Interim DIP Order, and (iii) the hearing for the entry of the Final DIP Order, as applicable.

Section 3.19.    DIP Orders. The Debtors are in compliance in all material respects with the terms and conditions of the DIP Orders. Each of the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) or the Final DIP Order (from after the date the Final DIP Order is entered), as applicable, is in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders, and solely with respect to terms and provisions affecting the rights, protections, duties or obligations of the Administrative Agent, the Administrative Agent in its sole and absolute discretion, in each case, except for (i) any such modification, stay, vacation, reversal, rescindment or amendment that is reversed within five Business Days and (ii) modifications and amendments that do not affect the interests of the Lenders.

ARTICLE IV

CONDITIONS

Section 4.01.    Closing Date.  The obligations of any Lender to make Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)        Credit Agreement and Loan Documents.  The Administrative Agent (or its counsel) shall have received from each Loan Party party thereto (i) a counterpart signed by each such Loan Party (or written evidence satisfactory to the Administrative Agent (which may include a copy transmitted by facsimile or other electronic method) that such party has signed a counterpart) of (A) this Agreement and (B) any Promissory Note requested by a Lender at least three Business Days prior to the Closing Date and (ii) a Borrowing Request as required by Section 2.03.

(b)        Chapter 11 Cases.  The Chapter 11 Cases shall have been filed with the Bankruptcy Court on the Petition Date and shall not have been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. No trustee under Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases of the Debtors.

(c)        Initial Budget.  The Administrative Agent and the Lenders shall have received the Initial Budget in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders.

(d)    <u>Closing Certificates; Certified Charters; Good Standing Certificates</u>.    The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date and executed by a secretary, assistant secretary or other senior officer (as the case may be) thereof, which shall (A) certify that attached thereto is a true and complete copy of the resolutions or written consents of its shareholders, board of directors, board of managers, members or other governing body authorizing the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions or written consents have not been modified, rescinded or amended and are in full force and effect, (B) identify by name and title and bear the signatures of the officers, managers, directors or authorized signatories of such Loan Party authorized to sign the Loan Documents to which it is a party on the Closing Date and (C) certify (x) that attached thereto is a true and complete copy of the certificate or articles of incorporation or organization (or memorandum of association or other equivalent thereof) of such Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party and a true and correct copy of its by-laws or operating, management, partnership or similar agreement and (y) that such documents or agreements have not been amended (except as otherwise attached to such certificate and certified therein as being the only amendments thereto as of such date) and (ii) a good standing (or equivalent) certificate as of a recent date for such Loan Party from its jurisdiction of organization.

(e)    <u>Representations and Warranties</u>.    The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date; provided that if any such representation is qualified by or subject to a "material adverse effect", "material adverse change" or similar term or qualification, such representation is true and correct in all respects.

(f)    <u>Fees and Expenses</u>.    Prior to or substantially concurrently with the funding of the New Money Initial DIP Loan hereunder, the Administrative Agent shall have received in cash (i) all fees required to be paid by the Borrower on the Closing Date hereunder and (ii) all expenses required to be paid by the Borrower for which invoices have been presented at least three Business Days prior to the Closing Date or such later date to which the Borrower may agree (including the fees and expenses of legal counsel), in each case on or before the Closing Date, which amounts may be offset against the proceeds of the Loans.

(g)    <u>First Day Motions</u>.    The Administrative Agent shall have received, all first day motions, including those related to the DIP Facility, filed by the Debtors and related orders entered by the Bankruptcy Court in the Chapter 11 Cases, each in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders.

(h)    <u>Material Motions and Other Documents</u>.    The Administrative Agent shall have received, all material motions and other documents to be filed and with submitted to the Bankruptcy Court (provided that any of the foregoing relating to the DIP Facility shall be deemed material) and the approval thereof shall be in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders.

(i)    <u>Security Interests</u>.    Subject to the entry of the Interim DIP Order and the terms therein, the Administrative Agent, for the benefit of the Secured Parties, shall have a valid and perfected DIP Lien on and security interest in the DIP Collateral of the Debtors on the basis and with priority set forth in the DIP Orders.

(j)    <u>Interim DIP Order</u>.    Within three (3) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order, in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion, (i) authorizing and approving the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the

superpriority claim status, security interests and priming liens, and the payment of all fees, referred to herein and therein; (ii) authorizing the lifting or modification of the automatic stay to permit the Borrowers and the Guarantors to perform their obligations, and the Lenders to exercise their rights and remedies, with respect to the DIP Facility; (iii) authorizing the use of cash collateral and providing for adequate protection in favor of the Prepetition Agents and Prepetition Lenders, as and to the extent provided herein and therein; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the Administrative Agent (at the direction of the Required Lenders) and the Debtors, in their respective discretion in each case, which Interim DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent (at the direction of the Required Lenders).

(k)    Perfection Certificate. The Administrative Agent shall have received a completed Perfection Certificate dated the Closing Date and signed by a Responsible Officer of each Loan Party, together with all attachments contemplated thereby.

(l)    USA PATRIOT Act.  No later than three Business Days in advance of the Closing Date, the Administrative Agent shall have received all documentation and other information (including, if the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification) reasonably requested by any Lender that is party hereto on the Closing Date in writing with respect to any Loan Party at least five days in advance of the Closing Date, which documentation or other information is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and Beneficial Ownership Regulation; provided that, in the case of a Beneficial Ownership Certification, upon the request of the Administrative Agent, the Borrower shall return such completed Beneficial Ownership Certification directly to the requesting Lender.

(m)    No Default.  On the Closing Date, no Event of Default or Default exists.

(n)    Requirement of Law.  Neither entry into the Loan Documents nor making of the New Money Initial DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(o)    Approvals. Other than the DIP Orders, all governmental and third party consents and approvals necessary in connection with the DIP Facility shall have been obtained (without the imposition of any conditions that are not acceptable to the Administrative Agent and the Required Lenders in their reasonable discretion) and shall remain in effect.

(p)    Material Adverse Effect. Since the Petition Date there has been no event or circumstance, either individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect.

(q)    Litigation. Other than the Chapter 11 Cases, or as stayed upon the commencement of the Chapter 11 Cases, or the Orders, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality that (i) could reasonably be expected to result in a Material Adverse Effect or (ii) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the DIP Facility, the DIP Collateral or the transactions contemplated thereby.

For purposes of determining whether the conditions specified in this Section 4.01 have been satisfied on the Closing Date, by funding the Loans hereunder, the Administrative Agent and each Lender that has executed this Agreement (or an Assignment and Assumption on the Closing Date) shall be

72

deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to the Administrative Agent or such Lender, as the case may be.

Section 4.02.    <u>Each Credit Extension</u>.  After the Closing Date, the obligation of each Lender to make a Credit Extension is subject to the satisfaction of the following conditions:

(a)    In the case of a Borrowing, the Administrative Agent shall have received a Borrowing Request as required by <u>Section 2.03</u>.

(b)    The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents  shall be true and correct in all material respects on and as of the date of any such Credit Extension with the same effect as though such representations and warranties had been made on and as of the date of such Credit Extension; <u>provided</u> that (A) to the extent that any representation and warranty specifically refers to a given date or period, it is true and correct in all material respects as of such date or for such period and (B) if any such representation is qualified by or subject to a "material adverse effect", "material adverse change" or similar term or qualification, such representation is true and correct in all respects.

(c)    At the time of and immediately after giving effect to the applicable Credit Extension, no Event of Default or Default exists.

(d)    The making of any New Money Delayed Draw DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)    The making of any New Money Delayed Draw DIP Loan complies with the Approved Budget, subject to Permitted Variances.

(f)    The Bankruptcy Court shall have entered the Final DIP Order in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders, which Final DIP Order shall include, a Supplemental Approved Budget, as necessary, as an exhibit thereto, entered on notice to such parties as may be satisfactory to the Administrative Agent acting at the direction of the Required Lenders and otherwise as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the Bankruptcy Court, (i) authorizing and approving, on a final basis, the DIP Facility and the transactions contemplated hereby, including, without limitation, the granting of the superpriority claim status, security interests and priming liens, and the payment of all fees, referred to herein; (ii) authorizing, on a final basis, the lifting or modification of the automatic stay to permit the Borrower and the Guarantors to perform their obligations, and the Lenders to exercise their rights and remedies, with respect to the DIP Facility as provided in the Final DIP Order; (iii) authorizing, on a final basis, the use of cash collateral and providing for adequate protection in favor of the Prepetition Lenders Parties as provided in the Final DIP Order; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the Administrative Agent (at the direction of the Required Lenders) and the Debtors, in their respective discretion, in each case, which Final DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent (at the direction of the Required Lenders).

Each Credit Extension after the Closing Date shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in this <u>Section 4.02</u>.

ARTICLE V

AFFIRMATIVE COVENANTS

From the Closing Date until the date that all the Commitments have expired or terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document (other than contingent indemnification obligations for which no claim or demand has been made) have been paid in full in Cash (such date, the "**Termination Date**"), (i) in the case of Holdings, solely with respect to <u>Sections 5.01</u>, <u>5.02</u>, <u>5.03</u>, <u>5.08</u>, <u>5.12</u> and <u>5.15</u> and (ii) the Borrower hereby covenant and agree with the Lenders that:

Section 5.01.    <u>Financial Statements and Other Reports</u>.  The Borrower will deliver to the Prepetition First Lien Agents and the Administrative Agent for delivery to each Lender:

(a)    <u>Quarterly Financial Statements</u>.  Within 45 days after the end of each of each Fiscal Quarter of each Fiscal Year, commencing with the Fiscal Quarter ending June 30, 2024, the consolidated balance sheet of the Borrower as at the end of such Fiscal Quarter and the related consolidated statements of income and cash flows of the Borrower for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, and setting forth, in reasonable detail, in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a Responsible Officer **Certification** with respect thereto and, at the option of the Borrower, either (i) a Narrative Report with respect thereto or (ii) a conference call with the Lenders, hosted by the Administrative Agent, which call shall be held within 15 calendar days of the date on which the applicable financial statements are required to be delivered pursuant to this paragraph (a), during normal business hours and otherwise at a time mutually agreed between the Borrower and the Administrative Agent for the applicable Fiscal Quarter.

(b)    <u>Monthly Financials.</u> Within thirty (30) days after the end of each calendar month (commencing with the month ending April 30, 2024), the Borrower shall prepare and deliver to the Administrative Agent the consolidated balance sheet of the Borrower as at the end of such calendar month and the related consolidated statements of income and cash flows of the Borrower for such calendar month and for the period from the beginning of the then current Fiscal Year to the end of such calendar month, and setting forth, in reasonable detail, in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a Responsible Officer Certification with respect thereto.

(c)    <u>Compliance Certificate</u>.  Together with each delivery of financial statements of the Borrower pursuant to <u>Sections 5.01(a)</u> and <u>5.01(b)</u>, a duly executed and completed Compliance Certificate (A) certifying that no Default or Event of Default exists (or if a Default or Event of Default exists, describing in reasonable detail such Default or Event of Default and the steps being taken to cure, remedy or waive the same;

(d)    <u>Budget</u>.  Following the delivery of the Initial Budget on Closing Date, Borrower shall prepare and deliver to the Prepetition First Lien Agents and the Administrative Agent (for subsequent distribution to the respective Lenders) on:

(i)    commencing on April 26, 2024 and continuing every fourth Friday thereafter (*i.e.*, every four weeks) during the Chapter 11 Cases by 5:00 p.m. (prevailing Central Time), an updated budget for the then-upcoming thirteen (13) week period (each a "**Budget Update**"), in each case, in form reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders (and consistent with the form of the Initial Budget delivered on the Closing

Date) and the Prepetition First Lien Credit Agreement Agent (each such Budget Update that has been approved in writing by each of the Administrative Agent and the Prepetition First Lien Credit Agreement Agent, a "Supplemental Approved Budget"); provided, that the Administrative Agent and the Prepetition First Lien Credit Agreement Agent shall each have until Tuesday of the following week to approve each Budget Update (any such party that fails to timely provide the Debtors written notice of any objection to such updated budget shall be deemed to have approved such Budget Update); provided, further, however, that unless and until each of the Administrative Agent and the Prepetition First Lien Credit Agreement Agent have approved (or be deemed to have approved as provided above) such Budget Update, the Debtors shall still be subject to and be governed by the terms of the Initial Budget or most recent Supplemental Approved Budget, as applicable, then in effect in accordance with this Interim DIP Order, and the Secured Parties and the Prepetition First Lien Secured Parties shall, as applicable, have no obligation to fund to such Budget Update or permit the use of Cash Collateral with respect thereto, as applicable; and

(ii)    commencing on April 5, 2024 and continuing every Friday thereafter during the Chapter 11 Cases by 5:00 p.m. (prevailing Central Time), a variance report (the "Variance Report") with respect to the immediately prior week ended the last Business Day of such week, setting forth on a line-item basis (A) the actual cash receipts, expenditures, disbursements, and outstanding revolving loan balance (separating out the amount of the Roll-Up DIP Facility) of the Debtors for such immediately preceding week and the Aggregate Liquidity and outstanding letter of credit exposure as of the end of such week, (B) the variance in dollar amounts of the actual cash receipts and disbursements for each weekly period from those reflected for the corresponding period in the Approved Budget, (C) a description of the nature of any positive or negative variance of greater than fifteen percent (15%) and $150,000 in certain line items to be agreed, and (D) whether the Debtors complied with the applicable Budget Covenants for the applicable testing period.

(e)    Notice of Default.  Promptly upon, and in any event within five (5) Business Days after, any Responsible Officer of the Borrower obtaining knowledge of (i) any Default or Event of Default or (ii) the occurrence of any event or change that has caused or evidences or would reasonably be expected to cause or evidence, either individually or in the aggregate, a Material Adverse Effect, a reasonably-detailed notice specifying the nature and period of existence of such condition, event or change and what action the Borrower has taken, is taking and proposes to take with respect thereto;

(f)    Notice of Litigation.  Promptly upon, and in any event within five (5) Business Days after, any Responsible Officer of the Borrower obtaining knowledge of (i) the institution of, or threat of, any Adverse Proceeding not previously disclosed in writing by the Borrower to the Administrative Agent, or (ii) any material development in any Adverse Proceeding that, in the case of either of clause (i) or (ii), could reasonably be expected to have a Material Adverse Effect, or (iii) any litigation, investigation or proceeding with respect to the DIP Facility, written notice thereof from the Borrower together with such other non-privileged information as may be reasonably available to the Loan Parties to enable the Lenders to evaluate such matters;

(g)    ERISA.  Promptly upon, and in any event within five (5) Business Days after, any Responsible Officer of the Borrower becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof;

(h)    [Reserved].

