**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Never Slip Holdings, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10663 (LSS)<br><br>(Jointly Administered)<br><br>**Hearing Date:  April 25, 2024 at 11:00 a.m. (ET) (REQUESTED)**<br><br>**Objection Deadline: April 23, 2024 at 10:00 a.m. (ET) (REQUESTED)** |

**DEBTORS' MOTION PURSUANT TO SECTIONS 105, 363
AND 365 OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER
(I)(A) APPROVING THE BIDDING PROCEDURES, INCLUDING THE DEBTORS'
ENTRY INTO THE STALKING HORSE APA,THE SALE TIMELINE, AND THE
FORM AND MANNER OF NOTICE THEREOF, AND (B) APPROVING THE
DEADLINE FOR PARTIES IN INTEREST TO PROVIDE NOTICE OF THEIR
INTENTION TO USE THE CHALLENGE PERIOD TO INVESTIGATE THE LIENS
AND CLAIMS OF THE PREPETITION FIRST LIEN SECURED LENDERS SEEKING
TO CREDIT BID AT THE AUCTION; (II) APPROVING THE DEBTORS' (A) SALE OF
ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF
ALL LIENS OTHER THAN ASSUMED LIABILITIES AND (B) ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES TO THE SUCCESSFUL BIDDER; AND (III) GRANTING RELATED RELIEF**

Never Slip Holdings, Inc. and its affiliated debtors and debtors in possession (each, a

"Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases, by and through

their undersigned proposed counsel, hereby submit this motion (this "Motion")[2] for entry of orders

granting the relief described below.  In support hereof, the Debtors represent as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Bidding Procedures Order or the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363*

## BACKGROUND

1.      As set forth in the *Declaration of Christopher Sim, Chief Financial Officer, of Never Slip Holdings, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions*, the Debtors filed these chapter 11 cases to effectuate a sale (the "Sale") of all or substantially all of their assets (the "Assets") to maximize value for all stakeholders.  Through this Motion, the Debtors seek the Court's approval of bidding procedures pursuant to which they will seek bids for the Sale of all or substantially all of the Assets.

2.      A thorough yet expedited bidding process and consummation of the Sale are vitally important to the Debtors' efforts to maximize value by selling the Assets.  The expeditious timeline set forth in the Bidding Procedures, attached as Exhibit 1 (the "Bidding Procedures") to the Bidding Procedures Order (as defined below) is reasonable under the circumstances of these chapter 11 cases and is necessary to meet the DIP milestone for closing of the Sale.

3.      The Bidding Procedures and the related relief requested in this Motion are in the best interests of the Debtors' estates and their stakeholders. Accordingly, the Debtors request that this Court grant this Motion.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),

---

*and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 66] (the "Interim DIP Order" and the final order, the "Final DIP Order" and together, the "DIP Orders").

the Debtors confirm their consent to the entry of a final order by the Court in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot

enter final orders or judgments in connection herewith consistent with Article III of the United

States Constitution.

5.       This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter

11 cases and this Motion is proper in this district under 28 U.S.C. §§ 1408 and 1409.

6.       The statutory bases for the relief requested herein are sections 105, 363, and 365 of

title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rules 2002, 6004 and

6006 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Rules

2002-1 and 6004-1.

## RELIEF REQUESTED

7.       The Debtors seek entry of an order approving, among other things, the Bidding

Procedures, in substantially the form attached hereto as **Exhibit A** (the "Bidding Procedures

Order"), which:

(a)       authorizes and approves the Bidding Procedures;

(b)       authorizes the Debtors to enter into the Stalking Horse APA, attached hereto as **Exhibit B**;

(c)       approves the form and manner of notice of the proposed Sale of Assets, the Challenge Period Notice and Challenge Period Notice Deadline (each as defined herein), the Stalking Horse APA, the Bidding Procedures, the Auction, and the Sale Hearing, attached to the Bidding Procedures Order as Exhibit 2 (the "Sale Notice"), and the notice of Successful Bidder, attached to the Bidding Procedures Order as Exhibit 3;

(d)       approves procedures for the assumption and assignment of the Purchased Contracts (as defined in the Bidding Procedures Order) in connection with any sale, and approves the form and manner of the notice thereof, attached as Exhibit 4 to the Bidding Procedures Order (the "Cure Notice");

(e)       schedules certain dates with respect thereto; and

(f)     grants related relief.

8.     The Debtors will seek entry of a sale order (the "Sale Order") at the Sale Hearing (as defined below), which the Debtors will file in advance of the Sale Hearing.  The proposed Sale Order will, among other things:

> (a)     authorize and approve the Sale to the Stalking Horse Purchaser (as defined below) or otherwise Successful Bidder, on the terms substantially set forth in the Successful Bid;
>
> (b)     authorize and approve the Sale of the Assets free and clear of any claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, statutory or deemed trust, and deed of trust or other encumbrance to the extent set forth in the asset purchase agreement with the Successful Bidder, attached to the Sale Order, which may be the Stalking Horse APA;
>
> (b)     authorize and approve the assumption and assignment of the Purchased Contracts to the Successful Bidder; and
>
> (c)     grant related relief.

9.     The Debtors will file declarations or other evidence in support of the Sale in advance of the sale hearing (the "Sale Hearing") to approve the Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA).

## THE PROPOSED SALE

**I.     The Prepetition Marketing Process.**

10.     In June 2022, the Debtors engaged Solomon Partners Securities, LLC ("Solomon") to serve as their investment banker to begin exploring strategic alternatives to address upcoming debt maturities.  Upon its retention, Solomon immediately began conducting due diligence with respect to the Assets and the Debtors' operations.  Subsequent to its initial assessment of alternatives and timing of a marketing process, Solomon began marketing preparations, including

determining market interest in (a) a potential sale of the Debtors' business or (b) a new debt financing deal that would be coupled with a restructuring of existing debt claims.

11.     In mid-October 2023, Solomon began contacting potential bidders regarding the sale of the Debtors' business, providing a teaser to 49 potential bidders and holding introductory calls with a majority of those 49.  Of those parties, 36 potential bidders executed non-disclosure agreements, after which Solomon held numerous follow-up diligence calls for such parties' benefit.  In November 2023, Solomon disseminated a confidential information memorandum ("CIM") regarding the Debtors' operations and continued to field information requests from potential bidders.  Solomon requested that potential bidders submit initial indications of interest ("IOI") by December 6, 2023, and received 11 such IOIs.  The 11 potential bidders that submitted IOIs were invited to the next round and received access to a virtual data room, management presentations, and other, more comprehensive diligence information.  As part of the next round, these potential bidders were invited to submit letters of intent ("LOI") by January 17, 2024.  Solomon received 6 such LOIs.

12.     As for its marketing efforts with respect to potential new financing to refinance the Debtors' existing debt obligations, Solomon reached out to 18 potential financing parties during the third fiscal quarter of 2023.  Solomon held one-on-one calls with several potential financing parties that had submitted initial indications of interest. None of these initial indications, however, were for an amount sufficient to facilitate a refinancing of even the Debtors' Prepetition First Lien Obligations.

13.     Subsequent to completing the Sale marketing process, the Prepetition First Lien Lenders were unwilling to proceed with any of the Sale proposals as none of the proposals met the $290 million threshold required by the Prepetition First Lien Lenders to release their liens on the

Assets.  As a result, the Debtors continued discussions with the Prepetition First Lien Lenders, through the Prepetition First Lien Agent, to serve as a stalking horse bidder (the "Stalking Horse Purchaser").  During these discussions and through the petition date, Solomon continued its efforts to solicit offers for the Debtors' Assets, and the Prepetition First Lien Lenders remained willing to consider bids.  The Debtors commenced these chapter 11 cases to conduct a market check as to whether the Stalking Horse APA constitutes the highest and otherwise best bid for the Debtors' business and to conclude the sale process.

**II.      The Proposed Schedule.**

14.      Pursuant to the Bidding Procedures, the Debtors will solicit the highest or otherwise best proposals according to the following proposed schedule, subject to Court approval and availability (the "Sale Timeline"):

| **Date** | **Event or Deadline** |
|---|---|
| April 30, 2024, or as soon as reasonably practicable thereafter | Deadline to serve Sale Notice on the Notice Parties, including notice of the Challenge Period Notice Deadline |
| May 17, 2024 | Deadline for Prospective Bidders to Submit Qualifying Bids |
| May 20, 2024 | Challenge Period Notice Deadline |
| May 21, 2024 | Auction Date |
| May 23, 2024, or as soon thereafter as the Court is available | Hearing to Consider the Sale Order |
| No later than May 31, 2024 | Entry of the Sale Order |
| No later than June 17, 2024 | Consummation of the Sale |

15.      The Debtors believe that this timeline balances a thorough marketing process to maximize value with the need to proceed expeditiously, as required under the Debtors' postpetition financing.  In addition to the Debtors' marketing efforts thus far, the Debtors will utilize the time prior to, and after, entry of the Bidding Procedures Order to actively market the Assets to expedite

the solicitation of bids for the Debtors' Assets in advance of the bid deadline (the "Bid Deadline"). In light of the foregoing, the Debtors have determined that the proposed schedule is in the best interests of the Debtors' estates, will assist in establishing whether and to what extent a market exists for the Assets, and provides interested parties with sufficient opportunity to participate in any sale transaction(s) and ultimately, will result in the highest and best bid for the underlying Assets under the circumstances.

### III.    The Bidding Procedures.

16.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures.[3]  The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Debtors' assets, consistent with the Debtors' goal of implementing a cost-effective Sale.

17.    The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence to submit binding bids in advance of the Sale Hearing. Indeed, the Debtors' investment banker, Solomon, commenced a marketing and sale process over six months ago to inform the Debtors and their secured lenders of a market view of the value of the Debtors' assets and business. The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward, effectuate an expeditious sale process with minimal disruption, and create a path towards entry of the Sale Order that will secure the highest or otherwise best value for the business and the Debtors' stakeholders. The proposed Bidding Procedures are in the best interests of all stakeholders and should be approved.

