# EXHIBIT A

**Proposed Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. \_\_\_\_\_** |

**ORDER (I)(A) APPROVING CERTAIN BIDDING
PROCEDURES AND THE FORM AND MANNER OF
NOTICE THEREOF, (B) APPROVING THE DEBTORS' ENTRY
INTO THE STALKING HORSE APA, (C) APPROVING THE DEADLINE FOR
PARTIES IN INTEREST TO PROVIDE NOTICE OF THE THEIR INTENTION TO
USE THE CHALLENGE PERIOD TO INVESTIGATE THE LIENS AND CLAIMS OF
THE PREPETITION FIRST LIEN LENDERS SEEKING TO CREDIT BID AT
THE AUCTION; AND (II) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion") of the above-captioned debtors and

debtors in possession (collectively, the "Debtors") for, *inter alia*, the entry of an order

(this "Order")[2]: (i)  scheduling a hearing (the "Sale Hearing") on approval of the proposed sale

(the "Sale") of all or substantially all of the Debtors' assets (the "Assets") free and clear of all

Liens other than Assumed Liabilities to SFC Acquisition Co, LLC, an entity organized by the

Prepetition First Lien Agent and to be controlled by the Prepetition First Lien Lenders or any other

Successful Bidder, and the assumption and assignment of certain executory contracts and

unexpired leases (each, a "Purchased Contract" and collectively, the "Purchased Contracts");

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2]     Capitalized terms used but not defined herein shall have the meanings given them in the Bidding Procedures, or to the extent not defined therein, the Motion or the Stalking Horse APA.

(ii) authorizing and approving certain bidding procedures for the Sale (collectively, the "Bidding Procedures," a copy of which is attached as **Exhibit 1** to this Order),[3] and the form and manner of notice thereof, including the Sale Notice and notice of the Challenge Period Notice Deadline; (iii) authorizing the Debtors' entry into the asset purchase agreement attached to the Motion as Exhibit B (the "Stalking Horse APA") with the Stalking Horse Purchaser; (iv) scheduling an auction for the Assets (the "Auction"); and (v) granting related relief; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required except as set forth herein; and it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed the Motion; and the Bidding Procedures Hearing (as defined herein) having been held; and the Court having found and determined that the relief set forth herein is in the best interests of the Debtors, their estates and creditors and all parties in interest, and that the legal and factual bases set forth in the Motion and the evidence adduced at the Bidding Procedures Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

---

[3] Capitalized terms used but not defined in this Order have the meanings ascribed to them in the Bidding Procedures. If they are not defined in this Order or in the Bidding Procedures, then they shall have the meanings ascribed to them in the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 66] (the "Interim DIP Order" and the final order, the "Final DIP Order" and together, the "DIP Orders"). All references to the Bidding Procedures herein are qualified in their entirety by the Bidding Procedures themselves.

FOUND AND DETERMINED THAT:[4]

A.      This Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*.

B.      Venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.      The statutory and legal predicates for the relief requested in the Motion and provided for herein are sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

D.      In the Motion and at the hearing on the relief set forth herein (the ''Bidding Procedures Hearing"), the Debtors demonstrated that good and sufficient notice of the relief granted by this Order has been given and no further notice is required except as otherwise provided for herein.  A reasonable opportunity to object or be heard regarding the relief granted by this Order (including, without limitation, with respect to the Bidding Procedures) has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

E.      The Sale Notice, in substantially the form attached to this Order as Exhibit 2, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the Bidding Procedures, the Auction, the Sale, and the Sale Hearing, and any

---

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

and all objection deadlines related thereto, and no other or further notice is required of the foregoing.

F.      The Debtors have articulated good and sufficient business reasons for the Court to approve the Bidding Procedures.  The Bidding Procedures are: (i) fair, reasonable, and appropriate; and (ii) designed to maximize recovery with respect to the Sale.  The Bidding Procedures were negotiated in good faith and at arm's-length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Debtors' Assets. The process for selecting the Stalking Horse Purchaser was fair and appropriate under the circumstances and in the best interests of the Debtors' estates. The Bidding Procedures comply with the requirements of Local Rule 6004-1(c).

G.      The Stalking Horse APA represents the highest or otherwise best offer the Debtors have received to date to purchase the Assets designated for purchase thereunder.  The Stalking Horse APA provides the Debtors with the opportunity to sell such Assets in a manner designed to preserve and maximize their value and provides a floor for a further marketing and auction process. Without the Stalking Horse APA, the Debtors are at significant risk of realizing a lower price for their Assets.  The Stalking Horse Purchaser shall act as a "stalking horse bidder" pursuant to the Stalking Horse APA and shall be subject to higher or otherwise better offers in accordance with the Stalking Horse APA and the Bidding Procedures.  Pursuit of the Stalking Horse Purchaser as a "stalking horse bidder" and the Stalking Horse APA as a "stalking horse purchase agreement" is in the best interests of the Debtors and the Debtors' estates and their creditors, and it reflects a sound exercise of the Debtors' business judgment.

I.      Entry of this Order is in the best interests of the Debtors, their estates and creditors and all other interested parties.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      Those portions of the Motion seeking approval of (a) the Debtors' entry into the Stalking Horse APA (subject to higher or otherwise better offers in accordance with this Order), (b) the Bidding Procedures substantially in the form attached to this Order as **Exhibit 1**, (c) the date and time of the Sale Hearing, and (d) the noticing and objection procedures related to each of the foregoing, including, without limitation, the notice of (i) the deadline to provide notice that a party intends to investigate the claims and liens of the Prepetition First Lien Lenders who are seeking to credit bid certain or their liens and claims at the Auction and (ii) the Sale and the entry of this Order, substantially in the form attached to this Order as **Exhibit 2** (the "Sale Notice"), the notice of the Successful Bidder in the form attached to this Order as **Exhibit 3** (the "Notice of Successful Bidder"), and the notice of the Debtors' potential assumption and assignment of the Purchased Contracts, substantially in the form attached to this Order as **Exhibit 4** (the "Cure Notice"), (subclauses (a) - (d) above, collectively, the "Bidding and Auction Process"), are hereby GRANTED to the extent set forth herein.

2.      Any objections to the Motion as it pertains to the Bidding and Auction Process or the relief granted by this Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

3.      The Bidding Procedures are hereby approved.  The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being this Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order.  The

Debtors are hereby authorized to conduct the Auction pursuant to the terms of the Bidding Procedures and this Order.

4.      The Debtors shall have the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder.  Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders, *provided* that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors.  The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures or the Sale, *provided* that the information was provided in accordance with this Order.

5.      For all purposes under the Bidding Procedures: (a) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid; (b) the Stalking Horse Purchaser is, and will be deemed to be, a Qualifying Bidder for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth herein and without any other or further action by the Stalking Horse Purchaser; and (c) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

6.      The Bidding Procedures shall apply to the Potential Bidders, the Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction.

7.      The Debtors' decision to assume and assign the Purchased Contracts to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, is subject to this Court's approval and the closing of the Sale. Accordingly, absent this Court's approval and the closing of the Sale, the Purchased Contracts shall not be deemed assumed or assumed and assigned, and shall in all respects be subject to further administration by the Debtors and their estates under the Bankruptcy Code in connection with these chapter 11 cases (the "Chapter 11 Cases").

8.      The Cure Notice is: (a) reasonably calculated to (i) provide sufficient, effective notice to all counterparties and any other affected parties of the Debtors' intent to assume and assign to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, some or all of the Purchased Contracts, and (ii) afford the counterparties the opportunity to exercise any rights affected by the Motion and the relief granted by this Order pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006; and (b) hereby approved.

9.      The inclusion of a contract, lease or other agreement on the Sale Notice or Cure Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtors and their estates with respect thereto shall be reserved.

10.     The Sale Notice, the Cure Notice, any Supplemental Cure Notice (as defined in the Motion), the Bidding Procedures, the Auction, and the Sale Hearing, and the objection periods associated with each of the foregoing are reasonably calculated to provide notice to any affected party and afford the affected party the opportunity to exercise any rights affected by the Motion as

it relates to the Bidding Procedures, the Auction, the Sale, the Sale Hearing, and the assumption

and assignment to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is

not the Successful Bidder, then to the Successful Bidder, of the Purchased Contracts pursuant to

Bankruptcy Rules 2002(a)(2), 6004 and 6006, and such notice and objection periods are hereby

approved.

11.    The Sale Notice is approved.  Within three (3) business days of the entry of this

Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by

regular mail on the Notice Parties.

12.    The Cure Notice is approved.  Within three (3) business days of the entry of this

Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Cure Notice by

regular mail on counterparties to Purchased Contracts to provide notice of the potential assumption

and assignment of their Purchased Contracts by the Successful Bidder.

13.    The Debtors shall post the Sale Notice, the Cure Notice, any Supplemental Cure

Notice, and this Order on the website of the Debtors' claims and noticing agent.  Within seven (7)

business days of the entry of this Order or as soon as reasonably practicable thereafter, the Debtors

shall cause the Sale Notice to be published once in the national edition of *USA Today* and once in

the *Wilmington News Journal* in Delaware, with any modifications necessary for ease of

publication.  Publication of the Sale Notice as described in this Order conforms to the requirements

of Bankruptcy Rules 2002(l) and 9008 and is reasonably calculated to provide notice to any

affected party, including any Potential Bidders, and afford the affected party the opportunity to

exercise any rights affected by the Motion and the relief granted by this Order.

14.    Any party in interest seeking to investigate the liens and claims of the Prepetition

First Lien Lenders shall provide a written notice of the party's intent to do so to the Debtors and

the Prepetition First Lien Lenders (the "Challenge Period Notice") **no later than 4:00 p.m. (E.T.) on the first business day preceding the Auction Date (May 20, 2024)** (the "Challenge Period Notice Deadline").  Absent any party in interest providing the Debtors and the Prepetition First Lien Lenders a Challenge Period Notice on or before the Challenge Period Notice Deadline, the Challenge Period (as defined in the Final DIP Order) shall terminate as of the day the Auction is scheduled to commence and the Prepetition First Lien Lenders shall be entitled to credit bid all or any part of their secured claims and liens pursuant to Bankruptcy Code section 363(k).  In the event that no Challenge Period Notice is received by the Debtors and the Prepetition First Lien Lenders on or before the Challenge Period Notice Deadline, the Debtors shall file notice of the Challenge Period having expired on or before the date on which the Auction is scheduled to commence and notwithstanding the foregoing any in party interest objecting to the expiration of the Challenge Period pursuant to this paragraph shall be entitled to raise any objections to the Court at the Sale Hearing.

15.     Any objections to the Sale or the relief requested in connection with the Sale, including objections related to the adequate assurance of future performance by the Stalking Horse Purchaser but not including objections related to cure amounts for the Purchased Contracts or general objections to the assumption and assignment of the Purchased Contracts, (a "Sale Objection") must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of this Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (E.T.) on May 20, 2024** (the "Sale Objection Deadline"), and proof of service of such Sale Objection upon the Objection Notice Parties (as defined in the Sale Notice) shall be filed with the Court as and when required by the Local Rules; and (e) be served upon the Objection Notice Parties; *provided,*

*however*, that the Sale Objection Deadline solely for Sale Objections related to the adequate assurance of future performance of a purchaser that is not the Stalking Horse Purchaser shall be **on or before 12:00 p.m. (E.T.) on May 22, 2024**.  If a Sale Objection is not filed and served on or before the Sale Objection Deadline in accordance with the foregoing requirements, the objecting party may be barred from objecting to the Sale and being heard at the Sale Hearing, and this Court may enter the Sale Order (as defined in the Motion) without further notice to such party.

16.     Failure to file a Sale Objection on or before the Sale Objection Deadline (a) may forever bar the assertion, whether at any Sale Hearing or thereafter, of any objection to the Motion, to entry of the Sale Order, and to the consummation and performance of the Sale contemplated by the Stalking Horse APA or any alternative asset purchase agreement (an "Alternative APA") with a Successful Bidder other than the Stalking Horse Purchaser, and (b) for purposes of section 363(f)(2) of the Bankruptcy Code, shall be deemed to be "consent" to entry of the Sale Order and consummation of the Sale and all transactions related thereto.

17.     As part of its bid, each Qualifying Bidder must provide the Debtors, the other Bidding Procedures Notice Parties, and the Consultation Parties information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including (a) the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to such Qualifying Bidder; and (b) a contact person for the proposed assignee that the applicable counterparty may directly contact in connection with the adequate assurance of future performance.  In the event that a Qualifying Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the

Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor.

18.     Any party in receipt of Adequate Assurance Information under this Order shall review the Adequate Assurance Information received on a confidential basis and shall not disclose the Adequate Assurance Information except as expressly provided in this Order and the Bidding Procedures.  Such counterparty may not use or disclose, except to representatives, attorneys, advisors and financing sources (collectively, "Representatives"), any confidential Adequate Assurance Information for any purpose other than: (a) evaluating whether adequate assurance of future performance as required under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code has been provided; and (b) in support of any objection (the "Assignment Objection") (subject to the limitations on disclosure set forth herein) by such counterparty relating to adequate assurance of future performance.  Any Assignment Objection that includes confidential, non-public Adequate Assurance Information must be filed under seal unless disclosure of such confidential, non-public information is authorized by the Debtors and the applicable assignee(s).  The party filing an Assignment Objection under seal shall follow the procedures for the same set forth in Local Rule 9018-1(d).  The unredacted versions of such Assignment Objections shall be served upon the Debtors, the other Bidding Procedures Notice Parties, the Consultation Parties and the U.S. Trustee; *provided further* that all rights of all parties in interest in the Chapter 11 Cases are reserved to oppose the filing under seal of any such information and to seek any other relief from this Court with respect to such matter.  Any Representative receiving Adequate Assurance Information shall be notified and shall agree to be bound by the restrictions set forth in this Order.

19.     The Stalking Horse Purchaser shall be deemed to be a Qualifying Bidder and the Stalking Horse APA is deemed to be a Qualifying Bid.  Subject to the DIP Order, the Stalking Horse Purchaser is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit with the Debtors.  The Stalking Horse Purchaser shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition First Lien Obligations and the DIP Obligations.

20.     If no timely Qualifying Bids other than the Stalking Horse APA are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that this Court approve the Stalking Horse APA and the transactions contemplated thereunder.  If the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse APA, then the Debtors shall conduct the Auction on **May 21, 2024 at 11:00 a.m. (E.T.)**, at the offices of Ropes & Gray LLP, 1211 6th Avenue, New York, NY 10036, or virtually via telephone and/or video conference pursuant to information to be timely provided by the Debtors to the Auction Participants (as defined herein).  Only the Debtors, the Auction Bidders (including the Stalking Horse Purchaser), the Consultation Parties, the DIP Agent, the Prepetition First Lien Agents, the Prepetition Second Lien Agents, and any creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "Auction Participants"); *provided* that any such creditors provide Debtors' counsel with written notice of their intent to attend the Auction no later than 5:00 p.m. (E.T.) the day prior to the Auction.

21.     The Debtors shall have until the Sale Hearing to file and serve a reply to any objection filed in connection with the Sale, including any Sale Objection or Assignment Objection.

22.     The Sale Hearing shall be held in this Court on **May 23, 2024 at 2:30 p.m. (E.T.)**, unless otherwise determined by this Court.  The Sale Hearing may be adjourned by the Debtors, in consultation with the DIP Agent, the Prepetition Initial First Lien Agent[5] and the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then in consultation with the DIP Agent, the Prepetition Initial First Lien Agent and the Successful Bidder, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the Chapter 11 Cases.

23.     All persons and entities that participate in the Auction or bid for any Asset during the sale process shall be deemed to have knowingly and voluntarily (i) consented to the core jurisdiction of the Court to enter any order related to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order; (ii) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order; and (iii) consented to the entry of a final order or judgment in connection with any disputes relating to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order, if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the relevant parties.

24.     The Debtors are authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

---

[5]     Any reference to a consent right of the DIP Agent or the Prepetition First Lien Agents hereunder shall be a reference to the consent of such agent at the direction of the applicable consenting Lenders under the DIP Documents and the Prepetition Loan Documents, as applicable.

25.     In the event that there is a conflict between this Order or the Bidding Procedures, on the one hand, and the Motion, the Stalking Horse APA, or an Alternative APA, on the other hand, this Order and the Bidding Procedures shall control and govern.  If there is a conflict between this Order and the Bidding Procedures, this Order shall control and govern.  If there is a conflict between this Order or the Bidding Procedures, on the one hand, and any notice served in connection with the Motion or this Order, on the other hand, this Order and the Bidding Procedures shall control and govern.

26.     Prior to mailing the Cure Notice, any Supplemental Cure Notice, and the Sale Notice, the Debtors may fill in, or cause to be filled in, any missing dates and other information, correct any typographical errors, conform the provisions thereof to the provisions of this Order, and make such other, non-material changes as the Debtors deem necessary or appropriate.

27.     This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h) or 6006(d) or any other provision of the Bankruptcy Code, the Bankruptcy Rules or the Local Rules is expressly waived.  The Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and may, in their sole discretion and without further delay, take any action and perform any act authorized or approved under this Order.

28.     The requirements set forth in Local Rules 6004-1, 9006-1 and 9013-1 are hereby satisfied or waived.

29.     The Debtors are authorized to take all steps necessary or appropriate to implement the relief granted in this Order.

30.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation or interpretation of the Order.

## EXHIBIT 1

### Bidding Procedures

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket No. _____** |

## BIDDING PROCEDURES

On April 1, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Debtors are maintaining their business and managing their property as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On [April 25], 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. ●] (the "Bidding Procedures Order"), among other things, granting certain relief requested in the related motion [Docket No. ●] (the "Bidding Procedures Motion"), including authorizing the Debtors to solicit bids and approving the procedures set forth herein (collectively, the "Bidding Procedures") to be employed by the Debtors in connection with the proposed sale (the "Sale") of all or substantially all of the Debtors' assets (the "Assets"), free and clear of all Liens (as defined in the Stalking Horse APA, as defined below) other than Assumed Liabilities (as defined in the Stalking Horse APA) to SFC Acquisition Co, LLC  (the "Stalking Horse Purchaser"), pursuant to an asset purchase agreement dated as of April 8, 2024 (the "Stalking Horse APA") with the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder (as defined below), then an Alternative APA (as defined below) with the Successful Bidder.  The Stalking Horse APA is attached to the Bidding Procedures Motion as **Exhibit B**.

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT:**

    **(A)    THE INVESTMENT BANKER FOR THE DEBTORS, SOLOMON PARTNERS SECURITIES, LLC, JEFF DERMAN (212-508-1625; JEFF.DERMAN@SOLOMONPARTNERS.COM), TERO JÄNNE (212-508-**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

1676;    TERO.JANNE@SOLOMONPARTNERS.COM),    AND    DAN GOLYNSKIY                                    (646-378-4068; DANIEL.GOLYNSKIY@SOLOMONPARTNERS.COM); AND

(B)    GREGG        M.        GALARDI,        ESQ.        (212-596-9139; GREGG.GALARDI@ROPESGRAY.COM),        CRISTINE    PIRRO SCHWARZMAN,            ESQ.            (212-596-9635; CRISTINE.SCHWARZMAN@ROPESGRAY.COM); ELLEN WHEELER, ESQ. (212-841-5783;  ELLEN.WHEELER@ROPESGRAY.COM);  AND CONOR        P.        MCNAMARA,        ESQ.        (312-845-1200, CONOR.MCNAMARA@ROPESGRAY.COM) OF ROPES & GRAY LLP, COUNSEL FOR THE DEBTORS.

### *Summary of Key Dates Established by Bidding Procedures*

| Date | Event or Deadline |
|---|---|
| April 30, 2024, or as soon as reasonably practicable thereafter | Deadline to serve Sale Notice on the Notice Parties, including notice of the Challenge Period Notice Deadline |
| May 17, 2024 | Deadline for Prospective Bidders to Submit Qualifying Bids |
| May 20, 2024 | Challenge Period Notice Deadline |
| May 21, 2024 | Auction Date |
| May 23, 2024, or as soon thereafter as the Court is available | Hearing to Consider the Sale Order |
| No later than May 31, 2024 | Entry of the Sale Order |
| No later than June 17, 2024 | Consummation of the Sale |

1.    **Stalking Horse Purchaser**

On April 8, 2024, the Debtors entered into the Stalking Horse APA with the Stalking Horse Purchaser.  As set forth more fully in the Stalking Horse APA, the Stalking Horse Purchaser is (i) credit bidding no less than $290 million on account of the DIP Obligations and the Prepetition First Lien Obligations (as each term is defined in the DIP Order),[2] (ii) assuming certain liabilities and executory contracts and unexpired leases of the Debtors, and (iii) satisfying cure costs, subject

---

[2]    Capitalized terms used but not defined in the Bidding Procedures have the meanings ascribed to them in the Bidding Procedures Order.  If they are not defined in the Bidding Procedures or in the Bidding Procedures Order, then they shall have the meanings ascribed to them in the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 66] (the "Interim DIP Order" and the final order, the "Final DIP Order" and together, the "DIP Orders").

to the cure cost cap (collectively (i), (ii) and (iii), the "<u>Purchase Price</u>").  The Stalking Horse APA also includes various customary representations, warranties, and covenants by and from the Debtors and the Stalking Horse Purchaser, and certain conditions to closing and rights of termination related to the Sale and the Chapter 11 Cases generally.

The Stalking Horse Purchaser is deemed to be a Qualifying Bidder (as defined below) and the Stalking Horse APA is deemed to be a Qualifying Bid (as defined below).  Subject to the DIP Order, the Stalking Horse Purchaser is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit (as defined below) with the Debtors.  The Stalking Horse Purchaser shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition First Lien Obligations and the DIP Obligations.

**2.**      **<u>Assets to be Sold</u>**

The Debtors shall offer for sale the Assets, *provided* that the Debtors, in consultation with the Consultation Parties (as defined below), determine that the aggregate consideration offered by any bid, or combination of bids, for the Assets, satisfies the requirements set forth in these Bidding Procedures.  Potential Bidders (as defined below) may bid on all or any number or combination of the Assets.

**3.**      **<u>Participation Requirements</u>**

Any person or entity that wishes to conduct diligence about the Debtors (an "<u>Interested Party</u>") may request access to the Debtors' confidential electronic data room concerning the Assets (the "<u>Data Room</u>").  To become an Interested Party, and thus be able to conduct due diligence, an Interested Party must execute a non-disclosure agreement, in form and substance satisfactory to the Debtors, with the Debtors.

Any Interested Party that wishes to participate in the bidding process for the Assets other than in the case of the Stalking Horse Purchaser (each, a "<u>Potential Bidder</u>") must first become a "<u>Qualifying Bidder</u>." To become a Qualifying Bidder, a Potential Bidder must submit to the Debtors and their advisors:

(a)      documentation identifying the Interested Party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

(b)      an executed confidentiality agreement in form and substance satisfactory to the Debtors;

(c)      a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties, that the Interested Party has a *bona fide* interest in consummating a sale transaction; and

(d)      sufficient information, as determined by the Debtors, after consultation with the Consultation Parties, to allow the Debtors to determine that the Interested Party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited

to, current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate its contemplated transaction.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser; and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

4.      **Bankruptcy Court Jurisdiction**

Any Potential Bidders and Qualifying Bidders shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction (as defined below) and the construction and enforcement of the contemplated transaction documents of such parties; (b) bring any such action or proceeding in the Court; and (c) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

5.      **Form of Agreement**

Potential Bidders should reference the Stalking Horse APA in connection with their bids. As set forth below, Potential Bidders intending to submit bids must include with their bids:

(a)      a statement that such Potential Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse APA, if applicable; and

(b)      a clean and duly executed asset purchase agreement (an "Alternative APA") and a marked copy of the Alternative APA that reflects any variations from the Stalking Horse APA.

6. **Due Diligence**

The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: (a) proposed investment banker for the Debtors, Solomon Partners Securities, LLC, attn: Jeff Derman (212-508-1625; jeff.derman@solomonpartners.com), Tero Jänne (212-508-1676; tero.janne@solomonpartners.com), and Dan Golynskiy (646-378-4068; daniel.golynskiy@solomonpartners.com); or (b) proposed counsel for the Debtors, Gregg M. Galardi, Esq. (212-596-9139; gregg.galardi@ropesgray.com); Cristine Pirro Schwarzman, Esq. (212-596-9635; cristine.schwarzman@ropesgray.com); Conor P. McNamara, Esq. (312-845-1227; conor.mcnamara@ropesgray.com); and Ellen Wheeler, Esq. (212-841-5783; ellen.wheeler@ropesgray.com).

The due diligence period shall extend through and including the Bid Deadline (as defined below). The Debtors, in their business judgment, may, but shall not be obligated to, furnish any due diligence information after the Bid Deadline.

The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders *provided* that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors. The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

7. **Bid Requirements**

Other than in the case of the Stalking Horse Purchaser and the Stalking Horse APA, which shall be considered a Qualifying Bidder and a Qualifying Bid, respectively, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser, to be deemed a "Qualifying Bid," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "Bid Requirement"):

a.   be in writing;

b.   fully disclose the identity of the Qualifying Bidder (and to the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the identity of the Qualifying Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;

c.      set forth the purchase price to be paid by such Qualifying Bidder;

d.      identify separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids in accordance with section 363(k) of the Bankruptcy Code and assumed liabilities;

e.      state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

f.      specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estate than, the terms set forth in the Stalking Horse APA;

g.      be accompanied by an alternative asset purchase agreement (an "Alternative APA") and an alternative Sale Order (as defined in the Bidding Procedures Motion) that reflects any variations from the Stalking Horse APA or the Sale Order, as applicable;

h.      state that such Qualifying Bidder's offer is formal, binding and unconditional, and is irrevocable until two (2) business days after the closing of the Sale;

i.      to the extent that a bid is not accompanied by evidence of the Qualifying Bidder's capacity to consummate the Sale set forth in its bid with cash on hand, each bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Qualifying Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualifying Bidder's purchase price and other obligations under its bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties;

j.      contain such financial and other information to allow the Debtors to make a reasonable determination, after consultation with the Consultation Parties, as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Alternative APA, including, without limitation, such financial and

other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale within one (1) business day after the Debtors' receipt of such information. To the extent that the Qualifying Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor;

k.      identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative APA;

l.      include a commitment to close the transactions contemplated by the Alternative APA by no later than 75 days after the petition date;

m.      not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment;

n.      the aggregate consideration proposed by the Qualifying Bidder must (A) result, in the Debtors' reasonable judgment, in cash consideration of an amount equal to or greater than $290,000,000 to be applied to the Prepetition First Lien Obligations and DIP Obligations plus (B) $1,000,000;

o.      not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

p.      contain written evidence satisfactory to the Debtors that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Alternative APA, with appropriate contact information for such financing sources;

q.      contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all

due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale;

r.     set forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (ii) any regulatory and third-party approvals required for the Qualifying Bidder to close the transactions contemplated by the Alternative APA, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Alternative APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); *provided* that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Alternative APA; *provided*, *further* that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

s.     provide for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Successful Bid, in accordance with the terms of the Alternative APA;

t.     include written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative APA;

u.     provide a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the aggregate purchase price provided for in the Alternative APA (or such additional amount as may be determined by the Debtors in their reasonable discretion);

v.  state or otherwise estimate the types of, and costs or charges for, transition services, if any, the Potential Bidder would require of or provide to the Debtors, including an estimate of the time any such transition services would be required of or provided to the Debtor; and

w.  provide that in the event of the Qualifying Bidder's breach of, or failure to perform under, the Alternative APA, the Debtors and their estate shall be entitled to pursue all available legal and equitable remedies, including, without limitation, retention of the Deposit as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid. The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

**8.    Bid Deadline**

A Qualifying Bidder, other than the Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties (as defined below) and the Consultation Parties so as to be received on or before **May 17, 2024 at 5:00 p.m. (E.T.)** (the "Bid Deadline"); *provided* that the Debtors may extend the Bid Deadline without further order of the Court, subject to the DIP Credit Agreement and the Stalking Horse APA and after consultation with the DIP Agent, the Prepetition Initial First Lien Agent and the Consultation Parties. To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of the Chapter 11 Cases indicating the same. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

**9.    Evaluation of Qualifying Bids**

The Debtors will deliver, within one (1) business day after receipt thereof, copies of all bids from Qualifying Bidders to the Consultation Parties, the Prepetition Initial First Lien Agent and the DIP Agent.

The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid.

No later than **May 20, 2024**, the Debtors shall: (i) notify all Qualifying Bidders whether their respective bids have been determined to be Qualifying Bids; and (ii) determine, in

consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (which must be at least equal to the value of the Stalking Horse Bid, plus $1,000,000, the "<u>Baseline Bid</u>" and the Qualifying Bidder submitting the Baseline Bid, the "<u>Baseline Bidder</u>"), and shall promptly notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

10.    <u>No Qualifying Bids</u>

If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that the Court approve the Stalking Horse APA and the transactions contemplated thereunder.

11.    <u>Auction</u>

If the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse Purchaser's Qualifying Bid, then the Debtors shall conduct an auction (the "<u>Auction</u>").  Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the number, type and nature of any changes to the Stalking Horse APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates; (d) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates; and (f) any other factors the Debtors may reasonably deem relevant.

The Auction shall be governed by the following procedures:

(a)    the Auction shall be held on <u>**May 21, 2024 at 11:00 a.m. (E.T.)**</u> at the offices of Ropes & Gray LLP, 1211 6th Avenue, New York, NY 10036 or virtually via telephone or video conference pursuant to information to be timely provided by the Debtors to the Auction Participants (as defined below);

(b)    only the Stalking Horse Purchaser, the other Qualifying Bidders with Qualifying Bids (together, the "<u>Auction Bidders</u>"), and the Prepetition First Lien Lenders shall be entitled to make any subsequent bids at the Auction;

(c)    the Auction Bidders shall appear at the Auction, or through a duly authorized representative;

(d)    only the Debtors, the Auction Bidders, the Consultation Parties, the DIP Agent, the Prepetition First Lien Agents, the Prepetition First Lien Lenders, and any creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "<u>Auction Participants</u>"); *provided*

that any such creditors provide counsel for the Debtors written notice of their intent to attend the Auction no later than 5:00 p.m. (E.T.) the day prior to the Auction;

(e)    the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

(f)    prior to start of the Auction, each of the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale;

(g)    the Auction shall be conducted in an open cry format (and not by way of sealed bids). Bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least $1,000,000, *provided* that: (i) each such successive bid must be a Qualifying Bid; and (ii) the Debtors shall retain the right to modify the bid increment requirements at the Auction;

(h)    the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

(i)    all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

(j)    except as specifically set forth herein, for the purpose of evaluating the value of the purchase price provided by each successive bid (including any successive bid by the Stalking Horse Purchaser), the Debtors, in consultation with the Consultation Parties, may give effect to any additional liabilities to be assumed by a Qualifying Bidder, and any additional costs which may be imposed on the Debtors;

(k)    all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

(l)    each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign

jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

(m)    throughout the Auction, the Stalking Horse Purchaser (i) shall have the continuing right to credit bid DIP Obligations then outstanding, or any part thereof, to purchase the Assets, and (ii) shall have the continuing right to credit bid the Prepetition First Lien Obligations then outstanding, or any part thereof, to purchase the Assets;

(n)    the Auction Bidders shall have the right to make additional modifications to the Stalking Horse APA or any Alternative APA, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, *provided* that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Stalking Horse APA, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid (as defined below) or the Back-Up Bid, which shall remain binding as provided for herein;

(o)    the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Stalking Horse APA or any Alternative APA, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

(p)    upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction (the "<u>Successful Bid</u>"). In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Stalking Horse APA or any Alternative APA submitted with the Successful Bid, as applicable, requested by each bidder, and the net benefit to the Debtors' estate. The bidder submitting such Successful Bid at the Auction shall become the "<u>Successful Bidder</u>," and shall have such rights and responsibilities of the purchaser as set forth in the Stalking Horse APA or any Alternative APA, as applicable. The Debtors shall designate a Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Successful Bidder does not close the Sale, *provided* that the Stalking Horse Purchaser has not agreed to serve as the Back-Up Bidder;

(q)     without the written consent of the DIP Agent and the Prepetition Initial First Lien Agent, no bid may qualify as the Successful Bid unless such bid provides for cash consideration of an amount equal to or greater than the Prepetition First Lien Obligations and DIP Obligations that have been credit bid by the Stalking Horse Purchaser;

(r)     within one day after the conclusion of the Auction or as soon as reasonably practicable thereafter, the Debtors will file with the Court and serve on the Notice Parties a notice setting forth the results of the Auction (the "Notice of Successful Bidder"), which will (a) identify the Successful Bidder and the Back-Up Bidder; (b) include a copy of the Successful Bid and the Back-Up Bid or a summary of the material terms of such bids, including any proposed assumption and assignment of Contracts contemplated thereby; and (c) set forth the Sale Objection Deadline, the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Notice Parties of the outcome of the Auction;

(s)     within one (1) business bay of the close of the Auction, in the event the Stalking Horse Purchaser is not the Successful Bidder, the Successful Bidder shall supplement the Successful Bidder's Deposit such that the Deposit shall be equal to an amount that is ten (10%) percent of the Successful Bid; and

(t)     prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BID AND THEIR RELATED PURCHASE AGREEMENTS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED.  EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

## 12.     Sale Hearing

The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) will be subject to approval by the Court.  The Sale Hearing to approve the Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) shall take place on **May 23, 2024 at 2:30 p.m. (E.T.)**.  The Sale Hearing may be adjourned by the Debtors, in consultation with the DIP Agent, the Prepetition Initial First Lien Agent and the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then in consultation with the DIP Agent, the Prepetition Initial First Lien Agent and the Successful Bidder, from time to time without further notice to creditors or other parties in interest

other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the Chapter 11 Cases.

At the Sale Hearing, the Debtors will seek entry of a Sale Order that, among other things: (i) authorizes and approves the Sale to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, pursuant to the terms and conditions set forth in the Stalking Horse APA or Alternative APA submitted by the Successful Bidder, as applicable, free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances as determined by the Debtors and any Successful Bidder; (ii) finds that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; (iii) authorizes the assumption and assignment of certain contracts in connection with the Sale; (iv) as appropriate, exempts the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax or similar tax, or deposit under any applicable bulk sales statute; and (v) in the event that the Stalking Horse Purchaser is not the Successful Bidder, except as otherwise provided in the DIP Order, directs that all cash proceeds generated from the Sale shall be paid to the DIP Agent and the Prepetition Initial First Lien Agent, as applicable, on behalf of the DIP Lenders and the Prepetition Initial First Lien Lenders upon the closing of the Sale for application in accordance with the terms and conditions of the DIP Order, the DIP Documents, and the Prepetition Initial First Lien Documents, first, until the DIP Obligations are paid in full, and then, until the Prepetition First Lien Obligations are paid in full.

### 13.    <u>**Back-Up Bidder**</u>

Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale on or before **<u>June 17, 2024</u>** (or such date as may be extended by the Debtors with the consent of the DIP Agent, the Prepetition Initial First Lien Agent and in consultation with the Consultation Parties), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors shall be authorized to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

### 14.    <u>**Return of Deposits**</u>

All Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder no later than five (5) business days following the closing of the Sale.  The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale.  If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Stalking Horse APA or any Alternative APA, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.  For the avoidance of doubt, the Debtors' retention of a Deposit shall not constitute a waiver of any of the Debtors' legal or equitable rights relating to a Successful Bidder's or Back-Up Bidder's breach or failure to perform, and all such rights and remedies are preserved.

15. **No-Shop or No-Solicitation Provisions**

The Bidding Procedures Order and Bidding Procedures do not limit the Debtors' ability or right to solicit higher or otherwise better bids. The Sale contemplated by the Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order calls for a fair and open bidding and auction process.

16. **Notice and Consultation Parties**

(a)     The term "Bidding Procedures Notice Parties" as used in these Bidding Procedures shall mean: (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Gregg M. Galardi, Cristine Pirro Schwarzman, and Ellen Wheeler; email: gregg.galardi@ropesgray.com, cristine.schwarzman@ropesgray.com, and ellen.wheeler@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Conor P. McNamara, email: conor.mcnamara@ropesgray.com); and Chipman Brown Cicero & Cole, LLP (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com); (b) the U.S. Trustee, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (c) the DIP Agent; (d) the Prepetition Initial First Lien Agent; and (e) counsel for any statutory committee appointed in these chapter 11 cases.

(b)     The term "Consultation Parties" as used in these Bidding Procedures shall mean any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Creditors' Committee") and in the event that the Stalking Horse Purchaser terminates its credit bid, the DIP Agent and the Prepetition Initial First Lien Agent.