(i)    Information Regarding DIP Collateral.  Prompt (and in any event, within 10 days of the relevant change) written notice of any change (i) in any Loan Party's legal name, (ii) in any Loan

Party's type of organization, (iii) in any Loan Party's jurisdiction of organization or (iv) in any Loan Party's organizational identification number, in each case to the extent such information is necessary to enable the Administrative Agent to perfect or maintain the perfection and priority of its security interest in the Collateral of the relevant Loan Party, together with a certified copy of the applicable Organizational Document reflecting the relevant change;

(j)    Annual Collateral Verification.  Together with the delivery of each Compliance Certificate provided with the financial statements required to be delivered pursuant to Section 5.01(b), a Perfection Certificate Supplement;

(k)    Certain Reports.  Promptly upon their becoming available and without duplication of any obligations with respect to any such information that is otherwise required to be delivered under the provisions of any Loan Document, copies of (i) following an initial public offering, all financial statements, reports, notices and proxy statements sent or made available generally by Holdings or its applicable Parent Company to its security holders acting in such capacity and (ii) all regular and periodic reports and all registration statements (other than on Form S-8 or a similar form) and prospectuses, if any, filed by Holdings or its applicable Parent Company with any securities exchange or with the SEC or any analogous governmental or private regulatory authority with jurisdiction over matters relating to securities; and

(l)    Material Indebtedness.  Promptly, and in any event with five (5) Business Days after, the effectiveness of any notices of default to any holder or any material agreement (or any material amendment, waiver or consent with respect to any existing material agreement) relating to any Indebtedness, copies of any such notices, agreements or amendments, waivers or consents; and

(m)    Other Information.  Such other certificates, reports and information (financial or otherwise) as the Administrative Agent or the Prepetition First Lien Agents may reasonably request from time to time in connection with the affairs, finances, businesses, assets and equity interests of the Debtors, as well the Milestones.

Documents required to be delivered pursuant to this Section 5.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower (or a representative thereof) (x) posts such documents or (y) provides a link thereto on the website of the Borrower on the Internet at the website address listed on Schedule 9.01; provided that, other than with respect to items required to be delivered pursuant to Section 5.01(k), the Borrower shall promptly notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents on the website of the Borrower (or its applicable subsidiary) and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents; (ii) on which such documents are delivered by the Borrower to the Administrative Agent for posting on behalf of the Borrower on SyndTrak or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); (iii) on which executed certificates or other documents are faxed to the Administrative Agent (or electronically mailed to an address provided by the Administrative Agent); or (iv) in respect of the items required to be delivered pursuant to Section 5.01(k) in respect of information filed by Holdings or its applicable Parent Company with any securities exchange or with the SEC or any analogous governmental or private regulatory authority with jurisdiction over matters relating to securities (other than Form 10-Q reports and Form 10-K reports described in Sections 5.01(a) and (b), respectively), on which such items have been made available on the SEC website or the website of the relevant analogous governmental or private regulatory authority or securities exchange.

Notwithstanding the foregoing, the obligations in paragraphs (a), (b) and (h) of this Section 5.01 may be satisfied with respect to any financial statements of the Borrower by furnishing (A) the

applicable financial statements of Holdings (or any other Parent Company) or (B) Holdings' (or any other Parent Company's), as applicable, Form 10-K or 10-Q, as applicable, filed with the SEC or any securities exchange, in each case, within the time periods specified in such paragraphs; provided that, with respect to each of clauses (A) and (B), (i) to the extent such financial statements relate to any Parent Company, such financial statements shall be accompanied by consolidating information that summarizes in reasonable detail the differences between the information relating to such Parent Company, on the one hand, and the information relating to Holdings on a standalone basis, on the other hand, which consolidating information shall be certified by a Responsible Officer of Holdings as having been fairly presented in all material respects and (ii) to the extent such statements are in lieu of statements required to be provided under Section 5.01(b), such statements shall be accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall satisfy the applicable requirements set forth in Section 5.01(b).

Section 5.02.    Existence.  Except as otherwise permitted under Section 6.07, Holdings and the Borrower will, and the Borrower will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights, franchises, licenses and permits material to its business except, other than with respect to the preservation of the existence of the Borrower, to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect; provided that neither Holdings nor the Borrower nor any of the Borrower's Subsidiaries shall be required to preserve any such existence (other than with respect to the preservation of existence of the Borrower), right, franchise, license or permit if a Responsible Officer of such Person or such Person's board of directors (or similar governing body) determines that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the Lenders.

Section 5.03.    Payment of Taxes.  Holdings and the Borrower will, and the Borrower will cause each of its Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income or businesses or franchises before they become due before any penalty or fine accrues thereon; provided that no such Tax need be paid if (a) it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (i) adequate reserves or other appropriate provisions, as are required in conformity with GAAP, have been made therefor, and (ii) in the case of a Tax which has or may become a Lien against any of the DIP Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the DIP Collateral to satisfy such Tax, (b) the failure to pay or discharge the same could not reasonably be expected to result in a Material Adverse Effect, (c) the non-payment of which is permitted or required by the Bankruptcy Code or (d) such payment is stayed by the Bankruptcy Court.

Section 5.04.    Maintenance of Properties.  The Borrower will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear and casualty and condemnation excepted, all property reasonably necessary to the normal conduct of business of the Borrower and its Subsidiaries and from time to time will make or cause to be made all needed and appropriate repairs, renewals and replacements thereof except as expressly permitted by this Agreement or where the failure to maintain such properties or make such repairs, renewals or replacements could not reasonably be expected to have a Material Adverse Effect.

Section 5.05.    Insurance.  Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, the Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, such insurance coverage with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Borrower and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such

Persons, including flood insurance with respect to each Flood Hazard Property, in each case in compliance with the Flood Insurance Laws (where applicable). Each such policy of insurance shall (i) name the Administrative Agent on behalf of the Lenders as an additional insured thereunder as its interests may appear and (ii) to the extent available from the relevant insurance carrier, in the case of each casualty insurance policy (excluding any business interruption insurance policy), contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lenders as the loss payee thereunder and, to the extent available, provide for at least 30 days' prior written notice to the Administrative Agent of any modification or cancellation of such policy (or 10 days' prior written notice in the case of the failure to pay any premiums thereunder).

Section 5.06.    Inspections.  The Borrower will, and will cause each of its Subsidiaries to, permit any authorized representative designated by the Administrative Agent to visit and inspect any of the properties of the Borrower and any of its Subsidiaries at which the principal financial records and executive officers of the applicable Person are located, to inspect, copy and take extracts from its and their respective financial and accounting records, and to discuss its and their respective affairs, finances and accounts with its and their Responsible Officers and independent public accountants (provided that the Borrower (or any of its subsidiaries) may, if it so chooses, be present at or participate in any such discussion), all upon reasonable notice and at reasonable times during normal business hours; provided that, excluding such visits and inspections during the continuation of an Event of Default, (x) only the Administrative Agent on behalf of the Lenders may exercise the rights of the Administrative Agent and the Lenders under this Section 5.06, (y) the Administrative Agent shall not exercise such rights more often than one time during any calendar year and (z) only one such time per calendar year shall be at the expense of the Borrower; provided further that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice; provided further that, notwithstanding anything to the contrary herein, neither the Borrower nor any Subsidiary shall be required to disclose, permit the inspection, examination or making of copies of or taking abstracts from, or discuss any document, information, or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information of the Borrower and its subsidiaries and/or any of its customers and/or suppliers, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives or contractors) is prohibited by applicable law or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 5.07.    Maintenance of Book and Records.  Holdings and Borrower will, and will cause their Subsidiaries to, maintain proper books of record and account containing entries of all material financial transactions and matters involving the assets and business of the Borrower and its Subsidiaries that are full, true and correct in all material respects and permit the preparation of consolidated financial statements in accordance with GAAP.

Section 5.08.    Compliance with Laws.  Holdings and the Borrower will, and will cause each of its Subsidiaries to, comply with the requirements of (i) OFAC and the FCPA and (ii) all applicable laws, rules, regulations and orders of any Governmental Authority (including ERISA, all Environmental Laws, the USA PATRIOT Act and anti-money laundering laws), except, in the case of clause (ii), to the extent the failure to so comply could not reasonably be expected to have a Material Adverse Effect.

Section 5.09.    Environmental.

(a)    Environmental Disclosure.  The Borrower will deliver to the Administrative Agent:

(i)       as soon as practicable following receipt thereof, copies of all non-privileged environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of the Borrower or any of its Subsidiaries or by independent consultants, governmental authorities or any other Persons, with respect to significant environmental matters at the Borrower's real property or with respect to any Environmental Claims that, in each case might reasonably be expected to have a Material Adverse Effect;

(ii)      promptly upon the occurrence thereof, written notice describing in reasonable detail (A) any Release required to be reported by the Borrower or any of its Subsidiaries to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws that could reasonably be expected to have a Material Adverse Effect, (B) any remedial action taken by the Borrower or any of its Subsidiaries or any other Person of which the Borrower or any of its Subsidiaries has knowledge in response to (1) any Hazardous Materials Activity the existence of which has a reasonable possibility of resulting in one or more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect or (2) any Environmental Claim that, individually or in the aggregate, has a reasonable possibility of resulting in a Material Adverse Effect and (C) discovery by the Borrower of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that reasonably could be expected to have a Material Adverse Effect;

(iii)     as soon as practicable following the sending or receipt thereof by the Borrower or any of its Subsidiaries, a copy of any and all written communications with respect to (A) any Environmental Claim that, individually or in the aggregate, has a reasonable possibility of giving rise to a Material Adverse Effect, (B) any Release required to be reported by the Borrower or any of its Subsidiaries to any federal, state or local governmental or regulatory agency that reasonably could be expected to have a Material Adverse Effect, and (C) any request made to the Borrower or any of its Subsidiaries for information from any governmental agency that suggests such agency is investigating whether the Borrower or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity which is reasonably expected to have a Material Adverse Effect;

(iv)     prompt written notice describing in reasonable detail (A) any proposed acquisition of stock, assets, or property by the Borrower or any of its Subsidiaries that could reasonably be expected to expose the Borrower or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (B) any proposed action to be taken by the Borrower or any of its Subsidiaries to modify current operations in a manner that could subject the Borrower or any of its Subsidiaries to any additional obligations or requirements under any Environmental Law that are reasonably likely to have a Material Adverse Effect; and

(v)      with reasonable promptness, such other documents and information as from time to time may be reasonably requested by the Administrative Agent in relation to any matters disclosed pursuant to this Section 5.09(a).

(b)      Hazardous Materials Activities, Etc.  The Borrower will, and will cause each of its Subsidiaries to promptly take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by the Borrower or its Subsidiaries, and address with appropriate corrective or remedial action any Release or threatened Release of Hazardous Materials at or from any Facility, in each case, that could reasonably be expected to have a Material Adverse Effect and (ii) make an appropriate response to any Environmental Claim against the Borrower or any of its Subsidiaries and discharge any

obligations it may have to any Person thereunder, in each case, where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.10.    [Reserved].

Section 5.11.    Use of Proceeds.  The Debtors shall use the DIP Proceeds (i) fund the costs of the administration of the Chapter 11 Cases (including Professional Costs), (ii) to make adequate protection payments and other payments pursuant to any DIP Order entered by the Bankruptcy Court and any related orders; provided that the form and substance of such orders shall be reasonably acceptable to the Administrative Agent and the Required Lenders, (iii) fund interest, fees, and other payments contemplated in respect of the DIP Facility and (iv) to fund working capital needs and expenditures of the Debtors during the Chapter 11 Cases, in each case in accordance with the Approved Budget, the DIP Orders and the Loan Documents. Without in any way limiting the foregoing, no DIP Collateral, DIP Proceeds, any portion of the Carve-Out, the Cash Collateral or any other amounts may be used directly or indirectly by any of the Debtors, the Committee, if any, any other statutory committee appointed in the Chapter 11 Cases, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor case) or any other person or entity: (x) to (or support any other party to) litigate, object to, contest or challenge in any manner or raise any defenses to the debt, collateral position, liens or claims of the, whether by challenging the validity, extent, amount, perfection, priority or enforceability of the indebtedness under the DIP Facility or the Prepetition First Lien Loan Documents, or the validity, extent, perfection, priority or enforceability of any mortgage, security interest or lien with respect thereto or any other rights or interests or replacement liens with respect thereto or any other rights or interests of the Lenders, the Administrative Agent, the Prepetition First Lien Lenders, the Prepetition Sidecar Lenders or the Prepetition First Lien Agents or by seeking to subordinate or recharacterize the DIP Facility (or amounts outstanding thereunder) or the Prepetition First Lien Loan Documents (or amounts outstanding thereunder), or to disallow or avoid any claim, mortgage, security interest, lien, or replacement lien or by asserting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Lenders, the Administrative Agent, the Prepetition First Lien Lenders, the Prepetition Sidecar Lenders or the Prepetition First Lien Agents, or any of their respective officers, directors, agents, or employees.  In addition, none of the Carve-Out, DIP Collateral DIP Proceeds, nor any Cash Collateral shall be used in connection with (a) preventing, hindering or delaying the Lenders' or the Administrative Agent's, the Prepetition First Lien Agents' or the Prepetition First Lien Lenders' or the Prepetition Sidecar Lenders' enforcement or realization upon the DIP Collateral or the Collateral (as defined in the Prepetition First Lien Credit Agreement or Prepetition Sidecar Credit Agreement, as applicable) (the "**Prepetition Collateral**") or the exercise of rights by the Administrative Agent or the Prepetition First Lien Agents, as applicable, once an Event of Default has occurred and is continuing, (b) using or seeking to use Cash Collateral or selling or otherwise disposing of the DIP Collateral or the Prepetition Collateral other than as provided herein, (c) using or seeking to use any insurance proceeds related to the DIP Collateral or the Prepetition Collateral without the consent of the Administrative Agent or the Prepetition First Lien Agents, as applicable; or (d) incurring indebtedness other than in accordance with the Approved Budget or other than as permitted in the Loan Documents; provided that the foregoing limitations shall not prevent the Debtors and their professionals from being heard on whether an Event of Default has occurred and is continuing.

Section 5.12.    Bankruptcy Covenants. Notwithstanding anything in the Loan Documents to the contrary, the Debtors shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders.

Section 5.13.    Chapter 11 Cases.