---

[3]    This summary is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order. All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures or the DIP Orders, as applicable. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

18.     The Debtors also request authority, as set forth in the Bidding Procedures Order, to enter into the Stalking Horse APA with the Stalking Horse Purchaser.  The Stalking Horse APA will provide the Debtors with the ability to maximize the value of the Assets by setting a floor for potential bidders and encouraging potential bidders to put forth their best bid.  As noted above, although the Prepetition First Lien Lenders are the Stalking Horse Purchaser, the Debtors understand that the Prepetition First Lien Lenders are willing to release their liens if a higher or otherwise better bid is received. Therefore, given the Debtors' need to maximize value for creditors and other stakeholders through a timely and efficient marketing process, the Debtors' entry into the Stalking Horse APA is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

19.     Pursuant to Local Rule 6004-1(c)(i),  the chart below sets forth the salient points of the proposed Bidding Procedures:

| Requirement | Description |
|---|---|
| **Stalking Horse Purchaser** | On April 8, 2024, the Debtors entered into the Stalking Horse APA with the Stalking Horse Purchaser.  As set forth more fully in the Stalking Horse APA, the Stalking Horse Purchaser is (i) credit bidding no less than $290 million on account of the DIP Obligations and the Prepetition First Lien Obligations, (ii) assuming certain liabilities and executory contracts and unexpired leases of the Debtors, and (iii) satisfying cure costs, subject to the cure cost cap (collectively (i), (ii) and (iii), the "<u>Purchase Price</u>").  The Stalking Horse APA also includes various customary representations, warranties, and covenants by and from the Debtors and the Stalking Horse Purchaser, and certain conditions to closing and rights of termination related to the Sale and the Chapter 11 Cases generally. <br><br> The Stalking Horse Purchaser is deemed to be a Qualifying Bidder and the Stalking Horse APA is deemed to be a Qualifying Bid.  Subject to the DIP Orders, the Stalking Horse Purchaser is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit (as defined below) with the Debtors.  The Stalking Horse Purchaser shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition First |

| Requirement | Description |
|---|---|
| | Lien Obligations and the DIP Obligations. |
| **Assets to be Sold** | The Debtors shall offer for sale the Assets, *provided* that the Debtors, in consultation with the Consultation Parties, determine that the aggregate consideration offered by any bid, or combination of bids, for the Assets, satisfies the requirements set forth in these Bidding Procedures.  Potential Bidders may bid on all or any number or combination of the Assets. |
| **Participation Requirements: Qualified Bidders** | Any person or entity that wishes to conduct diligence about the Debtors (an "Interested Party") may request access to the Debtors' confidential electronic data room concerning the Assets (the "Data Room").  To become an Interested Party, and thus be able to conduct due diligence, an Interested Party must execute a non-disclosure agreement, in form and substance satisfactory to the Debtors, with the Debtors.<br><br>Any Interested Party that wishes to participate in the bidding process for the Assets other than in the case of the Stalking Horse Purchaser (each, a "Potential Bidder") must first become a "Qualifying Bidder." To become a Qualifying Bidder, a Potential Bidder must submit to the Debtors and their advisors:<br><br>    (a)    documentation identifying the Interested Party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;<br><br>    (b)    an executed confidentiality agreement in form and substance satisfactory to the Debtors;<br><br>    (c)    a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties, that the Interested Party has a *bona fide* interest in consummating a sale transaction; and<br><br>    (d)    sufficient information, as determined by the Debtors, after consultation with the Consultation Parties, to allow the Debtors to determine that the Interested Party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations |

| Requirement | Description |
|---|---|
| | to close a sale transaction, including, but not limited to, current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale. |
| | Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate its contemplated transaction. |
| | Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser; and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets. |
| **Bankruptcy Court Jurisdiction** | Any Potential Bidders and Qualifying Bidders shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of such parties; (b) bring any such action or proceeding in the Court; and (c) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law. |
| **Form of Agreement** | Potential Bidders should reference the Stalking Horse APA in connection with their bids.  As set forth below, Potential Bidders intending to submit bids must include with their bids: |

| Requirement | Description |
|---|---|
| | (a)     a statement that such Potential Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse APA, if applicable; and<br><br>(b)     a clean and duly executed asset purchase agreement (an "Alternative APA") and a marked copy of the Alternative APA that reflects any variations from the Stalking Horse APA. |
| **Due Diligence** | The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: (a) proposed investment banker for the Debtors, Solomon Partners Securities, LLC, attn: Jeff Derman (212-508-1625; jeff.derman@solomonpartners.com), Tero Jänne (212-508-1676; tero.janne@solomonpartners.com), and Dan Golynskiy (646-378-4068; daniel.golynskiy@solomonpartners.com); or (b) proposed counsel for the Debtors, Gregg M. Galardi, Esq. (212-596-9139; gregg.galardi@ropesgray.com); Cristine Pirro Schwarzman, Esq. (212-596-9635; cristine.schwarzman@ropesgray.com); Conor P. McNamara, Esq. (312-845-1227; conor.mcnamara@ropesgray.com); and Ellen Wheeler, Esq. (212-841-5783; ellen.wheeler@ropesgray.com).<br><br>The due diligence period shall extend through and including the Bid Deadline. The Debtors, in their business judgment, may, but shall not be obligated to, furnish any due diligence information after the Bid Deadline.<br><br>The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders *provided* that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors. The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, |

| Requirement | Description |
|---|---|
| | any Qualifying Bidders in connection with the Bidding Procedures and the Sale. |
| **Qualified Bids & Bid Requirements** | Other than in the case of the Stalking Horse Purchaser and the Stalking Horse APA, which shall be considered a Qualifying Bidder and a Qualifying Bid, respectively, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser, to be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"): |
| |     (a)    be in writing; |
| |     (b)    fully disclose the identity of the Qualifying Bidder (and to the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the identity of the Qualifying Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder; |
| |     (c)    set forth the purchase price to be paid by such Qualifying Bidder; |
| |     (d)    identify separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids in accordance with section 363(k) of the Bankruptcy Code and assumed liabilities; |
| |     (e)    state the liabilities proposed to be paid or assumed by such Qualifying Bidder; |
| |     (f)    specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estate than, the terms set forth in the Stalking Horse APA; |

| **Requirement** | **Description** |
|---|---|
| | (g)  be accompanied by an alternative asset purchase agreement (an "<u>Alternative APA</u>") and an alternative Sale Order that reflects any variations from the Stalking Horse APA or the Sale Order, as applicable; |
| | (h)  state that such Qualifying Bidder's offer is formal, binding and unconditional, and is irrevocable until two (2) business days after the closing of the Sale; |
| | (i)  to the extent that a bid is not accompanied by evidence of the Qualifying Bidder's capacity to consummate the Sale set forth in its bid with cash on hand, each bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Qualifying Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualifying Bidder's purchase price and other obligations under its bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties; |
| | (j)  contain such financial and other information to allow the Debtors to make a reasonable determination, after consultation with the Consultation Parties, as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Alternative APA, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases potentially being assumed and |

| **Requirement** | **Description** |
|---|---|
| | assigned in connection with the Sale within one (1) business day after the Debtors' receipt of such information.  To the extent that the Qualifying Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor; |
| | (k)  identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative APA; |
| | (l)  include a commitment to close the transactions contemplated by the Alternative APA by no later than 75 days after the petition date; |
| | (m)  not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment; |
| | (n)  the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the Purchase Price (offered under the Stalking Horse APA) and (B) $1,000,000; |
| | (o)  not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence; |
| | (p)  contain written evidence satisfactory to the Debtors that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Alternative APA, with appropriate contact information for such financing sources; |
| | (q)  contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, |

| **Requirement** | **Description** |
|---|---|

|  | representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale; |

(r)  set forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (ii) any regulatory and third-party approvals required for the Qualifying Bidder to close the transactions contemplated by the Alternative APA, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Alternative APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); *provided* that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Alternative APA; *provided, further* that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

(s)  provide for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Successful Bid, in accordance with the terms of the Alternative APA;

(t)  include written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the

| Requirement | Description |
|---|---|
| | submission, execution, and delivery of the Alternative APA; |
| | (u)    provide a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the aggregate purchase price provided for in the Alternative APA (or such additional amount as may be determined by the Debtors in their reasonable discretion); |
| | (v)    state or otherwise estimate the types of, and costs or charges for, transition services, if any, the Potential Bidder would require of or provide to the Debtors, including an estimate of the time any such transition services would be required of or provided to the Debtor; and |
| | (w)    provide that in the event of the Qualifying Bidder's breach of, or failure to perform under, the Alternative APA, the Debtors and their estate shall be entitled to pursue all available legal and equitable remedies, including, without limitation, retention of the Deposit as part of the damages resulting to the Debtors and their estates for such breach or failure to perform. |
| | A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid.  The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid. |
| | Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale. |
| **Bid Deadline** | A Qualifying Bidder, other than the Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties (as defined below) and the Consultation Parties so as to be received on or before **May 17, 2024 at 5:00 p.m. (E.T.)** (the "Bid Deadline"); *provided* that the Debtors may extend the Bid Deadline without further order of the Court, subject to the DIP Credit Agreement and the Stalking Horse APA and after consultation with |

| Requirement | Description |
|---|---|
| | the DIP Agent and the Consultation Parties.  To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of the Chapter 11 Cases indicating the same.  **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.** |
| **Evaluation of Qualifying Bids** | The Debtors will deliver, within one (1) business day after receipt thereof, copies of all bids from Qualifying Bidders to the Consultation Parties and the DIP Agent. |
| | The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid. |
| | No later than **May 20, 2024**, the Debtors shall: (i) notify all Qualifying Bidders whether their respective bids have been determined to be Qualifying Bids; and (ii) determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (which must be at least equal to the value of the Stalking Horse Bid, plus $1,000,000, the "<u>Baseline Bid</u>" and the Qualifying Bidder submitting the Baseline Bid, the "<u>Baseline Bidder</u>"), and shall promptly notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid. |
| **No Qualifying Bids** | If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that the Court approve the Stalking Horse APA and the transactions contemplated thereunder. |
| **Auction** | If the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse Purchaser's Qualifying Bid, then the Debtors shall conduct an auction (the "<u>Auction</u>").   Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the number, type and nature of any changes to the Stalking Horse APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates; (d) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the |

| **Requirement** | **Description** |
|---|---|
| | net benefit to the Debtors' estates; and (f) any other factors the Debtors may reasonably deem relevant. <br><br> The Auction shall be governed by the following procedures: <br><br> (a) the Auction shall be held on **May 21, 2024 at 11:00 a.m. (E.T.)** at the offices of Ropes & Gray LLP, 1211 6th Avenue, New York, NY 10036 or virtually via telephone or video conference pursuant to information to be timely provided by the Debtors to the Auction Participants; <br><br> (b) only the Stalking Horse Purchaser, the other Qualifying Bidders with Qualifying Bids (together, the "Auction Bidders"), and the Prepetition First Lien Lenders shall be entitled to make any subsequent bids at the Auction; <br><br> (c) the Auction Bidders shall appear at the Auction, or through a duly authorized representative; <br><br> (d) only the Debtors, the Auction Bidders, the Consultation Parties, the DIP Agent, the Prepetition First Lien Lenders, and any creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "Auction Participants"); *provided* that any such creditors provide counsel for the Debtors written notice of their intent to attend the Auction no later than 5:00 p.m. (E.T.) the day prior to the Auction; <br><br> (e) the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed; <br><br> (f) prior to start of the Auction, each of the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale; <br><br> (g) open cry format (and not by way of sealed bids). Bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least $1,000,000, *provided* that: (i) each such successive bid must be a Qualifying Bid; and (ii) the Debtors shall retain the right to modify the bid increment requirements at the Auction; |