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

In the event that any Consultation Party or any member of any Creditors' Committee or an affiliate of any of the foregoing submits a bid that is a Qualifying Bid, any obligation of the Debtors to consult with the bidding party established under these Bidding Procedures will be waived without further action; *provided* that the bidding party will have the same rights as any other Qualifying Bidder set forth above; *provided further* that in the event the Stalking Horse Purchaser is no longer a bidding party, the DIP Agent and the Prepetition Initial First Lien Agent shall be a Consultation Party.

17. **Reservation of Rights**

Notwithstanding any of the foregoing, the Debtors, in consultation with the Consultation Parties, may (a) subject to the DIP Credit Agreement and the Stalking Horse APA and after consultation with the DIP Agent and the Prepetition Initial First Lien Agent, extend the deadlines set forth in the Bidding Procedures Order or the Bidding Procedures, and (b) adopt, implement, and waive such other, additional or existing procedures or requirements that in their discretion

serves to further an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualifying Bidders submit sealed Qualifying Bids during the Auction, all without further notice except to the Auction Participants, as appropriate.

The Debtors, in consultation with the Consultation Parties, may (a) determine which Qualifying Bid, if any, is the Successful Bid, and (b) reject at any time before entry of the Sale Order approving the Successful Bid, any bid that, in the discretion of the Debtors, in consultation with the Consultation Parties, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors. At or before the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, may impose such other terms and conditions upon Qualifying Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these cases.

## EXHIBIT 2

**Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. _____** |

**NOTICE OF PROPOSED SALE OF ASSETS,**
**STALKING HORSE APA, CHALLENGE PERIOD NOTICE**
**DEADLINE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING**

PLEASE TAKE NOTICE that the above-captioned debtors and debtors-in-possession (the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on April 1, 2024, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are seeking to assume and assign certain of their executory contracts and unexpired leases in connection with the sale (the "Sale") of all or substantially all of their assets (the "Assets"), free and clear of all Liens other than Assumed Liabilities (each as defined in the Stalking Horse APA, as defined below).[2] In connection with the Sale, the Debtors have entered into an asset purchase agreement dated as of April 8, 2024 (the "Stalking Horse APA") with SFC Acquisition Co, LLC, an entity organized by the Prepetition First Lien Agent and to be controlled by the Prepetition First Lien Lenders, subject to the Debtors' acceptance of higher or otherwise better offers in accordance with the Bidding Procedures (as defined below).

PLEASE TAKE FURTHER NOTICE that any party in interest seeking to investigate the liens and claims of the Prepetition First Lien Lenders shall provide a written notice of the party's intent to do so to the Debtors and the Prepetition First Lien Lenders (the "Challenge Period Notice") **no later than 4:00 p.m. (E.T.) on the first business day preceding the Auction Date (May 20, 2024)** (the "Challenge Period Notice Deadline"). Absent any party in interest providing the Debtors and the Prepetition First Lien Lenders a Challenge Period Notice on or before the Challenge Period Notice Deadline, the Challenge Period (as defined in the Final DIP Order) shall terminate as of the day the Auction is scheduled to commence and the Prepetition First Lien

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order and Bidding Procedures (each as defined below).

Lenders shall be entitled to credit bid all or any part of their secured claims and liens pursuant to Bankruptcy Code section 363(k).

PLEASE TAKE FURTHER NOTICE that by order, dated [●], 2024 [Docket No. ●] (the "Bidding Procedures Order"), the Bankruptcy Court approved certain relief requested in the related motion [Docket No. ●] (the "Bidding Procedures Motion"), and certain "Bidding Procedures" that govern the sale of the Assets to the highest or otherwise best bidders. Copies of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures and the Stalking Horse APA are available for download at https://omniagentsolutions.com/ShoesforCrews (the "Case Website") or from the Debtors' claims and noticing agent, Omni Agent Solutions, via telephone at 888-202-5659 (US & Canada toll free) and 747-288-6384 (International) or via email at ShoesforCrewsInquiries@OmniAgnt.com. A separate notice will be provided to counterparties to executory contracts and unexpired leases with the Debtors that may be assumed and assigned in connection with the Sale. **Any interested bidder should contact the Debtors' proposed investment banking advisor, Solomon Partners Securities, LLC, attn: Jeff Derman (212-508-1625; jeff.derman@solomonpartners.com), Tero Jänne (212-508-1676; tero.janne@solomonpartners.com), and Dan Golynskiy (646-378-4068; daniel.golynskiy@solomonpartners.com).**

- The deadline to submit a bid for any Assets is **May 17, 2024 at 5:00 p.m. (E.T.)**.

- PUT IN NOTICE OF INVESTIGATION

- Any objections to the Sale or the relief requested in connection with the Sale, including objections related to the adequate assurance of future performance by the Stalking Horse Purchaser but not including objections related to cure amounts for the Purchased Contracts or general objections to the assumption and assignment of the Purchased Contracts, (a "Sale Objection") must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **May 20, 2024 at 4:00 p.m. (E.T.)** (the "Sale Objection Deadline"), and proof of service of such Sale Objection upon the Objection Notice Parties (as defined below) shall be filed with the Court as and when required by the Local Rules; and (e) be served upon the Objection Notice Parties; *provided, however*, that the Sale Objection Deadline solely for Sale Objections related to the adequate assurance of future performance of a purchaser that is not the Stalking Horse Purchaser shall be **May 22, 2024 at 12:00 p.m. (E.T.)**. The "Objection Notice Parties" are as follows: (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Gregg M. Galardi, Cristine Pirro Schwarzman, and Ellen Wheeler; email: gregg.galardi@ropesgray.com, cristine.schwarzman@ropesgray.com, and ellen.wheeler@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Conor P. McNamara, email: conor.mcnamara@ropesgray.com); and Chipman Brown Cicero & Cole, LLP (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com); (b) the U.S. Trustee, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (c) the DIP Agent; (d) the Prepetition Initial First Lien Agent; and (e) counsel for any statutory committee appointed in these chapter 11 cases.

- An auction for the Assets, unless cancelled or adjourned in accordance with the Bidding Procedures Order, will be held on **May 21, 2024 at 11:00 a.m. (E.T.)**, at the offices of Ropes & Gray LLP, 1211 6th Avenue, New York, NY 10036, or virtually via telephone and/or video conference pursuant to information to be timely provided by the Debtors to the Auction Participants.

- Unless adjourned in accordance with the Bidding Procedures Order, the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to consider the Sale on **May 23, 2024 at 2:30 p.m. (E.T.)**, subject to the Bankruptcy Court's availability.

**PLEASE TAKE FURTHER NOTICE THAT FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER OR ANY OTHER APPLICABLE ORDER OF THE COURT ENTERED IN THESE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID AND YOUR DISQUALIFICATION FROM PARTICIPATING IN THE BIDDING FOR AND AUCTION OF ANY OF THE DEBTORS' ASSETS.**

**PLEASE TAKE FURTHER NOTICE THAT IF A SALE OBJECTION IS NOT FILED AND SERVED ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE SALE AND BEING HEARD AT THE SALE HEARING, AND THE BANKRUPTCY COURT MAY ENTER THE SALE ORDER WITHOUT FURTHER NOTICE TO SUCH PARTY.**

Dated:  [●], 2024
      Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/*  _____
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
Email: desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Cristine Pirro Schwarzman (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com
        cristine.schwarzman@ropesgray.com

-and-

3

**ROPES & GRAY LLP**
Conor P. McNamara (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail:  conor.mcnamara@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **EXHIBIT 3**

**Notice of Successful Bidder**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. _____** |

**NOTICE OF SUCCESSFUL BIDDER AND**
**BACK-UP BIDDER FOR CERTAIN OF THE DEBTORS' ASSETS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On [April 25], 2024, United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I)(A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, and (B) Approving the Debtors' Entry into the Stalking Horse APA; and (II) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to conduct a marketing and auction process for the sale or sales of substantially all of the Debtors' assets (the "Assets") through one or more sale transactions.

On **May 21, 2024 at 11:00 a.m. (E.T.),** pursuant to the Order, the Debtors commenced the Auction with respect to certain Assets either in-person or by videoconference or such other form of remote communication established by the Debtors.

At the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, selected the following Successful Bidder and Back-Up Bidder with respect to the Assets subject to the applicable Auction.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order or the Bidding Procedures, attached to the Order as Exhibit 1 thereto, as applicable.

| Asset(s) | Successful Bidder | Back-Up Bidder | Key Terms of Proposed Sale |
|----------|-------------------|----------------|----------------------------|
|          |                   |                |                            |

The Sale Hearing to consider approval of the sale of the above-listed Assets to the Successful Bidder at the Auction referenced above will be held before the Honorable Laurie Selber Silverstein, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, on **May 23, 2024, at 2:30 p.m. (E.T.)**.

At the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid and designation of the Back-Up Bid (if any) for the applicable Assets. Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the sale for the applicable Assets, and there will be no further bidding at the Sale Hearing. If a Successful Bidder cannot or refuses to consummate the applicable sale transaction following entry of the applicable Sale Order because of the breach or failure on the part of the Successful Bidder, the Back-Up Bidder (if any) shall be deemed the new Successful Bidder and the Debtors shall be authorized, but not required, to close the applicable sale transaction with such Back-Up Bidder on the terms and provisions of such applicable Back-Up Bid without further order of the Court upon filing a notice with the Court providing at least five (5) days for parties to object to the sale to the Back-Up Bidder.

This notice is subject to the terms and conditions of the *Debtors' Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for Entry of an Order (I)(A) Approving the Bidding Procedures, Including the Debtors' Entry Into the Stalking Horse APA, the Sale Timeline, and the Form and Manner of Notice Thereof, and (B) Approving the Deadline for Parties in Interest to Provide Notice of Their Intention to Use the Challenge Period to Investigate the Liens and Claims of the Prepetition First Lien Secured Lenders Seeking to Credit Bid at the Auction; (II) Approving the Debtors' (A) Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens Other Than Assumed Liabilities and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to the Successful Bidder; and (III) Granting Related Relief* [Docket No. [●]] (the "Motion") and the Order, with such Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents, including the Bidding Procedures, attached as Exhibit 1 to the Order, in their entirety. Parties interested in receiving additional or other information regarding the proposed Sale, proposed sale transaction, or other disposition of the applicable Assets may make contact Omni Agent Solutions ("Omni"), via telephone at 888-202-5659 (US & Canada toll free) and 747-288-6384 (International) or via email at ShoesforCrewsInquiries@OmniAgnt.com.

Copies of the Motion, the Order, the Bidding Procedures, this notice, and any other related documents are available: (a) upon request to Omni, via telephone at 888-202-5659 (US & Canada toll free) and 747-288-6384 (International) or via email at ShoesforCrewsInquiries@OmniAgnt.com; (b) by visiting the Debtors' restructuring website at https://omniagentsolutions.com/ShoesforCrews; or (c) for a fee via PACER by visiting https://pacer.uscourts.gov.

# EXHIBIT 4

**Cure Notice**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. _____** |

**NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT WITH RESPECT**
**TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS**

**PLEASE TAKE NOTICE THAT:**

The above-captioned debtors and debtors-in-possession (the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on April 1, 2024, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are seeking to assume and assign certain of their executory contracts and unexpired leases in connection with the sale (the "Sale") of all or substantially all of their assets (the "Assets"), free and clear of all Liens other than Assumed Liabilities (each as defined in the Stalking Horse APA, as defined below).[2] In connection with the Sale, the Debtors have entered into an asset purchase agreement dated as of April 8, 2024 (the "Stalking Horse APA") with SFC Acquisition Co, LLC, an entity organized by the Prepetition First Lien Agent and to be controlled by the Prepetition First Lien Lenders, subject to the Debtors' acceptance of higher or otherwise better offers in accordance with the Bidding Procedures (as defined below).

By order, dated [April 25], 2024 [Docket No. ●] (the "Bidding Procedures Order"), the Bankruptcy Court approved certain relief requested in the related motion [Docket No. ●] (the "Bidding Procedures Motion"), and certain "Bidding Procedures" that govern the sale of the Assets to the highest or otherwise best bidders. Copies of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures and the Stalking Horse APA are available for download at https://omniagentsolutions.com/ShoesforCrews (the "Case Website") or from the Debtors' claims and noticing agent, Omni Agent Solutions ("Omni"), via telephone at 888-202-5659 (US

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order (as defined below).

& Canada toll free) and 747-288-6384 (International) or via email at ShoesforCrewsInquiries@OmniAgnt.com.

You are receiving this notice because you or one of your affiliates may be a party to an unexpired lease or an executory contract that *may* be assumed and assigned (collectively, the "<u>Contracts</u>") in connection with such Sale.  A list of the Contracts is attached hereto as <u>Exhibit A</u>.

To the extent that a counterparty to a Contract objects to adequate assurance of performance by the Stalking Horse Purchaser, the Counterparty must file and serve an objection (a "<u>Sale Objection</u>").  Any Sale Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 <u>May 20, 2024 at 4:00 p.m. (E.T.)</u> (the "<u>Sale Objection Deadline</u>"), and proof of service of such Sale Objection upon the Objection Notice Parties (as defined below) shall be filed with the Bankruptcy Court as and when required by the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection.

**Any objections to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Purchaser shall be filed not later than <u>May 22, 2024 at 12:00 p.m. (E.T.)</u>.**

The "<u>Objection Notice Parties</u>" are as follows: (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Gregg M. Galardi, Cristine Pirro Schwarzman, and Ellen Wheeler; email: gregg.galardi@ropesgray.com, cristine.schwarzman@ropesgray.com, and ellen.wheeler@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Conor P. McNamara, email: conor.mcnamara@ropesgray.com); and Chipman Brown Cicero & Cole, LLP (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com); (b) the U.S. Trustee, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (c) the DIP Agent; (d) the Prepetition Initial First Lien Agent; and (e) counsel for any statutory committee appointed in these chapter 11 cases.

If no timely objection is received as to adequate assurance of future performance with respect to a Contract, the non-Debtor party to such Contract shall be deemed to have consented to the Court determining that adequate assurance of future performance has been sufficiently demonstrated and shall be forever barred and estopped from asserting or claiming that the requirement of adequate assurance of future performance is not satisfied or demonstrated.

Subject to the terms of the Bidding Procedures Order, an auction (the "<u>Auction</u>") for the Assets, including the Contracts, will be conducted on <u>May 21, 2024 at 11:00 a.m. (E.T.),</u> at the offices of Ropes & Gray LLP, 1211 6th Avenue, New York, NY 10036, or virtually via telephone and/or video conference pursuant to information to be timely provided by the Debtors to the Auction Participants.  After the Auction, the Debtors will file and serve a notice that identifies the Successful Bidder for the Assets, including any Contracts**.**

The Debtors will seek to assume and assign the Contracts that have been selected by the Successful Bidder (which, for the avoidance of doubt, may be the Stalking Horse Purchaser) (collectively, the "Selected Purchased Contracts") at a hearing before the Honorable Laurie Selber Silverstein, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801 (a "Sale Hearing") on May 23, 2024 at 2:30 p.m. (E.T.), subject to the Bankruptcy Court's availability, or such other date as determined by the Debtors, in consultation with the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then in consultation with the Successful Bidder, in accordance with the terms of the Bidding Procedures Order.

*[Remainder of Page Intentionally Left Blank]*

Nothing contained herein shall obligate the Debtors or the Successful Bidder to assume any Selected Purchased Contracts, and all rights of the Debtors and the Successful Bidder with respect to such Selected Purchased Contracts are reserved.   Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Selected Purchased Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors or the Successful Bidder, as applicable, to designate any Selected Purchased Contract as either rejected or assumed on a post-closing basis.

Dated:  [●], 2024
       Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/*_____
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
Email: desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Cristine Pirro Schwarzman (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com
       cristine.schwarzman@ropesgray.com

-and-

**ROPES & GRAY LLP**
Conor P. McNamara (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail:  conor.mcnamara@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>EXHIBIT A TO CURE NOTICE</u>**

**<u>EXHIBIT B</u>**

**Stalking Horse APA**

**ASSET AND EQUITY PURCHASE AGREEMENT**

by and among

SFC ACQUISITION CO., LLC,

as Buyer,

THE SELLERS PARTY HERETO

and

solely for the purposes stated expressly herein,

ANTARES CAPITAL LP,

as Prepetition Agent and DIP Agent

Dated as of April 8, 2024

# TABLE OF CONTENTS

**Page**

### ARTICLE I
### DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Defined Terms | 2 |
| 1.2 | Other Definitional Provisions | 19 |

### ARTICLE II
### TRANSFER OF ASSETS AND LIABILITIES

| | | |
|---|---|---|
| 2.1 | Purchased Assets | 20 |
| 2.2 | Excluded Assets | 22 |
| 2.3 | Assumed Liabilities | 24 |
| 2.4 | Excluded Liabilities | 26 |
| 2.5 | Assumption and Assignment of Assumed Contracts | 27 |

### ARTICLE III
### CLOSING AND PURCHASE PRICE

| | | |
|---|---|---|
| 3.1 | Closing; Transfer of Possession; Certain Deliveries | 30 |
| 3.2 | Purchase Price; Related Matters | 32 |
| 3.3 | Allocation of Purchase Price | 33 |
| 3.4 | Withholding | 33 |
| 3.5 | Wind-Down | 33 |

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF SELLERS

| | | |
|---|---|---|
| 4.1 | Organization and Good Standing | 34 |
| 4.2 | Power and Authority | 34 |
| 4.3 | Litigation | 34 |
| 4.4 | No Contravention | 35 |
| 4.5 | Consents and Approvals | 35 |
| 4.6 | Title to Purchased Assets; Sufficiency | 35 |
| 4.7 | Validity of Available Contracts | 36 |
| 4.8 | Intellectual Property | 36 |
| 4.9 | Employee Benefits | 38 |
| 4.10 | Labor Matters | 40 |
| 4.11 | Conduct of Business | 40 |
| 4.12 | Compliance with Laws; Permits | 40 |
| 4.13 | Financial Statements | 41 |
| 4.14 | Absence of Undisclosed Liabilities | 41 |
| 4.15 | Financial Advisors | 41 |
| 4.16 | Tax Matters | 42 |
| 4.17 | Real Property | 42 |

i

4.18   Tangible Personal Property; Inventory ...........................................................43
4.19   Insurance ......................................................................................................43
4.20   Environmental ...............................................................................................43
4.21   Anti-Corruption & Global Trade Laws..........................................................44
4.22   Related Party Transactions ...........................................................................45
4.23   Customers, Distributors and Suppliers .........................................................45
4.24   Anti-Money Laundering ...............................................................................45
4.25   Use of Proceeds............................................................................................45
4.26   Disclaimer of Other Representations and Warranties....................................46

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF BUYER

5.1    Organization and Good Standing....................................................................46
5.2    Power and Authority ......................................................................................46
5.3    No Contravention ...........................................................................................46
5.4    Consents and Approvals .................................................................................46
5.5    Litigation........................................................................................................47
5.6    Financial Advisors .........................................................................................47
5.7    Sufficient Funds; Adequate Assurances; Qualification ..................................47
5.8    Solvency.........................................................................................................48
5.9    Acknowledgements; "As Is" "Where Is" Transaction....................................48

ARTICLE VI
COVENANTS OF THE PARTIES

6.1    Conduct of Business Pending the Closing.......................................................50
6.2    Negative Covenants .......................................................................................50
6.3    Access ............................................................................................................52
6.4    Confidentiality ...............................................................................................53
6.5    Public Announcements ...................................................................................54
6.6    Employment Matters.......................................................................................55
6.7    Reasonable Efforts; Approvals .......................................................................56
6.8    Corporate Name Change ................................................................................57
6.9    Assignment of Contracts and Rights...............................................................57
6.10   Tax Matters ....................................................................................................57
6.11   Available Contracts List .................................................................................58
6.12   *Reserved* ......................................................................................................59
6.13   Documents ......................................................................................................59
6.14   Casualty Loss .................................................................................................59
6.15   Subsidiary Conversions ..................................................................................59
6.16   Disclosure Schedules ......................................................................................59
6.17   Misallocated Assets; Misdirected Payments...................................................59

ARTICLE VII
BANKRUPTCY PROVISIONS

ii

7.1    Bankruptcy Court Orders and Related Matters ..................................................60
7.2    Bankruptcy Milestones ....................................................................................62

## ARTICLE VIII
### CONDITIONS TO OBLIGATIONS OF THE PARTIES

8.1    Conditions Precedent to Obligations of Buyer ................................................62
8.2    Conditions Precedent to the Obligations of the Sellers ..................................63
8.3    Conditions Precedent to Obligations of Buyer and the Sellers.......................64
8.4    Frustration of Closing Conditions...................................................................64

## ARTICLE IX
### TERMINATION

9.1    Termination of Agreement................................................................................64
9.2    Consequences of Termination..........................................................................67

## ARTICLE X
### MISCELLANEOUS

10.1    Expenses ........................................................................................................67
10.2    Assignment ....................................................................................................67
10.3    Parties in Interest...........................................................................................67
10.4    Matters Related to the Administrative Agents...............................................68
10.5    Notices ...........................................................................................................68
10.6    Entire Agreement; Amendments and Waivers ..............................................69
10.7    Counterparts ..................................................................................................70
10.8    Invalidity .......................................................................................................70
10.9    Governing Law ..............................................................................................70
10.10    Dispute Resolution; Consent to Jurisdiction................................................70
10.11    WAIVER OF RIGHT TO TRIAL BY JURY................................................71
10.12    Specific Performance ...................................................................................71
10.13    *Reserved.* ...................................................................................................71
10.14    Counting........................................................................................................71
10.15    Survival.........................................................................................................71
10.16    Non-Recourse ...............................................................................................72
10.17    Preparation of this Agreement .....................................................................72
10.18    Releases.........................................................................................................72
10.19    Schedules ......................................................................................................75
10.20    Fiduciary Obligation ....................................................................................76

**Exhibits**

Exhibit A        Bidding Procedures Order

## ASSET AND EQUITY PURCHASE AGREEMENT

This ASSET AND EQUITY PURCHASE AGREEMENT (this "Agreement"), dated as of April 8, 2024 (the "Agreement Date"), is made and entered into by and among (i) SFC Acquisition Co., LLC, a Delaware limited liability company (together with any assignee(s) pursuant to Section 10.2, "Buyer"), (ii) SHO Holding I Corporation, a Delaware corporation (the "Borrower"), Never Slip TopCo, Inc., a Delaware corporation ("Topco"), Never Slip Holdings, Inc., a Delaware corporation ("Holdings"), SHO Holding II Corporation, a Delaware corporation, Shoes for Crews, Inc., a Florida corporation, SFC Holdings, Inc., a Delaware corporation, Shoes for Crews Canada, Ltd., a Florida limited partnership, SFC Holdings, LLC, a Florida limited liability company, Shoes for Crews, LLC, a Florida limited liability company, SFC Canada, Inc., a Florida corporation, Sunrise Enterprises, LLC, a Delaware limited liability company, SRS/MKS, L.L.C., a Florida limited liability company (each a "Seller," and collectively, the "Sellers"), and (iii) Antares Capital LP, solely in its capacity as administrative agent and collateral agent for the Prepetition Lenders (as defined below) and signing solely with respect to Section 3.2, Section 10.4 to Section 10.18 of this Agreement (the "Prepetition Agent"). The Administrative Agent, Buyer and Sellers collectively are referred to herein as the "Parties" and each, a "Party."

## RECITALS:

A.    The Sellers operate a business that specializes in the design, manufacturing, distribution, and sale of slip-resistant solutions and footwear designed to provide traction and enhance safety in workplaces where slipping hazards are common, such as restaurants, hospitals, and manufacturing facilities (the "Business").

B.    Reference is made to (x) that certain Credit Agreement, dated as of October 27, 2015, by and among SHO Holding I Corporation, Never Slip Holdings, Inc., the "Lenders" party thereto (the "First Lien Lenders") and the Prepetition Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition First Lien Financing Agreement") and (y) that certain Credit Agreement, dated as of October 31, 2019, by and among SHO Holding I Corporation, Never Slip Holdings, Inc., the "Lenders" party thereto (the "Sidecar Lenders") and the Prepetition Agent (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Sidecar Financing Agreement" and together with the Prepetition First Lien Financing Agreement, the "Prepetition Financing Agreements"). The obligations under the Prepetition Financing Agreement and the other Prepetition Loan Documents (as defined below) are secured by Liens in and upon substantially all property and assets of the Sellers.

C.    Buyer is an entity organized for the purpose of effecting the rights and interests of the Prepetition Lenders in accordance with the terms and conditions of the Prepetition Loan Documents and has the authority to credit bid up to the full amount of the outstanding obligations under the Prepetition Financing Agreements and the DIP Facility.

D.    Prior to the execution of this Agreement, each of the Sellers filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (such cases, the "Bankruptcy Cases").

1

E.     Upon the terms and subject to the conditions set forth in this Agreement, subject to the approval of the Bankruptcy Court and as authorized under sections 105, 363 and 365 of the Bankruptcy Code as relates to the Sellers, the Sellers propose to sell, transfer, and assign to Buyer, and Buyer proposes to purchase, acquire and assume from the Sellers, respectively, the Purchased Assets and Assumed Liabilities.

F.     Sellers' ability to consummate the Transactions is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and upon the terms and subject to the conditions hereof, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     <u>Defined Terms</u>.  As used herein, the terms below shall have the following respective meanings:

"<u>Acquired Bank Accounts</u>" shall mean the bank accounts of Sellers that Buyer elects to acquire by written notice to Sellers on or before the date that is ten (10) days prior to the Bid Deadline (as defined in the Bidding Procedures), other than the Excluded Bank Accounts.

"<u>Acquired Entity</u>" means each of Shoes for Crews (Europe) Limited Company, an Ireland limited company, Shoes for Crews Canada Distributions ULC, a British Columbia unlimited liability company, and Shoes for Crews APAC Pte Ltd., a Singapore private company (and its subsidiary, Shoes for Crews Footwear (Guangzhou) Co., Ltd., a China limited company).

"<u>Actual Fraud</u>" means knowing and intentional common law fraud committed by a Party in the making of the representations by such Party in <u>Article IV</u> or <u>Article V</u>, as applicable, with such Party having actual knowledge that such representations were false when made and with the express intention of inducing the Person to whom such representations are made to act in reliance thereon to such Person's detriment, and that doing so causes the Person to whom such representations are made, in justifiable reliance upon such representation and with no actual knowledge of the falsity of such representation, to take or refrain from taking action and suffer damage as a result thereof, in each case, as determined in a final, non-appealable determination of a court of competent jurisdiction.  For the avoidance of doubt, the Parties expressly agree and acknowledge that "<u>Actual Fraud</u>" does not include, and following the Closing the Parties shall have no remedy in respect of, equitable fraud, constructive fraud, promissory fraud, unfair dealings fraud, unjust enrichment, or any torts (including fraud) or other claim based on negligence or recklessness (including based on constructive knowledge or negligent misrepresentation) or any other equitable claim.

"<u>Administrative Agents</u>" shall mean, collectively, or individually as applicable, the Prepetition Agent and the DIP Agent.

"<u>Administrative Expenses</u>" shall mean, collectively, the administrative expenses incurred by Sellers in the Bankruptcy Cases, including expenses of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 546(c), 546(d), 726 (to the extent permitted by Law), 1113, or 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the Final DIP Order, Section 506(c) of the Bankruptcy Code).

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble.

"<u>Agreement Date</u>" shall have the meaning set forth in the Preamble.

"<u>Allocation Schedule</u>" shall mean the schedule allocating the Purchase Price, the Assumed Liabilities and any other items that are treated as consideration for U.S. federal income tax purposes in accordance with Section 1060 of the Code and the Treasury Regulations thereunder and any corresponding requirements of any state, local, or foreign Tax Laws, as applicable.

"<u>Alternate Transaction</u>" shall mean a transaction or transactions pursuant to which any of the Sellers or any of its Subsidiaries, in one or a series of transactions, sells, transfers, exchanges, leases or otherwise disposes of, directly or indirectly, all or any material portion of the Sellers' assets or equity, including any transaction pursuant to one or more Competing Qualified Bids or through any other asset sale, stock sale, share exchange, debt-for-equity swap, joint venture, credit bid, financing, merger, amalgamation, business combination, reorganization, restructuring or recapitalization, a plan of reorganization, a plan of liquidation or agreement with a liquidation firm (or consortium) for the orderly liquidation of the Sellers, a plan of arrangement or any similar transaction, in each case that involves a sale or disposition of any or all of the Purchased Assets (other than the sale or provision of services of the Business in the Ordinary Course of Business) or the Business to Buyer or its Affiliates; <u>provided</u>, that any disposition of Purchased Assets that is expressly permitted by <u>Section 6.2</u> of this Agreement shall not be deemed an Alternate Transaction.

"<u>Anti-Corruption Laws</u>" shall mean the FCPA and all other applicable Laws concerning or relating to bribery or corruption in any jurisdiction in which any Seller or any of its Affiliates is located or is doing business.

"<u>Anti-Money Laundering Laws</u>" shall mean the U.S. Patriot Act, as amended, and all other applicable Laws in any jurisdiction in which any Seller or any of its Affiliates is located or is doing business, which Laws relate to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"<u>Antitrust Laws</u>" shall mean the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal

or state or foreign Laws that are designed to prohibit, restrict, or regulate actions having the purpose or effect of monopolization or restraint of trade.

"Assumed Benefit Plan" shall have the meaning set forth in Section 6.6(f).

"Assumed Contracts" shall have the meaning set forth in Section 2.5(a).

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Auction" shall mean the auction for the Purchased Assets to be conducted on the Auction Date in the event of the submission of one or more Competing Qualified Bids in accordance with the terms and provisions of the Bidding Procedures Order and as expressly defined in the Bidding Procedures.

"Auction Date" shall mean the date of the Auction scheduled by the Bankruptcy Court and set forth in the Bidding Procedures Order or such later date as shall be announced by the Sellers and agreed upon by the Sellers and Buyer (provided that no Party shall unreasonably withhold, condition, or delay its consent or agreement).

"Audited Financial Statements" shall have the meaning set forth in Section 4.13.

"Available Contracts" shall have the meaning set forth in Section 2.5(a).

"Avoidance Actions" shall mean those actual and/or potential claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

"Back-Up Bidder" shall have the meaning set forth in the Bidding Procedures Order.

"Bankruptcy Cases" shall have the meaning set forth in the Recitals.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bankruptcy Milestones" shall have the meaning set forth in Section 7.2.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure originally promulgated pursuant to 28 U.S.C. § 2075, and the general, local and chambers rules of the Bankruptcy Court applicable to the Bankruptcy Cases.

"Bankruptcy-Related Default" means any default or breach of a Contract or Lease that is not entitled to cure under section 365(b)(2) of the Bankruptcy Code, including a default or breach relating to the filing of the Bankruptcy Cases or the financial condition of the Sellers.

"Benefit Plan" shall mean any "employee benefit plan" (within the meaning of Section 3(3) of ERISA), and all pension, severance, retirement, consulting, compensation, profit sharing, commission, employment, change in control, retention, fringe benefit, bonus, stock or other equity, equity-based, option, incentive compensation, restricted stock, stock appreciation right or similar

4

right, phantom equity, profits interests, deferred compensation, employee loan, vacation, paid time off, welfare, dental, vision, flexible benefit, cafeteria, dependent care, disability or wage continuation benefits during periods of absence from work (including short-term disability, long-term disability and worker's compensation benefits), supplemental unemployment, hospitalization, life insurance, death or survivor benefits, employment insurance, and all other employee benefit plans, programs, policies, practices, agreements and other arrangements, and any funding vehicle therefor now in effect or required in the future to be established as a result of the transactions contemplated by this Agreement, in each case, whether or not subject to ERISA, whether formal or informal, written or oral, insured or self-insured, funded or unfunded, binding or not, that (i) provides benefits or compensation to, or which otherwise is for the benefit of, any present or former employee, director, independent contractor or other individual service provider of any Seller or any beneficiary or dependent of such Persons, (ii) is adopted, maintained, sponsored, contributed to, or required to be contributed to by any Seller, or (iii) with respect to which any Seller is a party, is bound, participates in, or has or could reasonably be expected to have any Liability with respect thereto, whether actual or contingent, or direct or indirect, in each case, other than any such plan, program, policy, practice, Contract, agreement or arrangement established pursuant to statute or sponsored or maintained by a Governmental Entity.

"Bidding Procedures" shall mean the Bidding Procedures filed with the Bankruptcy Court in the form attached to the Bidding Procedures Order and approved by the Bankruptcy Court, with any substantive changes thereto in form and substance reasonably acceptable to Buyer and Sellers (provided that no Party shall unreasonably withhold, condition, or delay its consent).

"Bidding Procedures Motion" shall mean the motion filed in the Bankruptcy Cases, which motion shall be in form and substance reasonably satisfactory to Sellers and Buyer (together with all exhibits thereto) (provided that no Party shall unreasonably withhold, condition, or delay its consent), (i) seeking approval of (A) this Agreement and the Transactions and (B) the Bidding Procedures and scheduling certain dates, deadlines, and forms of notice in connection therewith, and (ii) granting other related relief.

"Bidding Procedures Order" shall mean the order entered by the Bankruptcy Court approving the Bidding Procedures Motion, the Bidding Procedures and granting the relief requested therein, in the form set forth in Exhibit A, with any substantive changes thereto, in form and substance reasonably acceptable to Buyer and Sellers (provided that no Party shall unreasonably withhold, condition, or delay its consent).

"Bill of Sale and Assignment and Assumption Agreement" shall have the meaning set forth in Section 3.1(b)(i).

"Borrower" shall have the meaning set forth in the Preamble.

"Budget" shall mean the "Approved Budget" as defined in the DIP Documents.

"Business" shall have the meaning set forth in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday, or a legal holiday on which banking institutions in New York, New York or Governmental Entities in the State of Delaware are authorized or obligated by Law or executive order to close.

142958362_16

"Business Employee" means each employee of a Seller as of immediately prior to the Closing.

"Buyer" shall have the meaning set forth in the Preamble.

"CIT Escrow Account" means the segregated account created pursuant to the Interim DIP Order in relation to that certain Factoring Agreement with The CIT Group / Commercial Services, Inc. ("CIT") dated as of November 15, 2018, as amended, restated, amended and restated, or otherwise modified from time to time.

"Claims" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"Closing" shall mean the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder.

"Closing Date" shall have the meaning set forth in Section 3.1(a).

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Competing Qualified Bid" shall have the meaning of "Qualifying Bid" as set forth in the Bidding Procedures.

"Confidential Information" shall mean all information, in any form or medium that relates to the Business, the Purchased Assets or the Assumed Liabilities, including financial information, projections, pricing structures, technical data, Trade Secrets, know-how, ideas, inventions, designs, research, development plans, identities of, and arrangements with, customers and suppliers, software and databases, but shall not include any information that (i) at the time of disclosure thereof is generally available to the public (other than as a result of disclosure in violation of this Agreement), (ii) becomes available to the receiving party on a non-confidential basis or (iii) is independently developed by the receiving party following the Closing Date without reliance on or use of any Confidential Information.

"Contract" shall mean any written lease, sublease, license, sublicense, agreement, contract, contract right, obligation, trust, purchase order, sale order, instrument and other similar arrangements that is binding upon a Person or its property but shall expressly exclude purchase orders and invoices entered into in the Ordinary Course of Business.

"Contracting Parties" shall have the meaning set forth in Section 10.16.

"Copyrights" shall have the meaning set forth in the definition of Intellectual Property.

"Credit Bid Amount" shall have the meaning set forth in Section 3.2(a).

"Credit Documents" shall mean, collectively, the Prepetition Loan Documents and the DIP Documents.

6

"Cure Amounts" shall mean all amounts payable that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer pursuant to section 365 of the Bankruptcy Code.

"Debt" shall mean, without duplication, (i) indebtedness or other obligations for borrowed money or in respect of loans or advances or issued in substitution for or exchange of indebtedness for borrowed money or loans or advances, whether short-term or long-term, secured or unsecured, (ii) any indebtedness or other obligations evidenced by any note, bond, debenture or other debt security or instrument, (iii) all obligations to pay the deferred purchase price of property or services, contingent or otherwise (including all "earn-out" obligations), (iv) all obligations under interest rate and currency hedging agreements, including swap breakage or associated fees, (v) all obligations arising from bankers' acceptances, letters of credit (to the extent drawn) and cash/book overdrafts or similar facilities, (vi) all obligations for the payment of which a Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations, (vii) any obligations under leases that have been or are required to be, in accordance with GAAP, recorded as capital leases, (viii) any indebtedness or other obligations secured by a Lien on any Seller's interest in any assets, and (ix) all accrued interest, premiums, penalties (including any prepayment penalties or premiums) and other obligations related to any of the foregoing.

"Debtors" shall mean the Sellers as debtors in possession that filed the Bankruptcy Cases.

"Designation Notice" shall have the meaning set forth in Section 2.5(a).

"Determination Deadline" shall have the meaning set forth in Section 2.5(a).

"DIP Agent" shall mean Antares Capital LP, as administrative agent, and collateral agent under the DIP Facility.