(a)    Each Debtor shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable and in any event at least two (2) Business Days (or as soon thereafter as is

reasonably practicable under the circumstance) prior to filing, upon request, all material pleadings, motions and other documents (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Debtors with the Bankruptcy Court to King & Spalding LLP and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing. If not otherwise provided by the Bankruptcy Court's electronic docketing system, the Borrower shall provide (x) copies to the Administrative Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court, distributed by or on behalf of the Debtors to any Committee, filed with respect to the Chapter 11 Cases or filed with respect to any Loan Document and (y) such other reports and information as the Administrative Agent may, from time to time, reasonably request. In connection with the Chapter 11 Cases, the Debtors shall give the proper notice for (x) the motions seeking approval of the Loan Documents and the DIP Orders and (y) the hearings for the approval of the DIP Orders. The Borrower and the other Debtors shall give, on a timely basis as specified in the DIP Orders, all notices required to be given to all parties specified in the DIP Orders.

(c)     Each Loan Party shall deliver or cause to be delivered to the Administrative Agent and the Lenders, as soon as commercially reasonable upon receipt of same, copies of any term sheets, proposals, presentations or other material documents, from any Person, related to (i) the restructuring of the Debtors, or (ii) the sale of any material asset of one or all of the Debtors (for the avoidance of doubt, excluding ordinary course asset sales).

(d)     Except to the extent permitted (or required) hereunder, under the DIP Orders and under the Approved Budget, no Loan Party shall, without the express prior written consent of the Required Lenders or pursuant to an order of the Bankruptcy Court after notice and a hearing, use the DIP Proceeds or cash collateral to make any critical vendor payment with respect to any prepetition amount, subject to (i) the Approved Budget and (ii) Bankruptcy Court approval.

(e)     Except as approved in writing by the Administrative Agent (acting at the direction of the Required Lenders) or contemplated by the first day orders, no Loan Party shall assume, reject, cancel, terminate, breach or modify any agreement, contract, instrument or other document if such assumption, rejection, cancellation, termination, breach or modification, either individually or in the aggregate, would have a negative effect on the value of the DIP Collateral (except if pursuant to the Order) or result in a Material Adverse Effect.

(f)     All Professional Costs at any time paid by the Loan Parties, or any of them, shall be paid by the Loan Parties in accordance with the limitation and procedures set forth in the Loan Documents and the DIP Orders.

Section 5.14.    Cash Management System. The Debtors shall maintain a cash management system as in effect on the Petition Date and as required by the DIP Orders and as authorized by the Bankruptcy Court pursuant to orders approving the "first day" motions filed by the Debtors and otherwise in compliance with the Prepetition Credit Agreements (except as otherwise agreed by the Administrative Agent and Prepetition First Lien Agents, as applicable). Upon the request of the Administrative Agent (at the direction of the Required Lenders), the Debtors shall cause bank statements and/or other reports to be delivered to the Administrative Agent not less often than monthly, accurately setting forth all amounts deposited into each Cash Management Account to ensure proper transfer of funds as set forth herein.

Section 5.15.    Further Assurances. Promptly upon request of the Administrative Agent:

(a)     Holdings and the Borrower will, and will cause each other Loan Party to, execute any and all further documents, financing statements, agreements, instruments, certificates, notices and

acknowledgments and take all such further actions (including the filing and recordation of financing statements, fixture filings, Mortgages and/or amendments thereto and other documents), that may be required under any applicable law and which the Administrative Agent may request to ensure the creation, perfection and priority of the Liens created or intended to be created under the Loan Documents, all at the expense of the relevant Loan Parties.

(b)    Holdings and the Borrower will, and will cause each other Loan Party to, (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Loan Document or other document or instrument relating to any DIP Collateral and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts (including notices to third parties), deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Loan Documents.

Section 5.16.    Milestones.    Each of Holdings and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document have been paid in full in cash, each of Holdings and the Borrower shall and shall cause each of the Subsidiaries to ensure that each of the milestones set forth below is achieved in accordance with the applicable timing referred to below (or such later dates as may be approved in writing by the Required Lenders in their reasonable discretion):

(a)    Immediately following the Petition Date, the marketing process related to the Debtors' Sale shall be initiated.

(b)    No later than five (5) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order authorizing and approving, on an interim basis, the DIP Facility (including the Commitments, all documents and lender fees related thereto, and the payment of the fees and expenses of the Administrative Agent's and Prepetition First Lien Agents' advisors.

(c)    No later than five (5) calendar days after the Petition Date, the Debtors shall file a motion (the "**Sale Motion**"), in form and substance acceptable to the Administrative Agent and the Required Lenders, requesting (x) an order from the Bankruptcy Court (the "**Bid Procedures Order**") (i) approving the proposed bid procedures attached to the Sale Motion related to the sale of substantially all of the assets of the Debtors (the "**Bid Procedures**"), and (y) an order from the Bankruptcy Court (the "**Sale Order**") approving the sale of the Debtors' assets to the highest and best bidder for such assets pursuant to Section 363 of the Bankruptcy Code (the "**Sale**") determined in accordance with the Bid Procedures.

(d)    No later than 35 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order authorizing and approving, on a final basis, the DIP Facility (including the Commitments, all documents and lender fees related thereto, and the payment of the fees and expenses of the Administrative Agent's and Prepetition First Lien Agents' advisors.

(e)    No later than 35 calendar days after the Petition Date, the Debtors shall have obtained the Bid Procedures Order, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

(f) No later than 45 days after the Petition Date, the Debtors shall have completed an auction, as necessary, in connection with the Sale in accordance with the Bid Procedures Order.

(g) No later than 50 days after the Petition Date, in the discretion of the Administrative Agent at the direction of the Required Lenders, the Bankruptcy Court shall have entered a final order approving a Sale.

Section 5.17.    <u>Budget Matters</u>.  The Borrower hereby acknowledges and agrees that any Budget Update provided to the Administrative Agent and the Lenders shall not amend and supplement the applicable Approved Budget until the Administrative Agent (at the direction of the Required Lenders) and the Prepetition First Lien Credit Agreement Agent each deliver a notice (which may be delivered by electronic mail) to the Borrower stating that the Administrative Agent and the Required Lenders and the Prepetition First Lien Credit Agreement Agent have approved of such Budget Update in accordance with Section 5.01(d); provided, that if the Administrative Agent and the Prepetition First Lien Credit Agreement Agent do not deliver a notice of approval to the Borrower, then the existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as the subject Budget Update is agreed to among the Borrower, the Administrative Agent and the Required Lenders and the Prepetition First Lien Credit Agreement Agent in accordance with <u>Section 5.01(d)</u>.  Once such Budget Update is so approved in writing by the Administrative Agent and the Required Lenders and the Prepetition First Lien Credit Agreement Agent, it shall supplement or replace the prior Approved Budget, and shall thereafter constitute the Approved Budget.

Section 5.18.    <u>Europe Operations</u>.  The Borrower hereby agrees to continue to operate its European business, including without limitation the operations of Shoes for Crews (Europe) Limited Company, in all respects in the ordinary course and in accordance with past practices.

ARTICLE VI

NEGATIVE COVENANTS

From the Closing Date and until the Termination Date has occurred, (i) in the case of Holdings, solely with respect to <u>Sections 6.04(b)</u> and <u>6.14</u> and (ii) the Borrower covenant and agree with the Lenders that:

Section 6.01.    <u>Indebtedness</u>.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or otherwise become or remain liable with respect to any Indebtedness, except:

(a)    the Obligations and Indebtedness pursuant to the Loan Documents and the DIP Order;

(b)    Indebtedness of the Borrower to any Subsidiary and/or of any Subsidiary to the Borrower or any other Subsidiary; <u>provided</u> that in the case of any Indebtedness of any Subsidiary that is not a Loan Party owing to a Loan Party, such Indebtedness shall be permitted as an Investment by <u>Section 6.06</u>; <u>provided</u> <u>further</u> that any Indebtedness of any Loan Party to any Subsidiary that is not a Loan Party must be expressly subordinated to the Obligations of such Loan Party on terms that are reasonably acceptable to the Administrative Agent;

(c)    Indebtedness of the Loan Parties under Prepetition Loan Documents;

(d)     Indebtedness of the Borrower and/or any Subsidiary (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and consistent with past practice and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(e)     Indebtedness of the Borrower and/or any Subsidiary in respect of commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with Cash management and Deposit Accounts, including dealer incentive, supplier finance or similar programs solely to the extent such Indebtedness is incurred in the ordinary course of business and consistent with past practices of the Borrower and/or any Subsidiary;

(f)     (i) guaranties by the Borrower and/or any Subsidiary of the obligations of suppliers, customers and licensees in the ordinary course of business and consistent with past practice, (ii) Indebtedness incurred in the ordinary course of business and consistent with past practice in respect of obligations of the Borrower and/or any Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (iii) Indebtedness in respect of letters of credit, bankers' acceptances, bank guaranties or similar instruments supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business and consistent with past practice;

(g)     Guarantees by the Borrower and/or any Subsidiary of Indebtedness or other obligations of the Borrower and/or any Subsidiary with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.01 or other obligations not prohibited by this Agreement; provided that in the case of any Guarantee by any Loan Party of the obligations of any non-Loan Party, the related Investment is permitted under Section 6.06;

(h)     Indebtedness of the Borrower and/or any Subsidiary existing, or pursuant to commitments existing, on the Closing Date and described on Schedule 6.01;

(i)     Indebtedness of the Borrower and/or any Subsidiary consisting of obligations owing under incentive, supply, license or similar agreements entered into in the ordinary course of business and consistent with past practice;

(j)     [reserved];

(k)     Indebtedness of the Borrower and/or any Subsidiary consisting of (i) the financing of insurance premiums, or (ii) obligations to reacquire assets or inventory in connection with customer financing arrangements in the ordinary course of business and consistent with past practice;

(l)     Indebtedness (including obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness) incurred by the Borrower and/or any Subsidiary in respect of workers compensation claims, unemployment insurance (including premiums related thereto), other types of social security, pension obligations, vacation pay, health, disability or other employee benefits;

(m)     Indebtedness of the Borrower and/or any Subsidiary representing deferred compensation to directors, officers, employees, members of management, managers, and consultants of any

Parent Company, the Borrower and/or any Subsidiary in the ordinary course of business and in accordance with the Approved Budget;

(n)     unfunded pension fund and other employee benefit plan obligations and liabilities incurred by the Borrower and/or any Subsidiary in the ordinary course of business to the extent that the unfunded amounts would not otherwise cause an Event of Default under Section 7.01(i);

(o)     without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees, expenses and charges with respect to Indebtedness of the Borrower and/or any Subsidiary hereunder;

(p)     customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business and consistent with past practice; and

(q)     Indebtedness of the Borrower and/or any Subsidiary Guarantor incurred in the ordinary course of business and consistent with past practice and in accordance with the Approved Budget in an aggregate outstanding principal amount not to exceed $500,000 in the aggregate.

Section 6.02.    Liens.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, create, incur, assume or permit or suffer to exist any Lien on or with respect to any property of any kind owned by it, whether now owned or hereafter acquired, or any income or profits therefrom, except:

(a)     Liens securing the Obligations created pursuant to the Loan Documents and the DIP Order;

(b)     Liens for Taxes which are (i) for amounts not yet overdue by more than 30 days or (ii) which are not required to be paid pursuant to Section 5.03 or (iii) or are otherwise stayed pursuant to the Bankruptcy Cases;

(c)     statutory Liens (and rights of set-off) of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law, in each case incurred in the ordinary course of business (i) for amounts not yet overdue by more than 30 days or (ii) for amounts that are overdue by more than 30 days and that are being contested in good faith by appropriate proceedings, so long as adequate reserves or other appropriate provisions required by GAAP shall have been made for any such contested amounts;

(d)     Liens incurred (i) in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security laws and regulations, (ii) in the ordinary course of business to secure the performance of tenders, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), (iii) pursuant to pledges and deposits of Cash or Cash Equivalents in the ordinary course of business securing (x) any liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty, liability or other insurance to Holdings and its subsidiaries or (y) leases or licenses of property otherwise permitted by this Agreement and (iv) to secure obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments posted with respect to the items described in clauses (i) through (iii) above;

(e) Liens consisting of easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not, in the aggregate, materially interfere with the ordinary conduct of the business of the Borrower and/or its Subsidiaries, taken as a whole, or the use of the affected property for its intended purpose;

(f) Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate permitted hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii);

(g) purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases or consignment or bailee arrangements entered into in the ordinary course of business and consistent with past practice;

(h) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(i) Liens in connection with any zoning, building or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any or dimensions of real property or the structure thereon;

(j) Liens existing on the Closing Date and described on Schedule 6.02;

(k) Lien securing Indebtedness under the Prepetition Credit Agreements, so long as such Liens are subject to the terms of the Prepetition Intercreditor Agreements;

(l) Liens (i) that are contractual rights of set-off or netting relating to (A) the establishment of depository relations with banks not granted in connection with the issuance of Indebtedness, (B) pooled deposit or sweep accounts of the Borrower and/or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and/or any Subsidiary and consistent with past practice, (C) purchase orders and other agreements entered into with customers of the Borrower and/or any Subsidiary in the ordinary course of business and consistent with past practice and (D) commodity trading or other brokerage accounts incurred in the ordinary course of business and consistent with past practice and (ii) encumbering reasonable customary initial deposits and margin deposits;

(m) Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Borrower and/or its Subsidiaries and consistent with past practice;

(n) Liens on assets securing judgments, awards, attachments and/or decrees and notices of *lis pendens* and associated rights relating to litigation being contested in good faith not constituting an Event of Default under Section 7.01(h);

(o) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business and consistent with past practice which do not (i) interfere in any material respect with the business of the Borrower and its Subsidiaries or (ii) secure any Indebtedness;

(p) Liens securing obligations in respect letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments permitted under Sections 6.01(d), (f) and (l);

(q)       Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any assets or property in the ordinary course of business and permitted by this Agreement or (ii) by operation of law under Article 2 of the UCC (or similar law of any jurisdiction);

(r)       Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(s)       Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods; and

(t)       Liens securing Indebtedness permitted under <u>Section 6.01(q)</u>.