| Requirement | Description |
|---|---|
|  | (h)  the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders; |
|  | (i)  all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid; |
|  | (j)  except as specifically set forth herein, for the purpose of evaluating the value of the purchase price provided by each successive bid (including any successive bid by the Stalking Horse Purchaser), the Debtors, in consultation with the Consultation Parties, may give effect to any additional liabilities to be assumed by a Qualifying Bidder, and any additional costs which may be imposed on the Debtors; |
|  | (k)  all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid; |
|  | (l)  each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including |

| **Requirement** | **Description** |
|---|---|
| | any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law; |
| | (m)     throughout the Auction, the Stalking Horse Purchaser (i) shall have the continuing right to credit bid DIP Obligations then outstanding, or any part thereof, to purchase the Assets, and (ii) shall have the continuing right to credit bid the Prepetition First Lien Obligations then outstanding, or any part thereof, to purchase the Assets; |
| | (n)     the Auction Bidders shall have the right to make additional modifications to the Stalking Horse APA or any Alternative APA, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, *provided* that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Stalking Horse APA, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid or the Back-Up Bid, which shall remain binding as provided for herein; |
| | (o)     the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Stalking Horse APA or any Alternative APA, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction; |
| | (p)     upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the |

| Requirement | Description |
|---|---|
| | Qualifying Bids submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Stalking Horse APA or any Alternative APA submitted with the Successful Bid, as applicable, requested by each bidder, and the net benefit to the Debtors' estate. The bidder submitting such Successful Bid at the Auction shall become the "Successful Bidder," and shall have such rights and responsibilities of the purchaser as set forth in the Stalking Horse APA or any Alternative APA, as applicable. The Debtors shall designate a Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Successful Bidder does not close the Sale, *provided* that the Stalking Horse Purchaser has not agreed to serve as the Back-Up Bidder; |
| (q) | without the written consent of the DIP Agent and Prepetition Initial First Lien Agent, no bid may qualify as the Successful Bid unless such bid provides for cash consideration of an amount equal to or greater than the Prepetition First Lien Obligations and DIP Obligations that have been credit bid by the Stalking Horse Purchaser; |
| (r) | within one day after the conclusion of the Auction or as soon as reasonably practicable thereafter, the Debtors will file with the Court and serve on the Notice Parties a notice setting forth the results of the Auction (the "Notice of Successful Bidder"), which will (a) identify the Successful Bidder and the Back-Up Bidder; (b) include a copy of the Successful Bid and the Back-Up Bid or a summary of the material terms of such bids, including any proposed assumption and assignment of Contracts contemplated thereby; and (c) set forth the Sale Objection Deadline, the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Notice Parties of the outcome of the Auction; |

| Requirement | Description |
|---|---|
| | (s)    within one (1) business bay of the close of the Auction, in the event the Stalking Horse Purchaser is not the Successful Bidder, the Successful Bidder shall supplement the Successful Bidder's Deposit such that the Deposit shall be equal to an amount that is ten (10%) percent of the Successful Bid; and<br><br>(t)    prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.<br><br>**THE SUCCESSFUL BID AND ANY BACK-UP BID AND THEIR RELATED PURCHASE AGREEMENTS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.** |
| **Sale Hearing** | The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) will be subject to approval by the Court. The Sale Hearing to approve the Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) shall take place on **May 23, 2024 at 2:30 p.m. (E.T.)**. The Sale Hearing may be adjourned by the Debtors, in consultation with the DIP Agent and the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then in consultation with the DIP Agent and the Successful Bidder, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the Chapter 11 Cases.<br><br>At the Sale Hearing, the Debtors will seek entry of a Sale Order that, among other things: (i) authorizes and approves the Sale to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, pursuant |

| Requirement | Description |
|---|---|
|  | to the terms and conditions set forth in the Stalking Horse APA or Alternative APA submitted by the Successful Bidder, as applicable, free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances as determined by the Debtors and any Successful Bidder; (ii) finds that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; (iii) authorizes the assumption and assignment of certain contracts in connection with the Sale; (iv) as appropriate, exempts the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax or similar tax, or deposit under any applicable bulk sales statute; and (v) in the event that the Stalking Horse Purchaser is not the Successful Bidder, except as otherwise provided in the DIP Orders, directs that all cash proceeds generated from the Sale shall be paid to the DIP Agent and the Prepetition Initial First Lien Agent, as applicable, on behalf of the DIP Lenders and the Prepetition Initial First Lien Lenders upon the closing of the Sale for application in accordance with the terms and conditions of the DIP Orders, until the DIP Obligations and the secured Prepetition First Lien Obligations are paid in full. |
| **Back-Up Bidder** | Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale on or before **June 17, 2024** (or such date as may be extended by the Debtors with the consent of the DIP Agent and in consultation with the Consultation Parties), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors shall be authorized to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties. |
| **Return of Deposits** | All Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder no later than five (5) business days following the closing of the Sale.  The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale.  If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Stalking Horse APA or any Alternative APA, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.  For the avoidance of doubt, the Debtors' retention of a Deposit |

| Requirement | Description |
|---|---|
| | shall not constitute a waiver of any of the Debtors' legal or equitable rights relating to a Successful Bidder's or Back-Up Bidder's breach or failure to perform, and all such rights and remedies are preserved. |
| **No-Shop or No-Solicitation Provisions** | The Bidding Procedures Order and Bidding Procedures do not limit the Debtors' ability or right to solicit higher or otherwise better bids. The Sale contemplated by the Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order calls for a fair and open bidding and auction process. |
| **Notice and Consultation Parties** | (a)    The term "Bidding Procedures Notice Parties" as used in these Bidding Procedures shall mean: (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Gregg M. Galardi, Cristine Pirro Schwarzman, and Ellen Wheeler; email: gregg.galardi@ropesgray.com, cristine.schwarzman@ropesgray.com, and ellen.wheeler@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Conor P. McNamara, email: conor.mcnamara@ropesgray.com); and Chipman Brown Cicero & Cole, LLP (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com); (b) the U.S. Trustee, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (c) the DIP Agent; (d) the Prepetition Initial First Lien Agent; and (e) counsel for any statutory committee appointed in these chapter 11 cases.<br><br>(b)    The term "Consultation Parties" as used in these Bidding Procedures shall mean any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Creditors' Committee") and in the event that the Stalking Horse Purchaser terminates its credit bid, the DIP Agent.<br><br>For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment. |

| Requirement | Description |
|---|---|
| | In the event that any Consultation Party or any member of any Creditors' Committee or an affiliate of any of the foregoing submits a bid that is a Qualifying Bid, any obligation of the Debtors to consult with the bidding party established under these Bidding Procedures will be waived without further action; *provided* that the bidding party will have the same rights as any other Qualifying Bidder set forth above; *provided further* that in the event the Stalking Horse Purchaser is no longer a bidding party, the DIP Agent shall be a Consultation Party. |
| **Reservation of Rights** | Notwithstanding any of the foregoing, the Debtors, in consultation with the Consultation Parties, may (a) subject to the DIP Credit Agreement and the Stalking Horse APA and after consultation with the DIP Agent, extend the deadlines set forth in the Bidding Procedures Order or the Bidding Procedures, and (b) adopt, implement, and waive such other, additional or existing procedures or requirements that in their discretion serves to further an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualifying Bidders submit sealed Qualifying Bids during the Auction, all without further notice except to the Auction Participants, as appropriate. <br><br> The Debtors, in consultation with the Consultation Parties, may (a) determine which Qualifying Bid, if any, is the Successful Bid, and (b) reject at any time before entry of the Sale Order approving the Successful Bid, any bid that, in the discretion of the Debtors, in consultation with the Consultation Parties, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors. At or before the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, may impose such other terms and conditions upon Qualifying Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these cases. |

20.    Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

## IV.   The Stalking Horse APA.

21.   Certain material terms of the Stalking Horse APA, and certain provisions of the Stalking Horse APA that are required to be highlighted pursuant to Local Rule 6004-1(b)(iv), are described below:[4]

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| **Stalking Horse Purchaser** | A newly formed entity formed by the Prepetition Agent for the benefit and at the direction of the Prepetition Lenders for the purpose of assisting with the credit bid. |
| **Purchase Price (APA § 3.2; L.R. 6004-1(b)(iv)(N))** | The aggregate consideration for the Purchased Assets shall be no less than $290 million and shall consist of the following (collectively, the "Purchase Price"): (w) a credit bid equal to (A) all outstanding obligations under the DIP Facility (including the Roll-Up DIP Loans (as defined in the Interim DIP Order)), which such outstanding obligations shall be assumed by Buyer and (B) the outstanding obligations under the Prepetition Financing Agreement in an amount equal to $200 million, of which $50 million in principal shall be assumed by Buyer (the "Credit Bid Amount"); *plus* (x) the assumption by Buyer of the Assumed Liabilities; *plus* (y) the Wind-Down Amount; *plus* (z) the Minimum Cash Shortfall. |
| **Purchased Assets (APA § 2.1)** | The Purchased Assets shall include Sellers' rights, titles, and interests in, to and under each of the following of the Sellers as of the Closing: |
| | (a)    other than the Excluded Cash, the Wind-Down Amount, the Carve-Out Account funds and the CIT Escrow Account funds as provided in Section 2.2(n), (i) all cash, money orders, third-party checks, wire transfers and any other funds of the Sellers, commercial paper, marketable securities, demand deposits, reserves for Taxes, certificates of deposit and other bank deposits, deposits of any Seller with any third-party (including any vendor, manufacturer, customer, utility or landlord or |

---

[4]   Any summary of the Stalking Horse APA contained herein is qualified in its entirety by the actual terms and conditions of the Stalking Horse APA. To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Stalking Horse APA, the actual terms and conditions of the Stalking Horse APA shall control.