"DIP Documents" shall mean that certain Superpriority Secured Debtor-in-Possession Credit Agreement by and among the DIP Lenders, the Borrower, Holdings, and the DIP Agent and the other Loan Documents (as defined therein).

"DIP Facility" shall mean the debtor-in-possession term loan facility pursuant to which the DIP Lenders agreed to provide up to $30 million in debtor-in-possession financing commitments on the terms set forth in the DIP Documents.

"DIP Lenders" shall mean the lenders providing the DIP Facility.

"Documents" shall mean all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

7

"Environmental Laws" means any Law relating to pollution, human health or safety or the protection of the environment, or relating to the use, handling, transport, release, treatment, storage or disposal of, Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. 6901, et seq., the Toxic Substances Control Act, 15 U.S.C. 2601, et seq., the Occupational Safety and Health Act, 29 U.S.C. 651, et seq., the Clean Air Act, 42 U.S.C. 7401, et seq., the Federal Water Pollution Control Act, 33 U.S.C. 1251, et seq., the Safe Drinking Water Act, 42 U.S.C. 300f, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. 1802, et seq., and the Emergency Planning and Community Right to Know Act, 42 U.S.C. 11001, et seq.

"Equity Interests" of any Person shall mean all (i) shares of capital stock, rights to purchase shares of capital stock, partnership interests, membership interests, limited liability company interests, units, warrants, options, calls or restricted stock (whether or not currently exercisable), (ii) equity appreciation, phantom stock, stock plans, profit participation plans, profit units, profit interests, equity plans or similar rights, (iii) participations or other equivalents of or interests in (however designated, including units thereof) the equity (including common stock, preferred stock and limited liability company, partnership and joint venture interests) of such Person and (iv) securities exchangeable for or convertible or exercisable into any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" shall mean, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Code.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Bank Accounts" means the CIT Escrow Account, the Carve-Out Account (as defined in the Final DIP Order) and at least one other bank account of Sellers designated by the Sellers as an excluded bank account for purposes of holding the Wind-Down Amount, which shall fund the winding down of the Business and the Sellers pursuant to the Wind-Down Budget and in accordance with the Final DIP Order.

"Excluded Cash" means all cash on hand reserved for Professional Fees and Expenses, which cash shall be used solely in accordance with the Budget, the Final DIP Order and the Wind Down Budget. For the avoidance of doubt, any cash maintained in the CIT Escrow Account shall be treated exclusively as set forth in Section 2.2.

"Excluded Contracts" shall have the meaning set forth in Section 2.2(a).

"Excluded Documents" shall have the meaning set forth in Section 2.2(e).

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Express Representations" shall have the meaning set forth in Section 5.9(b).

8

"Extended Contract Period" shall have the meaning set forth in Section 2.5(a).

"FCPA" shall mean the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§78dd-1, et seq.

"Final DIP Order" shall mean an Order of the Bankruptcy Court acceptable to the DIP Agent and DIP Lenders, authorizing and approving on a final basis, among other things, the DIP Documents and the DIP Facility on a final basis (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of DIP Agent, in its sole discretion) as to which no stay has been entered.

"Final Order" shall mean an Order of the Bankruptcy Court or other applicable court (a) that is not the subject of a pending appeal, petition for certiorari, motion for reconsideration or leave to appeal or other proceeding for review, rehearing or reargument, (b) that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect, and (c) with respect to which the time to appeal, to petition for certiorari, to move for reconsideration or to seek review, rehearing or reargument shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or other applicable Laws, as applicable.

"Foreign Benefit Plan" shall have the meaning set forth in Section 4.09(j).

"GAAP" shall mean United States generally accepted accounting principles.

"Global Trade Laws" means (a) the U.S. Export Administration Regulations, (b) the U.S. International Traffic in Arms Regulations, (c) the economic sanctions rules and regulations implemented under statutory authority or President's Executive Orders and administered by OFAC, (d) the E.U. Council Regulations on export controls, including Nos. 428/2009, 267/2012, (e) other E.U. Council sanctions regulations, as implemented in E.U. Member States, and (f) United Nations sanctions policies.

"Government Official" shall mean any officer or employee of a Governmental Entity or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such Governmental Entity or department, agency, or instrumentality, or for or on behalf of any such public international organization, or any political party, party official, or candidate thereof, excluding officials related to the government of the United States.

"Governmental Entity" shall mean any (i) federal, state, provincial, local, municipal, foreign or other government, (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court, arbitrator or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Hazardous Materials" means any pollutant, contaminant, or toxic or hazardous material, substance, or waste, as defined or regulated under, or for which standards of conduct or liability

may be imposed pursuant to, Environmental Laws, including petroleum products or byproducts, polychlorinated biphenyls, per- and poly-fluoroalkyl substances and asbestos.

"Hired Employees" shall mean, collectively, the Business Employees who accept an offer of employment with Buyer or its Affiliate in accordance with the provisions of Section 6.6 hereof at or prior to the Closing and who actually commence employment with Buyer or its Affiliate following the Closing.

"HSR Act" shall mean the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended.

"Intellectual Property" shall mean all intellectual property, whether protected, created or arising under the Laws of the United States or any other jurisdiction, including all: (i) patents and patent applications, all continuations, divisionals, and continuations-in-part of any of the foregoing, all patents issuing on any of the foregoing, and all reissues, renewals, substitutions, reexaminations and extensions of any of the foregoing (collectively, "Patents"); (ii) trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, trade styles, and other source or business identifiers and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations, renewals and extensions of any of the foregoing (collectively, "Marks"); (iii) internet domain names; (iv) copyrights, rights in works of authorship, and all mask work, database and design rights, whether or not registered or published, all applications, registrations, reversions, extensions and renewals of any of the foregoing, and all moral rights, however denominated (collectively, "Copyrights"); (v) trade secrets and other confidential or proprietary information (collectively, "Trade Secrets"); and (vi) rights in Software.

"Intellectual Property Assignment Agreement" shall have the meaning set forth in Section 3.1(b)(ii).

"Interim DIP Order" shall mean an Order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), in form and substance acceptable to the DIP Agent and DIP Lenders in their sole discretion, authorizing on an interim basis, among other things, the DIP Documents and the DIP Facility.

"Interim Financial Statements" shall have the meaning set forth in Section 4.13.

"IT Systems" shall mean all information technology, computers, computer systems and communications systems owned, operated, leased, or licensed by any Seller in connection with the Business.

"Knowledge of the Sellers" shall mean, as to a particular matter, the actual knowledge of Donald Watros and Chris Sim.

"Labor Laws" shall mean, collectively, to the extent applicable to any Seller, any federal, national, state, and foreign Laws governing labor and/or employment and employment-related matters, including all such Laws relating to wages, employee classification, other compensation and benefits (including but not limited to any applicable federal, state or local laws concerning

10

COVID-19 related paid sick leave or other benefits), family and medical leave and other leaves of absence, the provision of meal and rest periods/breaks, hours, vacation, severance, restrictive covenants, background checks and screening, immigration, the WARN Act and any similar federal, state, provincial or local "mass layoff" or "plant closing" Law, collective bargaining, discrimination, harassment, retaliation, civil rights, safety and health (including but not limited to the federal Occupational Safety and Health Act and any applicable state or local laws concerning COVID-19-related health and safety issues), and workers' compensation.

"Law" shall mean any federal, state, provincial, local, or foreign statute, law, ordinance, regulation, rule, code, order, treaty, administrative interpretation, guideline, principle of common law or equity, judgment enacted, promulgated, issued, enforced, or entered by any Governmental Entity.

"Leased Real Property" shall mean each parcel of real property leased by a Seller as tenant, lessee or sublessee and used in or necessary for the conduct of the Business as currently conducted, together with all rights, title, and interest of each such Seller in and to leasehold improvements relating thereto.

"Leases" shall mean all leases, subleases, licenses, concessions, and other agreements pursuant to which a Seller holds any Leased Real Property.

"Lenders" shall mean, collectively, the Prepetition Lenders and the DIP Lenders.

"Liabilities" shall mean all debts, losses, damages, costs, royalties, proceedings, deficiencies, claims, liabilities, commitments, expenses, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, asserted or unasserted, absolute or contingent, whether accrued, vested or otherwise, whether known or unknown, and, with respect to any Person, whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records, including any liability for Taxes.

"Licensed Intellectual Property" shall mean all Intellectual Property that any Person other than the Sellers owns and that is used, held for use, or practiced in connection with the Business.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, statutory or deemed trust, and deed of trust or other encumbrance.

"Local Transfer Instruments" means the agreements, certificates and instruments required by applicable Law to effect the transfer of the Acquired Equity Interests in the manner contemplated by this Agreement.

"Marks" shall have the meaning set forth in the definition of Intellectual Property.

"Material Adverse Effect" shall mean any event, change, occurrence, circumstance, development, condition, fact or effect, which, when considered either individually or in the aggregate together with other events, changes, occurrences, circumstances, developments, conditions, facts or effects, is or would reasonably be expected to be materially adverse to (i) the Business or the properties, assets, condition (financial or otherwise), results or operations of the

Business, the Purchased Assets or the Assumed Liabilities, or (ii) any Seller's ability to consummate the Transactions, other than with respect to <u>clause (i)</u> hereof any event, change, occurrence, circumstance, development, condition or change of fact, arising out of, resulting from or attributable to (A) general economic conditions affecting the United States or those countries within which the Business operates or the industries in which the Business operates or events or conditions generally affecting the industries in which the Sellers and their Subsidiaries operate, (B) a change in GAAP or regulatory accounting principles or interpretations thereof after the date hereof, or a change in applicable Law (or interpretations thereof) by any Governmental Entity after the date hereof or compliance by the Sellers and their Subsidiaries with applicable Law, (C) global, national or regional political conditions, any act of war or terrorism (or, in each case, escalation thereof), cyberattack or declaration of a national emergency, (D) any pandemic or epidemic or public health emergencies (or any escalation or worsening thereof), any Pandemic Measures and any conditions resulting from earthquakes, hurricanes, tsunamis, tornados, floods, mudslides, wildfires or other natural or manmade disasters or other acts of God, (E) financial, banking, insurance or re-insurance or securities markets (including (x) any disruption of any of the foregoing markets, (y) any change in currency exchange rates, (z) any decline or rise in the price of any security, commodity, Contract or index), (F) any act or omission by any Seller or any of their respective Affiliates required to be taken pursuant to the terms of the Final DIP Order, (G) any change in the market price, credit rating or trading volume of Borrower's stock or other securities or any change affecting the ratings or the ratings outlook for Borrower, (H) the negotiation, announcement, pendency or consummation of the Bankruptcy Cases, this Agreement or the Transactions, or the identity, nature or ownership of Buyer or its Affiliates (and any communications by or with respect to Buyer or its Affiliates, including regarding their respective plans or intentions with respect to the Sellers, the Acquired Entities or the Business) including the effects thereof on business relationships with suppliers and customers, (I) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Buyer or its Affiliates or Representatives), (J) any action taken by Buyer or its Affiliates with respect to the Transactions or the financing thereof or any breach by Buyer of this Agreement, (K) actions or omissions of the Sellers or any Acquired Entity taken with the consent of Buyer or actions or omissions of the Sellers or any Acquired Entity contemplated by or taken in accordance with this Agreement (including the failure to take any action prohibited by this Agreement), (L) (x) the commencement or pendency of the Bankruptcy Cases, operating in bankruptcy, any reasonably anticipated effects of the commencement or prosecution of the Bankruptcy Cases or the financial condition of the Sellers or any Acquired Entity, (y) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) the Sale Order or the Bidding Procedures Order or any actions or omissions of the Sellers or their Affiliates in compliance therewith, (3) the reorganization or liquidation of the Sellers or their Affiliates, or (4) the assumption or rejection of any Available Contract, or (z) any Order of the Bankruptcy Court or any actions or omissions of Sellers or their Affiliates in compliance therewith or (M) any Proceeding brought against a Seller or any Acquired Entity for breach of Contract in connection with the collection of payment due thereunder (whether alone or with other claims) or any modification of credit, cash on delivery or similar terms of a Contract, except in each case covered by clauses (A) through (E) or (G) to the extent such event, change, occurrence, circumstance, development, condition or change of fact disproportionately and adversely affects the Sellers, taken as a whole, as compared to other companies in a business similarly situated to that of the Business.

12

"Material Customers" mean the top ten clients of Sellers in respect of aggregate revenue received therefrom in respect of fiscal year 2023.

"Material Vendors" mean the top ten vendors or suppliers of Sellers in respect of aggregate expenditures of Sellers in respect of fiscal year 2023.

"Minimum Cash Shortfall" means, if the Excluded Cash remaining immediately prior to the Closing is insufficient to fund (or unavailable to fund pursuant to the Budget, terms of the DIP Documents or Final DIP Order) the Cure Amounts, if any, that the Sellers are to satisfy, an amount of cash and cash equivalents equal to the amount of such shortfall. For the avoidance of doubt, (i) any cash maintained in the CIT Escrow Account and (ii) the Wind-Down Amount, shall not be considered Excluded Cash for purposes of the definition of "Minimum Cash Shortfall" or cash available to fund or offset the Minimum Cash Shortfall.

"Non-Recourse Persons" shall have the meaning set forth in Section 10.16.

"Notices" shall have the meaning set forth in Section 10.5.

"Open Source Software" shall mean any Software that is subject to, or licensed, provided or distributed under, any license meeting the Open Source Definition (as promulgated by the Open Source Initiative as of the date of this Agreement) or the Free Software Definition (as promulgated by the Free Software Foundation as of the date of this Agreement) or any similar license for "free," "publicly available" or "open source" Software, including the GNU General Public License, the Lesser GNU General Public License, the Apache License, the BSD License, Mozilla Public License (MPL), the MIT License, or any other license that includes similar terms.

"Order" shall mean any judgment, order, injunction, writ, ruling, verdict, decree, stipulation, award or other binding obligation, pronouncement, or determination of any Governmental Entity.

"Ordinary Course of Business" shall mean the conduct and operation of the Business, taken as a whole, in the ordinary course and in accordance with applicable Law; provided that in the case of Sellers and any Acquired Entity, "Ordinary Course of Business" shall take into account the business and operating practices of the Sellers and the Acquired Entities in light of their current financial condition, financial distress and the Bankruptcy Cases.

"Organizational Documents" shall mean, with respect to any Person (other than a natural Person), (i) the certificate or articles of incorporation, formation or organization and any limited liability company, operating or partnership agreement, or similar organizational document adopted or filed in connection with the creation, formation or organization of such Person and (ii) all bylaws and stockholders agreements or similar arrangements to which such Person (or holders of its Equity Interests) is a party relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Outside Date" shall have the meaning set forth in Section 9.1(d)(v).

"Owned Intellectual Property" shall mean all Intellectual Property owned or purported to be owned by any Seller.

"Pandemic Measures" means any "shelter-in-place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester, or other conditions or restrictions, or any other Law, directive, pronouncement, guideline or recommendations by a Governmental Entity, the Centers for Disease Control and Prevention, the World Health Organization or industry group in connection with or in respect to COVID-19 or any other pandemic, epidemic, public health emergency or disease outbreak.

"Party" or "Parties" shall have the meaning set forth in the Preamble.

"Permits" shall mean all licenses, certificates, consents, permits, registrations, quotas, and other authorizations of any Governmental Entity relating to the Purchased Assets or used by the Sellers in connection with the Business, and all pending applications therefor.

"Permitted Liens" shall mean (i) Liens for Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) zoning, entitlement and other land use and environmental regulations by any Governmental Entity having jurisdiction over any real property which are not violated by the current use, occupancy or operation of any real property, (iii) non-exclusive licenses of Intellectual Property, (iv) easements, rights of way, restrictive covenants, encroachments, and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Purchased Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Purchased Assets, (v) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for amounts not yet due and payable, (vi) licenses granted on a non-exclusive basis in the Ordinary Course of Business, (vii) Liens securing the DIP Facility and any other Liens not prohibited by the DIP Documents, (viii) such other defects, exceptions, restrictions, imperfections in title, charges, easements, restrictions and encumbrances (other than in connection with the DIP Facility) which would not, individually or in the aggregate, reasonably be expected to materially detract from the property and/or the use of the property for its intended purpose in the Ordinary Course of Business and (ix) Liens specifically permitted by the Sale Order.

"Person" shall mean an individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, association, joint stock company, estate, Governmental Entity, or other entity.

"Personal Information" shall mean (a) any information defined as "personal data" or "personally identifiable information" or "PII" under any applicable Privacy Laws; or (b) information that identifies or could be used to identify an identifiable individual.

"Personal Property Leases" shall have the meaning set forth in Section 4.18.

"Petition Date" shall mean the date on which the Sellers file voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

"Post-Closing COBRA Liability" shall have the meaning set forth in Section 6.6(f).

"Post-Closing Tax Period" shall mean all taxable years or other taxable periods that end after the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period beginning after the Closing Date.

"Post-Petition Payables" shall have the meaning set forth in Section 2.3(d).

"Pre-Closing Tax Period" shall mean all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period ending on and including the Closing Date.

"Prepetition Financing Agreements" shall have the meaning set forth in the Recitals.

"Prepetition Lenders" shall have the meaning set forth in the Recitals.

"Prepetition Loan Documents" shall mean the Prepetition Financing Agreements and the other Loan Documents (as defined therein).

"Previously Omitted Contract" shall have the meaning set forth in Section 2.5(j)(i).

"Previously Omitted Contract Notice" shall have the meaning set forth in Section 2.5(j)(ii).

"Privacy Laws" shall mean any and all applicable Laws relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (technical, physical, or administrative), disposal, destruction, disclosure, or transfer (including cross-border) of any Personal Information.

"Proceeding" shall mean any action, claim, complaint, arbitration, governmental investigation, prosecution, litigation, proceeding, or suit (whether civil, criminal, administrative, investigative, appellate, or informal) of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity.

"Professional Fees and Expenses" shall mean the reasonable and documented fees and expenses of professionals of Sellers and any committee appointed in the Bankruptcy Cases pursuant to section 1102 of the Bankruptcy Code that are accrued and unpaid as of the Closing Date, whether or not included in a fee statement or fee application at such time and whether or not allowed by the Bankruptcy Court at such time.

"Purchase Price" shall have the meaning set forth in Section 3.2(a).

"Purchased Assets" shall mean all right, title and interest of each of the Sellers, as of the Closing, in, to and under all of the assets, properties, interests, rights and claims of the Sellers as of the Closing (whether owned, leased, licensed, used or held for use by the Sellers), wherever situated and of whatever kind and nature, real or personal, tangible or intangible, and whether or

not reflected on the books and records of the Sellers, including the assets, properties, rights and claims as of the Closing described in <u>Section 2.1</u>, other than the Excluded Assets.

"<u>Related Party</u>" shall have the meaning set forth in <u>Section 4.22(a)</u>.

"<u>Related Party Transactions</u>" shall have the meaning set forth in <u>Section 4.22(a)</u>.

"<u>Representative</u>" shall mean, with respect to any Person, such Person's officers, managers, directors, members, partners, employees, agents, and representatives (including any investment banker, financial advisor, accountant, legal counsel, or expert retained by or acting on behalf of such Person or its Affiliates).

"<u>Restricted Country</u>" shall mean any country or geographic region subject to comprehensive economic sanctions administered by OFAC or the E.U., which currently includes: Cuba, Iran, North Korea, Sudan, Syria, Venezuela, the Crimea region of Ukraine, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic of Ukraine, and the disputed territories of Kherson and Zaporizhzhia.

"<u>Restricted Party</u>" shall mean (a) any individual or entity on one or more of the Restricted Party Lists, (ii) an agency or organization directly or indirectly controlled by the government of a country subject to Sanctions, and (iii) a Person resident in or determined to be resident in a country that is a target of Sanctions.

"<u>Restricted Party List</u>" means (a) the list of sanctioned entities maintained by the United Nations, (b) the Specially Designated Nationals and Blocked Persons List, the Foreign Sanctions Evaders List and the Sectoral Sanctions Identifications List, all administered by the U.S. Department of the Treasury, (c) the U.S. Denied Persons List, the U.S. Entity List, and the U.S. Unverified List, all administered by the U.S. Department of Commerce, and (d) the consolidated list of Persons, Groups and Entities Subject to E.U. Financial Sanctions, as implemented by the E.U. Common Foreign & Security Policy.

"<u>Sale Order</u>" shall mean, collectively, the Order or Orders entered by the Bankruptcy Court which shall be in a form and substance acceptable to Buyer and Sellers in their sole discretion and which shall, among other things: (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code (A) the execution, delivery and performance by the Sellers of this Agreement, including each and every term and condition hereof, and the other instruments and agreements contemplated hereby, (B) the sale of the applicated Purchased Assets of the Sellers to Buyer free and clear of all Liens and Liabilities (other than Permitted Liens and Assumed Liabilities), on the terms set forth herein, (C) the assumption of the Assumed Liabilities, which will not include any of Seller's Tax Liabilities existing or to be created whether arising by Law or in connection with this Agreement, of the Sellers by Buyer on the terms set forth herein and (D) effective as of the Closing, the release of Sellers from amounts due and owing under (x) the Prepetition Loan Documents up to an amount equal to the Credit Bid Amount and (y) the DIP Documents; (ii) authorize the Sellers to assume and assign to Buyer the Assumed Contracts; (iii) find that Buyer has provided adequate assurance of future performance with respect to the Assumed Contracts to which any Seller is a party; (iv) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code; (v) provide that neither Buyer nor any of its Affiliates or

equityholders will have any derivative, successor, transferee or vicarious liability of any kind or character, whether fixed or contingent, for Liabilities of the Sellers (whether under federal or state Law or otherwise), except for Assumed Liabilities, including on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing (except for such Taxes that constitute Assumed Liabilities); (vi) waive in all necessary jurisdictions, (A) the so-called "bulk sales," "bulk transfer" and similar Laws, including those related to Taxes and (B) the imposition of any Taxes incurred in connection with the Transactions and the Sale Order; and (vii) enjoin all Persons from commencing any proceeding or taking any action against Buyer or any of its Affiliates to recover any claim that such Person has solely against the Sellers or their Affiliates.

"Sanctions" shall mean any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes, anti-terrorism Laws and other sanctions, Laws, regulations or embargoes, including those imposed, administered or enforced from time to time by: (i) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (ii) the United Nations Security Council, (iii) the European Union or any European Union member state, (iv) Her Majesty's Treasury of the United Kingdom, or (v) any other Governmental Entity with jurisdiction over any Seller or its Affiliates.

"Seller Registered Intellectual Property" shall mean all issued Patents, pending Patent applications, Mark registrations, applications for Mark registration, Copyright registrations, applications for Copyright registration and Internet domain names, in each case, included in the Owned Intellectual Property.

"Seller Software" shall mean all Software owned or purported to be owned by any Seller.

"Sellers" shall have the meaning set forth in the Preamble.

"Sellers' Disclosure Schedules" shall mean the disclosure schedules delivered by the Sellers to Buyer in accordance with this Agreement.

"Software" shall mean, collectively, any and all (i) computer programs, including any and all software implementations of algorithms, models, and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all collections of data, whether machine readable or otherwise, and (iii) all documentation including user manuals and other training documentation related to any of the foregoing.

"Subsidiary" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.  For purposes of this definition, a Person is deemed to have a majority ownership interest in a partnership, association, or other business entity if such Person is allocated a majority of the gains or losses of such partnership,

17

association or other business entity or is or controls the managing director or general partner of such partnership, association, or other business entity.

"Tax" or "Taxes" shall mean all U.S. federal, state, local, foreign and other taxes, assessments, duties or charges in the nature of taxes, including, income, profits, gains, net worth, sales and use, *ad valorem,* gross receipts, sales, use, business and occupation, license, premium, minimum, alternative or add-on minimum, environmental, estimated, stamp, customs duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employment, social security (or similar), unemployment, transfer, severance, registration, lease, service, recording, documentary, permit or authorization, intangibles or other tax (whether payable directly or by withholding), together with any penalty, fine, addition to tax or interest on the foregoing.

"Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates) relating to Taxes, including any schedule or attachment thereto, and including any amendment or supplement thereof.

"Third Party Consents" shall have the meaning set forth in Section 6.7(b).

"Trade Payables" means trade obligations, accounts payable and accrued operating expenses of the Sellers with the Persons set forth on Schedule 2.3(l).

"Trade Secrets" shall have the meaning set forth in the definition of Intellectual Property.

"Transaction Dispute" shall have the meaning set forth in Section 10.9.

"Transaction Documents" means this Agreement, the Local Transfer Instruments and any other agreements, documents, and instruments to be executed and delivered pursuant to this Agreement.

"Transactions" shall mean the sale of the Purchased Assets and assumption of the Assumed Liabilities pursuant to this Agreement and the other transactions contemplated by this Agreement and the other Transaction Documents.

"Transfer Tax" or "Transfer Taxes" shall mean any stamp, sales, use, transfer, conveyance, recording, registration, filing or other similar non-Income Tax, fee, duty, or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto.

"Treasury Regulations" shall mean the regulations promulgated under the Code, as such regulations may be amended from time to time.

"U.S. Patriot Act" shall mean Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

"Utility Deposits" means (a) all deposits (whether maintained in escrow or otherwise) or other security provided in favor of a utility as adequate assurance of payment pursuant to section

18

366 of the Bankruptcy Code and (b) any other deposits made by or on behalf of Sellers with Persons providing water, sewer, gas, electricity, telephone, and other utilities.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any successor Law, and the rules and regulations thereunder and under any successor Law, and any comparable Law under the Laws of any state.

"Wind-Down Amount" shall have the meaning set forth in Section 3.5.

"Wind-Down Budget" shall have the meaning set forth in Section 3.5.

1.2     Other Definitional Provisions.

(a)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule, and Exhibit references are to this Agreement unless otherwise specified.

(b)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)     The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(d)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."  Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(e)     Words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(f)     A reference to any Party shall include such Party's successors and permitted assigns.

(g)     The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if".

(h)     References herein to any Law shall be deemed to refer to such Law as amended, modified, codified, reenacted, replaced, supplemented or superseded in whole or in part and in effect from time to time, including any successor legislation thereto, and also to all rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, reenactment, replacement or supplement of such section or other provision; provided that for purposes of any representation or warranty set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or

19

non-compliance, with any Law, the reference to such Law means such as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(i)     All references to "$" and dollars shall be deemed to refer to the currency of the United States of America.

(j)     The provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  References to the terms "Article," "Section," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, clauses, Schedules (i.e., sections of the Sellers' Disclosure Schedules), and Exhibits to this Agreement unless otherwise specified.

(k)     References to "days" means calendar days unless Business Days are expressly specified.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded.  If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(l)     Time is of the essence of each and every covenant, agreement, and obligation in this Agreement.

(m)     References to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)).

(n)     The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(o)     Any document or item will be deemed "delivered," "provided" or "made available" by the Sellers, within the meaning of this Agreement if such document or item is (a) actually delivered or provided to Buyer or any of Buyer's Representatives or (b) made available upon request, including at the Sellers' or any of their Subsidiaries' offices.

(p)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented, or waived.

## ARTICLE II
## TRANSFER OF ASSETS AND LIABILITIES

2.1     <u>Purchased Assets</u>.  At the Closing, and upon the terms and subject to the conditions set forth herein and in the Sale Order and, with respect to the Sellers, subject to the entry of the Sale Order, including approval of the Bankruptcy Court pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Sellers shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from the Sellers, all of the right, title and interest of each of the Sellers as of the Closing, free and clear of all Liens (other than Permitted Liens), in, to and under, all of the Purchased Assets.  The Purchased Assets shall include Sellers' rights, titles, and interests in, to and under each of the following of the Sellers as of the Closing:

142958362_16

(a)      other than the Excluded Cash, the Wind-Down Amount, the Carve-Out Account funds and the CIT Escrow Account funds as provided in <u>Section 2.2(n)</u>, (i) all cash, money orders, third-party checks, wire transfers and any other funds of the Sellers, commercial paper, marketable securities, demand deposits, reserves for Taxes, certificates of deposit and other bank deposits, deposits of any Seller with any third-party (including any vendor, manufacturer, customer, utility or landlord or other cash deposits for rent, electricity, telephone or otherwise), treasury bills, and other cash equivalents and liquid investments and (ii) the Acquired Bank Accounts; <u>provided</u>, that cash in an amount necessary and sufficient to cover checks in transit relating to items that were permitted to be paid, but have not been paid, pursuant to the Final DIP Order or the DIP Facility as of the Closing shall not be included;

(b)      all deposits, credits, and prepaid charges and expenses from whatever source paid; <u>provided</u>, that prepaid deposits related to professional fee retainers shall not be included to the extent applied to professional fees actually incurred, subject to <u>Section 2.2(q)</u>;

(c)      all accounts receivable;

(d)      all Avoidance Actions and all of the rights, claims or causes of action of the Sellers of any kind, including those available under the Bankruptcy Code, against any officer, director, employee, manager or Affiliate of, or lender to, any Seller or any of their respective Affiliates (and the proceeds of any insurance policies related to any such rights, claims or causes of action) arising at any time prior to the Closing, which such Avoidance Actions, rights, claims and causes of action shall be, and effective immediately upon Closing hereby are, waived and released in full immediately upon Closing;

(e)      *reserved*;

(f)      all royalties, advances, prepaid assets and other current assets;

(g)      all machinery, furniture, fixtures, furnishings, equipment, and other tangible personal property owned, leased, or otherwise used or held for use by the Sellers in the conduct of the Business, including all computers, computer equipment, artwork, desks, chairs, tables, hardware, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies, and, as set forth on <u>Schedule 2.1(g)</u>, vehicles;

(h)      all rights of any Seller under or pursuant to all warranties, representations and guarantees including those made by suppliers, manufacturers and contractors or any other third party to and for the benefit of any Seller, other than rights acquired pursuant to <u>Section 2.1(d)</u> (which shall be covered by <u>Section 2.1(d)</u>);

(i)      all current and prior insurance policies, to the extent transferable, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries or proceeds thereunder and rights to assert claims with respect to any such insurance recoveries or proceeds, other than any directors and officers insurance policies, fiduciary policies or employment practices policies (in each case, including any tail policies or coverage thereon) and any rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder (the "<u>Sellers D&O Policies and Rights</u>");

21

(j)  all Permits, including those listed on Schedule 2.1(j), to the extent transferable or assignable under Law;

(k)  all Assumed Contracts;

(l)  all Documents (other than Excluded Documents);

(m)  all Owned Intellectual Property and all of Sellers' rights to institute and pursue Proceedings against third parties for past, present, and future infringement, misappropriation, or dilution of Owned Intellectual Property, or for any other conflict therewith, and all of the Sellers' rights to recover damages or lost profits in connection with any of the foregoing;

(n)  all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with current or former employees and non-employee agents of any Seller or with third parties, in each case, to the extent included as an Assumed Contract;

(o)  any loans owed to any Seller by any current or former employee or officer of any Seller;

(p)  all Claims, other than the Claims set forth on Schedule 2.1(p), that the Sellers may have against any Person, including all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date (and any proceeds paid from all current and prior insurance policies, other than the Sellers D&O Policies and Rights) with respect to any Purchased Assets or any Assumed Liabilities, in each case, that are not Excluded Assets and other than claims pursuant to Section 2.1(d) (which shall be covered by Section 2.1(d));

(q)  all other assets or rights of every kind and description of Sellers as of the Closing related to the Business, wherever located, whether real, personal, or mixed, tangible or intangible that are not Excluded Assets and other than claims pursuant to Section 2.1(d) (which shall be covered by Section 2.1(d));

(r)  all Assumed Benefit Plans (as defined in Section 6.6(f) below), including the sponsorship thereof, and all right, title and interest in any asset thereof or relating thereto, including any trusts, insurance policies, and administrative services contracts relating thereto (the "Assumed Plans and Agreements");

(s)  *reserved*;

(t)  all goodwill related to the foregoing; and

(u)  all Equity Interests held by any Seller in each Acquired Entity (the "Acquired Equity Interests").

2.2  Excluded Assets. Notwithstanding anything herein contained to the contrary, each Seller shall retain, and Buyer shall not purchase, such Seller's right, title, and interest in and to (and the Purchased Assets shall not include any of) the following assets and properties of the

142958362_16

Sellers (collectively, the "Excluded Assets"), all of which shall remain the exclusive property of the Sellers:

(a)     any Contract other than any Assumed Contract (collectively, the "Excluded Contracts") and any deposits related thereto;

(b)     any Contract or arrangement (including any loan or similar arrangement) other than any Assumed Contract with or binding upon any of the Sellers and any Related Party;

(c)     any intercompany accounts receivable owed between or among the Sellers;

(d)     other than the Assumed Plans and Agreements, all Benefit Plans and all right, title and interest in any asset thereof or relating thereto, including any trusts, insurance policies, and administrative services contracts relating thereto;

(e)     all rights of the Sellers and any other Person under this Agreement (including to the Purchase Price) and the agreements and instruments delivered to the Sellers by Buyer pursuant to this Agreement, including the Transaction Documents;

(f)     all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of any Seller); (ii) that are minute books, organizational documents, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks; (iii) that are subject to the attorney work-product doctrine, the attorney-client privilege or similar protections or privileges; (iv) that any Seller is prohibited from disclosing or transferring to Buyer under applicable Law or is required by Law or, if applicable, a consumer privacy ombudsman appointed pursuant to Section 332 of the Bankruptcy Code to retain; or (v) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area (collectively, the "Excluded Documents"); provided that, to the extent not prohibited by applicable Law, Buyer shall have the right to make copies of any portions or all of such Documents in subsection (ii) and (iv) of this Section 2.2(f); provided, further, that Buyer shall have the right to Excluded Documents under clause (iii) that relate to any Claims that are included as Purchased Assets;

(g)     all Claims that the Sellers may have against any Person (including Governmental Entities) for refund or credit, rebate, abatement, deposit or prepayment, together with any refund of interest due thereon or penalty rebate arising therefrom (such Excluded Assets, "Seller Tax Refunds");

(h)     all assets owned or used by the Sellers that are specifically identified in Schedule 2.2(h);

(i)     all assets of the Sellers that would otherwise constitute a Purchased Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) at the direction of the Bankruptcy Court, (ii) as not prohibited by the terms of the DIP Documents or (iii) in the Ordinary Course of Business;

(j)      all Permits other than those set forth on <u>Schedule 2.1(j)</u> and those Permits that are not transferable;

(k)      all rights related to the matters set forth on <u>Schedule 2.1(p)</u>;

(l)      the Sellers D&O Policies and Rights;

(m)      the Excluded Cash and the Wind-Down Amount;

(n)      the CIT Escrow Account, subject to resolution of the treatment thereof; <u>provided</u>, that subject to any Final Order resolving the dispute related to the funds in the CIT Escrow Account, such proceeds may become Purchased Assets pursuant to the terms of any such Final Order, which Final Order may be the Sale Order;

(o)      *reserved*;

(p)      any confidential personnel and medical records pertaining to any employee of any Seller and its Affiliates who is not a Hired Employee and any personnel and medical records pertaining to any employee or independent contractor of the Sellers that cannot be provided under applicable Law;

(q)      retainers held by any professional retained by Sellers, and, subject to the DIP Facility, the Final DIP Order and subject in all respects to the Budget, any funds of the Sellers held in escrow or reserve with respect to the fees and expenses of any professional retained by Sellers, provided, however, this shall not include any residual amounts after such professional fees and expenses have been paid;

(r)      *reserved*;

(s)      *reserved*;

(t)      all Intellectual Property owned by a Person other than a Seller (other than rights to Intellectual Property granted to a Seller pursuant to an Assumed Contract);

(u)      all Claims of Sellers or their Affiliates against any Person with respect to any Excluded Asset or Excluded Liabilities;

(v)      Utility Deposits; and

(w)      all attorney-client privilege and attorney work-product protection of Sellers or their Affiliates or associated with their businesses arising with respect to legal counsel representation of Sellers or their Affiliates or their businesses in connection with the Bankruptcy Cases, transactions contemplated by this Agreement or any of the Transaction Documents.