Section 6.03.    <u>No Further Negative Pledges</u>.  The Borrower shall not, nor shall it permit any of its  Subsidiaries to, enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties, whether now owned or hereafter acquired, for the benefit of the Secured Parties with respect to the Obligations, except with respect to:

(a)       specific property to be sold pursuant to any Disposition permitted by <u>Section 6.07</u>;

(b)       restrictions contained in any agreement with respect to Indebtedness permitted by <u>Section 6.01</u> that is secured by a Permitted Lien, but only if such restrictions apply only to the Person or Persons obligated under such Indebtedness and its or their Subsidiaries or the property or assets securing such Indebtedness;

(c)       restrictions contained in the DIP Orders, and Prepetition Loan Documents;

(d)       restrictions by reason of customary provisions restricting assignments, subletting or other transfers (including the granting of any Lien) contained in leases, subleases, licenses, sublicenses and other agreements entered into in the ordinary course of business (<u>provided</u> that such restrictions are limited to the relevant leases, subleases, licenses, sublicenses or other agreements and/or the property or assets secured by such Liens or the property or assets subject to such leases, subleases, licenses, sublicenses or other agreements, as the case may be);

(e)       Permitted Liens and restrictions in the agreements relating thereto that limit the right of the Borrower or any of its Subsidiaries to Dispose of, or encumber the assets subject to such Liens;

(f)       provisions limiting the Disposition or distribution of assets or property in joint venture agreements, sale-leaseback agreements, stock sale agreements and other similar agreements, which limitation is applicable only to the assets that are the subject of such agreements (or the Persons the Capital Stock of which is the subject of such agreement);

(g)       any encumbrance or restriction assumed in connection with an acquisition of the property or Capital Stock of any Person, so long as such encumbrance or restriction relates solely to the property so acquired (or to the Person or Persons (and its or their subsidiaries) bound thereby) and was not created in connection with or in anticipation of such acquisition;

(h)       restrictions imposed by customary provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar

agreements that restrict the transfer of the assets of, or ownership interests in, the relevant partnership, limited liability company, joint venture or any similar Person;

(i)    restrictions on Cash or other deposits imposed by Persons under contracts entered into in the ordinary course of business or for whose benefit such Cash or other deposits exist;

(j)    restrictions set forth in documents which exist on the Closing Date;

(k)    restrictions set forth in any Loan Document;

(l)    restrictions contained in documents governing Indebtedness permitted hereunder of any Subsidiary that is not a Loan Party; and

(m)    other restrictions or encumbrances imposed by any amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of the contracts, instruments or obligations referred to in clauses (a) through (l) above; provided that no such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Borrower, more restrictive with respect to such encumbrances and other restrictions, taken as a whole, than those in effect prior to the relevant amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 6.04.    Restricted Payments; Certain Payments of Indebtedness.

(a)    The Borrower shall not pay or make, directly or indirectly, any Restricted Payment, except that:

(i)    Subject to the Approved Budget, (A) for any taxable year (or portion thereof) that Borrower is a partnership or disregarded entity for U.S. federal income Tax purposes and no Parent Company is treated as a corporation for U.S. federal income tax purposes, the Borrower may make Restricted Payments to fund the income tax liabilities of the direct or indirect equity owners of Borrower, in an assumed amount equal to the product of (x) the highest combined marginal federal and applicable state and/or local statutory Tax rate (after taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes) applicable to an individual resident in New York City, New York, and (y) the U.S. federal taxable income of the Borrower for such year (or portion thereof); or (B) for any taxable period (or portion thereof) that a Parent Company is treated as a corporation for U.S. federal income tax purposes and for which Borrower and/or any of its subsidiaries are members (or are pass-through entities of such members) of a consolidated, combined or similar income Tax group for U.S. federal, state, local or foreign income Tax purposes for which such Parent Company is the common parent, the Borrower may make Restricted Payments to such Parent Company to pay the portion of any U.S. federal, state, local or foreign income Taxes (as applicable) of such Parent Company for such taxable period that are attributable to the income of the Borrower and/or its applicable subsidiaries; provided that, the aggregate amount of such distributions shall not exceed the aggregate Taxes the Borrower and/or its subsidiaries, as applicable, would be required to pay in respect of such U.S. federal, state, local and foreign Taxes on a stand-alone basis for such taxable period;

(ii)    to the extent constituting a Restricted Payment, the Borrower may consummate any transaction permitted by Section 6.06, Section 6.07, and Section 6.09; and

(iii)    any Restricted Payment set forth in the DIP Orders and included in the Approved Budget.

(b)    Holdings and the Borrower shall not, nor shall they permit any Subsidiary to, make any payment (whether in Cash, securities or other property) on or in respect of principal of or interest on (x) any Junior Lien Indebtedness or (y) any Subordinated Indebtedness (such Indebtedness under clauses (x)  and (y), the "**Restricted Debt**"), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Restricted Debt prior to its scheduled maturity (collectively, "**Restricted Debt Payments**"), except:

(i)    (A) Restricted Debt Payments in exchange for, or with proceeds of any issuance of, Qualified Capital Stock of the Borrower and/or any Subsidiary and/or any capital contribution in respect of Qualified Capital Stock of the Borrower or any Subsidiary, (B) Restricted Debt Payments as a result of the conversion of all or any portion of any Restricted Debt into Qualified Capital Stock of the Borrower and/or any Subsidiary and (C) to the extent constituting a Restricted Debt Payment, payment-in-kind interest with respect to any Restricted Debt that is permitted under Section 6.01; and

(ii)    Any Restricted Debt Payment set forth in the DIP Orders, the "first day" orders or the Approved Budget.

Section 6.05.    Restrictions on Subsidiary Distributions.  Except as provided herein or in any other Loan Document and the Prepetition Loan Documents, the Borrower shall not, nor shall it permit any of its Subsidiaries to, enter into or cause to exist any agreement restricting the ability of (i) any subsidiary of the Borrower to pay dividends or other distributions to the Borrower or any Loan Party or (ii) any Subsidiary to make cash loans or advances to the Borrower or any Loan Party, except:

(a)    in any agreement evidencing Indebtedness permitted by Section 6.01;

(b)    by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, subleases, licenses, sublicenses, joint venture agreements and similar agreements entered into in the ordinary course of business;

(c)    that are or were created by virtue of any Lien granted upon, transfer of, agreement to transfer or grant of, any option or right with respect to any property, assets or Capital Stock not otherwise prohibited under this Agreement;

(d)    [reserved];

(e)    in any agreement for any Disposition of any Subsidiary (or all or substantially all of the property and/or assets thereof) that restricts the payment of dividends or other distributions or the making of cash loans or advances by such Subsidiary pending such Disposition;

(f)    in provisions in agreements or instruments which prohibit the payment of dividends or the making of other distributions with respect to any class of Capital Stock of a Person other than on a *pro rata* basis;

(g)    imposed by customary provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements;

(h)    on Cash, other deposits or net worth or similar restrictions imposed by any Person under any contract entered into in the ordinary course of business or for whose benefit such Cash, other deposits or net worth or similar restrictions exist;

89

(i)      set forth in documents which exist on the Closing Date and not created in contemplation thereof;

(j)      those arising pursuant to an agreement or instrument relating to any Indebtedness permitted to be incurred after the Closing Date if the relevant restrictions, taken as a whole, are not materially less favorable to the Lenders than the restrictions contained in this Agreement, taken as a whole (as determined in good faith by the Borrower); and

(k)      those arising under or as a result of applicable law, rule, regulation or order or the terms of any license, authorization, concession or permit.

Section 6.06.    <u>Investments</u>.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, make or own any Investment in any other Person except:

(a)      Cash or Investments that were Cash Equivalents at the time made;

(b)      (i) Investments existing on the Closing Date in any Subsidiary, (ii) Investments made after the Closing Date among the Borrower and/or one or more Subsidiaries that are Loan Parties (other than Holdings), (iii) Investments made after the Closing Date by any Loan Party in any Subsidiary that is not a Loan Party to the extent set forth in the Approved Budget, (iv) [reserved] and (v) Investments made by any Subsidiary that is not a Loan Party in any Loan Party (other than Holdings) or any other Subsidiary of the Borrower;

(c)      Investments (i) constituting deposits, prepayments and/or other credits to suppliers and/or (ii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, in the ordinary course of business or, in the case of <u>clause (ii)</u>, to the extent necessary to maintain the ordinary course of supplies to the Borrower or any Subsidiary;

(d)      Investments consistent with the Approved Budget or the DIP Orders;

(e)      Investments existing on, or contractually committed to or contemplated as of, the Closing Date and described on Schedule 6.06;

(f)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business and consistent with past practice;

(g)      [reserved];

(h)      Investments in the ordinary course of business  and consistent with past practice consisting of endorsements for collection or deposit and customary trade arrangements with customers;

(i)      Investments (including debt obligations and Capital Stock) received (i) in connection with the bankruptcy or reorganization of any Person, (ii) in settlement of delinquent obligations of, or other disputes with, customers, suppliers and other account debtors arising in the ordinary course of business, (iii) upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment and/or (iv) as a result of the settlement, compromise, resolution of litigation, arbitration or other disputes;

(j)      unfunded pension fund and other employee benefit plan obligations and liabilities to the extent that they are permitted to remain unfunded under applicable law; and

90

(k)      Investments in the Borrower, any Subsidiary and/or any joint venture in connection with intercompany cash management arrangements and related activities in the ordinary course of business and consistent with past practice.

Section 6.07.    <u>Fundamental Changes; Disposition of Assets</u>.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger, consolidation or amalgamation, or liquidate, wind up or dissolve themselves (or suffer any liquidation or dissolution), or make any Disposition, in a single transaction or in a series of related transactions, except:

(a)      any Subsidiary may be merged, consolidated or amalgamated with or into the Borrower or any other Subsidiary; <u>provided</u> that (i) in the case of any such merger, consolidation or amalgamation with or into the Borrower, the Borrower shall be the continuing or surviving Person, and (ii) in the case of any such merger, consolidation or amalgamation with or into any Subsidiary Guarantor, either (x) such Subsidiary Guarantor shall be the continuing or surviving Person or the continuing or Surviving Person shall expressly assume the guarantee obligations of the Subsidiary Guarantor in a manner reasonably satisfactory to the Administrative Agent or (y) the relevant transaction shall be treated as an Investment and shall comply with <u>Section 6.06</u>;

(b)      (x) Dispositions of inventory or equipment in the ordinary course of business (including on an intercompany basis) and consistent with past practice and (y) the leasing or subleasing of real property in the ordinary course of business and consistent with past practice;

(c)      Dispositions as may be authorized by the Bankruptcy Court after notice and a hearing with the consent of the Administrative Agent at the direction of the Required Lenders; and

(d)      Dispositions contemplated by (i) the Approved Budget or (ii) the DIP Orders or the "first day" orders.

Notwithstanding anything to the contrary herein, neither Borrower nor any of its Subsidiaries may sell, transfer or make any other Disposition to any Person that is not a Loan Party of any property that is material to the business of Borrower and its Subsidiaries, taken as a whole.

Section 6.08.    <u>Sale and Lease-Back Transactions</u>.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which the Borrower or the relevant Subsidiary (a) has sold or transferred or is to sell or to transfer to any other Person (other than the Borrower or any of its Subsidiaries) and (b) intends to use for substantially the same purpose as the property which has been or is to be sold or transferred by the Borrower or such Subsidiary to any Person (other than the Borrower or any of its Subsidiaries) in connection with such lease (such a transaction described herein, a "**Sale and Lease-Back Transaction**").

Section 6.09.    <u>Transactions with Affiliates</u>.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, enter into any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any of their respective Affiliates on terms that are less favorable to the Borrower or such Subsidiary, as the case may be, than those that might be obtained at the time in a comparable arm's-length transaction from a Person who is not an Affiliate (the "<u>Arm's Length Restriction</u>"); <u>provided</u> that, subject to the Approved Budget the foregoing restriction shall not apply to transactions in existence on the Closing Date and set forth on <u>Schedule 6.09</u>.

Section 6.10.    <u>Conduct of Business</u>.  From and after the Closing Date, the Borrower shall not, nor shall it permit any of its Subsidiaries to, engage in any material line of business other than (a) the

91

businesses engaged in by the Borrower or any Subsidiary on the Closing Date and similar, complementary, ancillary or related businesses and (b) such other lines of business to which the Administrative Agent may consent.

        Section 6.11.   <u>Amendments or Waivers of Organizational Documents</u>.  The Borrower shall not, nor shall it permit any Subsidiary Guarantor to, amend or modify their respective Organizational Documents, in each case in a manner that is materially adverse to the Lenders (in their capacities as such) without obtaining the prior written consent of the Administrative Agent; <u>provided</u> that, for purposes of clarity, it is understood and agreed that the Borrower and/or any Subsidiary Guarantor may effect a change to its organizational form and/or consummate any other transaction that is permitted under <u>Section 6.07</u>.

        Section 6.12.   <u>Amendments of or Waivers with Respect to Restricted Debt</u>.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, amend or otherwise modify the terms of any Restricted Debt (or the documentation governing any Restricted Debt) (a) if the effect of such amendment or modification, together with all other amendments or modifications made, is materially adverse to the interests of the Lenders (in their capacities as such) or (b) in violation of the Prepetition Intercreditor Agreements, any intercreditor agreement related to such debt entered into with the Administrative Agent or the subordination terms set forth in the definitive documentation governing any Restricted Debt.

        Section 6.13.   <u>Fiscal Year</u>.  The Borrower shall not change its Fiscal Year-end to a date other than December 31.

        Section 6.14.   <u>Permitted Activities of Holdings</u>.  Holdings shall not:

        (a)     incur any Indebtedness for borrowed money other than (i) Indebtedness under the Loan Documents and the Prepetition Loan Documents or otherwise permitted by the DIP Orders, and (ii) Guarantees of (x) Indebtedness or other obligations of the Borrower and/or any Subsidiary that are otherwise permitted hereunder;

        (b)     create or suffer to exist any Lien on any property or asset now owned or hereafter acquired by it other than (i) the Liens created under the Loan Documents and the Prepetition Loan Documents and (ii) Liens of the type permitted under <u>Section 6.02</u> (other than in respect of debt for borrowed money);

        (c)     engage in any business activity or own any material assets other than (i) holding the Capital Stock of the Borrower, as applicable, and, indirectly, any other subsidiary of the Borrower, (ii) performing its obligations under the Loan Documents, the Prepetition Loan Documents and other Indebtedness, Liens (including the granting of Liens) and Guarantees permitted to be incurred, granted or made, as applicable, by it hereunder; (iii) issuing its own Capital Stock (including, for the avoidance of doubt, the making of any dividend or distribution on account of, or any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of, any shares of any class of Capital Stock); (iv) filing Tax reports and paying Taxes and other customary obligations in the ordinary course (and contesting any Taxes); (v) preparing reports to Governmental Authorities and to its shareholders; (vi) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable Requirements of Law; (vii) [reserved]; (viii) holding (A) Cash, Cash Equivalents and other assets received in connection with permitted distributions or dividends received from, or permitted Investments or permitted Dispositions made by, any of its subsidiaries or permitted contributions to the capital of, or proceeds from the issuance of Capital Stock of, Holdings pending the application thereof and (B) the proceeds of Indebtedness permitted to be incurred by it hereunder; (ix) providing indemnification for its

officers, directors, members of management, employees and advisors or consultants; (x) participating in tax, accounting and other administrative matters; (xi) performance of its obligations under any document, or agreement contemplated by the Transactions or otherwise not prohibited under this Agreement; (xii) complying with applicable Requirements of Law (including with respect to the maintenance of its existence); (xiii) making and holding intercompany loans to the Borrower and/or the Subsidiaries of the Borrower, as applicable; and (xiv) activities incidental to any of the foregoing; or

(d)    consolidate or amalgamate with, or merge with or into, or convey, sell or otherwise transfer all or substantially all of its assets to, any Person; provided that, so long as no Default or Event of Default exists or would result therefrom, (A) Holdings may consolidate or amalgamate with, or merge with or into, any other Person (other than the Borrower and any of its subsidiaries) so long as Holdings is the continuing or surviving Person and (B) Holdings may convey, sell or otherwise transfer all or substantially all of its assets to any other Loan Party.