[5]   Capitalized terms used in this table and not otherwise defined herein shall have the meaning ascribed to such terms in the Stalking Horse APA.

| **Key Terms of the Stalking Horse APA[5]** | |
|---|---|
| | other cash deposits for rent, electricity, telephone or otherwise), treasury bills, and other cash equivalents and liquid investments and (ii) the Acquired Bank Accounts; provided, that cash in an amount necessary and sufficient to cover checks in transit relating to items that were permitted to be paid, but have not been paid, pursuant to the Final DIP Order or the DIP Facility as of the Closing shall not be included; |
| (b) | all deposits, credits, and prepaid charges and expenses from whatever source paid; provided, that prepaid deposits related to professional fee retainers shall not be included to the extent applied to professional fees actually incurred, subject to Section 2.2(q); |
| (c) | all accounts receivable; |
| (d) | all Avoidance Actions and all of the rights, claims or causes of action of the Sellers of any kind, including those available under the Bankruptcy Code, against any officer, director, employee, manager or Affiliate of, or lender to, any Seller or any of their respective Affiliates (and the proceeds of any insurance policies related to any such rights, claims or causes of action) arising at any time prior to the Closing, which such Avoidance Actions, rights, claims and causes of action shall be, and effective immediately upon Closing hereby are, waived and released in full immediately upon Closing; |
| (e) | *reserved*; |
| (f) | all royalties, advances, prepaid assets and other current assets; |
| (g) | all machinery, furniture, fixtures, furnishings, equipment, and other tangible personal property owned, leased, or otherwise used or held for use by the Sellers in the conduct of the Business, including all computers, computer equipment, artwork, desks, chairs, tables, hardware, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies, and, as set forth on Schedule 2.1(g), vehicles; |

| Key Terms of the Stalking Horse APA[5] | | |
|---|---|---|
| | (h) | all rights of any Seller under or pursuant to all warranties, representations and guarantees including those made by suppliers, manufacturers and contractors or any other third party to and for the benefit of any Seller, other than rights acquired pursuant to Section 2.1(d) (which shall be covered by Section 2.1(d)); |
| | (i) | all current and prior insurance policies, to the extent transferable, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries or proceeds thereunder and rights to assert claims with respect to any such insurance recoveries or proceeds, other than any directors and officers insurance policies, fiduciary policies or employment practices policies (in each case, including any tail policies or coverage thereon) and any rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder (the "Sellers D&O Policies and Rights"); |
| | (j) | all Permits, including those listed on Schedule 2.1(j), to the extent transferable or assignable under Law; |
| | (k) | all Assumed Contracts; |
| | (l) | all Documents (other than Excluded Documents); |
| | (m) | all Owned Intellectual Property and all of Sellers' rights to institute and pursue Proceedings against third parties for past, present, and future infringement, misappropriation, or dilution of Owned Intellectual Property, or for any other conflict therewith, and all of the Sellers' rights to recover damages or lost profits in connection with any of the foregoing; |
| | (n) | all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with current or former employees and non-employee agents of any Seller or with third parties, in each case, to the extent included as an Assumed Contract; |
| | (o) | any loans owed to any Seller by any current or former employee or officer of any Seller; |

| **Key Terms of the Stalking Horse APA[5]** | |
|---|---|
| | (p) all Claims, other than the Claims set forth on Schedule 2.1(p), that the Sellers may have against any Person, including all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date (and any proceeds paid from all current and prior insurance policies, other than the Sellers D&O Policies and Rights) with respect to any Purchased Assets or any Assumed Liabilities, in each case, that are not Excluded Assets and other than claims pursuant to Section 2.1(d) (which shall be covered by Section 2.1(d)); |
| | (q) all other assets or rights of every kind and description of Sellers as of the Closing related to the Business, wherever located, whether real, personal, or mixed, tangible or intangible that are not Excluded Assets; |
| | (r) all Assumed Benefit Plans (as defined in Section 6.6(f) below), including the sponsorship thereof, and all right, title and interest in any asset thereof or relating thereto, including any trusts, insurance policies, and administrative services contracts relating thereto (the "Assumed Plans and Agreements"); |
| | (s) *reserved*; |
| | (t) all goodwill related to the foregoing; and |
| | (u) all Equity Interests held by any Seller in each Acquired Entity (the "<u>Acquired Equity Interests</u>"). |
| **Excluded Assets (APA § 2.2)** | Notwithstanding anything herein contained to the contrary, each Seller shall retain, and Buyer shall not purchase, such Seller's right, title, and interest in and to (and the Purchased Assets shall not include any of) the following assets and properties of the Sellers (collectively, the "<u>Excluded Assets</u>"), all of which shall remain the exclusive property of the Sellers: |
| | (a) any Contract other than any Assumed Contract (collectively, the "Excluded Contracts") and any deposits related thereto; |

| **Key Terms of the Stalking Horse APA[5]** |
|---|

| | (b) | any Contract or arrangement (including any loan or similar arrangement) other than any Assumed Contract with or binding upon any of the Sellers and any Related Party; |
|---|---|---|
| | (c) | any intercompany accounts receivable owed between or among the Sellers; |
| | (d) | other than the Assumed Plans and Agreements, all Benefit Plans and all right, title and interest in any asset thereof or relating thereto, including any trusts, insurance policies, and administrative services contracts relating thereto; |
| | (e) | all rights of the Sellers and any other Person under the Agreement (including to the Purchase Price) and the agreements and instruments delivered to the Sellers by Buyer pursuant to the Agreement, including the Transaction Documents; |
| | (f) | all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of any Seller); (ii) that are minute books, organizational documents, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks; (iii) that are subject to the attorney work-product doctrine, the attorney-client privilege or similar protections or privileges; (iv) that any Seller is prohibited from disclosing or transferring to Buyer under applicable Law or is required by Law or, if applicable, a consumer privacy ombudsman appointed pursuant to Section 332 of the Bankruptcy Code to retain; or (v) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area (collectively, the "Excluded Documents"); provided that, to the extent not prohibited by applicable Law, Buyer shall have the right to make copies of any portions or all of such Documents in subsection (ii) and (iv) of Section 2.2(f); provided, further, that Buyer shall have the right to Excluded Documents under |

| **Key Terms of the Stalking Horse APA[5]** | | |
|---|---|---|
| | | clause (iii) that relate to any Claims that are included as Purchased Assets; |
| | (g) | all Claims that the Sellers may have against any Person (including Governmental Entities) for refund or credit, rebate, abatement, deposit or prepayment, together with any refund of interest due thereon or penalty rebate arising therefrom, in each case solely with respect to Taxes for Post-Closing Tax Periods, other than claims acquired pursuant to Section 2.1(d) (which shall be covered by Section 2.1(d)); |
| | (h) | all assets owned or used by the Sellers that are specifically identified in Schedule 2.2(h); |
| | (i) | all assets of the Sellers that would otherwise constitute a Purchased Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court, (ii) as not prohibited by the terms of the DIP Documents or (iii) in the Ordinary Course of Business; |
| | (j) | all Permits other than those set forth on Schedule 2.1(j) and those Permits that are not transferable; |
| | (k) | all rights related to the matters set forth on Schedule 2.1(p); |
| | (l) | the Sellers D&O Policies and Rights; |
| | (m) | the Excluded Cash and the Wind-Down Amount; |
| | (n) | the CIT Escrow Account, subject to resolution of the treatment thereof; provided, that subject to any Final Order resolving the dispute related to the funds in the CIT Escrow Account, such proceeds may become Purchased Assets pursuant to the terms of any such Final Order, which Final Order may be the Sale Order; |
| | (o) | *reserved*; |
| | (p) | any confidential personnel and medical records pertaining to any employee of any Seller and its Affiliates who is not a Hired Employee and any personnel and medical records pertaining to any |

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| | employee or independent contractor of the Sellers that cannot be provided under applicable Law; |
| | (q)      retainers held by any professional retained by Sellers, and, subject to the DIP Facility, the Final DIP Order and subject in all respects to the Budget, any funds of the Sellers held in escrow or reserve with respect to the fees and expenses of any professional retained by Sellers, provided, however, this shall not include any residual amounts after such professional fees and expenses have been paid; |
| | (r)      *reserved*; |
| | (s)      *reserved*; |
| | (t)      all Intellectual Property owned by a Person other than a Seller (other than rights to Intellectual Property granted to a Seller pursuant to an Assumed Contract); |
| | (u)      all Claims of Sellers or their Affiliates against any Person with respect to any Excluded Asset or Excluded Liabilities; |
| | (v)      Utility Deposits; and |
| | (w)      all attorney-client privilege and attorney work-product protection of Sellers or their Affiliates or associated with their businesses arising with respect to legal counsel representation of Sellers or their Affiliates or their businesses in connection with the Bankruptcy Cases, transactions contemplated by the Agreement or any of the Transaction Documents. |
| **Assumed Liabilities (APA § 2.3)** | Upon the terms and subject to the conditions set forth in the Agreement and the Sale Order, and subject to the exclusions set forth in Section 2.4 (and in the event of any conflict between the exclusions set forth in Section 2.4 and the provisions of Section 2.3, the exclusions set forth in Section 2.4 shall prevail), as partial consideration for the Purchased Assets, Buyer shall, effective as of the Closing, assume only, the following Liabilities of the Sellers (the "Assumed Liabilities"): |
| | (a)      all Liabilities under the Assumed Contracts to the extent that any such Liabilities under such Assumed Contracts: (i) arise out of or relate to |

| Key Terms of the Stalking Horse APA[5] | | |
|---|---|---|
| | | events, occurrences, acts, or omissions occurring solely after the Closing and (ii) do not arise from a breach, violation, or default of such Assumed Contract by any Seller prior to the Closing; |
| | (b) | all Liabilities relating to, or arising in respect of, Buyer's ownership or operation of the Purchased Assets to the extent arising out of or relating to events, occurrences, acts, or omissions occurring solely after the Closing; |
| | (c) | all Cure Amounts; |
| | (d) | all accrued and unpaid Administrative Expenses incurred by Sellers prior to the Closing Date (other than Professional Fees and Expenses and any other Purchased Assets or Assumed Liability), not to exceed the amounts set forth in the Budget (the "Post-Petition Payables"); |
| | (e) | all Liabilities in respect of wages and other compensation of Business Employees accrued prior to the Closing, including wages and other compensation for the last pay period immediately preceding the Closing Date (if such pay period ends on the Closing Date) or through the end of the then-current pay period that includes the Closing Date, including, for the avoidance of doubt, the employer portion of any payroll, social security or similar Taxes in respect thereof; |
| | (f) | all Liabilities relating to Hired Employees accruing on or after the close of business on the Closing Date, solely to the extent arising out of or relating to the Hired Employees' employment (including the termination thereof) by Buyer or its Affiliates, including relating to vacation and other time off as set forth in Section 6.6; |
| | (g) | all Liabilities relating to Business Employees on or after the Closing, including any notice pay or benefits and claims under the WARN Act, solely to the extent set forth in Section 6.6; |
| | (h) | all Liabilities relating to all Assumed Plans and Agreements; |
| | (i) | all Post-Closing COBRA Liabilities; |

| **Key Terms of the Stalking Horse APA[5]** | |
|---|---|
| | (j)    all Liabilities for Transfer Taxes pursuant to Section 6.10(a); |
| | (k)    to the extent lawfully transferable, all obligations, commitments and Liabilities under any Permits assigned to Buyer hereunder; |
| | (l)    all outstanding Trade Payables; and |
| | (m)    all Liabilities to the extent arising out of the ownership, operation, management or control of the Purchased Assets or the Business for periods following the Closing; and |
| | (n)    during the Extended Contract Period, all Administrative Expenses arising under Available Contracts until such time as they become an Excluded Asset or an Assumed Contract and any incremental costs or expenses (i) that arise out of the Sellers' extension and continuation of the Bankruptcy Cases that is attributable to the Extended Contract Period and (ii) are incurred as a result of the Sellers' performance of their obligations under the Agreement. |
| **Excluded Liabilities (APA § 2.4)** | Notwithstanding anything to the contrary set forth herein, Buyer shall not assume, and shall not be deemed to have assumed, and the Sellers shall retain all Liabilities of any Seller or any of their respective predecessors other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Buyer shall not be obligated to assume, nor assumes, and Buyer hereby disclaims, all of the Excluded Liabilities, including all of the following Liabilities of any Seller (or any of their respective predecessors) (each of which shall constitute an Excluded Liability hereunder): |
| | (a)    except for any Liabilities for Taxes that are Assumed Liabilities, any Liability for (i) Taxes of any Seller for any taxable period and (ii) Taxes relating to the operation of the Business or the ownership of the Purchased Assets for any Pre-Closing Tax Period; |
| | (b)    any Claim in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith; |