2.3      <u>Assumed Liabilities</u>.  Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, and subject to the exclusions set forth in <u>Section 2.4</u> (and in the event of any conflict between the exclusions set forth in <u>Section 2.4</u> and the provisions of this <u>Section 2.3</u>, the exclusions set forth in <u>Section 2.4</u> shall prevail), as partial consideration for the

Purchased Assets, Buyer shall, effective as of the Closing, assume only, the following Liabilities of the Sellers (the "Assumed Liabilities"):

(a)     all Liabilities under the Assumed Contracts to the extent that any such Liabilities under such Assumed Contracts: (i) arise out of or relate to events, occurrences, acts, or omissions occurring solely after the Closing and (ii) do not arise from a breach, violation, or default of such Assumed Contract by any Seller prior to the Closing;

(b)     all Liabilities relating to, or arising in respect of, Buyer's ownership or operation of the Purchased Assets to the extent arising out of or relating to events, occurrences, acts, or omissions occurring solely after the Closing;

(c)     all Cure Amounts;

(d)     all accrued and unpaid Administrative Expenses incurred by Sellers prior to the Closing Date (other than Professional Fees and Expenses and any other Purchased Assets or Assumed Liability), not to exceed the amounts set forth in the Budget (the "Post-Petition Payables");

(e)     all Liabilities in respect of wages and other compensation of Business Employees accrued prior to the Closing, including wages and other compensation for the last pay period immediately preceding the Closing Date (if such pay period ends on the Closing Date) or through the end of the then-current pay period that includes the Closing Date, including, for the avoidance of doubt, the employer portion of any payroll, social security or similar Taxes in respect thereof;

(f)     all Liabilities relating to Hired Employees accruing on or after the close of business on the Closing Date, solely to the extent arising out of or relating to the Hired Employees' employment (including the termination thereof) by Buyer or its Affiliates, including relating to vacation and other time off as set forth in Section 6.6;

(g)     all Liabilities relating to Business Employees on or after the Closing, including any notice pay or benefits and claims under the WARN Act, solely to the extent set forth in Section 6.6;

(h)     all Liabilities relating to all Assumed Plans and Agreements;

(i)     all Post-Closing COBRA Liabilities;

(j)     all Liabilities for Transfer Taxes pursuant to Section 6.10(a);

(k)     to the extent lawfully transferable, all obligations, commitments and Liabilities under any Permits assigned to Buyer hereunder;

(l)     all outstanding Trade Payables; and

(m)      all Liabilities to the extent arising out of the ownership, operation, management or control of the Purchased Assets or the Business for periods following the Closing; and

(n)      during the Extended Contract Period, all Administrative Expenses arising under Available Contracts until such time as they become an Excluded Asset or an Assumed Contract and any incremental costs or expenses (i) that arise out of the Sellers' extension and continuation of the Bankruptcy Cases that is attributable to the Extended Contract Period and (ii) are incurred as a result of the Sellers' performance of their obligations under this Agreement.

2.4      <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary set forth herein, Buyer shall not assume, and shall not be deemed to have assumed, and the Sellers shall retain all Liabilities of any Seller or any of their respective predecessors other than the Assumed Liabilities (collectively, the "<u>Excluded Liabilities</u>").  For the avoidance of doubt, and without limiting the foregoing, Buyer shall not be obligated to assume, nor assumes, and Buyer hereby disclaims, all of the Excluded Liabilities, including all of the following Liabilities of any Seller (or any of their respective predecessors) (each of which shall constitute an Excluded Liability hereunder):

(a)      except for any Liabilities for Taxes that are Assumed Liabilities, any Liability for (i) Taxes of any Seller for any taxable period and (ii) Taxes relating to the operation of the Business or the ownership of the Purchased Assets for any Pre-Closing Tax Period (such Excluded Liabilities ("<u>Excluded Tax Liabilities</u>");

(b)      any Claim in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith;

(c)      except for any Liabilities that are Assumed Liabilities, any fees, costs and expenses (including legal fees and accounting fees) incurred by any Seller in connection with the Bankruptcy Cases or the Transactions, including all fees, costs and expenses incurred by any Seller in connection with or by virtue of (i) the negotiation, preparation and review of this Agreement and all agreements ancillary or related hereto, (ii) the preparation and submission of any filing or notice required to be made or given in connection with the Transactions, and the obtaining of any consent required to be obtained in connection with the Transactions, (iii) the negotiation, preparing and review of the DIP Documents and (iv) any Alternate Transaction;

(d)      except for any Liabilities that are Assumed Liabilities, all Liabilities of Sellers relating to employees of Sellers that are not Hired Employees;

(e)      any Liabilities relating to the Hired Employees arising prior to the Closing Date (other than those expressly assumed by Buyer in <u>Section 2.3</u> or <u>Section 6.6</u>), and any Liabilities relating to all other current or former employees, directors, consultants and other individual service providers of the Sellers who are not Hired Employees arising at any time (other than those expressly assumed by Buyer in <u>Section 2.3</u> or <u>Section 6.6</u>), in each case, including any severance, termination or payment in lieu of notice Liability, and any other Liability arising under or out of any Law or Contract in connection with such Person's employment, service or Contract with, or the termination of such Person's employment, service or Contract with, any Seller;

(f)     any Liabilities of the Sellers and their respective ERISA Affiliates with respect to any Benefit Plan or other compensation or benefit plan, program, policy, agreement or arrangement of the Sellers, other than with respect to any Assumed Plans and Agreements and other than those Liabilities expressly assumed pursuant to Section 2.3 or Section 6.6;

(g)     other than Liabilities expressly assumed pursuant to Section 2.3(f) or Section 6.6, any success, retention, stay, change of control or similar bonuses and any other payments or benefits owing to current or former employees, independent contractors or consultants of the Sellers in connection with the consummation of the Transactions, including the employer portion of any payroll, social security or similar Taxes in respect thereof;

(h)     any Liability of any Seller arising out of this Agreement or any Transaction Document;

(i)     except for any Liabilities that are Assumed Liabilities, any Liabilities arising out of or relating to the Business, the Purchased Assets or the ownership, operation or conduct thereof prior to the Closing;

(j)     any Liabilities for accrued expenses and accounts payable of the Sellers, other than the Post-Petition Payables, Trade Payables or any other Liabilities that are Assumed Liabilities;

(k)     except for any Liabilities that are Assumed Liabilities, any Liabilities of the Sellers arising as a result of any Proceeding, whether initiated prior to or following the Closing, to the extent related to the Business or the Purchased Assets, including any actions for breach of contract, violations of or non-compliance with Law (including Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws), or any tort actions, in each case, solely to the extent related to periods prior to the Closing;

(l)     any Liabilities arising as a result of any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers and any Related Party (other than those Liabilities expressly assumed pursuant to Section 2.3), and all intercompany payables owed from one Seller to any other Seller;

(m)     any Liabilities of Sellers (i) existing prior to the filing of the Bankruptcy Cases that are subject to compromise under the Bankruptcy Code or other applicable Law and (ii) to the extent not otherwise expressly assumed herein, incurred subsequent to the filing of the Bankruptcy Cases and prior to the Closing; provided that in the event of any conflict between the terms of Section 2.3 and this Section 2.4, the terms of Section 2.3 shall control; and

(n)     any Liabilities arising out of Professional Fees and Expenses.

2.5     Assumption and Assignment of Assumed Contracts.

(a)     Schedule 2.5(a) sets forth a list of the executory Contracts and Leases to which one or more Sellers is a party that are subject to assumption or rejection pursuant to Section 365 of the Bankruptcy Code (the "Available Contracts"), together with estimated Cure Amounts for each such Available Contract, which Schedule 2.5(a) may be updated to add or remove

27

Contracts or Leases entered into in the Ordinary Course of Business or otherwise not prohibited by this Agreement following the date hereof or that were inadvertently included or excluded from such schedule (including any Contracts or Leases identified pursuant to Section 2.5(j)).  Buyer shall designate in writing (each such writing, a "Designation Notice") which Available Contracts from Schedule 2.5(a) that Buyer wishes for Sellers to assume and assign to Buyer at the Closing (such Contracts as set forth in the Designation Notice (as may be updated), the "Assumed Contracts") no later than two (2) Business Days prior to the Auction.  Buyer shall have the right to amend a Designation Notice in any respect at any time prior to (i) the date that is four (4) Business Days prior to the Closing or (ii) the date on which the Bankruptcy Code or Bankruptcy Courts otherwise would require a determination to assume or reject such Available Contracts (such date, the "Determination Deadline").  All Contracts or Leases of the Sellers that are listed on Schedule 2.5(a) and which Buyer does not designate in writing pursuant to a Designation Notice for assumption shall not constitute Assumed Contracts or Purchased Assets and shall automatically be deemed Excluded Assets; provided, however, that if an Available Contract is subject to a Cure Amount dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of Buyer and the Sellers prior to the Determination Deadline, then the Determination Deadline shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and the Sellers, (B) the date on which such Available Contract is deemed rejected by operation of section 365 of the Bankruptcy Code, (C) the date upon which such dispute is finally determined by the Bankruptcy Court, and (D) up to thirty (30) days (or such shorter period of time as provided in the Wind-Down Budget) following the Closing Date (the "Extended Contract Period").  If a Designation Notice with respect to such Available Contract is not delivered by Buyer in writing by the date which is three (3) Business Days following the expiration of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Asset.  For the avoidance of doubt, except as set forth in Section 2.3, Buyer shall not assume or otherwise have any Liability with respect to any Excluded Asset.  Buyer shall be responsible for any obligations or Liabilities arising following the Closing during any Extended Contract Period relating to any Available Contract that has not been assumed or rejected as of the Determination Deadline as provided in this Section 2.5(a) and any incremental costs or expenses (x) that arise out of the Sellers' extension and continuation of the Bankruptcy Cases that is attributable to the Extended Contract Period and (y) are incurred as a result of the Sellers' performance of their obligations under this Agreement.  The Parties acknowledge and agree that there will be no reduction in, or increase to, the Purchase Price as a result of any addition or elimination of any Contract or Lease as an Assumed Contract; provided, however, that any such addition or elimination may increase or decrease (as applicable) the extent of the Assumed Liabilities, Purchased Assets and/or Excluded Contracts.

(b)     The Sellers shall use commercially reasonable efforts to take all actions required by the Bankruptcy Court to obtain an Order (which shall be the Sale Order, unless as otherwise determined by Buyer) containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(c)     At the Closing, subject to Section 2.5(a), (i) the Sellers shall, pursuant to the Sale Order and the Bill of Sale and Assignment and Assumption Agreement, assume and assign, or cause to be assigned, to Buyer, each of the Assumed Contracts that is capable of being

28

assumed and assigned as of such date and (ii) Buyer shall assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order.

(d)     Buyer will cooperate with the Sellers in communicating with third parties to Available Contracts as may be reasonably necessary to assist the Sellers in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the applicable Available Contracts.

(e)     This Agreement shall not constitute an agreement to assign or transfer any Contract or Lease if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a violation of applicable Law or a breach of such Contract or Lease.  In the event Sellers are unable to assign any Assumed Contract to Buyer without the consent or approval of another Person, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all required consents or approvals necessary to assume and assign such Assumed Contracts to Buyer; provided that (i) Sellers shall not be required to expend any money in order to obtain any such consent and (ii) as set forth in Section 6.9, neither Sellers nor Buyer shall be in breach of this Agreement, the Purchase Price shall not be adjusted and the Closing shall not be delayed (and no condition precedent to Closing shall be determined to have failed to be satisfied as a result of any such failure to obtain such consent or approval).

(f)     Within five (5) Business Days after entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Sellers shall file with the Bankruptcy Court and shall serve the Sale Notice (as defined in the Bidding Procedures Order).  Within five (5) Business Days after entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Sellers shall file with the Bankruptcy Court and shall serve the Cure Notice on the counterparties to the Purchased Contracts (each as defined in the Bidding Procedures Order) listed on Schedule 2.5(a).

(g)     The Sellers shall use commercially reasonable efforts to file notice with the Bankruptcy Court within five (5) Business Days following the Determination Deadline, or as soon as reasonably practicable thereafter, which notice shall set forth only the Assumed Contracts (and exclude all other Available Contracts).

(h)     With respect to Cure Amounts that are disputed as of the Closing Date, the Parties shall cooperate and diligently pursue resolution of such disputes.  Upon the resolution of any disputed Cure Amounts, the Buyer shall pay such Cure Amount promptly, and in no event later than three (3) Business Days following such resolution.

(i)     Notwithstanding anything in this Agreement to the contrary, from and after the date hereof through the Closing or earlier termination of this Agreement in accordance with its terms, the Sellers will not reject or take any action to reject any Available Contract without the prior written consent of Buyer.  For the avoidance of doubt, the Sellers may reject any Available Contract for which Buyer does not deliver a timely Designation Notice.

(j)    Previously Omitted Contracts.

(i)    If prior to the Determination Deadline, it is discovered by any Party that a Contract or Lease should have been listed on Schedule 2.5(a) but was not listed on Schedule 2.5(a) and has not been rejected by the Sellers (any such Contract or Lease, a "Previously Omitted Contract"), the discovering Party shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify the other Parties in writing of such Previously Omitted Contract and then the Sellers shall, promptly following such notification (but in no event later than two (2) Business Days following such notification), notify Buyer of Sellers' good faith estimate of all Cure Amounts (if any) for such Previously Omitted Contract.  Buyer may thereafter deliver a Designation Notice to Sellers, no later than the earlier of (x) the Determination Deadline or the expiration of the Extended Contract Period, as applicable, and (y) five (5) Business Days following notification of such Previously Omitted Contract from the Seller with respect to such Previously Omitted Contract and such contract shall be an Assumed Contract under this Agreement.  All Previously Omitted Contracts with respect to which Buyer fails to timely deliver a Designation Notice shall be an Excluded Asset.

(ii)    If Buyer delivers a Designation Notice in accordance with Section 2.5(j)(i), the Sellers shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Amounts with respect to such Previously Omitted Contract and the Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.5.  The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) Business Days to object, in writing to the Sellers and Buyer, to the Cure Amounts or the assumption of its Contract.  If the counterparties, the Sellers, and Buyer are unable to reach a consensual resolution with respect to the objection, the Sellers shall seek an expedited hearing before the Bankruptcy Court to determine the Cure Amounts and approve the assumption.  If no objection is served on the Sellers and Buyer, the Sellers shall obtain an order of the Bankruptcy Court fixing the Cure Amounts and approving the assumption of the Previously Omitted Contract.  Buyer shall be responsible for all Cure Amounts related to any Previously Omitted Contract which becomes an Assumed Contract.

## ARTICLE III
## CLOSING AND PURCHASE PRICE

3.1    Closing; Transfer of Possession; Certain Deliveries.

(a)    Unless this Agreement shall have been terminated and the Transactions shall have been abandoned pursuant to Article IX, upon the terms and subject to the conditions hereof, the Closing shall take place at 10:00 a.m. (prevailing Eastern Time) no later than two (2) Business Days after all the conditions set forth in Article VIII shall have been satisfied or waived (excluding, but subject to the satisfaction or waiver of, conditions that, by their nature, are to be satisfied at the Closing), or such other time or date as agreed to in writing by the Parties.  The Closing shall take place by telephone or video conference and electronic exchange of documents, unless otherwise mutually agreed to by the Parties.  The date on which the Closing occurs is referred to

30

in this Agreement as the "<u>Closing Date</u>".  The Closing shall be effective as of 12:01 a.m. (prevailing Eastern Time) on the Closing Date.

(b)       At the Closing, the Sellers shall deliver, or shall cause to be delivered, to Buyer the following:

(i)       a counterpart to a Bill of Sale and Assignment and Assumption Agreement, which such agreement shall be on terms mutually satisfactory to the Sellers and Buyer relating to the transfer of the Purchased Assets to Buyer and the assumption of the Assumed Liabilities by Buyer (the "<u>Bill of Sale and Assignment and Assumption Agreement</u>"), duly executed by each applicable Seller;

(ii)       a counterpart to an Intellectual Property Assignment Agreement, which such agreement shall be on terms mutually satisfactory to the Sellers and Buyer relating to the assignment of Intellectual Property that is included in the Purchased Assets to Buyer (the "<u>Intellectual Property Assignment Agreement</u>"), duly executed by each Seller assigning assets therein;

(iii)       a certificate of a duly authorized officer of each Seller dated the Closing Date certifying that the conditions set forth in <u>Section 8.1(a)</u>, <u>Section 8.1(b)</u> and <u>Section 8.1(d)</u> have been satisfied;

(iv)       an IRS Form W-9 from each of the Sellers (or their regarded owners), duly completed and executed in compliance with applicable Treasury Regulations;

(v)       a duly executed counterpart of each Local Transfer Instrument and any such other documents reasonably requested by Buyer to evidence the transfer of the Acquired Equity Interests;

(vi)       each other Transaction Document to which any Seller is a party, duly executed by the applicable Seller; and

(vii)       such other closing instruments as may be reasonably requested by Buyer and otherwise necessary to consummate the Transaction, in each case in form and substance reasonably acceptable to Buyer and Sellers (<u>provided</u> that no Party shall unreasonably withhold, condition, or delay its consent).

(c)       At the Closing, Buyer shall deliver, or shall cause to be delivered to the Sellers, the following:

(i)       a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Buyer;

(ii)       a counterpart to the Intellectual Property Assignment Agreement, duly executed by Buyer;

(iii)       to an account designated by the Sellers, cash equal to the Wind-Down Amount by wire transfer of immediately available funds, which such funds shall remain

31

subject to the Final DIP Order as collateral under the DIP Documents and Final DIP Order in all respects;

(iv) to an account designated by the Sellers, cash equal to the Minimum Cash Shortfall, if any, by wire transfer of immediately available funds, which such funds shall remain subject to the Final DIP Order as collateral under the DIP Documents and Final DIP Order in all respects;

(v) payoff letter, release letter or other similar document confirming the conversion of the Credit Bid Amount as consideration for the transfer of the Purchased Assets and the satisfaction of Sellers' obligations under the Prepetition Financing Agreements and the DIP Documents, in form and substance reasonably satisfactory to the Sellers;

(vi) a certificate of a duly authorized officer of Buyer dated the Closing Date, certifying as to the matters set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>;

(vii) each other Transaction Document to which Buyer is a party, duly executed by Buyer; and

(viii) such other closing instruments as may be reasonably requested by Buyer and otherwise necessary to consummate the Transaction, in each case in form and substance reasonably acceptable to Buyer and Sellers (<u>provided</u> that no Party shall unreasonably withhold, condition, or delay its consent).

3.2    <u>Purchase Price; Related Matters</u>.

(a) <u>Purchase Price</u>. The aggregate consideration for the Purchased Assets shall be no less than $290 million and shall consist of the following (collectively, the "<u>Purchase Price</u>"): (w) a credit bid equal to (A) all outstanding obligations under the DIP Facility (including the Roll-Up DIP Loans (as defined in the Final DIP Order)), which such outstanding obligations shall be assumed by Buyer and (B) the outstanding obligations under the Prepetition Financing Agreement in an amount equal to $200 million, of which $50 million in principal shall be assumed by Buyer (the "<u>Credit Bid Amount</u>"); *plus* (x) the assumption by Buyer of the Assumed Liabilities; *plus* (y) the Wind-Down Amount; *plus* (z) the Minimum Cash Shortfall. The Credit Bid Amount shall be paid by means of a credit against the total amounts due and owing under the Credit Documents as of the Closing Date. In no event shall the Credit Bid Amount be payable by Buyer in cash. The Administrative Agent shall take all necessary actions under the DIP Facility and Prepetition Financing Agreement in order to cause the payment of the Credit Bid Amount in accordance with this <u>Section 3.2(a)</u>.

(b) <u>Bulk Sales Laws</u>. Buyer hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" Laws that may apply to the sale and transfer of the Purchased Assets to Buyer. Pursuant to section 363(f) of the Bankruptcy Code, the Parties intend that the transfer of the Purchased Assets of the Sellers shall be free and clear of all Liens, other than Permitted Liens, in each case pursuant to the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date, including any liens or claims arising out of the "bulk-transfer"

Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

3.3     Allocation of Purchase Price.  Sellers and Buyer agree to allocate all amounts treated as consideration for U.S. federal income tax purposes among the Purchased Assets for all purposes (including tax and financial accounting) in accordance with the allocation methodology set forth in Schedule 3.3 attached hereto.  Within ninety (90) days following the Closing Date, Buyer will provide to Sellers the Allocation Schedule prepared in accordance with such allocation methodology.  If, within thirty (30) calendar days of Sellers' receipt of Buyer's proposed allocation, Sellers do not deliver Buyer written notice (a "Seller Allocation Objection Notice") of any objections that they have to such allocation, Buyer's proposed allocation shall be final and binding to all parties.  If Sellers timely deliver to Buyer a Seller Allocation Objection Notice, then Buyer and Sellers shall work together in good faith to resolve the disputed items.  If Buyer and Sellers are unable to resolve all of the disputed items within thirty (30) calendar days of Buyer's receipt of the Seller Allocation Objection Notice (or such later date as Buyer and Sellers may agree), then Buyer and Sellers shall refer the disputed items for resolution to an accounting firm of national reputation mutually acceptable to Buyer and Sellers, with no existing relationship with either Buyer or Sellers and such accounting firm shall determine the final allocation in accordance with such allocation methodology.  Buyer and Sellers shall file all applicable Tax Returns (including Form 8594, any amended Tax Returns, and any claims for refund) consistent with the Allocation Schedule (as finally determined) and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings) absent a contrary "determination" (within the meaning of Section 1313(a) of the Code).

3.4     Withholding.  Buyer or any other paying agent (as applicable) shall be entitled to deduct and withhold from the amounts payable under this Agreement such amounts as may be required to be deducted and withheld under the Code and any other applicable Tax Laws.  Before withholding or deducting any amounts hereunder, the applicable withholding agent shall use commercially reasonable efforts to notify Sellers of its intent to withhold at least five (5) days before deducting or withholding any such amounts (other than (i) any withholding on payments in the nature of compensation for services and (ii) any withholding due to the failure of any Seller to deliver the documentation required by Section 3.1(b)(iv)) and cooperate with the Sellers to reduce or eliminate such withholding or deduction.  To the extent any such amount is to be so deducted and withheld by Buyer, such amounts shall be timely paid over to, or deposited with, the relevant Governmental Entity in accordance with the provisions of applicable Law and Buyer or any other applicable withholding agent shall upon written request from Sellers provide evidence that the amount deducted and withheld has been remitted to the appropriate taxing authority.  Any such withheld amount shall be treated as though it had been paid to the Person in respect of which such withholding was required.  Notwithstanding anything to the contrary, any compensatory amounts payable pursuant to or as contemplated by this Agreement shall be remitted to the applicable payor for payment to the applicable Person through regular payroll procedures, as applicable.

3.5     Wind-Down.  At Closing, Buyer shall fund $500,000 (the "Wind-Down Amount") to fund an orderly wind down process during the period from the Closing until one (1) Business Day following the closure, conversion, or dismissal of the Bankruptcy Cases or the appointment

of a trustee (if applicable), subject to a budget (the "Wind-Down Budget"), which Wind-Down Budget shall be reasonably acceptable to Buyer.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Sellers' Disclosure Schedules, each of the Sellers hereby jointly and severally makes the following representations and warranties to Buyer with respect to itself and each other Seller as of the Agreement Date:

4.1    Organization and Good Standing. Each Seller (a) is an entity duly formed, validly existing and in good standing under the Laws of its jurisdiction of incorporation or formation, and (b) subject to any limitations that may be imposed on such Seller as a result of filing a petition for relief under the Bankruptcy Code, has full organizational power and authority to own, lease and operate its properties, to perform all of its obligations under the Available Contracts, and carry on the Business as it is now being conducted. The Sellers have delivered to Buyer true, complete, and correct copies of each Seller's Organizational Documents as in effect on the date hereof.

4.2    Power and Authority. Subject to entry and effectiveness of the Sale Order in respect of the Sellers, each Seller has the requisite organizational power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement by each Seller and, subject to the approval of this Agreement by the Bankruptcy Court, the consummation by each Seller of the Transactions and the performance of each Seller's obligations hereunder have been duly authorized by all requisite organizational action on the part of each Seller. This Agreement has been duly executed and delivered by each Seller and (assuming the due and valid authorization, execution and delivery thereof by Buyer), subject to entry and effectiveness of the Bidding Procedures Order and upon the approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Sale Order, will constitute the legal, valid and binding obligation of each Seller, enforceable against each Seller in accordance with its terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions"). Each Seller has the requisite organizational power to operate its business with respect to the Purchased Assets that it owns as now conducted and is duly qualified as a foreign entity to do business, and to the extent legally applicable, is in good standing, with respect to the Business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing has not had a Material Adverse Effect.

4.3    Litigation. Except as set forth on Schedule 4.3 and other than the Bankruptcy Cases, as of the date hereof, there are no outstanding Orders or Proceedings pending, or, to the Knowledge of the Sellers, threatened in writing against any Seller or any controlled Affiliate, manager, director, officer or key employee of any Seller relating to the ownership or use of the Purchased Assets or conduct of the Business by the Sellers or otherwise affecting the Purchased Assets or the Business, which (a) if determined adversely to any such Seller, would be, individually or in the aggregate, material with respect to the Purchased Assets, Assumed Liabilities, the

34

Business or (b) questions the validity of this Agreement as of the date hereof, any Transaction Document or the Transactions, or in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.4     No Contravention.  Subject to the entry and effectiveness of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, and except as a result of the Bankruptcy Cases or as set forth on Schedule 4.4, neither the execution and delivery of this Agreement and compliance by the Sellers with any provisions hereof, nor the consummation of the Transactions, will (a) violate or conflict with any provision of any Seller's Organizational Documents, (b) with or without the giving of notice or the lapse of time or both violate, or result in a breach of, or constitute a default under, or conflict with, or accelerate the performance required by, any of the terms of any Available Contract or Lease that is included in the Purchased Assets, (c) violate or conflict with any Order, or any Law or Permit that is required to be discharged prior to Closing applicable to the Sellers, or (d) result in the creation of any Lien upon any of the Purchased Assets (other than Permitted Liens); except, in the case of clauses (b), (c) and (d) above, (i) for compliance with the applicable requirements of Antitrust Laws if required and (ii) for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole.

4.5     Consents and Approvals.  Except (a) to the extent excused or made unenforceable as a result of the filing of the Bankruptcy Cases, (b) to the extent not required if the Sale Order is entered, (c) for notices, filings and consents required in connection with the Bankruptcy Cases or (d) as set forth on Schedule 4.5, the execution, delivery and performance by each Seller of this Agreement and the Transactions, and the legality, validity, binding effect or enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with or notice to, any (i) Governmental Entities except as would not reasonably be expected to be material to the Business taken as a whole or to delay or prevent any Seller's ability to consummate the Transactions, or (ii) Material Customers or Material Vendors, except as, with respect to clause (ii), would not reasonably be expected to have a Material Adverse Effect with respect to clause (ii), or for any filings required to be made under any applicable Antitrust Laws.

4.6     Title to Purchased Assets; Sufficiency.  Sellers have, and subject to the entry and effectiveness of the Sale Order in respect of the Purchased Assets, at the Closing, Buyer will have, good and valid title to each of the Purchased Assets (except for those Purchased Assets that are leased or licensed to any Seller, as to which any Seller has, and at the Closing, Buyer will have, valid licensed or leasehold interests), free and clear of all Liens, other than (i) Permitted Liens, (ii) Liens securing any loan made directly to Buyer or expressly assumed by Buyer as of the Closing Date, (iii) as subject to Section 2.5 or (iv) the Enforceability Exceptions.  Except (a) as set forth on Schedule 4.6 and (b) for the exclusion of the Excluded Assets, and subject to entry of the Sale Order and any other applicable Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents and the assumption by Buyer of all Assumed Contracts in accordance with applicable Law (including satisfaction of all applicable Cure Amounts), the Purchased Assets, together with the assets of the Acquired Entities, constitute all of the material assets used in or held by the Sellers for use in the Business and are sufficient for Buyer

35

to conduct the Business from and after the Closing Date in all material respects as it has been conducted by the Sellers prior to the Closing.

4.7    <u>Validity of Available Contracts</u>.  As of the Agreement Date, subject to requisite Bankruptcy Court approvals and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction any applicable Cure Amounts) and except (i) as a result of the commencement of the Bankruptcy Cases, and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced: (a) each Available Contract is a legal, valid and binding obligation of the Seller that is a party thereto, and is enforceable against such Seller in accordance with its terms and, to the Knowledge of the Sellers, is a legal, valid and binding obligation of each other party to such Contract and is enforceable against such other party thereto in accordance with its terms, subject to bankruptcy Laws and general equitable principles; (b) no Seller that is a party to any Available Contract, or, to the Knowledge of the Sellers, any other party to an Available Contract, is in material default or breach of an Available Contract, other than any default or breach arising out of or relating to the financial condition of the Sellers or the Bankruptcy Cases; (c) to the Knowledge of the Sellers, during the twelve (12) months preceding the Agreement Date, no other party to any Available Contract has materially breached such Contract; (d) to the Knowledge of the Sellers, there does not exist any event, condition or omission that would constitute a material default or breach (or event which, with the giving of notice or lapse of time or both would become such a default or breach) under any Available Contract, other than any default or breach arising out of or relating to the financial condition of the Sellers or the Bankruptcy Cases; (e) to the Knowledge of the Sellers, no Seller that is a party to any Available Contract has received any written notice of termination or cancellation with respect to any Available Contract; (f) with respect to the Assumed Contracts, upon entry of the Sale Order, each Seller will not be in material breach or default of its obligations thereunder; and (g) except as set forth on <u>Schedule 4.7</u>, the Seller is not party to any material oral contracts.

4.8    <u>Intellectual Property</u>.

(a)    <u>Schedule 4.8(a)</u> sets forth a correct and complete list of all items of Seller Registered Intellectual Property as of the Agreement Date, specifying the record owner, jurisdiction and issuance, registration or application number and date, as applicable, of each such item.  To the Knowledge of the Sellers, all renewal, maintenance and other necessary filings and fees due and payable to any relevant Governmental Entity or domain name registrar to maintain all Seller Registered Intellectual Property in full force and effect have been timely submitted or paid in full.  To the Knowledge of the Sellers, all Seller Registered Intellectual Property is subsisting and all issuances and registrations included in the Seller Registered Intellectual Property are valid and enforceable in accordance with applicable Law.

(b)    A Seller is the sole and exclusive owner of all right, title and interest in and to all Owned Intellectual Property, free and clear of all Liens (other than Permitted Liens) and all Licensed Intellectual Property is, to the Knowledge of the Sellers, validly licensed to the applicable Seller, free and clear of all Liens (other than Permitted Liens).  To the Knowledge of the Sellers, the Owned Intellectual Property together with the Licensed Intellectual Property and any Intellectual Property in the public domain, constitutes all of the material Intellectual Property used

36

in, and necessary and sufficient for, the conduct and operation of the Business as currently conducted.

(c)     To the Knowledge of the Sellers, as of the Agreement Date, there are no Proceedings pending or threatened in writing against any Seller, (i) alleging any infringement, misappropriation, dilution, or other violation of any Intellectual Property, or (ii) challenging the ownership, validity, or enforceability of any Owned Intellectual Property.  Except as set forth on Schedule 4.8(c), to the Knowledge of the Sellers, none of the following infringes, constitutes or results from a misappropriation of, dilutes or otherwise violates, or has, during the twelve (12) months preceding the Agreement Date, infringed, constituted or resulted from a misappropriation of, diluted or otherwise violated, any Intellectual Property of any Person in any material respect: (1) any Owned Intellectual Property (or any use, practice or exploitation of any Owned Intellectual Property), (2) any products or services of any Seller in connection with the Business (or the making, use, offer for sale, sale, importation, distribution or other disposal, performance or exploitation of any products or services of any Seller in connection with the Business) or (3) the conduct or operations of the Business. This Section 4.8(c) constitutes the sole and exclusive representation and warranty with respect to the infringement, violation, misappropriation, or dilution of the Intellectual Property of any third party.

(d)     To the Knowledge of the Sellers, (i) no material Owned Intellectual Property has been or is being infringed, misappropriated, diluted, or otherwise violated by any Person in any material respect, and (ii) as of the Agreement Date, no Proceeding alleging any of the foregoing is pending or threatened against any Person by any Seller.

(e)     To the Knowledge of the Sellers, each Seller has taken commercially reasonable security measures designed to maintain and protect the confidentiality and value of all (i) material Trade Secrets included in the Owned Intellectual Property and (ii) material Trade Secrets owned by any Person to whom any Seller has a confidentiality obligation, in the case of clauses (i) and (ii), which measures are reasonable in the industry in which the Business operates. To the Knowledge of the Sellers, no material Trade Secret included in the Owned Intellectual Property has been disclosed to any Person other than pursuant to confidentiality obligations or duties sufficiently restricting the disclosure and use thereof.

(f)     To the Knowledge of the Sellers, the IT Systems are adequate and sufficient (including with respect to working condition and capacity) in all material respects for the operation of the Business.  To the Knowledge of the Sellers, during the twelve (12) months preceding the Agreement Date, there have been no (i) material security breaches or material unauthorized use, access, or intrusions of any IT Systems or (ii) outages of any IT Systems that have caused or resulted in a material disruption to the Business that has not been remedied in all material respects.

(g)     To the Knowledge of the Sellers, none of the source code or related confidential materials for any material Seller Software has been licensed or provided to, or used or accessed by, any Person other than Sellers' employees, consultants, or contractors, who have entered into written confidentiality obligations with respect to such source code or related confidential materials.  To the Knowledge of the Sellers, no Open Source Software is or has been included, incorporated or embedded in, linked to, combined or distributed with or used in the delivery or provision of any material Seller Software, in each case, in a manner that subjects any

such Seller Software to any Open Source Software license that requires as a condition of use, modification and/or distribution of such Seller Software, that such Seller Software be: (i) disclosed or distributed in source code form; (ii) licensed for the purpose of making derivative works; or (iii) redistributable at no charge.

(h)     To the Knowledge of the Sellers, the Sellers and any Person acting for or on the Sellers' behalf, are materially complying with and have, during the twelve (12) months preceding the Agreement Date, materially complied with (i) all applicable Privacy Laws, (ii) all of the Sellers' written policies and notices regarding Personal Information, and (iii) all of the Sellers' material contractual obligations with respect to Personal Information.  To the Knowledge of the Sellers, each Seller implements and maintains and has, during the twelve (12) months preceding the Agreement Date, maintained reasonable safeguards to protect Personal Information in its possession or under its control against loss, theft, misuse or unauthorized access, use, modification, alteration, destruction, or disclosure.  To the Knowledge of the Sellers, during the twelve (12) months preceding the Agreement Date, there have been no material breaches, material security incidents, material misuse of or material unauthorized access to or disclosure of any Personal Information in the possession or control of the Sellers or collected, used, or processed by or on behalf of the Sellers.  To the Knowledge of the Sellers, during the twelve (12) months preceding the Agreement Date, no Seller has received any written notice of any claims (including written notice from third parties acting on its behalf) of or investigations or inquires related to, or been charged with, the violation of any Privacy Laws, applicable privacy policies, or contractual commitments with respect to Personal Information.

4.9     Employee Benefits.

(a)     Schedule 4.9(a) lists all material Benefit Plans.

(b)     True, correct and complete copies of the following documents, with respect to each of the Assumed Benefit Plans, have been made available to Buyer (in each case, to the extent applicable): (i) any plan documents and all material amendments thereto, (ii) the most recent IRS determination or opinion letter, (iii) the most recent Form 5500, (iii) the most recent summary plan descriptions (including letters or other documents materially updating such descriptions), and (iv) any material non-routine correspondence with any Governmental Entity within the past three years.

(c)     Each of the Assumed Benefit Plans sponsored by any Seller that is intended to qualify under Section 401 of the Code has received a favorable determination letter from the Internal Revenue Service that such plan is so qualified.  To the Knowledge of the Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(d)     Each of the Assumed Benefit Plans is and has been established, funded and maintained in accordance in all material respects with its terms and in compliance in all material respects with applicable Laws and regulations and is and has been administered in all material respects in accordance with applicable Laws and regulations and with its terms. Except as disclosed in Schedule 4.9(d), the Sellers have not received notice of any pending material action (other than those relating to routine claims for benefits) with respect to any Assumed Benefit Plan.

(e)    Other than as disclosed on Schedule 4.9(e), no Benefit Plan is, and, neither the Sellers nor any ERISA Affiliate maintains, contributes to, participates in, or has any material current or contingent liability with respect: (i) to any "defined benefit plan" (as defined in Section 3(35) of ERISA) or any other plan that is or was subject to Title IV of ERISA or Sections 412 or 430 of the Code, or (ii) to a "multiemployer plan" as such term is defined in Section 3(37) of ERISA, including on account of the Sellers, together with any other Person, being treated as a single employer under Section 414 of the Code.  No Benefit Plan is a "multiple employer plan" (within the meaning of Section 210 of ERISA or Section 413(c) of the Code), or a "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA).

(f)    All required contributions to, and premium payments on account of, each Assumed Benefit Plan have been made on a timely basis, except where any failure to make such contributions or payments on a timely basis would not be material to the Sellers, taken as a whole.

(g)    None of the Benefit Plans provides, and none of the Sellers have any obligation to provide, post-employment health care, welfare or any other non-pension benefits to any employees, officers, or directors (or any dependent or beneficiary thereof) other than as required by Part 6 of Subtitle B of Title I of ERISA or similar state Law.