Section 6.15.    Investigation Rights.  The Committee (to the extent one is appointed) shall have a maximum of sixty (60) calendar days from the date of the Committee's appointment, and, to the extent that no Committee is formed, parties in interest with standing shall have a maximum of seventy-five (75) calendar days from entry of the Interim DIP Order (the "**Investigation Period**") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge (each, a "**Challenge**") the findings, the Loan Parties' stipulations, or any other stipulations contained in the Orders, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the obligations under the Prepetition Loan Documents, or to assert any claim or cause of action against the Prepetition Agents or the Prepetition Lenders arising under or in connection with the Prepetition Loan Documents or the Prepetition Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of Prepetition Obligations, or otherwise provided that the timely filing of a motion seeking standing to file a Challenge before the expiration of the Investigation Period shall toll the Investigation Period until such standing motion is resolved or adjudicated by the Court.  The Investigation Period may only be extended with the prior written consent of the Administrative Agent and the Prepetition First Lien Credit Agreement Agent, as memorialized in an order of the Bankruptcy Court.  Except to the extent asserted in an adversary proceeding or contested matter filed during the Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred), (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, waivers, releases, affirmations, acknowledgements and stipulations contained in the DIP Orders shall be irrevocably and forever binding on the Loan Parties, the Committee and all parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any Chapter 7 Trustee, without further action by any party or the Bankruptcy Court; (iii) the Prepetition Obligations shall be deemed to be finally allowed and the Prepetition Liens shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Loan Parties shall be deemed to have released, waived and discharged the Administrative Agent, the Lenders, the Prepetition Agents, the Prepetition Lenders, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (all in their capacities as such) (collectively, the "**Released Parties**"), from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations.  Notwithstanding anything to the contrary herein: (x) if any Challenge is timely commenced, the stipulations contained in the Final DIP Order shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge.

Section 6.16.    Compliance with DIP Orders and Approved Budget.  Except as otherwise provided herein or approved by the Required Lenders, the Loan Parties shall not use any cash or the

proceeds of any Loans or DIP Collateral in a manner or for a purpose other than in accordance with the DIP Orders and the Approved Budget, subject to Permitted Variances.

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01.   Events of Default.   If any of the following events (each, an "**Event of Default**") shall occur:

(a)   Failure To Make Payments When Due.   Failure by the Borrower to pay (i) any installment of principal of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Loan or any fee or any other amount due hereunder within five Business Days after the date due; or

(b)   Default in Other Agreements.   (i) Failure by any Loan Party or any of its Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in clause (a) above or under the Prepetition Credit Agreements) with an aggregate outstanding principal amount exceeding the Threshold Amount, in each case beyond the grace period, if any, provided therefor; or (ii) breach or event of default by any Loan Party or any of its Subsidiaries with respect to any other term of one or more items of Indebtedness with an aggregate outstanding principal amount exceeding the Threshold Amount, if the effect of such breach or event of default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, such Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; provided, that any failure described under clause (i) or (ii) above is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Article 7; or

(c)   Breach of Certain Covenants.   Failure of any Loan Party, as required by the relevant provision, to perform or comply with any term or condition contained in Section 2.26, Section 5.01(a), (b), (c), (d) or (e)(i), Section 5.02 (as it applies to the preservation of the existence of the Borrower), Section 5.14, Section 5.16, or Article 6; or

(d)   Breach of Representations, Etc.   Any representation, warranty or certification made or deemed made by any Loan Party in any Loan Document or in any certificate required to be delivered in connection herewith or therewith (including, for the avoidance of doubt, any Perfection Certificate and any Perfection Certificate Supplement) being untrue in any material respect as of the date made or deemed made; or

(e)   Other Defaults Under Loan Documents.   Default by any Loan Party in the performance of or compliance with any term contained herein or any of the other Loan Documents, other than any such term referred to in any other Section of this Article 7, which default has not been remedied or waived within 10 days after receipt by the Borrower of written notice thereof from the Administrative Agent; or

(f)   Involuntary Bankruptcy; Appointment of Receiver, Etc.   Other than the Chapter 11 Cases, (i) the entry by a court of competent jurisdiction of a decree or order for relief in respect of Holdings, the Borrower or any of its Subsidiaries in an involuntary case under any Debtor Relief Law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal, state or local law; or (ii) the commencement of an involuntary case against Holdings,

94

the Borrower or any of its Subsidiaries under any Debtor Relief Law; the entry by a court having jurisdiction in the premises of a decree or order for the appointment of a receiver, receiver and manager, (preliminary) insolvency receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Holdings, the Borrower or any of its Subsidiaries, or over all or a substantial part of its property; or the involuntary appointment of an interim receiver, trustee or other custodian of Holdings, the Borrower or any of its Subsidiaries for all or a substantial part of its property, which remains undismissed, unvacated, unbounded or unstayed pending appeal for 20 consecutive days; or

(g)     Voluntary Bankruptcy; Appointment of Receiver, Etc.  Other than the Chapter 11 Cases, (i) the entry against Holdings, the Borrower or any of its Subsidiaries of an order for relief, the commencement by Holdings, the Borrower or any of its Subsidiaries of a voluntary case under any Debtor Relief Law, or the consent by Holdings, the Borrower or any of its Subsidiaries to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case, under any Debtor Relief Law, or the consent by the Borrower or any of its Subsidiaries to the appointment of or taking possession by a receiver, receiver and manager, trustee or other custodian for all or a substantial part of its property; (ii) the making by Holdings, the Borrower or any of its Subsidiaries of a general assignment for the benefit of creditors; or (iii) the admission by Holdings, the Borrower or any of its Subsidiaries in writing of their inability to pay their respective debts as such debts become due; or

(h)     Judgments and Attachments.  The entry or filing of one or more final money judgments, writs or warrants of attachment or similar process against Holdings, the Borrower or any of its Subsidiaries or any of their respective assets involving in the aggregate at any time an amount in excess of the Threshold Amount (in either case to the extent not adequately covered by self-insurance (if applicable) or by insurance as to which the relevant third party insurance company has been notified and not denied coverage), which judgment, writ, warrant or similar process remains unpaid, undischarged, unvacated, unbonded or unstayed pending appeal for a period of 45 days; or

(i)     Employee Benefit Plans.  The occurrence of one or more ERISA Events, which individually or in the aggregate result in liability of Holdings, the Borrower or any of its Subsidiaries in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; or

(j)     Change of Control.  The occurrence of a Change of Control; or

(k)     Guaranties, DIP Collateral and Other Loan Documents.  At any time after the execution and delivery thereof (i) any Loan Guaranty for any reason ceasing to be in full force and effect (other than in accordance with its terms or as a result of the occurrence of the Termination Date) or being declared to be null and void or the repudiation in writing by any Loan Party of its obligations thereunder (other than as a result of the discharge of such Loan Party in accordance with the terms thereof), (ii) this Agreement or any collateral document ceasing to be in full force and effect (other than solely by reason of (x) the failure of the Administrative Agent to maintain possession of any DIP Collateral actually delivered to it or the failure of the Administrative Agent to file UCC (or equivalent) continuation statements, (y) a release of DIP Collateral in accordance with the terms hereof or thereof or (z) the occurrence of the Termination Date or any other termination of such collateral document in accordance with the terms thereof) or being declared null and void or (iii) the contesting by any Loan Party of the validity or enforceability of any material provision of any Loan Document (or any Lien purported to be created by the collateral documents or any collateral provision in the Loan Documents or Loan Guaranty) in writing or denial by any Loan Party in writing that it has any further liability (other than by reason of the occurrence of the Termination Date), including with respect to future advances by the Lenders, under any Loan Document to which it is a party; it being understood and agreed that the failure of the Administrative Agent to maintain possession of any DIP Collateral actually delivered to it or file any UCC (or equivalent)

continuation statement shall not result in an Event of Default under this clause (k) or any other provision of any Loan Document; or

(l)    <u>Subordination</u>.  The Obligations ceasing or the assertion in writing by any Loan Party that the Obligations cease to constitute senior indebtedness under the subordination provisions of any document or instrument evidencing any permitted Subordinated Indebtedness or any Junior Lien Indebtedness with an aggregate principal amount outstanding in excess of the Threshold Amount or any such subordination provision being invalidated or otherwise ceasing, for any reason, to be valid, binding and enforceable obligations of the parties thereto; or

(m)    <u>Chapter 11 Cases</u>: The occurrence of any of the following in any Chapter 11 Case:

(i)    filing of a plan of reorganization under Chapter 11 of the Bankruptcy Code by the Debtors that has not been consented to by the Required Lenders;

(ii)    filing of a plan of reorganization or liquidation by the Debtors that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by the Administrative Agent and the Required Lenders;

(iii)    any of the Debtors shall file a pleading seeking to vacate or modify any of the DIP Orders without the prior consent of the Administrative Agent at the direction of the Required Lenders;

(iv)    entry of an order without the prior written consent of the Required Lenders amending, supplementing or otherwise modifying the DIP Orders (other than, in respect of the Interim DIP Order, the entry of the Final DIP Order);

(v)    reversal, vacatur or stay of the effectiveness of any DIP Order (and, other than, in respect of the Interim DIP Order, the entry of the Final DIP Order);

(vi)    any material violation of the terms of any DIP Order by the Debtors;

(vii)    dismissal of the Chapter 11 Case of a Debtor or conversion of the Chapter 11 Case of a Debtor to a case under Chapter 7 of the Bankruptcy Code;

(viii)    appointment of a Chapter 11 trustee without the consent of the Required Lenders;

(ix)    any sale of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code or entry into an agreement obligating any Debtor to consummate any such sale (other than a Sale) unless (i) the proceeds of such sale indefeasibly satisfy the Obligations and Prepetition First Lien Obligations in full in cash or (ii) such sale is supported by the Administrative Agent at the direction of the Required Lenders;

(x)    appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrower or any Guarantor without the consent of the Required Lenders;

(xi)    failure to meet a Milestone, unless extended or waived pursuant by the prior written consent of the Administrative Agent at the direction of the Required Lenders;

(xii)    granting of relief from the automatic stay in the Chapter 11 Cases to permit foreclosure or enforcement on Prepetition Collateral of any of the Debtors;

(xiii)    the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or pari passu with the Lenders' claims under the DIP Facility;

(xiv)    the Debtors shall seek, or shall support any other person's motion seeking (in any such case, verbally in any court of competent jurisdiction or by way of any motion or pleading with the Bankruptcy Court, or any other writing to another party in interest by Debtors) to challenge the extent, validity, perfection, priority, or enforceability of any of the Lien or obligations of the parties under the Prepetition First Lien Loan Documents;

(xv)    payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or consented to by the Administrative Agent at the direction of the Required Lenders, or otherwise required under the Bankruptcy Code or by the Bankruptcy Court;

(xvi)    expiration or termination of exclusivity by the Debtors or the filing of a plan of reorganization without the prior consent of the Required Lenders;

(xvii)    cessation of the DIP Liens or the DIP Superpriority Claims to be valid, perfected and enforceable in all respects

(xviii)    the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, without the prior written consent of the Required Lenders;

(xix)    any of the Debtors uses cash collateral or New Money DIP Loans for any item other than those set forth in, and in accordance with, the Approved Budget and as approved by the Bankruptcy Court, the Carve-Out or prepays prepetition debt, except with the prior consent of the Required Lenders;

(xx)    the Debtors fail to comply with the Budget Covenants; and

(xxi)    any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full in cash and the commitments are terminated

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by written notice to the Borrower, its counsel, the U.S. Trustee and counsel for any statutory committee, terminate the DIP Facility, declare the Obligations in respect thereof to be immediately due and payable and, subject to <u>Section 7.02</u>, exercise all rights and remedies under the Loan Documents and the DIP Orders.

Section 7.02.    <u>Remedies upon an Event of Default</u>. If any Event of Default occurs and is continuing, then, and in any such event, subject to the terms of the DIP Orders, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Administrative Agent and/or Administrative Agent, as applicable, and the Lenders to exercise all rights and remedies provided for in the Loan Documents, and to take any or all of the following actions without further

97

order of or application to the Bankruptcy Court (as applicable): (i) immediately terminate the Loan Parties' limited use of any cash collateral; (ii) cease making any Loans under the DIP Facility to the Loan Parties; (iii) declare all Obligations to be immediately due and payable; (iv) freeze monies or balances in the Loan Parties' accounts; (v) immediately set-off any and all amounts in accounts maintained by the Loan Parties with the Administrative Agent or the Lenders against the Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable Secured Parties, including, without limitation, disposition of the DIP Collateral solely for application towards the Obligations; and (vi) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the Loan Documents or applicable law to effect the repayment of the Obligations; provided, that neither the Loan Parties, the Committee nor any other party-in-interest (other than the Prepetition Sidecar Lenders  and the Prepetition Second Lien Lenders, solely in accordance with the Prepetition Intercreditor Agreements) shall have the right to contest the enforcement of the remedies set forth in the DIP Orders and the Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable Loan Documents. The Debtors shall cooperate fully with the Administrative Agent and the Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise. If the Bankruptcy Court finds that an Event of Default has occurred and is continuing, the Lenders' right to enforce the remedies provided for herein and in the DIP Orders shall be subject to satisfaction of the obligations occasioned by the issuance of a Carve-Out Trigger Notice.

(b)    Except as expressly provided above in this <u>Section 7.02</u>, to the maximum extent permitted by applicable law, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

(c)    Each of the Loan Parties hereby waives any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Administrative Agent and the Lenders set forth in the DIP Orders and in the Loan Documents.