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| (c) | except for any Liabilities that are Assumed Liabilities, any fees, costs and expenses (including legal fees and accounting fees) incurred by any Seller in connection with the Bankruptcy Cases or the Transactions, including all fees, costs and expenses incurred by any Seller in connection with or by virtue of (i) the negotiation, preparation and review of the Agreement and all agreements ancillary or related hereto, (ii) the preparation and submission of any filing or notice required to be made or given in connection with the Transactions, and the obtaining of any consent required to be obtained in connection with the Transactions, (iii) the negotiation, preparing and review of the DIP Documents and (iv) any Alternate Transaction; |
| (d) | except for any Liabilities that are Assumed Liabilities, all Liabilities of Sellers relating to employees of Sellers that are not Hired Employees; |
| (e) | any Liabilities relating to the Hired Employees arising prior to the Closing Date (other than those expressly assumed by Buyer in Section 2.3 or Section 6.6), and any Liabilities relating to all other current or former employees, directors, consultants and other individual service providers of the Sellers who are not Hired Employees arising at any time (other than those expressly assumed by Buyer in Section 2.3 or Section 6.6), in each case, including any severance, termination or payment in lieu of notice Liability, and any other Liability arising under or out of any Law or Contract in connection with such Person's employment, service or Contract with, or the termination of such Person's employment, service or Contract with, any Seller; |
| (f) | any Liabilities of the Sellers and their respective ERISA Affiliates with respect to any Benefit Plan or other compensation or benefit plan, program, policy, agreement or arrangement of the Sellers, other than with respect to any Assumed Plans and Agreements and other than those Liabilities |

| Key Terms of the Stalking Horse APA[5] | | |
|---|---|---|
| | | expressly assumed pursuant to Section 2.3 or Section 6.6; |
| | (g) | other than Liabilities expressly assumed pursuant to Section 2.3(f) or Section 6.6, any success, retention, stay, change of control or similar bonuses and any other payments or benefits owing to current or former employees, independent contractors or consultants of the Sellers in connection with the consummation of the Transactions, including the employer portion of any payroll, social security or similar Taxes in respect thereof; |
| | (h) | any Liability of any Seller arising out of the Agreement or any Transaction Document; |
| | (i) | except for any Liabilities that are Assumed Liabilities, any Liabilities arising out of or relating to the Business, the Purchased Assets or the ownership, operation or conduct thereof prior to the Closing; |
| | (j) | any Liabilities for accrued expenses and accounts payable of the Sellers, other than the Post-Petition Payables, Trade Payables or any other Liabilities that are Assumed Liabilities; |
| | (k) | except for any Liabilities that are Assumed Liabilities, any Liabilities of the Sellers arising as a result of any Proceeding, whether initiated prior to or following the Closing, to the extent related to the Business or the Purchased Assets, including any actions for breach of contract, violations of or non-compliance with Law (including Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws), or any tort actions, in each case, solely to the extent related to periods prior to the Closing; |
| | (l) | any Liabilities arising as a result of any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers and any Related Party (other than those Liabilities expressly assumed pursuant to Section 2.3), and all intercompany payables owed from one Seller to any other Seller; |

| **Key Terms of the Stalking Horse APA**[5] | |
|---|---|
| | (m)    any Liabilities of Sellers (i) existing prior to the filing of the Bankruptcy Cases that are subject to compromise under the Bankruptcy Code or other applicable Law and (ii) to the extent not otherwise expressly assumed herein, incurred subsequent to the filing of the Bankruptcy Cases and prior to the Closing; provided that in the event of any conflict between the terms of Section 2.3 and Section 2.4, the terms of Section 2.3 shall control; and<br><br>(n)    any Liabilities arising out of Professional Fees and Expenses. |
| **Sale Free and Clear (APA § 2.1)** | At the Closing, and upon the terms and subject to the conditions set forth herein and in the Sale Order and, with respect to the Sellers, subject to the entry of the Sale Order, including approval of the Bankruptcy Court pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Sellers shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from the Sellers, all of the right, title and interest of each of the Sellers as of the Closing, free and clear of all Liens (other than Permitted Liens), in, to and under, all of the Purchased Assets. |
| **No Successor Liability (APA § 2.4; L.R. 6004-1(b)(iv)(L))** | Notwithstanding anything to the contrary set forth herein, Buyer shall not assume, and shall not be deemed to have assumed, and the Sellers shall retain all Liabilities of any Seller or any of their respective predecessors other than the Assumed Liabilities |
| **Conditions to Closing (APA § 8)** | The obligation of Buyer to consummate the Transactions to occur at the Closing is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing of each of the following conditions:<br><br>(a)    Accuracy of Representations and Warranties. The representations and warranties of the Sellers contained in Section 4.1 (Organization and Good Standing), Section 4.2 (Power and Authority) and Section 4.15 (Financial Advisors) shall be true and correct in all respects (other than de minimis inaccuracies) on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date, |

| Key Terms of the Stalking Horse APA[5] |
|---|

|  |  |  |
|---|---|---|
|  |  | in which case such representations and warranties shall be true and correct as of such earlier date). All other representations and warranties of the Sellers contained in Article IV shall be true and correct on the date hereof and on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representations and warranties shall be true and correct as of such earlier date), except where the failure of any such representations or warranties to be true and correct (without giving effect to any limitations to "material" or "Material Adverse Effect"), either individually or in the aggregate, has resulted in or would reasonably be expected to result in a Material Adverse Effect. |
|  | (b) | Performance of Obligations.  Each of the Sellers shall have performed in all material respects all obligations and agreements contained in the Agreement required to be performed by it at or prior to the Closing. |
|  | (c) | DIP Financing.  The DIP Documents shall have each been approved by the Bankruptcy Court pursuant to the Final DIP Order, which shall be in form and substance reasonably acceptable to Buyer. |
|  | (d) | No Material Adverse Effect.  There shall have been no Material Adverse Effect from the Agreement Date through the Closing Date that is continuing. |
|  | (e) | No Challenges to Credit Bid.  As of the expiration of the Challenge Period (as defined in the Interim DIP Order), there shall be no pending challenge or contest to the validity amount, perfection or priority of the DIP Documents, the Loan Documents or other Claims of Buyer or Administrative Agents (as applicable) thereunder that would prevent Buyer's credit bid, unless any such challenge or contest shall have been resolved to the reasonable satisfaction of Buyer. |

| Key Terms of the Stalking Horse APA[5] |
|---|

|  |  |  |
|---|---|---|
|  | (f) | **Deliverables.** Sellers shall have delivered to the Buyer each deliverable required pursuant to Section 3.1(b). |
|  | (g) | **Bidding Procedures Order.** The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall have become a Final Order. |
|  | (h) | **Sale Order.** The Bankruptcy Court shall have entered the Sale Order, which Order shall have become a Final Order. |
|  | (i) | **Disclosure Schedules.** Sellers shall have delivered the Sellers' Disclosure Schedules by the date required under Section 6.16 which such Sellers' Disclosure Schedules shall be satisfactory to Buyer in its sole discretion, provided, however, that this condition shall be deemed satisfied on the date on which the hearing on the Bidding Procedures Order occurs unless Buyer shall have notified Sellers at least one (1) Business Day prior to such date that the Sellers' Disclosure Schedules were not satisfactory. |
|  | The obligation of the Sellers to consummate the Transactions is subject to the satisfaction (or waiver by the Sellers) at or prior to the Closing of each of the following conditions: |  |
|  | (a) | **Accuracy of Representations and Warranties.** The representations of Buyer contained in Section 5.1 (Organization and Good Standing), Section 5.2 (Power and Authority) and Section 5.6 (Financial Advisors) shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representations and warranties shall be true and correct as of such earlier date). All other representations and warranties contained in Article V shall be true and correct on the date hereof and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representations and warranties shall be |

| **Key Terms of the Stalking Horse APA[5]** | |
|---|---|
| | true and correct as of such earlier date), except where the failure of any such representations or warranties to be true and correct (without giving effect to any limitations to "material" or similar qualifier), either individually or in the aggregate, has resulted in or would reasonably be expected to have an adverse effect on Buyer's ability to perform its obligations under the Agreement in any material respect. |
| | (b)    Performance of Obligations.  Buyer shall have performed in all material respects all obligations and agreements contained in the Agreement required to be performed by it at or prior to the Closing. |
| | (c)    Deliverables.  Buyer shall have delivered to the Sellers each deliverable required pursuant to Section 3.1(c). |
| | (d)    Bidding Procedures Order. The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall have become a Final Order. |
| | (e)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order, which Order shall have become a Final Order. |
| | The respective obligations of Buyer and the Sellers to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of the condition (which may be waived by the Parties in whole or in part to the extent permitted by applicable Law) that no provision of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other Transactions. |
| **Agreements with Management (L.R. 6004-1(b)(iv)(B))** | The Debtors expect key management contracts to be assumed and assigned as part of the Sale, or otherwise renegotiated. |
| **Closing and Other Deadlines (APA § 3.1, § 6.16 and § 8.1(i); L.R. 6004-1(b)(iv)(E))** | The Closing shall take place at 10:00 a.m. (prevailing Eastern Time) no later than two (2) Business Days after all the conditions set forth in Article VIII shall have been satisfied or waived (excluding, but subject to the satisfaction or waiver of, conditions that, by their nature, are to be satisfied at the Closing), or such other time or date |