(h)    Each Benefit Plan that constitutes, in whole or in part, a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code has been administered, operated, and maintained in all material respects in operational and documentary compliance with Section 409A of the Code and applicable guidance thereunder.

(i)    Except as set forth on Schedule 4.9(i), neither the execution and delivery of this Agreement nor the consummation of the Transactions, either alone or in connection with any other event, will (i) to the Knowledge of the Sellers, give rise to any payments or benefits that would be nondeductible to the Sellers under Section 280G of the Code or that could result in an excise Tax on any recipient under Section 4999 of the Code, (ii) result in any payment or benefit becoming due to any current or former employee, independent contractor or consultant of the Sellers, (iii) increase the amount or value of any compensation or benefits payable under any Benefit Plan, result in any acceleration of the time of payment or vesting of any compensation or benefits or provide any additional compensatory rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any current or former employee, independent contractor or consultant of the Sellers, (iv) limit or restrict the ability of Buyer, its Affiliates, or the Sellers to merge, amend or terminate any Assumed Benefit Plan or (v) result in a requirement to pay any tax "gross-up" or similar "make-whole" payments to any employee, director or consultant of the Sellers.

(j)    With respect to any Assumed Benefit Plan that is subject to the Laws of a jurisdiction other than the United States (whether or not the Laws of the United States also apply) (any such Benefit Plan, a "Foreign Benefit Plan"): (i) each Foreign Benefit Plan required to be registered has been registered and has been maintained in good standing in all material respects with applicable regulatory authorities and (ii) except to the extent permitted under a Foreign Benefit Plan, there are no unfunded or underfunded liabilities or obligations with respect to such Foreign Benefit Plan.

4.10    Labor Matters.

(a)    Schedule 4.10(a) sets forth a complete (but anonymized) list of all Business Employees as of the a date within five (5) Business Days of the Agreement Date, and based on the Sellers' records as of a date within five (5) Business Days of the Agreement Date, correctly reflects, with respect to each individual, as applicable: (i) date of hire; (ii) job title and department; (iii) rate of pay or salary; (iv) target incentive cash compensation opportunities, (v) employee versus independent contractor status; (vi) exempt versus non-exempt status; (vii) accrued but unused paid-time off; and (viii) to the extent known, leave of absence status.

(b)    Except as set forth on Schedule 4.10(b), none of the Sellers is a party to any labor or collective bargaining agreements which pertain to any Business Employees, and no such agreements are being negotiated as of the Agreement Date.  The Sellers do not have any duty to bargain with any labor union, works council or other labor organization.  To the Knowledge of the Sellers, no labor union, works council or other labor organization claims or demands to represent any employee of the Sellers and there are no organization campaigns in progress or threatened with respect to any of the employees, nor have there been any such claims, demands or organizational campaigns within the past three (3) years.  No Business Employees are represented by a labor or trade union, works council, employee association or other employee representative.

(c)    Each of the Sellers is in material compliance with all Labor Laws.  The Sellers are, and for the past three (3) years have been, in compliance in all material respects with all applicable Laws respecting labor, employment and employment practices, including, without limitation, all Laws respecting terms and conditions of employment, health and safety, wages and hours, immigration, employment harassment, discrimination or retaliation, whistleblowing, disability rights or benefits, equal opportunity, plant closures and layoffs (including the WARN Act), employee trainings and notices, workers' compensation, labor relations, employee leave issues, COVID-19, affirmative action and unemployment insurance.

(d)    Neither the Sellers, nor any of their respective officers or directors in their individual capacities as such have, within the past three (3) years, settled any material claims, actions, complaints, or other grievances relating to sexual harassment involving or relating to one or more Business Employee. There are no such claims, actions, complaints or other grievances relating to sexual harassment currently pending or, to the Knowledge of the Sellers, threatened against any Business Employee or Seller in respect of any Business Employee.

4.11    Conduct of Business.  Except as set forth on Schedule 4.11, and except for the DIP Documents, all negotiation and preparation therefor, and the negotiation, execution, delivery and performance of this Agreement, from January 1, 2023, to the Agreement Date, (a) the Business has been conducted in the Ordinary Course of Business and (b) the Sellers have owned and operated the Purchased Assets in the Ordinary Course of Business.

4.12    Compliance with Laws; Permits.

(a)    Except as disclosed on Schedule 4.12, the Sellers are conducting, and to the Knowledge of Sellers have conducted since January 1, 2022, the Business in compliance, in all material respects, with all applicable Laws, notices, approvals and Orders.  Except as disclosed on

Schedule 4.12, to the Knowledge of the Sellers, (i) each Seller is not in material breach of any Law, notice, approval or order applicable to it or the Business, and (ii) there are no facts or circumstances which could form the basis for any such material breach.  Each Seller is not under investigation with respect to the material violation of any Laws and to the Knowledge of the Sellers, there are no facts or circumstances which could form the basis for any such material violation.  None of the Sellers has received, since January 1, 2022, to the Agreement Date, (A) any written notice or other communication that alleges that the Business is not in compliance in any material respect with any Law, Order or Permit applicable to the Business or the Purchased Assets or (B) any written notice or communication regarding any deficiencies in any material respect in the compliance practices, procedures, methodologies or methods of the Business or its employees or internal compliance controls, including any complaint, allegation, assertion or claim that the Business or its employees has engaged in illegal practices.

(b)    The Sellers have all material Permits which are required for the lawful operation of the Business as presently conducted and the ownership and operation of the Purchased Assets, and each such Permit is valid, binding and in full force and effect, in each case except as would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 4.12(b), to the Knowledge of the Sellers, none of the Sellers is or has been, since January 1, 2022, in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party.  Schedule 4.12(b) sets forth a list of all material Permits of the Sellers as of the Agreement Date.

4.13    Financial Statements.  The Sellers have delivered to Buyer the audited consolidated balance sheets and the related consolidated statements of operations and consolidated statements of comprehensive, shareholders' equity and cash flow of Topco and its Subsidiaries for the year ended December 31, 2022 (the "Audited Financial Statements") and the unaudited, consolidated balance sheet of Topco and its Subsidiaries for the twelve (12) month period ended December 31, 2023 (respectively, the "Most Recent Balance Sheet Date" and the "Interim Financial Statements" and together with the Audited Financial Statements, the "Financial Statements").  Except as set forth on Schedule 4.13, the Financial Statements present fairly in all material respects the financial position, results of operations and cash flows of Topco on the basis stated therein as of the dates and for the applicable periods stated therein, subject, in the case of the Interim Financial Statements, to normal year-end audit adjustments and the absence of related notes.

4.14    Absence of Undisclosed Liabilities.  Except as set forth on Schedule 4.14, there are no Liabilities of Topco of any nature, whether accrued, contingent, absolute, known or otherwise, in each case, required by GAAP to be reflected or reserved against on a balance sheet of Topco prepared in accordance with GAAP or the notes thereto, other than: (a) Liabilities as and to the extent reflected or reserved against in the Audited Financial Statements, (b) Liabilities incurred since January 1, 2023, in the Ordinary Course of Business, (c) Liabilities incurred in connection with this Agreement, the Transaction Documents or the Transactions or (d) Liabilities which would not reasonably be expected to have a Material Adverse Effect.

4.15    Financial Advisors.  Except as set forth on Schedule 4.15, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

41

4.16    <u>Tax Matters</u>.  Except as set forth on <u>Schedule 4.16</u>:

(a)    The Sellers and the Acquired Entities have timely filed (taking into account any valid extensions of time to file) all material Tax Returns which are required to be filed by the Sellers and the Acquired Entities, all such Tax Returns are true, correct and complete in all material respects, and all material Taxes due and payable by the Sellers and the Acquired Entities prior to the date hereof have been timely and fully paid.

(b)    There are no Liens for Taxes upon the Purchased Assets or assets of the Acquired Entities other than Permitted Liens.

(c)    To the Knowledge of the Sellers, the Sellers and the Acquired Entities have complied in all material respects with all applicable Laws relating to the withholding, collection and payment of Taxes and have duly and timely withheld, collected and paid over to the appropriate Governmental Entity all material Taxes required to be so withheld, collected and paid under all applicable Laws.

(d)    Within the last three (3) years, neither the Sellers nor the Acquired Entities have received any written notice from any taxing authority or Governmental Entity asserting that any Seller or Acquired Entity may be subject to Tax in any jurisdiction in which any Seller or Acquired Entity does not file Tax Returns.

(e)    No action, suit, proceeding, or audit is pending against or with respect to the Sellers or the Acquired Entities regarding material Taxes.

(f)    Neither the Sellers nor the Acquired Entities have waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, other than any waiver or exclusion which has expired or any extension of time to file Tax Returns obtained in the Ordinary Course of Business.

(g)    No Seller or Acquired Entity is a party to, or bound by, any Tax indemnity, Tax sharing or Tax allocation agreement, other than agreements entered into in the Ordinary Course of Business that relate primarily to non-Tax matters.

4.17    <u>Real Property</u>.

(a)    None of the Sellers own any real property.

(b)    <u>Schedule 4.17(b)</u> sets forth a complete list of the Leased Real Property as of the Agreement Date.  Except for the Leased Real Property set forth on <u>Schedule 4.17(b)</u>, as of the date hereof, the Sellers do not lease or otherwise occupy any other real property or have any other place of business.

(c)    Except as set forth on <u>Schedule 4.17(c)</u>, a Seller or Acquired Entity has good and valid leasehold title to the Leased Real Property, in each case free and clear of all Liens of any nature whatsoever except for Permitted Liens.

(d)      The Sellers have not subleased, licensed, or otherwise granted to any Person the right to possess, use or occupy the Leased Real Property or any portion thereof.

(e)      As of the date hereof, the Leases are in full force and effect.  As of the date hereof, no Seller has delivered or received written notice from the other party to any Lease of the termination or surrender thereof.  The Sellers have delivered to Buyer true and complete copies of the Leases in effect as of the date hereof, including all amendments, notices, or memoranda of lease thereto, and all estoppel certificates, or subordination, non-disturbance, and attornment agreements, if any, relating to the Leased Real Property.  There are no material agreements, understandings or undertakings pertaining to the Leases and the Sellers' leasehold interests in the Leased Real Property in effect as of the date hereof which have not been disclosed or made available to Buyer prior to the date hereof.

(f)      Except as set forth in Schedule 4.17(f), as of the date hereof, no Seller has received any written notice from any Governmental Entity asserting any material violation of applicable Laws with respect to the Leased Real Property, and there is no pending or, to the Knowledge of the Sellers, threatened eminent domain taking, expropriation, condemnation or re-zoning affecting any portion of the Leased Real Property.

4.18    Tangible Personal Property; Inventory.    Schedule 4.18 sets forth all leases of personal property in effect as of the date hereof relating to personal property used or held for use by the Sellers related to the Business or to which any Seller is a party or by which the properties or assets of any of the Sellers related to the Business is bound ("Personal Property Leases").  No Seller has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by any Seller under any of the Personal Property Leases, in each case, (a) except for any Bankruptcy-Related Default or payment default or (b) except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All inventory of the Sellers, whether or not reflected in the Interim Financial Statements, consists of a quality and quantity usable and salable in the Ordinary Course of Business in all material respects, except for obsolete or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established, in each case, in accordance with GAAP, and is fit for its intended use except for immaterial exceptions.  All such inventory is owned by the Sellers free and clear of all Liens (other than Permitted Liens), and other than as set forth on Schedule 4.18, no inventory is held on a consignment basis.

4.19    Insurance.    The Sellers have insurance policies in full force and effect for such amounts as are sufficient for all requirements of Law and all agreements to which any Seller is a party or by which it is bound.  Set forth in Schedule 4.19 is a list of all insurance policies and all fidelity bonds held by or applicable to any Seller in effect on the date hereof.  Except as noted in each insurance policy or on Schedule 4.19, all premiums due to date thereunder have been paid in full and, to the Knowledge of the Sellers, neither Sellers nor any of Sellers' Affiliates is in material default with respect to any obligations under any such insurance policy.

4.20    Environmental.    Except as set forth on Schedule 4.20:

(a)      the Sellers are, and since January 1, 2022, have been, in compliance in all material respects with all Environmental Laws;

43

(b)      the Sellers possess and are and, since January 1, 2022, have been in material compliance with, all material Permits required by Environmental Laws for their operations;

(c)      since January 1, 2022, the Sellers have not received notice of any pending or threatened action or Order against the Sellers pursuant to, or of any alleged violation of or liability under, Environmental Laws;

(d)      to the Knowledge of the Sellers, there has been no release, disposal, manufacture or distribution of, contamination by, or exposure of any Person to, any Hazardous Materials, including on, under, or from the Leased Real Property (or any other facility or real property currently or formerly owned or operated by the Sellers (or any of their predecessors)), for which the Sellers have or would reasonably be expected to have material liability under any Environmental Law; and

(e)      the Sellers have made available to Buyer copies of all material environmental audits and reports within the possession of the Sellers related to the environmental condition of the Leased Real Property or any other facility or real property currently or formerly owned or operated by the Sellers, or to the compliance of or any liability for the Sellers under Environmental Law.

4.21    <u>Anti-Corruption & Global Trade Laws.</u>The Sellers, and their respective officers, directors and employees, and to the Knowledge of the Sellers, any agent or other third party representative acting on behalf of the Sellers are, and since January 1, 2022, have been, in compliance in all material respects with all applicable Anti-Corruption Laws.  The Sellers have not received written notice of any pending action (other than those relating to claims for benefits) with respect to any applicable Anti-Corruption Laws.  None of the Sellers, nor any of their respective officers, directors or employees, nor to the Knowledge of the Sellers, any agent or other third party representative acting on behalf of the Sellers have, since the January 1, 2022, promised to make, made any unlawful payment or given, offered, authorized or agreed to give, any money or thing of value, either directly or indirectly, to or for the use or benefit of any Government Official to obtain or keep business or to secure some other improper advantage, the payment of which would violate applicable Anti-Corruption Laws.

(b)      The Sellers, their respective officers, directors, and employees, and to the Knowledge of the Sellers, any agent or other third-party representative acting on behalf of the Sellers are, and since January 1, 2022, have been, in compliance in all material respects with all applicable Global Trade Laws.  The Sellers have not received notice of any pending Proceeding (other than those relating to claims for benefits) with respect to any applicable Global Trade Laws.  None of the Sellers nor any of their respective officers, directors and employees, and to the Knowledge of the Sellers, any agent or other third party representative acting on behalf of the Sellers is or has been since January 1, 2022: (i) a Restricted Party; (ii) organized, resident or located in a Restricted Country or (iii) engaging in any business in or with any Restricted Party or Restricted Country or knowingly financing the activities of any Restricted Party.

4.22    Related Party Transactions.

(a)    Except as set forth on Schedule 4.22(a) and except for any Benefit Plan disclosed in the Sellers' Disclosure Schedules, or any other employment or consulting agreements with any employee, officer or consultant of Sellers that is not also an employee or representative of an equityholder or any of its Affiliates, or any inter-company agreements among the Sellers, as of the date hereof, no current or former officer, director, employee, or equityholder of the Sellers or any of their Affiliates, any Affiliate of the Sellers or any of the foregoing, or, to the Knowledge of the Sellers, any immediate family members of any of the foregoing (each, a "Related Party") is a party to any material Contract or transaction with the Sellers or has, directly or indirectly, (a) any material interest in any material property or asset owned, leased or used by the Sellers or (b) any obligation to pay any material amount of money to, or any right to receive any material amount of money from, the Sellers (each such Contract, transaction, arrangement or interests, an "Related Party Transaction").

(b)    Except as disclosed on Schedule 4.22(b), to the Knowledge of the Sellers, no Related Party will, immediately following the Closing, hold any material asset (tangible or intangible), property, right, claim, cause of action (including any counterclaim) or defense used in or related to the Business, other than (i) any Excluded Assets and (ii) rights, claims, cause of actions (including any counterclaim) or defenses with respect to the Sellers.

4.23    Customers, Distributors and Suppliers.

(a)    Schedule 4.23 sets forth (a) the names of the ten (10) most significant customers (by revenue) of each Seller for the twelve (12) months ended December 31, 2023 (the "Top Customers"), and (b) the ten (10) most significant distributors of each Seller for the twelve (12) months ended December 31, 2023 (the "Top Distributors"). Since the Most Recent Balance Sheet Date, no such customer or distributor has ceased, or, to the Knowledge of the Sellers, intends to cease, to use, or change in any material respect the terms or conditions under which it uses, the services and products of the Sellers, or has substantially reduced, or intends to substantially reduce, the use of such services or products.

(b)    Schedule 4.23(b) sets forth the names of the ten (10) most significant suppliers (including any vendors) (by fees paid or payable) of each Seller for the twelve (12) months ended December 31, 2023 (the "Top Suppliers"). Since the Most Recent Balance Sheet Date, no such vendor or supplier has ceased, or, to the Knowledge of the Sellers, intends to cease, to provide, or change in any material respect the terms or conditions under which it provides, services or products to the Sellers, or has substantially reduced, or intends to substantially reduce, the provision of such services or products.

4.24    Anti-Money Laundering. Each of the Sellers and, to the Knowledge of the Sellers, each director, officer, employee, agent, and Affiliate of any Seller, is, and since January 1, 2022, has been, in compliance in all material respects with all applicable Anti-Money Laundering Laws.

4.25    Use of Proceeds. No proceeds as a result of the Transactions will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Restricted

Party, or otherwise used in any manner that would result in a violation of any Sanctions, Anti-Corruption Law, or Anti-Money Laundering Law by any Persons.

4.26    Disclaimer of Other Representations and Warranties.  Except as expressly and specifically set forth in this Article IV (as modified by the Sellers' Disclosure Schedules hereto) or any certificate delivered pursuant to this Agreement, no Seller nor any other Person makes any representation and warranty, express or implied, including with regard to the accuracy or completeness of any of the information provided or made available to the Buyer or any of its Affiliates or Representatives, or any other Person for their benefit.  Except for the representations and warranties expressly and specifically set forth in this Article IV or in any certificate delivered pursuant to this Agreement, the Sellers hereby disclaim all liability and responsibility for, or any use by Buyer, any of its Affiliates or Representatives or any other Person of, any representation, warranty, projection, forecast, statement, or information made, communicated or furnished (orally or in writing) to Buyer, any of its Affiliates or Representatives.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Sellers as follows:

5.1    Organization and Good Standing.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation, and has full power and authority to own, lease and operate its properties and carry on its business as it is now being conducted.

5.2    Power and Authority.  Buyer has the requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement and the consummation of the Transactions and the performance of Buyer's obligations hereunder have been duly authorized by all requisite company action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer and constitutes (assuming the due and valid authorization, execution, and delivery thereof by the other parties thereto and the entry of approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Sale Order) the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

5.3    No Contravention.  Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) violate or conflict with any provision of Buyer's Organizational Documents, (b) with or without the giving of notice or the lapse of time or both, result in a breach of, constitute a default under, result in the termination of or a right of termination or cancellation under, or accelerate the performance of any obligation required by, any material Contract to which Buyer is a party, or (c) violate or conflict with any Order, Governmental Entity or arbitrator, or any Law applicable to Buyer; other than, in the case of clauses (c), compliance with the applicable requirements of the Antitrust Laws, if required.

5.4    Consents and Approvals. Except for (a) entry of the Sale Order, and (b) any consents or approvals as are reflected on Schedule 5.4, the execution, delivery and performance by Buyer of this Agreement and the Transactions, and the legality, validity, binding effect or

enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons or Governmental Entities, other than any filings required to be made under applicable Antitrust Laws.

5.5     Litigation. There are no Proceedings pending or, to the knowledge of Buyer, threatened, against Buyer or any Affiliate of Buyer that would reasonably be expected to adversely affect the ability of Buyer to consummate the Transactions, to prevent or materially impair or materially delay the ability of Buyer to consummate the Transactions or that challenges the validity of proprietary of the transactions contemplated by this Agreement, including the credit bid.  Buyer is not subject to any Order that specifically names Buyer or any of its Affiliates and that would reasonably be expected to adversely affect the ability of Buyer to consummate the Transactions, to prevent or materially impair or materially delay the ability of Buyer to consummate the Transactions or that challenges the validity of proprietary of the transactions contemplated by this Agreement, including the credit bid.

5.6     Financial Advisors.  Except for Ankura Consulting Group, LLC, the fees and expenses of which will be paid in accordance with the terms of the Final DIP Order, no Person has acted, directly or indirectly, as a broker, finder, or financial advisor for Buyer in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

5.7     Sufficient Funds; Adequate Assurances; Qualification.

(a)     Buyer has or will have as of the Closing, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby.  Buyer is and, as of the Closing, Buyer shall be, capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts and the related Assumed Liabilities.

(b)     There exist no facts or circumstances that would cause, or be reasonably expected to cause, Buyer and/or its Affiliates not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

(c)     Buyer was formed by the Prepetition Agent for the benefit and at the direction of the Prepetition Lenders for the purpose of assisting with the credit bid, and the Lenders have the legal right to direct the Administrative Agents and has directed (or caused to be directed) the Administrative Agents to make a credit bid pursuant to section 363 of the Bankruptcy Code in order to pay the Credit Bid Amount portion of the Purchase Price.  On or prior to the date of this agreement, Buyer has provided to the Sellers a copy of the direction letter (the "Direction Letter") delivered by the Required Lenders (as defined in the Prepetition Financing Agreements and the DIP Documents) as holders of outstanding indebtedness under the Prepetition Financing Agreements and the DIP Documents, to Buyer, on or prior to the date hereof, fully authorizing Buyer and the Administrative Agents to, among other things, enter into and perform and comply with this Agreement and consummate the Transactions hereby, including the credit bid contemplated in Section 3.2.  The Buyer represents that the Direction Letter complies in all

47

material respects with the provisions of the Prepetition Financing Agreements and the DIP Documents.

5.8   <u>Solvency</u>.  Assuming the accuracy of the representations and warranties set forth in Article IV, after giving effect to the consummation of the Transactions, the Buyer and the Acquired Entities will not (a) be insolvent (either because its financial condition is such that the sum of its liabilities is greater than the fair market value of its assets or because the fair saleable value of its assets is less than the amount required to pay its liabilities as they come due), (b) have unreasonably small capital with which to engage in its business or fail to satisfy any capital adequacy requirements under applicable Law or (c) have incurred obligations beyond their ability to pay them as they become due.

5.9   <u>Acknowledgements; "As Is" "Where Is" Transaction</u>.

(a)   BUYER, ON ITS OWN BEHALF AND ON BEHALF OF ITS AFFILIATES, ACKNOWLEDGES AND AGREES THAT IT AND ITS AFFILIATES HAVE RECEIVED FROM SELLERS CERTAIN PROJECTIONS, FORWARD-LOOKING STATEMENTS, FORECASTS, AND PROSPECTIVE OR THIRD-PARTY INFORMATION RELATING TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES (WHETHER IN WRITTEN, ELECTRONIC, OR ORAL FORM) (COLLECTIVELY, "<u>PROJECTIONS</u>").   BUYER, ON BEHALF OF ITSELF AND ITS AFFILIATES, ACKNOWLEDGES THAT (I) SUCH PROJECTIONS ARE BEING PROVIDED SOLELY FOR THE CONVENIENCE OF BUYER AND ITS AFFILIATES TO FACILITATE THEIR OWN INDEPENDENT INVESTIGATION; (II) THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH PROJECTIONS AND FORECASTS AND IN SUCH INFORMATION; (III) BUYER AND ITS AFFILIATES ARE FAMILIAR WITH SUCH UNCERTAINTIES AND ARE TAKING FULL RESPONSIBILITY FOR MAKING THEIR OWN EVALUATION OF THE ADEQUACY AND ACCURACY OF ALL SUCH PROJECTIONS, FORECASTS, AND INFORMATION SO FURNISHED (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH PROJECTIONS); AND (IV) NONE OF THE SELLERS NOR ANY OTHER PERSON MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO SUCH PROJECTIONS AND FORECASTS. BUYER, ON ITS OWN BEHALF AND ON BEHALF OF ITS AFFILIATES HEREBY DISCLAIMS RELIANCE ON ANY SUCH PROJECTIONS.

(b)   BUYER, ON ITS OWN BEHALF AND ON BEHALF OF ITS AFFILIATES, FURTHER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLERS TO BUYER IN <u>ARTICLE IV</u> (AS QUALIFIED BY THE SELLERS' DISCLOSURE SCHEDULES) OR IN OR ANY CERTIFICATE DELIVERED PURSUANT TO THIS AGREEMENT (COLLECTIVELY, THE "<u>EXPRESS REPRESENTATIONS</u>") ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS, WARRANTIES AND STATEMENTS OF ANY KIND MADE TO BUYER IN CONNECTION WITH THE TRANSACTIONS, BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTS WHATSOEVER, STATUTORY, EXPRESSED OR IMPLIED, WRITTEN OR ORAL, AT LAW OR IN EQUITY BEYOND THE EXPRESS REPRESENTATIONS AND THAT ALL OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED, WHETHER IN WRITTEN,

142958362_16

ELECTRONIC OR ORAL FORM, INCLUDING (A) TO THE COMPLETENESS OR ACCURACY OF, OR ANY OMISSION TO STATE OR TO DISCLOSE ANY INFORMATION (OTHER THAN SOLELY TO THE EXTENT OF AN EXPRESS REPRESENTATION), AND (B) ANY OTHER STATEMENT RELATING TO THE HISTORICAL, CURRENT OR FUTURE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, PROPERTIES, CONTRACTS, EMPLOYEE MATTERS, REGULATORY COMPLIANCE, BUSINESS RISKS AND PROSPECTUS OF THE SELLERS, THE ACQUIRED ENTITIES OR ANY OF THEIR RESPECTIVE AFFILIATES OR SUBSIDIARIES, OR THE QUALITY, QUANTITY OR CONDITION OF THE SELLERS' ASSETS, ARE, IN EACH CASE, EXPRESSLY DISCLAIMED BY EACH OF THE SELLERS, INCLUDING WITH RESPECT TO (I) ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS, (II) ANY WARRANTY WITH RESPECT TO THE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, AND PROSPECTS OF SELLERS OR THE ACQUIRED ENTITIES OR THE BUSINESS OF THE SELLERS OR THE ACQUIRED ENTITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF, (III) ANY WARRANTY CONCERNING ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT AND (II) ANY WARRANTY CONCERNING ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, COLLECTABILITY OF ACCOUNTS RECEIVABLE, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ENTITIES, THE PURCHASED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES.

(c)    UPON THE CLOSING DATE, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

(d)    Buyer acknowledges and agrees that: (i) it has such knowledge and experience in financial and business matters and investments in general that make it capable of evaluating the merits and risks of this Agreement and the Transactions; (ii) it has conducted, and completed to its satisfaction, such investigations of the Sellers, the Business, Purchased Assets, the Assumed Liabilities and the Acquired Entities as it deems necessary and appropriate, and has been provided with all of the information that it has requested from the Sellers and their respective Representatives and believes necessary to make an informed investment decision with respect to the execution and delivery of this Agreement and the consummation of the Transactions; (iii) in making the decision to enter into this Agreement and the documents contemplated hereby to which it is a party and to consummate the Transactions, other than reliance on the Express Representations, it has relied solely on its own independent investigation, analysis, and evaluation of the Sellers, the Business, Purchased Assets, the Assumed Liabilities and the Acquired Entities; (iv) none of the Sellers, any of their respective Subsidiaries, any of the Non-Recourse Persons, or any other Person has made, and Buyer and its Affiliates have not relied on and are not relying on, any representations or warranties whatsoever, express or implied, in connection with the Transactions, except for the Express Representations; and (v) none of the Sellers, any of their respective Subsidiaries, any of the Non-Recourse Persons, or any other Person has made, and

Buyer and its Affiliates have not relied on and are not relying on, any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Sellers, the Business, Purchased Assets, the Assumed Liabilities or the Acquired Entities, or the Transactions, other than the Express Representations, including, except to the extent set forth in any such representation or warranty, any information included in any confidential memoranda or presentation distributed on behalf of any Seller relating to a Seller or any of its Subsidiaries or other publications or data room information provided to Buyer or any of its Affiliates or its or their Representatives, or any other document or information in any form provided to Buyer or any of its Affiliates or its or their Representatives in connection with the Transactions, and neither the Sellers nor their respective Subsidiaries nor any of the Non-Recourse Persons shall have or be subject to any liability to Buyer or its Affiliates or any other Person resulting from or in connection with the dissemination to Buyer or its Affiliates or its or their Representatives or any other Person of any such information.

## ARTICLE VI
## COVENANTS OF THE PARTIES

6.1     <u>Conduct of Business Pending the Closing</u>.  Except (a) as required by applicable Law or by order of the Bankruptcy Court or any Order, (b) as otherwise expressly required by this Agreement, (c) as limited by or required by the terms of the DIP Documents, (d) as set forth on <u>Schedule 6.1</u>, or (e) with the prior written consent of Buyer (not to be unreasonably withheld, conditioned, or delayed), during the period from the Agreement Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing, the Sellers shall use commercially reasonable efforts to carry on the Business in the Ordinary Course of Business (subject to the requirements or Orders of the Bankruptcy Code and Bankruptcy Court) and use commercially reasonable efforts to preserve in all material respects (i) the operations, organization and goodwill of the Business (including by maintaining and renewing its material Permits) and (ii) the relationships with Governmental Entities, customers, suppliers, partners, lessors, licensors, licensees, vendors, contractors, distributors, agents, officers and employees and others having material business dealings with the Business (it being understood that no increases to any payments or compensation, including any incentive, retention or similar compensation, shall be required in respect of either clause (i) or (ii) hereof or other expenditures of funds). The Sellers shall notify Buyer in writing of any event, occurrence, fact, condition or change in the Business, assets, operations or prospects of the Sellers that results in, or could reasonably be expected to result in, a Material Adverse Effect promptly upon Knowledge of the Sellers of such occurrence of any such event, occurrence, fact or condition.

6.2     <u>Negative Covenants</u>.  Except as otherwise expressly provided by this Agreement, as set forth on <u>Schedule 6.2</u>, or consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned or delayed), or as may be required by applicable Law or by order of the Bankruptcy Court or any Order, or as limited by or required by the terms of the DIP Documents, during the period from the Agreement Date until the earlier of the termination of this Agreement in accordance with its terms or the Closing, the Sellers shall not take any of the following actions:

(a)     incur or commit to incur any capital expenditures other than as expressly contemplated under the Budget;

142958362_16

(b)    acquire or agree to acquire (by merging or consolidating with, or by purchasing any portion of the stock of, or other ownership interests in, or substantial portion of assets of, or by any other manner), any business or division or any corporation, partnership, association, limited liability company or other entity;

(c)    grant any Lien on or otherwise encumber or dispose of (or consent to the disposition of) any of the Purchased Assets (including any Available Contract), including the Equity Interests of any of the Sellers, other than among the Sellers or Acquired Entities, any Permitted Lien or in the Ordinary Course of Business;

(d)    sell, assign, transfer, license, sublicense, covenant not to sue with respect to, abandon, cancel, terminate, permit to lapse, or expire, or otherwise dispose of any material Owned Intellectual Property, other than in the Ordinary Course of Business;

(e)    adjust, split, combine, redeem, repurchase, or reclassify any capital stock or equity interests or issue or propose or authorize the issuance of any other securities (including Debt securities, options, profits interests, warrants or any similar security exercisable for, or convertible into, such other security), other than as not prohibited by the DIP Documents;

(f)    incur or assume any Debt (other than the DIP Facility and any other Debt not prohibited by the DIP Documents);

(g)    guarantee any Debt of any Person or enter into any "keep well" or other agreement to maintain any financial condition of another Person or enter into any arrangement having the economic effect of any of the foregoing (other than the DIP Facility and any guarantee not prohibited by the DIP Documents);

(h)    enter into, restate, terminate, or materially amend, supplement, or modify, or grant any waiver of any material entitlement of any Seller other than entering into, any Available Contract in the Ordinary Course of Business;

(i)    initiate, compromise, settle or agree to settle any Claim, complaint, or Proceeding, other than compromises or settlements in the Ordinary Course of Business that (i) involve only the payment of money damages not in excess of $50,000 individually or $250,000 in the aggregate, (ii) do not impose ongoing limits on the conduct of the Business, and (iii) result in a full release of all Sellers with regard to the Claims or complaint giving rise to such Proceeding;

(j)    make, change or revoke any material Tax election (including entity classification elections), change any financial or Tax accounting method, except insofar as may have been required by applicable Law or a change in GAAP, consent to an extension or waiver of the limitation period applicable to any Tax claim or assessment other than obtaining an extension of time to file a Tax Return in the Ordinary Course of Business, or surrender any right to claim a refund of a material amount of Taxes;

(k)    enter into, amend, negotiate, or terminate any collective bargaining agreement or similar agreement with any labor union or labor organization representing any employees;

(l)     unless in accordance with an Order of the Bankruptcy Court and the Budget, or as otherwise required by applicable Law or the terms of a Benefit Plan, (i) materially increase the compensation payable to or to become payable to, or the benefits provided to, pay any bonus to, or grant any equity or equity-based award to, any current or former employee, director, individual independent contractor or other individual service provider of the Sellers with annual target cash compensation greater than $250,000; (ii) grant, increase, pay, provide or modify any severance, retention, change in control or termination payment or benefit to, or loan or advance or accelerate any amount to, any current or former employee, director, individual independent contractor or other individual service provider of the Sellers; (iii) accelerate the vesting or payment, or fund or in any other way secure the payment, of any compensation or benefit for any current or former employee, director, individual independent contractor or other individual service provider of the Sellers; (iv) approve, establish, adopt, enter into, amend or terminate any Assumed Benefit Plan, except as required by Law; (v) grant or forgive any loans to any current or former employee, director, individual independent contractor or other individual service provider of the Sellers; or (vi) hire or promote, or, other than for cause, terminate or demote any current or former employee, individual independent contractor or other individual service provider of the Business with annual target cash compensation greater than $250,000;

(m)     (i) enter into any Contract or arrangement (including any loan or similar arrangement) with a Related Party or that would be a Related Party Transaction if it existed on the Agreement Date that, in each case, would impose any obligation on an Acquired Entity or (ii) make payments to or on behalf of any Related Party (including by exercise of set-off rights or otherwise), other than in accordance with the terms of an existing, disclosed Related Party Transaction or otherwise not prohibited by the DIP Documents; or

(n)     authorize, commit, or agree to take any of the foregoing actions.

6.3     Access.

(a)     Subject to applicable Law, from the Agreement Date until the earlier of the termination of this Agreement in accordance with its terms or the Closing, the Sellers (i) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, assets, contracts, properties, officers, employees, accountants, auditors, financial advisors, counsel (other than counsel to the Sellers in connection with the Bankruptcy Cases) and other representatives, books and records, of the Sellers and their Affiliates, in each case, related to the Business, (ii) shall furnish to Buyer and its Representatives such financial, operating and property related data and other information as such Persons reasonably request, in each case, related to the Business; (iii) shall instruct the employees, accountants, counsel and financial advisors of the Sellers and their Affiliates to cooperate reasonably with Buyer in its investigation of the Business and (iv) shall, upon reasonable request of Buyer and subject to approval of the Bankruptcy Court, use commercially efforts to provide Buyer with access to their customers, suppliers, vendors, distributors, manufacturers and other Persons with whom the Business has had material dealings to discuss Buyer's entering into this Agreement and its intent to acquire the Purchased Assets; provided, that Buyer shall not reach out to any such Person without the prior written approval of the Sellers and the Sellers or one or more of their Representatives must be included in full and in real time in all communications (whether in writing, by telephone, in person or otherwise) with any such Person.  No investigation by Buyer prior to or after the date of this Agreement shall

diminish or obviate any of the representations, warranties, covenants, or agreements of the Sellers contained in this Agreement.  For the avoidance of doubt, nothing in this <u>Section 6.3(a)</u> shall require Sellers to take any such action if (x) such action may result in a waiver or breach of any attorney/client privilege or (y) such action could reasonably be expected to result in violation of applicable Law, any Contract or Order.

(b)     From and after the Closing Date until the later of the conclusion of the Bankruptcy Cases and the wind-down and final distribution of all assets of the Sellers, Buyer shall give the Sellers and the Sellers' Representatives reasonable access during normal business hours to the books and records pertaining to the Purchased Assets and Assumed Liabilities and certain key employees, for the purposes of (i) the preparation or amendment of Tax Returns, (ii) the determination of any matter relating to the rights or obligations of the Sellers under this Agreement, or (iii) as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Cases and the wind-down of the Sellers and their assets.  Buyer shall, and shall cause each of its controlled Affiliates to, cooperate with the Sellers as may reasonably be requested by the Sellers for such purposes.  For the avoidance of doubt, nothing in this <u>Section 6.3(b)</u> shall require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege or (ii) such action could reasonably be expected to result in violation of applicable Law or Order.  Unless otherwise consented to in writing by the Sellers, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter, or otherwise dispose of any of the books and records without first offering to surrender to the Sellers such books and records or any portion thereof that Buyer may intend to destroy, alter, or dispose of.  From and after the Closing, Buyer will, and will cause its employees to, provide Sellers with reasonable assistance, support, and cooperation with Sellers' wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(c)     The information provided pursuant to <u>Section 6.3(a)</u> will be used solely for the purpose of consummating the transactions contemplated hereby, and will be governed by all the terms and conditions of <u>Section 9.13</u> of the Prepetition First Lien Financing Agreement.  None of Sellers or their Affiliates makes any representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 6.3</u>, and Buyer may not rely on the accuracy of any such information, in each case, other than the Express Representations.