Section 7.03.    <u>Rights Not Exclusive.</u> The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.<u>Application of Proceeds</u>. Following the occurrence and during the continuance of an Event of Default, all amounts received by any Agent from the Loan Parties or with respect to the proceeds of any DIP Collateral shall be promptly disbursed by such Agent in accordance with the priorities set forth in <u>Section 2.18(b).</u>

ARTICLE VIII

THE ADMINISTRATIVE AGENT

Each of the Lenders hereby irrevocably appoints Antares Capital (or any successor appointed pursuant hereto) as Administrative Agent and authorizes the Administrative Agent to take such actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

Any Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, unless the context otherwise requires or unless such Person is in fact not a Lender, include each Person serving as Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may

accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or any subsidiary of any Loan Party or other Affiliate thereof as if it were not the Administrative Agent hereunder.  The Lenders acknowledge that, pursuant to such activities, the Administrative Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall not be under any obligation to provide such information to them.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default exists, and the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law; it being understood that such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary power, except discretionary rights and powers that are expressly contemplated by the Loan Documents and which the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the relevant circumstances as provided in <u>Section 9.02</u>); <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable laws, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable to the Lenders or any other Secured Party for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the relevant circumstances as provided in <u>Section 9.02</u>) or in the absence of its own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein.  The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or any Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any covenant, agreement or other term or condition set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of any Lien on the DIP Collateral or the existence, value or sufficiency of the DIP Collateral, (vi) the satisfaction of any condition set forth in <u>Article 4</u> or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or (vii) any property, book or record of any Loan Party or any Affiliate thereof.

If any Lender acquires knowledge of a Default or Event of Default, it shall promptly notify the Administrative Agent and the other Lenders thereof in writing.  Each Lender agrees that, except with the written consent of the Administrative Agent, it will not take any enforcement action hereunder or under any other Loan Document, accelerate the Obligations under any Loan Document, or exercise any right that it might otherwise have under applicable law or otherwise to credit bid at any foreclosure sale, UCC sale, any sale under Section 363 of the Bankruptcy Code or other similar Dispositions of DIP Collateral.

Notwithstanding the foregoing, however, a Lender may take action to preserve or enforce its rights against a Loan Party where a deadline or limitation period is applicable that would, absent such action, bar enforcement of the Obligations held by such Lender, including the filing of a proof of claim in a case under the Bankruptcy Code.

Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, the Borrower, the Administrative Agent and each Secured Party agree that (i) no Secured Party shall have any right individually to realize upon any of the DIP Collateral or to enforce the Loan Guaranty; it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by, the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the other Loan Documents may be exercised solely by, the Administrative Agent, and (ii) in the event of a foreclosure by the Administrative Agent on any of the DIP Collateral pursuant to a public or private sale or in the event of any other Disposition (including pursuant to Section 363 of the Bankruptcy Code), (A) the Administrative Agent, as agent for and representative of the Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the DIP Collateral sold at any such sale, to use and apply any of the Obligations as a credit on account of the purchase price for any DIP Collateral payable by the Administrative Agent at such Disposition and (B) the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such DIP Collateral at any such Disposition.

Each of the Lenders hereby irrevocably authorizes the Administrative Agent, on behalf of all Secured Parties to take any of the following actions upon the instruction of the Required Lenders:

(a)    consent to the Disposition of all or any portion of the DIP Collateral free and clear of the Liens securing the Obligations in connection with any Disposition pursuant to the applicable provisions of the Bankruptcy Code, including Section 363 thereof;

(b)    credit bid all or any portion of the Obligations, or purchase all or any portion of the DIP Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the DIP Collateral pursuant to the applicable provisions of the Bankruptcy Code, including under Section 363 thereof;

(c)    credit bid all or any portion of the Obligations, or purchase all or any portion of the DIP Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any Disposition of all or any portion of the DIP Collateral pursuant to the applicable provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC;

(d)    credit bid all or any portion of the Obligations, or purchase all or any portion of the DIP Collateral (in each case, either directly or through one or more acquisition vehicles), in connection with any foreclosure or other Disposition conducted in accordance with applicable law following the occurrence of an Event of Default, including by power of sale, judicial action or otherwise; and/or

(e)    estimate the amount of any contingent or unliquidated Obligations of such Lender or other Secured Party;

it being understood that no Lender shall be required to fund any amount in connection with any purchase of all or any portion of the DIP Collateral by the Administrative Agent pursuant to the foregoing <u>clause (b)</u>, <u>(c)</u> or <u>(d)</u> without its prior written consent.

Each Secured Party agrees that the Administrative Agent is under no obligation to credit bid any part of the Obligations or to purchase or retain or acquire any portion of the DIP Collateral; <u>provided</u>

that, in connection with any credit bid or purchase described under clause (b), (c) or (d) of the preceding paragraph, the Obligations owed to all of the Secured Parties (other than with respect to contingent or unliquidated liabilities as set forth in the next succeeding paragraph) may be, and shall be, credit bid by the Administrative Agent on a ratable basis.

With respect to each contingent or unliquidated claim that is a Secured Obligation, the Administrative Agent is hereby authorized, but is not required, to estimate the amount thereof for purposes of any credit bid or purchase described in the second preceding paragraph so long as the estimation of the amount or liquidation of such claim would not unduly delay the ability of the Administrative Agent to credit bid the Obligations or purchase the DIP Collateral in the relevant Disposition.  In the event that the Administrative Agent, in its sole and absolute discretion, elects not to estimate any such contingent or unliquidated claim or any such claim cannot be estimated without unduly delaying the ability of the Administrative Agent to consummate any credit bid or purchase in accordance with the second preceding paragraph, then any contingent or unliquidated claims not so estimated shall be disregarded, shall not be credit bid, and shall not be entitled to any interest in the portion or the entirety of the DIP Collateral purchased by means of such credit bid.

Each Secured Party whose Obligations are credit bid under clauses (b), (c) or (d) of the third preceding paragraph shall be entitled to receive interests in the DIP Collateral or any other asset acquired in connection with such credit bid (or in the Capital Stock of the acquisition vehicle or vehicles that are used to consummate such acquisition) on a ratable basis in accordance with the percentage obtained by dividing (x) the amount of the Obligations of such Secured Party that were credit bid in such credit bid or other Disposition, by (y) the aggregate amount of all Obligations that were credit bid in such credit bid or other Disposition.

In addition, in case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, each Secured Party agrees that the Administrative Agent (irrespective of whether the principal of any Loan is then due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, and the Administrative Agent and their respective agents and counsel and all other amounts to the extent due to the Lenders and the Administrative Agent under Sections 2.12 and 9.03) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same.

Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent consents to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amount due to the Administrative Agent under Sections 2.12 and 9.03.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent has received notice to the contrary from such Lender prior to the making of such Loan or the issuance of such Letter of Credit.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it.  The Administrative Agent and any such sub-agent may perform any and all of their respective duties and exercise their respective rights and powers through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent. Each of the Loan Parties, the Lenders, and the other Secured Parties, acknowledges that, in addition to acting as Administrative Agent under this Agreement, Antares Capital also serves as administrative agent and collateral agent under the Prepetition First Lien Credit Agreement and Prepetition Sidecar Credit Agreement, and each Secured Party hereby waives any right to make any objection or claim against Antares Capital (or any successor or any of their respective counsel) based on any alleged conflict of interest or breach of duties arising from the Antares Capital also serving as administrative agent and collateral agent under the Prepetition First Lien Credit Agreement or Prepetition Sidecar Credit Agreement.

The Administrative Agent may resign at any time by giving ten days' written notice to the Lenders and the Borrower.  If the Administrative Agent becomes subject to an insolvency proceeding, either the Required Lenders or the Borrower may, upon ten days' notice, remove the Administrative Agent.  Upon receipt of any such notice of resignation or delivery of any such notice of removal, the Required Lenders shall have the right, with the consent of the Borrower (not to be unreasonably withheld or delayed), to appoint a successor Administrative Agent which shall be a commercial bank or trust company with offices in the U.S. having combined capital and surplus in excess of $1,000,000,000; provided that during the existence and continuation of an Event of Default under Section 7.01(a) or, with respect to Holdings or the Borrower, Section 7.01(f) or (g), no consent of the Borrower shall be required.  If no successor shall have been appointed as provided above and accepted such appointment within ten days after the retiring Administrative Agent gives notice of its resignation or the Administrative Agent receives notice of removal, then (a) in the case of a retirement, the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above (including, for the avoidance of doubt, consent of the Borrower) or (b) in the case of a removal, the Borrower may, after consulting with the Required Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that (x) in the case of a retirement, if the Administrative Agent notifies the Borrower, the Lenders that no qualifying Person has accepted such appointment or (y)

in the case of a removal, the Borrower notifies the Required Lenders that no qualifying Person has accepted such appointment, then, in each case, such resignation or removal shall nonetheless become effective in accordance with and on the 30th day following delivery of such notice  and (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent in its capacity as collateral agent for the Secured Parties for perfection purposes, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) all payments, communications and determinations required to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly (and each Lender will cooperate with the Borrower to enable the Borrower to take such actions), until such time as the Required Lenders or the Borrower, as applicable, appoint a successor Administrative Agent, as provided for above in this Article 8.  Upon the acceptance of its appointment as Administrative Agent hereunder as a successor Administrative Agent, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder (other than its obligations under Section 9.13).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor Administrative Agent.  After the Administrative Agent's resignation or removal hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any action taken or omitted to be taken by any of them while the relevant Person was acting as Administrative Agent (including for this purpose holding any collateral security following the retirement or removal of the Administrative Agent).  Notwithstanding anything to the contrary herein, no Disqualified Institution (nor any Affiliate thereof) may be appointed as a successor Administrative Agent.

Each of each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each of each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their respective Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of the Administrative Agent or any of its Related Parties.

Each Secured Party irrevocably authorizes and instructs the Administrative Agent to, and the Administrative Agent shall,

(a)        release any Lien on any property granted to or held by Administrative Agent under any Loan Document (i) upon the occurrence of the Termination Date, (ii) that is sold or to be sold or transferred as part of or in connection with any disposition permitted under the Loan Documents to a Person that is not a Loan Party, (iii) that does not constitute (or ceases to constitute) DIP Collateral, (iv) if the property subject to such Lien is owned by a Subsidiary Guarantor, upon the release of such Subsidiary Guarantor from its Loan Guaranty otherwise in accordance with the Loan Documents, (v) as required under clause (d) below or (vi) if approved, authorized or ratified in writing by the Required Lenders in accordance with Section 9.02;

103

(b)     subject to <u>Section 9.22</u>, release any Subsidiary Guarantor from its obligations under the Loan Guaranty if such Person ceases to be a Subsidiary;

(c)     subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is expressly permitted to be senior to the DIP Lien by <u>Sections 6.02</u> and the DIP Orders; and

(d)     enter into subordination, intercreditor and/or similar agreements with respect to Indebtedness that is (i) required or permitted to be subordinated hereunder and/or (ii) secured by Liens, and with respect to which Indebtedness, this Agreement contemplates an intercreditor, subordination or collateral trust agreement; <u>provided</u> that, for the avoidance of doubt, the Administrative Agent shall not be required to subordinate any Lien pursuant to this <u>clause (d)(ii)</u> other than to the extent contemplated by <u>clause (c)</u> of this paragraph.

Upon the request of the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under the Guarantee or its Lien on any DIP Collateral pursuant to this <u>Article 8</u>.  In each case as specified in this <u>Article 8</u>, the Administrative Agent will (and each Lender hereby authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of DIP Collateral from the assignment and security interest granted under the Loan Documents or to subordinate its interest therein, or to release such Loan Party from its obligations under the Loan Guaranty, in each case in accordance with the terms of the Loan Documents and this <u>Article 8</u>; <u>provided</u> that upon the request of the Administrative Agent, the Borrower shall deliver a certificate of a Responsible Officer certifying that the relevant transaction has been consummated in compliance with the terms of this Agreement.

The Administrative Agent is authorized to enter into any intercreditor, subordination, collateral trust or similar agreement contemplated hereby with respect to Indebtedness that is (i) required or permitted to be subordinated hereunder and/or (ii) secured by Liens and which Indebtedness contemplates an intercreditor, subordination or collateral trust agreement (any such other intercreditor agreement, an "**Additional Agreement**"), and the parties hereto acknowledge that any Additional Agreement is binding upon them.  Each Lender (a) hereby agrees that it will be bound by, and will not take any action contrary to the provisions of any Additional Agreement and (b) hereby authorizes and instructs the Administrative Agent to enter into any Additional Agreement and to subject the Liens on the DIP Collateral securing the Obligations to the provisions thereof.  The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrower, and the Secured Parties are intended third-party beneficiaries of such provisions and the provisions of any Additional Agreement.

To the extent that the Administrative Agent (or any Affiliate thereof) is not reimbursed and indemnified by the Borrower, the Lenders will reimburse and indemnify the Administrative Agent (and any Affiliate thereof) in proportion to their respective pro rata share of the outstanding Loans (determined as if there were no Defaulting Lenders) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any Affiliate thereof) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; <u>provided</u> that, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

(a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)    Such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b) In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

ARTICLE IX

MISCELLANEOUS

Section 9.01.    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email, as follows:

(i)    if to any Loan Party, to such Loan Party in the care of the Borrower at:

SHO Holding I Corporation
1400 Centrepark Boulevard, Suite 310
West Palm Beach, Florida 33401
Attention:   Alex Kramarchuk
Telephone: (561) 227-0765
Facsimile:   (866) 370-8590
Email:        alexk@showsforcrews.com

with copy to (which shall not constitute notice to any Loan Party):

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Attention: Leonard Klingbaum
Telephone:  (212) 596-9747
Email: leonard.klingbaum@ropesgray.com

(ii)    if to the Administrative Agent, at:

Antares Capital LP
500 West Monroe Street
Chicago, Illinois 60661
Attn: SHO Holding I Corporation Account Officer
Facsimile:  (855) 314-8952

with a copy to (which shall not constitute notice to the Administrative Agent):

Antares Capital LP
500 West Monroe Street
Chicago, Illinois 60661
Attention:   Senior Counsel
Facsimile:   (312) 441-6876

106

and

King & Spalding LLP
110 N Wacker Drive, Suite 3800
Chicago, Illinois 60606
Attention:   Matt Warren
Telephone:  (312) 764-6921
Email:        mwarren@kslaw.com

      (iii)     if to any Lender, to it at its address or facsimile number set forth in its Administrative Questionnaire.

All such notices and other communications (A) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof or three Business Days after dispatch if sent by certified or registered mail, in each case, delivered, sent or mailed (properly addressed) to the relevant party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01 or (B) sent by facsimile shall be deemed to have been given when sent and when receipt has been confirmed by telephone; provided that received notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notices or other communications shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in clause (b) below shall be effective as provided in such clause (b).

      (b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and Internet or Intranet websites) pursuant to procedures set forth herein or otherwise approved by the Administrative Agent.  The Administrative Agent or the Borrower (on behalf of any Loan Party) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures set forth herein or otherwise approved by it; provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or Intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

      (c)     Any party hereto may change its address or facsimile number or other notice information hereunder by notice to the other parties hereto.