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| | as agreed to in writing by the Parties.  The Closing shall take place by telephone or video conference and electronic exchange of documents, unless otherwise mutually agreed to by the Parties.  The date on which the Closing occurs is referred to in the Agreement as the "Closing Date".  The Closing shall be effective as of 12:01 a.m. (prevailing Eastern Time) on the Closing Date. |
| | Sellers shall provide final versions of the Sellers' Disclosure Schedules and make available to Buyer copies of all Contracts or other information specified therein no later than four (4) Business Days prior to the date on which the hearing on the Bidding Procedures Order is scheduled to occur; provided, however, the Parties acknowledge that Schedule 2.5 may be updated after such date but no later than the applicable dates set forth herein, in each case subject to the express terms of the Agreement. |
| | The obligation of Buyer to consummate the Transactions to occur at the Closing is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing of the following condition: Sellers shall have delivered the Sellers' Disclosure Schedules by the date required under Section 6.16 which such Sellers' Disclosure Schedules shall be satisfactory to Buyer in its sole discretion, provided, however, that this condition shall be deemed satisfied on the date on which the hearing on the Bidding Procedures Order occurs unless (A) Buyer shall have notified Sellers at least one (1) Business Day prior to such date that the Sellers' Disclosure Schedules were not satisfactory or (B) Sellers' Disclosure Schedules were not timely delivered by the date specified in Section 6.16. |
| **Good Faith Deposit (L.R. 6004- 1(b)(iv)(F))** | None. |
| **Interim Arrangements with Stalking Horse Purchaser (L.R. 6004-1(b)(iv)(G))** | None. |
| **Use of Proceeds (APA § 4.25; L.R. 6004-1(b)(iv)(H))** | No proceeds as a result of the Transactions will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Restricted Party, or otherwise used in any manner that would result in a violation of any Sanctions, Anti-Corruption Law, or Anti-Money Laundering Law by any Persons. |
| **Tax Exemption (L.R. 6004- 1(b)(iv)(I))** | Buyer hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" Laws |

| **Key Terms of the Stalking Horse APA[5]** | |
|---|---|
| | that may apply to the sale and transfer of the Purchased Assets to Buyer.  Pursuant to section 363(f) of the Bankruptcy Code, the Parties intend that the transfer of the Purchased Assets of the Sellers shall be free and clear of all Liens, other than Permitted Liens, in each case pursuant to the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date, including any liens or claims arising out of the "bulk-transfer" Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. |
| **Record Retention (APA § 6.3(a); L.R. 6004-1(b)(iv)(J))** | From and after the Closing Date until the later of the conclusion of the Bankruptcy Cases and the wind-down and final distribution of all assets of the Sellers, Buyer shall give the Sellers and the Sellers' Representatives reasonable access during normal business hours to the books and records pertaining to the Purchased Assets and Assumed Liabilities and certain key employees, for the purposes of (i) the preparation or amendment of Tax Returns, (ii) the determination of any matter relating to the rights or obligations of the Sellers under the Agreement, or (iii) as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Cases and the wind-down of the Sellers and their assets.  Buyer shall, and shall cause each of its controlled Affiliates to, cooperate with the Sellers as may reasonably be requested by the Sellers for such purposes.  For the avoidance of doubt, nothing in Section 6.3(b) shall require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege or (ii) such action could reasonably be expected to result in violation of applicable Law or Order.  Unless otherwise consented to in writing by the Sellers, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter, or otherwise dispose of any of the books and records without first offering to surrender to the Sellers such books and records or any portion thereof that Buyer may intend to destroy, alter, or dispose of.  From and after the Closing, Buyer will, and will cause its employees to, provide Sellers with reasonable assistance, support, and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims). |

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| **Sale of Avoidance Actions (APA § 2.1(d); L.R. 6004-1(b)(iv)(K))** | The Purchased Assets shall include all Avoidance Actions and all of the rights, claims or causes of action of the Sellers of any kind, including those available under the Bankruptcy Code, against any officer, director, employee, manager or Affiliate of, or lender to, any Seller or any of their respective Affiliates (and the proceeds of any insurance policies related to any such rights, claims or causes of action) arising at any time prior to the Closing, which such Avoidance Actions, rights, claims and causes of action shall be, and effective immediately upon Closing hereby are, waived and released in full immediately upon Closing. |
| **Credit Bid (APA § 3.2; Local Rule 6004- 1(b)(iv)(N))** | Purchase Price includes a credit bid equal to (A) all outstanding obligations under the DIP Facility (including the Roll-Up DIP Loans (as defined in the Interim DIP Order)), which such outstanding obligations shall be assumed by Buyer and (B) the outstanding obligations under the Prepetition Financing Agreement in an amount equal to $200 million, of which $50 million in principal shall be assumed by Buyer. |
| **Relief from Bankruptcy Rule 6004(h) (L.R. 6004-1(b)(iv)(O))** | This Motion seeks, and the proposed Final Bidding Procedures Order approves, relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h). |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder (Local Rule 6004-1(c)(i)(C))** | None. |
| **Releases (APA § 10.18; L.R. 6004-1(b)(iv)(C))** | Effective as of the Closing and subject to entry of the Sale Order (with any discrepancy between the release provided in the Sale Order and the Agreement being controlled by the Agreement), each of the Sellers on their own behalf and on behalf of their past, present, and future predecessors, successors and assigns hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, in their capacity as purchaser of the Purchased Assets, the Buyer, Administrative Agent and the Lenders, and each of their predecessors, successors, assigns, Subsidiaries and Affiliates, and each of their respective former, current or future equity holders, officers, employees, directors, agents, advisory board members, representatives, owners, members, partners, employees, management companies, direct and indirect parent entities, "controlling persons" (within the meaning of federal securities law), heirs, |

| Key Terms of the Stalking Horse APA[5] |
|---|

|  | administrators and executors, financial advisors, attorneys, shareholders, managers, principals, consultants, accountants, actuaries, investment bankers and other professionals in each case acting in such capacity whether current or former, including in their capacity as directors of the Company, as applicable (such Persons, the "Buyer Released Persons"), of and from any and all Claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, franchises, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, liquidated or unliquidated, secured or unsecured, direct or derivative, matured or unmatured, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof based on or relating to, or in any manner arising from, in whole or in part, the Sellers, Acquired Entities or the Business (including the capital structure, management, ownership or operation thereof), the business operations of the Sellers and the Acquired Entities, actions taken by the Sellers' boards of directors, the purchase, sale or recession of any security of the Sellers, the subject matter of, the business or contractual arrangements between or among any of the Sellers any Sellers Released Persons or Buyer Released Persons, the Sellers' restructuring efforts, the ownership or operation of the Sellers by any Sellers Released Persons, this distribution of any cash or other property of the Sellers to any Sellers Released Persons or Buyer Released Persons, the assertion of enforcement of rights or remedies against the Sellers, the Sellers' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to claims asserts against the Sellers), intercompany transactions, the restructuring transactions, entry into the Bankruptcy Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, any term sheets, any restructuring support agreement, the DIP Documents, the Agreement, the Transaction Documents or any other documents relating to any of the foregoing created or |

| **Key Terms of the Stalking Horse APA[5]** |
| --- |

|  | entered into in connection with the Transaction, the Agreement or the DIP Documents, or any other act or omission, transaction, agreement, conduct, circumstance, event or other occurrence with respect to the foregoing occurring or taking place on or before the Closing; provided that nothing herein shall release the Buyer of its obligations under the Agreement and the other Transaction Documents, or otherwise constitute a release by Seller or any of its Affiliates of any claims that Seller or any of its Affiliates have in the Bankruptcy Cases. Nothing in Section 10.18(a) shall limit Sellers' or their respective Affiliates' rights in the case of fraud (but not, for the avoidance of doubt, fraudulent conveyance claims). Effective as of the Closing and subject to entry of the Sale Order (with any discrepancy between the release provided in the Sale Order and the Agreement being controlled by the Agreement), each of the Sellers on their own behalf and on behalf of their past, present, and future predecessors, successors and assigns, covenants not to sue Buyer, the Administrative Agents or any Buyer Released Person, or to instigate, initiate, or pursue against any of them, in any manner of judicial or administrative proceeding on such Seller's own behalf or on behalf of any of the Sellers Released Persons, or any other Person, regarding or in connection with any of the claims released pursuant to Section 10.18(a). |
| --- | --- |
|  | Effective as of the Closing, each of the Buyer and the Administrative Agents, on its own behalf and on behalf of its past, present, and future Affiliates (including the Lenders), predecessors, successors and assigns hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, the Sellers and each of their predecessors, successors, assigns, Subsidiaries and Affiliates, and each of their respective former, current or future equity holders, officers, employees, directors, agents, advisory board members, representatives, owners, members, partners, employees, management companies, direct and indirect parent entities, "controlling persons" (within the meaning of federal securities law), heirs, administrators and executors, financial advisors, attorneys, shareholders, managers, principals, consultants, accountants, actuaries, investment bankers and other professionals in each case acting in such capacity whether current or former, including in their capacity as directors of the Company, as applicable |

| **Key Terms of the Stalking Horse APA**[5] |
| --- |
| (such Persons, the "Sellers Released Persons"), of and from any and all Claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, franchises, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, liquidated or unliquidated, secured or unsecured, direct or derivative, matured or unmatured, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof based on or relating to, or in any manner arising from, in whole or in part, the Sellers, Acquired Entities or the Business (including the capital structure, management, ownership or operation thereof), the business operations of the Sellers and the Acquired Entities, actions taken by the Sellers' boards of directors, the purchase, sale or recession of any security of the Sellers, the subject matter of, the business or contractual arrangements between or among any of the Sellers any Sellers Released Persons or Buyer Released Persons, the Sellers' restructuring efforts, the ownership or operation of the Sellers by any Sellers Released Persons, this distribution of any cash or other property of the Sellers to any Sellers Released Persons or Buyer Released Persons, the assertion of enforcement of rights or remedies against the Sellers, the Sellers' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to claims asserts against the Sellers), intercompany transactions, the restructuring transactions, entry into the Bankruptcy Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, any term sheets, any restructuring support agreement, the DIP Documents, the Agreement, the Transaction Documents or any other documents relating to any of the foregoing created or entered into in connection with the Transaction, the Agreement or the DIP Documents, or any other act or omission, transaction, agreement, conduct, circumstance, event or other occurrence with respect to the foregoing occurring or taking place on or before the Closing; provided that nothing |

| Key Terms of the Stalking Horse APA[5] | |
|---|---|
| | herein shall release the Sellers of their obligations under the Agreement, the Sale Order, and the other Transaction Documents.    Nothing in Section 10.18(b) shall limit Buyer's rights in the case of Actual Fraud (but not, for the avoidance of doubt, fraudulent conveyance claims). Effective as of the Closing, each of the Buyer and the Administrative Agents, on its own behalf and on behalf of its past, present, and future Affiliates (including the Lenders), predecessors, successors and assigns, covenants not to sue any Seller or any Sellers Released Person, or to instigate, initiate, or pursue against any of them, in any manner of judicial or administrative proceeding on such Buyer's or Administrative Agent's own behalf or on behalf of any of the Buyer Released Persons, or any other Person, regarding or in connection with any of the claims released pursuant to Section 10.18(b). |
| | Without limiting in any way the scope of the releases contained in Section 10.18 and effective upon the Closing, each of Seller, Buyer and the Administrative Agents, to the fullest extent allowed under applicable Law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any Law which provides that a release may not apply to material unknown Claims.  Each of Seller, Buyer and the Administrative Agents hereby affirms its intent to waive and relinquish such unknown Claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto. Each of Seller, Buyer and the Administrative Agents hereby represents and warrants that it has access to adequate information regarding the terms hereof, the scope and effect of the releases in Section 10.18, and all other matters encompassed by the Agreement to make an informed and knowledgeable decision with regard to entering into the Agreement. |
| **Sale Free and Clear of Unexpired Leases (L.R. 6004-1(b)(iv)(M))** | The Debtors' contracts and leases shall, to the extent designated by the Buyer, be assumed and assigned in accordance with Section 2.5 of the Agreement. |

**V.      Notice Procedures for The Sale, Bidding Procedures, Auction, and Sale Hearing**

22.      The Debtors also request approval of the Sale Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>.

23.      Within three (3) business days of the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors will serve the Sale Notice by regular mail on the Notice Parties (as defined below).