6.4     <u>Confidentiality</u>.  From and after the Closing Date:

(a)     the Sellers will treat and hold as confidential all of the Confidential Information, and will not, directly or indirectly, without the prior written consent of Buyer, disclose any Confidential Information, except (i) as required by Law, (ii) in connection with any effort to enforce any rights or defend any claim under this Agreement or related to the Transactions or any Excluded Asset or Excluded Liability, (iii) in response to a routine audit or investigation conducted by a regulatory entity or Governmental Entity that does not primarily relate to the Company or the Transactions; (iv) in connection with the Bankruptcy Cases if so required under the Bankruptcy Code or Bankruptcy Court local rules; or (v) that is or may be necessary to wind down any of Sellers' estates or in connection with the enforcement of the rights of, or the defense of any Proceeding against or involving, any Seller or its Affiliates.  The Sellers' obligation not to disclose Confidential Information shall not apply (w) to Confidential Information that they are required to

disclose by Law, (x) in connection with any effort to enforce any rights or defend any claim under this Agreement or related to the Transactions or any Excluded Asset or Excluded Liability, (y) in response to a routine audit or investigation conducted by a regulatory entity or Governmental Entity that does not primarily relate to the Company or the Transactions or (z) in connection with any information required to be disclosed in the Bankruptcy Cases; provided, however, that, with respect to clause (w) and, with respect to Confidential Information that contains business plans, research and development information, product offerings, product pricing, product availability, algorithms, processes, ideas, techniques, formulas, technical and operational data, know-how, improvements, inventions, marketing plans and strategies, trade secrets, or other commercially sensitive information, clause (z), prior to making such disclosure, the Sellers shall notify Buyer reasonably promptly to the extent not prohibited by Law so that Buyer may seek confidential treatment or protection of such Confidential Information at Buyer's sole cost and expense; and

(b)     in the event that the Sellers are required in any Proceeding to disclose any Confidential Information, the Sellers will notify Buyer reasonably promptly of the requirement to the extent not prohibited by Law so that Buyer may seek an appropriate protective order at Buyer's sole cost and expense or waive compliance with the provisions of this Section 6.4; provided, however, that no notice will be required pursuant to this Section 6.4 with respect to disclosure (i) to any bank, securities, tax or other regulatory authority having jurisdiction in the course of an examination of the Sellers' books and records by such regulatory authority or in response to any request by a regulatory authority, (ii) in connection with any effort to enforce any rights or defend any claim under this Agreement or related to the Transactions or any Excluded Asset or Excluded Liability or (iii) in connection with the Bankruptcy Cases if so required under the Bankruptcy Code or Bankruptcy Court local rules.

Notwithstanding the foregoing, each of the Parties and their respective Representatives may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Transactions and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure, all as contemplated by Treasury Regulation Section 1.6011-4(b)(3)(iii). For the avoidance of doubt, nothing in this Section 6.4 shall restrict the Parties or their Affiliates or Representatives from making disclosures to the Bankruptcy Court or in filings in the Bankruptcy Court.

6.5     Public Announcements. From the Agreement Date until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Buyer and the Sellers shall use reasonable best efforts to consult with each other before issuing, and provide each other the reasonable opportunity to review and comment upon, any press release or other public statements with respect to the Transactions, and neither Buyer nor the Sellers shall issue any such press release or make any such public statement without the prior written approval of the other Party, in each case except as may be required by Law, or by obligations pursuant to any listing agreement with any national securities exchange; provided, that nothing in this Section 6.5 shall restrict the Parties or their Affiliates or Representatives from making disclosures to the Bankruptcy Court or in filings in the Bankruptcy Court, which such disclosure and filings are addressed by Section 7.1(e). Sellers shall use their respective commercially reasonable efforts to cause their respective Affiliates, employees, officers, and directors to comply with this Section 6.5.

6.6    <u>Employment Matters</u>.

(a)    Prior to Closing, Buyer must (following consultation with the executive management of Sellers) provide an offer of employment to at least sixty-eight percent (68%) of the total number of Business Employees who remain employed as of such date, which offer shall provide for (i) a base salary or hourly wage rate that is no less than the base salary set forth on <u>Schedule 4.10(a)</u>, (ii) target incentive cash bonus opportunities that are no less favorable to those set forth on <u>Schedule 4.10(a)</u>, and (iii) such other terms and conditions determined by Buyer in its sole discretion; <u>provided</u> that, notwithstanding the foregoing, Buyer shall, or shall cause its Affiliates to, in all events, offer employment to the number of Business Employees, and provide each Hired Employee (and the relevant employment offers to Business Employees must reflect) terms and conditions of employment, in each case, sufficient to avoid liability under the WARN Act.  In addition, Buyer will not take, or cause or permit any of its Affiliates to take, any action with respect to any of the Hired Employees within ninety (90) days after the Closing that would result in any of the Sellers or any of their respective Affiliates incurring any liabilities or obligations under the WARN Act.  Buyer shall be responsible for any and all obligations and liability under the WARN Act resulting from any employment loss that is incurred at or following the Closing, in each case with respect to any Business Employee or Hired Employee to the extent that Buyer fails to comply with this <u>Section 6.6(a)</u>.

(b)    Buyer shall provide credit to Hired Employees under Buyer's paid time off plans for all accrued but unused paid time off days as of the Closing, except to the extent that Hired Employees receive payment for such paid time off days in connection with the Closing.

(c)    Following the Closing, Buyer shall give each Hired Employee full credit for prior service with the Sellers for purposes of (i) eligibility and vesting under any Benefit Plans of Buyer (for the avoidance of doubt, excluding defined benefit pension accruals, deferred compensation, or equity or equity-based incentive plans), and (ii) determination of benefit levels under any employee benefit plans of Buyer, including relating to paid time off, in each case, for which the Hired Employee is otherwise eligible and in which the Hired Employee is offered participation, except where such credit would result in a duplication of benefits. Buyer shall use commercially reasonable efforts to waive, or cause to be waived, any limitations on benefits relating to pre-existing conditions and waiting periods to the same extent such limitations are waived under any comparable plan of the Sellers and use commercially reasonable efforts to recognize for purposes of annual deductible, co-insurance, and out-of-pocket limits under its employee benefit plans, deductible, co-insurance and out-of-pocket expenses paid by Hired Employees in the calendar year in which the Closing Date occurs.

(d)    The Seller and Buyer shall work in good faith to transfer sponsorship of any Assumed Plans and Agreements (including any third party insurance contracts or services agreements thereto) from Seller to Buyer or its Affiliates.

(e)    For any Hired Employees who are principally based outside the United States, the provisions of this <u>Section 6.6</u> shall apply to such Hired Employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(f)     On or prior to the Closing Date, Buyer shall, or shall cause an Affiliate to, assume the sponsorship of each Benefit Plan set forth on Schedule 6.6(f) (each, an "Assumed Benefit Plan").  From and after the Closing Date, Buyer shall, or shall cause an Affiliate to, continue the Assumed Benefit Plans, and honor all such obligations relating to the Assumed Benefit Plans in accordance with their terms and applicable Law.  Buyer or one of its Affiliates shall be responsible for satisfying the continuation coverage requirements of COBRA for all individuals who are M&A qualified beneficiaries (as such term is defined in Treasury Regulation Section 54.4980B-9, Q+A-4(a)) with respect to the transactions contemplated by this Agreement ("Post-Closing COBRA Liability").

(g)     This Section 6.6 shall operate exclusively for the benefit of the Sellers and Buyer and not for the benefit of any other Person, including any current or former employees of the Sellers or the Hired Employees, which Persons shall have no rights to enforce this Section 6.6. Nothing in this Section 6.6 shall: (i) entitle any Hired Employee to employment with Buyer; (ii) change such Hired Employee's status as an employee-at-will or restrict the ability of Buyer to terminate the service of any Hired Employee at any time or for any reason; (iii) create any third party rights in any current or former service provider of the Sellers (including any beneficiary or dependent thereof); or (iv) be treated as an amendment of any Benefit Plan or other employee benefit plan or arrangement or restrict the ability of Buyer, the Sellers or any of their respective Affiliates to amend, modify, discontinue or terminate any Benefit Plan or other employee benefit plan or arrangement.

6.7     Reasonable Efforts; Approvals.

(a)     Buyer and the Sellers will use commercially reasonable efforts to take, or cause to be taken, all actions and use commercially reasonable efforts to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things which are necessary, proper or advisable to consummate and make effective the Transactions including: (i) the transfer, modification or reissuance of all Permits, (ii) the obtaining or taking of all other necessary actions, non-actions or waivers from Governmental Entities and the making of all other necessary registrations and filings with Governmental Entities (including any Regulatory Authorizations), and (iii) the execution and delivery of any additional certificates, agreements, instruments, reports, schedules, statements, consents, documents and information necessary to consummate the Transactions.  The covenants in this Section 6.7(a) shall survive the Closing; provided, that nothing herein shall delay or restrict any wind-down, liquidation or related activities of the Sellers.

(b)     In furtherance of the foregoing, Buyer and each Seller shall use its commercially reasonable efforts to obtain any consents and approvals from any third party other than a Governmental Entity that may be required in connection with the Transactions (the "Third Party Consents").  Without limiting the generality of the foregoing sentence, the Sellers shall not be required to compensate any applicable third party, commence or participate in any Proceeding or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to indemnify, remain primarily, secondarily or contingently liable for any Assumed Liability) to any applicable third party in connection with the Sellers' obligations under this Section 6.7(b); provided, that the Sellers shall obtain the written consent of Buyer prior to any Seller paying any such compensation, commencing or participating in any Proceeding, or offering or granting any such accommodation.  For the avoidance of doubt, receipt of any such Third Party Consent

56

shall not be a condition to Buyer's obligation to consummate the Closing or Buyer's obligations under this Agreement or any other Transaction Document.  The covenants in this <u>Section 6.7(a)</u> shall survive the Closing; provided, that nothing herein shall delay or restrict any wind-down, liquidation or related activities of the Sellers.

(c)     The obligations of the Sellers pursuant to this <u>Section 6.7</u> shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Cases), the DIP Facility, and each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Purchased Assets as required by the Bankruptcy Code.

(d)     *Reserved.*

6.8     <u>Corporate Name Change</u>.  Within forty-five (45) days following the Closing, each Seller shall deliver to Buyer a duly executed certificate of amendment to such Seller's certificate of incorporation or other Organizational Document which is required to change such Seller's corporate or other entity name to a new name that is not confusingly similar to and, in all cases, does not include, the name "Shoes for Crews".  To the extent a Seller does not file such certificate within such time period, Buyer and any Affiliate of Buyer are hereby authorized (but not obligated) to file such certificates or other documents (at Buyer's expense) with the applicable Governmental Entities in order to effectuate such change of name at or after the Closing as Buyer may elect.

6.9     <u>Assignment of Contracts and Rights</u>.  To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets of the Sellers shall be assumed and assigned to Buyer pursuant to section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if, after giving effect to the Sale Order, an attempted assignment without the consent or approval of a third party (including any Governmental Entity) would constitute a breach or in any way adversely affect the rights of Buyer following the Closing.  If, as of the Closing Date, such consent or approval is not obtained or such assignment is not attainable pursuant to sections 105, 363 or 365 of the Bankruptcy Code, then (a) neither Sellers nor Buyer shall be in breach of this Agreement, the Purchase Price shall not be adjusted and the Closing shall not be delayed (and no condition precedent to Closing shall be determined to have failed to be satisfied as a result of any such failure to obtain such consent) and (b) the Sellers and Buyer will, for a period of up to thirty (30) days (or such shorter period of time as provided in the Wind-Down Budget) following the Closing, cooperate in a mutually agreeable arrangement, to the extent feasible (without infringing upon the legal rights of any third party or violating any Law), under which Buyer would obtain the benefits and assume all obligations thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which the Sellers would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming all of the Sellers' obligations, and any and all rights of the Sellers thereunder.

6.10     <u>Tax Matters</u>.

(a)    Subject to <u>Section 2.3(j)</u>, all Transfer Taxes arising out of the transfer of the Purchased Assets and any Transfer Taxes required to effect any recording or filing with respect thereto shall be borne by Buyer. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available, unless otherwise indicated in the Sale Order or, at Closing, the Sellers or Buyer, as appropriate, provide an appropriate resale exemption certificate or other evidence acceptable to Buyer or the Sellers, as appropriate, of exemption from such Transfer Taxes.  The Sellers and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.  Each Party shall file all necessary documentation and returns that it is required by Law to file with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other party.  Each Party shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any claim for exemption or exclusion from the application or imposition of any Taxes or making of any election related to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.

(b)    Other than Transfer Taxes, all Liability for Taxes with respect to the Business or the Purchased Assets attributable to the Pre-Closing Tax Period shall be borne by the Sellers, and all Liability for Taxes with respect to the Purchased Assets attributable to the Post-Closing Tax Period shall be borne by Buyer.  For purposes of this Agreement, with respect to Taxes attributable to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of any such Taxes allocated to a Pre-Closing Tax Period shall be: (i) in the case of Taxes based upon, or related to income, receipts, profits, or wages or imposed in connection with the sale, transfer or assignment of property, or required to be withheld, deemed equal to the amount which would be payable if such taxable year or other taxable period ended on the Closing Date, and (ii) in the case of other Taxes deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.  If the amount of Seller Tax Refunds (net of expenses) received by the Sellers after the Closing exceed the amount of Excluded Tax Liabilities paid by the Sellers after the Closing, the Sellers shall pay the Buyer the amount of such excess prior to the dissolution of the Sellers.

(c)    The Parties agree that the transfer of the Purchased Assets to the Buyer is intended to be treated as a taxable acquisition of assets and the Parties shall prepare and file all relevant U.S. federal income Tax Returns consistent with such intended treatment and <u>Section 3.3</u>, respectively, absent a contrary "determination" (within the meaning of Section 1313(a) of the Code).

(d)    The obligations set forth in this <u>Section 6.10</u> with respect to Taxes shall survive until the date that is thirty (30) days following the expiration of the applicable statute of limitations.

6.11    <u>Available Contracts List</u>. Sellers shall use commercially reasonable efforts to provide Buyer with a true and correct list of all Available Contracts (and copies thereof) promptly

following the date hereof and in no event later thirty (30) days from the Agreement Date, which time may be reasonably extended upon the agreement of the Buyer and Sellers.

6.12    *Reserved*.

6.13    <u>Documents</u>.  Sellers shall be permitted to keep copies of all of the Documents to the extent necessary or required by the Bankruptcy Courts or in connection with the Bankruptcy Cases or in any subsequent wind-down proceedings of Sellers.

6.14    <u>Casualty Loss</u>.  If, before the Closing, all or any portion of the Purchased Assets is condemned or taken by eminent domain, or is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Buyer reasonably promptly in writing of such fact, and (a) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any condemnation or taking proceeds thereof (of which are payable to or actually received by Sellers) to Buyer at the Closing, and (b) in the case of fire, flood or other casualty to the Purchased Assets, Sellers shall, at Buyer's option, either use insurance proceeds to restore such damage, or to the extent such proceeds were not previously applied, assign the insurance proceeds therefrom to Buyer at Closing.

6.15    <u>Subsidiary Conversions</u>.    Notwithstanding anything to the contrary in the Agreement, each Seller shall be permitted to cause any or all of its corporate Subsidiaries to convert to a limited liability company on or prior to the Closing Date.

6.16    <u>Disclosure Schedules</u>.  Sellers shall provide final versions of the Sellers' Disclosure Schedules and make available to Buyer copies of all Contracts or other information specified therein no later than four (4) Business Days prior to the date on which the hearing on the Bidding Procedures Order is scheduled to occur; <u>provided</u>, <u>however</u>, the Parties acknowledge that <u>Schedule 2.5</u> may be updated after such date but no later than the applicable dates set forth herein, in each case subject to the express terms of this Agreement.

6.17    <u>Misallocated Assets; Misdirected Payments</u>.

(a)    If, at any time following the Closing, Buyer or its Affiliates discover that any asset owned or held by Buyer or its Affiliates is or should have been an Excluded Asset (including by having an Excluded Asset located at any Leased Real Property that is or will be owned or leased by Buyer or any of its Affiliates), Buyer shall transfer, or shall cause its Affiliate to transfer, at no cost to Sellers, all right, title and interest in such Excluded Asset as soon as practicable to any Sellers designated by the Company, and such Excluded Asset will be deemed the property of such Seller held in trust by Buyer for such Seller until so transferred, and if any such Excluded Asset requires notice or approval in connection with the transfer of such asset, Buyer and its Affiliates shall use reasonable best efforts to make or obtain such notice or approvals. If, at any time following the Closing, Sellers or any of their respective Affiliates discover that any asset owned by Sellers or any of their respective Affiliates should have been a Purchased Asset, Sellers shall transfer, or shall cause their respective Affiliates to transfer, all right, title and interest in such Purchased Asset as soon as practicable to Buyer or an Affiliate designated by Buyer, and such Purchased Asset will be deemed the property of Buyer held in trust by such Seller for Buyer until so transferred. Buyer shall be responsible for any Transfer Taxes payable as a result of any such transfers.

59

(b)      In the event that any Seller receives any payment from a third party (other than Buyer or any of its Affiliates) after the Closing Date pursuant to any of the Assumed Contracts and to the extent such payment is not made in connection with an Excluded Asset or an Excluded Liability, Sellers shall forward such payment, as promptly as practicable but in any event within five (5) days after such receipt, to Buyer (or other entity nominated by Buyer in writing to Sellers) and notify such third party to remit all future payments (in each case, to the extent such payment is not in respect of an Excluded Asset or an Excluded Liability) pursuant to the Assumed Contract to Buyer (or such other entity designated by Buyer in writing to the Company). Notwithstanding anything to the contrary in this Agreement, in the event that Buyer or any of its Affiliates receives any payment from a third party after the Closing on account of, or in connection with, any Excluded Asset, Buyer shall forward such payment, as promptly as practicable but in any event within five (5) days after such receipt, to the Company (or other entity nominated by the Company in writing to Buyer) and notify such third party to remit all future payments on account of or in connection with the Excluded Assets to the Company (or such other entity as the Company may designate). The Parties agree that the Party that is entitled to receive any amounts paid from a third party with respect to an Assumed Contract or Excluded Asset, as the case may be, pursuant to this Section 6.17 shall be treated as the recipient of the applicable payment for all Tax purposes, and the Parties agree not to (and not to permit any of their respective Affiliates to) take a position inconsistent therewith upon examination of any Tax Return, in any Tax refund claim, in any Proceeding related to Taxes, or otherwise unless otherwise required by a determination within the meaning of Section 1313(a) of the Code (and comparable provision of state, local, or non-U.S. Laws).

## ARTICLE VII
## BANKRUPTCY PROVISIONS

7.1      Bankruptcy Court Orders and Related Matters.

(a)      The Sellers and Buyer acknowledge that this Agreement and the Transactions are subject to entry of, as applicable, the Bidding Procedures Order and the Sale Order.  In the event of any discrepancy between this Agreement and the Bidding Procedures Order and the Sale Order, the Bidding Procedures Order and the Sale Order shall govern. In the event the entry of the Sale Order or the Bidding Procedures Order or the Bidding Procedures Order is appealed, Sellers shall use commercially reasonable efforts to defend such appeal, and Buyer shall cooperate in such efforts.  Buyer and Sellers acknowledge that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers' business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting the Auction. Buyer agrees and acknowledges that Sellers and their Affiliates will be permitted, and will be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Buyer and its Affiliates, agents and Representatives).

(b)    The bidding procedures to be utilized for the Auction, if held, will be those reflected in the Bidding Procedures Order, including as modified pursuant to the terms thereof.

(c)    Buyer shall use commercially reasonable efforts to take all actions as may be reasonably necessary to cause the Bidding Procedures Order and Sale Order to be issued, entered, and become Final Orders, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.  Buyer agrees that it will use commercially reasonable efforts to take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and Sale Order and a finding of adequate assurance of future performance by Buyer.  Buyer will provide adequate evidence and assurance under the Bankruptcy Code of the future performance by Buyer of each Assumed Contract.  Buyer will, and will cause its Affiliates to, reasonably promptly take all actions reasonably required or requested by Sellers to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's Representatives available to testify before the Bankruptcy Court. Subject to the other terms and conditions of this Agreement and any applicable orders of the Bankruptcy Court, Buyer will, from and after the Closing Date, (i) assume all Liabilities of Sellers under the Assumed Contracts and (ii) satisfy and perform all of the Liabilities related to each of the Assumed Contracts when the same are due thereunder.

(d)    The Sellers shall use commercially reasonable efforts to cooperate with Buyer concerning the Bidding Procedures Order, the Sale Order, and any other orders of the Bankruptcy Court relating to the Transactions.  The Sellers shall use commercially reasonable efforts to give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion to all known creditors and parties in interest entitled to notice thereof pursuant to the Bankruptcy Code and the Bankruptcy Rules, including all known Persons that have asserted Liens on any Seller's assets, and all known non-debtor parties to the Available Contracts of the Sellers and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement, the Transactions and the Bidding Procedures Motion.

(e)    The Sellers shall use commercially reasonable efforts to provide draft copies of all orders, motions, pleading, applications and other material documents they intend to file with the Bankruptcy Court in connection with the sale of the Purchased Assets or the Transactions not less than three (3) days prior to the date when the Sellers plan to file such document (provided, that if the delivery of such drafts at least three (3) days is not reasonably practicable, such drafts shall be delivered to Buyer as soon as reasonable practicable prior to filing). The form and substance of any such document hereunder shall be mutually acceptable to Sellers and Buyer (provided that no Party shall unreasonably withhold, condition, or delay its consent).

(f)    Subject to the Sellers exercising their rights pursuant to this Section 7.1, the Sellers shall not, and shall cause their Subsidiaries not to, take any action that is intended to result in, or fail to take any action that is intended to result in, or fail to take any action the intent of which failure to act would reasonably be expected to result in, the reversal, voiding, modification

61

or staying of the Bidding Procedures Order or, if applicable, if Buyer is the prevailing bidder at the Auction, the Sale Order. The Sellers shall, and shall cause their Subsidiaries to, comply with the Bidding Procedures Order and the Sale Order.

(g)     For the avoidance of doubt, nothing in this Agreement will restrict Sellers or their Affiliates from selling, disposing of or otherwise transferring any Excluded Assets (other than Available Contracts, which the Sellers may not terminate, amend or otherwise dispose of, or reject in the Bankruptcy Cases, without Buyer's consent; provided that Buyer's failure to timely designate an Available Contract for assumption pursuant to a written Designation notice shall be deemed consent) or from settling, delegating or otherwise transferring any Excluded Liabilities, in each case, with the approval of the Bankruptcy Court, or from entering into discussions or agreements with respect to the foregoing.

(h)     Notwithstanding anything to the contrary in the Bidding Procedures Order, or the Bidding Procedures, Sellers and Buyer agree that, in the event that Buyer is not the successful bidder at the Auction (the "Successful Bidder"), Buyer shall act as the back-up bidder if so designated by Sellers at the Auction or within one day after the conclusion of the Auction pursuant to a Notice of Successful Bidder (as defined in the Bidding Procedures). If the Successful Bidder fails to consummate the applicable Alternate Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, Buyer will be deemed to have the new prevailing bid, and Sellers may, and may cause Buyer to, consummate the transactions contemplated by this Agreement on the terms and conditions set forth herein (as the same may have been improved upon in the Auction).

7.2     Bankruptcy Milestones. The Sellers shall use commercially reasonable efforts to achieve the milestones set forth in the Final DIP Order (or such later date as may be reasonably agreed by Buyer, or otherwise ordered by the Bankruptcy Court) (the "Bankruptcy Milestones").

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

8.1     Conditions Precedent to Obligations of Buyer. The obligation of Buyer to consummate the Transactions to occur at the Closing is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing of each of the following conditions:

(a)     Accuracy of Representations and Warranties.  The representations and warranties of the Sellers contained in Section 4.1 (Organization and Good Standing), Section 4.2 (Power and Authority) and Section 4.15 (Financial Advisors) shall be true and correct in all respects (other than *de minimis* inaccuracies) on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representations and warranties shall be true and correct as of such earlier date).  All other representations and warranties of the Sellers contained in Article IV shall be true and correct on the date hereof and on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representations and warranties shall be true and correct as of such earlier date), except where the failure of any such representations or warranties to be true and

62

correct (without giving effect to any limitations to "material" or "Material Adverse Effect"), either individually or in the aggregate, has resulted in or would reasonably be expected to result in a Material Adverse Effect.

(b)     Performance of Obligations.  Each of the Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it at or prior to the Closing.

(c)     DIP Financing.  The DIP Documents shall have each been approved by the Bankruptcy Court pursuant to the Final DIP Order, which shall be in form and substance reasonably acceptable to Buyer.

(d)     No Material Adverse Effect.  There shall have been no Material Adverse Effect from the Agreement Date through the Closing Date that is continuing.

(e)     No Challenges to Credit Bid.  As of the expiration of the Challenge Period (as defined in the Interim DIP Order), there shall be no pending challenge or contest to the validity amount, perfection or priority of the DIP Documents, the Loan Documents or other Claims of Buyer or Administrative Agents (as applicable) thereunder that would prevent Buyer's credit bid, unless any such challenge or contest shall have been resolved to the reasonable satisfaction of Buyer.

(f)     Deliverables.  Sellers shall have delivered to the Buyer each deliverable required pursuant to Section 3.1(b).

(g)     Bidding Procedures Order.  The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall have become a Final Order.

(h)     Sale Order.  The Bankruptcy Court shall have entered the Sale Order, which Order shall have become a Final Order.

(i)     Disclosure Schedules.  Sellers shall have delivered the Sellers' Disclosure Schedules by the date required under Section 6.16 which such Sellers' Disclosure Schedules shall be satisfactory to Buyer in its sole discretion, provided, however, that this condition shall be deemed satisfied on the date on which the hearing on the Bidding Procedures Order occurs unless (A) Buyer shall have notified Sellers at least one (1) Business Day prior to such date that the Sellers' Disclosure Schedules were not satisfactory or (B) Sellers' Disclosure Schedules were not timely delivered by the date specified in Section 6.16.

8.2     Conditions Precedent to the Obligations of the Sellers.  The obligation of the Sellers to consummate the Transactions is subject to the satisfaction (or waiver by the Sellers) at or prior to the Closing of each of the following conditions:

(a)     Accuracy of Representations and Warranties.  The representations of Buyer contained in Section 5.1 (Organization and Good Standing), Section 5.2 (Power and Authority) and Section 5.6 (Financial Advisors) shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or

63

warranty is expressly made as of a specified date, in which case such representations and warranties shall be true and correct as of such earlier date). All other representations and warranties contained in <u>Article V</u> shall be true and correct on the date hereof and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representations and warranties shall be true and correct as of such earlier date), except where the failure of any such representations or warranties to be true and correct (without giving effect to any limitations to "material" or similar qualifier), either individually or in the aggregate, has resulted in or would reasonably be expected to have an adverse effect on Buyer's ability to perform its obligations under this Agreement in any material respect.

(b)    <u>Performance of Obligations</u>.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it at or prior to the Closing.

(c)    <u>Deliverables</u>.  Buyer shall have delivered to the Sellers each deliverable required pursuant to <u>Section 3.1(c)</u>.

(d)    <u>Bidding Procedures Order</u>.  The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall have become a Final Order.

(e)    <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order, which Order shall have become a Final Order.

8.3    <u>Conditions Precedent to Obligations of Buyer and the Sellers</u>. The respective obligations of Buyer and the Sellers to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of the condition (which may be waived by the Parties in whole or in part to the extent permitted by applicable Law) that no provision of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other Transactions.

8.4    <u>Frustration of Closing Conditions</u>. Upon the occurrence of the Closing, any condition set forth in <u>Article VIII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing.  Neither the Sellers nor Buyer may rely on the failure of any condition to their respective obligations to consummate the Transactions set forth in <u>Section 8.1</u>, <u>Section 8.2</u>, or <u>Section 8.3</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to comply with or breach of any provision of this Agreement.

## ARTICLE IX
## TERMINATION

9.1    <u>Termination of Agreement</u>. This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a)    by mutual written agreement of the Sellers and Buyer;

(b)    by Buyer, if:

142958362_16

(i)     the Bankruptcy Milestone related to entry of the Bidding Procedures Order or the Bankruptcy Milestone related to entry of the Sale Order is not timely satisfied in accordance with Section 7.2; provided, that Buyer shall not have the right to terminate this Agreement under this Section 9.1(b)(i) if it is the primary cause of the failure of any Bankruptcy Milestone to be met;

(ii)     there shall have been a breach by the Sellers of any of their representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.1, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured by the earlier of (A) Outside Date or (B) twenty (20) Business Days after written notice thereof shall have been received by the Sellers; provided that the right to terminate this Agreement pursuant to this Section 9.1(b)(ii) will not be available to Buyer at any time that Buyer is in material breach of any covenant, representation or warranty hereunder;

(iii)     a Chapter 11 trustee or examiner is appointed under section 1104 of the Bankruptcy Code and the order of appointment is not vacated or reversed within fourteen (14) days after entry thereof;

(iv)     there has occurred and is continuing an Event of Default (as defined in the DIP Documents) under the DIP Documents that is not curable or has not been cured (or waived by the applicable percentage of the lenders under the DIP Facility) within fifteen (15) Business Days' written notice thereof to the Sellers and the outstanding obligations under the DIP Facility have been accelerated and such acceleration has not been rescinded after three (3) Business Days' notice thereof;

(c)     by the Sellers, if:

(i)     there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.2 or Section 8.3, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured by the earlier of (A) Outside Date or (B) twenty (20) Business Days after written notice thereof shall have been received by Buyer;

(ii)     (A) (i) all of the conditions set forth in Sections 8.1 and 8.3 are satisfied or waived by Buyer as of the Closing Date (other than those conditions that, by their nature, can only be satisfied as of the Closing Date, but which would be satisfied as of the Closing Date); (ii) Sellers have notified Buyer in writing that (A) they are ready, willing and able to consummate the transactions contemplated by this Agreement, and (B) all conditions set forth in Section 8.2 have been satisfied (other than those conditions that, by their nature, can only be satisfied as of the Closing Date, but which would be satisfied as of the Closing Date) or that they are willing to irrevocably waive any unsatisfied conditions set forth in Section 8.2; (iii) Sellers have given Buyer written notice at least two (2) Business Days prior to such termination stating Sellers' intention to terminate this Agreement pursuant to this Section 9.1(c)(ii); and (iv) Buyer fails to complete the Closing, including if Buyer does not provide, or cause to be provided, Sellers with sufficient funds to complete the

142958362_16

transactions contemplated by this Agreement, within two (2) Business Days (as contemplated by clause (iii) hereof) of the time which the Closing should have occurred pursuant to Section 3.1(a) or (B) if Sellers or the board of directors (or similar governing body) of any Seller determine in good faith that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would violate Law or be inconsistent with their fiduciary obligations;

(d)    by either Buyer or the Sellers:

(i)    if any Governmental Entity shall have enacted or issued an Order permanently restraining, prohibiting, or enjoining any of the Parties from consummating the Transactions and such Order shall have become final and non-appealable; provided that the right to terminate this Agreement pursuant to this Section 9.1(d)(i) will not be available to any Party at any time that such Party is in material breach of any covenant, representation, or warranty hereunder and such Order was primarily caused by such material breach;

(ii)    if the Bankruptcy Cases are (A) converted to cases under Chapter 7 of the Bankruptcy Code or (B) dismissed prior to the Closing; provided that the right to terminate this Agreement pursuant to this Section 9.1(d)(ii) will not be available to any Party at any time that such Party is in material breach of any covenant, representation, or warranty hereunder;

(iii)    if, at the end of two (2) days following the end of the Auction[1], Buyer is not determined by Sellers to be either the (x) Successful Bidder or (y) Back-Up Bidder with respect to the Purchased Assets;

(iv)    upon the Bankruptcy Court's approval of Sellers' entry into a definitive agreement with respect to an Alternate Transaction; provided, that if Buyer is the Back-Up Bidder, Buyer cannot terminate this Agreement pursuant to this Section 9.1(d)(iv) or Sections 9.1(b)(i), 9.1(d)(i), 9.1(d)(iii) or 9.1(d)(v); or

(v)    the Closing shall not have occurred by the date that is twenty-five (25) calendar days after entry of the Sale Order (or such later date as the Parties may agree upon in writing, the "Outside Date"); provided, however, that if the Closing has not occurred by the Outside Date, but on such date all of the conditions set forth in Article VIII have been satisfied or waived (to the extent such conditions may be waived) other than the condition set forth in Section 8.3), then the Outside Date shall automatically be extended until thirty (30) days after such initial Outside Date (and such extended date shall be deemed to be the "Outside Date" for all purposes hereunder); provided, further that the terminating Party under this Section 9.1(d)(v) is not (at such time of termination) in breach of any representation, warranty, covenant or other agreement in this Agreement so as to cause any

---

[1] Note to Buyer:  Bidding Procedures provide that Notice of Successful Bidder will be delivered within one day after the conclusion of the Auction.

conditions to Closing not to be satisfied and shall not have been the proximate cause of the failure of the Closing to occur on or prior to the Outside Date.

9.2     Consequences of Termination.

(a)     If either Buyer, on the one hand, or Sellers, on the other hand, desire to terminate this Agreement pursuant to Section 9.1, such Party (or Parties, as applicable) shall give written notice of such termination to the other Parties. Upon delivery of such notice of termination, this Agreement will become void and have no further force and effect and all further obligations of the Parties to each other under this Agreement will terminate without further obligation or liability of the Parties.

(b)     *Reserved*.

(c)     *Reserved*.

(d)     Notwithstanding the foregoing set forth in this Section 9.2, Section 1.1 (Defined Terms), Section 6.5 (Public Announcements), this Section 9.2 (Consequences of Termination) and Article X (Miscellaneous) shall survive any termination of this Agreement.

(e)     Nothing in this Section 9.2 shall relieve Buyer or the Sellers of any liability for an intentional breach of this Agreement prior to the date of termination; provided, that no Party shall be liable for consequential, special, exemplary, punitive or incidental damages.

## ARTICLE X
## MISCELLANEOUS

10.1     Expenses.  Except as set forth in this Agreement, the Credit Documents, the Final DIP Order or the Sale Order, and whether or not the Transactions are consummated, each Party shall bear its own costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the negotiation, evaluation, and consummation of the Transactions (including all compensation and expenses of counsel, financial advisors, consultants, actuaries, and independent accountants).

10.2     Assignment.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers and any such assignment in contravention of this Section 10.2 shall be null and void *ab initio*; provided, however, that Buyer may assign any or all of its rights and/or liabilities hereunder (or any document delivered by Buyer pursuant hereto) to one or more Affiliates of Buyer, which assignment shall not relieve Buyer of its obligations hereunder; provided, further, that Sellers may transfer or assign such rights and obligations under this Agreement to a liquidation trust or similar vehicle under a confirmed chapter 11 plan of liquidation in the Bankruptcy Cases.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

10.3     Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of the Sellers and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits, or remedies of any nature whatsoever

under or by reason of this Agreement except as expressly set forth herein, including Sections 10.16 and 10.18. Each of the Non-Recourse Persons, Sellers Released Persons and Buyer Released Persons is and shall be an intended third-party beneficiary with respect to the applicable provisions of this Agreement and shall have the right to enforce such provisions to the same extent as if it was a party.