      (d)     The Borrower hereby acknowledges that (A) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "**Borrower Materials**") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "**Platform**") and (B) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing

107

any material non-public information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Confidential Information, they shall be treated as set forth in Section 9.13); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; provided that, for purposes of the foregoing, all information and materials provided pursuant to Section 5.01(a) or (b) shall be deemed to be suitable for posting to Public Lenders.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "*Private Side Information*" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "*Public Side Information*" portion of the Platform and that may contain material nonpublic information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "*AS IS*" AND "*AS AVAILABLE*." NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR MATERIAL BREACH OF ANY LOAN DOCUMENT.

Section 9.02.    Waivers; Amendments.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same is permitted by paragraph (b) of this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, to the extent permitted by law, the making of a Loan or the issuance of any Letter of Credit shall not be construed as a waiver of any

Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)    Subject to clauses (A), (B), (C) and (D) of this Section 9.02(b) and Section 2.14(b), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) or (ii) in the case of any other Loan Document (other than any waiver, amendment or modification to effectuate any modification thereto expressly contemplated by the terms of such other Loan Documents), pursuant to an agreement or agreements in writing entered into by the Administrative Agent and each Loan Party that is party thereto, with the consent of the Required Lenders; provided that, notwithstanding the foregoing:

(A)    except with the consent of each Lender directly and adversely affected thereby (but without the consent of the Required Lenders), no such waiver, amendment or modification shall:

(1)    increase or extend the Commitment of such Lender; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall constitute an increase of any Commitment of such Lender;

(2)    reduce or forgive the principal amount of any Loan;

(3)    (x) extend the scheduled final maturity of any Loan or (y) postpone any Interest Payment Date or the date of any scheduled payment of any fee payable hereunder (in each case, other than any extension for administrative reasons agreed by the Administrative Agent);

(4)    reduce the rate of interest (other than to waive any Default or Event of Default or obligation of the Borrower to pay interest at the default rate of interest under Section 2.13(d), which shall only require the consent of the Required Lenders) or the amount of any fee owed to such Lender;

(5)    extend the expiry date of such Lender's Commitment; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall constitute an extension of any Commitment of any Lender; and

(6)    waive, amend or modify the provisions of Section 2.11(a), 2.11(b)(vi), 2.18(b) or 2.18(c) of this Agreement in a manner that would by its terms alter the *pro rata* sharing of payments required thereby) or as otherwise provided in this Section 9.02); and

(B)    no such waiver, amendment or modification shall:

109

(1)    change any of the provisions of Section 9.02(a) or Section 9.02(b) or the definition of "Required Lenders" to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the prior written consent of each Lender;

(2)    release all or substantially all of the DIP Collateral from the Lien granted pursuant to the Loan Documents (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Article 8 or Section 9.22 and except in connection with the Sale or the Prepetition First Lien Agents' or Administrative Agent's right to credit bid under the DIP Order and the Loan Documents), without the prior written consent of each Lender;

(3)    release all or substantially all of the value of the Guarantees under the Loan Guaranty (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Section 9.22 hereof), without the prior written consent of each Lender; or

(4)    any change in the superpriority status of the DIP Superpriority Claims hereunder or under the DIP Orders, without the prior consent of each Lender;

provided, further, that no agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent. The Administrative Agent may also amend the Commitment Schedule to reflect assignments entered into pursuant to Section 9.05, Commitment reductions or terminations pursuant to Section 2.09. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of any Defaulting Lender may not be increased without the consent of such Defaulting Lender (it being understood that any Commitment or Loan held or deemed held by any Defaulting Lender shall be excluded from any vote hereunder that requires the consent of any Lender, except as expressly provided in Section 2.21(b)). Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities permitted hereunder to this Agreement and to permit any extension of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the relevant benefits of this Agreement and the other Loan Documents and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion.

(c)    [Reserved]:

(d)    Notwithstanding anything to the contrary contained in this Section 9.02 or any other provision of this Agreement or any provision of any other Loan Document, (i) the Borrower and the Administrative Agent may, without the input or consent of any Lender, amend, supplement and/or waive any guaranty, collateral security agreement, pledge agreement and/or related document (if any) executed in connection with this Agreement to (x) comply with Requirements of Law or the advice of counsel or (y) cause any such guaranty, collateral security agreement, pledge agreement or other document to be consistent with this Agreement and/or the relevant other Loan Documents, (ii) the Borrower and the Administrative Agent may, without the input or consent of any other Lender (other than the relevant Lenders providing Loans under such Sections), to add terms (including representations and warranties,

conditions, prepayments, covenants or events of default), in connection with the addition of any Loan or Commitment hereunder, that are favorable to the then-existing Lenders, as reasonably determined by the Administrative Agent, and (iii) if the Administrative Agent and the Borrower have jointly identified any ambiguity, mistake, defect, inconsistency, obvious error or any error or omission of a technical nature or any necessary or desirable technical change, in each case, in any provision of any Loan Document, then the Administrative Agent and the Borrower shall be permitted to amend such provision solely to address such matter as reasonably determined by them acting jointly.

Section 9.03.    Expenses; Indemnity.

(a)    The Borrower shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and their respective Affiliates (including applicable syndication expenses and travel expenses and all reasonable and documented out-of-pocket fees, disbursements and its outside counsel, King & Spalding LLP, and one firm of local counsel engaged by the Administrative Agent in connection with the Debtors' Chapter 11 Cases) in connection with the syndication and distribution (including via the Internet or through a service such as SyndTrak) of the DIP Facilities, the DIP Orders, the preparation, execution, delivery and administration of the Loan Documents and any related documentation, including in connection with any amendment, modification or waiver of any provision of any Loan Document (whether or not the transactions contemplated thereby are consummated) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent  or the Lenders or any of their respective Affiliates and professional advisors of the foregoing in connection with the enforcement, collection, investigation or protection of their respective rights in connection with the DIP Facility, Loan Documents, the DIP Order and the transaction contemplated thereby, including their respective rights under this Section 9.03, or in connection with the Loans made hereunder.  Except to the extent required to be paid on the Closing Date, all amounts due under this paragraph (a) shall be payable by the Borrower within 10 days of receipt by the Debtors, the Committee and the U.S. Trustee (the "**Review Period**") of summary invoices thereof (the "**Invoiced Fees**") (subject in all respects to applicable privilege or work product doctrines), including a description of the services provided and the expenses incurred by the applicable professional arising before or after the Petition Date, as applicable. The Debtors, the Committee and the U.S. Trustee may preserve their right to dispute the payment of any portion of the Invoiced Fees (the "**Disputed Invoiced Fees**") if, within the Review Period, (i) the Debtors pay in full the Invoiced Fees, including the Disputed Invoices; and (ii) the Debtors, the Committee or the U.S. Trustee files with the Bankruptcy Court a motion or other pleading, on at least ten (10) calendar days prior written notice to the applicable parties of any hearing on such motion or other pleading, which must contain a specific basis for the objection to the Disputed Invoiced Fees and quantification of the undisputed amount of the fees and expenses invoiced. Failure to object with specificity or to quantify the undisputed amount of the invoice subject to such objection will constitute a waiver of any objection to such invoice. None of the Invoiced Fees shall be subject to Bankruptcy Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any payment on account thereof shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court. Payment of Invoiced Fees shall not be delayed based on any objections thereto, and the relevant professional shall only be required to disgorge amounts objected to upon being "so ordered" pursuant to a final non-appealable order of the Bankruptcy Court.

(b)    The Borrower shall indemnify each Arranger, the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages and liabilities incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby and/or the enforcement of the Loan Documents, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated

111

hereby or thereby, (ii) the use of the proceeds of the Loans, (iii) any actual or alleged Release or presence of Hazardous Materials on, at, under or from any property currently or formerly owned or operated by the Borrower, any of its Subsidiaries or any other Loan Party or any Environmental Liability related to the Borrower, any of its Subsidiaries or any other Loan Party and/or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower, any other Loan Party or any of their respective Affiliates); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that any such loss, claim, damage, or liability results solely from the gross negligence or willful misconduct by such Indemnitee, in each case, as determined by a final non-appealable judgment of a court of competent jurisdiction.  Each Indemnitee shall be obligated to refund or return any and all amounts paid by the Borrower pursuant to this Section 9.03(b) to such Indemnitee for any fees, expenses, or damages to the extent such Indemnitee is not entitled to payment thereof in accordance with the terms hereof.  All amounts due under this paragraph (b) shall be payable by the Borrower within 10 days (x) after written demand therefor, in the case of any indemnification obligations and (y) in the case of reimbursement of costs and expenses, after receipt of  summary invoices thereof  (subject in all respects to applicable privilege or work product doctrines )supporting the relevant reimbursement request. This Section 9.03(b) shall not apply to Taxes other than any Taxes that represent losses, claims, damages or liabilities in respect of a non-Tax claim.

(c)     The Borrower shall not be liable for any settlement of any proceeding effected without its consent (which consent shall not be unreasonably withheld, delayed or conditioned), but if any proceeding is settled with the Borrower's written consent, or if there is a final judgment against any Indemnitee in any such proceeding, the Borrower agrees to indemnify and hold harmless each Indemnitee to the extent and in the manner set forth above.  The Borrower shall not, without the prior written consent of the affected Indemnitee (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened claim, litigation, investigation or proceeding against any Indemnitee in respect of which indemnity could have been sought hereunder by such Indemnitee unless (i) such settlement includes an unconditional release of such Indemnitee from all liability or claims that are the subject matter of such proceeding and (ii) such settlement does not include any statement as to any admission of fault or culpability.

Section 9.04.    Waiver of Claim.  To the extent permitted by applicable law, no party to this Agreement shall assert, and each hereby waives, any claim against any other party hereto or any Related Party thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or any Letter of Credit or the use of the proceeds thereof, except, in the case of any claim by any Indemnitee against any of the Borrower, to the extent such damages would otherwise be subject to indemnification pursuant to the terms of Section 9.03.

Section 9.05.    Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that (i) except as provided under Section 6.07, the Debtors may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Debtors without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with the terms of this Section 9.05 (any attempted assignment or transfer not complying with the terms of this Section 9.05 shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties

hereto, their respective successors and permitted assigns, Participants (to the extent provided in paragraph (c) of this Section 9.05) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of any Loan) with the prior written consent (not to be unreasonably withheld or delayed) of:

(A)    [reserved];

(B)    the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for any assignment to another Lender, any Affiliate of a Lender or any Approved Fund; and

(C)    [reserved].

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of any assignment to another Lender, any Affiliate of any Lender or any Approved Fund or any assignment of the entire remaining amount of the relevant assigning Lender's Loans or commitments, the principal amount of Loans or commitments of the assigning Lender subject to the relevant assignment (determined as of the date on which the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and determined on an aggregate basis in the event of concurrent assignments to Related Funds or by Related Funds) shall not be less than $1,000,000 unless the Borrower and the Administrative Agent otherwise consent;

(B)    any partial assignment shall be made as an assignment of a proportionate part of all the relevant assigning Lender's rights and obligations in respect of any DIP Facility under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); and

(D)    the relevant Eligible Assignee, if it is not a Lender, shall deliver on or prior to the effective date of such assignment, to the Administrative Agent (1) an Administrative Questionnaire and (2) any IRS form required under Section 2.17.

(iii)    Subject to the acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section 9.05, from and after the effective date specified in any Assignment and Assumption, the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned pursuant to such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the

interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be (A) entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03 with respect to facts and circumstances occurring on or prior to the effective date of such assignment and (B) subject to its obligations thereunder and under Section 9.13).  If any assignment by any Lender holding any Promissory Note is made after the issuance of such Promissory Note, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender such Promissory Note to the Administrative Agent for cancellation, and, following such cancellation, if requested by either the assignee or the assigning Lender, the Borrower shall issue and deliver a new Promissory Note to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders and their respective successors and assigns, and the commitment of, and principal amount of and interest on the Loans and LC Disbursements owing to each Lender pursuant to the terms hereof from time to time (the "**Register**").  Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of such Loans and LC Disbursements.  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and each Lender (but only as to its own holdings), at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Eligible Assignee, the Eligible Assignee's completed Administrative Questionnaire and any tax certification required by Section 9.05(b)(ii)(D)(2) (unless the assignee is already a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.05, if applicable, and any written consent to the relevant assignment required by paragraph (b) of this Section 9.05, the Administrative Agent shall promptly accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)    By executing and delivering an Assignment and Assumption, the assigning Lender and the Eligible Assignee thereunder shall be deemed to confirm and agree with each other and the other parties hereto as follows:  (A) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that the amount of its commitments, and the outstanding balances of its Loans, in each case without giving effect to any assignment thereof which has not become effective, are as set forth in such Assignment and Assumption, (B) except as set forth in clause (A) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statement, warranty or representation made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower or any Subsidiary or the performance or observance by the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan

Document or any other instrument or document furnished pursuant hereto; (C) such assignee represents and warrants that it is an Eligible Assignee, legally authorized to enter into such Assignment and Assumption; (D) such assignee confirms that it has received a copy of this Agreement and the Intercreditor Agreement, together with copies of the financial statements referred to in Section 4.01(c) or the most recent financial statements delivered pursuant to Section 5.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (E) such assignee will independently and without reliance upon the Administrative Agent, the assigning Lender or any other Lender and based on such documents and information as it deems appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (F) such assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent, by the terms hereof, together with such powers as are reasonably incidental thereto; and (G) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(c)       (i) Any Lender may, without the consent of the Borrower, the Administrative Agent or any other Lender, sell participations to any bank or other entity (other than to any Disqualified Institution, any natural Person or the Borrower or any of its Affiliates) (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which any Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the relevant Participant, agree to any amendment, modification or waiver described in (x) clause (A) of the first proviso to Section 9.02(b) that directly and adversely affects the Loans or commitments in which such Participant has an interest and (y) clause (B)(1), (2) or (3) of the first proviso to Section 9.02(b). Subject to paragraph (c)(ii) of this Section 9.05, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.05 (it being understood that the documentation required under Section 2.17(f) shall be delivered to the participating Lender, and if additional amounts are required to be paid pursuant to Section 2.17(a) or Section 2.17(c), to the Borrower and the Administrative Agent upon reasonable written request by the Borrower). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.09 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.

(ii)       No Participant shall be entitled to receive any greater payment under Section 2.15, 2.16 or 2.17 than the participating Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent expressly acknowledging that such Participant's entitlement to benefits under Sections 2.15, 2.16 and 2.17 is not limited to what the participating Lender would have been entitled to receive absent the participation.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and their respective successors and assigns, and the principal amounts and stated interest of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"). The

115

entries in the Participant Register shall be conclusive absent manifest error, and each Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (other than to any Disqualified Institution or any natural person) to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to any Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section 9.05 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release any Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPC**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of any Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 2.15, 2.16 or 2.17) and no SPC shall be entitled to any greater amount under Section 2.13, 2.14 or 2.15 or any other provision of this Agreement or any other Loan Document than that the Granting Lender would have been entitled to receive, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender) and (iii) the Granting Lender shall for all purposes including approval of any amendment, waiver or other modification of any provision of the Loan Documents, remain the Lender of record hereunder.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the U.S. or any State thereof; provided that (i) such SPC's Granting Lender is in compliance in all material respects with its obligations to the Borrower hereunder and (ii) each Lender designating any SPC hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such SPC during such period of forbearance. In addition, notwithstanding anything to the contrary contained in this Section 9.05, any SPC may (i) with notice to, but without the prior written consent of, the Borrower or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guaranty or credit or liquidity enhancement to such SPC.