24.      Within seven (7) business days of the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors will also cause the Sale Notice to be published once in the national edition of *USA Today* and once in the *Wilmington News Journal* in Delaware, with any modifications necessary for ease of publication, and post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent.

**VI.      Challenge Period Notice and Proposed Challenge Period Notice Deadline.**

25.      Pursuant to the Local Rule 4001-2(a)(i)(q), debtors must provide justification for the inclusion of a provision binding parties in interest without first giving such parties in interest at least seventy-five (75) days to investigate the validity, perfection, or amount of a secured creditor's prepetition lien or the waiver of claims against the secured party. Parties in interest currently have 75 days to investigate the liens and claims of the Prepetition First Lien Lenders (the "<u>Challenge Period</u>").  Interim DIP Order at ¶ 6.  As the Debtors advised the Court at the first day hearing in these cases, the Debtors are seeking to have the Challenge Period terminated as of the entry of a Sale Order approving the sale of substantially all of the Debtors' Assets. Accordingly, to that end, the Debtors have included in the proposed Sale Notice a provision that would require any party in interest to provide counsel to the Debtors and the Prepetition First Lien Lenders written notice of their intent to investigate the secured claims and liens of the Prepetition First Lien Lenders (the "<u>Challenge Period Notice</u>") **no later than 4:00 p.m. (E.T.) on the first**

**business day preceding the Auction Date (May 20, 2024)** (the "<u>Challenge Period Notice Deadline</u>"), and absent any such Challenge Period Notice being timely received and no objection being raised to the termination of the Challenge Period as of the commencement of the Sale Hearing, the Debtors will seek to have the Challenge Period terminated upon entry of a Sale Order.

**VII.     Assumption and Assignment Notice.**

26.     The Debtors have reviewed their prepetition executory contracts and unexpired leases and have designated certain of those executory contracts and leases as those that a purchaser of all of the Assets may wish to have assumed and assigned to it.  At the Sale Hearing, to facilitate and effect the Sale of Assets, the Debtors will also seek authorization to assume certain of the executory contracts and leases (collectively, the "<u>Purchased Contracts</u>") and to assign the Purchased Contracts to the Successful Bidder.

27.     By this Motion, the Debtors request approval of the Cure Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 4</u>, to be sent to counterparties to Purchased Contracts to provide notice of the potential assumption and assignment of their Purchased Contracts by the Successful Bidder.  Within three (3) business days of the entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Cure Notice by regular mail on counterparties to Purchased Contracts to provide notice of the potential assumption and assignment of their Purchased Contracts by the Successful Bidder (the "<u>Initial Purchased Contracts</u>").  Supplements to the Cure Notice shall be served on parties no later than two days following the Stalking Horse Purchaser's or other potential bidder's designation of any additional executory contracts or unexpired leases as Purchased Contracts.  Any objections by the counterparties to adequate assurance of future performance by the Stalking Horse Purchaser with respect to Initial Purchased Contracts are due on May 20, 2024, at 4:00 p.m. (E.T.) (the "<u>Sale</u>

Objection Deadline"), and any objections with respect to subsequently added Purchased Contracts are due seven (7) days from service of the applicable supplement to the Cure Notice.

28.     As soon as reasonably practicable after the completion of the Auction, the Debtors shall file with the Court a notice identifying the Successful Bidder (a "Notice of Successful Bidder"), which shall set forth, among other things, (i) the Successful Bidder and Back-Up Bidder (if any) and the amount of each of the Successful Bid and the Back-Up Bid (if any), (ii) the Purchased Contracts the Successful Bidder intends to assume, and (iii) the proposed assignee(s) of such Purchased Contracts.  To the extent the Successful Bidder is not the Stalking Horse Purchaser, the non-debtor counterparties to the Purchased Contracts shall have until 4:00 p.m. (E.T.) on May 22, 2024 to file any objections to adequate assurance of future performance by the Successful Bidder.

29.     The inclusion of a contract, lease, or other agreement on either the Assumption Amounts Motion, the list of Purchased Contracts attached to the Stalking Horse APA and the Cure Notice, and any Supplemental Cure Notice shall not (a) constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease, or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights with respect thereto shall be reserved; or (b) obligate the Debtors to assume any Purchased Contract listed thereon or the Successful Bidder(s) to take assignment of such Purchased Contract.  Only those Purchased Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder, subject to the terms of the applicable sale order and asset purchase agreement.

30.     If, following the closing date, and only to the extent permitted under the asset purchase agreement that is the Successful Bid, the Stalking Horse Purchaser or other Successful Bidder designates a contract or lease not initially included as a Purchased Contract as a Purchased Contract, and not previously rejected by the Debtors, the Debtors will promptly file and serve, at the Stalking Horse Purchaser or other Successful Bidder's expense (except with respect to any omitted contracts under the Stalking Horse APA, which shall be at the Debtors' expense), a supplemental notice of potential assumption and assignment by electronic transmission, hand delivery, or overnight mail on the counterparty to the Purchased Contract (each, a "Supplemental Purchased Contract Counterparty") to each impacted Purchased Contract, and its attorney, if known, at the last known address available to the Debtors (a "Supplemental Cure Notice").

31.     Any Supplemental Purchased Contract Counterparty may file an objection (a "Supplemental Purchased Contract Objection") to, as applicable, the proposed assumption and assignment of such Purchased Contract, the proposed Cure Amounts (if any) (as defined below), or adequate assurance of future performance by the Stalking Horse Purchaser or other Successful Bidder.  All Supplemental Purchased Contract Objections must: (a) to the extent the monetary amount the Debtors believe they will be required to pay under section 365(b)(1)(A) and (B) of the Bankruptcy Code (the "Cure Amount") has not been resolved by the Assumption Amounts Motion, state, with specificity, the legal and factual basis for the objection and, if applicable, what Cure Amounts are required; (b) include appropriate documentation in support of the objection; and (c) be filed and served so as to be actually received by the Objection Notice Parties (as defined in the Cure Notice) no later than seven (7) days from the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice.

**BASIS FOR RELIEF**

**I.     THE COURT SHOULD APPROVE THE BIDDING PROCEDURES AND ENTRY INTO THE STALKING HORSE APA.**

32.     The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

33.     The Debtors and their professional advisors, including Solomon, have designed the Bidding Procedures, including the Sale Timeline, to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors estates and creditors.  The proposed Sale Timeline contemplates an efficient sale process and the Debtors want to ensure that all interested parties, and any potential bidders, understand the timeline to participate in the sale process and submit Qualifying Bids.

34.     The Debtors submit that the Sale Timeline is appropriate.  The Debtors and their advisors have negotiated a timeline that balances the need to provide adequate notice to parties in interest, including to sufficiently market the Assets in the context of a postpetition sale process, with the need to quickly and efficiently consummate one or more sale transactions while the Assets have realizable going-concern value.  The sale timeline is a product of good-faith, arm's-length negotiations and reflects the best option for maximizing the value of the Assets under the circumstances of these chapter 11 cases.  As detailed above, the Debtors' business has been

thoroughly marketed to a wide range of potential strategic and financial buyers. A substantial amount of information regarding the Debtors' businesses has been made available to these prospective purchasers during the prepetition phase of the sale process. As such, the Debtors believe that prospective bidders already know the Assets well and will have sufficient time and information to conduct the necessary due diligence to submit binding bids in accordance with the Sale Timeline. Moreover, Bankruptcy Rule 2002(a)(2) requires twenty-one (21) days' notice of the Sale and given the Debtors spent approximately five months conducting an extensive pre-bankruptcy marketing process, the Sale Timeline is more than adequate.

35.     Access to the DIP Facility (as defined in the DIP Orders) is critical to the Debtors' ability to operate their businesses through the completion of the sale process and during the pendency of these chapter 11 cases. Failure to adhere to a quick and efficient Sale Timeline, could jeopardize the Debtors' available borrowing under the DIP Facility and, in turn, compromise the Debtors' chapter 11 strategy of transitioning the Debtors' Assets to new owners efficiently and expeditiously. Given the anticipated cost of administering these chapter 11 cases, the Debtors cannot afford any delay in monetizing their Assets. The proposed Sale Timeline allows the Debtors to maximize value while minimizing administrative expenses.

36.     The Bidding Procedures will allow the Debtors to conduct the Auction in an orderly, fair and open fashion, which will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets. The Debtors' entry into the Stalking Horse APA further increases the likelihood of the Debtors receiving the highest or best consideration for the Assets by setting the floor for the Sale. Furthermore, the Bidding Procedures and the Stalking Horse APA provide an appropriate framework for the Debtors and their fiduciaries and professional advisors to review,

analyze and compare any bids received to determine which bids are in the best interests of the Debtors' estates and their creditors. Solomon, the Debtors' investment banker in connection with the sale process, believes that the Bidding Procedures and Stalking Horse APA are appropriately crafted to, and will maximize, the value of the Assets. Finally, the Bidding Procedures and Stalking Horse APA do not contemplate approval of any break-up fee or expense reimbursement, so there is no threat that the Bidding Procedures and entry into the Stalking Horse APA chill or otherwise hamper potential bidders' bidding. Rather, approval of the Bidding Procedures and the Debtors' entry into the Stalking Horse APA sets a floor for the Debtors at the Auction and increases the likelihood that the Debtors receive the highest or best consideration for the Assets.

37.    The Debtors submit that the Bidding Procedures and entry into the Stalking Horse APA are necessary and provide for a fair and transparent sale process that will result in the Debtors' obtaining the highest or otherwise best value for the Assets. Therefore, the Debtors request the Court to approve the Bidding Procedures and entry into the Stalking Horse APA through the Bidding Procedures Order.

## II.    THE PREPETITION FIRST LIEN AGENT AND THE DIP AGENT SHOULD BE AUTHORIZED TO CREDIT BID ON THE ASSETS UNDER SECTION 363(K) OF THE BANKRUPTCY CODE.

38.    Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the full face value of its claim and does not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 459-60 (3d Cir. 2006).

39.     As a result, the Debtors propose that the Prepetition First Lien Agent and the DIP Agent, in their capacity as such under the DIP Orders, which hold claims that are secured by valid, binding, enforceable, non-avoidable and perfected liens on and security interests in substantially all of the Assets as provided for in the DIP Orders, be entitled to credit bid all or a portion of the amounts then outstanding under the Prepetition First Lien Secured Parties' claims and the DIP Lenders' claims, or any part thereof, under section 363(k) of the Bankruptcy Code and as provided for in the DIP Orders and the Bidding Procedures.