10.4    Matters Related to the Administrative Agents. Each of the Parties acknowledges and agrees that none of the Sellers' title to, control of or possession of any of the Purchased Assets, or any of the Sellers' obligations in respect of any of the Assumed Liabilities, shall be transferred to or assumed by the Administrative Agents. Each Seller and Buyer, on behalf of itself and its respective Affiliates, acknowledges and agrees that neither the Administrative Agents nor any of their Affiliates (other than Buyer) shall have any Liability in the event of any breach by Buyer or any Seller of any of its representations, warranties, covenants, obligations or other agreements under this Agreement, including its obligations to consummate the Transactions in accordance with the terms of any document contemplated by this Agreement, other than as a result of or arising out of such Administrative Agent's intentional fraud, willful breach or willful misconduct (which, for the avoidance of doubt, shall include any breach of Section 3.2(a)). Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that neither the Prepetition Agent, the DIP Agent, nor any of their Affiliates (other than Buyer) shall in any way be deemed to be attributed or otherwise responsible for any of the representations, warranties, covenants, obligations or other agreements of Buyer or the Sellers under any document contemplated by this Agreement, including any obligation of Buyer or the Sellers hereunder to make payments of any kind, provide written approvals or make deliveries. Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that neither the Prepetition Agent, the DIP Agent, nor any of their Affiliates (other than Buyer) shall have any Liability or other obligation in respect of any action taken or not taken by the Prepetition Agent or the DIP Agent in connection with any document contemplated by this Agreement, other than as a result of or arising out of such Administrative Agent's intentional fraud, willful breach or willful misconduct (which, for the avoidance of doubt, shall include any breach of Section 3.2(a)). Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that neither the Prepetition Agent nor the DIP Agent has negotiated the terms of the purchase set forth herein, including the assets being purchased, the Liabilities being assumed, the Purchase Price and all the terms of this Agreement relating to the purchase by Buyer. For all purposes of this Section 10.4, references to the Prepetition Agent, DIP Agent or any Affiliate thereof, as applicable, shall mean such Person solely in such Person's capacity as the Prepetition Agent or DIP Agent, as applicable, and not in any other capacity under this Agreement or otherwise.

10.5    Notices. All notices, demands, requests, waivers, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by electronic mail (so long as no undeliverable message is promptly received by sender); provided, however, that, if delivered or transmitted on a day other than a Business Day (or if transmitted by electronic mail after 5:00 pm Eastern Time on a Business Day), notice shall be deemed given on the next Business Day. Notice

otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

If to the Sellers:         SFC Holdings, Inc.
                          5000 T-Rex Avenue, Suite 100 and 200
                          Boca Raton, FL 33431
                          <u>Attention</u>: Chris Sim
                          <u>Email</u>:     chriss@shoesforcrews.com

With a copy to (which copy shall not constitute notice):

                          Ropes & Gray LLP
                          1211 Avenue of the Americas
                          New York, NY 10036
                          <u>Attention</u>: Gregg Galardi; Ellen Wheeler
                          <u>Email</u>: gregg.galardi@ropesgray.com;
                          ellen.wheeler@ropesgray.com

If to Buyer or
Administrative Agents:

                          Antares Capital LP
                          500 West Monroe Street
                          Chicago, IL 60661
                          <u>Email</u>: bradley.kimme@antares.com

With a copy to (which copy shall not constitute notice):

                          King & Spalding LLP
                          1185 Avenue of the Americas, 34th Floor
                          New York, NY 10036
                          <u>Attention</u>: Timothy M. Fesenmyer
                          <u>Email</u>:     tfesenmyer@kslaw.com

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal, or inability to deliver.

10.6    <u>Entire Agreement; Amendments and Waivers</u>.    This Agreement, the Bidding Procedures Order, the Sale Order, the Transaction Documents and all agreements entered into pursuant hereto and thereto and all certificates, documents, schedules or instruments delivered in connection herewith and therewith constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior agreements (including drafts), understandings, negotiations, and discussions, whether oral or written, of the Parties, none of which shall be used as evidence of the Parties' intent; <u>provided</u>, that nothing herein shall modify or alter the terms, rights or obligations of the Administrative Agents, the Lenders or the Sellers under the Prepetition

Loan Documents or the DIP Documents prior to Closing. This Agreement may be amended, supplemented, or modified, and any of the terms, covenants, representations, warranties, or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

10.7    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via electronic delivery, "pdf" or facsimile. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

10.8    <u>Invalidity</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. In the event that any provision hereof would, under applicable Law, be invalid or unenforceable in any respect, each Party intends that such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable Law and to otherwise give effect to the intent of the Parties.

10.9    <u>Governing Law</u>. This Agreement, and any Proceeding that may be based upon, arise out of or relate or be incidental to the Transactions, this Agreement, the Transaction Documents, the negotiation, execution, performance or consummation of the foregoing (including any representation or warranty made in connection with or as an inducement to this Agreement) or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "<u>Transaction Dispute</u>"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied, except to the extent that such Laws are superseded by mandatory provisions of the Bankruptcy Code (in which case the Bankruptcy Code shall govern).

10.10    <u>Dispute Resolution; Consent to Jurisdiction</u>.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 10.5</u>; <u>provided</u>, <u>however</u>, upon the closing of the Bankruptcy Cases (except for any matter(s) with respect to the Sellers and/or the Bankruptcy Cases

70

in which the Bankruptcy Court retains jurisdiction with respect to such matter with respect to Sellers and/or the Bankruptcy Cases), or if the Bankruptcy Court is unwilling or unable to hear such Transaction Dispute, then, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Chancery Court of the State of Delaware or, if but only if such court declines jurisdiction, the Superior Court of the State of Delaware or the United States District Court for the District of Delaware, for the resolution of any such Transaction Dispute. In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally: (x) submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts; (y) agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and (z) agrees that Notice demand in accordance with <u>Section 10.5</u>, will be effective service of process; <u>provided</u>, <u>however</u>, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of Delaware.

(b)     The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of Delaware for any purpose except with respect to any Transaction Dispute.

10.11   <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING IN CONNECTION WITH A TRANSACTION DISPUTE.

10.12   <u>Specific Performance</u>.  Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event that a Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Buyer or the Sellers may have under law or equity, each Party shall be entitled to injunctive relief to prevent any breaches of the provisions of this Agreement by the other Parties and to enforce specifically this Agreement and the terms and provisions hereof, in each case, without any requirement for the posting of any bond or other undertaking and without the necessity of proving the inadequacy of money damages as a remedy.  Buyer and Seller agree that they will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the Buyer or Sellers, as applicable, have an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity.

10.13   <u>*Reserved.*</u>

10.14   <u>Counting</u>.  If the due date for any action to be taken under this Agreement (including the delivery of Notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

10.15   <u>Survival</u>.  All representations and warranties and, except as expressly set forth in this Agreement to the contrary, covenants of Buyer and the Sellers, respectively, contained in this Agreement or in any document delivered pursuant hereto shall not survive the Closing and

thereafter shall be of no further force and effect. Notwithstanding the foregoing, all covenants and agreements set forth in this Agreement, which by their express terms would require performance after the Closing Date, shall survive until fully performed or until such covenant or agreement expires by its terms.

10.16   <u>Non-Recourse</u>. All claims, Liabilities, Proceedings, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to a Transaction Dispute, may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their permitted assignees (collectively, the "<u>Contracting Parties</u>"). No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing (collectively, the "<u>Non-Recourse Persons</u>"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, Liabilities, or causes of action, arising under, out of, in connection with, or related in any manner to a Transaction Dispute; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, Liabilities, and causes of action, against any such Non-Recourse Persons.

10.17   <u>Preparation of this Agreement</u>.  Buyer and the Sellers hereby acknowledge that (a) Buyer and the Sellers jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (b) Buyer and the Sellers have been adequately represented and advised by legal counsel with respect to this Agreement and the Transactions, and (c) no presumption shall be made that any provision of this Agreement shall be construed against either Party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

10.18   <u>Releases</u>.

(a)   Effective as of the Closing and subject to entry of the Sale Order (with any discrepancy between the release provided in the Sale Order and this Agreement being controlled by this Agreement), each of the Sellers on their own behalf and on behalf of their past, present, and future predecessors, successors and assigns hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, in their capacity as purchaser of the Purchased Assets, the Buyer, the Administrative Agents and the Lenders, and each of their predecessors, successors, assigns, Subsidiaries and Affiliates, and each of their respective former, current or future, direct or indirect, equity holders, officers, employees, directors, agents, advisory board members, representatives, owners, members, partners, employees, management companies, direct and indirect parent entities, "controlling persons" (within the meaning of federal securities law), heirs, administrators and executors, financial advisors, legal advisors, shareholders, managers, principals, consultants, accountants, attorneys, actuaries, investment bankers and other professionals in each case acting in such capacity whether current or former, including in their capacity as directors of the Company, as applicable (collectively, the "<u>Buyer Released Persons</u>"), of and from any and all Claims, demands, liabilities, responsibilities, disputes,

72

remedies, causes of action, indebtedness and obligations, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, franchises, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, foreseen or unforeseen, accrued, unaccrued, fixed, contingent, liquidated or unliquidated, secured or unsecured, direct or derivative, matured or unmatured, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract or otherwise, including any derivative claims asserted or assertable on behalf of any of the Sellers, each Sellers Released Persons and Buyer Released Persons, of every nature and description that exist on the date hereof or that such Person would have been legally entitled to assert (whether individually or collectively) with respect to, based on or relating to, or in any manner arising from, in whole or in part, the Sellers, Acquired Entities or the Business (including the capital structure, management, ownership or operation thereof), the business operations of the Sellers and the Acquired Entities, actions taken by the Sellers' boards of directors, the purchase, sale or rescission of any security of the Sellers, the subject matter of the business or contractual arrangements between or among any of the Sellers Released Persons or Buyer Released Persons, the Sellers' restructuring efforts, the ownership or operation of the Sellers by any Sellers Released Persons, the distribution of any cash or other property of the Sellers to any Sellers Released Persons or Buyer Released Persons, the assertion of enforcement of rights or remedies against the Sellers, the Sellers' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to claims asserted against the Sellers), intercompany transactions, the restructuring transactions and the Transactions, entry into the Bankruptcy Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, any term sheets, any restructuring support agreement, the DIP Documents, this Agreement, the Transaction Documents or any other documents relating to any of the foregoing created or entered into in connection with the Transaction, this Agreement or the DIP Documents, or any other act or omission, transaction, agreement, conduct, circumstance, event or other occurrence with respect to the foregoing occurring or taking place on or prior to the Closing; provided that nothing herein shall release the Buyer of its obligations under this Agreement, the Sale Order and the other Transaction Documents, or otherwise constitute a release by Seller or any of its Affiliates of any claims that Seller or any of its Affiliates have in the Bankruptcy Cases. Nothing in this Section 10.18(a) shall limit Sellers' or their respective Affiliates' rights in the case of Actual Fraud (but not, for the avoidance of doubt, fraudulent conveyance claims). Effective as of the Closing and subject to entry of the Sale Order (with any discrepancy between the release provided in the Sale Order and this Agreement being controlled by this Agreement), each of the Sellers on their own behalf and on behalf of their past, present, and future predecessors, successors and assigns, covenants not to sue Buyer, the Administrative Agents or any Buyer Released Person, or to instigate, initiate, or pursue against any of them, in any manner of judicial or administrative proceeding on such Seller's own behalf or on behalf of any of the Sellers Released Persons, or any other Person, regarding or in connection with any of the claims released pursuant to this Section 10.18(a).

(b)     Effective as of the Closing, each of the Buyer and the Administrative Agents, on its own behalf and on behalf of its past, present, and future Affiliates (including the Lenders), predecessors, successors and assigns hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge, the Sellers and each of their predecessors, successors, assigns, Subsidiaries and Affiliates, and each of their respective

former, current or future, direct or indirect, equity holders, officers, employees, directors, agents, advisory board members, representatives, owners, members, partners, employees, management companies, direct and indirect parent entities, "controlling persons" (within the meaning of federal securities law), heirs, administrators and executors, financial advisors, legal advisors, shareholders, managers, principals, consultants, accountants, attorneys, actuaries, investment bankers and other professionals in each case acting in such capacity whether current or former, including in their capacity as directors of the Company, as applicable (collectively, the "Sellers Released Persons"), of and from any and all Claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, franchises, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, foreseen or unforeseen, accrued, unaccrued, fixed, contingent, liquidated or unliquidated, secured or unsecured, direct or derivative, matured or unmatured, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract or otherwise, , including any derivative claims asserted or assertable on behalf of any of the Sellers, each Sellers Released Persons and Buyer Released Persons, of every nature and description that exist on the date hereof or that such Person would have been legally entitled to assert (whether individually or collectively) with respect to, based on or relating to, or in any manner arising from, in whole or in part, the Sellers, Acquired Entities or the Business (including the capital structure, management, ownership or operation thereof), the business operations of the Sellers and the Acquired Entities, actions taken by the Sellers' boards of directors, the purchase, sale or rescission of any security of the Sellers, the subject matter of, the business or contractual arrangements between or among any Sellers Released Persons or Buyer Released Persons, the Sellers' restructuring efforts, the ownership or operation of the Sellers by any Sellers Released Persons, the distribution of any cash or other property of the Sellers to any Sellers Released Persons or Buyer Released Persons, the assertion of enforcement of rights or remedies against the Sellers, the Sellers' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to claims asserted against the Sellers), intercompany transactions, the restructuring transactions and the Transactions, entry into the Bankruptcy Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, any term sheets, any restructuring support agreement, the DIP Documents, this Agreement, the Transaction Documents or any other documents relating to any of the foregoing created or entered into in connection with the Transaction, this Agreement or the DIP Documents, or any other act or omission, transaction, agreement, conduct, circumstance, event or other occurrence with respect to the foregoing occurring or taking place on or prior to the Closing; provided that nothing herein shall release the Sellers of their obligations under this Agreement, the Sale Order, and the other Transaction Documents.  Nothing in this Section 10.18(b) shall limit Buyer's rights in the case of Actual Fraud (but not, for the avoidance of doubt, fraudulent conveyance claims).  Effective as of the Closing, each of the Buyer and the Administrative Agents, on its own behalf and on behalf of its past, present, and future Affiliates (including the Lenders), predecessors, successors and assigns, covenants not to sue any Seller or any Sellers Released Person, or to instigate, initiate, or pursue against any of them, in any manner of judicial or administrative proceeding on such Buyer's or Administrative Agent's own behalf or on behalf of any of the Buyer Released Persons, or any other Person, regarding or in connection with any of the claims released pursuant to this Section 10.18(b).

(c)     Without limiting in any way the scope of the releases contained in this Section 10.18 and effective upon the Closing, each of Seller, Buyer and the Administrative Agents, to the fullest extent allowed under applicable Law, hereby waives and relinquishes all statutory and common law protections purporting to limit the scope or effect of a general release, whether due to lack of knowledge of any claim or otherwise, including, waiving and relinquishing the terms of any Law which provides that a release may not apply to material unknown Claims.  Each of Seller, Buyer and the Administrative Agents hereby affirms its intent to waive and relinquish such unknown Claims and to waive and relinquish any statutory or common law protection available in any applicable jurisdiction with respect thereto.  Each of Seller, Buyer and the Administrative Agents hereby represents and warrants that it has access to adequate information regarding the terms hereof, the scope and effect of the releases in this Section 10.18, and all other matters encompassed by this Agreement to make an informed and knowledgeable decision with regard to entering into this Agreement.

10.19    Schedules.  The Sellers' Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections and subsections corresponding to the sections and subsections of this Agreement; provided that each section and subjection of the Sellers' Disclosure Schedules will be deemed to incorporate by reference all information disclosed in any other section or subsection of the Sellers' Disclosure Schedules, and any disclosure in the such Seller's Disclosure Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement.  Capitalized terms used in the Sellers' Disclosure Schedules and not otherwise defined therein have the meanings given to them in this Agreement.  The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Sellers' Disclosure Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Sellers' Disclosure Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Sellers' Disclosure Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business.  In addition, matters reflected in the Sellers' Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Sellers' Disclosure Schedules.  Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  No information set forth in the Sellers' Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties.  Any description of any agreement, document, instrument, plan, arrangement, or other item set forth on any Sellers' Disclosure Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement.  The information contained in this Agreement, in the Sellers' Disclosure Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.20   <u>Fiduciary Obligation</u>. Notwithstanding anything to the contrary in this Agreement or any document related to the transactions contemplated hereby, nothing in this Agreement or any such document will require any Seller or any of their respective directors, managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, that the board of directors or managers (or other governing body) of such Seller has determined, in good faith after consultation with legal counsel and independent financial advisors, would be a violation of such Person's fiduciary obligations or applicable Law. For the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates.   For the avoidance of doubt, the Sellers' ability to conduct the sale process and to consider or advance alternative proposals in a manner consistent with the foregoing and the Bidding Procedures Order shall not be impaired by anything in this Agreement.

[<i>Remainder of Page Intentionally Left Blank</i>]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the Sellers, Buyer, and the Administrative Agent as of the date first above written.

**<u>SELLERS</u>:**

**SHO Holding I Corporation**

By:_____
Name:
Title:

**Never Slip TopCo, Inc.**

By:_____
Name:
Title:

**Never Slip Holdings, Inc.**

By:_____
Name:
Title:

**SHO Holding II Corporation**

By:_____
Name:
Title:

**Shoes for Crews, Inc.**

By:_____
Name:
Title:

**SFC Holdings, Inc.**


By:_____
Name:
Title:


**Shoes for Crews Canada, Ltd.**


By:_____
Name:
Title:


**SFC Holdings, LLC**


By:_____
Name:
Title:


**Shoes for Crews, LLC**


By:_____
Name:
Title:


**SFC Canada, Inc.**


By:_____
Name:
Title:


**Sunrise Enterprises, LLC**


By:_____
Name:
Title:


[*Signature Page to Asset Purchase Agreement*]

**SRS/MKS, L.L.C.**


By:_____
Name:
Title:

**<u>BUYER</u>:**

**SFC Acquisition Co., LLC**


By:_____
Name:
Title:

**ADMINISTRATIVE AGENT:**

**ANTARES CAPITAL LP**, solely for purposes of
Section 3.2, Section 10.4 to Section 10.18

By:_____
Name:
Title:

**Exhibit A**

Bidding Procedures Order

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket No. _____** |

**ORDER (I)(A) APPROVING CERTAIN BIDDING
PROCEDURES AND THE FORM AND MANNER OF
NOTICE THEREOF, (B) APPROVING THE DEBTORS' ENTRY
INTO THE STALKING HORSE APA, (C) APPROVING THE DEADLINE FOR
PARTIES IN INTEREST TO PROVIDE NOTICE OF THE THEIR INTENTION TO
USE THE CHALLENGE PERIOD TO INVESTIGATE THE LIENS AND CLAIMS OF
THE PREPETITION FIRST LIEN LENDERS SEEKING TO CREDIT BID AT
THE AUCTION; AND (II) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion") of the above-captioned debtors and

debtors in possession (collectively, the "Debtors") for, *inter alia*, the entry of an order

(this "Order")[2]: (i)  scheduling a hearing (the "Sale Hearing") on approval of the proposed sale

(the "Sale") of all or substantially all of the Debtors' assets (the "Assets") free and clear of all

Liens other than Assumed Liabilities to SFC Acquisition Co, LLC, an entity organized by the

Prepetition First Lien Agent and to be controlled by the Prepetition First Lien Lenders or any other

Successful Bidder, and the assumption and assignment of certain executory contracts and

unexpired leases (each, a "Purchased Contract" and collectively, the "Purchased Contracts");

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2]    Capitalized terms used but not defined herein shall have the meanings given them in the Bidding Procedures, or to the extent not defined therein, the Motion or the Stalking Horse APA.

(ii) authorizing and approving certain bidding procedures for the Sale (collectively, the "Bidding Procedures," a copy of which is attached as **Exhibit 1** to this Order),[3] and the form and manner of notice thereof, including the Sale Notice and notice of the Challenge Period Notice Deadline; (iii) authorizing the Debtors' entry into the asset purchase agreement attached to the Motion as Exhibit B (the "Stalking Horse APA") with the Stalking Horse Purchaser; (iv) scheduling an auction for the Assets (the "Auction"); and (v) granting related relief; and due and proper notice of the Motion having been given; and it appearing that no other or further notice of the Motion is required except as set forth herein; and it appearing that the Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed the Motion; and the Bidding Procedures Hearing (as defined herein) having been held; and the Court having found and determined that the relief set forth herein is in the best interests of the Debtors, their estates and creditors and all parties in interest, and that the legal and factual bases set forth in the Motion and the evidence adduced at the Bidding Procedures Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby

---

[3]    Capitalized terms used but not defined in this Order have the meanings ascribed to them in the Bidding Procedures.  If they are not defined in this Order or in the Bidding Procedures, then they shall have the meanings ascribed to them in the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 66] (the "Interim DIP Order" and the final order, the "Final DIP Order" and together, the "DIP Orders").  All references to the Bidding Procedures herein are qualified in their entirety by the Bidding Procedures themselves.

2

FOUND AND DETERMINED THAT:[4]

A.      This Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*.

B.      Venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.      The statutory and legal predicates for the relief requested in the Motion and provided for herein are sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

D.      In the Motion and at the hearing on the relief set forth herein (the "Bidding Procedures Hearing"), the Debtors demonstrated that good and sufficient notice of the relief granted by this Order has been given and no further notice is required except as otherwise provided for herein.  A reasonable opportunity to object or be heard regarding the relief granted by this Order (including, without limitation, with respect to the Bidding Procedures) has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

E.      The Sale Notice, in substantially the form attached to this Order as Exhibit 2, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the Bidding Procedures, the Auction, the Sale, and the Sale Hearing, and any

---

[4]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

and all objection deadlines related thereto, and no other or further notice is required of the foregoing.

F.      The Debtors have articulated good and sufficient business reasons for the Court to approve the Bidding Procedures.  The Bidding Procedures are: (i) fair, reasonable, and appropriate; and (ii) designed to maximize recovery with respect to the Sale.  The Bidding Procedures were negotiated in good faith and at arm's-length and are reasonably designed to promote a competitive and robust bidding process to generate the greatest level of interest in the Debtors' Assets. The process for selecting the Stalking Horse Purchaser was fair and appropriate under the circumstances and in the best interests of the Debtors' estates. The Bidding Procedures comply with the requirements of Local Rule 6004-1(c).

G.      The Stalking Horse APA represents the highest or otherwise best offer the Debtors have received to date to purchase the Assets designated for purchase thereunder.  The Stalking Horse APA provides the Debtors with the opportunity to sell such Assets in a manner designed to preserve and maximize their value and provides a floor for a further marketing and auction process. Without the Stalking Horse APA, the Debtors are at significant risk of realizing a lower price for their Assets.  The Stalking Horse Purchaser shall act as a "stalking horse bidder" pursuant to the Stalking Horse APA and shall be subject to higher or otherwise better offers in accordance with the Stalking Horse APA and the Bidding Procedures.  Pursuit of the Stalking Horse Purchaser as a "stalking horse bidder" and the Stalking Horse APA as a "stalking horse purchase agreement" is in the best interests of the Debtors and the Debtors' estates and their creditors, and it reflects a sound exercise of the Debtors' business judgment.

I.      Entry of this Order is in the best interests of the Debtors, their estates and creditors and all other interested parties.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      Those portions of the Motion seeking approval of (a) the Debtors' entry into the Stalking Horse APA (subject to higher or otherwise better offers in accordance with this Order), (b) the Bidding Procedures substantially in the form attached to this Order as **Exhibit 1**, (c) the date and time of the Sale Hearing, and (d) the noticing and objection procedures related to each of the foregoing, including, without limitation, the notice of (i) the deadline to provide notice that a party intends to investigate the claims and liens of the Prepetition First Lien Lenders who are seeking to credit bid certain or their liens and claims at the Auction and (ii) the Sale and the entry of this Order, substantially in the form attached to this Order as **Exhibit 2** (the "Sale Notice"), the notice of the Successful Bidder in the form attached to this Order as **Exhibit 3** (the "Notice of Successful Bidder"), and the notice of the Debtors' potential assumption and assignment of the Purchased Contracts, substantially in the form attached to this Order as **Exhibit 4** (the "Cure Notice"), (subclauses (a) - (d) above, collectively, the "Bidding and Auction Process"), are hereby GRANTED to the extent set forth herein.

2.      Any objections to the Motion as it pertains to the Bidding and Auction Process or the relief granted by this Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits with prejudice.

3.      The Bidding Procedures are hereby approved.  The failure to specifically include or reference any particular provision of the Bidding Procedures in the Motion or this Order shall not diminish or otherwise impair the effectiveness of such procedures, it being this Court's intent that the Bidding Procedures are approved in their entirety, as if fully set forth in this Order.  The

5

Debtors are hereby authorized to conduct the Auction pursuant to the terms of the Bidding Procedures and this Order.

4.     The Debtors shall have the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determine is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder.  Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders, *provided* that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors.  The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures or the Sale, *provided* that the information was provided in accordance with this Order.

5.     For all purposes under the Bidding Procedures: (a) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid; (b) the Stalking Horse Purchaser is, and will be deemed to be, a Qualifying Bidder for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth herein and without any other or further action by the Stalking Horse Purchaser; and (c) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

6.     The Bidding Procedures shall apply to the Potential Bidders, the Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction.

7.      The Debtors' decision to assume and assign the Purchased Contracts to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, is subject to this Court's approval and the closing of the Sale. Accordingly, absent this Court's approval and the closing of the Sale, the Purchased Contracts shall not be deemed assumed or assumed and assigned, and shall in all respects be subject to further administration by the Debtors and their estates under the Bankruptcy Code in connection with these chapter 11 cases (the "Chapter 11 Cases").

8.      The Cure Notice is: (a) reasonably calculated to (i) provide sufficient, effective notice to all counterparties and any other affected parties of the Debtors' intent to assume and assign to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, some or all of the Purchased Contracts, and (ii) afford the counterparties the opportunity to exercise any rights affected by the Motion and the relief granted by this Order pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006; and (b) hereby approved.

9.      The inclusion of a contract, lease or other agreement on the Sale Notice or Cure Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtors and their estates with respect thereto shall be reserved.

10.     The Sale Notice, the Cure Notice, any Supplemental Cure Notice (as defined in the Motion), the Bidding Procedures, the Auction, and the Sale Hearing, and the objection periods associated with each of the foregoing are reasonably calculated to provide notice to any affected party and afford the affected party the opportunity to exercise any rights affected by the Motion as

7

it relates to the Bidding Procedures, the Auction, the Sale, the Sale Hearing, and the assumption and assignment to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, of the Purchased Contracts pursuant to Bankruptcy Rules 2002(a)(2), 6004 and 6006, and such notice and objection periods are hereby approved.

11.     The Sale Notice is approved.  Within three (3) business days of the entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by regular mail on the Notice Parties.

12.     The Cure Notice is approved.  Within three (3) business days of the entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Cure Notice by regular mail on counterparties to Purchased Contracts to provide notice of the potential assumption and assignment of their Purchased Contracts by the Successful Bidder.

13.     The Debtors shall post the Sale Notice, the Cure Notice, any Supplemental Cure Notice, and this Order on the website of the Debtors' claims and noticing agent.  Within seven (7) business days of the entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall cause the Sale Notice to be published once in the national edition of *USA Today* and once in the *Wilmington News Journal* in Delaware, with any modifications necessary for ease of publication.  Publication of the Sale Notice as described in this Order conforms to the requirements of Bankruptcy Rules 2002(l) and 9008 and is reasonably calculated to provide notice to any affected party, including any Potential Bidders, and afford the affected party the opportunity to exercise any rights affected by the Motion and the relief granted by this Order.

14.     Any party in interest seeking to investigate the liens and claims of the Prepetition First Lien Lenders shall provide a written notice of the party's intent to do so to the Debtors and

8

the Prepetition First Lien Lenders (the "Challenge Period Notice") **no later than 4:00 p.m. (E.T.) on the first business day preceding the Auction Date (May 20, 2024)** (the "Challenge Period Notice Deadline").  Absent any party in interest providing the Debtors and the Prepetition First Lien Lenders a Challenge Period Notice on or before the Challenge Period Notice Deadline, the Challenge Period (as defined in the Final DIP Order) shall terminate as of the day the Auction is scheduled to commence and the Prepetition First Lien Lenders shall be entitled to credit bid all or any part of their secured claims and liens pursuant to Bankruptcy Code section 363(k).  In the event that no Challenge Period Notice is received by the Debtors and the Prepetition First Lien Lenders on or before the Challenge Period Notice Deadline, the Debtors shall file notice of the Challenge Period having expired on or before the date on which the Auction is scheduled to commence and notwithstanding the foregoing any in party interest objecting to the expiration of the Challenge Period pursuant to this paragraph shall be entitled to raise any objections to the Court at the Sale Hearing.

15.    Any objections to the Sale or the relief requested in connection with the Sale, including objections related to the adequate assurance of future performance by the Stalking Horse Purchaser but not including objections related to cure amounts for the Purchased Contracts or general objections to the assumption and assignment of the Purchased Contracts, (a "Sale Objection") must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of this Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (E.T.) on May 20, 2024** (the "Sale Objection Deadline"), and proof of service of such Sale Objection upon the Objection Notice Parties (as defined in the Sale Notice) shall be filed with the Court as and when required by the Local Rules; and (e) be served upon the Objection Notice Parties; *provided*,

*however*, that the Sale Objection Deadline solely for Sale Objections related to the adequate assurance of future performance of a purchaser that is not the Stalking Horse Purchaser shall be **on or before 12:00 p.m. (E.T.) on May 22, 2024**.  If a Sale Objection is not filed and served on or before the Sale Objection Deadline in accordance with the foregoing requirements, the objecting party may be barred from objecting to the Sale and being heard at the Sale Hearing, and this Court may enter the Sale Order (as defined in the Motion) without further notice to such party.

16.     Failure to file a Sale Objection on or before the Sale Objection Deadline (a) may forever bar the assertion, whether at any Sale Hearing or thereafter, of any objection to the Motion, to entry of the Sale Order, and to the consummation and performance of the Sale contemplated by the Stalking Horse APA or any alternative asset purchase agreement (an "Alternative APA") with a Successful Bidder other than the Stalking Horse Purchaser, and (b) for purposes of section 363(f)(2) of the Bankruptcy Code, shall be deemed to be "consent" to entry of the Sale Order and consummation of the Sale and all transactions related thereto.

17.     As part of its bid, each Qualifying Bidder must provide the Debtors, the other Bidding Procedures Notice Parties, and the Consultation Parties information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "Adequate Assurance Information"), including (a) the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to such Qualifying Bidder; and (b) a contact person for the proposed assignee that the applicable counterparty may directly contact in connection with the adequate assurance of future performance.  In the event that a Qualifying Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the

Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor.

18.    Any party in receipt of Adequate Assurance Information under this Order shall review the Adequate Assurance Information received on a confidential basis and shall not disclose the Adequate Assurance Information except as expressly provided in this Order and the Bidding Procedures.  Such counterparty may not use or disclose, except to representatives, attorneys, advisors and financing sources (collectively, "Representatives"), any confidential Adequate Assurance Information for any purpose other than: (a) evaluating whether adequate assurance of future performance as required under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code has been provided; and (b) in support of any objection (the "Assignment Objection") (subject to the limitations on disclosure set forth herein) by such counterparty relating to adequate assurance of future performance.  Any Assignment Objection that includes confidential, non-public Adequate Assurance Information must be filed under seal unless disclosure of such confidential, non-public information is authorized by the Debtors and the applicable assignee(s).  The party filing an Assignment Objection under seal shall follow the procedures for the same set forth in Local Rule 9018-1(d).  The unredacted versions of such Assignment Objections shall be served upon the Debtors, the other Bidding Procedures Notice Parties, the Consultation Parties and the U.S. Trustee; *provided further* that all rights of all parties in interest in the Chapter 11 Cases are reserved to oppose the filing under seal of any such information and to seek any other relief from this Court with respect to such matter.  Any Representative receiving Adequate Assurance Information shall be notified and shall agree to be bound by the restrictions set forth in this Order.

19.     The Stalking Horse Purchaser shall be deemed to be a Qualifying Bidder and the Stalking Horse APA is deemed to be a Qualifying Bid.  Subject to the DIP Order, the Stalking Horse Purchaser is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit with the Debtors.  The Stalking Horse Purchaser shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition First Lien Obligations and the DIP Obligations.

20.     If no timely Qualifying Bids other than the Stalking Horse APA are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that this Court approve the Stalking Horse APA and the transactions contemplated thereunder.  If the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse APA, then the Debtors shall conduct the Auction on **May 21, 2024 at 11:00 a.m. (E.T.)**, at the offices of Ropes & Gray LLP, 1211 6th Avenue, New York, NY 10036, or virtually via telephone and/or video conference pursuant to information to be timely provided by the Debtors to the Auction Participants (as defined herein).  Only the Debtors, the Auction Bidders (including the Stalking Horse Purchaser), the Consultation Parties, the DIP Agent, the Prepetition First Lien Agents, the Prepetition Second Lien Agents, and any creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "Auction Participants"); *provided* that any such creditors provide Debtors' counsel with written notice of their intent to attend the Auction no later than 5:00 p.m. (E.T.) the day prior to the Auction.

21.     The Debtors shall have until the Sale Hearing to file and serve a reply to any objection filed in connection with the Sale, including any Sale Objection or Assignment Objection.

22.     The Sale Hearing shall be held in this Court on **May 23, 2024 at 2:30 p.m. (E.T.)**, unless otherwise determined by this Court.  The Sale Hearing may be adjourned by the Debtors, in consultation with the DIP Agent, the Prepetition Initial First Lien Agent[5] and the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then in consultation with the DIP Agent, the Prepetition Initial First Lien Agent and the Successful Bidder, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the Chapter 11 Cases.

23.     All persons and entities that participate in the Auction or bid for any Asset during the sale process shall be deemed to have knowingly and voluntarily (i) consented to the core jurisdiction of the Court to enter any order related to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order; (ii) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order; and (iii) consented to the entry of a final order or judgment in connection with any disputes relating to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order, if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the relevant parties.

24.     The Debtors are authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

---

[5]     Any reference to a consent right of the DIP Agent or the Prepetition First Lien Agents hereunder shall be a reference to the consent of such agent at the direction of the applicable consenting Lenders under the DIP Documents and the Prepetition Loan Documents, as applicable.

25.     In the event that there is a conflict between this Order or the Bidding Procedures, on the one hand, and the Motion, the Stalking Horse APA, or an Alternative APA, on the other hand, this Order and the Bidding Procedures shall control and govern.  If there is a conflict between this Order and the Bidding Procedures, this Order shall control and govern.  If there is a conflict between this Order or the Bidding Procedures, on the one hand, and any notice served in connection with the Motion or this Order, on the other hand, this Order and the Bidding Procedures shall control and govern.

26.     Prior to mailing the Cure Notice, any Supplemental Cure Notice, and the Sale Notice, the Debtors may fill in, or cause to be filled in, any missing dates and other information, correct any typographical errors, conform the provisions thereof to the provisions of this Order, and make such other, non-material changes as the Debtors deem necessary or appropriate.

27.     This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h) or 6006(d) or any other provision of the Bankruptcy Code, the Bankruptcy Rules or the Local Rules is expressly waived.  The Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and may, in their sole discretion and without further delay, take any action and perform any act authorized or approved under this Order.

28.     The requirements set forth in Local Rules 6004-1, 9006-1 and 9013-1 are hereby satisfied or waived.

29.     The Debtors are authorized to take all steps necessary or appropriate to implement the relief granted in this Order.

30.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation or interpretation of the Order.

**EXHIBIT 1**

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. _____** |

## BIDDING PROCEDURES

On April 1, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  The Debtors are maintaining their business and managing their property as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On [April 25], 2024, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. ●] (the "Bidding Procedures Order"), among other things, granting certain relief requested in the related motion [Docket No. ●] (the "Bidding Procedures Motion"), including authorizing the Debtors to solicit bids and approving the procedures set forth herein (collectively, the "Bidding Procedures") to be employed by the Debtors in connection with the proposed sale (the "Sale") of all or substantially all of the Debtors' assets (the "Assets"), free and clear of all Liens (as defined in the Stalking Horse APA, as defined below) other than Assumed Liabilities (as defined in the Stalking Horse APA) to SFC Acquisition Co, LLC  (the "Stalking Horse Purchaser"), pursuant to an asset purchase agreement dated as of April 8, 2024 (the "Stalking Horse APA") with the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder (as defined below), then an Alternative APA (as defined below) with the Successful Bidder.  The Stalking Horse APA is attached to the Bidding Procedures Motion as **Exhibit B**.

**ANY PARTY INTERESTED IN BIDDING ON THE ASSETS SHOULD CONTACT:**

> **(A)    THE INVESTMENT BANKER FOR THE DEBTORS, SOLOMON PARTNERS SECURITIES, LLC, JEFF DERMAN (212-508-1625; JEFF.DERMAN@SOLOMONPARTNERS.COM), TERO JÄNNE (212-508-**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

1676; TERO.JANNE@SOLOMONPARTNERS.COM), AND DAN GOLYNSKIY (646-378-4068; DANIEL.GOLYNSKIY@SOLOMONPARTNERS.COM); AND

(B) GREGG M. GALARDI, ESQ. (212-596-9139; GREGG.GALARDI@ROPESGRAY.COM), CRISTINE PIRRO SCHWARZMAN, ESQ. (212-596-9635; CRISTINE.SCHWARZMAN@ROPESGRAY.COM); ELLEN WHEELER, ESQ. (212-841-5783; ELLEN.WHEELER@ROPESGRAY.COM); AND CONOR P. MCNAMARA, ESQ. (312-845-1200, CONOR.MCNAMARA@ROPESGRAY.COM) OF ROPES & GRAY LLP, COUNSEL FOR THE DEBTORS.