(f)    (i) Upon the request of any Lender, the Borrower shall make available to such Lender the list of Disqualified Institutions at the relevant time and such Lender may provide the list to any potential assignee or participant on a confidential basis in accordance with Section 9.13 for the purpose of verifying whether such Person is a Disqualified Institution.

116

(ii)      Without limiting the foregoing, the Administrative Agent, in its capacity as such, shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Institutions (other than with respect to updating the list with names of Disqualified Institutions provided in writing to the Administrative Agent in accordance with the definition of "Disqualified Institution" or providing the list (with such updates) upon request in accordance with this Section 9.05). Without limiting the generality of the foregoing, the Administrative Agent, in its capacity as such, shall not (i) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (ii) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

(g)      (i) If any assignment or participation under this Section 9.05 is made to any Disqualified Institution or to any Person that cannot be reasonably identified as a Disqualified Institution pursuant to clause (a)(ii) or (c)(ii) of the definition thereof as of the date of such assignment or participation and subsequently becomes reasonably identifiable as a Disqualified Institution, then (A) the Borrower may, at the Borrower's sole expense and effort, upon notice to the applicable Disqualified Institution and the Administrative Agent, require such Disqualified Institution to assign, without recourse (in accordance with and subject to the restrictions contained in this Section 9.05), all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; provided that the relevant assignment shall otherwise comply with this Section 9.05 (except that no registration and processing fee required under this Section 9.05 shall be required with respect to any assignment pursuant to this paragraph); and (B) the Loans and Commitments held by such Disqualified Institution shall be deemed not to be outstanding for purposes of any amendment, waiver or consent hereunder, and such Disqualified Institution shall not be permitted to attend meetings of the Lenders or receive information prepared by the Administrative Agent or any Lender in connection with this Agreement.  Nothing in this Section 9.05(g) shall be deemed to prejudice any right or remedy that Holdings or the Borrower may otherwise have at law or equity.  Each Lender acknowledges and agrees that Holdings and its subsidiaries will suffer irreparable harm if such Lender breaches any obligation under this Section 9.05 insofar as such obligation relates to any assignment, participation or pledge to any Disqualified Institution without the Borrower's prior written consent and, therefore, each Lender agrees that Holdings and/or the Borrower may seek to obtain specific performance or other equitable or injunctive relief to enforce this Section 9.05(g) against such Lender with respect to such breach without posting a bond or presenting evidence of irreparable harm.

Section 9.06.    Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letter of Credit regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Termination Date. The provisions of Sections 2.15, 2.16, 2.17, 9.03 and 9.13 and Article 8 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of Credit and Commitments, the occurrence of the Termination Date or the termination of this Agreement or any provision hereof but in each case, subject to the limitations set forth in this Agreement.

Section 9.07.    Counterparts; Integration; Effectiveness.    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This

117

Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire agreement among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it has been executed by Holdings, the Borrower and the Administrative Agent and when the Administrative Agent has received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.08.    <u>Severability</u>.  To the extent permitted by law, any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.09.    <u>Right of Setoff</u>.  .  At any time when an Event of Default exists, upon the written consent of the Administrative Agent, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (in any currency) at any time owing by the Administrative Agent, such Lender or Affiliate (including by branches and agencies of the Administrative Agent or such Lender, wherever located) to or for the credit or the account of the Borrower or any Loan Party against any of and all the Obligations held by the Administrative Agent or such Lender or Affiliate, irrespective of whether or not the Administrative Agent or such Lender or Affiliate shall have made any demand under the Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch or office of such Lender different than the branch or office holding such deposit or obligation on such Indebtedness.  Any applicable Lender or Affiliate shall promptly notify the Borrower and the Administrative Agent of such set-off or application; <u>provided</u> that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this <u>Section 9.09</u>.  The rights of each Lender, the Administrative Agent and each Affiliate under this <u>Section 9.09</u> are in addition to other rights and remedies (including other rights of setoff) which such Lender, the Administrative Agent or such Affiliate may have.

Section 9.10.    <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN THE OTHER LOAN DOCUMENTS), WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction (subject to the last sentence of this <u>clause (b)</u>) of the United States Bankruptcy Court for the District of Delaware, and if the United States Bankruptcy Court for the District of Delaware does not have or abstains from exercising jurisdiction, any U.S. Federal or New York State court sitting in the Borough of Manhattan, in the City of New York (or any appellate court therefrom) (except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing) over any suit, action or proceeding arising out of or relating to any Loan Documents

and agrees that all claims in respect of any such action or proceeding shall (except as permitted below) be heard and determined in the United States Bankruptcy Court for the District of Delaware or such New York State or, to the extent permitted by law, federal court. Each party hereto agrees that service of any process, summons, notice or document by registered mail addressed to such person shall be effective service of process against such Person for any suit, action or proceeding brought in any such court. Each party hereto agrees that a final judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each party hereto agrees that the administrative agent and the secured parties retain the right to bring proceedings against any loan party in the courts of any other jurisdiction solely in connection with the exercise of any rights under any collateral document.

(c)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section 9.10. Each party hereto hereby irrevocably waives, to the fullest extent permitted by law, any claim or defense of an inconvenient forum to the maintenance of such action, suit or proceeding in any such court.

(d)    To the extent permitted by law, each party hereto hereby irrevocably waives personal service of any and all process upon it and agrees that all such service of process may be made by registered mail (or any substantially similar form of mail) directed to it at its address for notices as provided for in Section 9.01. each Party hereto hereby waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any loan document that service of process was invalid and ineffective. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.11.    Waiver of Jury Trial.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

Section 9.12.    Headings.    Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.13.    Confidentiality.    Each of the Administrative Agent, each Lender, and each Arranger agrees (and each Lender agrees to cause its SPC, if any) to maintain the confidentiality of the Confidential Information (as defined below), except that Confidential Information may be disclosed (a) to its and its Affiliates' directors, officers, managers, employees, independent auditors, or other experts and advisors, including accountants, legal counsel and other advisors (collectively, the "**Representatives**") on a "need to know" basis solely in connection with the transactions contemplated hereby and who are informed of the confidential nature of the Confidential Information and are or have been advised of their obligation to keep the Confidential Information of this type confidential; provided that such Person shall

119

be responsible for its Affiliates' and their Representatives' compliance with this paragraph; provided, further, that unless the Borrower otherwise consents, no such disclosure shall be made by the Administrative Agent, any Arranger, any Lender or any Affiliate or Representative thereof to any Affiliate or Representative of the Administrative Agent, any Arranger, or any Lender that is a Disqualified Institution, (b) upon the demand or request of any regulatory or Governmental Authority (including any self-regulatory body or any Federal Reserve Bank or other central bank acting as pledgee pursuant to Section 9.05) purporting to have jurisdiction over such Person or its Affiliates (in which case such Person shall, except with respect to any audit or examination conducted by bank accountants or any Governmental Authority or regulatory or self-regulatory authority exercising examination or regulatory authority, to the extent practicable and permitted by law, (i) inform the Borrower promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any information so disclosed is accorded confidential treatment), (c) to the extent compelled by legal process in, or reasonably necessary to, the defense of such legal, judicial or administrative proceeding, in any legal, judicial or administrative proceeding or otherwise as required by applicable Requirements of Law (in which case such Person shall (i) to the extent practicable and permitted by law, inform the Borrower promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (d) to any other party to this Agreement, (e) subject to an acknowledgment and agreement by the relevant recipient that the Confidential Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as otherwise reasonably acceptable to the Borrower and the Administrative Agent) in accordance with the standard syndication process of the Administrative Agent or market standards for dissemination of the relevant type of information, which shall in any event require "click through" or other affirmative action on the part of the recipient to access the Confidential Information and acknowledge its confidentiality obligations in respect thereof, to (i) any Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or prospective Participant in, any of its rights or obligations under this Agreement, including any SPC (in each case other than a Disqualified Institution), (ii) any pledgee referred to in Section 9.05, (iii) [reserved] and (iv) subject to the Borrower's prior approval of the information to be disclosed (not to be unreasonably withheld or delayed), to Moody's or S&P on a confidential basis in connection with obtaining or maintaining ratings, (f) with the prior written consent of the Borrower, (g) to the extent the Confidential Information becomes publicly available other than as a result of a breach of this Section 9.13 by such Person, its Affiliates or their respective Representatives and (h) to insurers, any numbering administration or settlement services providers on a "need to know" basis solely in connection with the transactions contemplated hereby and who are informed of the confidential nature of the Confidential Information and are or have been advised of their obligation to keep the Confidential Information of this type confidential; provided that any disclosure made in reliance on this clause (h) is limited to the general terms of this Credit Agreement and does not include financial or other information relating to Holdings, the Borrower and/or any of their respective subsidiaries. For purposes of this Section 9.13, "**Confidential Information**" means all information relating to the Borrower and/or any of its subsidiaries and their respective businesses, the Sponsor or the Transactions (including any information obtained by the Administrative Agent, any Lender or any Arranger, or any of their respective Affiliates or Representatives, based on a review of the books and records relating to the Borrower and/or any of its subsidiaries and their respective Affiliates from time to time, including prior to the date hereof) other than any such information that is publicly available to the Administrative Agent or any Arranger, or Lender on a non-confidential basis prior to disclosure by the Borrower or any of its subsidiaries. For the avoidance of doubt, in no event shall any disclosure of any Confidential Information be made to Person that is a Disqualified Institution at the time of disclosure.

Section 9.14.    No Fiduciary Duty. Each of the Administrative Agent, each Lender, and their respective Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their respective affiliates. Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender,

on the one hand, and such Loan Party, its respective stockholders or its respective affiliates, on the other. Each Loan Party acknowledges and agrees that:  (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its respective stockholders or its respective affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its respective stockholders or its respective Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of such Loan Party, its respective management, stockholders, creditors or any other Person.  Each Loan Party acknowledges and agrees that such Loan Party has consulted its own legal, tax and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.

Section 9.15.    Several Obligations.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan, issue any Letter of Credit or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.

Section 9.16.    USA PATRIOT Act.  Each Lender that is subject to the requirements of the USA PATRIOT Act and the requirements of the Beneficial Ownership Regulation hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 9.17.    Disclosure.  Each Loan Party and each Lender hereby acknowledges and agrees that the Administrative Agent and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

Section 9.18.    Appointment for Perfection.  Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens for the benefit of the Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession.  If any Lender (other than the Administrative Agent) obtains possession of any DIP Collateral, such Lender shall notify the Administrative Agent thereof; and, promptly upon the Administrative Agent's request therefor shall deliver such DIP Collateral to the Administrative Agent or otherwise deal with such DIP Collateral in accordance with the Administrative Agent's instructions.

Section 9.19.    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan or Letter of Credit, together with all fees, charges and other amounts which are treated as interest on such Loan or Letter of Credit under applicable law (collectively the "**Charged Amounts**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or Letter of Credit in accordance with applicable law, the rate of interest payable in respect of such Loan or Letter of Credit hereunder, together with all Charged Amounts payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charged Amounts that would have been payable in respect of such Loan or Letter of Credit but were not payable as a result of the operation of this Section 9.19 shall be cumulated and the interest and Charged Amounts payable to such Lender in respect

121

of other Loans or Letters of Credit or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 9.20.    [Reserved].

Section 9.21.    Conflicts.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, in the event of any conflict or inconsistency between this Agreement and any other Loan Document,  the terms of this Agreement shall govern and control. In the event of any inconsistency between the terms and conditions of the Loan Documents, the Interim DIP Order or any Final DIP Order, the provisions of the Interim DIP Order or Final DIP Order, as the case may be, shall govern and control.

Section 9.22.    Release of Guarantors.  Notwithstanding anything in Section 9.02(b) to the contrary, any Subsidiary Guarantor shall automatically be released from its obligations hereunder (and its Loan Guaranty shall be automatically released) (a) upon the consummation of any permitted transaction or series of related transactions if as a result thereof such Subsidiary Guarantor ceases to be a Subsidiary and/or (b) upon the occurrence of the Termination Date.  In connection with any such release, the Administrative Agent shall promptly execute and deliver to the relevant Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence termination or release; provided, that upon the request of the Administrative Agent, the Borrower shall deliver a certificate of a Responsible Officer certifying that the relevant transaction has been consummated in compliance with the terms of this Agreement. Any execution and delivery of documents pursuant to the preceding sentence of this Section 9.22 shall be without recourse to or warranty by the Administrative Agent (other than as to the Administrative Agent's authority to execute and deliver such documents)

Section 9.23.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[SIGNATURE PAGES FOLLOW]

122

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

NEVER SLIP HOLDINGS, INC. as Holdings

By: _____
    Name:
    Title:

SHO HOLDING I CORPORATION, as the Borrower

By: _____
    Name:
    Title:

ANTARES CAPITAL LP, individually, as Administrative Agent and as a Lender

By: _____
    Name:
    Title:

## **EXHIBIT 3**

**Sale Milestones**

1) No later than five (5) calendar days after the Petition Date, the Debtors shall file and properly serve a motion, in form and substance reasonably satisfactory to the DIP Agent and the Requisite DIP Lenders (as defined in the DIP Credit Agreement) (the "Bidding Procedures Motion"), seeking this Court's approval of bidding procedures acceptable for the sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  The terms of such sale shall be acceptable to the DIP Agent and the Requisite DIP Lenders in their sole discretion.

2) Within thirty-five (35) calendar days after the Petition Date, this Court shall have entered a sales procedures order (the "Bidding Procedures Order") approving the bidding procedures contained in the Bidding Procedures Motion, which Bidding Procedures Order shall be in form and substance reasonably satisfactory to the DIP Agent and the Requisite DIP Lenders in their sole discretion.

3) Within forty-five (45) calendar days after the Petition Date, the Debtors shall have conducted an auction, if necessary, with respect to the Sale which shall have been completed in accordance with the Bidding Procedures Order.

4) Within fifty (50) calendar days after the Petition Date, this Court shall have entered one or more final orders (the "Sale Approval Order") approving the Sale(s), which Sale Approval Order shall be in form and substance acceptable to the DIP Agent and the Requisite DIP Lenders in their sole discretion.

5) The Sale shall close no later than twenty-five (25) calendar days after entry of the Sale Approval Order; provided that the Challenge Period will have expired.