### III.     THE COURT SHOULD APPROVE THE PROPOSED PROCEDURES FOR TERMINATING THE CHALLENGE PERIOD.

40.     As this Court well knows, Bankruptcy section 363 permits the Debtors to sell their assets outside the ordinary course of business and Bankruptcy Rule 363(k) permits the holder of an allowed secured claim to bid on property that is subject to a lien that secures that claim. Moreover, Bankruptcy Rule 2002 and Local Rule 6004-1(c) only require the Debtors to provide 21 days notice of any sale, and does not require a longer period of time when the proposed sale is to a party seeking to credit bid is secured debt for property securing the lien.  Indeed, the only requirement of such a bidder is that in any hearing on such credit bid is that the secured party "has the burden of proof on the issue of the validity, priority, or extent of such interest."  11 U.S.C. § 363(p)(2).

41.     Admittedly, however, for good reasons the Local Rules of this Court have provided parties in interest with 75 days from the Petition Date to investigate the validity, priority or extent of any asserted interests in property (*i.e.*, the Challenge Period), Local Rule 4001-2(a)(i)(q), which Challenge Period was embodied in the DIP Orders entered in this case, Interim DIP Order at ¶ 6. The same Local Rules, however, permit the Court to shorten the Challenge Period "for cause" and in the present circumstances of this case the Debtors maintain that cause exists and Bankruptcy

Code sections 363(b), (k), and (p)(2) justify the Court terminating the Challenge Period upon entry of the Sale Order for the reasons set forth below.

42.    ***First***, the Debtors contend that in the event that no Challenge Period Notice is received by the Debtors and the Prepetition First Lien Lenders by the Challenge Period Notice Deadline, and no objection is raised at the Sale Hearing, all parties in interest may be deemed to have waived any right to investigate and, thus challenge the Prepetition First Lien Secured Lenders' liens and secured claims. *See In re Am. Home Mortg. Holding*, 458 B.R. 161, 174 (Bankr. D. Del. 2011) (discussing that waiver requires a showing of: (1) the existence of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege advantage or benefit) (internal quotations omitted); *see also Evcco Leasing Corp. v. Ace Trucking Co.*, 828 F.2d 188, 196 (3d Cir. 1987) ("[T]he same facts may establish both waiver and estoppel."). The Sale Notice will provide notice of the Sale and notice of the Challenge Period Notice Deadline to parties in interest. In the event no Challenge Period Notice is received by the Challenge Period Notice Deadline, parties in interest should be deemed to have waived any right to investigate and be estopped from challenging the Prepetition First Lien Secured Lenders' liens and secured claims.

43.    ***Second***, even if such a Challenge Period Notice were made, the Debtors maintain cause exists for this Court to terminate the Challenge Period as of the entry of the Sale Order. Specifically, the early termination of the Challenge Period will result in significant savings to the Debtors' estate and promote judicial efficiency. Indeed, as will be shown at the hearing on the Bid Procedure Motion, the Debtors anticipate that there would be substantial cost savings to their estates if the sale of substantially all of the Debtors assets could be consummated fifteen (15) to thirty (30) days prior to the expiration of the Challenge Period.

44.     Moreover, no party in interest would be harmed or otherwise prejudiced by the early termination of the Challenge Period.  Specifically, in the particular circumstances of these cases, an investigation and challenge to the liens and secured claims of the Prepetition First Lien Lenders is of little or no value to prepetition unsecured creditors who will not receive any payments under the first day motions or the sale.  Indeed, the only likely beneficiaries of a successful lien challenge are the DIP Lenders and the Prepetition Second Lien Lenders.  The DIP Lenders would get any value because they are not credit-bidding the entire amount of their DIP Secured Claims and even if they were, the value from any challenge would flow to the Prepetition Second Lien Lenders who are receiving little, to nothing, on account of their prepetition liens and secured claims, and would actually be required to turnover any proceeds they receive from such challenges to the Prepetition First Lien Lenders under the existing intercreditor agreement.  Second Lien Intercreditor Agreement at § 6.12.[6]

45.     In sum, under the present circumstances, cause exists to terminate the Challenge Period as of the entry of the Sale Order, especially if no party in interest provides a Challenge Period Notice.

## IV.    SUFFICIENT BUSINESS JUSTIFICATION EXISTS FOR CONSUMMATION OF THE SALE UNDER SECTIONS 105(A) AND 363(B) OF THE BANKRUPTCY CODE.

46.     Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and

---

[6]    "Second Lien Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of October 27, 2015, by and between the Prepetition First Lien Agent, for itself and on behalf of the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Agent, for itself and on behalf of the Prepetition Second Lien Secured Parties.

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1070-71 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999) (same).

47.     The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

48.     The Debtors submit that their decision to consummate the Sale represents a reasonable exercise of the Debtors' business judgment, and accordingly the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors will continue to conduct an extensive and fulsome process to market the Assets.  The open and fair auction and sale process contemplated by the Bidding Procedures will ensure that the Debtors' estates receive

the highest or best value available for the Assets by allowing the market to dictate the value of the Assets and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then the Successful Bidder, and establish that the Debtors and such bidder have proceeded in good faith.

49.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances. Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections. The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse APA, the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

50.     The Sale, conducted in accordance with the Bidding Procedures, will generate significant value for the Debtors' estates and represents the best path forward for maximizing recoveries in connection with these chapter 11 cases. The Debtors submit that ample business justification exists for the consummation of the Sale and, therefore, request that this Court approve such Sale.

## V.    THE SALE OF THE ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN THE ASSUMED LIABILITIES IS AUTHORIZED UNDER SECTION 363(F) OF THE BANKRUPTCY CODE.

51.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

52. Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the Sale of the Assets "free and clear" of liens and interests. *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens. *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

53. The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all Liens other than Assumed Liabilities (both as defined in the Stalking Horse APA) (and except as otherwise expressly set forth in the Sale Order), in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale. In particular, the Debtors believe that section 363(f)(2) of the Bankruptcy Code will be met because the Prepetition First Lien Lenders consented to the Sale as the Stalking Horse Purchaser pursuant to the Stalking Horse APA, subject to higher or better terms as set forth in an Alternative APA.

54.     Moreover, with respect to any other party asserting a lien, claim, encumbrance or the like against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented.  *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).  Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the Sale of the Assets in accordance therewith shall be "consent" to such Sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

55.     Furthermore, the Debtors propose that any Lien asserted against the Assets be transferred to, and attach to, the proceeds of the Sale, and application of the proceeds generated by the Sale will be subject to any applicable provisions of the DIP Orders and the DIP Credit Agreement.

## VI.    THE SUCCESSFUL BIDDER SHOULD BE ENTITLED TO THE PROTECTIONS OF SECTION 363(M) OF THE BANKRUPTCY CODE.

56.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of

the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. *See* 11 U.S.C. § 363(m). In approving the Sale free and clear of Liens other than Assumed Liabilities, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bidding Procedures, including, without limitation, the Stalking Horse Purchaser, are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. Such relief is appropriate in that selection of the Successful Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction. *See In re Tempo Technology Corp.*, 202 B.R. 363, 370 (D. Del. 1996) (affirming the bankruptcy court's approval of a sale under section 363(b) of the Bankruptcy Code where, *inter alia*, adequate notice to creditors and other interested parties was given and the negotiations between buyer and seller took place at arm's-length with no evidence of fraud, collusion, or interested dealing).

## VII. THE ASSUMPTION AND ASSIGNMENT OF THE PURCHASED CONTRACTS IN CONNECTION WITH THE SALE SATISFIES SECTION 365 OF THE BANKRUPTCY CODE.

57. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

58. In reviewing whether to approve the Debtors' assumption of a contract or an unexpired lease, the Court applies the "business judgment" standard. *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad

faith, whim, or caprice).  As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872).  Indeed, "the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

59.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See, e.g., id.*; *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule.").  Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the [Bankruptcy] Code.") (internal quotations omitted); *see also In re Trans World Airlines, Inc.*, 261 B.R. 103, 123 (Bankr. D. Del. 2001) ("Section 365(a) grants a debtor in possession the fundamental authority to assume or reject an executory contract as a vital part of the bankruptcy process…[The debtor in possession] has decided, based on its business judgment and as joined by the Committee, that rejection is in the best interest of the estate and its decision is entitled to the appropriate deference by this Court.").

60.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Purchased Contracts is in the best interests of the Debtors and their estates, and accordingly the Court should approve the proposed assumption under section

365(a) of the Bankruptcy Code.  *See, e.g., In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

61.    As set forth above, the Sale will provide significant benefits to the Debtors' estates. To that end, the assumption, assignment and sale of the Purchased Contracts is necessary for the Debtors to obtain the benefits of the Stalking Horse APA or an Alternative APA, as applicable.  In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Thus, following an assignment to the Successful Bidder of any Purchased Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

62.    Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Purchased Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  As detailed in the Stalking Horse APA and the Bidding Procedures Order, the Debtors propose fixing the Cure Amounts (as defined in the Stalking Horse APA) through the Stalking Horse APA and allowing the counterparties the opportunity to object to the proposed Cure Amount, as well as the Debtors' assumption and assignment of the Purchased Contracts.

63.     Section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

64.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

65.     Here, the Successful Bidder will have provided adequate assurance of future performance with respect to any Purchased Contract.  For its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"),

including: (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the counterparty may directly contact in connection with the adequate assurance of future performance.  To the extent that the Qualifying Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor.  Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Successful Bidder to provide adequate assurance of future performance.

66.     Therefore, the Debtors request the Court to approve the proposed assumption and assignment of the Purchased Contracts.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)**

67.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale on the timeline contemplated by the Bidding Procedures would be detrimental to the Debtors, their creditors and estates.

68.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

## NOTICE

69.     The Debtors will provide notice of this Motion to:  (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (b) the United States Attorney's Office for the District of Delaware; (c) the state attorneys general for all states in which the Debtors conduct business; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the holders of the fifty (50) largest unsecured claims against the Debtors on a consolidated basis; (g) counsel to the DIP agent; (h) counsel to Antares Capital LP, as administrative agent, under the Debtors' First Lien Credit Agreement and the Debtors' Sidecar Credit Agreement, King & Spalding LLP (Attn: Lindsey Henrikson and Matthew Warren, email: lhenrikson@kslaw.com and mwarren@kslaw.com); (i) counsel to Ares Capital Corporation, as administrative agent, under the Debtors' Second Lien Credit Agreement, Proskauer Rose LLP, (Attn: David M. Hillman and Justin Breen, email: DHillman@proskauer.com and JBreen@proskauer.com); and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, the Debtors request entry of the Bidding Procedures Order and the Sale

Order to be filed in advance of the Sale Hearing, granting the relief requested herein and such other

and further relief as is just and proper.

Dated: April 8, 2024
      Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Mark L. Desgrosseilliers*
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
Email: desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Cristine Pirro Schwarzman (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com
        cristine.schwarzman@ropesgray.com

-and-

**ROPES & GRAY LLP**
Conor P. McNamara (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail:  conor.mcnamara@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*