### *Summary of Key Dates Established by Bidding Procedures*

| Date | Event or Deadline |
|---|---|
| April 30, 2024, or as soon as reasonably practicable thereafter | Deadline to serve Sale Notice on the Notice Parties, including notice of the Challenge Period Notice Deadline |
| May 17, 2024 | Deadline for Prospective Bidders to Submit Qualifying Bids |
| May 20, 2024 | Challenge Period Notice Deadline |
| May 21, 2024 | Auction Date |
| May 23, 2024, or as soon thereafter as the Court is available | Hearing to Consider the Sale Order |
| No later than May 31, 2024 | Entry of the Sale Order |
| No later than June 17, 2024 | Consummation of the Sale |

### 1.    Stalking Horse Purchaser

On April 8, 2024, the Debtors entered into the Stalking Horse APA with the Stalking Horse Purchaser. As set forth more fully in the Stalking Horse APA, the Stalking Horse Purchaser is (i) credit bidding no less than $290 million on account of the DIP Obligations and the Prepetition First Lien Obligations (as each term is defined in the DIP Order),[2] (ii) assuming certain liabilities and executory contracts and unexpired leases of the Debtors, and (iii) satisfying cure costs, subject

---

[2]    Capitalized terms used but not defined in the Bidding Procedures have the meanings ascribed to them in the Bidding Procedures Order. If they are not defined in the Bidding Procedures or in the Bidding Procedures Order, then they shall have the meanings ascribed to them in the *Interim Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 66] (the "Interim DIP Order" and the final order, the "Final DIP Order" and together, the "DIP Orders").

to the cure cost cap (collectively (i), (ii) and (iii), the "<u>Purchase Price</u>").  The Stalking Horse APA also includes various customary representations, warranties, and covenants by and from the Debtors and the Stalking Horse Purchaser, and certain conditions to closing and rights of termination related to the Sale and the Chapter 11 Cases generally.

The Stalking Horse Purchaser is deemed to be a Qualifying Bidder (as defined below) and the Stalking Horse APA is deemed to be a Qualifying Bid (as defined below).  Subject to the DIP Order, the Stalking Horse Purchaser is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit (as defined below) with the Debtors.  The Stalking Horse Purchaser shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition First Lien Obligations and the DIP Obligations.

**2.    <u>Assets to be Sold</u>**

The Debtors shall offer for sale the Assets, *provided* that the Debtors, in consultation with the Consultation Parties (as defined below), determine that the aggregate consideration offered by any bid, or combination of bids, for the Assets, satisfies the requirements set forth in these Bidding Procedures.  Potential Bidders (as defined below) may bid on all or any number or combination of the Assets.

**3.    <u>Participation Requirements</u>**

Any person or entity that wishes to conduct diligence about the Debtors (an "<u>Interested Party</u>") may request access to the Debtors' confidential electronic data room concerning the Assets (the "<u>Data Room</u>").  To become an Interested Party, and thus be able to conduct due diligence, an Interested Party must execute a non-disclosure agreement, in form and substance satisfactory to the Debtors, with the Debtors.

Any Interested Party that wishes to participate in the bidding process for the Assets other than in the case of the Stalking Horse Purchaser (each, a "<u>Potential Bidder</u>") must first become a "<u>Qualifying Bidder</u>." To become a Qualifying Bidder, a Potential Bidder must submit to the Debtors and their advisors:

(a)    documentation identifying the Interested Party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

(b)    an executed confidentiality agreement in form and substance satisfactory to the Debtors;

(c)    a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties, that the Interested Party has a *bona fide* interest in consummating a sale transaction; and

(d)    sufficient information, as determined by the Debtors, after consultation with the Consultation Parties, to allow the Debtors to determine that the Interested Party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited

3

to, current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate its contemplated transaction.

Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bidding Procedures: (i) the Stalking Horse Purchaser shall be considered a Qualifying Bidder, and the Stalking Horse APA shall be considered a Qualifying Bid, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser; and (ii) in determining whether the Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

### 4.    **Bankruptcy Court Jurisdiction**

Any Potential Bidders and Qualifying Bidders shall: (a) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction (as defined below) and the construction and enforcement of the contemplated transaction documents of such parties; (b) bring any such action or proceeding in the Court; and (c) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law.

### 5.    **Form of Agreement**

Potential Bidders should reference the Stalking Horse APA in connection with their bids. As set forth below, Potential Bidders intending to submit bids must include with their bids:

(a)     a statement that such Potential Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estates than, the terms set forth in the Stalking Horse APA, if applicable; and

(b)     a clean and duly executed asset purchase agreement (an "Alternative APA") and a marked copy of the Alternative APA that reflects any variations from the Stalking Horse APA.

6.      <u>**Due Diligence**</u>

The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to: (a) proposed investment banker for the Debtors, Solomon Partners Securities, LLC, attn: Jeff Derman (212-508-1625; jeff.derman@solomonpartners.com), Tero Jänne (212-508-1676; tero.janne@solomonpartners.com), and Dan Golynskiy (646-378-4068; daniel.golynskiy@solomonpartners.com); or (b) proposed counsel for the Debtors, Gregg M. Galardi, Esq. (212-596-9139; gregg.galardi@ropesgray.com); Cristine Pirro Schwarzman, Esq. (212-596-9635; cristine.schwarzman@ropesgray.com); Conor P. McNamara, Esq. (312-845-1227; conor.mcnamara@ropesgray.com); and Ellen Wheeler, Esq. (212-841-5783; ellen.wheeler@ropesgray.com).

The due diligence period shall extend through and including the Bid Deadline (as defined below). The Debtors, in their business judgment, may, but shall not be obligated to, furnish any due diligence information after the Bid Deadline.

The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder. Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders *provided* that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors. The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bidding Procedures and the Sale.

7.      <u>**Bid Requirements**</u>

Other than in the case of the Stalking Horse Purchaser and the Stalking Horse APA, which shall be considered a Qualifying Bidder and a Qualifying Bid, respectively, for all purposes under the Bidding Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchaser, to be deemed a "<u>Qualifying Bid</u>," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "<u>Bid Requirement</u>"):

a.      be in writing;

b.      fully disclose the identity of the Qualifying Bidder (and to the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the identity of the Qualifying Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the bid submitted by the Qualifying Bidder;

c.      set forth the purchase price to be paid by such Qualifying Bidder;

d.      identify separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids in accordance with section 363(k) of the Bankruptcy Code and assumed liabilities;

e.      state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

f.      specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estate than, the terms set forth in the Stalking Horse APA;

g.      be accompanied by an alternative asset purchase agreement (an "Alternative APA") and an alternative Sale Order (as defined in the Bidding Procedures Motion) that reflects any variations from the Stalking Horse APA or the Sale Order, as applicable;

h.      state that such Qualifying Bidder's offer is formal, binding and unconditional, and is irrevocable until two (2) business days after the closing of the Sale;

i.      to the extent that a bid is not accompanied by evidence of the Qualifying Bidder's capacity to consummate the Sale set forth in its bid with cash on hand, each bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors in consultation with the Consultation Parties, that demonstrates that the Qualifying Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualifying Bidder's purchase price and other obligations under its bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with the Consultation Parties;

j.      contain such financial and other information to allow the Debtors to make a reasonable determination, after consultation with the Consultation Parties, as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Alternative APA, including, without limitation, such financial and

other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale within one (1) business day after the Debtors' receipt of such information.  To the extent that the Qualifying Bidder (other than the Stalking Horse Purchaser) is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor;

k.      identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative APA;

l.      include a commitment to close the transactions contemplated by the Alternative APA by no later than 75 days after the petition date;

m.      not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment;

n.      the aggregate consideration proposed by the Qualifying Bidder must (A) result, in the Debtors' reasonable judgment, in cash consideration of an amount equal to or greater than $290,000,000 to be applied to the Prepetition First Lien Obligations and DIP Obligations plus (B) $1,000,000;

o.      not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

p.      contain written evidence satisfactory to the Debtors that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Alternative APA, with appropriate contact information for such financing sources;

q.      contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all

due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation or inspection of any documents and other information in making its Qualifying Bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bidding Procedures and the Sale;

r.    set forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (ii) any regulatory and third-party approvals required for the Qualifying Bidder to close the transactions contemplated by the Alternative APA, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Alternative APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); *provided* that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Alternative APA; *provided*, *further* that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

s.    provide for the Qualifying Bidder to serve as a backup bidder (the "Back-Up Bidder") if the Qualifying Bidder's bid is the next highest and best bid (the "Back-Up Bid") after the Successful Bid, in accordance with the terms of the Alternative APA;

t.    include written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative APA;

u.    provide a good faith cash deposit (the "Deposit") in an amount equal to ten percent (10%) of the aggregate purchase price provided for in the Alternative APA (or such additional amount as may be determined by the Debtors in their reasonable discretion);

     v.      state or otherwise estimate the types of, and costs or charges for, transition services, if any, the Potential Bidder would require of or provide to the Debtors, including an estimate of the time any such transition services would be required of or provided to the Debtor; and

     w.      provide that in the event of the Qualifying Bidder's breach of, or failure to perform under, the Alternative APA, the Debtors and their estate shall be entitled to pursue all available legal and equitable remedies, including, without limitation, retention of the Deposit as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid. The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bidding Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bidding Procedures, and the Sale.

**8.**      **Bid Deadline**

A Qualifying Bidder, other than the Stalking Horse Purchaser, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties (as defined below) and the Consultation Parties so as to be received on or before **May 17, 2024 at 5:00 p.m. (E.T.)** (the "Bid Deadline"); *provided* that the Debtors may extend the Bid Deadline without further order of the Court, subject to the DIP Credit Agreement and the Stalking Horse APA and after consultation with the DIP Agent, the Prepetition Initial First Lien Agent and the Consultation Parties. To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of the Chapter 11 Cases indicating the same. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

**9.**      **Evaluation of Qualifying Bids**

The Debtors will deliver, within one (1) business day after receipt thereof, copies of all bids from Qualifying Bidders to the Consultation Parties, the Prepetition Initial First Lien Agent and the DIP Agent.

The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid.

No later than **May 20, 2024**, the Debtors shall: (i) notify all Qualifying Bidders whether their respective bids have been determined to be Qualifying Bids; and (ii) determine, in

consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (which must be at least equal to the value of the Stalking Horse Bid, plus $1,000,000, the "Baseline Bid" and the Qualifying Bidder submitting the Baseline Bid, the "Baseline Bidder"), and shall promptly notify any Stalking Horse Purchaser and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

### 10.    No Qualifying Bids

If no timely Qualifying Bids other than any Stalking Horse Purchaser's Qualifying Bid are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that the Court approve the Stalking Horse APA and the transactions contemplated thereunder.

### 11.    Auction

If the Debtors timely receive one or more Qualifying Bids other than the Stalking Horse Purchaser's Qualifying Bid, then the Debtors shall conduct an auction (the "Auction"). Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the number, type and nature of any changes to the Stalking Horse APA requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates; (d) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates; and (f) any other factors the Debtors may reasonably deem relevant.

The Auction shall be governed by the following procedures:

(a)    the Auction shall be held on **May 21, 2024 at 11:00 a.m. (E.T.)** at the offices of Ropes & Gray LLP, 1211 6th Avenue, New York, NY 10036 or virtually via telephone or video conference pursuant to information to be timely provided by the Debtors to the Auction Participants (as defined below);

(b)    only the Stalking Horse Purchaser, the other Qualifying Bidders with Qualifying Bids (together, the "Auction Bidders"), and the Prepetition First Lien Lenders shall be entitled to make any subsequent bids at the Auction;

(c)    the Auction Bidders shall appear at the Auction, or through a duly authorized representative;

(d)    only the Debtors, the Auction Bidders, the Consultation Parties, the DIP Agent, the Prepetition First Lien Agents, the Prepetition First Lien Lenders, and any creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "Auction Participants"); *provided*

that any such creditors provide counsel for the Debtors written notice of their intent to attend the Auction no later than 5:00 p.m. (E.T.) the day prior to the Auction;

(e)     the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

(f)     prior to start of the Auction, each of the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bidding Procedures, the Auction or the Sale;

(g)     the Auction shall be conducted in an open cry format (and not by way of sealed bids). Bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least $1,000,000, *provided* that: (i) each such successive bid must be a Qualifying Bid; and (ii) the Debtors shall retain the right to modify the bid increment requirements at the Auction;

(h)     the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

(i)     all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

(j)     except as specifically set forth herein, for the purpose of evaluating the value of the purchase price provided by each successive bid (including any successive bid by the Stalking Horse Purchaser), the Debtors, in consultation with the Consultation Parties, may give effect to any additional liabilities to be assumed by a Qualifying Bidder, and any additional costs which may be imposed on the Debtors;

(k)     all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

(l)     each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bidding Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign

jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

(m)     throughout the Auction, the Stalking Horse Purchaser (i) shall have the continuing right to credit bid DIP Obligations then outstanding, or any part thereof, to purchase the Assets, and (ii) shall have the continuing right to credit bid the Prepetition First Lien Obligations then outstanding, or any part thereof, to purchase the Assets;

(n)     the Auction Bidders shall have the right to make additional modifications to the Stalking Horse APA or any Alternative APA, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, *provided* that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Stalking Horse APA, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Successful Bid (as defined below) or the Back-Up Bid, which shall remain binding as provided for herein;

(o)     the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Stalking Horse APA or any Alternative APA, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

(p)     upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction (the "Successful Bid").  In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Stalking Horse APA or any Alternative APA submitted with the Successful Bid, as applicable, requested by each bidder, and the net benefit to the Debtors' estate.  The bidder submitting such Successful Bid at the Auction shall become the "Successful Bidder," and shall have such rights and responsibilities of the purchaser as set forth in the Stalking Horse APA or any Alternative APA, as applicable.  The Debtors shall designate a Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Successful Bidder does not close the Sale, *provided* that the Stalking Horse Purchaser has not agreed to serve as the Back-Up Bidder;

(q)     without the written consent of the DIP Agent and the Prepetition Initial First Lien Agent, no bid may qualify as the Successful Bid unless such bid provides for cash consideration of an amount equal to or greater than the Prepetition First Lien Obligations and DIP Obligations that have been credit bid by the Stalking Horse Purchaser;

(r)     within one day after the conclusion of the Auction or as soon as reasonably practicable thereafter, the Debtors will file with the Court and serve on the Notice Parties a notice setting forth the results of the Auction (the "Notice of Successful Bidder"), which will (a) identify the Successful Bidder and the Back-Up Bidder; (b) include a copy of the Successful Bid and the Back-Up Bid or a summary of the material terms of such bids, including any proposed assumption and assignment of Contracts contemplated thereby; and (c) set forth the Sale Objection Deadline, the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Notice Parties of the outcome of the Auction;

(s)     within one (1) business bay of the close of the Auction, in the event the Stalking Horse Purchaser is not the Successful Bidder, the Successful Bidder shall supplement the Successful Bidder's Deposit such that the Deposit shall be equal to an amount that is ten (10%) percent of the Successful Bid; and

(t)     prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

**THE SUCCESSFUL BID AND ANY BACK-UP BID AND THEIR RELATED PURCHASE AGREEMENTS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE SUCCESSFUL BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED.  EACH QUALIFYING BID THAT IS NOT THE SUCCESSFUL BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

## 12.    Sale Hearing

The Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) will be subject to approval by the Court.  The Sale Hearing to approve the Successful Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchaser is received, then the Stalking Horse APA) shall take place on **May 23, 2024 at 2:30 p.m. (E.T.)**.  The Sale Hearing may be adjourned by the Debtors, in consultation with the DIP Agent, the Prepetition Initial First Lien Agent and the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then in consultation with the DIP Agent, the Prepetition Initial First Lien Agent and the Successful Bidder, from time to time without further notice to creditors or other parties in interest

other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the Chapter 11 Cases.

At the Sale Hearing, the Debtors will seek entry of a Sale Order that, among other things: (i) authorizes and approves the Sale to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then to the Successful Bidder, pursuant to the terms and conditions set forth in the Stalking Horse APA or Alternative APA submitted by the Successful Bidder, as applicable, free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances as determined by the Debtors and any Successful Bidder; (ii) finds that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; (iii) authorizes the assumption and assignment of certain contracts in connection with the Sale; (iv) as appropriate, exempts the Sale(s) and conveyance(s) of the Assets from any transfer tax, stamp tax or similar tax, or deposit under any applicable bulk sales statute; and (v) in the event that the Stalking Horse Purchaser is not the Successful Bidder, except as otherwise provided in the DIP Order, directs that all cash proceeds generated from the Sale shall be paid to the DIP Agent and the Prepetition Initial First Lien Agent, as applicable, on behalf of the DIP Lenders and the Prepetition Initial First Lien Lenders upon the closing of the Sale for application in accordance with the terms and conditions of the DIP Order, the DIP Documents, and the Prepetition Initial First Lien Documents, first, until the DIP Obligations are paid in full, and then, until the Prepetition First Lien Obligations are paid in full.

### 13.    **Back-Up Bidder**

Notwithstanding any of the foregoing, in the event that the Successful Bidder fails to close the Sale on or before **June 17, 2024** (or such date as may be extended by the Debtors with the consent of the DIP Agent, the Prepetition Initial First Lien Agent and in consultation with the Consultation Parties), the Back-Up Bid will be deemed to be the Successful Bid, the Back-Up Bidder will be deemed to be the Successful Bidder, and the Debtors shall be authorized to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

### 14.    **Return of Deposits**

All Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder no later than five (5) business days following the closing of the Sale. The deposit of the Successful Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale. If the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Stalking Horse APA or any Alternative APA, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Successful Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform. For the avoidance of doubt, the Debtors' retention of a Deposit shall not constitute a waiver of any of the Debtors' legal or equitable rights relating to a Successful Bidder's or Back-Up Bidder's breach or failure to perform, and all such rights and remedies are preserved.

14

15.     **No-Shop or No-Solicitation Provisions**

The Bidding Procedures Order and Bidding Procedures do not limit the Debtors' ability or right to solicit higher or otherwise better bids. The Sale contemplated by the Bidding Procedures Motion, the Bidding Procedures, and the Bidding Procedures Order calls for a fair and open bidding and auction process.

16.     **Notice and Consultation Parties**

(a)     The term "Bidding Procedures Notice Parties" as used in these Bidding Procedures shall mean: (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Gregg M. Galardi, Cristine Pirro Schwarzman, and Ellen Wheeler; email: gregg.galardi@ropesgray.com, cristine.schwarzman@ropesgray.com, and ellen.wheeler@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Conor P. McNamara, email: conor.mcnamara@ropesgray.com); and Chipman Brown Cicero & Cole, LLP (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com); (b) the U.S. Trustee, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (c) the DIP Agent; (d) the Prepetition Initial First Lien Agent; and (e) counsel for any statutory committee appointed in these chapter 11 cases.

(b)     The term "Consultation Parties" as used in these Bidding Procedures shall mean any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Creditors' Committee") and in the event that the Stalking Horse Purchaser terminates its credit bid, the DIP Agent and the Prepetition Initial First Lien Agent.

For the avoidance of doubt, any consultation rights provided to the Consultation Parties by these Bidding Procedures shall not limit the Debtors' discretion in any way and shall not include the right to veto any decision made by the Debtors in the exercise of their business judgment.

In the event that any Consultation Party or any member of any Creditors' Committee or an affiliate of any of the foregoing submits a bid that is a Qualifying Bid, any obligation of the Debtors to consult with the bidding party established under these Bidding Procedures will be waived without further action; *provided* that the bidding party will have the same rights as any other Qualifying Bidder set forth above; *provided further* that in the event the Stalking Horse Purchaser is no longer a bidding party, the DIP Agent and the Prepetition Initial First Lien Agent shall be a Consultation Party.

17.     **Reservation of Rights**

Notwithstanding any of the foregoing, the Debtors, in consultation with the Consultation Parties, may (a) subject to the DIP Credit Agreement and the Stalking Horse APA and after consultation with the DIP Agent and the Prepetition Initial First Lien Agent, extend the deadlines set forth in the Bidding Procedures Order or the Bidding Procedures, and (b) adopt, implement, and waive such other, additional or existing procedures or requirements that in their discretion

serves to further an orderly Auction and bid process, including, but not limited to, the imposition of a requirement that all Qualifying Bidders submit sealed Qualifying Bids during the Auction, all without further notice except to the Auction Participants, as appropriate.

The Debtors, in consultation with the Consultation Parties, may (a) determine which Qualifying Bid, if any, is the Successful Bid, and (b) reject at any time before entry of the Sale Order approving the Successful Bid, any bid that, in the discretion of the Debtors, in consultation with the Consultation Parties, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors. At or before the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, may impose such other terms and conditions upon Qualifying Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these cases.

**EXHIBIT 2**

**Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. _____** |

**NOTICE OF PROPOSED SALE OF ASSETS,**
**STALKING HORSE APA, CHALLENGE PERIOD NOTICE**
**DEADLINE, BIDDING PROCEDURES, AUCTION, AND SALE HEARING**

PLEASE TAKE NOTICE that the above-captioned debtors and debtors-in-possession (the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on April 1, 2024, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are seeking to assume and assign certain of their executory contracts and unexpired leases in connection with the sale (the "Sale") of all or substantially all of their assets (the "Assets"), free and clear of all Liens other than Assumed Liabilities (each as defined in the Stalking Horse APA, as defined below).[2] In connection with the Sale, the Debtors have entered into an asset purchase agreement dated as of April 8, 2024 (the "Stalking Horse APA") with to SFC Acquisition Co, LLC, an entity organized by the Prepetition First Lien Agent and to be controlled by the Prepetition First Lien Lenders, subject to the Debtors' acceptance of higher or otherwise better offers in accordance with the Bidding Procedures (as defined below).

PLEASE TAKE FURTHER NOTICE that any party in interest seeking to investigate the liens and claims of the Prepetition First Lien Lenders shall provide a written notice of the party's intent to do so to the Debtors and the Prepetition First Lien Lenders (the "Challenge Period Notice") **no later than 4:00 p.m. (E.T.) on the first business day preceding the Auction Date (May 20, 2024)** (the "Challenge Period Notice Deadline"). Absent any party in interest providing the Debtors and the Prepetition First Lien Lenders a Challenge Period Notice on or before the Challenge Period Notice Deadline, the Challenge Period (as defined in the Final DIP Order) shall terminate as of the day the Auction is scheduled to commence and the Prepetition First Lien

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order and Bidding Procedures (each as defined below).

Lenders shall be entitled to credit bid all or any part of their secured claims and liens pursuant to Bankruptcy Code section 363(k).

PLEASE TAKE FURTHER NOTICE that by order, dated [●], 2024 [Docket No. ●] (the "Bidding Procedures Order"), the Bankruptcy Court approved certain relief requested in the related motion [Docket No. ●] (the "Bidding Procedures Motion"), and certain "Bidding Procedures" that govern the sale of the Assets to the highest or otherwise best bidders. Copies of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures and the Stalking Horse APA are available for download at https://omniagentsolutions.com/ShoesforCrews (the "Case Website") or from the Debtors' claims and noticing agent, Omni Agent Solutions, via telephone at 888-202-5659 (US & Canada toll free) and 747-288-6384 (International) or via email at ShoesforCrewsInquiries@OmniAgnt.com. A separate notice will be provided to counterparties to executory contracts and unexpired leases with the Debtors that may be assumed and assigned in connection with the Sale. **Any interested bidder should contact the Debtors' proposed investment banking advisor, Solomon Partners Securities, LLC, attn: Jeff Derman (212-508-1625; jeff.derman@solomonpartners.com), Tero Jänne (212-508-1676; tero.janne@solomonpartners.com), and Dan Golynskiy (646-378-4068; daniel.golynskiy@solomonpartners.com).**

- The deadline to submit a bid for any Assets is **May 17, 2024 at 5:00 p.m. (E.T.)**.

- PUT IN NOTICE OF INVESTIGATION

- Any objections to the Sale or the relief requested in connection with the Sale, including objections related to the adequate assurance of future performance by the Stalking Horse Purchaser but not including objections related to cure amounts for the Purchased Contracts or general objections to the assumption and assignment of the Purchased Contracts, (a "Sale Objection") must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **May 20, 2024 at 4:00 p.m. (E.T.)** (the "Sale Objection Deadline"), and proof of service of such Sale Objection upon the Objection Notice Parties (as defined below) shall be filed with the Court as and when required by the Local Rules; and (e) be served upon the Objection Notice Parties; *provided, however*, that the Sale Objection Deadline solely for Sale Objections related to the adequate assurance of future performance of a purchaser that is not the Stalking Horse Purchaser shall be **May 22, 2024 at 12:00 p.m. (E.T.)**. The "Objection Notice Parties" are as follows: (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Gregg M. Galardi, Cristine Pirro Schwarzman, and Ellen Wheeler; email: gregg.galardi@ropesgray.com, cristine.schwarzman@ropesgray.com, and ellen.wheeler@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Conor P. McNamara, email: conor.mcnamara@ropesgray.com); and Chipman Brown Cicero & Cole, LLP (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com); (b) the U.S. Trustee, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (c) the DIP Agent; (d) the Prepetition Initial First Lien Agent; and (e) counsel for any statutory committee appointed in these chapter 11 cases.

- An auction for the Assets, unless cancelled or adjourned in accordance with the Bidding Procedures Order, will be held on **May 21, 2024 at 11:00 a.m. (E.T.)**, at the offices of Ropes & Gray LLP, 1211 6th Avenue, New York, NY 10036, or virtually via telephone and/or video conference pursuant to information to be timely provided by the Debtors to the Auction Participants.

- Unless adjourned in accordance with the Bidding Procedures Order, the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to consider the Sale on **May 23, 2024 at 2:30 p.m. (E.T.)**, subject to the Bankruptcy Court's availability.

**PLEASE TAKE FURTHER NOTICE THAT FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER OR ANY OTHER APPLICABLE ORDER OF THE COURT ENTERED IN THESE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID AND YOUR DISQUALIFICATION FROM PARTICIPATING IN THE BIDDING FOR AND AUCTION OF ANY OF THE DEBTORS' ASSETS.**

**PLEASE TAKE FURTHER NOTICE THAT IF A SALE OBJECTION IS NOT FILED AND SERVED ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER, THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO THE SALE AND BEING HEARD AT THE SALE HEARING, AND THE BANKRUPTCY COURT MAY ENTER THE SALE ORDER WITHOUT FURTHER NOTICE TO SUCH PARTY.**

Dated:  [●], 2024                     **CHIPMAN BROWN CICERO & COLE, LLP**
      Wilmington, Delaware

/s/
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
Email: desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Cristine Pirro Schwarzman (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com
       cristine.schwarzman@ropesgray.com

-and-

3

**ROPES & GRAY LLP**
Conor P. McNamara (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail: conor.mcnamara@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

4

## EXHIBIT 3

**Notice of Successful Bidder**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. _____** |

**NOTICE OF SUCCESSFUL BIDDER AND**
**BACK-UP BIDDER FOR CERTAIN OF THE DEBTORS' ASSETS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On [April 25], 2024, United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Order (I)(A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, and (B) Approving the Debtors' Entry into the Stalking Horse APA; and (II) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to conduct a marketing and auction process for the sale or sales of substantially all of the Debtors' assets (the "Assets") through one or more sale transactions.

On **May 21, 2024 at 11:00 a.m. (E.T.),** pursuant to the Order, the Debtors commenced the Auction with respect to certain Assets either in-person or by videoconference or such other form of remote communication established by the Debtors.

At the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, selected the following Successful Bidder and Back-Up Bidder with respect to the Assets subject to the applicable Auction.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Order or the Bidding Procedures, attached to the Order as Exhibit 1 thereto, as applicable.

| Asset(s) | Successful Bidder | Back-Up Bidder | Key Terms of Proposed Sale |
|----------|-------------------|----------------|----------------------------|
|          |                   |                |                            |

The Sale Hearing to consider approval of the sale of the above-listed Assets to the Successful Bidder at the Auction referenced above will be held before the Honorable Laurie Selber Silverstein, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801, on **May 23, 2024, at 2:30 p.m. (E.T.)**.

At the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid and designation of the Back-Up Bid (if any) for the applicable Assets. Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the sale for the applicable Assets, and there will be no further bidding at the Sale Hearing. If a Successful Bidder cannot or refuses to consummate the applicable sale transaction following entry of the applicable Sale Order because of the breach or failure on the part of the Successful Bidder, the Back-Up Bidder (if any) shall be deemed the new Successful Bidder and the Debtors shall be authorized, but not required, to close the applicable sale transaction with such Back-Up Bidder on the terms and provisions of such applicable Back-Up Bid without further order of the Court upon filing a notice with the Court providing at least five (5) days for parties to object to the sale to the Back-Up Bidder.

This notice is subject to the terms and conditions of the *Debtors' Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for Entry of an Order (I)(A) Approving the Bidding Procedures, Including the Debtors' Entry Into the Stalking Horse APA, the Sale Timeline, and the Form and Manner of Notice Thereof, and (B) Approving the Deadline for Parties in Interest to Provide Notice of Their Intention to Use the Challenge Period to Investigate the Liens and Claims of the Prepetition First Lien Secured Lenders Seeking to Credit Bid at the Auction; (II) Approving the Debtors' (A) Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens Other Than Assumed Liabilities and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to the Successful Bidder; and (III) Granting Related Relief* [Docket No. [●]] (the "Motion") and the Order, with such Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents, including the Bidding Procedures, attached as Exhibit 1 to the Order, in their entirety. Parties interested in receiving additional or other information regarding the proposed Sale, proposed sale transaction, or other disposition of the applicable Assets may make contact Omni Agent Solutions ("Omni"), via telephone at 888-202-5659 (US & Canada toll free) and 747-288-6384 (International) or via email at ShoesforCrewsInquiries@OmniAgnt.com.

Copies of the Motion, the Order, the Bidding Procedures, this notice, and any other related documents are available: (a) upon request to Omni, via telephone at 888-202-5659 (US & Canada toll free) and 747-288-6384 (International) or via email at ShoesforCrewsInquiries@OmniAgnt.com; (b) by visiting the Debtors' restructuring website at https://omniagentsolutions.com/ShoesforCrews; or (c) for a fee via PACER by visiting https://pacer.uscourts.gov.

4893-4843-8709, v. 1

**<u>EXHIBIT 4</u>**

**Cure Notice**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Never Slip Holdings, Inc., *et al.*,[1] | Case No. 24-10663 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. _____** |

**NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT WITH RESPECT
TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS**

**PLEASE TAKE NOTICE THAT:**

The above-captioned debtors and debtors-in-possession (the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on April 1, 2024, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors are seeking to assume and assign certain of their executory contracts and unexpired leases in connection with the sale (the "Sale") of all or substantially all of their assets (the "Assets"), free and clear of all Liens other than Assumed Liabilities (each as defined in the Stalking Horse APA, as defined below).[2] In connection with the Sale, the Debtors have entered into an asset purchase agreement dated as of April 8, 2024 (the "Stalking Horse APA") with SFC Acquisition Co, LLC, an entity organized by the Prepetition First Lien Agent and to be controlled by the Prepetition First Lien Lenders, subject to the Debtors' acceptance of higher or otherwise better offers in accordance with the Bidding Procedures (as defined below).

By order, dated [April 25], 2024 [Docket No. ●] (the "Bidding Procedures Order"), the Bankruptcy Court approved certain relief requested in the related motion [Docket No. ●] (the "Bidding Procedures Motion"), and certain "Bidding Procedures" that govern the sale of the Assets to the highest or otherwise best bidders. Copies of the Bidding Procedures Motion, the Bidding Procedures Order, the Bidding Procedures and the Stalking Horse APA are available for download at https://omniagentsolutions.com/ShoesforCrews (the "Case Website") or from the Debtors' claims and noticing agent, Omni Agent Solutions ("Omni"), via telephone at 888-202-5659 (US

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  Never Slip Holdings, Inc. (5010); Never Slip TopCo, Inc. (8956); SHO Holding I Corporation (7699); SHO Holding II Corporation (7738); Shoes For Crews, Inc. (9679); SFC Holdings, Inc. (8908); SFC Holdings, LLC (2357); Shoes for Crews, LLC (2362); SRS/MKS, L.L.C. (7003); Shoes for Crews Canada, Ltd. (0085); SFC Canada, Inc. (1314); and Sunrise Enterprises, LLC (4516).  The Debtors' service address is 5000 T-Rex Avenue, Suite 100, Boca Raton, FL 33431.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order (as defined below).

& Canada toll free) and 747-288-6384 (International) or via email at ShoesforCrewsInquiries@OmniAgnt.com.

You are receiving this notice because you or one of your affiliates may be a party to an unexpired lease or an executory contract that *may* be assumed and assigned (collectively, the "Contracts") in connection with such Sale.  A list of the Contracts is attached hereto as Exhibit A.

To the extent that a counterparty to a Contract objects to adequate assurance of performance by the Stalking Horse Purchaser, the Counterparty must file and serve an objection (a "Sale Objection").  Any Sale Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 May 20, 2024 at 4:00 p.m. (E.T.) (the "Sale Objection Deadline"), and proof of service of such Sale Objection upon the Objection Notice Parties (as defined below) shall be filed with the Bankruptcy Court as and when required by the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection.

**Any objections to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Purchaser shall be filed not later than May 22, 2024 at 12:00 p.m. (E.T.).**

The "Objection Notice Parties" are as follows: (a) proposed co-counsel to the Debtors, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036 (Attn: Gregg M. Galardi, Cristine Pirro Schwarzman, and Ellen Wheeler; email: gregg.galardi@ropesgray.com, cristine.schwarzman@ropesgray.com, and ellen.wheeler@ropesgray.com); Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606 (Attn: Conor P. McNamara, email: conor.mcnamara@ropesgray.com); and Chipman Brown Cicero & Cole, LLP (Attn: Mark L. Desgrosseilliers; email: desgross@chipmanbrown.com); (b) the U.S. Trustee, 844 N. King Street, Room 2207, Wilmington, Delaware 19801 (Attn: Linda Casey and Fang Bu, email: Linda.Casey@usdoj.gov and Fang.Bu@usdoj.gov); (c)  the DIP Agent; (d) the Prepetition Initial First Lien Agent; and (e) counsel for any statutory committee appointed in these chapter 11 cases.

If no timely objection is received as to adequate assurance of future performance with respect to a Contract, the non-Debtor party to such Contract shall be deemed to have consented to the Court determining that adequate assurance of future performance has been sufficiently demonstrated and shall be forever barred and estopped from asserting or claiming that the requirement of adequate assurance of future performance is not satisfied or demonstrated.

Subject to the terms of the Bidding Procedures Order, an auction (the "Auction") for the Assets, including the Contracts, will be conducted on May 21, 2024 at 11:00 a.m. (E.T.), at the offices of Ropes & Gray LLP, 1211 6th Avenue, New York, NY 10036, or virtually via telephone and/or video conference pursuant to information to be timely provided by the Debtors to the Auction Participants.  After the Auction, the Debtors will file and serve a notice that identifies the Successful Bidder for the Assets, including any Contracts.

**The Debtors will seek to assume and assign the Contracts that have been selected by the Successful Bidder** (which, for the avoidance of doubt, may be the Stalking Horse Purchaser) (collectively, the "**Selected Purchased Contracts**") **at a hearing before the Honorable Laurie Selber Silverstein, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801 (a "Sale Hearing**") **on May 23, 2024 at 2:30 p.m. (E.T.)**, **subject to the Bankruptcy Court's availability, or such other date as determined by the Debtors, in consultation with the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Successful Bidder, then in consultation with the Successful Bidder**, **in accordance with the terms of the Bidding Procedures Order**.

[*Remainder of Page Intentionally Left Blank*]

4893-4843-8709, v. 1

Nothing contained herein shall obligate the Debtors or the Successful Bidder to assume any Selected Purchased Contracts, and all rights of the Debtors and the Successful Bidder with respect to such Selected Purchased Contracts are reserved.    Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Selected Purchased Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors or the Successful Bidder, as applicable, to designate any Selected Purchased Contract as either rejected or assumed on a post-closing basis.

Dated:  [●], 2024
       Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/*
Mark L. Desgrosseilliers (No. 4083)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0192
Email: desgross@chipmanbrown.com

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (No. 2991)
Cristine Pirro Schwarzman (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: gregg.galardi@ropesgray.com
       cristine.schwarzman@ropesgray.com

-and-

**ROPES & GRAY LLP**
Conor P. McNamara (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
E-mail:  conor.mcnamara@ropesgray.com

*Proposed Counsel to the Debtors and Debtors in Possession*

4

**EXHIBIT A TO CURE NOTICE**

**EXHIBIT B**

**Stalking Horse APA**